# 22-1345

## United States Court of Appeals for the Second Circuit

UPSOLVE, INC., REVEREND JOHN UDO-OKON,

*Plaintiffs-Appellees,*

v.

LETITIA JAMES, in her official capacity as Attorney General of New York,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of New York

## BRIEF FOR APPELLANT

BARBARA D. UNDERWOOD
*Solicitor General*
JUDITH N. VALE
*Deputy Solicitor General*
CLELAND B. WELTON II
*Assistant Solicitor General*
*of Counsel*

LETITIA JAMES
*Attorney General*
*State of New York*
Attorney for Appellant
28 Liberty Street
New York, New York 10005
(212) 416-6197

Dated: October 5, 2022

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................iii

PRELIMINARY STATEMENT .................................................. 1

JURISDICTION ........................................................................ 3

ISSUE PRESENTED ................................................................. 3

STATEMENT OF THE CASE .................................................. 4

    A.   New York's Regulation of the Practice of Law ........................ 4

        1.   Attorney licensure requirements ...................................... 4

        2.   Regulations governing attorney conduct........................... 6

        3.   Prohibition on nonlawyers practicing law ........................ 7

    B.   Factual and Procedural Background..................................... 10

        1.   Upsolve's proposal to provide unlicensed legal services.... 10

        2.   The complaint and preliminary-injunction motion......... 19

        3.   The preliminary-injunction order ................................... 21

SUMMARY OF ARGUMENT .................................................. 25

STANDARD OF REVIEW....................................................... 28

ARGUMENT ........................................................................... 29

    A.   Plaintiffs Are Unlikely to Succeed on the Merits.................. 30

        1.   Plaintiffs failed to demonstrate standing to sue............. 30

        2.   New York's unauthorized-practice statutes are likely to be upheld on the merits.................................... 35

i

**Page**

a. The unauthorized-practice statutes are not subject to strict scrutiny under the First Amendment. .................................................... 36

b. The district court's contrary reasoning is wrong. ..... 44

  i. The unauthorized-practice statutes do not directly target plaintiffs' speech. ...................... 44

  ii. The unauthorized-practice statutes are content neutral. ................................................. 48

  iii. The unauthorized-practice statutes are part of a long tradition of regulating law practice. ........................................................... 53

c. The unauthorized-practice statutes satisfy any applicable level of First Amendment scrutiny ......... 56

  i. The State has important and compelling interests in regulating the practice of law ........ 60

  ii. The unauthorized-practice statutes are tailored to the State's interests ......................... 66

B. The Public Interest and Balance of the Equities Strongly Weigh Against a Preliminary Injunction. ............... 69

CONCLUSION ....................................................................... 72

# TABLE OF AUTHORITIES

**Cases**                                                          **Page(s)**

*Adams v. American Bar Ass'n,*
  400 F. Supp. 219 (E.D. Pa. 1975)........................................ 37

*American Booksellers Found. v. Dean,*
  342 F.3d 96 (2d Cir. 2003) ................................................. 32

*Ashcroft v. ACLU,*
  542 U.S. 656 (2004)........................................................... 55

*Barr v. American Ass'n of Pol. Consultants, Inc.,*
  140 S. Ct. 2335 (2020)....................................................... 52

*Brokamp v. James,*
  573 F. Supp. 3d 696 (N.D.N.Y. 2021) ........................... 38, 56

*Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.,*
  462 F.3d 219 (2d Cir. 2006) .............................................. 46

*Bucklew v. Precythe,*
  139 S. Ct. 1112 (2019)....................................................... 46

*Cacchillo v. Insmed, Inc.,*
  638 F.3d 401 (2d Cir. 2011) .............................................. 30

*Capital Associated Indus., Inc. v. Stein,*
  922 F.3d 198 (4th Cir. 2019)................................. 41-43, 47, 58-60, 69

*Cincinnati Bar Ass'n v. Bailey,*
  110 Ohio St. 3d 223 (2006) ............................................... 37

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC,*
  142 S. Ct. 1464 (2022)................................................... 50, 52

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013)..................................................... 31-32, 34

*Connecticut Bar Ass'n v. United States,*
  620 F.3d 81 (2d Cir. 2010) ............................................ 34-35

**Cases**                                                                    **Page(s)**

*Cornelio v. Connecticut,*
    32 F.4th 160 (2d Cir. 2022) ................................................................ 59

*Dawson v. Delaware,*
    503 U.S. 159 (1992) ........................................................................ 57

*Del Castillo v. Sec'y, Fla. Dep't of Health,*
    26 F. 4th 1214 (11th Cir. 2022) ....................................... 39, 41, 47, 58

*Delgado v. A. Korenegay Senior House HDFC,*
    No. 07-cv-7761, 2008 WL 748848 (S.D.N.Y. Mar. 21, 2008) ............. 32

*Delta Fin. Corp. v. Morrison,*
    15 Misc. 3d 308 (Sup. Ct. Nassau County 2007) ................................. 7

*Doyle v. Palmer,*
    365 F. Supp. 3d 295 (E.D.N.Y. 2019) ................................................ 48

*El Gemayel v. Seaman,*
    72 N.Y.2d 701 (1988) ............................................... 4, 8, 11, 31, 39, 70

*Elansari v. Montana,*
    No. 21-cv-57, 2021 WL 5534930 (D. Mont. Oct. 6, 2021) ................... 37

*Federal Election Comm'n v. Wisconsin Right to Life, Inc.,*
    551 U.S. 449 (2007) .......................................................................... 61

*Goldfarb v. Virginia State Bar,*
    421 U.S. 773 (1975) .................................................................... 60, 71

*Green Haven Prison Preparative Meeting of Religious Soc'y of
    Friends v. New York State Dep't of Corr. & Cmty. Supervision,*
    16 F.4th 67 (2d Cir. 2021) ........................................................... 30, 32

*Grievance Comm. of the Bar of Fairfield Cnty. v. Dacey,*
    154 Conn. 129 (1966) ....................................................................... 37

*Hedges v. Obama,*
    724 F.3d 170 (2d Cir. 2013) .............................................................. 30

iv

**Cases**                    **Page(s)**

*Hobbs v. County of Westchester*,
 397 F.3d 133 (2d Cir. 2005) ................................................................ 48

*Holder v. Humanitarian L. Project*,
 561 U.S. 1 (2010) .................................................................... 50-52, 59, 66

*In re Peterson*,
 Nos. 19-24045, 19-24551, 2022 WL 1800949
 (Bankr. D. Md. June 1, 2022) ............................................................. 10

*International Action Ctr. v. City of New York*,
 587 F.3d 521 (2d Cir. 2009) ............................................................... 49

*Jacoby & Meyers, LLP v. Presiding Justs. of the First, Second,*
 *Third & Fourth Dep'ts, App. Div. of the Sup. Ct.*,
 852 F.3d 178 (2d Cir. 2017) ............................................................... 58

*Kolodziej v. Mason*,
 774 F.3d 736 (11th Cir. 2014) ........................................................... 65

*Law Students C.R. Rsch. Council, Inc. v. Wadmond*,
 401 U.S. 154 (1971) .......................................................................... 37

*Lawline v. American Bar Ass'n*,
 956 F.2d 1378 (7th Cir. 1992) ..................................................... 37, 42

*Lederman v. New York City Dep't of Parks & Recreation*,
 731 F.3d 199 (2d Cir. 2013) ............................................................... 49

*Lightman v. Flaum*,
 97 N.Y.2d 128 (2001) ......................................................................... 6

*Locke v. Shore*,
 634 F.3d 1185 (11th Cir. 2011) ......................................................... 39

*Lujan v. Defenders of Wildlife*,
 504 U.S. 555 (1992) .......................................................................... 30

*Mastrovincenzo v. City of New York*,
 435 F.3d 78 (2d Cir. 2006) ............................................... 29, 49, 56, 62

| Cases | Page(s) |
|---|---|

*Matter of Barrett,*
170 A.D.3d 69 (2d Dep't 2019) ............................................................ 7

*Matter of New York Cnty. Laws. Ass'n (Roel),*
3 N.Y.2d 224 (1957) ........................................................................ 37

*Matter of Rosenberg,*
202 A.D.3d 1271 (3d Dep't 2022) ........................................................ 7

*Matter of Rowe,*
80 N.Y.2d 336 (1992) ........................................................... 8, 43, 68

*McDermott v. Langevin,*
587 B.R. 173 (Bankr. N.D. Ga. 2018) .............................................. 37

*Monroe v. Horwitch*
820 F. Supp. 682 (D. Conn. 1993) ............................................. 37, 58

*Montana Sup. Ct. Comm'n on the Unauthorized Prac. of L. v. O'Neil,*
334 Mont. 311 (2006) ...................................................................... 37

*Mullins v. City of New York,*
626 F.3d 47 (2d Cir. 2010) .............................................................. 32

*NAACP v. Button,*
371 U.S. 415 (1963) ......................................................................... 48

*Napoli v. New York Post,*
175 A.D.3d 433 (1st Dep't 2019) ...................................................... 6

*National Ass'n for Advancement of Psychoanalysis v. California*
*Bd. of Psych.,*
228 F.3d 1043 (9th Cir. 2000) .................................................... 38, 49

*National Inst. of Fam. & Life Advocs. v. Becerra,*
138 S. Ct. 2361 (2018) ............................................................. passim

*New York ex rel. James v. Griepp,*
11 F.4th 174 (2d Cir. 2021) ............................................................. 29

**Cases**                                                                                       **Page(s)**

*New York State Ass'n of Career Schs. v. State Educ. Dep't,*
823 F. Supp. 1096 (S.D.N.Y. 1993) .................................................. 56

*North Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.,*
883 F.3d 32 (2d Cir. 2018) ................................................ 28

*Ohralik v. Ohio State Bar Ass'n,*
436 U.S. 447 (1978) ......................................... 5, 40, 57, 60

*Oregon State Bar v. Smith,*
149 Or. App. 171 (1997) .................................................. 41

*People v. Alfani,*
227 N.Y. 334 (1919) ........................... 4-5, 8, 36, 39, 54, 71

*People v. Divorce Associated & Pub. Ltd.,*
95 Misc.2d 340 (Sup. Ct. Queens County 1978) ................................. 8

*People v. Jakubowitz,*
184 Misc. 2d 559 (Sup. Ct. Bronx County 2000) ............................... 37

*People v. Shell,*
148 P.3d 162 (Colo. 2006) ................................................ 37

*Planned Parenthood of Se. Pa. v. Casey,*
505 U.S. 833 (1992) .......................................................... 57

*Reed v. Town of Gilbert,*
576 U.S. 155 (2015) ........................................... 48, 55, 59

*Rudolf v. Shayne, Dachs, Stanisci, Corker & Sauer,*
8 N.Y.3d 438 (2007) ........................................................ 6

*SAM Party of N.Y. v. Kosinski,*
987 F.3d 267 (2d Cir. 2021) ............................................. 70

*Schware v. Board of Bar Exam'rs,*
353 U.S. 232 (1957) ....................................................... 57

vii

| Cases | Page(s) |
|---|---|

*Spivak v. Sachs,*
16 N.Y.2d 163 (1965) ........................................................................ 8

*State v. Niska,*
380 N.W.2d 646 (N.D. 1986) ............................................................ 37

*Time Warner Cable Inc. v. Federal Commc'ns Comm'n,*
729 F.3d 137 (2d Cir. 2013) ............................................................ 59

*Tingley v. Ferguson,*
47 F.4th 1055 (9th Cir. 2022) ........................................... 38, 53-54, 58

*Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.,*
109 F.3d 105 (2d Cir. 1997) ............................................................ 32

*TransUnion LLC v. Ramirez,*
141 S. Ct. 2190 (2021) .................................................................... 30

*Turner Broad. Sys., Inc. v. FCC,*
512 U.S. 622 (1994) ................................................................... 62, 68

*Turner Broad. Sys., Inc. v. FCC,*
520 U.S. 180 (1997) ........................................................................ 68

*Turner v. American Bar Ass'n,*
407 F. Supp. 451 (N.D. Tex. 1975) .................................................. 37

*United States v. Bein,*
728 F.2d 107 (2d Cir. 1984) .............................................................. 7

*United States v. Kovel,*
296 F.2d 918 (2d Cir. 1961) .............................................................. 7

*United States v. Playboy Ent. Grp., Inc.,*
529 U.S. 803 (2000) ........................................................................ 66

*Ward v. Rock Against Racism,*
491 U.S. 781 (1989) ........................................................................ 49

**Cases**                                                  **Page(s)**

*We The Patriots USA, Inc. v. Hochul,*
    17 F.4th 266 (2d Cir. 2021) .......................................................... 28-29

*Wilmington Sav. Fund Soc'y, FSB v. Unknown Heirs at L.*
    *of Danny Higdon,*
    161 A.D.3d 1559 (4th Dep't 2018) ...................................................... 18

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ............................................................................... 70

**Laws & Rules**

*Federal*

28 U.S.C.
    § 1292 ................................................................................................... 3
    § 1331 ................................................................................................... 3
    § 1343 ................................................................................................... 3
    § 2107 ................................................................................................... 3

Fed. R. App. P. 4 ...................................................................................... 3

Fed. R. Evid. 801 ................................................................................... 32

*New York – Statutes*

Ch. 165, 1898 N.Y. Laws 309 ............................................................. 4, 36

C.P.L.R.
    213-d .................................................................................................. 18
    3025 ................................................................................................... 17
    3101 ..................................................................................................... 6
    3211 ................................................................................................... 17
    3215 ................................................................................................... 17
    4503 .................................................................................................. 6-7

Education Law tit. VIII ........................................................................... 55

**Laws & Rules**                                                    **Page(s)**

Judiciary Law
 § 53 ............................................................................... 9
 § 460 et seq. ................................................................... 5
 § 466 ............................................................................... 5
 § 468-a ........................................................................... 6
 § 476-a ........................................................................... 8
 § 476-b ........................................................................... 8
 § 476-c ........................................................................... 8
 § 478 ...................................................................... 7, 9, 36
 § 484 ............................................................................... 7
 § 485 ............................................................................... 8
 § 485-a ........................................................................... 8
 § 486 ............................................................................... 8
 § 487 ............................................................................... 6
 § 750 ............................................................................... 8
 § 753 ............................................................................... 8

N.Y.C. Civ. Ct. Act
 § 201 ............................................................................. 10
 § 202 ............................................................................. 10
 § 909 ............................................................................. 17

*New York – Attorney Regulations*

Mandatory Continuing Legal Educ. Program for Att'ys (22 N.Y.C.R.R.)
 § 1500.12 ....................................................................... 6
 § 1500.22 ....................................................................... 6

Rules of Ct. of Appeals for Admission of Att'ys
and Counselors-at-Law (22 N.Y.C.R.R.)
pt. 520 ................................................................................. 5
§§ 520.3-520.9 ................................................................... 5
§ 520.12 ............................................................................. 5

Rules for Att'y Disciplinary Matters (22 N.Y.C.R.R.) pt. 1240 ............... 7

**Laws & Rules** **Page(s)**

*New York – Attorney Regulations (cont'd)*

Rules of Pro. Conduct (22 N.Y.C.R.R. 1200.0)

    r. 1.1 ........................................................................... 6, 65

    rr. 1.6-1.9 ...................................................................... 14

    rr. 1.6-1.18 ...................................................................... 6

    r. 3.1 .............................................................................. 7

    r. 3.3 .............................................................................. 7

    r. 3.4 .............................................................................. 7

    r. 4.1 .............................................................................. 7

    r. 5.3 .............................................................................. 9

## Miscellaneous Authorities

Cathy Moran, *Do It Yourself Bankruptcy Software Is a Trap*,
The Soap Box (2019), https://www.bankruptcysoapbox.com/diy-bankruptcy-software/ .......................................................... 10

Paul R. Tremblay, *Surrogate Lawyering: Legal Guidance,*
Sans *Lawyers*, 31 Geo. J. Legal Ethics 377 (2018) ............................ 39

Robert Kry, *The "Watchman for Truth": Professional Licensing
and the First Amendment*, 23 Seattle U. L. Rev. 885 (2000) ............. 36

Roy D. Simon, *Simon's New York Rules of Professional
Conduct Annotated* (Dec. 2021 update) (Westlaw) ........................ 9, 42

Standing Comm. on Lawyers' Responsibility for Client Protection,
Am. Bar Ass'n, *1994 Survey and Related Materials on the
Unauthorized Practice of Law / Nonlawyer Practice* (1996) ............... 36

# PRELIMINARY STATEMENT

Plaintiffs in this case—a nonprofit organization and an individual with no legal education—claim a First Amendment right to practice law without a license. But plaintiffs do not have any such right. For well over a century, New York has required lawyers practicing in its jurisdiction to hold a bar license, and prior to this case no court had ever held that such a regulation of the legal profession violates the First Amendment. To the contrary, the U.S. Supreme Court has repeatedly affirmed that the "States may regulate professional conduct"—including by prohibiting those without a required license from practicing the profession—"even though that conduct incidentally involves speech." *National Inst. of Fam. & Life Advocs. v. Becerra* (*NIFLA*), 138 S. Ct. 2361, 2372-73 (2018).

Departing from history and precedent, the U.S. District Court for the Southern District of New York (Crotty, J.) issued a preliminary injunction barring the New York Attorney General from enforcing the State's unauthorized-practice statutes against plaintiffs while this litigation is pending.

This Court should reverse. At the threshold, plaintiffs failed to carry their burden to establish the injury-in-fact element of standing. Plaintiffs

presented no evidence that anyone would avail themselves of plaintiffs' unlicensed legal services, even if the challenged statutes did not stand in the way. And plaintiffs' implausible speculation that unnamed third parties might seek legal counsel from them is insufficient to establish standing.

Reversal is also warranted because plaintiffs are unlikely to prevail on the merits of their First Amendment claim. Contrary to the district court's reasoning, there is no basis for subjecting New York's long-established attorney-licensing requirement to strict scrutiny. The licensing regime is not a content-based regulation of speech. Instead, it is directed to professional *conduct*—namely, the *conduct* of applying legal knowledge, judgment, and skill to a client's case. Any burden on nonlawyers' ability to *communicate* legal counsel that results from engaging in that conduct without a license is merely incidental to the State's permissible regulation of the legal profession.

Moreover, the attorney-licensing requirement does not discriminate against speech based on its content or viewpoint: A licensed attorney may provide legal counsel on any topic, while a nonlawyer cannot practice law regardless of topic. This licensure regime is a critical and long-established aspect of the State's legitimate effort to protect the public from the dangers

of unqualified and unscrupulous legal practice. Plaintiffs' novel First Amendment theory should be rejected, and the preliminary injunction should be reversed.

## JURISDICTION

The district court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

The district court entered its preliminary-injunction order on May 24, 2022. Defendant timely filed the notice of appeal on June 22, 2022. (J.A. 208-209.) *See* 28 U.S.C. § 2107(a); Fed. R. App. P. 4(a)(1)(A).

## ISSUE PRESENTED

Whether the district court erred in preliminarily enjoining the New York Attorney General from enforcing against plaintiffs state statutes prohibiting the unauthorized practice of law, where (1) plaintiffs failed to present evidence that there exist potential clients to whom plaintiffs would speak in the absence of the unauthorized-practice statutes; and (2) the statutes at issue regulate the conduct of practicing law, and have at most an incidental and content-neutral effect on nonlawyers' speech.

3

## STATEMENT OF THE CASE

This is an appeal from a preliminary injunction issued by the U.S. District Court for the Southern District of New York (Crotty, J.), 2022 WL 1639554 (S.D.N.Y. May 24, 2022) (*reprinted at* J.A. 176-208). The district court ruled that New York's statutes prohibiting the unauthorized practice of law likely violate plaintiffs' First Amendment rights, and on that basis enjoined the Attorney General from enforcing those statutes against plaintiffs.

### A.   New York's Regulation of the Practice of Law

### 1.   Attorney licensure requirements

For well over a century, New York has required individuals who want to practice law to obtain and maintain a license. *See* Ch. 165, 1898 N.Y. Laws 309. The Legislature enacted this requirement "to protect the public in this State from 'the dangers of legal representation and advice given by persons not trained, examined and licensed for such work,'" *El Gemayel v. Seaman*, 72 N.Y.2d 701, 705 (1988) (quoting *Spivak v. Sachs*, 16 N.Y.2d 163, 168 (1965)), including the dangers of "ignorance, inexperience and unscrupulousness," *People v. Alfani*, 227 N.Y. 334, 339 (1919). The licensure requirement ensures that individuals providing legal

4

services have not only the relevant knowledge and ability, but also the honesty and integrity that are essential both to the attorney-client relationship and to the sound administration of justice. *See id.*; *see also Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 460 (1978).

To these ends, New York requires those seeking to practice law to meet a number of qualifications. *See generally* N.Y. Judiciary Law § 460 et seq.; Rules of Ct. of Appeals for Admission of Att'ys and Counselors-at-Law (22 N.Y.C.R.R.) pt. 520. An aspiring lawyer ordinarily must complete an appropriate course of legal study, and must pass examinations demonstrating fundamental legal knowledge and ability, facility with New York law, and an understanding of the rules of legal ethics. *See* 22 N.Y.C.R.R. §§ 520.3-520.9. Each applicant must also demonstrate "the good moral character and general fitness requisite for an attorney- and counselor-at-law." *Id.* § 520.12(a).

Upon satisfying these requirements, each new attorney must solemnize his or her admission to the bar by "tak[ing] the constitutional oath of office in open court." Judiciary Law § 466. After admission, each lawyer must maintain his or her license, including by satisfying biennial continu-

ing legal education requirements. *See id.* § 468-a; Mandatory Continuing Legal Educ. Program for Att'ys (22 N.Y.C.R.R.) §§ 1500.12(a), 1500.22(a).

### 2. Regulations governing attorney conduct

Once admitted to practice, attorneys in New York are bound by the Rules of Professional Conduct. Among other things, the rules obligate attorneys to provide "competent representation" reflecting the necessary "legal knowledge, skill, thoroughness and preparation." N.Y. Rules of Pro. Conduct (22 N.Y.C.R.R. 1200.0) r. 1.1. Failure to provide competent representation exposes an attorney to malpractice liability. *See Rudolf v. Shayne, Dachs, Stanisci, Corker & Sauer*, 8 N.Y.3d 438, 442 (2007).

Attorneys must also "remain faithful to the fiduciary duties of loyalty and confidentiality owed by attorneys to their clients." *Lightman v. Flaum*, 97 N.Y.2d 128, 135 (2001) (citation and quotation marks omitted); *see* Rules of Pro. Conduct rr. 1.6-1.18. A lawyer who violates his or her fiduciary obligations may be subject to civil and criminal liability. *See, e.g.*, *Napoli v. New York Post*, 175 A.D.3d 433, 435 (1st Dep't 2019), *lv. denied*, 35 N.Y.3d 906 (2020); Judiciary Law § 487. A lawyer's duty of confidentiality is effectuated in part through the attorney-client privilege. *See* N.Y. C.P.L.R 3101(b), 4503. That privilege does not shield commu-

nications with a nonlawyer. *See, e.g.*, *United States v. Bein*, 728 F.2d 107, 112-13 (2d Cir. 1984); *United States v. Kovel,* 296 F.2d 918, 922 (2d Cir. 1961); *Delta Fin. Corp. v. Morrison*, 15 Misc. 3d 308, 316-17 (Sup. Ct. Nassau County 2007); C.P.L.R. 4503.

A lawyer's role as an "officer of the court" also obligates him to preserve the courts' integrity and resources by refusing to advocate false or frivolous claims and defenses. *See* Rules of Pro. Conduct r. 3.1; *see also id.* rr. 3.3, 3.4, 4.1.

In addition to civil and criminal liability, breaches of a lawyer's professional obligations can lead to attorney discipline, including public censure, temporary suspension, and permanent disbarment. *See, e.g.*, *Matter of Rosenberg*, 202 A.D.3d 1271 (3d Dep't 2022); *Matter of Barrett*, 170 A.D.3d 69 (2d Dep't 2019). *See generally* Rules for Att'y Disciplinary Matters (22 N.Y.C.R.R.) pt. 1240.

### 3. Prohibition on nonlawyers practicing law

Persons who lack a law license, and who thus are not subject to a lawyer's legal and ethical duties (or the mechanisms for enforcing those duties), are prohibited from practicing law in New York. Judiciary Law §§ 478, 484. This prohibition is not limited to appearing in court or hold-

7

ing oneself out as a lawyer, but also includes out-of-court "legal advice and counsel." *Spivak v. Sachs*, 16 N.Y.2d 163, 166 (1965); *see El Gemayel*, 72 N.Y.2d at 706; *Alfani*, 227 N.Y. at 337; *People v. Divorce Associated & Pub. Ltd.*, 95 Misc.2d 340, 343 (Sup. Ct. Queens County 1978) (enjoining unauthorized practice of law by, inter alia, "giving legal advice by aiding and assisting individual customers in filling out legal forms"). To constitute the "practice of law," advice must be "rendered to particular clients" based on their individual circumstances. *El Gemayel*, 72 N.Y.2d at 706. Conduct or speech on legal subjects that is untethered to any specific client, such as publishing legal literature or providing general opinions about a legal topic, does not require a law license. *See id.*; *Matter of Rowe*, 80 N.Y.2d 336, 342 (1992).

The practice of law by one not licensed to do so is a misdemeanor. Judiciary Law §§ 485, 486. More serious violations constitute felonies. *Id.* § 485-a (falsely holding oneself out as an attorney and causing loss exceeding $1,000). The New York Attorney General is authorized to investigate and prosecute violations of the unauthorized-practice statutes, including by obtaining injunctions. *Id.* §§ 476-a(1), 476-b, 476-c; *see id.* §§ 750(B), 753(A)(4).

8

Nonlawyers may perform a variety of tasks to assist an attorney in rendering legal services, so long as the nonlawyer's work is properly supervised by the attorney. *See* Rules of Pro. Conduct r. 5.3; Roy D. Simon, *Simon's New York Rules of Professional Conduct Annotated* §§ 5.3:1 to 5.3:16 (Dec. 2021 update) (Westlaw); *see also id.* § 5.5:31 (collecting authorities). For example, lawyers routinely rely on nonlawyers, such as paralegals, to conduct client interviews, gather facts, undertake research, and draft legal documents. In this way, lawyers can reduce the need for their own direct involvement, while retaining supervisory legal judgment over nonlawyers acting "for the lawyer in rendition of the lawyer's professional services." *See* Rules of Pro. Conduct r. 5.3 cmt. 2. Certain law students and not-yet-licensed recent graduates may also provide legal services under the supervision of lawyers working for an approved legal-aid organization or the State.[1] Judiciary Law § 478(2)-(3).

---

[1] In addition, attorneys licensed in other States may be admitted pro hac vice in New York, Judiciary Law § 478(4), and lawyers admitted in foreign countries may practice as legal consultants, *id.* §§ 53(6), 478(5).

**B.      Factual and Procedural Background**

**1.      Upsolve's proposal to provide unlicensed legal services**

Lead plaintiff Upsolve, Inc. is a nonprofit that wants to launch a program (the "American Justice Movement") through which nonlawyers would render legal services to low-income New Yorkers in debt-collection litigation.[2] (J.A. 10; *see* J.A. 13, 64.) Under Upsolve's proposed program, nonlawyers would provide unlicensed legal counsel to individuals who cannot afford attorneys but who have been named as defendants in debt-collection cases filed in New York City Civil Court (*see* J.A. 43-45), a tribunal that hears claims worth as much as $50,000, *see* N.Y.C. Civ. Ct. Act §§ 201-202. Upsolve would confer on these nonlawyers the newly coined title of "Justice Advocate." (J.A. 65.) Co-plaintiff Reverend John

---

[2] Upsolve previously created an automated internet program that assists debtors in preparing bankruptcy filings. (J.A. 61-62.) Although the bankruptcy program is not at issue here, at least one court has determined that certain aspects of the program constitute the unauthorized practice of law. *See In re Peterson*, Nos. 19-24045, 19-24551, 2022 WL 1800949, at *52-54 (Bankr. D. Md. June 1, 2022). Practitioners have criticized Upsolve's bankruptcy program. *See, e.g.*, Cathy Moran, *Do It Yourself Bankruptcy Software Is a Trap*, The Soap Box (2019), https://www.bankruptcysoapbox.com/diy-bankruptcy-software/.

Udo-Okon, a South Bronx pastor, claims to be a prospective Justice Advocate. (*See* J.A. 79-80, 83-85.)

Under Upsolve's proposed program, nonlawyer advocates would provide legal services to individual clients in relation to answering debt-collection complaints filed in New York City Civil Court. (J.A. 45.) The nonlawyer advocates would counsel their clients based on an answer form that the New York court system makes publicly available to debt-collection defendants. (*See* J.A. 40, 56.) Because Upsolve's nonlawyer advocates would provide legal services to individual debtors based on the debtors' particular circumstances (J.A. 45-53), the nonlawyer advocates' participation in Upsolve's program would constitute unauthorized practice of law (J.A. 32-33). *See El Gemayel*, 72 N.Y. 2d at 706.

The answer form on which Upsolve's proposed program is based contains 24 checkboxes pertaining to legal defenses and counterclaims that a defendant might raise in a debt-collection lawsuit. Although some of the potential defenses presented on the answer form are simple, many are legally or factually complex. (*See* J.A. 40.) Indeed, plaintiffs admit that the form "includes language that requires some measure of familiarity

with the legal system." (J.A. 19.) For example, the form contains boxes to check if:

- "service [of the complaint] was not correct as required by law";

- "the time has passed to sue on this debt";

- "[t]he collateral (property) was not sold at a commercially reasonable price";

- the creditor engaged in conduct giving rise to a defense of unjust enrichment;

- the creditor breached the duty of good faith;

- the equitable doctrine of laches applies;

- there are other reasons (beyond those set forth on the answer form) that the defendant should not be liable on the debt;

- the defendant's income is exempt from collection (in whole or in part), also for reasons not specified on the form; or

- the defendant has counterclaims against the plaintiff.

(J.A. 40.)

Although Upsolve has stated an intention to limit its services to cases filed in New York City Civil Court (*see* J.A. 45), the answer form is not so limited—it is designed for use throughout the State and refers to proceedings "outside of New York City," including in Suffolk County, Buffalo, and other municipalities (J.A. 40 (capitalization omitted)). And while Upsolve's program is not limited to particular kinds of debt (*see,*

12

*e.g.*, J.A. 49), the answer form is expressly designed for use only in cases arising out of "consumer credit transaction[s]" (J.A. 40 (capitalization omitted)).

According to Upsolve, its nonlawyer advocates would counsel debt-collections defendants about how to fill out the answer form. (J.A. 45-53.) The nonlawyer advocates would also instruct their clients regarding where and how to file the answer. (J.A. 52.) The nonlawyer advocates would not appear in court; each client would still be required to file the answer, attend court hearings, and submit other legal documents that may be required. (*See* J.A. 55.)

Although the nonlawyer advocates must be "approved" by Upsolve (J.A. 43; *see* J.A. 54), the criteria (if any) for such approval are unclear. To participate, nonlawyer advocates would not be required to satisfy any educational prerequisites; plaintiffs tacitly acknowledged in the district court that Upsolve will not require its nonlawyer advocates to have graduated high school. (*See* J.A. 150.) Upsolve's materials do not indicate any requirement that the nonlawyer advocates must hold any license or certification, or that they should have prior experience related to the law. Upsolve does not propose to require the nonlawyer advocates to pass any

13

examination regarding either substantive legal knowledge or the rules of ethics. Plaintiffs acknowledged in the district court that Upsolve designed its program to "bypass[]" the State's "character and fitness regulations" (J.A. 149), and they do not allege that Upsolve has adopted character and fitness requirements of its own. Upsolve does not allege that it would conduct background checks or review the criminal history of prospective nonlawyer advocates.

Upsolve alleges that it will require its nonlawyer advocates to execute a "Justice Advocate's Affidavit" to participate in the program. (J.A. 54.) Through the affidavit, the nonlawyer advocates would agree to provide legal counsel free of charge and only as described in a "Training Guide" prepared by Upsolve. (J.A. 54.) They would also agree to comply with consumer-protection laws and rules 1.6 through 1.9 of the New York Rules of Professional Conduct, which are among the provisions that govern licensed attorneys' obligations concerning confidentiality and conflicts of interest. (J.A. 43-44, 54.) However, Upsolve's materials fail to acknowledge that communications with nonlawyers are not shielded by the attorney-client privilege (see *supra* at 7). Upsolve's materials do not establish any conflicts-check procedure, nor do they provide guidance to

14

nonlawyer advocates (or their clients) regarding identifying or addressing conflicts. And Upsolve's materials do not require the nonlawyer advocates to abide by other professional conduct rules applicable to lawyers, such as rule 1.1's obligation to provide competent representation.

Upsolve states that nonlawyer advocates participating in its program would be required to attend a "virtual training" (J.A. 43), but it does not supply information concerning who would conduct the training; what topics would be covered; or whether the training curriculum accurately states the relevant law. Upsolve would provide its nonlawyer advocates with its training guide, which spans barely ten pages of text. (J.A. 42-53.) The guide generally describes the process of filing a complaint and answer in a debt-collection lawsuit. (J.A. 44-45.) It states that "[i]f the defendant fails to respond [to a complaint], the plaintiff can obtain a default judgment" (J.A. 45), but it does not explain how a default judgment works or how a litigant may properly obtain or vacate a default judgment.

The training guide contains a series of questions for the nonlawyer advocates to ask individual clients, and instructions on counseling legal those clients in the preparation of the answer form based on the information that each client provides. (J.A. 47-52.) The guide indicates that

15

nonlawyer advocates should budget "15-20 minutes" to the process of discussing an individual client's case and preparing the legal pleading. (J.A. 47.) The guide does not describe a process for confirming the accuracy of the information that a client provides during the consultation.

The guide acknowledges that some of the scripted questions are "unclear," and instructs that when in doubt, a nonlawyer advocate should "apply your best judgment . . . to determine whether you think [the client's] description satisfies the requirements for a particular defense." (J.A. 47.) The guide states that the advocate "should err on the side of telling the client to check the box to make sure they don't lose the opportunity to raise that defense" (J.A. 47), but it does not call for the nonlawyer advocate to advise the client regarding potential consequences for making false or unsupported claims in a legal pleading.

Although some portions of the training guide are straightforward, other aspects appear to be confusing, problematic, or incorrect. A few examples follow—but this list is not exhaustive:

- The guide instructs nonlawyer advocates to provide counsel to clients "sued in a county outside of New York City" (J.A. 50), even though Upsolve's services are supposed to be limited to cases filed in New York City Civil Court (*see* J.A. 45).

16

- The guide states that a nonlawyer advocate can provide counsel only if the client "ha[s] been served with a Summons and/or Complaint" (J.A. 45; *see* J.A. 53), but confusingly provides advice regarding potential defenses relating to failure to serve process (J.A. 47-48).

- The guide instructs that it is always "in [the client's] interest to file an answer," "even if th[e] deadline has elapsed" (J.A. 46), disregarding that there are circumstances in which filing an answer may be detrimental to a client's interests.[3]

- The guide indicates that a client with an insufficient-service defense should "probably" file a motion to dismiss (J.A. 48), but does not supply advice regarding such a motion and does not mention the strict sixty-day deadline.[4]

- The guide states that a nonlawyer advocate "cannot assist a client" if the client "ha[s] already filed an answer" (J.A. 53; *see* J.A. 58), but confusingly states that an advocate may assist a client with an amended answer (J.A. 45). The guide does not address the rules governing amendment of pleadings, which often requires a motion.[5]

- The guide's initial question regarding a statute of limitations defense—"How long has it been since you last made a payment[?]" (J.A. 49)—incorrectly measures the period between a client's last payment and his or her consultation with Upsolve, rather than the period between the client's payment

---

[3] For example, the best strategy may be to decline to answer where the complaint has not been properly served, or where the period for obtaining a default judgment has passed. *See* C.P.L.R. 3215(a)-(c).

[4] C.P.L.R. 3211(e).

[5] *See* N.Y.C. Civ. Ct. Act § 909; C.P.L.R. 3025.

*default* (i.e., *missed* payment) and the date on which the action was commenced.[6]

- The guide misstates the limitations period for medical debt (J.A. 49), which is three years (not six).[7]

Plaintiffs supply little information regarding how Upsolve intends to supervise the nonlawyer advocates or hold them accountable for mistakes or malfeasance. For example, although the nonlawyer advocates would purportedly be required to log whether they and the clients completed certain paperwork, Upsolve's form does not collect information regarding the client's circumstances or the nonlawyer advocate's advice. (*See* J.A. 46; Addendum (Add.) 1-2 (reproducing https://www.american justicemovement.org/tracking-form).[8]) Plaintiffs allege that Upsolve intends to have someone "contact[] clients" to ask whether the nonlawyer advocate's counsel was consistent with Upsolve's training guide (J.A. 28), but there is no information about who would make such calls (or when) or how Upsolve would ascertain whether a particular nonlawyer advocate

---

[6] *See, e.g.*, *Wilmington Sav. Fund Soc'y, FSB v. Unknown Heirs at L. of Danny Higdon*, 161 A.D.3d 1559 (4th Dep't 2018).

[7] C.P.L.R. 213-d.

[8] For the Court's convenience, screenshots of relevant web pages published by Upsolve (as those pages appeared on October 5, 2022) are submitted in an addendum to this brief.

complied with the guide. Although plaintiffs refer to a complaint form, they do not indicate how Upsolve would investigate reported misconduct. (*See* J.A. 28 & n.20, 55; Add. 3-4 (reproducing https://www.american justicemovement.org/complaint-form).)

Upsolve's materials state that nonlawyer advocates who violate Upsolve's rules may be "terminated" from the program, risk prosecution for the unauthorized practice of law, or face "liability under various other consumer-protection laws." (J.A. 44; *see* J.A. 54.) However, Upsolve's clients would be required to agree to a broad disclaimer of civil liability stating that neither Upsolve nor the nonlawyer advocates "assume any liability regarding the outcome of your case." (J.A. 55.)

### 2. The complaint and preliminary-injunction motion

In January 2022, plaintiffs filed this lawsuit and sought a preliminary injunction barring the New York Attorney General from enforcing the State's unauthorized-practice statutes against plaintiffs. (*See* J.A. 32, 37.) Plaintiffs alleged that enforcing the unauthorized-practice statutes against them would violate their First Amendment right to freedom of

speech by preventing them from dispensing unlicensed legal counsel to clients.[9] (J.A. 35-36.)

Although Upsolve alleged that it is "in the process of recruiting and training" nonlawyers for its program (J.A. 66; *see* J.A. 25), plaintiffs identified only Udo-Okon as a prospective nonlawyer advocate. Udo-Okon does not disclose his educational background, does not attest to having read Upsolve's training guide, and does not contend that he has studied any relevant legal or ethical rules, concepts, or procedures. Udo-Okon submitted a petition with signatures purportedly from individuals who are "interested in . . . free legal advice" from him. (J.A. 88-107.) The signatories did not indicate that they have ever needed legal assistance in answering a debt-collection lawsuit in New York City Civil Court or that they are likely to need such assistance.

Plaintiffs also filed declarations from three individuals who were subjected to default judgments in debt-collection lawsuits. (J.A. 116-131.) But each default judgment was entered because the debtor was not

---

[9] Plaintiffs also asserted a freedom-of-association claim (J.A. 36-37), but the district court found that claim unlikely to succeed and declined to grant relief on that basis (J.A. 189-191).

properly served with process and thus did not file an answer. (*See* J.A. 118, 121, 123, 128.) Upsolve's materials expressly exclude such cases from its program, stating that nonlawyer advocates may advise clients only if they have been served with a summons or complaint. (J.A. 45, 53.) In addition, two of the declarants reside on Long Island (J.A. 120, 126), and therefore were not sued in New York City Civil Court—the only court for which Upsolve's nonlawyer advocates would provide counsel.[10]

### 3.   The preliminary-injunction order

In May 2022, the district court issued a preliminary injunction barring enforcement of New York's unauthorized-practice statutes against plaintiffs. (J.A. 176-208.)

First, the court ruled that plaintiffs had established standing. (J.A. 181-184.) The court reasoned that although plaintiffs have not yet faced enforcement action, the unauthorized-practice statutes are "frequently enforced" and that plaintiffs' proposal to provide unlicensed legal counsel "would clearly run afoul" of those statutes. (J.A. 182-183.) The

---

[10] *See Americredit Fin. Servs. Inc. v. Lepre*, Index No. CV-002270-16/NA (Nassau Dist. Ct.); *Suffolk Anesthesiology Assoc., P.C. v. Jurado*, Index No. CV-005874-10/SM (Suffolk Dist. Ct.).

court cited "the signatories to the Reverend's petition" as "willing clients" to whom plaintiffs would give legal counsel in violation of the law (J.A. 184), but did not consider whether those signatories had actually indicated either eligibility or need for Upsolve's proposed services.

Second, the court concluded that plaintiffs are likely to succeed on their claim that the State's unauthorized-practice statutes violate the First Amendment as applied to plaintiffs. (J.A. 191-192.) The court recognized that the "orderly functioning of our judicial system and the protection of our citizens require that legal advice should be offered only by those who possess the requisite qualifications and authorization for the practice of law." (J.A. 176 (quotation marks omitted).) And the court acknowledged the "overwhelming[]" judicial consensus that professional-licensing regimes, including those governing attorneys, are not subject to strict scrutiny because they "regulate professional 'conduct' and merely burden a non-lawyer's speech incidentally." (*See* J.A. 193.)

The court departed from this consensus by applying strict scrutiny. The court reasoned that plaintiffs' as-applied challenge to the unauthorized-practice statutes focused on the supposedly "pure verbal speech" of giving legal counsel to individual clients about how to draft and file an

22

answer. (*See* J.A. 194.) The court described such verbal legal counsel as "content-based speech," the regulation of which supposedly "trigger[s] strict scrutiny." (J.A. 196-197, 201.)

The district court then concluded that, as applied to plaintiffs, the unauthorized-practice statutes likely do not survive strict scrutiny. (J.A. 201-206.) Although the court acknowledged New York's compelling interests in maintaining legal ethics and protecting the public from the dangers of legal representation and counsel given by nonlawyers, the court ruled that these interests are "less compelling in the context of Plaintiffs' specific, narrow mission." (J.A. 202.) The court also ruled that the unauthorized-practice statutes are not narrowly tailored given the purported availability of tort remedies against nonlawyer advocates and "less restrictive alternatives to [a] banket ban on all unauthorized legal advice." (J.A. 204.)

Finally, the court concluded that the remaining injunction factors favored relief. The court ruled that plaintiffs' "irreparable injury necessarily follows from the likelihood of their success on the merits on the free speech claim." (J.A. 206.) And the court reasoned that the State lacks an

interest "in the enforcement of an unconstitutional law." (J.A. 206 (quotation marks omitted).)

On these bases, the court enjoined "the Attorney General and her officers, agents, and employees, and all other persons acting in concert with them" from enforcing the unauthorized-practice statutes against plaintiffs, as well as against "any Justice Advocates," "clients of [Upsolve's] program," and Upsolve's "legal advisors." (J.A. 207-208.) The court did not explain its extension of relief to nonparty "Justice Advocates," "clients," and "legal advisors."

The Attorney General timely appealed. The district court stayed further proceedings pending this appeal. (J.A. 209-210.)

On or about May 24, 2022 (the date of the preliminary injunction), Upsolve posted an "Update" to its website soliciting volunteer nonlawyers for its program. (*See* Add. 5-7 (reproducing https://www.americanjustice movement.org/).) In August 2022, Upsolve published a job listing for a "Justice Fellow" who would "be responsible for finding low-income New York residents who need help and connecting them" with Upsolve. (*See* Add. 8-9 (reproducing https://upsolve.org/careers/justice-fellow/).)

## SUMMARY OF ARGUMENT

The district court's order takes the extraordinary step—before discovery and trial—of enjoining New York's Attorney General from enforcing against plaintiffs the State's 125-year-old prohibition on nonlawyers practicing law. That decision rests on multiple errors.

*First*, the district court erred in concluding that plaintiffs carried their burden to establish standing to sue. Plaintiffs' theory of injury-in-fact is that the unauthorized-practice statutes prevent them from delivering legal counsel to clients. That theory depends on the existence of clients—without clients, plaintiffs cannot practice law, and so cannot have a well-founded fear of being prosecuted for violating the unauthorized-practice statutes. But plaintiffs put on no evidence that any prospective client exists. And there is no basis but speculation to suppose that a low-income debt-collection defendant would choose to seek counsel from plaintiffs rather than from the various lawfully operating legal-aid organizations that offer (for free) the same services that plaintiffs wish to offer—and which do not turn away clients. Plaintiffs cannot establish standing through such speculation.

*Second*, the district court erred on the merits in subjecting New York's unauthorized-practice statutes to strict scrutiny under the First Amendment. The requirement to maintain a bar license is a means of regulating attorney *conduct*, not speech. Specifically, the statutes regulate the conduct of exercising legal knowledge, judgment, and skill to generate counsel for particular clients in particular cases. The license requirement may burden the speech of persons not licensed to practice law, but it does so only incidentally: The reason that a nonlawyer may not generate and then distribute legal counsel is not that he is prohibited from speaking about legal topics, but because he is prohibited from acting as a lawyer to generate the advice. The unauthorized-practice statutes, moreover, are content neutral—the statutes do not discriminate against advice that addresses particular topics or that expresses particular viewpoints, but merely limit who may engage in the legal profession. A statute that has only an incidental and content-neutral effect on speech rights is not subject to strict scrutiny, particularly where (as here) the statute at issue is part of a long tradition (dating to before the Founding) evincing broad acceptance that the regulation at issue comports with the Constitution.

*Third*, irrespective of the applicable tier of scrutiny, the district court erred in concluding that the unauthorized-practice statutes are likely unconstitutional as applied to plaintiffs. The court correctly recognized that New York has compelling interests in protecting the public from the dangers of unlicensed law practice. But contrary to the district court's reasoning, those dangers are not diminished by the terms of plaintiffs' proposed program. Quite the contrary: plaintiffs' training materials are rife with errors, and in general fall distantly short of establishing the controls and enforcement mechanisms that are necessary to ensure that those who enter the legal profession provide competent counsel and protect the best interests of their clients. Prohibiting plaintiffs' unauthorized practice of law is the only way to ensure that plaintiffs do not expose low-income New Yorkers to the dangers of unauthorized law practice. No less-restrictive oversight regime would suffice, because any regime that allowed plaintiffs to pursue their proposed program would mean putting New Yorkers at risk. And the State's interests also are not adequately served by the backstop of tort liability, because a premise of plaintiffs' program is that their clients will disclaim any right to civil recovery. The unauthorized-practice statutes are likely to survive any level of constitutional

27

scrutiny (whether strict, intermediate, or only rational-basis), and therefore plaintiffs are not likely to succeed on the merits of their complaint.

*Finally*, the remaining injunction factors weigh firmly against the preliminary injunction. Plaintiffs have not demonstrated irreparable harm to their speech rights, because they have not shown that there exist any clients to whom the unauthorized-practice statutes prevent them from speaking. And the public interest weighs firmly against allowing plaintiffs to expose vulnerable New Yorkers to unqualified legal advisors who could easily cause serious harm that is impossible later to undo.

The preliminary injunction should be reversed.

## STANDARD OF REVIEW

A district court abuses its discretion in issuing a preliminary injunction that "rests on an error of law." *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 280 (2d Cir. 2021) (per curiam) (quotation marks omitted), *cert. denied*, 142 S. Ct. 2569 (2022). Whether the court committed such an error is reviewed de novo. *North Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 36 (2d Cir. 2018). A court also abuses its discretion if it made a "clearly erroneous factual finding," or if its ruling "cannot be located within the range of permissible decisions."

28

*Mastrovincenzo v. City of New York*, 435 F.3d 78, 88 (2d Cir. 2006) (quotation marks omitted).

## ARGUMENT

A "preliminary injunction is an extraordinary and drastic remedy." *New York ex rel. James v. Griepp*, 11 F.4th 174, 177 (2d Cir. 2021) (quotation marks omitted). "To obtain a preliminary injunction that will affect government action taken in the public interest pursuant to a statute or regulatory scheme, the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *We The Patriots*, 17 F.4th at 279 (quotation marks omitted).

Here, the district court erred in preliminarily enjoining enforcement of the unauthorized-practice statutes against plaintiffs. Plaintiffs are unlikely to succeed on the merits of their free-speech claim; they have not established irreparable harm; and the public interest weighs decidedly against allowing plaintiffs to provide unlicensed legal counsel to low-income debtors during the pendency of this litigation.

29

## A. Plaintiffs Are Unlikely to Succeed on the Merits.

### 1. Plaintiffs failed to demonstrate standing to sue.

At the outset, plaintiffs are unlikely to succeed on the merits of their claims because they failed to establish standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Hedges v. Obama*, 724 F.3d 170, 203-05 (2d Cir. 2013). To establish standing, plaintiffs "must show (i) that [they] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).

Plaintiffs' burden to prove standing at the preliminary-injunction stage is "no less than that required on a motion for summary judgment." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (quotation marks omitted). Accordingly, plaintiffs "cannot rest on . . . 'mere allegations,' as would be appropriate at the pleading stage but must 'set forth' by affidavit or other evidence 'specific facts'" sufficient to establish each element of the standing inquiry. *Id.* (alteration marks and some quotation marks omitted) (quoting *Lujan,* 504 U.S. at 561); *accord Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. New York State Dep't*

30

*of Corr. & Cmty. Supervision*, 16 F.4th 67, 78 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 2676 (2022).

Where, as here, plaintiffs assert standing based on an injury that has not yet occurred, they must prove that the threatened injury is "imminent"—that is, "*certainly* impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quotation marks omitted). Merely "*possible* future injury" or "hypothetical future harm" does not suffice. *Id.* at 402, 409 (quotation marks omitted). Plaintiffs similarly "cannot rely on speculation about the unfettered choices made by independent actors not before the court." *Id.* at 414 n.5 (quotation marks omitted).

Here, the district court concluded that plaintiffs established injury-in-fact based on the "threat" of "civil or criminal prosecution" if they were to provide unlicensed legal counsel under Upsolve's proposed program. (*See* J.A. 181-184.) That was error. Enforcement action against these plaintiffs is plausible only if they actually render individualized legal counsel "to particular clients." *See, e.g.*, *El Gemayel*, 72 N.Y.2d at 706. But plaintiffs failed to demonstrate the existence of any client to whom they anticipate providing unlicensed legal counsel. Absent such a client, plaintiffs do not face any "*certainly* impending" enforcement action, *see*

31

*Clapper*, 568 U.S. at 409 (quotation marks omitted), and do not have any "well-founded fear" of prosecution, *American Booksellers Found. v. Dean*, 342 F.3d 96, 101 (2d Cir. 2003) (quotation marks omitted).[11]

The district court clearly erred in concluding that plaintiffs demonstrated that prospective clients actually exist. The court relied (J.A. 184) on the signatories to Udo-Okon's petition, who represented in general terms that they are "interested in . . . free legal advice" from him (J.A. 88-107). But the petition is pure hearsay entitled to little or no evidentiary weight, particularly because the signatures are unsworn and unverifiable. *See* Fed. R. Evid. 801(c); *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010); *Delgado v. A. Korenegay Senior House HDFC*, No. 07-cv-7761, 2008 WL 748848, at *4 (S.D.N.Y. Mar. 21, 2008).

In any event, Udo-Okon's petition states only that the signatories are generally interested in free legal counsel, without any suggestion that they are interested in legal counsel *about debt-collection lawsuits.*

---

[11] Although the Attorney General did not raise in the district court the precise standing argument presented here, "a challenge to subject matter jurisdiction cannot be waived." *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.*, 109 F.3d 105, 107 (2d Cir. 1997) (quotation marks omitted); *see Green Haven*, 16 F.4th at 78.

(J.A. 88-107.) For example, there is no evidence that any of the signatories has been served (or is likely to be served) with a debt-collection complaint in New York City Civil Court, or that any of them needs (or is likely to need) legal counsel about responding to such a complaint. For all that appears, the petition's signatories were interested in "free legal advice" concerning divorce proceedings, landlord-tenant disputes, or any of the other legal problems that a New Yorker may face.

Plaintiffs also failed to establish standing based on the three declarations filed by individuals who faced default judgments in debt-collection lawsuits. The district court did not rely on those affidavits (*see* J.A. 184), and with good reason. None of those individuals would have been eligible for plaintiffs' legal services, because they were never served with process before having default judgments entered against them. (*See* J.A. 118, 121, 123, 128.) Upsolve's materials state that its program would be available only to those who have already been served with a summons or complaint. (J.A. 45, 53.) Moreover, two of the declarants were not sued in New York City Civil Court—the only court for which Upsolve has proposed to conduct its program. (J.A. 45.)

Plaintiffs cannot remedy their failure of proof by speculating about unidentified prospective clients. Such individuals would not necessarily seek out Upsolve's services—many would be able to fill out the answer form on their own, and others could obtain assistance from one of several lawfully operating legal-aid organizations that "do not turn away clients." (*See* J.A. 204). Plaintiffs cannot satisfy Article III through "guesswork" or "speculation" about hypothetical future decisions made by unidentified prospective clients. *See Clapper*, 568 U.S. at 409, 413-14 & n.5.

Indeed, in *Connecticut Bar Association v. United States*, this Court rejected a claim of standing in similar circumstances. 620 F.3d 81 (2d Cir. 2010). In that case, various plaintiffs raised First Amendment and due process challenges to a federal statute that prohibited attorneys "who offer bankruptcy-related services to consumer debtors" from providing certain legal advice. *Id*. at 86-87, 90 (quotation marks omitted). Although some of the plaintiffs in *Connecticut Bar* had standing (specifically, attorneys whose clients included consumer debtors), this Court was "compelled to conclude" that the plaintiffs who did not represent debtors lacked standing. *Id*. at 90. The latter group did not have clients to whom they would provide prohibited advice, and so could not "demonstrate the requi-

34

site 'actual and well-founded fear' that the challenged statutes will be enforced against them." *See id*. & n.12. The same reasoning applies here, because plaintiffs failed to demonstrate the existence of any actual clients to whom they would provide legal services in the absence of the unauthorized-practice statutes.

### 2. New York's unauthorized-practice statutes are likely to be upheld on the merits.

The district court also erred on the merits. Contrary to the district court's conclusion (J.A. 201), the unauthorized-practice statutes do not directly regulate plaintiffs' speech, and any incidental effect on that speech is content neutral. The statutes thus are not subject to strict scrutiny. And regardless of the applicable constitutional standard, New York's 125-year-old unauthorized-practice statutes pass muster under the First Amendment.

### a. The unauthorized-practice statutes are not subject to strict scrutiny under the First Amendment.

As the district court acknowledged, the practice of law has been the legitimate subject of government regulation since even before the Founding. (*See* J.A. 200.[12]) The attorney-licensing requirement at issue in this case has been in force—in largely the same terms that prevail today—for nearly 125 years. *See* Ch. 165, 1898 N.Y. Laws 309; Judiciary Law § 478. And for more than 100 of those years, the New York Court of Appeals has expressly followed the lead of other States and the U.S. Supreme Court in defining the regulated "practice of law" to include out-of-court legal counsel. *Alfani*, 227 N.Y. at 337-38 (collecting cases, including *Savings Bank v. Ward*, 100 U.S. 195 (1879)).

Never (before this case) have attorney-licensing requirements or unauthorized practice statutes been considered a violation of the First Amendment merely because they prevent nonlawyers from practicing

---

[12] *See also* Robert Kry, *The "Watchman for Truth": Professional Licensing and the First Amendment*, 23 Seattle U. L. Rev. 885, 955 (2000) (cited in J.A. 200) (acknowledging that States "passed professional licensing laws following the American Revolution"); Standing Comm. on Lawyers' Responsibility for Client Protection, Am. Bar Ass'n, *1994 Survey and Related Materials on the Unauthorized Practice of Law/Nonlawyer Practice* at xi-xiii (1996) (describing early American attorney regulation).

law—including through written or oral legal counsel. To the contrary, such requirements have been consistently upheld by the U.S. Supreme Court,[13] by this Court,[14] by the courts of New York,[15] and by many federal and state courts around the country.[16]

One reason that attorney-licensing regimes like New York's have always been understood to comport with the First Amendment is the

---

[13] *See, e.g.*, *Law Students C.R. Rsch. Council, Inc. v. Wadmond*, 401 U.S. 154, 159 (1971).

[14] *See, e.g., Monroe v. Horwitch* 820 F. Supp. 682 (D. Conn. 1993), *aff'd*, 19 F.3d 9 (2d Cir. 1994) (table).

[15] *See, e.g.*, *Matter of New York Cnty. Laws. Ass'n (Roel)*, 3 N.Y.2d 224, 232-33 (1957); *People v. Jakubowitz*, 184 Misc. 2d 559, 561 (Sup. Ct. Bronx County 2000).

[16] *See, e.g.*, *Lawline v. American Bar Ass'n*, 956 F.2d 1378, 1386 (7th Cir. 1992); *Elansari v. Montana*, No. 21-cv-57, 2021 WL 5534930, at *5 (D. Mont. Oct. 6) (report & recommendation), *adopted*, 2021 WL 5036046 (D. Mont. Oct. 29, 2021), *appeal dismissed as frivolous*, No. 21-35984 (9th Cir. June 17, 2022); *Turner v. American Bar Ass'n*, 407 F. Supp. 451, 478 (N.D. Tex. 1975), *aff'd sub nom. Taylor v. Montgomery*, 539 F.2d 715 (7th Cir. 1976) (table), *and Pilla v. American Bar Ass'n*, 542 F.2d 56 (8th Cir. 1976); *Adams v. American Bar Ass'n*, 400 F. Supp. 219, 225 (E.D. Pa. 1975); *McDermott v. Langevin*, 587 B.R. 173, 185 (Bankr. N.D. Ga. 2018); *People v. Shell*, 148 P.3d 162, 170-74 (Colo. 2006); *Montana Sup. Ct. Comm'n on the Unauthorized Prac. of L. v. O'Neil,* 334 Mont. 311, 331-32 (2006); *Cincinnati Bar Ass'n v. Bailey*, 110 Ohio St. 3d 223, 223-30 (2006); *State v. Niska*, 380 N.W.2d 646, 648-50 (N.D. 1986); *Grievance Comm. of the Bar of Fairfield Cnty. v. Dacey*, 154 Conn. 129, 147-48 (1966), *appeal dismissed for want of substantial federal question*, 386 U.S. 683 (1967).

37

longstanding principle that the "States may regulate professional conduct" without running afoul of the Constitution, "even though that conduct incidentally involves speech." *See NIFLA*, 138 S. Ct. at 2372. Indeed, many professions require licenses even though practicing such professions involves speech, and courts routinely conclude that such licensing systems permissibly regulate the underlying professional conduct with only incidental effects on speech. For example, States permissibly require doctors to obtain a license to practice medicine, even though practicing medicine includes speech like giving patients medical advice or instructing nurses on the proper course of treatment. States similarly require psychologists and other mental-health counselors to obtain a license to treat patients, even though mental-health counseling is usually done primarily through spoken communications with patients. *See Tingley v. Ferguson*, 47 F.4th 1055, 1073-77 (9th Cir. 2022); *National Ass'n for Advancement of Psychoanalysis v. California Bd. of Psych.* (*NAAP*)*,* 228 F.3d 1043, 1053-54 (9th Cir. 2000); *Brokamp v. James*, 573 F. Supp. 3d 696, 709-10 (N.D.N.Y. 2021), *appeal pending*, No. 21-3050 (2d Cir.). And States routinely and permissibly require many other practitioners to obtain licenses, even though such requirements have the incidental effect of preventing unlicensed

practitioners from giving professional advice to clients. *See, e.g.*, *Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F. 4th 1214, 1225 (11th Cir. 2022) (dieticians and nutritionists); *Locke v. Shore*, 634 F.3d 1185, 1191 (11th Cir. 2011) (interior designers).

The same principles apply here to New York's attorney-licensing requirement and unauthorized-practice statutes. These statutes regulate the professional conduct of applying one's legal knowledge, judgment, and skill to render legal services to particular clients. *See El Gemayel*, 72 N.Y.2d at 706; *Alfani*, 227 N.Y. at 337; Paul R. Tremblay, *Surrogate Lawyering: Legal Guidance,* Sans *Lawyers*, 31 Geo. J. Legal Ethics 377, 405 (2018). For example, the unauthorized-practice statutes regulate conduct by ensuring that legal counsel is rendered only by individuals who have been "trained, examined and licensed for such work." *El Gemayel*, 72 N.Y.2d at 705 (quotation marks omitted). They impose pre-admission education, bar examination, and character-and-fitness requirements to ensure that those engaged in the practice of law possess the necessary knowledge, skill, diligence, and integrity. And by imposing an ongoing obligation to maintain one's bar license, the unauthorized-practice statutes supply a mechanism for ensuring that lawyers conduct themselves in

conformity with their legal and ethical duties—including the duties of competency, confidentiality, and loyalty. See *supra* at 4-7.

Although the practice of law often entails spoken or written communication with clients, courts, and counterparties, the unauthorized-practice statutes affect such communications only as an incident of the primary project of regulating the underlying professional conduct of practicing law. *See NIFLA*, 138 S. Ct. at 2373 ("While drawing the line between speech and conduct can be difficult, [the Supreme] Court's precedents have long drawn it, and the line is long familiar to the bar." (citations and quotation marks omitted)); *see also Ohralik,* 436 U.S. at 456-57.

As specifically relevant here, the unauthorized-practice statutes limit who may engage in the *conduct* of applying legal knowledge, judgment, and skill to the facts of a client's case to *generate* legal counsel for that client. That exercise of legal knowledge, judgment, and skill is a discrete nonspeech act that is logically and temporally prior to the speech act of *communicating* the counsel thereby generated. As one court put it, the "communicative" aspects of law practice, such as "advice, negotiation, and drafting, are only the final, articulated products of the skills and processes that form the core of the lawyer's craft, the exercise of profes-

40

sional judgment" in relation to a client's individual circumstances. *Oregon State Bar v. Smith*, 149 Or. App. 171, 187 (1997); *see also Del Castillo*, 26 F.4th at 1225-26 (dietician's generation of professional advice by "[a]ssessing a client's nutrition needs, conducting nutrition research, developing a nutrition care system, and integrating information from a nutrition assessment [is] not speech" but "occupational conduct" (quotation marks omitted)). While a person who cannot lawfully generate legal counsel also cannot communicate counsel that he has unlawfully rendered, that is merely the incidental result of the State's permissible restriction on who may practice law in the first place—not a direct restriction of speech itself.

The Fourth Circuit has recently explained as much in an analogous case, in which trade associations wanted to provide unlicensed legal counsel to their members. *Capital Associated Indus., Inc. v. Stein* (*CAI*), 922 F.3d 198, 202-03 (4th Cir.), *cert. denied*, 140 S. Ct. 666 (2019). As that court put it, prohibitions on unauthorized law practice do not "target the communicative aspects of practicing law," but rather "focus more broadly on the question of who may conduct themselves as a lawyer." *Id.* at 208. While the unauthorized-practice statutes may affect speech by forbidding nonlawyers from, among other things, giving legal counsel to a client,

41

that effect is "merely incidental to the primary objective of regulating the conduct of the profession." *Id.*; *see Lawline*, 956 F.2d at 1386 ("Any abridgment of the right to free speech is merely the incidental effect of observing an otherwise legitimate regulation" of law practice).

An example helps to illustrate the distinction between the *conduct* of practicing law (which is what the unauthorized-practice statutes regulate) and the speech that may incidentally accompany that conduct. Suppose that a nonlawyer paralegal interviews an individual about his or her situation and then provides the facts gathered to a properly licensed attorney. Based on that information, the attorney exercises her legal knowledge, judgment, and skill to formulate legal counsel for the client. But instead of advising the client directly, the attorney instructs the paralegal to call the client and convey the counsel. In such an arrangement, only the licensed attorney has engaged in the conduct of practicing law— and she has done so even though she never spoke to the client. Conversely, the paralegal has not engaged in the practice of law—even though the paralegal did engage in the speech acts of interviewing the client and communicating legal counsel. *See* Simon, *supra*, § 5.5:31.

A person could even practice law without saying anything to anyone. Suppose that a client retains an attorney, hands her a case file, and directs her to send a demand letter to a potential adversary if the attorney concludes that the client has a meritorious cause of action. The attorney reviews the file, concludes that the client has no claim, and therefore determines not to send a letter. She has practiced law, by exercising her legal knowledge, judgment, and skill in respect of the client's particular situation—even though the outcome was to stay silent.

As these examples show, the unauthorized-practice statutes directly target the underlying practice of law, and have only incidental effects on speech. And the statutes' scope is limited to that professional conduct. The statutes do not require a license to publish a book or an article on a legal topic, or to give general opinions about legal issues unconnected to a particular client. *See, e.g.*, *Matter of Rowe*, 80 N.Y.2d at 342. Accordingly, the unauthorized-practice statutes are not subject to strict scrutiny as applied to plaintiffs' proposed program—which they admit constitutes the unauthorized practice of law (J.A. 32-33). *See NIFLA*, 138 S. Ct. at 2372; *CAI*, 922 F.3d at 208.

### b. The district court's contrary reasoning is wrong.

The district court erred in concluding that the unauthorized-practice statutes are subject to strict scrutiny. (J.A. 201.) The court did not question that "lower courts have overwhelmingly concluded" that unauthorized-practice statutes like New York's principally "regulate professional 'conduct' and merely burden a non-lawyer's speech incidentally." (J.A. 193 (quotation marks omitted).) And the court also agreed that "regulations of professional conduct that *incidentally* involve speech" are subject to deferential constitutional review rather than strict scrutiny. (*See* J.A. 192.) It should have followed that strict scrutiny does not apply here. The district court's contrary determination is incorrect.

### i. The unauthorized-practice statutes do not directly target plaintiffs' speech.

The district court erred in reasoning that strict scrutiny should apply because New York's attorney-licensing regime "directly" regulates plaintiffs' "pure verbal speech" rather than their conduct. (*See* J.A. 193-196, 194 n.10.) The unauthorized-practice statutes do not prohibit plaintiffs' proposed speech on the basis that it involves uttering certain words. Rather, the statutes forbid plaintiffs from the conduct of purporting to

apply legal judgment, knowledge, and skill to generate legal counsel for another person in a particular case.

To be sure, plaintiffs are prohibited from communicating legal counsel that they have generated without a license, but the unauthorized-practice statutes do not prohibit their communication of legal counsel *as such*. For example, Udo-Okon would be free to convey legal counsel generated by a licensed attorney. The statutes bar plaintiffs' underlying exercise of purported legal expertise for particular clients, and have only incidental effects on the communication of counsel so generated.

Contrary to the district court's reasoning (J.A. 193), plaintiffs' asserted intent to give only out-of-court legal counsel does not alter the result. As the district court appeared to recognize, strict scrutiny would be inappropriate if the unauthorized-practice statutes were applied to prohibit plaintiffs from drafting legal briefs for debtors or presenting oral argument to the New York City Civil Court. (*See* J.A. 193.) But oral argument involves verbal speech just as much as giving counsel to clients. And words written in a legal document are also speech. There is no plausible basis to distinguish between the application of the unauthorized-practice statutes to these other communicative aspects of legal practice and the

45

statutes' application to the out-of-court legal counsel that plaintiffs intend to give. To the contrary, these communications are all incidental to the *conduct* of practicing law.

This is true regardless of the fact that plaintiffs have brought an as-applied challenge rather than a facial one. (*Contra* J.A. 193-194.) "[C]lassifying a lawsuit as facial or as-applied affects the extent to which the invalidity of the challenged law must be demonstrated and the corresponding 'breadth of the remedy.'" *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019). An "as-applied" claim requires proof only that the statute is unconstitutional in its application to the plaintiff himself (and can support relief only for the plaintiff), whereas a facial challenge requires a showing that the statute is invalid in every application (and so can support a more expansive remedy). *See id.* But this classification "does not speak at all to the substantive rule of law necessary to establish a constitutional violation." *Id.*; *see Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219, 228 (2d Cir. 2006).

The district court misapplied the Supreme Court's decision in *NIFLA*, which did not concern the unauthorized practice of a profession without a required license. Far from supporting plaintiffs' claims (J.A. 193-194,

194 n.10), the Supreme Court's decision in *NIFLA* reaffirmed that "States may regulate professional conduct, even though that conduct incidentally involves speech." 138 S. Ct. at 2372. And *NIFLA* expressly acknowledged the States' traditional authority to impose "reasonable licensing" requirements upon those who want to practice certain professions. *Id.* at 2373 (quotation marks omitted); *see Del Castillo,* 26 F.4th at 1223 (noting *NIFLA*'s "unmistakable clarity" in endorsing "precedents upholding regulations of professional conduct that incidentally burden speech"); *CAI*, 922 F.3d at 208 (*NIFLA* "provides ample support for the view that strict scrutiny shouldn't apply to [unauthorized-practice] statutes").

Far from undermining the constitutionality of professional-licensing requirements, *NIFLA* addressed the constitutionality of a California statute that, according to the Court, required clinics (which were themselves licensed) to provide patients with information about publicly funded abortion care. 138 S. Ct. at 2368-69. The Court concluded that the information at issue was both controversial and unrelated (i.e., not incidental) to the care that the licensed clinics provided. *See id.* at 2373-74. Unlike in *NIFLA*, plaintiffs here do not assert that the unauthorized-practice statutes improperly *compel* speech by anyone. Nor does the licensing

requirement otherwise "regulate[] speech as speech." *See id.* at 2374. It regulates the conduct of the legal profession. Plaintiffs' attempt to avoid that conduct regulation does not trigger strict scrutiny.

### ii. The unauthorized-practice statutes are content neutral.

The district court also erred in characterizing the unauthorized-practice statutes as content-based regulations of plaintiffs' speech. (J.A. 196-197.) New York's licensing requirement is content neutral—both in general and as applied in this case.

The licensure requirement does not disproportionately burden a disfavored group, *cf. NAACP v. Button*, 371 U.S. 415, 438-39 (1963), nor do they "target speech based on its communicative content" or the viewpoint of the speaker, *see Reed v. Town of Gilbert,* 576 U.S. 155, 163 (2015); *see also Doyle v. Palmer*, 365 F. Supp. 3d 295, 304 (E.D.N.Y.), *aff'd*, 787 F. App'x 794 (2d Cir. 2019) (summary order), *cert. denied*, 141 S. Ct. 135 (2020). Rather, the unauthorized-practice statutes are "justified without reference to the content of the regulated speech," *see Hobbs v. County of Westchester*, 397 F.3d 133, 149 (2d Cir. 2005) (quotation marks omitted), which is permissible "even if" the regulation "has an incidental effect on

48

some speakers or messages but not others," *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *see Mastrovincenzo*, 435 F.3d at 98.

Specifically, the attorney-licensing requirement applies even-handedly to all persons practicing law, irrespective of the nature of the law practice and regardless of any message or political position that a particular practitioner may convey through her work. *See Lederman v. New York City Dep't of Parks & Recreation*, 731 F.3d 199, 202 (2d Cir. 2013); s*ee also International Action Ctr. v. City of New York*, 587 F.3d 521, 526 (2d Cir. 2009). For example, the unauthorized-practice statutes apply equally to individuals who provide legal advice only to creditors and to those who advise only debtors. They apply to prosecutors, to individuals who represent crime victims, and to individuals who represent criminal defendants. They apply to individuals who defend class-action lawsuits and to those who file such suits. They apply to individuals working for politically oriented advocacy organizations of all ideological stripes. And the unauthorized-practice statutes do not "dictate what can be said" within a valid attorney-client relationship. *See NAAP*, 228 F.3d at 1055. The statutes are thus content neutral.

This is so even if it is necessary to consider the content of a communication to determine whether it conveys legal counsel that might trigger the unauthorized-practice statutes. The Supreme Court has "consistently recognized that restrictions on speech may require some evaluation of the speech and nonetheless remain content neutral." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1473 (2022). A regulation fails content neutrality only if it "discriminate[s] based on 'the topic discussed or the idea or message expressed.'" *Id.* at 1474 (quoting *Reed*, 576 U.S. at 171). The unauthorized-practice statutes do not so discriminate.

In concluding that the unauthorized-practice statutes regulate speech based on its content, the district court misplaced reliance (J.A. 195-197) on the Supreme Court's decision in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010). For one thing, *Holder* did not involve professional licensing, but rather addressed the constitutionality of a federal statute prohibiting individuals from providing "material support" to terrorist organizations. *See id.* at 8-15. The decision also predates *NIFLA*'s reiteration of the principle that professions are "subject to reasonable licensing and regulation by the State." 138 S. Ct. at 2373 (quotation marks omitted). *Holder* does not speak to the constitutional question in this case.

50

In any event, the Supreme Court applied strict scrutiny in *Holder* because the material-support statute directly targeted the plaintiffs' communication of particular messages (including "expert advice") to designated terrorist organizations. *See* 561 U.S. at 21-22, 25-28 (quotation marks omitted). The plaintiffs in *Holder* were prohibited from conveying expert advice regardless of whether they had obtained accreditation demonstrating professional expertise, and regardless of whether the expert advice had been generated by plaintiffs themselves or by some third party. All that mattered was whether plaintiffs spoke prohibited words to a designated organization—the statute banned speech qua speech, based on the government's disapproval of the message. *See id.*

In contrast to *Holder*, the unauthorized-practice statutes in this case do not ban speech as such, and do not discriminate based on content. Rather, they regulate the conduct of practicing law, and burden speech only as an incident of that conduct regulation. Plaintiffs' speech is not burdened because of what they propose to say, but because the counsel that they propose to communicate will have been formulated by a person without a license to do so. For example, Udo-Okon (unlike the *Holder* plaintiffs) could permissibly convey expert legal counsel if that counsel

51

was generated by a licensed attorney. And a licensed attorney could of course convey the same counsel. The statutes only prohibit Udo-Okon from undertaking the *conduct* of generating legal counsel by applying purported legal knowledge, judgment, and skill to a client's circumstances. Thus, unlike in *Holder*, the "conduct triggering coverage" here is not the act of communication, 561 U.S. at 28, but the unlicensed conduct of practicing law. And what matters under the unauthorized-practice statutes is not the "topic discussed or the idea or message expressed," *City of Austin*, 142 S. Ct. at 1474 (quotation marks omitted), but whether the person who formulated the legal counsel being communicated had a license to do so. Unlike the material-support statute in *Holder*, the statutes here are content neutral and constitutionally permissible regulations of professional conduct.

The district court also mistakenly suggested in passing that the unauthorized-practice statutes are "speaker-based" and therefore subject to strict scrutiny. (*See* J.A. 197.) But a speaker preference triggers strict scrutiny only where it "reflects a content preference," *Barr v. American Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2347 (2020) (quotation marks omitted)—and there is no content preference here.

52

### iii. The unauthorized-practice statutes are part of a long tradition of regulating law practice.

The district court further erred in disregarding (J.A. 200-201) the long tradition of imposing licensure requirements on persons who want to practice law, *see NIFLA*, 138 S. Ct. at 2372. New York's attorney-licensing requirement has existed for more than a century, and the practice of law has been regulated since before (and after) the First Amendment was ratified. See *supra* at 36 & n.12. By establishing the acceptance of a particular form of regulation over an extended period of history, this tradition of regulating attorney practice supplies an independent basis to conclude that the unauthorized-practice statutes comport with the Constitution. *See Tingley*, 47 F.4th at 1079-83.

The district court waved away the extensive history of attorney-licensing requirements by pointing to secondary sources purporting to show that *out-of-court* law practice was unregulated at the time of the Founding. (J.A. 200-201.) But there is no plausible constitutional distinction between a limitation on who may practice law in court (i.e., speak to judges) and a limitation on who may practice law out of court (i.e., speak to clients). If anything, regulation of out-of-court law practice is *better* justified than regulation of in-court practice. As the New York Court of

Appeals explained in *Alfani*: while relatively "little can go wrong in a court where the proceedings are public" and a judge is present, an attorney alone with a client may through "[i]gnorance and stupidity . . . create damage which the courts of the land cannot thereafter undo." 227 N.Y. at 339-40.

Even if the historical inquiry were limited to regulations of out-of-court legal practice, the century-plus in which such regulations have persisted plainly constitutes a sufficiently "long . . . tradition" reflecting broad and durable acceptance that attorney-licensing requirements accord with the Constitution. *See NIFLA*, 138 S. Ct. at 2372 (quotation marks omitted); *see also Tingley*, 47 F.4th at 1080. It is plaintiffs' First Amendment theory—not New York's 125-year-old licensing regime—that presents a novel and incorrect interpretation of the First Amendment.

Applying strict scrutiny to attorney-licensing regimes like New York's would risk upending the States' traditional authority to regulate professional practice. Doing so would empower any individual who wants to practice law without a license to write his own personal version of Upsolve's "training guide" and then sue to assert his own "as-applied" challenge and to demand his own "narrow exception" to the unauthorized-

54

practice statutes. (*See* J.A. 207.) Others may forgo the step of filing a lawsuit, simply commencing unlicensed law practice with the intention of asserting the First Amendment as a defense if they are discovered and prosecuted. In all of these cases, whether the First Amendment is invoked affirmatively or defensively, the State would bear the burden to prove a compelling government interest in preventing each unlicensed practitioner from practicing law, and that prohibiting each plaintiff's law practice is the least restrictive means of attaining that interest. *See Reed*, 576 U.S. at 171; *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004). And the federal courts would be burdened with determining whether each such "unique program" (*see* J.A. 207) has sufficient safeguards to protect clients from the risks of unlicensed legal practice.

Subjecting the unauthorized-practice statutes to strict scrutiny would also threaten the licensing regimes that protect state residents from unqualified practitioners in other professions. Fields including medicine, architecture, accounting, psychology, and social work all require state licensure, despite entailing the communication of ideas, advice, or verbal treatment. *See* N.Y. Education Law tit. VIII. While these and other licens-

ing requirements have long been upheld over constitutional challenges,[17] applying strict scrutiny to the attorney-licensing rules would upend that status quo. The result would imperil the State's ability to regulate and oversee many fields of conduct.

### c. The unauthorized-practice statutes satisfy any applicable level of First Amendment scrutiny.

For the foregoing reasons, the district court erred in applying strict scrutiny to New York's unauthorized-practice statutes. That error alone warrants vacatur.

However, the district court also erred in concluding that the unauthorized-practice statutes likely fail strict scrutiny. In fact, as shown below, the statutes are likely to survive under any constitutional standard. This Court therefore should reverse and remand with a direction to deny plaintiffs' preliminary-injunction motion.

As an initial matter, rational-basis review is the correct standard. As the Supreme Court has long recognized, "it has never been deemed an

---

[17] *See, e.g.*, *Mastrovincenzo*, 435 F.3d at 97-102 (street vendors' sale of art); *Brokamp*, 573 F. Supp. 3d at 709-10 (mental-health counseling); *New York State Ass'n of Career Schs. v. State Educ. Dep't*, 823 F. Supp. 1096, 1101-06 (S.D.N.Y. 1993) (educational institutions)

abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part . . . carried out by means of language, either spoken, written, or printed." *Ohralik*, 436 U.S. at 456 (quotation marks omitted) (collecting examples). Indeed, the Court has made clear that a State "can require high standards of qualification, such as good moral character or proficiency in its law, before it admits an applicant to the bar," so long as the requirements "have a rational connection with the applicant's fitness or capacity to practice law." *Schware v. Board of Bar Exam'rs*, 353 U.S. 232, 238-39 (1957); *see also Dawson v. Delaware*, 503 U.S. 159, 168 (1992) (characterizing *Schware* as applying the First Amendment). More recently, *NIFLA* reiterated that "[t]he First Amendment does not prevent restrictions directed at . . . [professional] conduct from imposing incidental burdens on speech." 138 S. Ct. at 2373 (quotation marks omitted). Indeed, *NIFLA* stated categorically—without reference to any level of constitutional scrutiny—that the "States may regulate professional conduct, even though that conduct incidentally involves speech." *Id.* at 2372; *see also Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 884 (1992) (rejecting First Amendment challenge to regulation of speech incidental to professional conduct without conduct-

57

ing strict or intermediate scrutiny) (cited in *NIFLA*, 138 S. Ct. at 2372-

73). And this Court and many other courts of appeals have rejected consti-

tutional challenges to professional regulations without applying even

intermediate scrutiny.[18]

Ultimately, this Court need not decide the level-of-scrutiny issue

because plaintiffs are unlikely to succeed on the merits under any appli-

cable form of constitutional review. The unauthorized-practice statutes

easily satisfy intermediate scrutiny, because they "(1) advance[] important

governmental interests unrelated to the suppression of free speech and

---

[18] *See, e.g.*, *Jacoby & Meyers, LLP v. Presiding Justs. of the First, Second, Third & Fourth Dep'ts, App. Div. of the Sup. Ct.*, 852 F.3d 178, 190-91 (2d Cir. 2017) (applying rational-basis review in rejecting challenge to New York's prohibition on nonlawyer investments in law firms); *Monroe*, 820 F. Supp. at 683-88 (rejecting paralegal's challenge to Connecticut's unauthorized-practice statute); *Tingley,* 47 F.4th at 1077-78 (applying rational-basis review to law prohibiting licensed health care providers from practicing conversion therapy); *Del Castillo*, 26 F.4th at 1218, 1225-26 (upholding licensing requirement for dieticians and nutritionists under rational-basis review).

Although the Fourth Circuit analyzed an unauthorized-practice rule under intermediate scrutiny in *CAI*, 922 F.3d at 208-09, the court did not reject rational-basis review. Rather, the court stated (correctly) that "the standard for conduct-regulating laws can't be greater than intermediate scrutiny," and proceeded to conclude that the statute at issue survived that elevated level of scrutiny. *Id.* at 208-10. The court thus simply declined to address a level-of-scrutiny question that would not have altered the outcome.

(2) do[] not burden substantially more speech than necessary to further those interests." *See Time Warner Cable Inc. v. Federal Commc'ns Comm'n*, 729 F.3d 137, 160 (2d Cir. 2013) (quotation marks omitted); *see also CAI*, 922 F.3d at 209-10.

Indeed, the unauthorized-practice statutes satisfy even strict scrutiny. The statutes serve interests that are not only important but compelling, and no measure short of prohibition would adequately protect those interests from the dangers posed by plaintiffs' unlicensed and unregulated law practice. *See Reed*, 576 U.S. at 171 (describing standard); *Holder*, 561 U.S. at 28-39 (upholding content-based speech prohibition that was "necessary" to satisfy compelling government interests). Because the unauthorized-practice statutes survive heightened constitutional review, they plainly satisfy rational-basis review. And because the choice of constitutional standard would not alter the outcome, this Court may resolve the appeal and reverse the injunction without deciding which tier of scrutiny applies. *See Cornelio v. Connecticut*, 32 F.4th 160, 170 (2d Cir. 2022).

59

### i. The State has important and compelling interests in regulating the practice of law.

As the district court correctly acknowledged in applying strict scrutiny, New York "undoubtedly" has "compelling interest[s] in enforcing the [unauthorized-practice] rules." (J.A. 202.) *See, e.g.*, *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 792 (1975) ("the States have a compelling interest in the practice of professions within their boundaries" and "broad power to establish standards for licensing practitioners and regulating the practice of professions").

For example, the State has compelling interests in regulating attorney conduct and "maintaining ethical behavior and independence among the members of the legal profession." (J.A. 202 (quotation marks omitted).) The State also has compelling interests in "protect[ing] the public from the dangers of legal representation and advice given by persons not trained, examined and licensed for such work." (J.A. 202 (quotation marks omitted).) And the State has compelling interests in promoting "judicial integrity and efficiency" by ensuring that legal practitioners are competent. (J.A. 202.) *See Ohralik*, 436 U.S. at 460; *CAI*, 922 F.3d at 209.

These interests are both important and compelling, and thus satisfy both intermediate and strict scrutiny. The State's interests are also

unrelated to the suppression of speech. And the licensure requirement undoubtedly serves New York's interests by allowing the State to exercise oversight over those who practice law. Requiring a license allows the State to screen practitioners to ensure that they possess the requisite knowledge, judgment, skill, and integrity to practice law—including by generating and conveying legal counsel to clients, who rely on practitioners' professed expertise. Requiring lawyers to obtain and maintain their licenses also ensures that the State retains mechanisms through which to address and deter breaches of ethical and professional standards, including through enforcement actions to suspend or disbar attorneys where appropriate. And prohibiting the unauthorized practice of law ensures that those who lack the requisite credentials do not practice law.

The district court's conclusion that the State's "justifications . . . appear less compelling in the context of Plaintiffs' specific, narrow mission" (J.A. 202) was based on its incorrect application of strict scrutiny—which requires a compelling interest to support "*each application* of a statute restricting speech," *Federal Election Comm'n v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 478 (2007). Under intermediate scrutiny, however, the government's interests may properly be "viewed in the abstract" and

61

evaluated without regard to the particular plaintiffs' circumstances. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662-63 (1994); *see, e.g.*, *Mastrovincenzo*, 435 F.3d at 100 (evaluating government interest in licensing requirement based on general government interests rather than plaintiff-specific factors). The State's compelling interests in regulating the practice of law amply satisfy this less-demanding standard.

Indeed, the State's interests in prohibiting plaintiffs' proposed unlicensed law practice satisfy strict scrutiny. The district court acknowledged that those interests are "compelling" (J.A. 202), and its attempts to minimize them in the as-applied posture of this case are unpersuasive. The court relied on plaintiffs' various self-imposed rules, but those rules are riddled with problems that highlight the State's important interests in applying to plaintiffs the same unauthorized-practice statutes that apply to everyone else. For example, Upsolve imposes no prerequisites in terms of education, legal knowledge, judgment, or character and fitness for nonlawyer advocates to be "approved" to participate in its program. While the district court pointed to Upsolve's requirement that its nonlawyer advocates agree to be bound by "State ethical guidelines" (J.A. 202-203), that promise is empty. The training guide does not discuss

the ethics rules, and there is no evidence that Upsolve plans to explain those rules to its nonlawyer advocates.

Moreover, Upsolve's program lacks the safeguards by which the State customarily ensures compliance with the rules of legal ethics. Upsolve has no procedure for identifying, avoiding, or resolving conflicts of interest. And neither Upsolve's clients nor its nonlawyer advocates would be able to rely on the attorney-client privilege to shield confidential communications from third parties. More broadly, Upsolve has supplied no credible plan for overseeing its nonlawyer advocates, investigating possible wrongdoing, or enforcing its purported rules. The nonlawyer advocates would not be subject to professional sanctions, such as the suspension or revocation of a law license—at most, they might be denied further opportunities to volunteer for Upsolve. Nor would the nonlawyer advocates likely face civil liability, because Upsolve requires its clients to waive such claims. (J.A. 55.)

There is also no support for the district court's conclusion that Upsolve's program adequately protects the public from the dangers of incompetent legal counsel. The district court stated that Upsolve's nonlawyer advocates "must attend a training—designed by lawyers"

(J.A. 202)—but there is no evidence that the purported training was designed by lawyers. There also is no evidence concerning the content of the training, nor any proof that the training is sufficient to allow nonlawyer advocates to competently practice law.[19]

There also is no basis for the district court's suggestion that a nonlawyer advocate armed only with Upsolve's "limited legal training would logically protect clients' interests better than" having those clients proceed pro se or suffer default judgments. (*See* J.A. 202 n.13.) For one thing, those are not the only alternatives to plaintiffs' unlicensed legal counsel—as the district court acknowledged, low-income New Yorkers already have access to licensed lawyers at legal-aid organizations that "do not turn away clients." (J.A. 204.) Moreover, the training guide is riddled with problems. See *supra* at 12-19. And even to the extent that the guide may be accurate, "a little learning is a dangerous thing." *See*

---

[19] Upsolve has not disclosed the training guide's author(s). It has averred only that the training guide was "reviewed" (not written) by Tashi Lhewa of the Legal Aid Society and Pamela Foohey of the Cardozo School of Law (who is herself unauthorized to practice law in New York). (*See* J.A. 26, 108-111, 112-115.) Lhewa's and Foohey's declarations contain no meaningful analysis of the training guide and do not justify the conclusion that the guide would allow nonlawyers to render competent legal counsel. (*See* J.A. 110, 114.)

*Kolodziej v. Mason*, 774 F.3d 736, 745 (11th Cir. 2014) (quotation marks omitted). Upsolve's nonlawyer advocates, incorrectly believing themselves to be experts, may readily and overconfidently misadvise clients who would have made better choices acting on their own. And this is particularly so given that Upsolve calls for client consultations to last 20 minutes at most. (J.A. 47.) During such cursory consultations, nonlawyer advocates may easily misunderstand the facts, the nature of the asserted claims, the available defenses, or the procedural posture of a case. As a result, a nonlawyer advocate may readily give counsel that causes clients to waive meritorious defenses or take other harmful steps that would have been avoided by a licensed lawyer or even a pro se litigant who understands the facts of his own case.[20]

---

[20] The district court also suggested that "a non-lawyer who has handled 50 debt collection matters" might "provide better representation than a patent lawyer" (J.A. 202 n.13 (quotation marks omitted)), but plaintiffs have proffered only a single nonlawyer advocate, Udo-Okon. So far as the record shows, Udo-Okon has never handled a debt-collection matter and has no relevant education or expertise. A patent lawyer, moreover, would at minimum comprehend the basics of the court system—and (unlike Upsolve's nonlawyer advocates) would owe a professional obligation of competency that would require her to educate herself on the relevant legal topics before advising a client on a debt-collection matter. *See, e.g.*, Rules of Pro. Conduct r. 1.1(a) & cmts. 2, 4, 5.

65

### ii. The unauthorized-practice statutes are tailored to the State's interests.

Upsolve's program thus does not adequately protect the State's compelling interests in protecting the public from the dangers of unethical, incompetent, and unsupervised legal counsel provided by unlicensed nonlawyers. That being the case, the unauthorized-practice statutes are sufficiently tailored to the State's interests to survive intermediate or even strict scrutiny.

No "less restrictive alternative would serve the Government's purpose[s]" while allowing plaintiffs to practice law under the program that Upsolve has designed. *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000) (strict scrutiny standard); *see also Holder*, 561 U.S. at 36 (upholding content-based speech prohibition that was "necessary" to serve compelling government interests). There is no way to prevent plaintiffs from dispensing unlicensed and unregulated legal counsel other than prohibiting them from dispensing that counsel.

The district court erred in suggesting that the State's interests are adequately served by "tort remedies . . . that could apply to non-lawyers who harm their clients." (*See* J.A. 205.) Such remedies appear to be unavailable, as Upsolve's clients would be required to waive their rights

66

to pursue them. (J.A. 55.) And it is not clear that any tort remedy would be available even absent a disclaimer. Whereas attorneys are subject to a settled liability standard for professional malpractice (see *supra* at 6), no recognized standard of care governs an unlicensed nonlawyer advocate. It is likewise doubtful that plaintiffs would be considered their clients' fiduciaries—plaintiffs have never agreed to accept any such role. And in any event, there is no evidence that plaintiffs (a nonprofit and a pastor) have assets or insurance sufficient to satisfy claims that may arise against them.

The district court was also wrong to suggest that New York could satisfy its interests through "less restrictive alternatives" such as "targeted trainings or educational standards" or "narrower tailoring of New York's [unauthorized-practice] rules." (*See* J.A. 204-205.) Because this is an as-applied challenge based on the specific terms of Upsolve's proposed program, the strict-scrutiny tailoring question must be whether Upsolve's specific program satisfies the State's interests in competent and ethical legal representation. The answer to that question is "no," for the reasons explained above. Even under strict scrutiny, the First Amendment does not require the State to adopt a separate licensing tier designed by

Upsolve for persons who want to give legal counsel to debt-collection defendants in New York City Civil Court.

The tailoring requirement is even more clearly satisfied under intermediate scrutiny. Under that standard, "a regulation need not be the least speech-restrictive means of advancing the Government's interests." *Turner*, 512 U.S. at 662. A regulation is sufficiently tailored in this context so long as the "burden imposed" on speech rights is "congruent to the benefits [that the regulation] affords." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 215-16 (1997). A regulation is "not invalid" under intermediate scrutiny "simply because there is some imaginable alternative that might be less burdensome on speech." *Id.* at 217 (quotation marks omitted).

Here, the unauthorized-practice statutes burden speech only incidentally, and only to the extent necessary to serve the State's important government interests. While plaintiffs may not practice law, they remain free to speak on legal topics—such as by publishing books, articles, or litigation guides that address particular problems without specifically advising individual clients. *See Matter of Rowe*, 80 N.Y.2d at 342. Nor does anything stop plaintiffs from advocating for legislative or regulatory reform regarding debt-collection practices or litigation. Plaintiffs are also

free to refer those in need of legal counsel to licensed attorneys. Or plaintiffs could associate with licensed attorneys and thereby assist in the provision of lawfully rendered legal counsel.

The *only* speech plaintiffs cannot undertake is the distribution of legal counsel generated through the unauthorized practice of law. While "[a]nother state legislature might balance the interests differently," *CAI*, 922 F.3d at 209, this lawsuit is not the proper forum for enacting a sweeping change to the law governing lawyers. New York's 125-year-old attorney-licensing requirement comports with the First Amendment.

## B. The Public Interest and Balance of the Equities Strongly Weigh Against a Preliminary Injunction.

Reversal is also warranted because the public interest and balance of the equities weigh decisively against enjoining enforcement of the unauthorized-practice statutes. The injunction authorizes plaintiffs to dispense unlicensed and improperly supervised legal counsel to low-income debtors, exposing New Yorkers to significant litigation and economic risks. Particularly in view of its errors on the merits, the district court abused its discretion in reaching the contrary conclusion.

***Irreparable injury.*** The district court's only basis for finding irreparable injury was the purported violation of plaintiffs' First Amendment rights. (J.A. 206.) But plaintiffs are unlikely to establish any such violation and thus are unlikely to experience irreparable harm. *See, e.g.*, *SAM Party of N.Y. v. Kosinski*, 987 F.3d 267, 278 (2d Cir. 2021).

In any event, plaintiffs failed to establish that any potential irreparable injury is imminent or substantial enough to warrant the extraordinary remedy of a preliminary injunction. Plaintiffs have not shown that any prospective clients actually exist, let alone that any such client requires plaintiffs' immediate assistance. Plaintiffs thus failed to establish that the unauthorized-practice statutes are actually preventing them from engaging in speech that would otherwise occur. Without proof on this point, plaintiffs have not carried their burden "to demonstrate that irreparable injury is *likely* in the absence of an injunction." *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

***Public interest.*** The State has powerful and uncontroverted interests in protecting the public "from the dangers of legal representation and advice given by persons not trained, examined and licensed for such work." *El Gemayel*, 72 N.Y.2d at 705 (quotation marks omitted); *see*

*Goldfarb*, 421 U.S. at 792. The district court's injunction, if allowed to stand, would produce and multiply those dangers by allowing a corps of unidentified and unvetted nonlawyer advocates to provide unlicensed and unsupervised legal counsel—exposing vulnerable New Yorkers to "ignorance, inexperience and unscrupulousness." *See Alfani*, 227 N.Y. at 339. And the injunction will exacerbate these public harms by preventing the State from conducting meaningful oversight of plaintiffs' unlicensed legal practice.

Plaintiffs also have not shown that an injunction is necessary to allow debtors to find legal assistance. A variety of established legal-aid organizations already provide free legal advice through properly credentialed and regulated attorneys, and those organizations do not turn away clients. (J.A. 204.)

Finally, the injunction will encourage the proliferation of other unauthorized legal providers throughout the State—exposing more New Yorkers to harm. And the injunction will generate significant administrative and adjudicative burdens as more would-be providers seek their own "exceptions" to the State's licensing laws. The public interest weighs heavily against allowing plaintiffs (and others following in their footsteps)

to practice law beyond the reach of the State's legitimate regulatory oversight.

## CONCLUSION

The preliminary injunction should be reversed.

Dated:  New York, New York
       October 5, 2022

Respectfully submitted,

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Appellant


By:  */s/ Cleland B. Welton II*
     CLELAND B. WELTON II
     Assistant Solicitor General

BARBARA D. UNDERWOOD       28 Liberty Street
  *Solicitor General*           New York, NY 10005
JUDITH N. VALE             (212) 416-6197
  *Deputy Solicitor General*
CLELAND B. WELTON II
  *Assistant Solicitor General*
    *of Counsel*

72

# CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Kelly Cheung, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 13,991 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

 /s/ *Kelly Cheung*

# Addendum

 **American Justice Movement**

Mission     The Lawsuit     About     Media

Donate     Join

# American Justice Movement Tracking Form

Please use the form below to track the
legal advice you provide low-income
New Yorkers in your community.

You must be a trained Justice
Advocate, authorized by the
American Justice Movement, to use
this form. Use this form every time
you provide assistance.

Your Name

[                                        ]

Your Organization

[                                        ]

Your Physical Address

[                                        ]

Your Email Address

[                                        ]

Your Phone Number

[                                        ]

Name of Client

[                                        ]

Case 22-1345, Document 62, 10/05/2022, 3394395, Page88 of 95

## Phone Number of Client

[                                        ]

## Email Address of Client

[                                        ]

## Have you signed the Justice Advocate's Affidavit and are you a member of the American Justice Movement?

[ Select one...                        ▾ ]

## Did you receive a signed copy of the AJM user agreement from your client?

[ Select one...                        ▾ ]

Submit

Case 22-1345, Document 62, 10/05/2022, 3394395, Page89 of 95



Mission     The Lawsuit     About     Media

Donate     Join

# American Justice Movement Complaint Form

Please use the form below to file a complaint against a Justice Advocate who provided you with assistance under the American Justice Movement. We will investigate and follow up with you. Thank you so much.

Your Name

Your Address

Your Email Address

Your Phone Number

Justice Advocate Name

Justice Advocate Location/Organization

Justice Advocate Address

Case 22-1345, Document 62, 10/05/2022, 3394395, Page90 of 95

Please describe the alleged misconduct with
as much detail as possible. Include what
happened, where and when, the names and
contact information of any witnesses, what
was said, etc.

Example Text

Submit

 **AJM** American Justice Movement

Mission    The Lawsuit    About    Media    Donate    Join

## May 24, 2022 Update

As of a court ruling in SDNY on May 24, 2022, trained professionals in NYC who are not lawyers are able to provide vetted, monitored legal advice under the American Justice Movement program to low-income NYC residents facing debt collection lawsuits. If you are a public interest professional in NYC who is not a lawyer and you're interested in helping members of your community respond to debt collection lawsuits, please let us know.

## The Mission

Liz Jurado, a working mom in Bayshore, NY, was sued $12,000 by her anesthesiologist for a surprise medical bill she received after a routine epidural in childbirth.

Chris Lepre, a veteran and power plant technician, was unknowingly sold a broken car, financed with a high-interest loan from a subprime auto-lender, and then sued for over $15,000 – even though he gave the car back within three months.

William Evertson, a social worker in Brooklyn, was sued fraudulently by a large third-party debt buyer for a debt that was never his.

Liz, Chris, and William all could not afford legal fees to fight back when they were unjustly sued. And it was against the law for each of them to get free, routine legal advice from a trained social worker, patient advocate, or any other public interest professional who was not a lawyer.

Each of them automatically lost their case without the court considering any of the facts. Liz and William ended up filing bankruptcy. Chris had his wages garnished and borrowed from his 401(k) to make rent.

In America, you're only guaranteed a free lawyer in criminal cases, not the vast majority of civil cases. And there aren't close to enough free lawyers to meet the demand of every single person who needs legal help.

The American Justice Movement, launched in January 2022 by the nonprofit Upsolve, is **working to empower low-income families to get free, safe, and accountable legal advice from trained professionals in their communities who are not lawyers, called Justice Advocates**.

We're fighting for a new civil right: the right to access your rights, regardless of how much money is in your bank account. Justice Advocates include clergy members, social workers, community organizers, patient advocates, and other frontline professionals. Increasing the supply of free, safe help is the only way we can ever achieve equal rights for all.

Right now, we're focused on debt collection lawsuits in NY. Each year, about 4 million Americans are sued for their debt, often for debt that they don't actually owe or for the wrong amounts. Over 90% of people sued for their debt receive no legal advice at all. The downstream consequences can include hunger, homelessness, poverty, and even jail. This problem is urgent in 2022, as experts predict an onslaught of debt collection activity.

But every state in America has policies that make it illegal for low-income people to get free, vetted, and accountable legal advice from trained professionals in their communities who are not lawyers.

This is one of the fundamental civil rights injustices of our time. These policies restrict the supply of help available, perpetuate the imbalance of our justice system towards those who can afford legal fees, and guarantee that we'll never have equal rights under the law.

They're also unconstitutional.


Chris Lepre outside his home in Lynbrook, NY.


Liz Jurado inside her home in Bay Shore, NY.

## The Lawsuit

On January 25, 2022, Upsolve, the nonprofit launching the American Justice Movement, filed a First Amendment lawsuit against New York in Federal Court (SDNY). We're challenging the constitutionality of New York's laws that make it illegal for low-income people to get free, vetted, and accountable legal advice from trained professionals in their communities who are not lawyers. **See full challenge**. And here are the five amicus briefs filed in our suit from the NAACP, National Center for Access to Justice, Institute for Justice, 25 law professors, and Prof. Becky Sandefur.

Upsolve is joined as a plaintiff by Reverend John Udo-Okon, a pastor in the South Bronx who wants to provide free legal advice on debt collection lawsuits but cannot.

Liz Jurado, Chris Lepre, and William Evertson are all participating in the case, representing the millions of Americans each year whose lives are upended because they cannot afford legal fees.

Upsolve aims to vindicate the constitutional right to provide free, safe, and accountable legal advice – and the right of low-income Americans to receive this advice. We aim to create the volunteer firefighter equivalent in the law.

We're fighting to protect rights the Constitution already guarantees the Americans most in need – like the challengers in Miranda v. Arizona and Gideon v. Wainwright.

Recent filings and transcripts:

New York Attorney General Opposition Brief
(April 15, 2022)

Upsolve Response to New York Attorney General Brief
(May 2, 2022)

SDNY Oral Argument Transcript
(May 12, 2022)

Landmark 33-Page Opinion in SDNY
(May 24, 2022)

"It is vitally important that low-income individuals get the help they need when trying to respond to debt collection actions. Black Americans are more likely to face these actions, and they're more likely to have to do so without being able to call on a lawyer. The rules surrounding the practice of law should make it easier, not harder, to redress this problem by ensuring access to high quality legal help for those who need it." - Janette Wallace, NAACP General Counsel

"Upsolve's lawsuit matters to millions of people nationwide who need basic legal advice and can't get it. The only things laws like New York's achieve is ensuring that ordinary people who most need help can't get practical advice from people who are willing to give it." - Robert McNamara, Institute for Justice Senior Attorney



Rev. John Udo-Okon outside his church in the South Bronx.

## Join the Movement

Please sign up below to join our movement and stay in touch.

If you're a New York resident and interested in being a Justice Advocate or receiving free legal advice on your debt collection lawsuit, please let us know below. We're unable to conduct trainings or provide access to advice as of now, given NY state laws.

Name

Email Address

Organization

Select one...

Submit

## About Upsolve

Upsolve is a 501(c)(3) nonprofit, based in NYC, with the mission of helping Americans access their civil legal rights for free and achieve economic mobility, using technology, education, community, and advocacy. Upsolve's first project was an online web application to help families file bankruptcy on their own for free, which has relieved over $400M in debt for families facing medical bills and other financial shocks. Upsolve also provides free financial and legal education that reaches 2 million individuals per year. Upsolve donors include Jack Dorsey, Emergent Ventures at the Mercatus Center, Eric & Wendy Schmidt, Jim Breyer, Chris Sacca, Scott & Cyan Banister, the Robin Hood Foundation, and Y Combinator. In 2020, TIME named Upsolve one of the Best Inventions of the Year. Upsolve launched the American Justice Movement in 2022 to empower low-income families to get free, safe, and accountable legal advice from trained frontline professionals.

## Media Resources

For media inquiries, please contact Natalie Trono at natalie@upsolve.org. See **press kit**.

Sign-up to get updates on news on our work and our case.

**Email Address**

**Outlet**

Submit

## Donate

To donate by card, please visit upsolve.org/donate. To donate by check, wire, stock, or other way, please email rohan@upsolve.org.

## Additional Resources

Full Case Papers: Upsolve v. New York (Filed Jan 25, 2022)

TED Talk: An app that empowers people to solve their legal problems (1.4M+ views)

We Need a New Civil Right (CNN Opinion, Joe Kennedy & Rohan Pavuluri)

Unauthorized Practice Of Law' Rules Promote Racial Injustice (Law360, Rohan Pavuluri)

Civil Justice for All (American Academy of Arts & Sciences)

Give People the Law (Democracy Journal, Vivek Maru)

Legal Advice from Nonlawyers (Stanford Journal of Civil Rights & Civil Liberties, Rebecca Sandefur)

How Debt Collectors Are Transforming the Business of State Courts (Pew)

Rubber Stamp Justice US Courts, Debt Buying Corporations, and the Poor (Human Rights Watch)

Case 22-1345, Document 62, 10/05/2022, 3394395, Page94 of 95

File Bankruptcy for Free | TurboTax for Bankruptcy | Upsolve

 **UPSOLVE** Civil Rights Should Be Free     **TIME** 2020 Best Invention     About Bankruptcy     How to File     How it's Free     Learn ⌄     🔍 Login     [ Free Filing Tool › ]

Careers / Justice Fellow

# Upsolve Justice Fellow (Full-Time)

### In a Nutshell

Upsolve is an award-winning nonprofit that helps low-income families file for both bankruptcy and immigration for free using technology. To date, Upsolve has relieved over $500 million in debt for low-income families trapped in debt from medical bills, predatory loans, and layoffs and has helped hundreds of immigrant families obtain work permits. We combine the scale of tech startups with the quantifiable impact of the most effective nonprofits.

 Written by **Upsolve Team.**
Updated August 18, 2022

### About Upsolve

Upsolve is one of the leading civil rights and technology-focused nonprofits in the United States. Our mission is to help low-income families access the law, so they can achieve economic mobility. Launched nationally in 2019, Upsolve has relieved over $500M in debt for Americans through its free "TurboTax for bankruptcy" app. Upsolve also provides educational content that reaches over 3M Americans every year.

In 2022, Upsolve launched the American Justice Movement project to empower low-income New York residents who have been sued for their debt to get free legal advice from Justice Advocates in their community. To learn more:

- They Need Legal Advice on Debts. Should It Have to Come From Lawyers? (NY Times)
- Kudos to Upsolve for fighting to provide debt-collection advice (NY Daily News)
- American Justice Movement (Project Site)

### About the Fellowship

Upsolve is hiring a full-time Justice Fellow to support our new American Justice Movement project. You will be responsible for finding low-income New York residents who need help and connecting them with trained Justice Advocates. You will also be responsible for providing feedback to our product & engineering team on how to improve the technology that we're building to support the training, matching, and advice-giving process.

You're a good fit if you are passionate about social justice and building a more equitable legal system. Our Fellowship is open to all kinds of individuals from various career backgrounds, whether you are a recent college graduate who is planning to attend law school or a working professional interested in growing your career as a social entrepreneur and advocate for justice.

The initial term for this fellowship is 6 months and you will receive a stipend of $5,000/month. You may have the opportunity to grow into another role at Upsolve, based on your performance.

### Requirements

You should have a commitment to social justice, be comfortable using technology, be able to start full-time in September 2022, have a strong sense of organization, have a high degree of personal autonomy, and have a bias towards action. We prefer that you live in New York City, but it's not required. This job doesn't require a legal degree.

### How to Apply

Please email your resume and two paragraphs that tell us (1) why you're a good fit, and (2) why you want to lead this work. Please send your email to jonathan@upsolve.org, fernando@upsolve.org, and rohan@upsolve.org. We look forward to hearing from you by 8/26!

↑ Back to top     Share Article ↗

    

Case 22-1345, Document 62, 10/05/2022, 3394895, Page95 of 95

File Bankruptcy for Free | TurboTax for Bankruptcy | Upsolve

**Upsolve is a 501(c)(3) nonprofit that started in 2016.** Our mission is to help low-income families who cannot afford lawyers file bankruptcy for free, using an online web app. Spun out of Harvard Law School, our team includes lawyers, engineers, and judges. We have world-class funders that include the U.S. government, former Google CEO Eric Schmidt, and leading foundations. It's one of the greatest civil rights injustices of our time that low-income families can't access their basic rights when they can't afford to pay for help. Combining direct services and advocacy, we're fighting this injustice.

To learn more, read why we started Upsolve in 2016, our reviews from past users, and our press coverage from places like the New York Times and Wall Street Journal.

| Upsolve | Need help? | Policies & Privacy | Made in NYC |
|---|---|---|---|
| Team | Learning Center | Terms of Service | f Facebook |
| Press | Browse Articles and Pages | Terms of Use | Twitter |
| Donate | Legal Definitions | Privacy Policy | Youtube |
| Careers | | Editorial Policy | Charity Navigator |
| Policy Platform | | | Guidestar |
| Our Story | | | **Mailing Address** |
| Contact Us | | | Upsolve |
| | | | 205 Hudson St., 7th Floor |
| | | | New York, NY 10013 |

© 2022 Upsolve. Upsolve Inc., EIN 82-1736267, is a registered nonprofit 501(c)(3) organization. Although many of Upsolve's informational articles are drafted or reviewed by attorneys, Upsolve is not a law firm or a substitute for an attorney or law firm. Upsolve provides an online web app that helps you file for bankruptcy for free on your own, if you have a simple case and pass our eligibility criteria. We do not provide any form of legal advice and absolutely no communication between you and Upsolve should be considered legal advice. If you do not qualify for our free web app or you do not want to use it, we provide access to private independent attorneys at your specific direction. Attorneys pay Upsolve for the chance to provide free evaluations to people who ask for them, which helps keep our web app free. By using Upsolve, you do not enter any form of attorney-client relationship with Upsolve. Your access to the website is subject to our Terms of Use.

ADD9