# 22-1345

## United States Court of Appeals for the Second Circuit

UPSOLVE, INC., REVEREND JOHN UDO-OKON,

*Plaintiffs-Appellees,*

v.

LETITIA JAMES, in her official capacity as Attorney General of New York,

*Defendant-Appellant.*

On Appeal from the United States District Court for the Southern District of New York

## JOINT APPENDIX

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

LETITIA JAMES
  *Attorney General*
  *State of New York*
28 Liberty Street
New York, NY 10005
(212) 416-8020

*Attorney for Appellees*

*Attorney for Appellant*

# TABLE OF CONTENTS

PAGE

Docket Report, dated Sept. 7, 2022....................................................................A1

Complaint, dated Jan. 25, 2022 ......................................................................A9

    Ex. A  -  Form of Written Answer, Consumer Credit Transaction
            (n.d.) ........................................................................A39

    Ex. B  -  American Justice Movement, *Justice Advocate Training
            Guide, New York City* (n.d.)....................................A41

Declaration of Gregory Silbert in Support of Plaintiffs' Motion
for a Preliminary Injunction, dated Jan. 25, 2022

    Ex. 1  -  Declaration of Rohan Pavuluri, dated Jan. 10, 2022............A60

        Ex. 1A  -  American Justice Movement, *Action Plan* (n.d.) ...........A70

    Ex. 2  -  Declaration of Rev. John Udo-Okon, dated Dec. 15, 2021.......A79

        Ex. 2A  -  Petition with Signatures (n.d.) ......................................A87

    Ex. 3  -  Declaration of Tashi Lhewa, dated Dec. 9, 2021................A108

    Ex. 4  -  Declaration of Pamela Foohey, dated Dec. 20, 2021...........A112

    Ex. 5  -  Declaration of William Evertsen, dated Dec. 23, 2021.......A116

    Ex. 6  -  Declaration of Liz Jurado, dated Dec. 23, 2021 .................A120

    Ex. 7  -  Declaration of Christopher Lepre, dated Jan. 18, 2022 .....A126

Oral Argument Transcript, dated May 12, 2022 ........................................A132

Opinion and Order, dated May 24, 2022 ....................................................A176

Notice of Appeal, dated June 22, 2022 .......................................................A209

Order Staying Proceedings, dated July 13, 2022 .......................................A210

STAYED,APPEAL,ECF

## U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:22−cv−00627−PAC

| | |
|---|---|
| Upsolve, Inc. et al v. James | Date Filed: 01/25/2022 |
| Assigned to: Judge Paul A. Crotty | Jury Demand: None |
| Cause: 42:1983 Civil Rights Act | Nature of Suit: 440 Civil Rights: Other |
| | Jurisdiction: Federal Question |

| Date Filed | # | Docket Text |
|---|---|---|
| 01/25/2022 | 1 | COMPLAINT against Letitia James. (Filing Fee $ 402.00, Receipt Number ANYSDC−25630458)Document filed by Upsolve, Inc., Rev. John Udo−Okon. (Attachments: # 1 Exhibit A − Answer Form, # 2 Exhibit B − Training Guide).(Silbert, Gregory) (Entered: 01/25/2022) |
| 01/25/2022 | 2 | CIVIL COVER SHEET filed..(Silbert, Gregory) (Entered: 01/25/2022) |
| 01/25/2022 | 3 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Rev. John Udo−Okon, Upsolve, Inc...(Silbert, Gregory) (Entered: 01/25/2022) |
| 01/25/2022 | 4 | **FILING ERROR − DEFICIENT SUMMONS REQUEST − PDF ERROR** REQUEST FOR ISSUANCE OF SUMMONS as to Letitia James, Attorney General of the State of New York, re: 1 Complaint. Document filed by Rev. John Udo−Okon, Upsolve, Inc...(Silbert, Gregory) Modified on 1/26/2022 (sj). (Entered: 01/25/2022) |
| 01/25/2022 | 5 | MOTION for Preliminary Injunction . Document filed by Rev. John Udo−Okon, Upsolve, Inc...(Silbert, Gregory) (Entered: 01/25/2022) |
| 01/25/2022 | 6 | MEMORANDUM OF LAW in Support re: 5 MOTION for Preliminary Injunction . . Document filed by Rev. John Udo−Okon, Upsolve, Inc...(Silbert, Gregory) (Entered: 01/25/2022) |
| 01/25/2022 | 7 | DECLARATION of Gregory Silbert in Support re: 5 MOTION for Preliminary Injunction .. Document filed by Rev. John Udo−Okon, Upsolve, Inc.. (Attachments: # 1 Exhibit 1 − Rohan Pavuluri Declaration, # 2 Exhibit 2 − Rev. John Udo−Okon Declaration (Part 1), # 3 Exhibit 2 −Rev. John Udo−Okon Declaration (Part 2), # 4 Exhibit 2 − Rev. John Udo−Okon Declaration (Part 3), # 5 Exhibit 3 − Professor Tashi Lhewa Declaration, # 6 Exhibit 4 − Professor Pamela Foohey Declaration, # 7 Exhibit 5 − William "Tyler" Evertsen Declaration, # 8 Exhibit 6 − Liz Jurado Declaration, # 9 Exhibit 7 − Christopher Lepre Declaration).(Silbert, Gregory) (Entered: 01/25/2022) |
| 01/25/2022 | 8 | NOTICE OF APPEARANCE by Gregory Stewart Silbert on behalf of Rev. John Udo−Okon, Upsolve, Inc...(Silbert, Gregory) (Entered: 01/25/2022) |
| 01/25/2022 | 9 | NOTICE OF APPEARANCE by Robert Niles−Weed on behalf of Rev. John Udo−Okon, Upsolve, Inc...(Niles−Weed, Robert) (Entered: 01/25/2022) |
| 01/25/2022 | 10 | NOTICE OF APPEARANCE by Elena De Santis on behalf of Rev. John Udo−Okon, Upsolve, Inc...(De Santis, Elena) (Entered: 01/25/2022) |
| 01/25/2022 | 11 | MOTION for Zachary D. Tripp to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−25631647. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Rev. John Udo−Okon, Upsolve, Inc.. (Attachments: # 1 Affidavit in support, # 2 Exhibit New York Certificate of Good Standing, # 3 Exhibit DC Certificate of Good Standing, # 4 Text of Proposed Order).(Tripp, Zachary) (Entered: 01/25/2022) |
| 01/25/2022 | 12 | NOTICE OF APPEARANCE by Zachary Tripp on behalf of Rev. John Udo−Okon, Upsolve, Inc...(Tripp, Zachary) (Entered: 01/25/2022) |
| 01/25/2022 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 11 MOTION for Zachary D. Tripp to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−25631647. Motion and supporting papers to be** |

| | | |
|---|---|---|
| | | reviewed by Clerk's Office staff.. **The document has been reviewed and there are no deficiencies. (aea)** (Entered: 01/25/2022) |
| 01/26/2022 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above−entitled action is assigned to Judge Paul A. Crotty. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district−judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf−related−instructions..(sj) (Entered: 01/26/2022) |
| 01/26/2022 | | Magistrate Judge Sarah L. Cave is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018−06/AO−3.pdf. (sj) (Entered: 01/26/2022) |
| 01/26/2022 | | Case Designated ECF. (sj) (Entered: 01/26/2022) |
| 01/26/2022 | | **\*\*\*NOTICE TO ATTORNEY REGARDING DEFICIENT REQUEST FOR ISSUANCE OF SUMMONS. Notice to Attorney Gregory Stewart Silbert to RE−FILE Document No. 4 Request for Issuance of Summons. The filing is deficient for the following reason(s): the PDF attached to the docket entry for the issuance of summons is not correct; the date field on the offical A.O. Summons form was completed by the attorney. Re−file the document using the event type Request for Issuance of Summons found under the event list Service of Process − select the correct filer/filers − and attach the correct summons form PDF. (sj)** (Entered: 01/26/2022) |
| 01/26/2022 | 13 | REQUEST FOR ISSUANCE OF SUMMONS as to Letitia James, Attorney General of the State of New York, re: 1 Complaint. Document filed by Rev. John Udo−Okon, Upsolve, Inc...(Silbert, Gregory) (Entered: 01/26/2022) |
| 01/26/2022 | | Notice of Conference: A Scheduling Conference is scheduled to go forward on: Tuesday, February 1, 2022 @ 3:00 PM, via teleconference before Judge Paul A. Crotty. Dial−in: 888−363−4749. Access: 8539662. Plaintiff is directed to serve a copy of this notice on the Defendant. If the date is not convenient, either party can e−mail three (3) mutually convenient dates to the Courtroom Deputy at: David_C_Gonzalez@nysd.uscourts.gov −−−− A PDF IS NOT ATTACHED TO THIS ENTRY −−−− (By: David Gonzalez − Courtroom Deputy).(dgo) (Entered: 01/26/2022) |
| 01/27/2022 | 14 | ELECTRONIC SUMMONS ISSUED as to Letitia James. (sj) (Entered: 01/27/2022) |
| 01/31/2022 | 15 | SUMMONS RETURNED EXECUTED. Letitia James served on 1/28/2022, answer due 2/18/2022. Service was accepted by Lorraine Wright, Legal Secretary. Document filed by Upsolve, Inc.; Rev. John Udo−Okon..(Silbert, Gregory) (Entered: 01/31/2022) |
| 01/31/2022 | 16 | AFFIDAVIT OF SERVICE of Motion for Preliminary Injunction and Notice of Conference served on Defendant Letitia James, in her official capacity as Attorney General of the State of New York on 01/28/2022. Service was accepted by Lorraine Wright, Legal Secretary. Document filed by Rev. John Udo−Okon, Upsolve, Inc...(Silbert, Gregory) (Entered: 01/31/2022) |
| 02/01/2022 | 17 | NOTICE OF APPEARANCE by Matthew Joseph Lawson on behalf of Letitia James..(Lawson, Matthew) (Entered: 02/01/2022) |
| 02/01/2022 | | Minute Entry for proceedings held before Judge Paul A. Crotty: Scheduling Conference held on 2/1/2022. REMARK: All counsel of record on the docket appeared for the parties. The Court set the following schedules: The Defendant's reply to the PI is due by March 11, 2022. Replies are due by March 28, 2022. Defendant's Answer deadline is extended to 10−days after a decision on the PI.See transcript for details. (Court Reporter Kris Sellin) (dgo) (Entered: 02/01/2022) |
| 02/24/2022 | 18 | ORDER granting 11 Motion for Zachary D. Tripp to Appear Pro Hac Vice. (HEREBY ORDERED by Judge Paul A. Crotty)(Text Only Order) (dgo) (Entered: 02/24/2022) |

| 02/25/2022 | 19 | NOTICE OF APPEARANCE by William R. Aronin on behalf of Institute for Justice..(Aronin, William) (Entered: 02/25/2022) |
|---|---|---|
| 02/25/2022 | 20 | LETTER addressed to Judge Paul A. Crotty from William R. Aronin, Counsel for Amicus Curiae Institute for Justice dated February 25, 2022 re: Pre−Motion Conference Request. Document filed by Institute for Justice..(Aronin, William) (Entered: 02/25/2022) |
| 02/28/2022 | | DOCKET ANNOTATION: There is no need for a pre−motion conference. The Institute For Justice may file their amicus brief. The parties are directed to meet and confer on a briefing schedule. The proposed schedule is due by March 3, 2022. SO ORDERED.(dgo) (Entered: 02/28/2022) |
| 03/01/2022 | 21 | NOTICE OF APPEARANCE by Daniel Adam Rubens on behalf of NAACP, NAACP New York State Conference..(Rubens, Daniel) (Entered: 03/01/2022) |
| 03/01/2022 | 22 | MOTION for Jodie C. Liu to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−25799502. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by NAACP, NAACP New York State Conference. (Attachments: # 1 Affidavit of Jodie C. Liu in Support, # 2 Certificate of Good Standing − NY, # 3 Text of Proposed Order).(Liu, Jodie) (Entered: 03/01/2022) |
| 03/01/2022 | 23 | MOTION for Sarah H. Sloan to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−25799971. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by NAACP, NAACP New York State Conference. (Attachments: # 1 Affidavit of Sarah H. Sloan in Support, # 2 Certificate of Good Standing − DC, # 3 Certificate of Good Standing − NY, # 4 Text of Proposed Order).(Sloan, Sarah) (Entered: 03/01/2022) |
| 03/01/2022 | 24 | MOTION for Joseph R. Schottenfeld to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−25799955. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by NAACP, NAACP New York State Conference. (Attachments: # 1 Affidavit, # 2 Exhibit, # 3 Text of Proposed Order).(Schottenfeld, Joseph) (Entered: 03/01/2022) |
| 03/01/2022 | 25 | MOTION to File Amicus Brief . Document filed by NAACP, NAACP New York State Conference. (Attachments: # 1 Amicus Curiae Brief).(Rubens, Daniel) (Entered: 03/01/2022) |
| 03/01/2022 | 26 | MEMORANDUM OF LAW in Support re: 25 MOTION to File Amicus Brief . . Document filed by NAACP, NAACP New York State Conference..(Rubens, Daniel) (Entered: 03/01/2022) |
| 03/01/2022 | 27 | MOTION to File Amicus Brief . Document filed by National Center for Access to Justice..(Udell, David) (Entered: 03/01/2022) |
| 03/01/2022 | 28 | DECLARATION of David S. Udell in Support re: 27 MOTION to File Amicus Brief .. Document filed by National Center for Access to Justice. (Attachments: # 1 Exhibit A − Proposed Amicus Brief, # 2 Exhibit B − Disclosure Statement, # 3 Exhibit C − Proposed Order).(Udell, David) (Entered: 03/01/2022) |
| 03/01/2022 | 29 | MEMORANDUM OF LAW in Support re: 27 MOTION to File Amicus Brief . . Document filed by National Center for Access to Justice..(Udell, David) (Entered: 03/01/2022) |
| 03/02/2022 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 22 MOTION for Jodie C. Liu to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−25799502. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bcu)** (Entered: 03/02/2022) |
| 03/02/2022 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 23 MOTION for Sarah H. Sloan to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−25799971. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bcu)** (Entered: 03/02/2022) |

| | | |
|---|---|---|
| 03/02/2022 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 24 MOTION for Joseph R. Schottenfeld to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−25799955. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (bcu)** (Entered: 03/02/2022) |
| 03/02/2022 | 30 | ORDER granting 22 Motion for Jodie C. Liu to Appear Pro Hac Vice. (HEREBY ORDERED by Judge Paul A. Crotty)(Text Only Order) (dgo) (Entered: 03/02/2022) |
| 03/02/2022 | 31 | ORDER granting 23 Motion for Sarah H. Sloan to Appear Pro Hac Vice. (HEREBY ORDERED by Judge Paul A. Crotty)(Text Only Order) (dgo) (Entered: 03/02/2022) |
| 03/02/2022 | 32 | ORDER granting 24 Motion for Joseph R. Schottenfeld to Appear Pro Hac Vice (HEREBY ORDERED by Judge Paul A. Crotty)(Text Only Order) (dgo) (Entered: 03/02/2022) |
| 03/02/2022 | 33 | NOTICE OF APPEARANCE by Richard Christopher St. John on behalf of Law Professors..(St. John, Richard) (Entered: 03/02/2022) |
| 03/02/2022 | 34 | MOTION to File Amicus Brief . Document filed by Law Professors. (Attachments: # 1 Exhibit Exhibit A − Brief of Amici Curiae, # 2 Text of Proposed Order).(St. John, Richard) (Entered: 03/02/2022) |
| 03/02/2022 | 35 | MEMORANDUM OF LAW in Support re: 34 MOTION to File Amicus Brief . . Document filed by Law Professors..(St. John, Richard) (Entered: 03/02/2022) |
| 03/02/2022 | 36 | ORDER: granting 34 Letter Motion to File Amicus Brief. ORDERED, that parties shall file letter by March 18, 2022 containing suggested independent third parties, if any, who should be asked to file briefs regarding the legal and practical effects of applying New York's Unauthorized Practice of Law rules to the proposed activities at issue. SO ORDERED. (Signed by Judge Paul A. Crotty on 3/02/2022) (ama) (Entered: 03/02/2022) |
| 03/02/2022 | 37 | NOTICE OF APPEARANCE by Peter Karanjia on behalf of Rebecca L. Sandefur..(Karanjia, Peter) (Entered: 03/02/2022) |
| 03/02/2022 | 38 | MOTION for Leave to File Amicus Brief *of Rebecca L. Sandefur in Support of Plaintiffs' Motion for Preliminary Injunction*. Document filed by Rebecca L. Sandefur. (Attachments: # 1 Proposed Amicus Brief, # 2 Text of Proposed Order).(Karanjia, Peter) (Entered: 03/02/2022) |
| 03/02/2022 | 39 | MEMORANDUM OF LAW in Support re: 38 MOTION for Leave to File Amicus Brief *of Rebecca L. Sandefur in Support of Plaintiffs' Motion for Preliminary Injunction*. . Document filed by Rebecca L. Sandefur..(Karanjia, Peter) (Entered: 03/02/2022) |
| 03/02/2022 | 40 | DECLARATION of Peter Karanjia in Support re: 38 MOTION for Leave to File Amicus Brief *of Rebecca L. Sandefur in Support of Plaintiffs' Motion for Preliminary Injunction*.. Document filed by Rebecca L. Sandefur..(Karanjia, Peter) (Entered: 03/02/2022) |
| 03/03/2022 | 41 | MOTION for David Halleck Fry to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−25809936. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Law Professors. (Attachments: # 1 Affidavit of David H. Fry in support of Motion for Admission Pro Hac Vice, # 2 Text of Proposed Order Granting Motion for Admission Pro Hac vice).(Fry, David) (Entered: 03/03/2022) |
| 03/03/2022 | 42 | MOTION for Andrew T. Nguyen to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−25810234. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Law Professors. (Attachments: # 1 Affidavit Affidavit of Andrew T. Nguyen, # 2 Exhibit Certificate of Good Standing, # 3 Text of Proposed Order).(Nguyen, Andrew) (Entered: 03/03/2022) |
| 03/03/2022 | 43 | MOTION for Paul M. Sherman to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−25811597. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Institute for Justice. (Attachments: # 1 Exhibit A − Certificate of Good Standing, # 2 Exhibit B − Affidavit of Paul M. Sherman in Support of Motion for Admission Pro Hac Vice, # 3 Text of Proposed |

| | | |
|---|---|---|
| | | Order).(Sherman, Paul) (Entered: 03/03/2022) |
| 03/03/2022 | 44 | MOTION for Robert J. McNamara to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−25811705. **Motion and supporting papers to be reviewed by Clerk's Office staff.** Document filed by Institute for Justice. (Attachments: # 1 Exhibit A − Certificate of Good Standing, # 2 Exhibit B − Affidavit of Robert J. McNamara in Support of Motion for Admission Pro Hac Vice, # 3 Text of Proposed Order).(McNamara, Robert) (Entered: 03/03/2022) |
| 03/03/2022 | 45 | MEMORANDUM OF LAW in Support re: 5 MOTION for Preliminary Injunction . . Document filed by Institute for Justice..(Aronin, William) (Entered: 03/03/2022) |
| 03/03/2022 | 46 | LETTER MOTION for Extension of Time to File *Opposition to Motion for Preliminary Injunction and Response to the Court's Request for a Briefing Schedule on the Amicus Brief Filed by the Institute for Justice* addressed to Judge Paul A. Crotty from Matthew J. Lawson dated March 3, 2022. Document filed by Letitia James..(Lawson, Matthew) (Entered: 03/03/2022) |
| 03/04/2022 | 47 | ORDER granting 46 Letter Motion for Extension of Time to File. The requested three week extension to file an opposition after the amicus briefs are filed is granted. SO ORDERED.. (Signed by Judge Paul A. Crotty on 3/4/2022) (ks) (Entered: 03/04/2022) |
| 03/04/2022 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 41 MOTION for David Halleck Fry to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−25809936. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (vba)** (Entered: 03/04/2022) |
| 03/04/2022 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 42 MOTION for Andrew T. Nguyen to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−25810234. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (vba)** (Entered: 03/04/2022) |
| 03/04/2022 | | **>>>NOTICE REGARDING PRO HAC VICE MOTION. Regarding Document No. 43 MOTION for Paul M. Sherman to Appear Pro Hac Vice . Filing fee $ 200.00, receipt number ANYSDC−25811597. Motion and supporting papers to be reviewed by Clerk's Office staff.. The document has been reviewed and there are no deficiencies. (vba)** (Entered: 03/04/2022) |
| 03/11/2022 | 48 | ORDER granting 41 Motion for David Halleck Fry to Appear Pro Hac Vice. (HEREBY ORDERED by Judge Paul A. Crotty)(Text Only Order) (dgo) (Entered: 03/11/2022) |
| 03/11/2022 | 49 | ORDER granting 42 Motion for Andrew T. Nguyen to Appear Pro Hac Vice. (HEREBY ORDERED by Judge Paul A. Crotty)(Text Only Order) (dgo) (Entered: 03/11/2022) |
| 03/11/2022 | 50 | ORDER granting 43 Motion for Paul M. Sherman to Appear Pro Hac Vice. (HEREBY ORDERED by Judge Paul A. Crotty)(Text Only Order) (dgo) (Entered: 03/11/2022) |
| 03/11/2022 | 51 | ORDER granting 44 Motion for Robert J. McNamara to Appear Pro Hac Vice. (HEREBY ORDERED by Judge Paul A. Crotty)(Text Only Order) (dgo) (Entered: 03/11/2022) |
| 03/11/2022 | 52 | LETTER addressed to Judge Paul A. Crotty from Gregory Silbert dated March 11, 2022 re: Independent Third Parties. Document filed by Upsolve, Inc...(Silbert, Gregory) (Entered: 03/11/2022) |
| 03/14/2022 | | DOCKET ANNOTATION: The Court is in receipt of multiple Amicus Curiae briefs and they are deemed accepted by the Court. Any further Amicus Cariae briefs are due no later than March 28, 2022. The Defendant's opposition is due by April 18, 2022. SO ORDERED.(dgo) (Entered: 03/14/2022) |
| 03/16/2022 | 53 | LETTER addressed to Judge Paul A. Crotty from Matthew J. Lawson dated March 16, 2022 re: Independent Third Parties Who May Wish to File an Amicus Curiae Brief. Document filed by Letitia James..(Lawson, Matthew) (Entered: 03/16/2022) |

| | | |
|---|---|---|
| 03/17/2022 | 54 | NOTICE OF APPEARANCE by Matthew D. Brinckerhoff on behalf of Advocate Amici..(Brinckerhoff, Matthew) (Entered: 03/17/2022) |
| 03/17/2022 | 55 | LETTER MOTION for Extension of Time *to File Amicus Brief* addressed to Judge Paul A. Crotty from Matthew D. Brinckerhoff dated 3/17/2022. Document filed by Advocate Amici..(Brinckerhoff, Matthew) (Entered: 03/17/2022) |
| 03/17/2022 | 56 | ORDER: granting 55 Letter Motion for Extension of Time. Advocate Amici may file their brief by April 13, 2022. SO ORDERED. Brief due by 4/13/2022. (Signed by Judge Paul A. Crotty on 3/17/2022) (ama) (Entered: 03/17/2022) |
| 04/13/2022 | 57 | MEMORANDUM OF LAW in Opposition re: 5 MOTION for Preliminary Injunction . *On Behalf of Amici Curiae Consumer Law Experts, Civil Legal Services Organizations and Civil Rights Organizations ("Advocate Amici")*. Document filed by Advocate Amici..(Brinckerhoff, Matthew) (Entered: 04/13/2022) |
| 04/15/2022 | 58 | MEMORANDUM OF LAW in Opposition re: 5 MOTION for Preliminary Injunction . . Document filed by Letitia James..(Lawson, Matthew) (Entered: 04/15/2022) |
| 04/18/2022 | 59 | LETTER MOTION for Extension of Time to File Response/Reply *(Extension of time to submit a reply in support of Plaintiffs' Motion for a Preliminary Injunction)* addressed to Judge Paul A. Crotty from Gregory Silbert dated April 18, 2022., LETTER MOTION for Oral Argument *(Court schedule oral argument on the Motion)* addressed to Judge Paul A. Crotty from Gregory Silbert dated April 18, 2022. Document filed by Rev. John Udo−Okon, Upsolve, Inc...(Silbert, Gregory) (Entered: 04/18/2022) |
| 04/19/2022 | 60 | ORDER granting 59 Letter Motion for Extension of Time to File Response/Reply re 59 . The requested extension to May 2, 2022 is granted. Oral argument will be held on Thursday, May 12, 2022 at 11:30 AM in courtroom 14−C. SO ORDERED. (HEREBY ORDERED by Judge Paul A. Crotty)(Text Only Order) (dgo) (Entered: 04/19/2022) |
| 05/02/2022 | 61 | NOTICE OF APPEARANCE by Elizabeth Grefrath−Sessions on behalf of Rev. John Udo−Okon, Upsolve, Inc...(Grefrath−Sessions, Elizabeth) (Entered: 05/02/2022) |
| 05/02/2022 | 62 | REPLY MEMORANDUM OF LAW in Support re: 5 MOTION for Preliminary Injunction . . Document filed by Rev. John Udo−Okon, Upsolve, Inc...(Silbert, Gregory) (Entered: 05/02/2022) |
| 05/10/2022 | 63 | ERWIN ROSENBERG'S MOTION FOR PERMISSIVE INTERVENTION, re: to Intervene purs. to Rule 24(b).(sc) (Entered: 05/10/2022) |
| 05/12/2022 | | CALENDAR ENTRY **REMINDER**: Oral Argument scheduled to go forward today: Thursday, May 12, 2022 @ 11:30 AM, 500 Pearl Street, Courtroom 14−C before Judge Paul A. Crotty, U.S.D.J. ――― A PDF IS NOT ATTACHED TO THIS ENTRY ――― (By David Gonzalez − Courtroom Deputy). (dgo) (Entered: 05/12/2022) |
| 05/12/2022 | | Minute Entry for proceedings held before Judge Paul A. Crotty: Oral Argument held on 5/12/2022 re: 5 MOTION for Preliminary Injunction . filed by Rev. John Udo−Okon, Upsolve, Inc.. REMARK: Counsel for both sides appeared. The Court heard argument from both sides and will render a decision on the request for a PI in due time. See transcript for details. (Court Reporter Raquel Robbles) (dgo) (Entered: 05/16/2022) |
| 05/23/2022 | 64 | ERWIN ROSENBERG'S AMENDED MOTION FOR PERMISSIVE INTERVENTION.(sc) Modified on 5/24/2022 (sc). (Entered: 05/23/2022) |
| 05/23/2022 | 65 | RESPONSE in Opposition to Motion re: 64 MOTION to Intervene., 63 MOTION to Intervene. . Document filed by Rev. John Udo−Okon, Upsolve, Inc...(Silbert, Gregory) (Entered: 05/23/2022) |
| 05/24/2022 | 66 | TRANSCRIPT of Proceedings re: Oral Argument held on 5/12/2022 before Judge Paul A. Crotty. Court Reporter/Transcriber: Raquel Robles, (212) 805−0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/14/2022. Redacted Transcript Deadline set for 6/24/2022. Release of Transcript Restriction set for 8/22/2022..(Moya, Goretti) (Entered: 05/24/2022) |

| 05/24/2022 | 67 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a Oral Argument proceeding held on 5/12/2022 has been filed by the court reporter/transcriber in the above−captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 05/24/2022) |
|---|---|---|
| 05/24/2022 | 68 | OPINION & ORDER re: 5 MOTION for Preliminary Injunction . filed by Rev. John Udo−Okon, Upsolve, Inc.. Plaintiffs' motion for a preliminary injunction is GRANTED. The parties are directed to jointly submit a Civil Case Management Plan in accordance with the Court's Individual Practices by June 3, 2022. The Clerk of Court is respectfully directed to close the motion at ECF Number 5. SO ORDERED. (Signed by Judge Paul A. Crotty on 5/24/2022) (ks) (Entered: 05/24/2022) |
| 05/25/2022 | 69 | ORDER: denying 63 Motion to Intervene; denying 64 Motion to Intervene. For the reasons stated in the Court's Opinion granting Plaintiffs' motion for a preliminary injunction, Rosenberg seeks much broader relief than Plaintiffs, and is not similarly situated. See ECF No. 68 at 17 n.6. His intervention would deeply complicate the issues presented and delay the proceedings. Therefore, his motion to intervene is DENIED. The Clerk of Court is respectfully directed to close the motion at ECF Numbers 63 and 64. SO ORDERED. (Signed by Judge Paul A. Crotty on 5/25/2022) (ama) (Entered: 05/25/2022) |
| 05/31/2022 | 70 | LETTER MOTION for Extension of Time to File Answer addressed to Judge Paul A. Crotty from Matthew J. Lawson dated May 31, 2022. Document filed by Letitia James..(Lawson, Matthew) (Entered: 05/31/2022) |
| 06/01/2022 | 71 | LETTER MOTION for Extension of Time to File *Civil Case Management Plan* addressed to Judge Paul A. Crotty from Gregory Silbert dated June 1, 2022. Document filed by Rev. John Udo−Okon, Upsolve, Inc...(Silbert, Gregory) (Entered: 06/01/2022) |
| 06/02/2022 | 72 | ORDER: granting 71 Letter Motion for Extension of Time to File. The time to submit the CCMP is extended to July 15, 2022. SO ORDERED. (Signed by Judge Paul A. Crotty on 6/02/2022) (ama) (Entered: 06/02/2022) |
| 06/06/2022 | 73 | CONSENT LETTER MOTION for Extension of Time to File *Motion for Attorneys' Fees* addressed to Judge Paul A. Crotty from Gregory Silbert dated June 6, 2022. Document filed by Rev. John Udo−Okon, Upsolve, Inc...(Silbert, Gregory) (Entered: 06/06/2022) |
| 06/06/2022 | 74 | ORDER granting 70 Letter Motion for Extension of Time to Answer re 70 LETTER MOTION for Extension of Time to File Answer addressed to Judge Paul A. Crotty from Matthew J. Lawson dated May 31, 2022., 1 Complaint. Defendant's time to answer is extended to July 15, 2022. SO ORDERED. Letitia James answer due 7/15/2022. (Signed by Judge Paul A. Crotty on 6/2/2022) (kv) (Entered: 06/06/2022) |
| 06/07/2022 | 75 | ORDER granting 73 Letter Motion for Extension of Time to File. Motion for attorneys' fees may be filed 14 days after final judgment is entered. SO ORDERED. (Signed by Judge Paul A. Crotty on 6/7/2022) (tg) (Entered: 06/07/2022) |
| 06/13/2022 | 76 | EDWIN ROSENBERG'S MOTION FOR RECONSIDERATION OF (E.C.F. NO. 69) ORDER DENYING ROSENBERG'S MOTION FOR PERMISSIVE INTERVENTION TO CORRECT A CLEAR ERROR. Document filed by Erwin Rosenberg, proposed intervenor.(sc) (Entered: 06/21/2022) |
| 06/22/2022 | 77 | NOTICE OF INTERLOCUTORY APPEAL from 68 Memorandum & Opinion,. Document filed by Letitia James. Filing fee $ 505.00, receipt number ANYSDC−26312525. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit..(Lawson, Matthew) (Entered: 06/22/2022) |
| 06/22/2022 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 77 Notice of Interlocutory Appeal,..(nd) (Entered: 06/22/2022) |
| 06/22/2022 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 77 Notice of Interlocutory Appeal, filed by Letitia James were transmitted to the U.S. Court of Appeals..(nd) (Entered: 06/22/2022) |

| 06/27/2022 | 78 | ORDER: denying 76 Motion to Intervene. While Rosenberg is free to assert this claim in a standalone lawsuit, he will not be permitted to intervene in this case. Therefore, his motion for reconsideration is DENIED. The Clerk of Court is respectfully directed to close the motion at ECF Number 76. And as set forth herein. SO ORDERED. (Signed by Judge Paul A. Crotty on 6/27/2022) (ama) (Entered: 06/27/2022) |
| 07/13/2022 | 79 | CONSENT LETTER MOTION to Stay *all deadlines pending resolution of the Second Circuit appeal* addressed to Judge Paul A. Crotty from Gregory Silbert dated July 13, 2022. Document filed by Rev. John Udo−Okon, Upsolve, Inc...(Silbert, Gregory) (Entered: 07/13/2022) |
| 07/13/2022 | 80 | ORDER granting 79 Letter Motion to Stay re: 79 CONSENT LETTER MOTION to Stay *all deadlines pending resolution of the Second Circuit appeal* addressed to Judge Paul A. Crotty from Gregory Silbert dated July 13, 2022. The matter is stayed pending the resolution of Defendant's appeal in the Second Circuit. SO ORDERED.. (Signed by Judge Paul A. Crotty on 7/13/2022) (ate) (Entered: 07/13/2022) |

**A8**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UPSOLVE, INC. and REV. JOHN UDO-OKON,<br><br>                             Plaintiffs,<br><br>                    -v-<br><br>LETITIA JAMES, in her official capacity as Attorney General of the State of New York,<br><br>                             Defendant. | Case No. _____<br><br>**COMPLAINT** |

## NATURE OF THE ACTION

1.      Plaintiffs bring this action to vindicate their First Amendment rights to close a well-documented gap in access to justice for low-income New Yorkers who are faced with debt collection actions.

2.      Debt collection actions are one of the most common kinds of lawsuits in New York, and responding to such suits is straightforward: New York State itself provides a standard fill-in-the-blank form for responding to such lawsuits. But the vast majority of defendants are low-income individuals who cannot afford a lawyer, cannot find pro bono counsel, and face additional barriers that make it difficult to prepare and file an answer themselves. The result is that the large majority of low-income New Yorkers in such actions default. They never have a day in court and lose their lawsuits and their property—even where the cases against them lack merit. The result is often wage garnishment, damage to credit, and a cascading cycle of harm to people who are already vulnerable, which also comes at a cost to the public.

3.       Plaintiffs stand ready to respond to this access to justice crisis. Plaintiff Upsolve is a nonprofit organization with a mission and a track record of fighting to ensure that all Americans can access their legal rights. Upsolve has carefully designed, crafted, and obtained funding to implement a program—the American Justice Movement ("AJM")—to train professionals who are not lawyers to provide free legal advice on whether and how to respond to a debt collection lawsuit. All advice under the program would be reliable, free, straightforward, and narrowly circumscribed, provided on a strictly non-commercial basis to ensure that defendants can understand their rights and respond to the debt collection lawsuits against them. Plaintiff Rev. John Udo-Okon is a pastor in the South Bronx whose community is desperately in need of such free advice. Rev. Udo-Okon stands ready to associate with Upsolve to advocate for and provide free, narrowly circumscribed legal advice for the purpose of increasing access to the courts and thereby protecting the property and liberty of low-income New Yorkers who are currently unable to understand or access their legal rights when faced with a debt collection action.

4.       The only thing stopping Plaintiffs is the threat of prosecution under New York's rules governing the unauthorized practice of law ("UPL"). New York law is clear that individuals who are not lawyers may not provide legal advice, and that advising a person on how to respond to a lawsuit qualifies as legal advice even when the advice is free, straightforward, and simple. The UPL rules threaten anybody who does so—or anybody who solicits or aids in providing such advice—with criminal misdemeanor prosecution and civil penalties. Because AJM staff and Rev. Udo-Okon are not lawyers, they cannot provide truthful and non-misleading advice about how to answer a debt collection lawsuit without facing the risk of such punishment.

5.       The UPL rules put the many low-income New Yorkers who would receive AJM's advice in a devastating bind. If they solicit legal advice from qualified and trusted advisors who

**A10**

are not lawyers, they face a risk of criminal or civil prosecution themselves and also expose their advisors to that same risk. But if they do not receive such advice, they will likely receive no advice at all, default in their debt collection lawsuits, and face the risk of being wrongfully deprived of their property and the risk of harmful and long-lasting follow-on consequences.

6.     Plaintiffs bring this action to vindicate their First Amendment rights to close this gap in the access to justice, and to declare that New York's UPL rules cannot be validly applied to prohibit the truthful and non-misleading advice they would provide.

7.     At the outset, application of the UPL rules here triggers First Amendment scrutiny. The UPL rules are content-based because their application depends on the content of a person's speech, and in particular whether one individual's speech to another includes advice about how to respond to a lawsuit. They also impede on the Plaintiffs' associational rights, as "collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment" to the United States Constitution. *In re Primus*, 436 U.S. 412, 426 (1978) (quoting *United Transp. Union v. State Bar of Mich.*, 401 U.S. 576, 585 (1971)).

8.     New York's UPL rules are well intentioned and effective at combatting the risk of unreliable advice in many applications, so would ordinarily withstand First Amendment scrutiny. But they cannot withstand First Amendment scrutiny as applied under the narrow circumstances of this case. As applied to Plaintiffs, those rules would be affirmatively counterproductive and impede the very interests the UPL rules were adopted to protect. In particular, UPL rules are designed to protect consumers from unreliable or fraudulent advice and to protect the integrity of the courts and the public perception of the justice system. But Plaintiffs would be providing advice for free, without any financial motivation. They would be advising individuals in an area where New York has itself recognized an access to justice gap and that straightforward advice can be

**A11**

reliably provided, as New York promulgates a standard form for filing such a response. And Plaintiffs have carefully crafted their program to ensure reliability—with third-party experts attesting that the program would help many New Yorkers. Conversely, without the free advice provided under Plaintiffs' program, many low-income New Yorkers would be left to fend for themselves without any advice at all about how to respond to a debt collection action: Low-income New Yorkers typically cannot afford a lawyer, especially to respond to relatively low-dollar demands, and pro bono counsel are in too short supply to fill the gap. Experience shows that many individuals will simply fail to respond, leading to default judgments entered without any adversarial testing, notwithstanding evidence that debt collection suits often lack merit or demand inflated payments. New York does not have a legitimate interest in increasing the number of default judgments and preventing people from obtaining help to respond to lawsuits using a form that New York has itself provided, particularly when Plaintiffs have carefully crafted a program to provide the requisite protections against uninformed, bad-faith, or false advice.

9.      This Court accordingly should enter a declaration that the UPL rules are unconstitutional as applied to Plaintiffs' participation in the American Justice Movement, and an injunction preventing the enforcement of the UPL rules against Plaintiffs' conduct, along with other relief necessary for Plaintiffs to vindicate their constitutional rights.

## THE PARTIES

10.      Plaintiff Upsolve, Inc., is a 501(c)(3) nonprofit, tax-exempt organization chartered in New York with the mission of helping Americans access their civil legal rights for free and engaging in widespread education and advocacy to that end. Upsolve is currently the largest nonprofit organization providing free bankruptcy-related resources in the United States and has confirmed relieving more than $400 million in debt for low-income self-represented debtors filing for simple, no-asset Chapter 7 bankruptcy. Upsolve also provides free online education on a

4

**A12**

number of topics, including debt collection defense, student loans, wage garnishment, repossession, foreclosures, evictions, among others, and serves over 150,000 individuals per month. Coupled with its free online resources, Upsolve invests heavily in public advocacy to raise awareness around civil rights injustices, and the corresponding inability of millions of low-income families to access their legal rights.

11.     Upsolve's success has been widely recognized in the media. Upsolve has received funding support from major public-interest and philanthropic organizations, such as the Robin Hood Foundation and the Hewlett Foundation.

12.     The American Justice Movement is an Upsolve project.

13.     Plaintiff Reverend John Udo-Okon is a reverend at Word of Life Christian Fellowship International in the South Bronx. Rev. Udo-Okon and his congregation provide services to people in need. Many members of his community are facing credit issues and debt collection lawsuits and lack access to free counsel or legal advice they can afford.

14.     Defendant Letitia James is the Attorney General of the State of New York. Defendant James' official duties include the administration and enforcement of regulations governing the unauthorized practice of law. She is sued in her official capacity.

## JURISDICTION AND VENUE

15.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 because this suit arises under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983. This Court also has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

16.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim have occurred or will occur in this judicial district.

**A13**

<u>FACTS</u>

**I.      Many New Yorkers lack the basic legal assistance they need to respond to debt collection lawsuits, which can result in severe long-term consequences.**

17.      The problem Plaintiffs seek to solve is widespread and severe: A restricted supply of free or low-cost civil legal assistance prevents low-income New Yorkers from understanding and accessing their legal rights when they are faced with debt collection actions, leading to wrongful deprivations of property and a cascade of other life-altering consequences.

18.      Debt collection actions are one of the most common kinds of lawsuit in New York State courts. Debt collection actions have been estimated to comprise approximately one quarter of all lawsuits in New York's courts.

19.      In the vast majority of debt collection lawsuits in New York State, the defendant fails to appear and thus faces a default judgment. Some estimates put this rate of default as high as 85-90%. A lower range of estimates puts it closer to 70%. Either way, the large majority of debt collection lawsuits end with a default judgment.

20.      Defendants can avoid a default judgment, and the adverse consequences flowing from such a judgment, only if they file a timely response to the debt collection action.

21.      Defendants who respond to debt collection lawsuits often obtain better outcomes, because many debt collection lawsuits lack merit or demand an amount that is too large. For example, one study by the Legal Aid Society of New York reviewed a sample of debt collection cases and estimated that more than a third were "clearly meritless."[1]

_____

[1] The Legal Aid Society et al., *Debt Deception: How Debt Buyers Abuse the Legal System to Prey on Lower-Income New Yorkers*, at 8–10 & 26 n.91 (May 2010), https://www.neweconomy nyc.org/wp-content/uploads/2014/08/DEBT_DECEPTION_FINAL_WEB-new-logo.pdf.

**A14**

22.     By failing to answer and to assert available affirmative defenses, many defendants are deprived of their property without ever having their day in court. When defendants default, plaintiffs never have any need to prove their cases, and courts have no opportunity to assess the merits of their claims, even when a claim would fail were it subjected to adversarial testing.

23.     Adverse judgements in debt collection actions can have devastating effect on the lives of low-income New Yorkers.

24.     Defaulting in a debt collection lawsuit can lead to wage garnishment, eviction, repossession of an automobile, bank seizures, and lasting damage to a consumer's credit. This damage to credit can make it difficult for low-income New Yorkers to secure future financing— such as on a car they need to access employment opportunities—and can make it more difficult for them to rebuild their credit. For somebody living in precarious financial circumstances, even small-dollar lawsuits can snowball to have devastating consequences.

25.     The stories of New Yorkers William Evertsen, Liz Jurado, and Christopher Lepre— all of whom defaulted in debt collection actions in which they received no legal advice— demonstrate the need for such advice and the serious long-term consequences New Yorkers can experience without it[2]:

- *William Evertsen*: William ("Tyler") Evertsen is a 60-year-old HIV-positive gay man living in Brooklyn. In 2017, Evertsen received harassing phone calls from a third-party debt buyer regarding a debt he did not owe. The third-party debt buyer sued him and got a default judgment against him for this debt he did not owe, which has contributed to his financial distress. Evertsen explained that "[t]he judgment made me feel like I was defrauded, because they never proved that I actually owed the debt [and] I was also powerless to do anything about it."

- *Liz Jurado*: In 2019, after her husband lost his job, Liz Jurado got a full-time job that would allow her to "provide for my kids and take care of my husband." But shortly

---

[2] Declarations from these three individuals describing their experiences are attached to the Silbert Declaration in Support of the Motion for a Preliminary Injunction. *See* Silbert Decl. Ex. 5 (Evertsen); Ex. 6 (Jurado); Ex. 7 (Lepre).

**A15**

thereafter Jurado received a letter from the sheriff that they were going to garnish her wages because she had defaulted in a lawsuit to collect a surprise medical debt incurred in connection with the birth of one of her children. Jurado "knew that having my wages garnished would have severe effects for myself and my family" since they "were living paycheck-to-paycheck." Jurado received no legal advice because she "could not afford a lawyer" and "did not know of any resources that would provide me with legal assistance for free." As Jurado describes her experience, "I was facing permanent, life-altering consequences for something that I didn't even know how to do anything about."

- *Christopher Lepre*: In 2015, Christopher Lepre's car flipped over. Lepre, a U.S. Navy veteran, had "no choice but to take on a high interest loan" to purchase a new car. Lepre's car quickly stopped working. Lepre's auto lender demanded repayment, sued him on his debt, and he defaulted because he "didn't know what I needed to do in order to defend myself" and was unable to find a lawyer to help him. As Lepre explains, "I wish I had gotten my day in court . . . [but] the judge decided the case without hearing my side and without the [other side] ever having to prove their case." Lepre continues to suffer the "negative consequences of the lawsuit": his wages are being garnished at the rate of over $1000 per month; there were times he "could not afford to pay [his] rent"; he "cannot afford a car"; and his credit score is "further damaged."

26.    Access to basic free legal advice could make a big difference for many other debt collection defendants. Individual defendants who have legal assistance not only have their day in court, but also tend to secure more favorable outcomes. As a report from the National Center for State Courts explains: "Although plaintiffs are generally represented by attorneys, defendants in [lower-value] cases are overwhelmingly self-represented, creating an asymmetry in legal expertise that, without effective court oversight, can easily result in unjust case outcomes."[3]

27.    There is accordingly a pressing need among many low-income New Yorkers for legal advice about how to respond to a debt collection action to avoid a default judgment, obtain access to justice, and potentially obtain a better outcome by prevailing on the merits.

---

[3] National Center for State Courts, *Call to Action: Achieving Civil Justice for All*, at 34 (2016), https://www.ncsc.org/__data/assets/pdf_file/0029/19289/call-to-action_-achieving-civil-justice-for-all.pdf; *see also* The Pew Charitable Trusts, *How Debt Collectors Are Transforming the Business of State Courts*, at 14–15 (May 2020), https://www.pewtrusts.org/-/media/assets/2020/06/debt-collectors-to-consumers.pdf (collecting "analyses from jurisdictions across the country indicat[ing] that when consumers are represented by attorneys, they are more likely to secure a settlement or win the case outright").

8

**A16**

28.     Despite this need for legal assistance, the vast majority of debt collection defendants in New York lack legal representation and many face default judgments as a result. Many low-income debt collection defendants cannot afford to pay for a lawyer to represent them in their case. And free lawyers are in too short supply to meet the immediate needs of many individuals in low-income communities.

29.     As a 2010 report by the Federal Trade Commission ("FTC") explained: Although "[f]undamental fairness dictates that the legal process afford consumers a reasonable opportunity to defend themselves[,]" "[m]ost alleged debtors fail to answer complaints or otherwise defend themselves in debt collection actions."[4] The FTC Report went on to note that "[t]here [is] broad consensus . . . that relatively few consumers who are sued for alleged unpaid debts actually participate in the lawsuits," and cited estimates that "sixty percent to ninety-five percent of consumer debt collection lawsuits result in defaults."[5]

30.     The rate of default is particularly high among communities of color. A study of judgments over a five-year period in St. Louis, Chicago, and Newark, New Jersey, found that, even

---

[4] Federal Trade Comm'n, *Repairing a Broken System: Protecting Consumers in Debt Collection Litigation and Arbitration*, at 6–7 (July 2010), https://www.ftc.gov/sites/default/files/documents/reports/federal-trade-commission-bureau-consumer-protection-staff-report-repairing-broken-system-protecting/debtcollectionreport.pdf.

[5] *Id.* at 7; *see also*, The Aspen Institute Financial Security Program, Aspen Inst., *A Financial Security Threat in the Courtroom: How Federal and State Policymakers Can Make Debt Collection Litigation Safer and Fairer for Everyone*, at 8 (Sept. 2021) ("Multiple studies have shown that more than 70 percent of debt collection lawsuits end in default judgments in the studies jurisdictions. This is despite the fact that the individuals being sued may have legitimate defenses.") https://www.aspeninstitute.org/wp-content/uploads/2021/09/ASP-FSP_Debt CollectionsPaper_092221.pdf.

after accounting for income, the rate of default judgments in mostly black neighborhoods was nearly double that of mostly white ones.[6]

31.     This high rate of default—which means that plaintiffs never have to prove their cases—is particularly problematic because many debt collection suits lack merit.

32.     A study by the Legal Aid Society of New York found that, in more than a third of a sample of debt collection cases reviewed, "the debt was the result of mistaken identity or identity theft, the debt had been previously paid, the debt had been discharged in bankruptcy, or the statute of limitations on the debt had expired."[7]

## II.     New York provides a form for responding to a debt collection action, but many low-income New Yorkers are unable to use it.

33.     Responding to a debt collection lawsuit in New York is typically straightforward and does not require significant specialized legal training. Law school, however, takes three years and often comes at a significant cost.

34.     Indeed, New York State has provided a fill-in-the-blank answer form for debt collection defendants that allows them to respond to lawsuits and raise common defenses, asserting, for example, that they do not owe the debt, the amount is inaccurate, or the lawsuit is outside the statute of limitations.[8] A copy of the form is attached as Exhibit A to this complaint.

---

[6] Paul Kiel and Annie Waldman, *The Color of Debt: How Collection Suits Squeeze Black Neighborhoods*, ProPublica (Oct. 8, 2015), https://www.propublica.org/article/debt-collection-lawsuits-squeeze-black-neighborhoods.

[7] Legal Aid Society et al., *supra* note 1, at 10, 26 n.91.

[8] *See* New York State Unified Court System, *Answer Form*, https://nycourts.gov/LegacyPDFS/rules/CCR/forms/Consumer-Credit-Answer.pdf; *see also* New York State Unified Court System, *Common Defenses in a Debt Collection Case* (describing common affirmative defenses that can be raised on the Answer Form), https://www.nycourts.gov/courthelp/moneyproblems/defenses.shtml (last updated March 14, 2018).

35.     The one-page form is simple. Its heading provides labeled blank spaces in which to write the caption of the action. After that, the form offers a series of 24 labeled checkboxes that can be checked to raise particular defenses, for example, "I have paid all or part of the alleged debt" or "I had no business dealings with Plaintiff (Plaintiff lacks standing)." One of the checkboxes is labeled "Other Reasons" and provides a blank space in which additional answers can be written. The bottom of the form allows for verification and notarization.

36.     In providing this form, New York itself thus recognizes that the practical importance of responding to a debt collection action and that doing so is typically straightforward and simple.

37.     New York's form is inadequate, however, to close the gap in the access to justice.

38.     Even with this form, the large majority of low-income New Yorkers fail to respond to debt collection actions, or fail to do so accurately, and accordingly face default judgments.

39.     The high default rate despite the availability of New York's answer form confirms that barriers of legal complexity and fear (among others) prevent low-income New Yorkers from vindicating their rights on their own.

40.     For example, New York's form includes language that requires some measure of familiarity with the legal system and specialized terminology, which many low-income defendants lack. Among the checkboxes that the answer form offers are: "General Denial: I deny the allegations in the Complaint"; "I received the Summons and Complaint, but service was not correct as required by law"; "Unconscionability (the contract is unfair)"; "Statute of limitations (the time has passed to sue on this debt)"; "Unjust enrichment (the amount demanded is excessive compared with the original debt)"; and "Laches (plaintiff has excessively delayed in bringing this lawsuit to

11

**A19**

my disadvantage)."[9] Many low-income New Yorkers are unfamiliar, however, with concepts of a general denial, the requirements of service of process under law, the meaning of unconscionability, the applicable statute of limitations to a debt collection action, or the application of laches in a debt collection suit.

41.     Low-income defendants often face language barriers and literacy and educational gaps. They also typically lack familiarity with the civil justice system and are often intimidated by, or anxious and uncertain about how to respond, when served with a debt collection lawsuit. Many people thus do not understand how the civil legal system works, much less how to respond to a lawsuit to defend their own rights, or are apprehensive to do so.

42.     What scholars have called the "costs of financial misery"—which cause people to "work overtime, forego basic necessities, face serious health consequences, deal with persistent debt collection calls, end up in court, lose homes, and sell what little they own"—further increase the barriers low-income New Yorkers face in vindicating their legal rights.[10] As the high rate of default indicates, especially when coupled with the high number of meritless collection actions, more assistance is needed to ensure that all New Yorkers are able to participate in the legal system and vindicate their rights in court.

43.     Low-income New Yorkers faced with debt collection lawsuits often cannot afford to hire paid counsel to represent them.

44.     Some attorneys provide free legal counsel, including for responding to debt collection actions. But the availability of free assistance from barred lawyers is in too short supply

---

[9] New York State Unified Court System, *Answer Form*.

[10] Pamela Foohey, Robert M. Lawless, Katherine M. Porter & Deborah Thorne, *Life in the Sweatbox*, 94 Notre Dame L. Rev. 219, 255 (2018).

**A20**

to satisfy the demand. One study estimated that the leading nonprofit program in New York City for debt collection defense had the resources to assist fewer than 2% of all individuals sued on a debt in New York City Civil Court.[11]

45.     There is a constitutional right to free counsel is criminal cases, but no such right attaches in civil debt collection actions.

46.     Attorneys who provide free or low-cost services to debt collection defendants are frequently overloaded and often cannot provide enough assistance on the quick timeline on which such suits proceed.

47.     The result is that most low-income New Yorkers facing debt collection lawsuits are left without any representation at all, and instead must fend for themselves. By many estimates, over 90% of defendants in debt collection lawsuits—and by some estimates up to 99%—are left without any representation and must fend for themselves.[12]

48.     This problem has been exacerbated by the pressures of COVID-19, as a number of free legal aid programs have been curtailed due to the constraints of the pandemic. For example, New York's Civil Legal Advice and Resource Office ("CLARO") cancelled all in-person programming until further notice, due to the COVID-19 pandemic.[13] Additionally, the New York State Courts' Volunteer Lawyer for a Day Program—a program where which volunteer attorneys

---

[11] Legal Aid Society et al., *supra* note 1, at 17.

[12] The Pew Charitable Trusts, *supra* note 3, at 13–14.

[13] CLARO, *COVID-19 Notice*, http://www.claronyc.org/claronyc/default.html (last visited Jan. 20, 2022).

provide limited representation for unrepresented consumer debtors in state court in New York City—is now operating virtually and on a limited basis in some counties.[14]

49.    The lack of representation for debt collection defendants is often contrasted with sophisticated representation on the plaintiff side.

50.    In its November 2020 annual report, the State of New York's Permanent Commission on Access to Justice stated that "high-volume debt collection cases with frequent defaults" are "notorious for having over-zealous plaintiff attorneys and largely unrepresented defendants."[15]

51.    Because creditors often have (and debt buyers can purchase) large books of similar debts, they can take advantage of economies of scale to bring many lawsuits at a lower cost and pursue actions even for small-dollar debts. The high rate of defendant default means that creditor-plaintiffs will rarely have to prove their cases in court, creating a disincentive to invest the resources to investigate potential actions thoroughly before filing lawsuits. Individual defendants, by contrast, are faced only with a single suit—sometimes demanding less money than it would cost to hire a lawyer to defend the suit—and cannot take advantage of economies of scale. They instead face transaction costs that are effectively insurmountable for many low-income individuals, contributing to the high rate of default judgments. Absent free or low-cost legal advice, this asymmetry can have the effect of preventing low-income New Yorkers from defending their property against wrongful deprivation in a manner that is economically rational.

---

[14] New York State Unified Court System, *Access to Justice Volunteer Attorney Programs*, http://ww2.nycourts.gov/attorneys/volunteer/VAP/program_descriptions.shtml (last visited Jan. 20, 2022).

[15] Permanent Comm'n on Access to Justice, *Report to the Chief Judge of the State of New York*, at 10 (Nov. 2020), https://www.nycourts.gov/LegacyPDFS/accesstojusticecommission/20_ATJ-Comission_Report.pdf.

14

**A22**

52.     The ability to bring a high number of cases with confidence that many defendants will default and the merits of the cases will never be examined also creates a risk of fraud and abuse of the legal process and in the origination of the loans whose collection ultimately results in such default judgments. For example, one process server in New York State pleaded guilty to fraud in connection with a failure to properly notify debt collection defendants that led to approximately 100,000 improper default judgments.[16] And the New York Attorney General and other state Attorneys General have investigated the origination and collection practices of lenders in connection with potential violations of federal and state consumer protection laws.[17]

53.     Debt collection lawsuits are emblematic of a broader access to justice gap that prevents low-income New Yorkers from understanding and accessing their civil legal rights.

54.     As the American Bar Association has concluded, "[d]espite sustained efforts to expand the public's access to legal services, significant unmet needs persist."[18] In a single year in

---

[16] N.Y. State Off. of the Att'y Gen., *The New York State Attorney General Andrew M. Cuomo Announces Guilty Plea Of Process Server Company Owner Who Denied Thousands Of New Yorkers Their Day In Court* (Jan. 15, 2010), https://ag.ny.gov/press-release/2010/new-york-state-attorney-general-andrew-m-cuomo-announces-guilty-plea-process.

[17] *See, e.g.*, Credit Acceptance Corporation, Quarterly Report (Form 10-Q), at 42 (Sept. 30, 2021) (describing a notification that that the New York State Attorney General was considering bringing claims against the company under the Dodd-Frank Wall Street Reform and Consumer Protection Act, New York Executive Law § 63(12), the New York Martin Act and New York General Business Law § 349 in connection with the Company's origination and securitization practices); *see also, e.g.*, *id.* at 43 (describing a settlement of $27.2 million in connection with a lawsuit by the Massachusetts Attorney General for unfair and deceptive trade practices).

[18] Am. Bar Ass'n Comm'n on the Future of Legal Services, *Report on the Future of Legal Services in the United States*, at 11 (2016) ("ABA Report"), https://www.americanbar.org/content/dam/aba/images/abanews/2016FLSReport_FNL_WEB.pdf.

New York, "1.8 million litigants in civil matters did not have representation for matters involving housing, family, access to health care and education, and subsistence income."[19]

**III.    Plaintiffs seek to provide free, narrowly circumscribed legal advice on how to respond to a debt collection lawsuit with the goal of helping low-income New Yorkers understand and access their legal rights.**

55.    The Plaintiffs seek to help close this access to justice gap.

56.    Specifically, Plaintiffs seek to associate to provide free, narrowly circumscribed legal advice to low-income New Yorkers to ensure that they can understand how to respond to the debt collection lawsuits against them and help reduce wrongful deprivation of property and the lasting harm it can cause. Plaintiffs also hope to improve public faith in the court system by ensuring that all defendants rich and poor can have their day in court, courts can decide more cases on their merits, and plaintiffs cannot secure default judgments on meritless claims simply due to defendants' inability to vindicate their rights. Plaintiffs' intervention is carefully designed—and reviewed and approved by experts on debt collection defense—to help individuals respond to debt collection actions consistent with New York's form response, to ensure robust protections for the communities Plaintiffs hope to serve, and to serve the public interest.

57.    Plaintiffs have developed and are prepared to implement the American Justice Movement ("AJM"). AJM is a program to train and supervise "Justice Advocates," public-interest professionals who are not lawyers, to provide free legal advice on responding to a debt collection lawsuit. By training, empowering, and overseeing Justice Advocates to provide free, narrow, and reliable legal advice, Plaintiffs hope to help overcome the educational, financial, structural, and cultural barriers that low-income New Yorkers face in trying to access their legal rights when they

_____

[19] *Id.* at 12 (citing Task Force to Expand Access to Just. to Civ. Legal Servs. in N.Y., *Report to the Chief Judge of the State of New York*, at 2 (Nov. 2014), http://ww2.nycourts.gov/sites/default/files/document/files/2018-05/CLS%20TaskForce%20Report%202014.pdf.

are faced with a debt collection lawsuit. Justice Advocates would be individuals who are already working in the public interest, are already embedded in low-income communities, and reflect the diversity of their communities.

58.     AJM has started to recruit, will continue to recruit, and is prepared to support and oversee the work of Justice Advocates.

59.     Because New York State already streamlines the process of responding to a debt collection lawsuit, the advice needed to help a defendant to do so can be reliably and consistently provided without the need for significant specialized legal training. For example, three years of law school often involves significant cost and creates a substantial barrier to entry.

60.     Justices Advocates will only provide advice for free. AJM will require that the Justice Advocate cannot receive and the client cannot provide any form of compensation in connection with the advice they give.

61.     By empowering Justice Advocates to provide straightforward advice that is in the served community's best interest, Plaintiffs hope to help support low-income New Yorkers facing debt collection actions who currently risk being wrongfully deprived of their property because they lack the knowledge or support to respond.

62.     Specifically, the Justice Advocates will: (1) determine whether the client could benefit from their advice; (2) confirm the limited scope of representation with the client; (3) advise the client whether it is in their best interest to answer the lawsuit against them; (4) advise the client on how to fill out the answer based on the client's answers to a series of straightforward questions; and (5) advise the client on how and where to file and serve the answer.

63.     AJM has prepared a robust step-by-step Training Guide to ensure that all of the advice that Justice Advocates are being directed to provide is in the clients' best interest. A copy of the AJM Training Guide is attached to this complaint as Exhibit B ("Training Guide").

64.     The Training Guide has been independently reviewed by third-party experts in consumer law and debt collection defense. Those experts have confirmed that advice provided according to the terms of the Training Guide will provide clients with substantial benefits at no cost and that the program minimizes the risk of unreliable or harmful advice. Declarations from Mr. Tashi Lhewa and Professor Pamela Foohey describing their credentials and their review and endorsement of the Training Guide are attached to the Silbert Declaration in Support of the Motion for a Preliminary Injunction.

65.     AJM will train all Justice Advocates to ensure that they understand the Training Guide and are willing to comply with its restrictions. Additionally, AJM will regularly review and, if necessary, update the Training Guide to ensure it is consistent with applicable law, ethical requirements, and the best interests of its advisees.

66.     The Training Guide describes a step-by-step process the Justice Advocate should follow and provides them with advice to give clients about whether and how to fill out their answer forms based on the client's answers to a series of questions with explanatory guidance the Justice Advocate can provide to advise the client about whether it is in the client's best interest to raise particular affirmative defenses.

67.     The Training Guide also includes an affidavit that Justice Advocates must sign and adhere to describing the limited scope of their responsibilities and the safeguards they must implement to provide advice under the auspices of AJM. Moreover, in designing the Training Guide, Plaintiffs carefully limited the issues on which Justice Advocates may advise to ensure that,

18

**A26**

where more complex issues arise calling for legal advice that Justice Advocates are not equipped to reliably provide, Justice Advocates are required to refer clients to alternative sources of legal assistance.

68.     To participate in the American Justice Movement, clients will be required to sign a User Agreement, also included in the Training Guide, attesting to their understanding and acceptance of this limited arrangement and agreeing that they are joining AJM in its mission of increasing access to justice. The Agreement provides the clients with information about how to proactively contact AJM to report any misconduct or bad advice by a Justice Advocate. *See* Training Guide, Ex. B – User Agreement. AJM will also track all advice-giving encounters and will communicate with clients to confirm that the advice they received was helpful, accurate, and followed the strict requirements AJM imposes on Justice Advocates.

69.     Specifically, as the Training Guide describes, Plaintiffs have adopted a series of protections to minimize the risk of unreliable or unethical advice and ensure that all advice being provided is in the best interest of the clients, including but not limited to:

- Justice Advocates must successfully complete a training program provided by AJM explaining the Training Guide in order to be certified by AJM to provide legal advice.

- Justice Advocates must provide all advice for free and for the purpose of increasing access to justice, thereby avoiding the risk of any conflict-of-interest resulting from the possibility of compensation.

- All advice must be truthful, non-misleading, and provided in good faith.

- Justice Advocates must provide all advice only within the scope of the Training Guide that AJM has prepared and has vetted with attorney experts to ensure that all advice is in the client's best interest.

- Justice Advocates must clearly disclose and require clients to acknowledge the limited scope of the legal advice being provided and that Justice Advocates are not attorneys. Where a Justice Advocate is unable to advise a client, they must direct the client to alternative resources.

- Justice Advocates must adhere to the exact same confidentiality and conflict-of-interest restrictions that New York State imposes on lawyers providing pro bono services.

- AJM will closely monitor the conduct and behavior of Justice Advocates, including by tracking each client encounter and contacting clients to confirm that the advice they received was fully consistent with the strict guidance required by AJM's training materials.

- To the extent Justice Advocates are acting outside the scope of AJM's program or not strictly adhering to AJM's guidelines, AJM will sever ties with noncompliant Justice Advocates and, as necessary, refer them to government authorities for further investigation.

70.    AJM encourages clients to contact AJM about any misbehavior or deviation from these standards by Justice Advocates. AJM commits to investigating any complaints and, if necessary, removing Justice Advocates from the program. AJM also plans to track every interaction between a Justice Advocate and a client and to follow up with clients to confirm that the service provided was consistent with the terms AJM requires. As part of its preparations to launch AJM, Upsolve has already created web-based forms for both of these purposes.[20]

71.    AJM warns Justice Advocates that providing legal advice outside the narrow scope and strict terms of the program may expose them to prosecution for engaging in the unauthorized practice of law or under other fraud or consumer-protection laws, like N.Y. Gen. Bus. Law §§ 349, 350, which impose liability for "[d]eceptive acts or practices in the conduct of any business" and could potentially be used to prosecute false, misleading, or bad faith advice.

72.    Multiple third-party experts have reviewed the program and Training Guide and determined that AJM's clients will receive a substantial benefit from free legal advice from a Justice Advocate, and will be better off than they would have been had they received no advice at

---

[20] *See* Tracking Form, https://www.americanjusticemovement.org /tracking-form (last visited Jan. 20, 2022); Complaint Form, https://www.americanjusticemovement.org/complaint-form (last visited Jan. 20, 2022).

all and been forced to go it alone. As Professor Pamela Foohey explains: "Given the limited resources available to unrepresented individuals in debt collection proceedings, particularly during the continuing COVID-19 pandemic, when debt collection proceedings are predicted to increase, allowing individuals who are not lawyers to provide carefully tailored and circumscribed assistance will significantly enhance low-income New Yorkers' ability to assert their legal rights in court."[21]

73.     AJM gives life to recent recommendations by the American Academy of Arts & Sciences, the American Bar Association, and other leading groups that have "endorsed the expanded use of trained, supervised individuals," sometimes called "justice advocates," who lack full "formal legal education" but are nonetheless trained "to help people who would otherwise receive no legal assistance."[22]

74.     A number of successful programs already exist in a variety of states and in the federal system that allow professionals who are not lawyers to provide meaningful legal assistance within the civil justice system.[23]

75.     For example, a number of states, like Arizona and Utah, are developing licensing regimes for legal paraprofessionals.[24] Additionally, advocates who are not lawyers are allowed to

---

[21] Professor Foohey's declaration is attached to the Silbert Declaration in Support of the Motion for a Preliminary Injunction as Exhibit 4 ("Foohey Decl."). *See* Foohey Decl. ¶ 12.

[22] Am. Acad. of Arts & Scis., *Civil Justice for All*, at 15 (2020), https://www.amacad.org/sites/default/files/publication/downloads/2020-Civil-Justice-for-All_0.pdf; *see id.* at 15 & 47 nn. 44–45 (collecting sources); *also* ABA Report at 16, 40–41.

[23] *See id.* at 17 ("Some nonlawyer advocates already perform well-defined roles in civil justice.").

[24] *See* Ariz. Sup. Ct., *Arizona Supreme Court Makes Generational Advance in Access to Justice* (Aug. 27, 2020), https://www.azcourts.gov/Portals/201/Press%20Releases/2020Releases/082720 RulesAgenda.pdf; Utah Cts., *Licensed Paralegal Practitioners*, https://www.utcourts.gov/legal/lpp/index.html (last modified Feb. 6, 2021).

practice in a limited capacity in various federal forums, like "[A]ccredited [R]epresentatives" who may represent people in federal immigration proceedings, and other professionals who are not lawyers are empowered to represent claimants seeking Social Security disability benefits.[25]

76. New York State itself allows qualified individuals who are not lawyers to practice before the New York State Workers' Compensation Board, provided they have "competent knowledge of the [relevant] law" and pass a written examination and participate in an orientation program.[26]

77. New York nonetheless continues to prohibit similarly situated professionals with similar training and supervision from providing straightforward legal advice when it comes to advising on how to respond to a debt collection action, including advising people on how to responding using New York's own form.

**IV.   Plaintiffs are ready, willing, and able to implement this program.**

78. Plaintiffs Upsolve and Rev. John Udo-Okon are prepared to launch AJM to help low-income New Yorkers understand and access their legal rights in debt collection proceedings.

79. Upsolve is well situated to create and administer AJM and to recruit, train, and supervise Justice Advocates to provide free, narrow, and reliable legal advice to individuals facing debt collection actions.

80. Upsolve's mission and activities as an organization are rooted in advocating for systemic change in America's legal and financial systems. Over the past five years, Upsolve's political advocacy has materialized in policy proposals, op-eds, speeches, conference and panel

---

[25] *See* 8 C.F.R. § 1292.1; 20 C.F.R. § 404.1705.

[26] *See* N.Y. Comp. Codes R. & Regs. tit 12, §§ 302-1.1– 302-1.4, 302-1.11.

presentations, media outreach, and conversations with elected officials, Bar Associations, judges, legal scholars, and state agencies.

81.     Upsolve and its co-founder and Chief Executive Officer, Rohan Pavuluri, have been widely lauded, including by the *New York Times*, the *Wall Street Journal*, and the *Washington Post*. Mr. Pavuluri's TED Talk discussing the access to justice crisis and Upsolve's work has been viewed more than 1.4 million times.

82.     Upsolve has already invested the time and resources to design AJM, prepare the Training Guide, consult with subject-matter experts to ensure that the advice provided is in the public interest, and recruit potential Justice Advocates, including Plaintiff Rev. Udo-Okon. Upsolve has secured funding to finance AJM and stands ready to implement the program immediately.

83.     Plaintiff Rev. John Udo-Okon is a pastor in the South Bronx who is ready and willing to serve as an AJM Justice Advocate. He believes that he can preach the gospel by providing various services to community members. Rev. Udo-Okon has witnessed firsthand the need for greater access to legal rights in his community.

84.     Members of Rev. Udo-Okon's community face many legal problems, including harassing calls from debt collectors. However, community members typically cannot afford to hire a lawyer to help them respond to debt collection actions, and doing so is too complicated and intimidating for individuals on their own.

85.     As a result, many individuals seek out Rev. Udo-Okon for assistance with their legal problems. However, Rev. Udo-Okon is not a lawyer. He knows that New York makes it unlawful for him to provide legal advice, so the only option that remains is to refer these individuals to outside agencies, which are more often than not overwhelmed with requests for free

**A31**

legal assistance. Members of Rev. Udo-Okon's community are frequently put on long waiting lists before even getting the opportunity to receive legal advice, even though their situations can be quite time sensitive. The wait alone can result in losing the ability to access their rights.

86.    Through conversations with members of his community, Rev. Udo-Okon has learned that many of them are being regularly harassed by debt collectors. In some cases, they believe they do not owe the debts that are being demanded. Some people have lost their homes and had their credit scores damaged as a result of their failure to properly respond to these lawsuits, regardless of their merit.

87.    Rev. Udo-Okon is acutely aware of the urgency for a project like AJM in his community.  Following a recent town hall meeting, more than one hundred community members signed a petition asserting that they want to receive this kind of advice from Rev. Udo-Okon. That response indicates both the size of the demand and that Rev. Udo-Okon could immediately begin helping people access the justice system as a Justice Advocate, if doing so were lawful.

**V.    The only barrier to Plaintiffs providing and receiving this critical service is the threat of civil sanction and criminal prosecution under New York's UPL rules.**

88.    The only thing preventing Upsolve and Justice Advocates from associating and providing free legal advice under AJM, in furtherance of increasing their clients' access to courts and the justice system, is the threat of prosecution under New York's UPL rules.

89.    A number of statutes and rules governing the practice of law make it a crime and civilly sanctionable to engage in, solicit, or aid in the unauthorized practice of law. *See* N.Y. Jud. Law §§ 476-a, 478, 484, 485, 750, 753; *see also* N.Y. Penal Law § 20.00 (imposing criminal liability for "solicit[ing], request[ing] . . . . or intentionally aid[ing]" in unlawful conduct).

24

**A32**

90.     The assistance AJM seeks to provide would violate New York's UPL rules, because it would involve providing individualized legal advice about whether and how to respond to ongoing litigation (and advertising that assistance to potential advisees).

91.     The risk of prosecution under these rules is acute because New York's UPL rules are vigorously enforced.

92.     As a result, as soon as AJM launches, Upsolve, Rev. Udo-Okon, potential clients, and any other individuals who aid in this project would face the risk of criminal and civil prosecution for engaging in the unauthorized practice of law. This risk is chilling Upsolve from launching the program. Indeed, the only thing stopping Rev. Udo-Okon from associating with Upsolve and providing this legal advice is the threat of being prosecuted for violating New York's UPL rules.

93.     The low-income New Yorkers who would receive Rev. Udo-Okon's and other future Justice Advocates' advice are also in a bind. They cannot afford a paid lawyer and cannot find free counsel, but if they solicit this kind of advice from a non-lawyer they face the risk of prosecution, and they do not know how to go it alone. Without legal help, they are likely to default and face the risk of wrongful deprivation of their property and significant follow-on harms.

94.     The experts who reviewed and endorsed the Training Guide limited the scope of their review "[i]n part," as Professor Foohey explained, "to avoid any possibility of liability under rules governing the unauthorized practice of law." This illustrates that industry experts likewise fear prosecution under UPL rules. Foohey Decl. ¶ 11.

95.     But applying New York's UPL rules to bar Plaintiffs' advocacy and expressive association violates Plaintiffs' rights under the First and Fourteenth Amendments of the United States Constitution.

**A33**

96.     *First*, application of the UPL rules here would trigger strict scrutiny. The Supreme Court has held that "collective activity undertaken to obtain meaningful access to the courts"—just like the activity Plaintiffs plan to undertake—"is a fundamental right within the protection of the First Amendment['s]" guarantee of the Freedom of Association. *In re Primus*, 436 U.S. 412, 426 (1978) (quoting *United Transp. Union v. State Bar of Mich.*, 401 U.S. 576, 585 (1971)).

97.     Furthermore, application of New York's UPL rules triggers strict scrutiny under the First Amendment's protection of Free Speech. "Above all else, the First Amendment means that government generally has no power to restrict expression"—or the hearing of that expression—"because of its message, its ideas, its subject matter, or its content." *Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020) (quoting *Police Dep't. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)) (internal quotation marks omitted). And application of the UPL rules here is content-based, because it depends on the content of speech and in particular whether it includes individualized advice about whether and how to respond to a debt collection action.

98.     *Second*, application of the challenged rules to Plaintiffs cannot survive First Amendment scrutiny.

99.     Application of the UPL rules in this context has the effect of preventing many low-income New Yorkers from receiving advice that would help them avoid the risk of wrongfully losing their property (and more), even where, as here, trained professionals who are not lawyers are already embedded in low-income communities and are acting in the public interest to provide truthful, free, and carefully circumscribed legal advice on terms that mirror those on which pro bono lawyers may provide similar advice.

100.    The application of the UPL rules to Plaintiffs is particularly unjustified because the American Justice Movement will advance the very interests underlying the rules. New York's UPL

rules are designed to protect consumers from the risk of unreliable or unscrupulous representation and thereby increase public faith in the justice system. These rules serve these salutary aims in many applications.

101.    By providing free, reliable, and helpful information about how low-income New Yorkers can access their legal rights, Plaintiffs seek to protect consumers and help to bolster faith in the justice system and thereby avoid the significant harm that currently results from low-income New Yorkers' inability to understand and access their legal rights. Far from undermining the State's interest, Plaintiffs seek to help New Yorkers fill out a form that the state itself has provided, confirming the state's own recognition of the significance of responding to debt collection actions and the need to support the many defendants who currently are unable to do so. By doing so, Plaintiffs hope to help ensure that every low-income New Yorker is able to access and exercise their legal rights and avoid paying a debt they do not owe or that a plaintiff has no right to collect.

102.    Plaintiffs accordingly bring this action to vindicate those rights and ensure that no more Americans will be deprived of their property and their civil rights due to the lack of free assistance to help them access and vindicate those rights.

## CAUSES OF ACTION

### COUNT ONE

#### 42 U.S.C. § 1983: Violation of the Freedom of Speech

103.    Plaintiffs repeat and allege paragraphs 1–102 as if fully set forth herein.

104.    The First Amendment's protection of Free Speech protects Plaintiffs' activity against the application of New York's UPL rules because the government "generally has no power to restrict expression"—or the hearing of that expression—"because of its message, its ideas, its subject matter, or its content." *Barr v. Am. Ass'n of Political Consultants, Inc.*, 140 S. Ct. 2335,

27

**A35**

2346 (2020) (quoting *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972)) (internal quotation marks omitted).

105.    New York's UPL rules, as applied to Plaintiffs, punish Plaintiffs' truthful, non-commercial, and non-misleading speech on the basis of its content.

106.    New York's UPL rules, as applied to Plaintiffs, cannot satisfy strict scrutiny because they are not narrowly tailored to a compelling government interest. Nor can they satisfy any lesser level of scrutiny that might apply. To the contrary, Plaintiffs' carefully designed program to provide free, reliable, truthful, and non-misleading legal advice to low-income New Yorkers advances the State's interests in consumer protection and preserving the integrity of the legal system that underlie the UPL rules.

107.    In implementing and enforcing the UPL rules against Plaintiffs, Defendant is, under color of state law, depriving Plaintiffs of their constitutional rights.

## COUNT TWO

### 42 U.S.C. § 1983: Violation of the Freedom of Association

108.    Plaintiffs repeat and allege paragraphs 1–107 as if fully set forth herein.

109.    The Supreme Court has held that "collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment" to the United States Constitution. *In re Primus*, 436 U.S. 412, 426 (1978) (quoting *United Transp. Union v. State Bar of Mich.*, 401 U.S. 576, 585 (1971)).

110.    New York's UPL rules, as applied to Plaintiffs, would prevent Plaintiffs from associating to engage in collective activity for the purposes of expressing their personal beliefs in access to justice and ensuring that low-income New Yorkers can access their rights to be heard in court.

111.    New York's UPL rules, as applied to Plaintiffs, cannot satisfy strict scrutiny because they are not narrowly tailored to a compelling government interest. To the contrary, Plaintiffs' carefully designed program to provide free, reliable, truthful, and non-misleading legal advice to low-income New Yorkers advances the State's interests in consumer protection and preserves the integrity of the legal system that underlie the UPL rules.

112.    In implementing and enforcing the UPL rules against Plaintiffs, Defendant is, under color of state law, depriving Plaintiffs of their constitutional rights.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court enter judgment in their favor and grant the following relief:

A.    A declaration that application of New York's UPL rules to Plaintiffs' truthful, non-misleading, and good faith legal advice provided through the American Justice Movement would violate Plaintiffs' protected rights under the First and Fourteenth Amendments of the United States Constitution;

B.    A preliminary and permanent injunction enjoining Defendants and other state agencies—as well as their agents, offices, and employees—from taking any action that would interfere with Plaintiffs' intended activities.

C.    Nominal damages of $1.00 to remedy the past violation of Plaintiffs' constitutional rights.

D.    An award of Plaintiffs their reasonable costs, litigation expenses, and attorney's fees associated with this litigation pursuant to 42 U.S.C. § 1988; and

E.    Any other relief the Court deems just and proper.


Dated: New York, New York        WEIL, GOTSHAL & MANGES LLP
      January 25, 2022

                         /s/ Gregory Silbert
                        Gregory Silbert
                        Robert B. Niles-Weed
                        Elena De Santis
                        WEIL, GOTSHAL & MANGES LLP
                        767 Fifth Avenue
                        New York, New York 10153
                        (212) 310-8000

**A37**

Zachary D. Tripp*
WEIL, GOTSHAL & MANGES LLP
2001 M Street, NW
Washington, DC 20036
(202) 682-7000

*_Pro hac vice_ motion forthcoming

_Counsel for Plaintiffs_

**A38**

# Exhibit A

COURT COUNTY OF _____ Part: _____

_____,
                                                          **Plaintiff(s)**

-against-

_____,
                                                          **Defendant(s)**

**WRITTEN ANSWER**
**CONSUMER CREDIT TRANSACTION**

**Index Number:** _____

**ANSWER: (Check all that apply)**
1. ☐ General Denial: I deny the allegations in the Complaint.
**SERVICE**
2. ☐ I did not receive a copy of the Summons and Complaint.
3. ☐ I received the Summons and Complaint, but service was not correct as required by law.
**DEFENSES**
4. ☐ It is not my debt. I am a victim of identity theft or mistaken identity.
5. ☐ I have paid all or part of the alleged debt.
6. ☐ I dispute the amount of the debt.
7. ☐ I had no business dealings with Plaintiff (Plaintiff lacks standing).
8. ☐ There is no record of plaintiff having a license to collect debt (only for cases filed in New York City, Buffalo and other municipalities requiring debt collectors to be licensed).
9. ☐ Plaintiff does not allege a debt collector's license number in the Complaint (only for cases filed in New York City, Buffalo and other municipalities requiring debt collectors to be licensed).
10. ☐ Statute of limitations (the time has passed to sue on this debt).
11. ☐ This debt has been discharged in bankruptcy.
12. ☐ The collateral (property) was not sold at a commercially reasonable price.
13. ☐ Failure to provide proper notice before selling collateral (property).
14. ☐ Failure to mitigate damages (Plaintiff did not take reasonable steps to limit damages).
15. ☐ Unjust enrichment (the amount demanded is excessive compared with the original debt).
16. ☐ Violation of the duty of good faith and fair dealing.
17. ☐ Unconscionability (the contract is unfair).
18. ☐ Laches (plaintiff has excessively delayed in bringing this lawsuit to my disadvantage).
19-a. ☐ **OUTSIDE OF NEW YORK CITY ONLY:** Lack of personal jurisdiction under Uniform City Court Act § 213 (applies if you do not work in the city where the case was filed **and** you are not a resident of that city **or** (for all counties except Westchester and Nassau counties) you are not a resident of a town next to that city within the same county).
19-b. ☐ **SUFFOLK COUNTY:** Lack of personal jurisdiction; the defendant is not a resident and/or was not served in, or there was no transaction of business in, that portion of Suffolk County for which a District Court has been established (Towns of Huntington, Babylon, Islip, Smithtown and Brookhaven).
20. ☐ Defendant is in the military.
**OTHER**
21. ☐ Other Reasons _____
22. ☐ Please take notice that my only source of income is _____, which is exempt from collection.
**COUNTERCLAIM(S)**
23. ☐ Counterclaim(s): $_____ Reason:_____

**VERIFICATION**
State of New York, County of _____ss:
_____, being duly sworn, deposes and says: I have read the Answer in Writing and know the contents to be true from my own knowledge, except as to those matters stated on information and belief, and as to those matters I believe them to be true.
   Sworn to before me this _____ day of _____, 20___.

_____              _____
            Notary Public                    Defendant's              Signature of Defendant
                                             Address:     _____

This case is scheduled to appear on the court calendar as follows:
Date: _____ Part: _____ Room: _____ Time: _____ Both sides notified:   Yes     No

UCS-CC-1 revised 11/15)

**A40**

# Exhibit B



## The American Justice Movement
## Consumer Rights Project



## Justice Advocate Training Guide
## New York City

1



## Introduction

Congratulations on joining the American Justice Movement (AJM) as a Justice Advocate!

This guide will introduce you to our mission, code of conduct, disciplinary infrastructure, and values. This guide will also train you on how to provide limited scope, free legal advice in debt collection defense cases in New York, outline your exact responsibilities as a Justice Advocate, and explain the limitations of your role.

## I.    Your Obligations as a Justice Advocate

As a member of the American Justice Movement, you will have the ability to help low-income Americans access their civil legal rights by providing free legal advice even if you are not a lawyer.

In order to do so, you must meet the following criteria:

1.  You accept the attached "Justice Advocate Affidavit" (Exhibit A) and agree that you are participating in the American Justice Movement for the purpose of helping low-income New Yorkers access their legal rights for free. **You must fill out and return your Justice Advocate Affidavit to the American Justice Movement, attend a virtual training, and be approved by the American Justice Movement before you can provide any advice.**

2.  Your assistance is provided free of charge to the person you are helping and you don't request or require any compensation from them, their family, or their friends.

3.  Before providing any advice, you must make clear to people receiving your advice that even though you are providing them with free legal advice, not merely clerical assistance, you are not a lawyer and that the advice you can provide is limited in scope.

4.  You provide free legal advice only in responding to a debt collection lawsuit in New York, and only in the manner and circumstances described in the Training Guide.

Additionally, you must comply with the following requirements—which are similar to those followed by lawyers providing pro bono advice:

- *Conflicts of Interest*: Justice Advocates must comply with Rules 1.7, 1.8, and 1.9 of the New York State Rules of Professional Conduct as though the Justice Advocate were acting as a lawyer, if the Justice Advocate has knowledge at the time of the representation that the representation involves a conflict of interest.

AJM **American Justice Movement**

- *Informed consent*: Justice Advocates must secure the client's informed consent to the limited scope of the representation—all decisions must be made in the client's best interest.
- *Confidentiality*: The representation provided through AJM must comply with the confidentiality requirements set out in Rule 1.6 of the New York State Rules of Professional Conduct.

If you violate any of these rules, your membership in the American Justice Movement will be terminated and you may face the risk of prosecution for the unauthorized practice of law. Additionally, if you provide unlawful or fraudulent advice, you may also face liability under various other consumer-protection laws governing, for example, fraud or false advertising.

## II.   Introduction to Debt Collection Defense

Nearly 4 million individuals every year are sued for their debt, mostly by businesses, including third-party debt buyers, payday lenders, subprime auto-lenders, hospitals for medical debt, for-profit colleges, etc.

The vast majority of these lawsuits are for amounts that are less than $10,000 and the vast majority of defendants – over 90% by many estimates – receive no legal advice in their cases. As a result, most people who face debt collection actions receive default judgments – they lose their lawsuits without courts considering any facts at all. And when people have counsel, they often prevail or reduce the amount owed. Together, this means that the lack of access to counsel forces many defendants to pay debts they do not owe, or to pay more than they owe. Debt collection judgments can cause adverse consequences, like wage garnishment, levied bank accounts, liens on their homes, automobile repossession, and damage to credit. This gap in access to justice is particularly problematic in New York where, by some estimates, 97% of consumer debt litigants are unrepresented. Moreover, money judgments in New York accrue interest at 9 percent per year and are enforceable for 20 years.

As a Justice Advocate of the American Justice Movement, you will be responsible for helping address this civil rights crisis.

## Steps in a Debt Collection Lawsuit

1. Before a debt collection lawsuit is filed, a consumer must default on a debt, *i.e.* miss one or more payments to their original creditor. The creditor themselves, or a debt buyer, may then engage in communication in an attempt to collect the debt or may file a lawsuit.

2. The plaintiff files a complaint and serves the defendant.

**A44**

**AJM** American Justice Movement

3. The defendant is required to respond to the complaint, such as by filing an answer, for which New York State provides a standard, fill-in-the-black form. **(This is where you will be providing free legal advice.)**

4. If the defendant fails to respond, the plaintiff can obtain a default judgment and seek to collect on the debt. If, however, the defendant answers the complaint, the plaintiff is required to prove their case. (While this Training Guide does not allow you to provide advice beyond advising the client how to answer, there are additional resources, including those attached as Exhibit E, to help the client represent themselves for issues outside the scope of your assistance.)

## III.   Your Role: Providing Advice on Answering the Complaint

### Step 1: Determine whether the client could benefit from your advice

- This Training Guide is designed to empower you to assist only clients who are defendants in a debt collection lawsuit in New York Civil Court.
- New York offers a simple check-box form to assist people in filing an answer, but many people do not know it exists, do not know how to fill it in, and fail to submit it. You can help people protect their rights using this simple form.
- Before you can help a client, you will first need to determine whether they are within the limited category of people who can benefit from the advice you can provide.
- To confirm that a potential client is eligible for your services, please confirm that they have been served with a Summons and/or Complaint in New York Civil Court and that they have not yet answered their lawsuit or filed an answer on their own but are interested in filing an updated or amended answer with your help.
  - If the client's papers reflect that they have been sued in Supreme Court, please let them know that you are unable to advise them and direct them to the alternative resources in Exhibit D.
  - If the client explains that the lawsuit involves their failure to pay child support, please let them know that you are unable to advise them and direct them to the alternative resources in Exhibit D.
- If the client has already received a default judgment, you should advise them that they may be able to have that judgment vacated but that you cannot advise them how to do so and they should consider contacting other resources for free legal assistance, including those listed in Exhibit D.
- If a client is not sure what stage their case is at, you should advise them to visit the courthouse website or records office to determine the status of their case.

4

**A45**

**AJM** **American Justice Movement**

## Step 2: Confirm limited scope of representation with client

- Once you have confirmed that a potential client has a debt collection lawsuit that they have not answered or already answered on their own but want to amend, you should inform them that you can provide them with free legal advice about how to answer their lawsuit.
- You should tell the client that you cannot help them outside of that narrow advice, but that answering their lawsuit can make a big difference in their case, by requiring the creditors to prove their cases using admissible evidence.
- You should tell the client that you will be providing your advice for free and for the purpose of helping them access their legal rights and thereby increasing access to justice.
- Finally, before advising the client, you should have them read and sign the **User Agreement**, which is attached to this Training Guide as Exhibit B.
- You must also input yours and the client's information on the **American Justice Movement Website Web-Form** (accessible at https://www.americanjusticemovement.org/tracking-form), which tracks all advice-giving encounters and allows us to follow up with clients to confirm that the advice they received is fully consistent with the terms of this guide.

## Step 3: Advise the client how to answer their lawsuit

- Showing up is often half the battle in debt collection cases. Debtors should therefore answer the complaints filed against them and assert their rights. In cases where the plaintiff is not the original creditor, they may not have the proof to make even a basic case that they have the right to collect the debt they are suing on.
- If the client has not yet filed an answer, you should advise them that it is in their interest to file an answer.
- Ordinarily, a defendant has either 20 or 30 days from when they are served to file an answer, depending on how they were served.[1] But you should advise clients that they should answer their lawsuits even if that deadline has elapsed.
- To file an answer, explain to the client that New York provides a simple form. Provide them a copy of the form (attached as Exhibit C), and tell them you will help them fill out their answer form by asking them a series of questions about their debt.
- Tell them they will need to file their answer in the clerk's office of the appropriate court, which they can find out by checking the court's website.
    - There may be alternative options that allow the client to file the answer by mail, email, or over the phone, but these options are generally temporary (due to

---

[1] If the defendant was personally serviced, they have 20 days, and if they were served by mail or service was made on another, they have 30 days.

**AJM** **American Justice Movement**

COVID) and vary from court to court. But you can suggest to the client that they call the court to find out if they have alternative options to going in person.

- Before you ask the questions below and advise the client how to fill out their answer form, be sure to provide the client with a copy of the form attached as Exhibit C.
- Ask the client the following series of questions and follow the guidelines below to direct them how to fill out the answer form. You should let the client know that this may take 15-20 minutes but that they should be patient and that it will be worthwhile for them to answer the complaint.
- Where the guidelines below are unclear, apply your best judgment to the answer the client provides to determine whether you think their description satisfies the requirements for a particular defense. If you are not still sure of whether a specific defense applies to the client's case, you should err on the side of telling the client to check the box to make sure they don't lose the opportunity to raise that defense, but you should advise the client to determine whether they have any documents or other information they can use to back up their claim.
- Note that the client may end up checking more than one box on the form.

- **Questions for advising a client on how to fill out their answer form:**

  ○ 1. "Do you deny the allegations in the Complaint?"
    ■ Unless the client tells you that they agree with every statement in the complaint, they should check this box.
    ■ You should advise the client to check this box in most cases, as there is usually at least one statement in the complaint that they dispute. They may dispute the identity of the debt buyer, creditor, exact dollar amount down to the penny, account number, their stated residence or any other information in the complaint.

  ○ 2, 3. "Did you or somebody close to you receive a copy of the Summons and Complaint? Was it properly served within 120 days of the complaint being filed? There are only three ways for the complaint to be properly served, either (1) it was delivered personally to you, (2) it was delivered to another person of appropriate age at your home or work who can be trusted to get it to you and mailed to you within 20 days, or (3) it was attached to the front door of your home or work at separate times on three different days and was mailed to you within 20 days. If you were served any other way, even if it was slightly different, you were not properly served."
    ■ If they did not receive the Summons and Complaint, advise the client to check box 2.
    ■ If the Summons and Complaint was not properly served, advise the client to check box 3.

6

**A47**

AJM **American Justice Movement**

- Some additional common examples of improper service include being served on a Sunday or being served by the person suing you. More examples are described at this link.
  - Please advise the client that if they want to challenge service, they will probably want to file a Motion to Dismiss. Tell them this is outside the scope of what you're able to advise them on, but may be a good option IN ADDITION to filing this answer. Whether to file a Motion to Dismiss is something for which you should advise the client to consult the resources listed in Exhibit D.

- 4. "Do you not owe this debt because it is not a debt you owe or you do not recognize the account number?"
  - If yes, advise the client to check box 4.
  - Remind clients that they should not check this box if it is a debt they co-signed on.

- 5. "Have you already paid this debt or a portion of this debt, even if paid through a debt settlement company?"
  - If yes, advise the client to check box 5.

- 6. "Do you dispute the amount of the debt alleged in the complaint?"
  - If yes, check box 6.
  - The client should check this box even if they dispute a small amount of the debt.

- 7. "Is the person or company bringing this lawsuit not a name you recognize?"
  - If they do not recognize the name of the plaintiff, they should most likely check this box, as the plaintiff is most likely a debt buyer. Even if they recognize the original creditor, in most cases the debt buyer-plaintiff does not have proper proof of assignment or failed to serve required notice of assignment. A debt may have been sold several times and each assignee in the chain must provide proper proof and notice of assignment. If they do not recognize the plaintiff, advise the client to check box 7.
  - Unless the client tells you otherwise, you should advise the client to check this box in every case where the plaintiff is a debt buyer.

- 8, 9. "If the person or company is not the original creditor, when you look online, at http://www1.nyc.gov/site/dca/consumers/check-license.page, does the person or company have a debt collector's license and include that license number in the complaint?" (If the plaintiff is the original creditor, you will not be able to use this defense.)

7

**A48**

**AJM** **American Justice Movement**

- To the extent possible, please help the client look up the debt collector's information online.
- If the plaintiff does not have a license, advise the client to check box 8.
- If the plaintiff does not include the license number in the complaint, advise the client to check box 9.
- Note that this defense may not apply in every part of New York State, but you should advise the client to check the box if it may apply.

○ 10. "How long has it been since you last made a payment on this debt (even a small payment counts)? Or if you have never made a payment, how long has it been since you missed your first payment?"
- Whether or not the client should check box 10 depends on what type of debt it is:
  - If it is a consumer credit claim (like a credit card, private student loan, or personal loan), check box 10 if it has been more than 3 years.
  - If it is an auto loan or store credit card (e.g., Macy's of Sears cards), check box 10 if it has been more than 4 years.
  - If it is a cell phone debt, check box 10 if it has been more than 2 years.
  - And if it is a rent obligation, a medical debt, or tuition, check box 10 if it has been more than 6 years.
- [After April 1, 2022, the statute on consumer credit claims (e.g., credit card, auto loan, private student loan, personal loans) will become 3 years.]

○ 11. "Did you file for bankruptcy and list this debt in your bankruptcy forms and receive a discharge?"
- If yes, advise the client to check box 11.

○ 12, 13. "Did your creditor sell whatever the property was that was securing this loan? For example, did your creditor already repossess your car that is the subject of this loan? If they did, did they sell it for a price that is less than you think the property is worth? And did you receive notice of the sale on paper with information of the sale within 10 days of the sale?"
- If the collateral was not sold, go on to 14.
- If the collateral was sold but not for a fair price, advise the client to check box 12.
  - In most auto loan or lease-to-own cases, the collateral will not be sold at a commercially reasonable price due to the limited effort to publicize the auction. Client can look at https://www.kbb.com/ to get an estimate of vehicle's value.

8

**A49**

**AJM** **American Justice Movement**

- ■ If the collateral was sold and the client did not receive notice, advise the client to check box 13.

- ○ 14. "Are the things the creditor could have done but didn't do that would have helped minimize their loss? One common example is where a tenant leaves a lease early and the landlord delays in seeking an alternative tenant. It is landlord's burden in court to prove that it took reasonable measures to mitigate damages."
  - ■ If the answer is yes, advise the client to check box 14.

- ○ 15. "Is the amount demanded more than the amount you owe? The amount may be higher than the original debt due to interest and other charges, but the plaintiff cannot excessively delay to allow such amounts to unreasonably increase."
  - ■ If the amount demanded seems out of step with the amount owed, advise the client to check box 15.
  - ■ You will likely advise clients to check this box in most cases, especially for clients who already checked box 6.

- ○ 16. "Has the other side not dealt honestly and fairly with you? For example, has your creditor lied to you about your rights or about how to handle your debt?"
  - ■ If yes, advise the client to check box 16.
  - ■ You will likely advise clients to check this box in most cases.

- ○ 17. "Was the agreement you signed very unfair in the first place? For example, was the interest rate your creditor charged much higher than the market rate for similar debts?"
  - ■ If yes, advise the client to check box 17.
  - ■ You will likely advise clients to check this box in most cases.

- ○ 18. "Do you think the plaintiff waited too long to bring this case on purpose and it makes it that much harder for you to defend against it?"
  - ■ If yes, advise the client to check box 18.

- ○ 19. "Were you sued in a county outside of New York City where you do not live or work?"
  - ■ If yes, check box 19-a, but if the suit was filed in Suffolk County, advise the client to check 19-b.

- ○ 20. "Are you in the military?"
  - ■ If yes, advise the client to check box 20.

**A50**

**AJM** **American Justice Movement**

- ■ Being in the military may mean that the client can delay their case. If the client is in the military, advise the client to seek advice from a lawyer (or other resources described in Exhibit D to this Training Guide).

- ○ 21. "Are there any other reasons you should not be held liable for this debt that you want to communicate to the court?"
  - ■ If yes, check box 21 and advise the client to write the reasons in the blank or additional information they want to share with the judge (but advise the client not to include any information that might contradict any of the prior boxes they checked).
  - ■ Some examples of additional reasons might be that the client did not have the capability to understand the original agreement they signed or if the client was under 18 years old at the time and did not have the consent of their parent or guardian.

- ○ 22. "Is your only source of income one that may not be taken by creditors to satisfy judgments. This includes:
  - ■ If you make less than $450 per week after mandatory deductions (taxes, social security, Medicare), or
  - ■ Supplemental Security Income (SSI), Social Security retirement, Social Security Disability, Public assistance (like TANF), Income earned while receiving SSI or public assistance, Disability of Workers' compensation benefits, Veterans benefits, black lung benefits, Spousal or child support, Railroad retirement, Unemployment."
  - ■ If the client answers yes, advise the client to check box 22, and advise the client to write the source of their income in the blank on line 22.

- ○ 23. "Counterclaims are claims that the client might be able to bring against the debt collector if the debt collector did something unlawful in connection with their attempts to collect the debt."
  - ■ If the client believes they may have a counterclaim, you should inform them that they would mostly likely be better off looking for a lawyer, including through some of the institutions in Exhibit D.
  - ■ Some examples of a potential counterclaims include:
    - ● If the client has received two summonses in different cases for the same debt, or if the other side lied to the client about whether and when they would file a lawsuit, advise the client to check line 23 and write the dollar amount of damages the client suffered (or $50 if the client has not suffered more than $50 in harm) and, next to "Reason:" write "Unfair and Deceptive Business Practice under N.Y. General Business Law section 349" and a very brief description of the conduct.

10

**A51**

AJM **American Justice Movement**

- Additionally, if the client has experienced inappropriate debt collection behaviors that violate the Fair Debt Collection Practices Act ("FDCPA")[2], advise the client to check line 23, write $1000 plus any monetary damages the client suffered, and, next to "Reason:" write "Fair Debt Collection Practices Act, 15 U.S.C. sections 1692a-o" and briefly describe the conduct. Some common examples of conduct by debt collectors that may violate the FDCPA include: contacting unrelated people (e.g., neighbors) about the debt; making harassing phone calls, using obscene language, or threatening violence; and making any false representations about the debt.
- You should warn the client that they may have additional counterclaims that you are not equipped to help them with, but that these are common counterclaims that people in their situation sometimes have.

- Once you've directed the client how to fill out the answer form, tell them to (1) take the Answer form to the court clerk; (2) ask the court clerk to notarize the Answer; (3) ask for a copy of the notarized Answer to keep for their records; (4) ask the clerk about when they will be notified about their court appearance. Remind the client that they should do all of this as soon as possible and that they may be required to do so within 20 days of being served with summons, but that they should still answer even if they are late.
    - The location for bringing the answer to the court depends on which county the lawsuit is in:
        - Bronx: 851 Grand Concourse, Basement, Bronx, NY 10451; Go to Window 6 to request your file and then to Window 14 to answer.
        - Kings (Brooklyn): 141 Livingston St., Room 302, Brooklyn, NY 11201.
        - New York (Manhattan): 111 Centre Street, Room 118 Windows 7-10, New York, NY 10013.
        - Queens: 89-17 Sutphin Boulevard, Room 147, Jamaica, NY 11435.
        - Richmond (Staten Island): 927 Castleton Avenue, Basement, Staten Island, NY 10310
    - There may be other temporary options for filing the answer online or by phone, but these vary by court and the client should contact the relevant court to determine if there is an alternative to bringing the answer to the court in person.

- You should advise the client that after they have answered they will be required to show up at the court either in-person or virtually through Microsoft Teams, and that they might receive more information about their court date through a postcard in the mail. Remind

---

[2] More details about the FDCPA and other laws that limit what debt collectors can say or do are available from the Consumer Financial Protection Bureau at https://www.consumerfinance.gov/ask-cfpb/are-there-laws-that-limit-what-debt-collectors-can-say-or-do-en-329/.

11

# AJM American Justice Movement

them that if they don't show up they can still lose their case, but encourage them that showing up is half the battle. Please also provide the client with the information in Exhibit E about "What happens next after you answer?"

**If you cannot assist a client—for example, because they have not been served with a debt collection lawsuit or have already filed an answer in such a lawsuit—you should inform them that they require assistance you cannot provide and that they should consider contacting the resources listed in Exhibit D.**



# Ex. A – Justice Advocate's Affidavit

In order to provide legal advice as part of the American Justice Movement, you must attest to the following:

- I am providing limited legal advice for the purpose of helping all Americans understand and access their legal rights and to increase access to the courts.
- I recognize that I am providing clients with legal advice and am not merely engaging in clerical non-legal assistance.
- I promise not to request or receive any compensation for the services I provide.
- I promise to adhere to the Training Guide provided by the American Justice Movement and to not provide legal advice on any other issue. I understand that if I provide legal advice outside the scope of the Training Guide, I may be engaged in the unauthorized practice of law and I understand the consequences of doing so.
- I promise to clearly and honestly communicate the limited nature of the service I can provide to all of the people who seek my legal advice.
- I promise to adhere to the obligations described below and promise to withdraw from any representation if there is any risk that it will not be in the client's best interest:
  - *Conflicts of Interest*: Justice Advocates must comply with Rules 1.7, 1.8, and 1.9 of the New York State Rules of Professional Conduct as though the Justice Advocate were acting as a lawyer if the Justice Advocate has knowledge at the time of the representation that the representation involves a conflict of interest.
  - *Informed consent*: Justice Advocates must secure the client's informed consent to the limited scope of the representation—all decisions must be made in the client's best interest.
  - *Confidentiality*: The representation provided through AJM must comply with the confidentiality requirements set out in Rule 1.6 of the New York State Rules of Professional Conduct.
- I promise to abide by other consumer-protection laws, including protections against false advertising, fraud, and deceptive practices. *See, e.g.*, New York General Business Law § 349 ("Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.").
- I recognize that if I fail to abide by these guidelines, I can be removed as a Justice Advocate and may face other penalties, including under laws governing the unauthorized practice of law.

_____        _____
Name                                          Phone number and/or email address

_____        _____
Signature                                     Date



# Ex. B – User Agreement

Thank you for being a part of the American Justice Movement, an organization committed to ensuring that all Americans can exercise their right to provide and receive free legal advice for the purpose of expanding access to the courts.

This is an agreement between you and the American Justice Movement. It describes the terms of the project to provide you with free, limited legal advice and assistance. By signing this agreement, you acknowledge that you understand the limitations of the advice you are receiving and that you are receiving this advice for the purpose of asserting your own rights and expanding access to the courts.

**Justice Advocates:** The Justice Advocates who are offering you free legal advice are not lawyers and not employees of the court. They are volunteers who believe in the American Justice Movement's mission to increase access to justice and are providing you with free advice to advance that goal.

**Scope of Legal Advice:** Justice Advocates are able to provide limited, free legal advice about whether and how to respond to your debt collection lawsuit based on the information you provide. You will still be required to represent yourself in your case and neither the Justice Advocates nor the American Justice Movement will represent you. Neither the American Justice Movement nor the Justice Advocates assume any liability regarding the outcome of your case.

**Cost:** All of the advice you receive will be provided for free. If the Justice Advocate asks you to pay anything in connection with this service, please notify the American Justice Movement immediately through the form on our website: https://www.americanjusticemovement.org/complaint-form.

**Duration and Follow-up:** The advice the Justice Advisor provides is limited to this meeting. However, you acknowledge that the American Justice Movement may contact you in the future.

**Limitations:** The Justice Advocate may decline to provide you with advice if your legal problems are too complicated or outside the scope of this project or for any other reason.

_____         _____
Name                                                    Phone number and/or email address


_____         _____
Signature                                              Date

**AJM** American Justice Movement

## Ex. C – Answer Form

_____COURT       COUNTY OF _____       Part: _____

_____
                                    **Plaintiff(s)**
-against-

_____
                                    **Defendant(s)**

**WRITTEN ANSWER**
**CONSUMER CREDIT TRANSACTION**

**Index Number:** _____

**ANSWER: (Check all that apply)**

1.  ☐ General Denial: I deny the allegations in the Complaint.

**SERVICE**

2.  ☐ I did not receive a copy of the Summons and Complaint.
3.  ☐ I received the Summons and Complaint, but service was not correct as required by law.

**DEFENSES**

4.  ☐ It is not my debt. I am a victim of identity theft or mistaken identity.
5.  ☐ I have paid all or part of the alleged debt.
6.  ☐ I dispute the amount of the debt.
7.  ☐ I had no business dealings with Plaintiff (Plaintiff lacks standing).
8.  ☐ There is no record of plaintiff having a license to collect debt (only for cases filed in New York City, Buffalo and other municipalities requiring debt collectors to be licensed).
9.  ☐ Plaintiff does not allege a debt collector's license number in the Complaint (only for cases filed in New York City, Buffalo and other municipalities requiring debt collectors to be licensed).
10. ☐ Statute of limitations (the time has passed to sue on this debt).
11. ☐ This debt has been discharged in bankruptcy.
12. ☐ The collateral (property) was not sold at a commercially reasonable price.
13. ☐ Failure to provide proper notice before selling collateral (property).
14. ☐ Failure to mitigate damages (Plaintiff did not take reasonable steps to limit damages).
15. ☐ Unjust enrichment (the amount demanded is excessive compared with the original debt).
16. ☐ Violation of the duty of good faith and fair dealing.
17. ☐ Unconscionability (the contract is unfair).
18. ☐ Laches (plaintiff has excessively delayed in bringing this lawsuit to my disadvantage).
19-a. ☐ OUTSIDE OF NEW YORK CITY ONLY: Lack of personal jurisdiction under Uniform City Court Act § 213 (applies if you do not work in the city where the case was filed and you are not a resident of that city or (for all counties except Westchester and Nassau counties) you are not a resident of a town next to that city within the same county).
19-b. ☐ SUFFOLK COUNTY: Lack of personal jurisdiction; the defendant is not a resident and/or was not served in, or there was no transaction of business in, that portion of Suffolk County for which a District Court has been established (Towns of Huntington, Babylon, Islip, Smithtown and Brookhaven).
20. ☐ Defendant is in the military.

**OTHER**

21. ☐ Other Reasons _____
22. ☐ Please take notice that my only source of income is _____, which is exempt from collection.

**COUNTERCLAIM(S)**

23. ☐ Counterclaim(s): $_____   Reason:_____

**VERIFICATION**

State of New York, County of _____ss:

_____, being duly sworn, deposes and says: I have read the Answer in Writing and know the contents to be true from my own knowledge, except as to those matters stated on information and belief, and as to those matters I believe them to be true.

Sworn to before me this _____ day of _____, 20____.

_____                    _____
            **Notary Public**                               **Signature of Defendant**

                                    **Defendant's**      _____
                                     **Address:**

This case is scheduled to appear on the court calendar as follows:

Date: _____   Part: _____   Room: _____   Time: _____   Both sides notified:   Yes   No

UCS-CC-○ (revised) ○ (11/15)

1

**A56**

**AJM** American Justice Movement

## Ex. D – Alternative Sources of Assistance

**If you cannot help a client, you should encourage them to contact one of the following resources:**

- **New York City Consumer Help Finder:** https://nycoi.legalserver.org/modules/matter/extern_intake.php?pid=129&h=daa817
- **New York Legal Assistance Group: (212) 417-3700**
- **City Bar Justice Center: (212) 626-7383**
- **Brooklyn Volunteer Lawyers Project:** https://vlpoi.legalserver.org/modules/matter/extern_intake.php?pid=129&h=daa817&
- **New Economy Project: (212) 925-4929**
- **Legal Aid Society: (888) 663-6880 (Wednesday)**
- **Legal Services NYC: (917) 661-4500**
- **Law Help:** http://www.lawhelp.org/
  - **Law Help provides a directory of other legal resources**

**If the client has already had a default judgment entered against them, they may be able to have it vacated if they follow the directions here:** https://nycourts.gov/courts/nyc/civil/int_affidavit2vacate.shtml

1

**A57**



## Ex. E – What happens next after you answer?

**While you cannot help a client after they have filed an answer, you should let them know that the court will schedule a hearing. Provide them the following information about what will happen next.**

**More information is also available at: https://nycourts.gov/courts/nyc/civil/tips.shtml.**

*Tips for Your Day in Court*

---

**Don't Miss Your Court Date**

Court is not an appointment that can be missed or rescheduled. If you miss your court date (including being late) there could be serious consequences – the court could enter a judgment against you. If you have a serious reason why you can't go to court, you must call the court clerk and request an adjournment.

Due to the Covid-19 pandemic, you may be able to appear by phone or remotely with Microsoft Teams. If you are interested in appearing remotely, ask the court clerk how you should proceed. You should only appear remotely, if you have reliable internet and access to a computer, tablet, or smartphone.

**Get There Early**

You should allow plenty of time to travel. Consider the traffic, weather, parking, frequency of public transportation, and extra time needed to get through security at the entrance to the courthouse. Being late can make you anxious and unable to do your best. Remember that court may be an all day affair. If you choose to appear remotely, always test the Teams link before your court appearance. Once you log-in, you may be put in a virtual waiting room for some time until the court clerk lets you in.

**Be Prepared**

Bring your files. You should have a file with copies of all of your court papers and papers from the other side. Bring a notepad and pens in case you want to take notes. Bring change in case

1

**A58**

**AJM** American Justice Movement

you need to use the copy machine. Visit the courthouse and courtroom ahead of time, if possible, so you are comfortable with the location and observe how things work. Make notes of the questions you want to ask. Practice your presentation with friends and family.

**Bring Your Evidence**

If you are supposed to bring evidence and witnesses to the courtroom, bring everything. If you have documents or pictures, bring the original item and two copies. Ask your witnesses to arrive early and dress nicely. Some documents can't be used as evidence unless the right person is in the courtroom to explain the document and answer questions about it. You can learn more by reading a Civil Court publication on how to try or prepare for your case.

**Dress Nicely**

Wear conservative clothing. T-shirts with curses, belly shirts, plunging necklines, sunglasses, and torn clothing are not appropriate. You do not have to buy new clothing for court, but remember it is a formal place and you want to be conservative and respectful.

**Act Properly in the Courtroom**

Certain behaviors are not allowed because they are noisy, distracting or disrespectful. You should turn off your cell phone or pager when you are in the courtroom. You can't chew gum, eat, sleep, wear a hat, listen to music, talk on a cell phone, take pictures, or carry a weapon in the courtroom. You should enter and leave the courtroom quietly, so you do not disturb others.

The courtroom calendar is usually posted outside the courtroom. Look for your case and write down the calendar number. Tell the clerk or officer that you are there and give them the calendar number. Let them know if you need an interpreter. Listen for your case to be called. You should stand when you speak to the Judge and address the Judge as "Your Honor." You will be expected to treat others in the court respectfully, no yelling or cursing or cutting someone off when they are speaking. You should speak clearly and slowly. Your words are being recorded, either by a machine or a person. If you mumble, speak too quickly, too softly, or answer by shaking or nodding your head, the record will not be accurate.

**Before You Leave Court Make Sure You Understand What Happens Next**

Ask the Clerk, or Court Attorney if you do not understand something or are confused about what you are required to do. If you are supposed to come back, make sure you know when and where. If you are supposed to submit something to the court, make sure you know what to do. If the Judge made a decision or you settled the case, make sure you have a copy of the order or stipulation. You can also visit the Help Center in the courthouse for legal and procedural information.

2

**A59**

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

UPSOLVE, INC. and REV. JOHN UDO-OKON

Plaintiffs,

-v-

LETITIA JAMES, in her official capacity
Attorney General of the State of New York,

Defendant.

Case No. _____

---

**DECLARATION OF ROHAN PAVULURI**

1.      My name is Rohan Pavuluri. I am over the age of twenty-one and competent to testify to the matters set forth in this Declaration. Unless otherwise indicated, the facts stated herein are based on my personal knowledge or upon my review of documents to which I have access.

**BACKGROUND**

2.      I co-founded Upsolve—a 501(c)(3) nonprofit organized under the laws of the State of New York—and currently serve as Chief Executive Officer of Upsolve. I also serve in a volunteer capacity as a Board Director of the National Center for Access to Justice, a member of the Emerging Leaders Council of the Legal Services Corporation, and a member of the Making

Justice Accessible Initiative of the American Academy of Arts and Sciences. I got the conviction to start Upsolve during my time as a volunteer at the Access to Justice Lab at Harvard Law School.

3.      Upsolve is an organization that engages in education and advocacy with the mission of ensuring that all Americans can understand and access their legal rights for free, fight the cycle of poverty, and achieve economic mobility.

4.      Upsolve started by empowering people to file for bankruptcy on their own using a web application. Upsolve designed an application that asks people questions about their finances in language they can understand and then uses this information to help them generate legal forms they can file with the court to relieve their debt on their own and re-enter the economy. Upsolve also provides free education and online community that enables users to support each other emotionally.

5.      Upsolve is now the largest nonprofit organization providing bankruptcy-related resources in the United States. It is also one of the widest-reaching legal-related nonprofit organizations launched in the last two decades nationwide and a leading non-partisan political advocacy organization working toward a more accessible civil legal system. Many low-income self-represented debtors have used its tools to file for simple, no-asset Chapter 7 bankruptcy, relieving more than $400 million in debt.

6.      Upsolve also provides free online education that reaches over 150,000 individuals per month covering topics like student loans, wage garnishment, debt collection lawsuits, eviction, repossessions, foreclosures, and other topics at the intersection of financial distress and the civil legal system.

7.     Upsolve does not and has never received or requested any compensation from its users for the service it provides. It instead relies primarily on charitable donations from individuals and institutions.

8.     Until now, Upsolve has provided free software and education—not legal advice or representation—aimed at addressing the serious gap in available free services for low-income Americans with overwhelming debt, to whom free legal services, especially full representation, are in short supply. Upsolve has provided technology and education to self-represented debtors with simple no-asset Chapter 7 bankruptcy cases for whom full-representation may not be necessary. These individuals benefit from free online education, automated form generation, and checks for consistency, which Upsolve's web-based platform provides.

9.     From the beginning, the dual purpose of Upsolve has been to (1) directly improve people's lives and (2) advocate for a more accessible legal and financial system.

10.    Upsolve's advocacy over the last five years has taken the form of op-eds, speeches, conference and panel presentations, policy proposals, media outreach, and conversations with elected officials, Bar Associations, judges, legal scholars, and state agencies.

11.    In May 2021, I delivered a TED Talk on the access to justice crisis and Upsolve's vision for a more accessible legal system. The talk has been viewed over 1.4 million times. See TED, An App that Empowers People to Solve Their Legal Problems (May 2021), https://www.ted.com/talks/rohan_pavuluri_an_app_that_empowers_people_to_solve_their_legal _problems?language=en. In August 2021, I wrote an Op-Ed in CNN with Congressman Joe Kennedy III about the need for a new civil right in America: the right to access your rights, regardless of how much money is in your bank account. See Joe Kennedy and Rohan Pavuluri,

**A62**

We need a new civil right, CNN (Aug. 8, 2021 8:24 PM), https://www.cnn.com/2021/08/08/opinions/access-to-justice-gap-civil-rights-kennedy-pavuluri/index.html.

12.     Upsolve's success in providing technology-enabled support and free online education to self-represented debtors has been recognized and lauded by a number of legal institutions and media outlets, including TIME, the ABA Journal, New York Times, the Wall Street Journal, and the Washington Post. Upsolve has been funded by a variety of leading philanthropic institutions, including the Robin Hood Foundation and the Hewlett Foundation.

## THE ACCESS TO JUSTICE GAP IN DEBT COLLECTION IN NEW YORK

13.     My work in bankruptcy has shown me that there are other areas of our civil legal system where low-income Americans cannot access their legal rights because they cannot afford a lawyer, there are not enough free lawyers, and there is no adequate model of non-lawyer assistance. These problems are acute in New York City, where I live and Upsolve is headquartered.

14.     Based on our research and conversations with members of the Upsolve community, we have found that responding to debt collection actions is one area where the demand for straightforward, simple, and low-cost legal advice far exceeds the available supply of such advice. The result is that most low-income people in New York are unable to access the justice system to vindicate their rights. Indeed, debt collection lawsuits are one of the main reasons why Upsolve users consider bankruptcy. Debt collection lawsuits affect millions of people each year, including thousands of New Yorkers, and can have devastating consequences.

15.     Based on our experience, we have learned that low-income individuals often fail to understand and access their rights and fail to participate in the lawsuits against them, even where those lawsuits lack merit or ask for more money than the person owes. While representation by attorneys would be one way to fill this gap, our experience suggests that most low-income people

4

**A63**

who are facing debt collection actions cannot afford a paid attorney and free attorneys are in too short supply.

16.     Responding to a debt collection lawsuit is not complicated. New York State provides a one-page fill-in-the-box form for litigants to file that allows debt collection defendants to raise common affirmative defenses to owing the debt they are being sued on.

17.     Nonetheless, the overwhelming majority of debt collection defendants in New York still fail to file an answer and therefore default.

18.     Based on our experience, it appears that many people are unaware of their rights, unaware of the fill-in-the-box form provided by New York State, or do not understand how to fill it out or why they might want to respond to the lawsuit, given their lack of experience with the legal system, the complexity of the legal system, and the stress, intimidation, and discomfort caused by having to interact with the legal system. Furthermore, our understanding is that many defendants who do respond fail to adequately protect their rights by failing to assert the appropriate affirmative defenses—and thus risk forfeiting those defenses.

**THE AMERICAN JUSTICE MOVEMENT**

19.     In order to address this access to justice problem, Upsolve is prepared to launch a new project: the American Justice Movement ("AJM"). Attached to this Declaration, as Exhibit A, is the "Action Plan" Upsolve has prepared describing the program and its planned implementation to potential partners and funders.

20.     As the Plan describes, Upsolve has already invested its own existing staff and financial resources in developing this program and is preparing to hire dedicated staff for the program. Moreover, Upsolve has received a commitment of funds restricted to the American Justice Movement, which will allow Upsolve to hire staff to implement the program immediately. Once started, Upsolve will seek additional funding to expand the program further.

21.     The purpose of AJM is to create and support an association of professionals who are not lawyers and low-income individuals uniting to ensure meaningful access to the courts and raise awareness of the access to justice gap that prevents low-income Americans from understanding and accessing their legal rights when they cannot afford a lawyer and cannot find pro bono counsel. AJM is not being organized for any commercial purpose.

22.     AJM will do so by recruiting a corps of "Justice Advocates," who are professionals who are not lawyers. Upsolve will train the Justice Advocates to provide free, carefully circumscribed legal advice on how to respond to a debt collection action in New York.

23.     In order to ensure that AJM works in the interest of the low-income New Yorkers it is designed to help, Upsolve will exercise careful oversight over the selection, training, and performance of Justice Advocates and will provide Justice Advocates with careful guidelines they must adhere to in order to provide advice under AJM's auspices.

24.     Upsolve has prepared a Training Guide that specifies the assistance Justice Advocates may provide. The Training Guide also includes strict quality-control requirements that Justice Advocates must adhere to—including confidentiality and conflict-of-interest protections identical to those followed by lawyers providing pro bono representations, and consistent with New York's Rules of Professional Conduct.

25.     In designing these safeguards, we ensured that AJM will advance the interests in protecting consumers from harmful advice and ensuring the integrity of our judicial system that underpin New York State's regulation of the practice of law. We have designed the Training Guide in consultation with experts in debt collection law to ensure that all advice provided will be in clients' best interests and will leave them better off than they would have been without the assistance.

6

**A65**

26.     Upsolve has worked with Tashi Lhewa, the Supervising Attorney of the Legal Aid Society's Consumer Law Project, and Professor Pamela Foohey, a consumer-law expert at Cardozo Law School, in preparing this guide to ensure that all advice Justice Advocates will provide is in the clients' best interests and does not risk making clients worse off than they would be going it alone.

27.     The Training Guide clearly defines the narrow limits of the program and requires Justice Advocates to refer clients to other resources when the assistance needed is outside the scope of the Justice Advocates' training. By empowering low-income New Yorkers to answer the lawsuits against them and raise potential defenses to liability, AJM is designed to help increase public confidence in the legal system by ensuring that courts have the opportunity to fully and fairly adjudicate the cases before them.

28.     Specifically, as the Training Guide describes, Justice Advocates may provide advice under the auspices of AJM if they provide that advice for free, they ensure that their clients agree to the limited nature of the advice being provided, and they provide only advice described in the Training Guide. Moreover, AJM will track every instance of advice giving—which amounts to closer supervision than the bar ordinarily has over legal advice giving—and will routinely follow up with clients to ensure that Justice Advocates are providing advice consistent with the terms of the Training Guide and other guidelines set by AJM.

29.     In developing the American Justice Movement, we have spoken with many low-income individuals who have told us they would benefit from such advice. Upsolve is also in the process of recruiting and training Justice Advocates.

30.     Rev. John Udo-Okon is one individual who would like to participate as a Justice Advocate. Rev. Udo-Okon is prepared to provide free legal advice consistent with the Upsolve

7

**A66**

Training Guide and has potential advisees—members of his community—who would imminently seek and benefit from his advice.

31.     Upsolve therefore stands ready to implement AJM immediately.

32.     Unfortunately, Upsolve is chilled from engaging in this advocacy and association because of regulations governing the unauthorized practice of law, which prevent professionals who are not lawyers from providing legal advice. It is also unlawful to aid or solicit the unauthorized practice of law. On information and belief, these laws are consistently enforced in New York, and the Attorney General frequently investigates and prosecutes individuals engaged in the unauthorized practice of law. Providing individualized advice to a person about whether or how to respond to a debt collection action qualifies as legal advice, even when the advice simply involves helping the person understand, fill out, and submit New York's simple form.

33.     These regulations mean that as soon as AJM launches, Upsolve, its officers and employees, Rev. Udo-Okon, its advisees, and any others who aid our project or solicit our advice face the risk of criminal and civil liability. That threat has caused us to refrain from implementing the program. If the threat were eliminated, we would launch the program immediately.

34.     The chill on our associational and speech rights is particularly severe because this entire effort is grounded in our desire to engage in advocacy and expression on behalf of low-income Americans.

35.     Through my work at Upsolve, I have come to believe that it is one of the greatest civil rights injustices of our time that millions of people who are poor cannot access their civil legal rights because they cannot afford lawyers to help with the problems they face. By and large, when you cannot afford a lawyer, and you cannot find one for free, you simply cannot access the justice system to vindicate your rights. I believe this injustice is one of the most urgent and

8

**A67**

fundamental civil rights issues of our time. I co-founded Upsolve and now AJM as an advocacy effort to help close this access to justice gap and draw attention to these problems more broadly, including beyond the debt collection context. I firmly believe these injustices compromise our rule of law, undermine public perceptions of the fairness of the justice system, and undermine our democracy.

36.     AJM's mission to engage in this advocacy effort is also grounded in the belief that the access to justice gap is a racial justice issue. People of color have been—and continue to be—disproportionately impacted by the access to justice gap, in part because of historical disparities in education, employment, health, and wealth. Language barriers and cultural differences can also make accessing justice particularly hard for low-income immigrant communities. AJM is built on the recognition that among the people who can help solve these problems are professionals who are not lawyers and are already embedded in those communities. This includes clergy, patient advocates, social workers, community organizers, and so many others who are already living and working to help communities in need, and who often better reflect their full diversity than the attorneys who are available to individuals in these communities. AJM would empower these faith leaders and other individuals to meet the needs of their communities by helping each other advocate for their interests, and in turn help America truly live up to its founding ideals.

37.     The chilling effect of potential liability is causing Upsolve irreparable harm. Every day that goes by means more low-income New Yorkers—including many visitors to Upsolve's website and members of Rev. Udo-Okon's church and community—will be deprived of their property and their civil legal rights due to the lack of free assistance to help them vindicate those rights. This problem is especially acute as debt collection activity accelerates in the aftermath of the COVID-19 pandemic while alternative resources to assist low-income defendants remain

**A68**

limited as a result of the pandemic. This state of affairs undermines Upsolve's mission and gravely harms the interest of the individuals we serve.

38.     AJM's advocacy work to provide free legal advice is in furtherance of Upsolve's slogan and political belief that "Civil Rights Should Be Free." I believe now is the time to launch AJM to help make that belief a reality and to ensure access to the courts for all individuals rich and poor.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed this 10 day of _____January_____, 2022.

Rohan Pavuluri

**A69**

# Exhibit 1A



# Action Plan: The American Justice Movement

## Executive Summary

Today, Upsolve is one of the most impactful nonprofit membership organizations in America helping low-income families access their civil legal rights. We do this through our free online education, community, self-service technology tools, and advocacy.

About two million individuals consume our free legal education per year and our self-service legal tools have helped low-income families relieve over $400 million in debt. Our average user has less than $1,000 in savings and earns under $20,000 per year.

Upsolve exists to address one of the fundamental civil rights injustices of our time: Low-income Americans who cannot afford lawyers often don't receive equal justice under the law. People have a constitutional right to a free attorney in criminal cases, but not civil cases. So if a person needs legal help in a civil case but cannot afford a lawyer or cannot find free legal help, which is often in limited supply due to the high educational costs required, she will be forced to go it alone. The effects of legal fees in poverty law can be like modern-day poll taxes: If you can't afford the fees, you can't access your rights.

Over the last three years, we've learned that education and software alone cannot solve this civil rights injustice. The way to truly bring about equal justice under the law is to empower professionals who are already acting in the public interest – clergy, patient advocates, librarians, social workers, community organizers, and frontline nonprofit staff – to provide free legal advice to poor and working-class people who need legal help but can't afford lawyers and can't find free legal help.

The access to justice crisis gap harms economic mobility, contributes to the cycle of poverty, and comes at a financial cost to the entire public. This civil rights issue is also a racial justice issue: the status quo has a disproportionate impact on communities of color, preventing many people from vindicating their legal rights. Communities of color often have disproportionately fewer lawyers, and especially lack trustworthy legal advocates that reflect the diversity of their own communities.

Given our track-record reaching, educating, and assisting low-income families at scale about their civil legal rights, Upsolve is launching the **American Justice Movement (AJM)** to empower individuals who cannot afford lawyers to receive free legal advice from trained and vetted professionals who are not lawyers. AJM is a non-partisan political movement that aims to strengthen the American democracy by safely expanding the rule of law to people who are unable to access our courts.

# AJM American Justice Movement

The first initiative of the American Justice Movement is the **Consumer Rights Project**. Upsolve will train outside nonprofit professionals to be AJM Justice Advocates. These professionals will provide personalized, free legal advice to low-income individuals and families who have been sued by their debt collectors and need help responding to that lawsuit.

We believe the American Justice Movement will help low-income families understand their rights and curtail unsavory behavior from certain creditors. Our goal is to create a more accessible and humane financial and legal system.

## Problem

Debt collection lawsuits are one of the most common civil legal issues in America. According to a study by the Pew Charitable Trust, 1 in 4 civil cases is a debt collection lawsuit.[1] This amounts to about 4 million debt collection lawsuits every year. In recent decades, debt collection lawsuits have more than doubled. Almost always, these lawsuits are for less than $10,000 and often less than $5,000.[2]

Over 70% of debt collection lawsuits end in default judgments against the defendant because the defendant simply does not show up. This means that nearly 3 million Americans lose their debt collection lawsuits and lose their property and face the risk of wage garnishment, bank seizures, eviction, and lasting damage to credit without the plaintiff needing to ever prove their case and without the court ever needing to consider any facts at all.[3] **It is a civil rights injustice that low-income Americans suffer these grave harms, losing their property rights without being able to meaningfully access the courts to have a neutral determination of their rights.**

Very few private attorneys exist to represent individuals who have been sued for their debts. This is because the low dollar amounts of these claims make it difficult for private attorneys to build a sustainable business model around debt collection defense representation. And there aren't close to enough free lawyers in America—especially in light of the high educational costs—to meet the demand of every single person who needs legal help. One 2010 report stated that the leading free program serving low-income NYC residents facing debt collection lawsuits received funding sufficient to serve less than 2% of the approximately 300,000 New

---

[1] The Pew Charitable Trusts, *How Debt Collectors Are Transforming the Business of State Courts* (May 2020), https://www.pewtrusts.org/-/media/assets/2020/06/debt-collectors-to-consumers.pdf.
[2] Ibid.
[3] Ibid.

# AJM American Justice Movement

York City residents sued each year by debt collectors.[4] The COVID-19 pandemic has limited the availability of this service and others like it.

Research on debt collection lawsuits further shows that exceedingly few defendants in New York have an attorney, compared with nearly 100% of plaintiffs. Nationally, studies estimate that over 90%—and in some cases 99%--of individuals sued for their debt receive no legal advice at all.[5]

On the other side of these lawsuits, debt buyers can take advantage of economies of scale to cheaply bring hundreds or thousands of mass-produced lawsuits, with little risk that they will ever have to prove their case since so many low-income New Yorkers default. As a result, there is reduced incentive to check the quality of their claims or the supporting evidence, and increased risk of fraud and abuse. Research shows that although many debt collection suits have merit, a substantial portion are meritless or overstated.

Civil debt collection lawsuits may well be the area of poverty law where there's the largest gap between a need for legal advice and the amount of legal advice available – either paid or unpaid. Our conversations with Upsolve website visitors align with this data. Most Upsolve users we've talked to have been unable to afford or receive legal advice after they've been sued for their debt. It's their top unmet legal need.

There's also striking data on the racial disparities in debt collection lawsuits. A study of judgments over a five-year period in St. Louis, Chicago, and Newark, New Jersey, found that even after accounting for income, the rate of default judgments in mostly black neighborhoods was nearly double that of mostly white ones.[6]

## Solution

We believe individuals sued for their debt would benefit from free, individualized legal advice about their rights from trained Justice Advocates.

Because low-income Americans cannot afford paid lawyers and free lawyers are in too short supply to meet this need, Upsolve is launching the American Justice Movement to meet this

---

[4] The Legal Aid Society et al., *Debt Deception: How Debt Buyers Abuse the Legal System to Prey on Lower-Income New Yorkers* (May 2010), https://www.neweconomynyc.org/wp-content/uploads/2014/08/DEBT_DECEPTION_FINAL_WEB-new-logo.pdf.
[5] The Pew Charitable Trusts, *How Debt Collectors Are Transforming the Business of State Courts* (May 2020), https://www.pewtrusts.org/-/media/assets/2020/06/debt-collectors-to-consumers.pdf.
[6] Paul Kiel and Annie Waldman, *The Color of Debt: How Collection Suits Squeeze Black Neighborhoods*, ProPublica (Oct. 8, 2015),  HYPERLINK "https://www.propublica.org/article/debt collection-lawsuits-squeeze-black-neighborhoods" \h https://www.propublica.org/article/debt collection-lawsuits-squeeze-black-neighb

# AJM American Justice Movement

need with professionals who are not lawyers. AJM will train nonprofit professionals to be AJM Justice Advocates under AJM.

To receive advice from Justice Advocates, low-income individuals will answer a series of standard and scripted questions about their debt collection lawsuit. In our own conversations and research, we've learned that debt collection lawsuit defense is an area of the law where many judges and attorneys understand the value in training Justice Advocates who are not attorneys to provide free legal advice.

Based on the information an individual shares, the Justice Advocates will provide free individualized legal advice about whether and how to draft and file an answer, so the client can respond to the lawsuit. Providing this advice and assisting low-income individuals in responding to their debt collection lawsuits will ensure that plaintiffs cannot secure a judgment without proving their case. For many of these individuals, the lack of response is not due to their unwillingness to respond and is not because they concede that the lawsuit has merit. Rather, they lack either the financial resources to seek legal counsel or lack the support to understand their rights and the procedures associated with responding to their complaints. As a result, these individuals receive automatic default judgments against them, which can result in potentially life-altering consequences down the road. Across the board, consumer lawyers and advocates agree that responding to the initial complaint is the first important, and critical, step in a debt collection lawsuit.

Specifically, the Justice Advocate will be trained to provide free, routine legal advice on whether and how to draft an answer. This is extremely simple in New York given the straightforward check-the-box answer forms that the State already provides.

Potential advice, based on the specific situation of the user, could include:

- Advising an individual to check the box on the answer form to indicate that the plaintiff must verify the debt amount.
- Advising an individual to check the box on the answer form to indicate that they do not owe the plaintiff if they're the victim of mistaken identity.
- Advising an individual to check the box on the answer form to indicate that the plaintiff is collecting debts that are time-barred if the debt is outside the applicable statute of limitations.
- Advising an individual to check the box on the answer form that they were not served properly if the plaintiff did not meet their obligations when serving the lawsuit papers.
- Advising an individual to indicate on their forms whether their income or assets are protected in a debt collection lawsuit, based on the exemptions available in the state.
- Advising an individual on how to submit the form.

4

**A74**

# AJM American Justice Movement

The Justice Advocates must make clear to clients the limited scope of the advice they are able to provide and will require clients to acknowledge the nature of the advice. Some clients will require more attention, and, in these scenarios, the Justice Advocates will inform the clients that they may require the attention of an attorney and may provide the user with potential institutions to reach out to for further assistance. To further ensure the integrity of the advice given, Justice Advocates will be required to comply with relevant ethical rules around conflicts-of-interest and confidentiality that attorneys giving similar advice would be required to comply with, and the activities of Justice Advocates will be carefully tracked and monitored.

We choose to recruit and train non-lawyer Justice Advocates for reasons of supply, cost, convenience, and trust. There are many, many more frontline nonprofit staff and other community-embedded professionals than lawyers in America. It is also less expensive for institutions to hire professionals who are not lawyers than lawyers. This enables philanthropic and government funding to go further toward accomplishing its intended means of helping low-income families.

For consumers, it's more convenient to receive help from individuals already embedded in their communities, and, importantly, they're often more likely to trust these individuals. There are already many social workers, community organizers, librarians, and frontline staff embedded in communities across America that better reflect the diversity of the populations they serve than lawyers, who are disproportionately white.[7] These individuals are acting in the public interest. They should be equipped to serve low-income and working-class families who have been sued for their debts and cannot afford legal fees.

We are launching with a focus on New York, where Upsolve is headquartered and where we are most familiar with the state, given that we've had physical offices in NY for over five years. Our New York users and others have come to us expressing the need for this advice and their interest in receiving limited legal advice from professionals who are not lawyers. And New York is where we have found the first interest from potential Justice Advocates willing to take on the role and responsibilities of providing this advice for free and for the purpose of helping low-income Americans access their legal rights.

## Guidelines for AJM Professionals

To expand the supply of Justice Advocates, we will recruit clergy, librarians, social workers, community organizers, nonprofit case workers, nonprofit paralegals, and other frontline nonprofit staff.

---

[7] Am. Bar Ass'n Comm'n on the Future of Legal Services, Report on the Future of Legal Services in the United States (2016),
https://www.americanbar.org/content/dam/aba/images/abanews/2016FLSReport_FNL_WEB.pdf.

# AJM American Justice Movement

But in order to ensure that Justice Advocates are acting in the public interest and in the best interest of the advice receivers, AJM imposes strict conditions on the Justice Advocates and the advice they provide.

1. We vet and train professionals providing free legal advice to ensure the quality of the Justice Advocates and the advice they provide. As part of this quality-control process, all Justice Advocates must affirm that they will only provide limited legal advice on issues for which AJM provides training and that they are doing so in the interest of increasing access to justice by helping low-income Americans access their civil rights.

2. We require all Justice Advocates providing legal advice to abide by a shared set of standards. At the top of the list:

   a. Justice Advocates must never receive financial or in-kind contributions from beneficiaries for providing legal advice.
   b. Justice Advocates must inform every client that they are not a lawyer before providing any legal advice and clients must acknowledge the limited-scope of the advice being provided.
   c. Justice Advocates must inform individuals receiving advice about the American Justice Movement website, so that AJM beneficiaries can report bad behavior and bad advice.
   d. Justice Advocates must comply with the same confidentiality and conflict-of-interest requirements imposed on lawyers providing pro bono representation.

3. Upsolve will review and investigate complaints about Justice Advocates and will remove Justice Advocates who fail to uphold quality care and assistance requirements and notify them of the risk of further liability if they continue to provide unauthorized assistance.

## Distribution

To reach our target audience, the American Justice Movement will employ two strategies in our first phase:

1. Provide our 150,000+ monthly Upsolve website visitors with access to available Justice Advocates.

2. Recruit and train Justice Advocates, who are already serving communities of need, to raise awareness.

To recruit Justice Advocates to train, we'll conduct outreach to community-based nonprofits that serve communities in need.

6

**A76**



## Potential Impact

Nearly 4 million people per year are sued for the debts and receive no legal advice at all. The norm is that they don't respond and they automatically lose their lawsuit, with potentially disastrous consequences. This undermines our democracy and compromises our rule of law. America can and should do better.

The American Justice Movement empowers any low-income or working-class individual or family sued for their debt to receive free, carefully vetted legal advice from a professional in their community. We aim to restore the promise of equal rights under the law by addressing one of the largest unmet needs in our civil justice system.

Free legal advice from AJM professionals will have several concrete advantages in the lives of low-income families. These relate to their personal finances, safety, freedom, and livelihood. The downstream effects of erroneous debt collection lawsuits include homelessness, hunger, and poverty, which come at a cost to all of society.

In the long run, AJM aims to curtail debt collection lawsuits and practices that are unsavory. Debt collection agencies and debt buyers today know that the vast majority of individuals they sue will not respond. And they know that most people who do take action will not receive any legal advice. Some unsavory debt collectors take advantage of that information gap by filing sloppy or unfounded suits.

If more low-income people who were sued in a debt collection action had the ability to receive free legal advice, we believe they would reduce the potential for abuse and encourage debt collection agencies to be more careful in initiating suits in the first place. After all, multiple studies suggest that individuals who receive some kind of representation fare better in debt collection lawsuits than those who respond to their complaint but don't receive any kind of legal advice.

The theory of change built into the American Justice Movement– helping people directly in the near term while fighting to create a more accessible financial and legal system in the long term – is aligned with the Upsolve philosophy for how to maximize our impact in the world.

## Why is this Urgent?

COVID-19 has caused significant financial distress and has limited the degree to which lawyers and courts are able to provide free assistance, with a disproportionate impact on communities in need. Moreover, certain debt collection and eviction moratoriums are set to expire in 2022, which may lead to an unprecedented level of debt collection lawsuits. It will be critical for

**A77**

**AJM** American Justice Movement

individuals from communities in need to be able to understand and access their legal rights when they've been sued by their creditors.

## Budget & Ask

While Upsolve has already committed existing staff resources to developing AJM, we have already raised $100,000 to fund one full-time AJM staff member and are planning to raise additional funds to further broaden the program's reach. We will hire someone with a track record of consumer-rights advocacy, a commitment to social justice, and a deep familiarity with the legal system and the ways it comes up short for poor Americans. This consumer advocate will be responsible for outreach to nonprofit professionals already embedded in communities across New York, training them on how to provide limited scope, free legal advice to individuals sued for their debt, and ensuring that the advice being provided is advancing the interests of the public and consumers.

## Legality of this Service

Under existing regulations governing the practice of law, the American Justice Movement cannot provide this service: state law is clear that non-lawyers cannot provide legal advice without facing the risk of prosecution and potentially criminal punishment for engaging in the unauthorized practice of law. It does not matter whether the law is federal, the legal advice is free, the user cannot afford a lawyer, or the area of the law is simple and routine. It does not matter if the advice is a form of political advocacy intended to help communities access the courts, advance racial, social, and economic justice, expand individual freedom, protect property and liberty, or fight debt-based poverty. It also does not matter whether the user prefers to receive free legal advice from a trained consumer advocate who is not a lawyer and fully understands that the consumer advocate is not a licensed lawyer.

But the United States Constitution guarantees all Americans the right to access their legal rights in court, regardless of their race or socioeconomic status. And the Constitution also guarantees the rights of AJM and the Justice Advocates to associate and advocate to ensure that all Americans can understand and access their legal rights. In order to achieve the goal of this program, Upsolve intends to fight in court to protect the right to provide and receive free legal advice for the purpose of expanding access to courts.

Given the risk of state regulations on the unauthorized practice of law, we are asking for a conditional gift. We hope to receive funding to support AJM's Consumer Rights Project if we can be certain that it is legal to offer the services we've outlined above.

**A78**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UPSOLVE, INC., *et al.*,

Plaintiffs,

-v-                                    Case No. _____

LETITIA JAMES, Attorney General of New
York,

Defendant.

## DECLARATION OF REV. JOHN UDO-OKON

1.      My name is Reverend John Udo-Okon. I am over the age of twenty-one and
competent to testify to the matters set forth in this Declaration. Unless otherwise indicated, the
facts stated herein are based on my personal knowledge or upon my review of documents to which
I have access.

### BACKGROUND

2.      I immigrated to the United States from Nigeria in 1997. Prior to coming to the
United States, I carried out missionary work in Northern Nigeria, which included organizing

**A79**

churches and working with missionaries on a national project to develop Christian arts for Nigerian audiences.

3.      In 1999, my wife, Pastor Felicia Udo-Okon, and I formed a small church in the living room of our apartment in the Bronx. We named that church the Word of Life Christian Fellowship International. We then moved into a small storefront we rented, which was in a lower-income neighborhood, plagued by violence and drugs. We eventually relocated the church to the South Bronx, which is among the poorest neighborhoods in New York City.

4.      At the church, I preach the gospel by providing service to people in need, with a focus on the needs of community members in the South Bronx. I believe that this is the best service I can offer to a community that is trapped in cycles of poverty that have existed throughout generations.

5.      For example, we work with one program to provide food to 8,000 households per month. We also work with schools and mobile food pantries to ensure access to food for local children. To further meet the needs of our community, my church also frequently works with social services centers, clinicians, case workers, and community health workers to engage with community residents and provide them the assistance that they need.

6.      Recently, we have begun to provide COVID-19 relief services, including a vaccine equity partnership with New York City in three zip codes in the South Bronx, and enlisting seventeen field workers to link local residents with vaccines. My work on COVID-19 vaccine distribution was recently featured in the New York Times. *See* Liam Stack, *'A Safe Space': Black Pastors Promote Vaccinations from the Pulpit*, N.Y. Times (Oct. 9, 2021), https://www.nytimes.com/2021/10/09/nyregion/covid-vaccinations-black-churches.html.

**A80**

## THE NEED FOR LEGAL ADVICE IN THE COMMUNITY

7.    One of the greatest unmet needs in my community is that many people cannot understand or access their legal rights.

8.    Our community members face many legal problems—they are at risk of eviction, face harassing calls from debt collectors, and sometimes have their power shut off even when they have critical medical equipment that requires electricity.

9.    But our community members cannot afford to hire lawyers to help them with their problems. And the legal system is too complicated for members of our community to do it on their own. In general, there also are not many consumer lawyers based in my neighborhood, and there are very few lawyers who reflect the diversity of my community. Because they do not have access to good legal advice, members of my community often end up acting against their own interests through, for example, not responding to lawsuits in general.

10.    As a result, members of my community are shut out from ways to vindicate their own rights, and are left with what feels to them like an oppressive justice system stacked against them. This is a situation that predominantly Black communities like mine face every day, and is one of the many unfortunate examples through which vulnerable populations, like my own community, cannot access and fight for their legal rights.

11.    Left without any other options, people frequently come to me with legal problems they cannot solve on their own. But since I know that it is illegal for me to provide legal advice, all I can do is refer members of my community to outside agencies. Unfortunately, these agencies are often overwhelmed with requests for free legal assistance. Members of my community tell me that they are put on long waiting lists before even receiving legal advice, even though in most

cases their situations are quite time sensitive and having to wait means losing the ability to access their rights.

12.    Since members of my community cannot afford to pay for a lawyer, cannot access free lawyers quickly enough, and cannot understand the system on their own, they are left without any guidance and, as a result, often without any ways to move forward because they cannot meaningfully access the justice system.

13.    Based on my conversations with members of my community, this problem is especially severe when it comes to credit issues and debt-collection lawsuits. In some cases, individuals in the community are being harassed by debt collectors every day. In many other cases, people do not think they owe the debts that are being demanded. But one thing is consistent: people do not know what to do when they are sued on a debt and have nowhere to turn to for help.

14.    Many of these individuals face devastating consequences and risk long-term harm to their property, their credit, and their well-being because they do not know how to respond to their debt collection lawsuits. As a result, members of my community often do not participate in their own lawsuits, even when they don't think they owe the debt they are being sued for.

15.    I am aware of people losing their homes, and having their credit scores obliterated because they cannot adequately respond to the lawsuits, cannot speak to the debt collectors in a meaningful way, and do not have any assistance in filling out the requisite forms for their lawsuits.

16.    In addition to these negative consequences, people in my community are also prevented from accessing opportunities. One area where these disparities come to light is with respect to affordable housing. In this case, the affordable housing is—in theory—supposed to benefit members of my community by providing them with a place to live. However, many of these housing developments have credit score and credit verification requirements, and therefore,

**A82**

as a result of having their credit damaged by their debt-collection lawsuits, the people who these programs are designed to help are disqualified from even accessing this affordable housing to begin with.

17.　　There is a critical and immediate need in my community for legal advice on how to respond to debt-collection lawsuits. People seek that advice from me directly. However, due to New York's unauthorized practice of law regulations, I am unable to provide that advice, in fear that I would be arrested or fined.

18.　　I am already aware of other people in my community who have tried to give this kind of advice. There are many other issues for which people cannot afford or access legal representation. As a result, these people turn to their religious leaders for help. One such religious leader in the South Bronx was accused of practicing law without a license because he was trying to help members of his community out with their legal issues. I fear that I would face the same consequences if I tried to help members of my own community out with their debt collection lawsuits.

19.　　Because of my religious beliefs, I believe it is my duty to help meet the needs of my community and to advocate for a more fair legal system in which everybody—including the disproportionately poor and disproportionately Black members of my community—can access their legal rights.

## THE AMERICAN JUSTICE MOVEMENT

20.　　There are hundreds of individuals in my community who would benefit from legal advice about how to respond to debt-collection lawsuits and on other issues right now. Attached to this Declaration as Exhibit A is a petition with 114 signatories who both need and would be willing to receive this legal advice at this very moment. These signatures were collected in a single

**A83**

day; I have no doubt there are more similarly situated individuals who would welcome this type of program and advice as well. Every day that these community members are not offered advice on how to handle their debt-collection lawsuits means more people facing the risk of wrongly losing their property and facing permanent damage to their credit.

21.    I, and other individuals I know, would be ready, willing, and able to provide this type of legal advice immediately and for free. The only thing stopping us is the threat of being prosecuted for violating New York's unauthorized practice of law regulations. I cannot risk this type of punishment.

22.    Working with the American Justice Movement to receive the relevant training and provide this narrow advice would greatly benefit members of my community, who I have already established a sense of trust and familiarity with.

23.    I would welcome the opportunity to be trained by the American Justice Movement with respect to the narrow scope of legal assistance provided in debt collection lawsuits. I would be willing to comply with the relevant ethical obligations, including confidentiality and conflict-of-interest protections, for the individuals seeking my advice. My assistance will always be free to the people who receive it.

24.    After witnessing firsthand the devastating effects of inadequately responding to these debt collection lawsuits, I would explicitly put the needs of the members of my community first, and would do my best in giving advice best suited for their interests, not my own. The reason I am providing this advice is not for my own gain but rather to help increase access to the courts and ensure that all members of my community can access their legal rights, and to advocate for broader awareness of the barriers that people face trying to access their rights.

25.    I hope to be able to participate in this program as soon as possible because with each passing day more members of my community are deprived of their own rights and property due to the lack of free legal assistance to help them vindicate those rights.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge. Executed this 15 day of December, 2021

Rev. John Udo-Okon

# Exhibit 2A



**I'm interested in and would benefit from free legal advice from Pastor John Udo-Okon at Word of Life Church, so that I can access my legal rights in court. I'm a resident of New York.**

| Signature |
|---|
| Donato Chavez. |
| Ada Rosario |
| paula martins |
| (signature) |
| Luis Castro |
| Juan Carlos |

Note: Signature may be included as evidence of public interest in this program.

**A88**



I'm interested in and would benefit from free legal advice from Pastor John Udo-Okon at Word of Life Church, so that I can access my legal rights in court. I'm a resident of New York.

| Signature |
|---|
| Yesica Suazo |
| Diomedz Alcantara D. A |
| Martha Amaya |
| Aracely Chavez |
| Fernanda Endara. |
| CARMEN Quinones |

Note: Signature may be included as evidence of public interest in this program.



**I'm interested in and would benefit from free legal advice from Pastor John Udo-Okon at Word of Life Church, so that I can access my legal rights in court. I'm a resident of New York.**

| Signature |
|---|
| *Yitit Maria* |
| DEBORAH RICKS |
| *glmacglpin* |
| Richard Watkins |
| alejandra Rodrig — ▓▓▓▓ |
| *many martine* ▓▓▓▓ |

Note: Signature may be included as evidence of public interest in this program.

**A90**



**I'm interested in and would benefit from free legal advice from Pastor John Udo-Okon at Word of Life Church, so that I can access my legal rights in court. I'm a resident of New York.**

| Signature |
| --- |
| Maria Antonia Castro |
| Juan Antonio Perez |
| Victor Rivera |
| Victoriano Gonzalez |
| Ana Rodriguez |
| Carl Wilson |

Note: Signature may be included as evidence of public interest in this program.

**A91**



**I'm interested in and would benefit from free legal advice from Pastor John Udo-Okon at Word of Life Church, so that I can access my legal rights in court. I'm a resident of New York.**

| Signature |
| --- |
| *Eduardo Rodriguez* |
| *Henry Diaz* |
| *Elvis B* |
| *Larry Johnson* |
| *Parbin Blanchard* |
| *Vannessa Santaliz.* |

Note: Signature may be included as evidence of public interest in this program.

**A92**



I'm interested in and would benefit from free legal advice from Pastor John Udo-Okon at Word of Life Church, so that I can access my legal rights in court. I'm a resident of New York.

| Signature |
|---|
| Moriz Escaño |
| Bonavia Yepi. S. |
| Justin Garcia |
| Maria Rodriguez |
| Anthony Bush |
| Memul |

Note: Signature may be included as evidence of public interest in this program.



I'm interested in and would benefit from free legal advice from Pastor John Udo-Okon at Word of Life Church, so that I can access my legal rights in court. I'm a resident of New York.

| Signature |
|---|
| |
| |
| |
| |
| Francisco |
| Maria Loja |

Note: Signature may be included as evidence of public interest in this program.



I'm interested in and would benefit from free legal advice from Pastor John Udo-Okon at Word of Life Church, so that I can access my legal rights in court. I'm a resident of New York.



| Signature |
|---|
| |
| |
| |
| |
| |
| |

Note: Signature may be included as evidence of public interest in this program.



**I'm interested in and would benefit from free legal advice from Pastor John Udo-Okon at Word of Life Church, so that I can access my legal rights in court. I'm a resident of New York.**

| Signature |
|---|
| Filemeno Co Jo |
| Malo lo |
| Valerie Ortiz |
| NISIDA  MEGo |
| |
| |

Note: Signature may be included as evidence of public interest in this program.



I'm interested in and would benefit from free legal advice from Pastor John Udo-Okon at Word of Life Church, so that I can access my legal rights in court. I'm a resident of New York.



Note: Signature may be included as evidence of public interest in this program.



**I'm interested in and would benefit from free legal advice from Pastor John Udo-Okon at Word of Life Church, so that I can access my legal rights in court. I'm a resident of New York.**

| Signature |
|---|
| |
| Maria Aguoiza |
| Mokiortto |
| Santos Reyola |
| Guy Mattin |
| Pojon Soultani |
| Gusmain Jorge |

Note: Signature may be included as evidence of public interest in this program.



I'm interested in and would benefit from free legal advice from Pastor John Udo-Okon at Word of Life Church, so that I can access my legal rights in court. I'm a resident of New York.

| Signature |
|---|
| Linda Paige |
| Ann Marie Brown |
| Maria Lazo |
| Maria Ivansto |
| Daniel Quinche |
| Setombs Guasa |

Note: Signature may be included as evidence of public interest in this program.

**A99**



**I'm interested in and would benefit from free legal advice from Pastor John Udo-Okon at Word of Life Church, so that I can access my legal rights in court. I'm a resident of New York.**

| Signature |
|---|
| Rosalia almonte |
| Cindy Jackson |
| Emmanuel Ald |
| Rosa loya |
| Brenda Williams |
| Ines Guaman |

Note: Signature may be included as evidence of public interest in this program.

**A100**



**I'm interested in and would benefit from free legal advice from Pastor John Udo-Okon at Word of Life Church, so that I can access my legal rights in court. I'm a resident of New York.**

| Signature |
|---|
| Graciela Auyulema |
| Pedro Upxa |
| Filomeno Mooch |
| Maria Morocho |
| Elsa Yupangui |
| Lester Daniels |

Note: Signature may be included as evidence of public interest in this program.

**A101**



**I'm interested in and would benefit from free legal advice from Pastor John Udo-Okon at Word of Life Church, so that I can access my legal rights in court. I'm a resident of New York.**

| Signature |
|---|
| Maria Sanaguaray |
| Rosa   Tene |
| *(illegible signature)* |
| Ana Paredes |
| Delmi Barrera |
| Rafael Sanchez |

Note: Signature may be included as evidence of public interest in this program.

**A102**



**I'm interested in and would benefit from free legal advice from Pastor John Udo-Okon at Word of Life Church, so that I can access my legal rights in court. I'm a resident of New York.**

| Signature |
|---|
| BERTHONY GILLES |
| Clair Benjamin |
| Genovira Willis |
| Keith Grimes |
| *[signature]* |
| Ms Colkey |

Note: Signature may be included as evidence of public interest in this program.



**I'm interested in and would benefit from free legal advice from Pastor John Udo-Okon at Word of Life Church, so that I can access my legal rights in court. I'm a resident of New York.**

| Signature |
|-----------|
| Ebony gollman |
| *(signature)* |
| Abdoul Coulibaly |
| *(signature)* |
| *(signature)* |
| Noela Edwards |

Note: Signature may be included as evidence of public interest in this program.

**A104**



**I'm interested in and would benefit from free legal advice from Pastor John Udo-Okon at Word of Life Church, so that I can access my legal rights in court. I'm a resident of New York.**

| Signature |
|-----------|
| |
| |
| |
| |
| |
| |

Note: Signature may be included as evidence of public interest in this program.

**A105**



**I'm interested in and would benefit from free legal advice from Pastor John Udo-Okon at Word of Life Church, so that I can access my legal rights in court. I'm a resident of New York.**

| Signature |
|---|
| PEnfecto ROBLes |
| Glendy Siguan |
| EVa Esperanza Jiguan |
| leticia sigua miranda |
| |
| |

Note: Signature may be included as evidence of public interest in this program.

**A106**



**I'm interested in and would benefit from free legal advice from Pastor John Udo-Okon at Word of Life Church, so that I can access my legal rights in court. I'm a resident of New York.**

| Signature |
|---|
| *Joel Heluski* |
| *Cindy Jackson* |
| |
| |
| |
| |

Note: Signature may be included as evidence of public interest in this program.

**A107**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UPSOLVE, INC., *et al.*,

                Plaintiffs,

        -v-                  Case No. _____

LETITIA JAMES, Attorney General of New York,

                Defendant.

---

## DECLARATION OF TASHI LHEWA

1.      My name is Tashi Lhewa. I am over the age of twenty-one and competent to testify to the matters set forth in this Declaration. Unless otherwise indicated, the facts stated herein are based on my personal knowledge or upon my review of documents to which I have access.

### BACKGROUND

2.      I am the Supervising Attorney of the Legal Aid Society's Consumer Law Project. I have worked at the Legal Aid Society for more than ten years focused primarily on debt-collection defense. I currently oversee the Project's work providing representation, legislative and regulatory advocacy, trainings and outreach to low-income New York City residents. In particular,

1

**A108**

I have extensive experience representing clients in state and federal courts on a variety of consumer debt matters.

3.      In addition to my work at the Legal Aid Society, I am a Lecturer in Law at Columbia Law School, I co-host the New York City Consumer Advocates Taskforce and Broken Lease Taskforce, I am a member of the New York City Bar Civil Court Committee, and I serve on the New York State ADR Advisory Committee and New York State Supreme Court (Civil) and Legal Services Advisory Committees on E-filing.

4.      I have also served as a consumer law expert and trainer of volunteers for the Civil Legal Advice and Resource Office (CLARO), a program organized through the New York State Courts Access to Justice Program and operated the auspices of the New York City Civil Court, which provides free legal advice to unrepresented debtors. In that capacity I have trained volunteers to provide limited legal advice to unrepresented consumers in debt-collection actions. However, all in-person CLARO programs are currently cancelled due to COVID-19.

5.      I received my B.A. from the University of Minnesota, and his J.D. from the University of Minnesota Law School in 2006.

6.      In my experience, many self-represented individuals in debt-collection actions in New York State lack the knowledge, experience, or support to adequately protect their interests. In particular, individuals often fail to file an answer or file an answer failing to raise affirmative defenses, even when they have potentially meritorious defenses, and thereby lose the opportunity to raise those defenses.

7.      Through my experience representing people in debt-collection actions, I have also learned that there are far more people in need of assistance than there are free legal services

2

**A109**

available. The consequences for such individuals of not being able to get free legal assistance can include wrongful wage garnishment, bank seizures, car repossession, eviction, and damaged credit.

## REVIEW OF AMERICAN JUSTICE MOVEMENT TRAINING GUIDE

8.      I have had the opportunity to closely review the entire Justice Advocate Training Guide prepared by the American Justice Movement.

9.      Based on my experience, the Training Guide is sufficient to teach a non-lawyer how to provide limited assistance to unrepresented individuals in debt-collection actions to help those individuals respond to debt-collection lawsuits against them. Any unrepresented individual who receives personalized advice based on the Training Guide will be better off than they would be without receiving such advice.

10.      To the extent that the Training Guide and attached exhibits include statements that the Justice Advocate may provide or is or will be providing "legal advice," I do not endorse such statements. Any endorsement of the Training Guide is limited to the accuracy of the substantive information used in responding to consumer debt lawsuits, and not the unauthorized practice of law in any form.

11.      Given the limited resources available to unrepresented individuals in debt-collection actions—resources that have been further curtailed as a result of the COVID-19 pandemic—allowing trained professionals who are not lawyers to provide carefully circumscribed assistance is critical to ensuring that all low-income New Yorkers can vindicate their rights in court and will prevent significant harm to consumers who currently fail to adequately represent themselves.

**A110**

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed this 9th day of December, 2021.

Tashi Lhewa

**A111**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UPSOLVE, INC., *et al.*,

      Plaintiffs,

      -v-

LETITIA JAMES, Attorney General of New York,

      Defendant.

Case No. _____

---

**<u>DECLARATION OF PAMELA FOOHEY</u>**

1.  My name is Pamela Foohey. I am over the age of twenty-one and competent to testify to the matters set forth in this Declaration. Unless otherwise indicated, the facts stated herein are based on my review of one document, the Justice Advocate Training Guide prepared by the American Justice Movement Consumer Rights Project, which is part of Upsolve, and my personal knowledge.

2.  I am a tenured Professor of Law at Benjamin N. Cardozo School of Law, Yeshiva University. Prior to joining the Cardozo School of Law, I was a tenured Professor of Law at Indiana University Maurer School of Law, from 2020 to 2021, an Associate Professor of Law at Indiana University Maurer School of Law, from 2014 to 2020, and a Visiting Professor of Law at the University of Illinois College of Law, from 2012 to 2014. I received my B.S. in

1

**A112**

2004 from New York University, undergraduate Stern School of Business, and my J.D. in 2008 from Harvard Law School.

3.   My teaching and research focus on bankruptcy, consumer finance, and commercial law. In the course of my research, I have focused on debt collection, debt collection defense, and debt collection's intersection with people filing bankruptcy. A portion of my research is empirical, including surveying people about their pre-bankruptcy financial issues, which include dealing with collection lawsuits filed by creditors and debt collectors in state courts.

4.   Among other articles, my recent research on these topics includes:

- *Portraits of Bankruptcy Filers*, 56 Ga. L. Rev. __ (forthcoming 2022) (with Robert M. Lawless and Deborah Thorne)
- *The Debt Collection Pandemic*, 11 Cal. L. Rev. Online 222 (2020) (with Dalié Jiménez and Christopher K. Odinet);
- *Fines, Fees, and Filing Bankruptcy*, 98 N.C. L. Rev. 419 (2020);
- *Debt's Emotional Encumbrances*, Edward Elgar Research Handbook on Law and Emotion (Susan A. Bandes, Jody Lynee Madeira, Kathryn Temple, and Emily Kidd White eds. 2020);
- *A New Deal for Debtors: Providing Procedural Justice in Consumer Bankruptcy*, 60 B.C. L. Rev. 2297 (2019); and
- *Life in the Sweatbox*, 94 Notre Dame L. Rev. 219 (2018) (with Robert M. Lawless, Katherine Porter, and Deborah Thorne).

5.   Through my research, I have observed the struggles faced by many self-represented people in debt collection proceedings. People often fail to adequately assert their legal interests and rights.

6.   Through my research, I also have observed that people lack access to free legal services to assist them in responding to debt collection lawsuits.

2

**A113**

7.   Failure to raise potentially meritorious affirmative defenses in and an inability to access free legal services to defend debt collection lawsuits can lead to wage garnishment, seizure of bank accounts, eviction from housing, repossession of automobiles, and harm to credit scores.

8.   Judgments in debt collection proceedings also lead people to file bankruptcy to stop wage garnishments, evictions, and repossessions, and to repair their credit reports and credit scores, which is costly and time-consuming.

9.   I have closely reviewed the entire Justice Advocate Training Guide prepared by the American Justice Movement Consumer Rights Project, with an emphasis on the portion of the Training Guide pertinent to the defense that people can raise in debt collection proceedings.

10. Based on my knowledge, the Training Guide provides non-lawyers sufficient information and resources that they need to help unrepresented individuals respond to debt collection complaints such that people will have the opportunity to raise potentially meritorious defenses to the complaints. An unrepresented individual, who is unable to receive free legal services, who receives personalized advice based on the Training Guide will be better off than if they did not receive such advice.

11. In part because I want to avoid any possibility of liability under rules governing the unauthorized practice of law, my review of and endorsement of the Training Guide is limited to the accuracy of the substantive information about asserting affirmative defenses in responding to debt collection lawsuits. To be clear: I do not endorse any statements in the Training Guide and attached exhibits that the Justice Advocate may provide or is or will be providing legal advice.

**A114**

12. Given the limited resources available to unrepresented individuals in debt collection proceedings, particularly during the continuing COVID-19 pandemic, when debt collection proceedings are predicted to increase, allowing individuals who are not lawyers to provide carefully tailored and circumscribed assistance will significantly enhance low-income New Yorkers' ability to assert their legal rights in court.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed the 20th day of December, 2021.

Pamela Foohey

_____

Pamela Foohey

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UPSOLVE, INC., *et al.*,

                    Plaintiffs,

               -v-                     Case No. _____

LETITIA JAMES, Attorney General of New York,

                    Defendant.

## DECLARATION OF WILLIAM EVERTSEN

1.      My name is William ("Tyler") Evertsen. I am over the age of twenty-one and competent to testify to the matters set forth in this Declaration. Unless otherwise indicated, the facts stated herein are based on my personal knowledge or upon my review of documents to which I have access.

## BACKGROUND

2.      I am a sixty-year-old gay man living in Brooklyn, New York. I have two grown children.

3.      I am a social worker. I earned Bachelor's and Master's degrees in social work from New York University.

1

**A116**

4.      I currently work at the St. Albans Children's Community Residence through an agency called HeartShare St Vincent's Services. My work focuses on supporting children between thirteen and eighteen years old who have mental health diagnoses and are on the fringes of the foster care system.

5.      I have spent most of my career working with children who are in foster care or preventive services. I came into social work because helping people, especially children, is in my nature.

6.      I started my social work career as an HIV/AIDS case manager at the same agency where I myself received help in the 1990s after I tested positive for HIV. I was diagnosed HIV positive in 1991 and have been living with HIV for 30 years.

## FINANCIAL AND HEALTH HARDSHIPS

7.      Even though my job as a social worker is deeply fulfilling, it does not always pay the bills. I have a lot of student loan debt from my education. The social work field is very transient, so I have had periods of unemployment where I have had to put basic living expenses on my credit cards.

8.      I have always struggled financially. In the 1990s, around the time I was first diagnosed with AIDS, I began to accumulate debt. At the time, my only form of income was through collecting Social Security Disability payments, which was not enough to make ends meet. Though I ended up getting my life back on track through my training as a social worker, I continue to have trouble making ends meet given the work opportunities available in my field.

## DEBT-COLLECTION LAWSUIT

9.      In 2017, I was sued for a debt I did not owe by a third-party debt buyer called Cavalry SPV I, LLC ("Cavalry"). Cavalry told me I owed them for a debt they bought from another creditor that I know I never took out.

2

**A117**

10.     I started getting tons of phone calls from Cavalry, telling me I owed this debt, and asking "how are you going to pay today?" Every time they called I told them that this was not my debt. But they were very menacing and continued to harass me.

11.     I remember asking them to prove that I took out the loan, and they said "No, we don't have to do that." They never gave me any financial information showing I received the money or put it in my bank account. They instead demanded that I prove that I did not borrow the money. I just ignored it as long as I could because I figured they would eventually give up and try to find the real borrower or write the debt off.

12.     But they did not give up. As I learned much later, Cavalry sued me and got a default judgment against me for this debt that wasn't mine.

13.     As far as I know, I never received any notice or other paperwork from them or from the court indicating that I was being sued.

14.     I lived at the same address for at least five years.

15.     The judgment made me feel that I was defrauded, because they never proved that I actually owed the debt. I was also powerless to do anything about it.

16.     When dealing with this situation, a lawyer would have been helpful but I could not afford one.

17.     The default judgment contributed to my financial distress. I filed for bankruptcy in 2020.

18.     I believe that I'm not alone in this experience. Living in the neighborhood I do, which is largely immigrants and people of color, and working with the people that I do, who are highly disenfranchised and on the fringes of society, I see firsthand a lot of trepidation around the legal system. It appears to me that the way the legal system is currently organized makes people

3

**A118**

like me nervous and afraid because we lack basic knowledge of and access to information about the legal system and what rights we have available.

19.     As a social worker, I have more access to and familiarity with government institutions and processes than many other low-income people I know. But my knowledge about how to navigate the legal system is still very limited. Even if I had learned about the lawsuit against me, I would have had no idea how to respond or who to go to for help.

20.     This experience has confirmed for me that it would have been important for me, and probably would be important for other low-income people to get free, accurate legal advice on how to respond to debt collection lawsuits, so they can better understand their rights and decide how to respond.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed this 23 day of _____December_____, 20 21.

_William Evertsen_

William Evertsen

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UPSOLVE, INC., *et al.*,

                    Plaintiffs,

          -v-                                    Case No. _____

LETITIA JAMES, Attorney General of New
York,

                    Defendant.

**<u>DECLARATION OF LIZ JURADO</u>**

1.      My name is Liz Jurado. I am over the age of twenty-one and competent to testify

to the matters set forth in this Declaration. Unless otherwise indicated, the facts stated herein are

based on my personal knowledge or upon my review of documents to which I have access.

**<u>BACKGROUND</u>**

2.      I was born in Puerto Rico, where I lived until I was four years old. I speak fluent

Spanish, as well as English.

3.      I currently live in Bay Shore, Long Island, where I have lived for the past twenty-

two years. My husband and I have four children.

1

**A120**

4.      I work for DoorDash, Inc., a technology and logistics company that provides door-to-door delivery of food and other goods. I started as a Dasher Support Labs Agent in June 2019, and my job was to answer questions and resolve issues for the Dashers. I was a top performer and was asked to work with the expansion of DoorDash in Puerto Rico. In November 2021, I was promoted to Trust and Reactive Safety Representative, where I conduct investigations into safety and injury incidents concerning the Dashers.

## MY EXPERIENCE WITH DEBT AND THE LEGAL SYSTEM

5.      I have experienced first-hand the shortcomings of the legal system when it comes to debt collection. My inability to understand and access my rights has caused me substantial stress and anxiety and, at times, has put mine and my family's financial security at risk and risked causing substantial long-term damage to my credit.

6.      Specifically, I had one experience with a debt-collection lawsuit for a surprise medical bill relating to childbirth that I did not have the knowledge or support to adequately fight. I received no legal support or assistance in connection with the debt-collection lawsuit, as I was not even notified that I was being sued at the time. As a result, I did not respond, and my anesthesiologist got a default judgment against me.

7.      While I was eventually able to find resources on my own to help me figure out how to get that surprise medical bill discharged in bankruptcy, I remain nervous about the possibility of facing another debt-collection lawsuit in the future and wish there were free help available to help me and other people like me learn more about what our rights are.

8.      Prior to working at DoorDash, I was primarily a stay-at-home mom. My husband was the primary breadwinner for the household and he supported the children and me, while I focused on taking care of him and our four kids.

2

**A121**

9.      During this time, we had some credit card debt, student loans, and medical bills, and a car loan. I've received countless harassing calls from debt collectors; they've even called my neighbors. But we were responsible and hardworking and did everything we could to make payments on any debt we owed.

10.     Everything changed when my husband lost his job in 2016. He was a manager for twenty years and it is not his fault he got laid off. It had been a dream of mine for a while that my husband would be able to retire because he has done so much for our family over the years. But when my husband lost his job unexpectedly, it was scary to suddenly be the sole breadwinner responsible for making ends meet in my family.

11.     To help make ends meet for our family, I got a job managing an office in Bohemia, Long Island, but the pay was not enough to keep up with our expenses. I then started working as a Dasher for DoorDash to earn extra money as an independent contractor to try to make ends meet.

12.     Things were okay at first financially, but then they got really rough. We could not afford to pay the whole electric and gas bills and started making small payments, just to pay something. We almost lost our house (which is in my husband's name) to foreclosure because we could not afford the monthly mortgage payment. I had to apply for food stamps, which we really needed. It was a really stressful and scary time, and I hated not being able to provide for my kids.

13.     When DoorDash offered me a full-time job with a salary and benefits in 2019, I jumped on it. I was so relieved and happy to finally have a really good job that would allow me to provide for my kids and take care of my husband

14.     Just when things were starting to go well again, and three months after I started my new, salaried job at DoorDash in 2019, I received a letter from the Suffolk County Sheriff's Office

**A122**

saying that they had a judgment against me from 2010 for $12,774. The letter said that if I did not

pay the whole amount due, they were going to garnish my wages.

15.     I was completely shocked and scared. I had absolutely no idea what was going on

or why the Sheriff's Office was coming after me just as I was getting back on my feet, as I was

not aware of any outstanding debt I owed in that amount and I was not aware of having lost any

lawsuit.

16.     I considered hiring a lawyer to help me deal with this debt but I could not afford a

lawyer. I also did not know of any resources that would provide me with legal assistance for free.

17.     After I received the letter from the Sheriff's Office, I looked at the papers on my

own, and I was able to figure out that back in 2010, after I gave birth to my youngest children, my

anesthesiologist, Suffolk Anesthesiology, apparently sued me for thousands of dollars for a

surprise medical bill related to getting epidural anesthesia during childbirth. I could not figure out

if the medical bill was from 2007 or 2008, as I delivered a child in each of those years and needed

an epidural for each birth to manage the labor pains. Everything was otherwise the same for each

birth—my doctors, my insurance, my hospital—and I believed that the epidural was covered as a

basic part of childbirth. But I got a bill and lawsuit against me for one of the births and not the

other. No one at the hospital told me to expect a bill for the epidural anesthesia, a procedure that I

know so many women get while giving birth. As far as I know, I never got a letter from the

anesthesiologists, or a bill, or even a phone call. It felt so confusing and wrong.

18.     The first time I heard about the debt was in 2019, when I received the letter

threatening to garnish my wages because of the default judgment against me.

19.     I have had the same home address for twenty-two years. My youngest kids are now

13 and 14. I was floored that unknown costs from their births were now coming back to haunt me.

**A123**

As far as I know, no one from Suffolk Anesthesiology or the court ever communicated anything to me at all about this lawsuit. Even if I had learned about the lawsuit, I would not have known how to respond.

20.    When I got the wage garnishment letter, I was so upset because I was caught completely off-guard. I didn't know what to do, but I knew that having my wages garnished would have severe effects for myself and my family. I was incredibly worried because even with my new job, we were living paycheck-to-paycheck and my salary was never quite enough. We were still getting food stamps.

21.    The challenges caused by not understanding the legal system and having my wages garnished are especially difficult for me because I have a child with special needs, and have an auto-immune condition myself. If my wages were garnished, I would not be able to pay for our house, clothes and shoes for the kids, the cell phone bill, the electric and gas, the car, extra food, and I certainly wouldn't be able to save anything for my family's future. I am also concerned that unknown bills like this one could harm my credit.

22.    What's worse is that all of these very harmful consequences could happen without me understanding my rights or how to fight the debt-collection action against me. The whole thing felt so unfair. I felt like I was being bullied with a bill that I had no knowledge of, or means of fixing it, until it was too late. I was facing permanent, life-altering consequences for something that I didn't even know how to do anything about.

23.    I did not receive any legal advice in connection with this threat of wage garnishment.

24.    I ultimately decided to file for Chapter 7 bankruptcy in November 2019, largely due to the judgment from the surprise medical bill. I was so grateful to find Upsolve to empower

**A124**

me to file bankruptcy on my own because I could not afford the fees for a lawyer. I had my hearing in December 2019 and the court discharged my debts—which included the surprise anesthesiology bill—in February 2020.

26. 25. I am slowly rebuilding my credit. I can finally pay my bills on time and I can pay the whole utility bill each month.

26. It was scary to have to deal with the legal system alone without any advice.

27. This experience is why I believe that free, accurate legal advice on how to respond to debt collection lawsuits is so important. In my own situation, I believe it would have been a quick, but reliable solution, and helped me avoid the negative and unforeseen consequences nearly a decade later.

28. I trust Upsolve to run this program in a way that will help people like me. I was comforted by the fact that their services were free; it means they are not trying to gain anything from me.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed this 23 day of _____December_____, 2021.

_____

Liz Jurado

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UPSOLVE, INC., *et al.*,

              Plaintiffs,

        -v-                      Case No. _____

LETITIA JAMES, Attorney General of New York,

              Defendant.

---

## <u>DECLARATION OF CHRISTOPHER LEPRE</u>

1.      My name is Christopher Lepre. I am over the age of twenty-one and competent to testify to the matters set forth in this Declaration. Unless otherwise indicated, the facts stated herein are based on my personal knowledge or upon my review of documents to which I have access.

### <u>BACKGROUND</u>

2.      I currently live in Lynbrook, New York, with my significant other and two children.

3.      I work as an instrumentation and electronics technician at a power plant. I have been working at this power plant for eleven years, and have been working in this field since 1996.

4.      I am also a veteran. I served this country in the U.S. Navy from 1996 to 2000.

**A126**

## **FINANCIAL HARDSHIP**

5.      In 2015, my car flipped over, causing significant and costly damage that I could not afford to fix. As a result, I was left with mounting debt, worsening credit, and no car.

6.      Because of my bad credit, I was unable to find a fair, low-interest loan that I could use to purchase a new car. I needed a car to get to work and take care of my family. In 2017, left with no choice but to take on a high-interest loan, I purchased a used Mercury Mountaineer. I could only put down a small down payment, so I was stuck purchasing a car from one of the only car dealerships willing to sell to individuals, like me, with poor credit. They sold me the car for $15,000, but with the high interest loan from Credit Acceptance, a subprime auto-lender, the total amount with interest and other costs came to roughly $21,000. I felt like I was being taken advantage of due to my poor credit, but I had no choice because I needed the car in order to properly care for myself and my family.

7.      Based on my experience, the car was a lemon. After three months, it stopped working due to engine problems. I brought the car back to the dealership to have it repaired because I thought the warranty I purchased would cover the repair expenses. However, the warranty company refused to pay, and I could not afford to get the car back. I was once again left without a car and even more debt. And now my whole life has been upended – all because of a car that stopped working shortly after I bought it.

8.      The lender, Credit Acceptance, started calling me and demanding that I repay the loan. I tried speaking with them repeatedly to explain that the car didn't work and that I no longer had it. It did not seem fair to me that I would be responsible for full repayment on a loan for a car that had stopped working after only a few months and that the dealer kept. Despite what had happened, Credit Acceptance refused to budge and demanded payment in full.

2

**A127**

## MY EXPERIENCE WITH THE LEGAL SYSTEM

9.     The next time I remember hearing from Credit Acceptance was when I received notice of a default judgment against me for $15,909.79. Prior to this, I don't remember hearing anything about the lawsuit. I don't remember receiving a court date or being told to appear in court. I couldn't respond to the lawsuit or go to court to be heard because I didn't know what I needed to do in order to defend myself.

10.     I believe that even if I had received the papers, I would not have known what to do in my lawsuit. And I would have been interested in finding somebody who was willing to give me free legal advice about how to respond to the lawsuit.

11.     I now know that there was a default judgment against me because I did not respond to the lawsuit. I wish I had gotten my day in court so that I could have explained to the judge what happened to me. I believe my life would have been much better and different if I had that opportunity. Instead, as far as I know, the judge decided the case without hearing my side and without Credit Acceptance ever having to prove their case to the court with evidence.

12.     Before this experience, I thought that in America, the country that I honorably served, we would ensure that everyone gets their day in court before having to suffer the potentially awful consequences of losing a lawsuit. But that is unfortunately not what I experienced.

13.     As soon as I received the judgment against me, I called and left voicemails for a few lawyers, who I found through the internet. None of the lawyers returned my calls. I also did not know of any resource that would have provided me with free legal advice, though I definitely would have taken it. I was left with no options and did nothing as a result.

14.     Credit Acceptance started to garnish my wages so they could collect on the judgment.

3

**A128**

15.    I tried again to find a lawyer to help me. I sent emails and left voicemails, but I never heard back from anyone. Even if one of them had responded, I believe that it is unlikely that I would have been able to afford legal representation because of the effect of the wage garnishment on my income and the other needs that my family has.

16.    Defaulting in the debt collection lawsuit has severely and negatively impacted my life.

17.    The wage garnishment amounts to over $1,000 a month. Instead of being able to spend my hard-earned salary on my rent or getting a new car so that I could take my child to school or go to the grocery store to get food for my family, I have to repay a judgment from a case where I did not even get the opportunity to be heard in court and never got any legal advice to help me understand what my rights were.

18.    The timing of the wage garnishment was also unfortunate because it started at the beginning of the COVID-19 pandemic. In the early days of the pandemic, I had to miss work for two weeks, without pay. The combination of the wage garnishment and this immediate lack of income meant that I could not afford to pay my rent, so I was forced to borrow from my 401(k) retirement savings just to come current. The wage garnishment also caused me to be late in paying my utility bills.

19.    One of the worst consequences of not being able to have my day in court was that, on my understanding, the judgment and wage garnishment further damaged my already low credit score. Based on my knowledge and experience, my bad credit means I can only get a very high-interest loan for a car, with an interest rate around 25% per year. I believe that my credit score is in the 400s now.

4

**A129**

20.     Due to the wage garnishment, I cannot afford a car, particularly at such a high interest rate.

21.     The inability to afford a new car not only affects me, but also my family. I cannot take my three-year-old child to the things that she needs to do, I cannot drive my significant other's ten-year-old child to school, and I cannot drive to work. As a result, I have to use Ubers and taxis to accomplish basic tasks, like going to the grocery store or to the pharmacy, and those costs also add up. Now my family and I have to live close to the train station, even if we would rather live somewhere else, so that I can access public transportation to get to my job. It's not easy but I make it work so that I can provide for my family.

22.     Even when Credit Acceptance is finished garnishing my wages in April of 2022, I believe that the wage garnishment will continue to affect my credit score and keep it low. I am afraid that I will never be able to get a fresh start because I wasn't able to fight back in court.

23.     I did not and still do not understand how the legal process works. I am confused about why I did not get the opportunity to have my side heard by a judge. I don't know how I went from receiving harassing phone calls demanding payment to wage garnishment without ever having my day in court. I wish I knew how to understand and access and use the court system so that I could have avoided the negative consequences of the lawsuit for myself and my family.

24.     I believe that if I could have received free legal advice about how to respond to the lawsuit, I would have taken it in a heartbeat.  Having access to good, free legal advice could have helped me access the court and potentially avoid the harmful consequences that my family and I have suffered.

25.     At the very least, if I had been heard in court, I would feel that the decision was fair and based on all the facts. If I had been heard, I believe I would have more faith that America's

5

**A130**

legal system ensures that everyone gets their day in court, no matter who they are or what they have been through in their life.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed this 18 day of _____January_____, 2022.

_____

Christopher Lepre

**A131**

M5CHUpsO

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    UPSOLVE, INC., AND REV. JOHN
      UDO-OKON,
 4
                       Plaintiffs,
 5
              v.                              22 Civ. 627 (PAC)
 6
      LETITIA JAMES, in her capacity
 7    as Attorney General of the
      State of New York,
 8
                                              Oral Argument
 9            Defendant.

10    ------------------------------x
                                              New York, N.Y.
11                                            May 12, 2022
                                              11:30 a.m.
12
      Before:
13
                          HON. PAUL A. CROTTY,
14
                                              District Judge
15
                              APPEARANCES
16
      WEIL GOTSHAL & MANGES LLP
17         Attorneys for Plaintiffs
      BY:  ROBERT NILES-WEED
18         ELENA DE SANTIS
           GREGORY STEWART SILBERT
19
      OFFICE OF THE ATTORNEY GENERAL
20         Attorneys for Defendant
      BY:  MATTHEW JOSEPH LAWSON
21

22

23

24

25
```

M5CHUpsO

1              (Case called)

2              MR. NILES-WEED:  This is Robert Niles-Weed from Weil

3    Gotshal, for the plaintiffs.  I'm joined at counsel table by

4    Greg Silbert and Elena De Santis.

5              THE COURT:  Who's going to be arguing?

6              MR. NILES-WEED:  I will, your Honor.

7              THE COURT:  All right.  OK.

8              MR. LAWSON:  And for the defendant, Letitia James,

9    Matthew Lawson from the New York City Attorney General's

10   Office.  Good morning, your Honor.

11             THE COURT:  Good morning, Mr. Lawson.

12             Before we start, I want to make some oral

13   observations.  First of all, this is a question that deals with

14   great legal and social significance.  Before the parties

15   present their arguments, let me start with several aspects of

16   the case I do not understand to be in dispute.  If I am wrong,

17   you can correct me.

18             Everyone agrees that the default rate for New Yorkers

19   in these debt collection cases are astronomically high,

20   everyone also agrees that more quality legal advice in this

21   area would be good a thing, and everyone also agrees that the

22   advice that plaintiffs seek to give would constitute an

23   unauthorized practice of law under New York law.  As I

24   understand it, the question is, therefore, whether the

25   plaintiffs have a First Amendment right to give that advice

M5CHUpsO

1    anyway.

2          We also note the unusual relief the plaintiffs seek.

3    They seek a preliminary injunction, but an injunction normally

4    maintains the status quo.  Instead, the plaintiffs' injunction

5    would alter the status quo and create a new carve-out to a

6    time-honored statute.  The burden is therefore on the

7    plaintiffs to make their case.

8          I've allocated 15 or 20 minutes to each side, but

9    that's not a hard-and-fast time rule.  I can be flexible.  We

10   have plenty of time.

11         So we'll hear first from the plaintiff.

12         MR. NILES-WEED:  Thank you, your Honor.  I'm, as I

13   mentioned, Robert Niles-Weed, and I represent plaintiffs.

14         I first want to acknowledge the points the Court just

15   made.  It's not disputed that the default rate in these actions

16   is astronomically high, a bit more advice would be good, and

17   that providing advice would be the unauthorized practice of

18   law.

19         But I want to start by specifying exactly what the

20   question is in this case.  This is a narrow, as applied,

21   challenge, and plaintiffs seek to provide advice under very

22   precise terms.  Specifically, plaintiffs want to provide free

23   advice on a single discrete topic that is truthful,

24   non-misleading, and provided with fully informed consent.  It

25   is subject to strict training, regulation, and supervision, and

M5CHUpsO

```
 1      it is reliably in the client's best interest= are doing this to
 2      remedy the access to justice gap the Court recognized and are
 3      doing so without displacing any of the state's ordinary
 4      regulatory authority outside the narrow scope of that program.
 5           Let me explain in a bit more detail why each of those
 6      limitations of plaintiffs' programs are relevant here.
 7           First, the program is free.  None of the advice
 8      plaintiffs will provide is provided for pecuniary gain.
 9      There's no cost to clients, and also no risk of conflicts of
10      interest that come into play when law is practiced for
11      pecuniary gain.  The advice is provided solely to help
12      New Yorkers understand and access their legal rights.
13           Second, plaintiffs seek to provide advice only on the
14      single discrete topic of how to use the state-provided answer
15      form to respond to a debt collection action.  Plaintiffs are
16      not asking to represent anybody in court.  They're not even
17      asking to file those papers on behalf of the clients they
18      assist, and they're certainly not --
19           THE COURT:  What exactly are they doing?
20           MR. NILES-WEED:  So what plaintiffs will be doing is
21      providing limited person-to-person advice pursuant to the
22      strict terms of the training guide, which is attached as
23      Exhibit B to the complaint.  So a client will come to a justice
24      advocate, like plaintiff Reverend John Udo-Okon, and he will
25      direct them to describe their situation and will ask a number
```

1       of questions about the facts of their particular case.  Based

2       on the facts of their case, he will advise them the best way

3       that they might reliably fill out the state's answer form and

4       respond to the lawsuit against them.

5              The client -- and this is made clear in the affidavit

6       attached to the training and experience guide which the client

7       must acknowledge -- the client must recognize that they are

8       still fully self-represented, that they are in charge of all

9       the decisions in their lawsuit, and what they're receiving from

10      plaintiffs is just advice, and just advice delivered person to

11      person through speech.

12             And I'll discuss in a moment why that puts this case

13      within the clean line of the Supreme Court's First Amendment

14      cases.

15             THE COURT:  I was under the impression that the advice

16      didn't go much beyond what was in the brochure, the booklet.

17             MR. NILES-WEED:  Excuse me, your Honor.  Go ahead.

18             THE COURT:  Go ahead.

19             MR. NILES-WEED:  It doesn't go beyond that at all.  In

20      fact, plaintiffs require everyone providing that advice to

21      attest that they will only provide it subject to those strict

22      terms.  So the advice is that being provided in the training

23      guide, and nothing more.

24             THE COURT:  All right.

25             MR. NILES-WEED:  On the training guide, I want to

1    emphasize that the advice is being provided not just pursuant

2    to this training guide itself but subject to other strict

3    regulations and supervision.  The advisers must adhere to

4    conflict of interest and confidentiality rules.  Plaintiffs are

5    committed to tracking every single encounter and ensuring that

6    the advice being provided is within the strict, narrow terms of

7    the training guide.

8            Fifth, and finally, the advice is reliably in the

9    client's best interest.  We have two expert affidavits from

10   Professor Pamela Foohey, that's at ECF 7-16, and from Mr. Tashi

11   Lhewa, at ECF 7-5, and they say that a low-income New Yorker

12   receiving advice based on the training guide will be better off

13   than they would be without it.

14           Now, let me explain, now that I've laid out the

15   features of our program and what exactly it is plaintiffs seek

16   to do, why the First Amendment protects that limited activity.

17   And I'll do it in two discrete ways, because plaintiffs'

18   complaint raises two separate and independent First Amendment

19   challenges, a free speech challenge under the First Amendment

20   and a freedom of association challenge under the First

21   Amendment.  Either of which is independently sufficient for

22   plaintiffs to prevail, and both of which must be rejected for

23   plaintiffs not to be likely to succeed on the merits.

24           So before I do that, actually, let me offer just a

25   word on standing, which the government raised in their

M5CHUpsO

1    opposition.  Your Honor said in his opening remarks that this

2    is unusual relief, but in cases like this, in pre-enforcement

3    challenges to statutes for violating the First Amendment, the

4    bar is quite low to show standing, and the question is whether

5    there is a First Amendment right.

6            The case law -- and you could see this in the *Cayuga*

7    *Nation* case, for example, we cite in our brief -- requires

8    plaintiffs to show only that their fear of prosecution is not

9    imaginary or wholly speculative.  And the reason for that is

10   because First Amendment rights raise a particular danger of

11   self-censorship and chill that the fear of prosecution will

12   prevent plaintiffs and others like them from engaging in

13   protected speech.  And we've shown in a number of places from

14   statements by the parties, by the amicus parties here, and even

15   statements by the state itself why this fear of prosecution is

16   not wholly imaginary.

17           Plaintiffs, Mr. Rohan Pavuluri and Reverend John

18   Udo-Okon, both talk at declarations in ECF 7-1, paragraph 32,

19   that's Mr. Pavuluri, ECF 7-2, paragraph 18, that's plaintiff

20   Reverend Udo-Okon, talk about how they are currently today

21   being chilled from engaging in this activity because of the

22   fear of prosecution.

23           And it's not just plaintiffs.  I'll note also that

24   there's an amicus brief from 25 law professors who study

25   professional regulation and access to justice.  That's at

M5CHUpsO

1     ECF 34-1.  And at pages 5 to 8 of that brief, they talk about

2     how the existing regime paralyzes potential providers, and they

3     talk also about how not merely the threat of prosecution but

4     even the threat of investigation is enough to chill protected

5     speech in this area.

6          The state, for its part, does not disavow that it will

7     prosecute plaintiffs.  The state had ample opportunity in its

8     opposition to say that it would not prosecute plaintiffs, and

9     it didn't.  Now, I'll note that even if the state had done so,

10    or does so today, that's still not enough, as cases like the

11    *Vermont Right to Life* made clear, but the state didn't do that.

12    Instead, what the state, joined by its amicus parties, did was

13    to say that plaintiffs' activity would be against the public

14    interest.  The state has -- as we note in the first footnote of

15    our reply brief, the state has recently prosecuted people for

16    criminal penalties for violating these exact rules.  So I don't

17    think standing is at issue here.

18          THE COURT:  That case was substantially different,

19    though, wasn't it?

20          MR. NILES-WEED:  So the facts of that --

21          THE COURT:  There was a nonlawyer practicing law and

22    holding himself out as a lawyer.

23          MR. NILES-WEED:  That's right, your Honor.  The facts

24    are not --

25          THE COURT:  This is different.

M5CHUpsO

1            MR. NILES-WEED:  Absolutely.  But the cases talk about

2       how the question in this area is whether or not the statutes

3       that are being used to prosecute are not moribund, and I think

4       showing that the state does use these statutes and

5       encourages -- even in the press release the statement made

6       related to that case encourages people to make complaints to

7       the Attorney General when they're concerned about activity that

8       might be violating the statute.  I think it's hard to say that

9       plaintiffs' fear of prosecution is imaginary or speculative.

10           I'll move to say a few words on the merits.  And

11      again, in the First Amendment context, when looking at an

12      injunction, while your Honor is right that a preliminary

13      injunction is unusual relief, the Second Circuit has made clear

14      that in the First Amendment context, the merits, the likelihood

15      of success on the merits, are the dominant, if not the

16      dispositive, question in deciding whether or not to grant an

17      injunction.  I'll speak briefly at the end of my remarks on the

18      public interest balancing, but I really want to focus on the

19      First Amendment free speech and free association claims.  So

20      I'll start with the free speech claim.

21           The rules governing the unauthorized practice of law,

22      as they are applied to plaintiffs in this context, function as

23      a content-based regulation of speech.  And the Supreme Court

24      has made clear time and again in a number of recent cases that

25      content-based restrictions on speech must satisfy strict

M5CHUpsO

1    scrutiny.

2           Plaintiffs want to advise low-income New Yorkers

3    dealing with debt collection actions how to respond to those

4    actions, and the only reason their speech is unlawful is

5    because its content --

6           THE COURT:  If you have this right under the First

7    Amendment, why do you limit your speech, then, to the facts

8    contained in the materials contained in the brochure?

9           MR. NILES-WEED:  So we're doing that for a number of

10   reasons, your Honor.  I think the first reason is that to the

11   extent the program were much broader, the government would have

12   a much better case that the regulations, as applied to a

13   broader program, could satisfy strict scrutiny.  So that is one

14   reason why we're keeping this very limited.

15          The other is plaintiffs -- and this sort of connects

16   to the freedom of association claim -- plaintiffs want to

17   ensure that the advice they're providing is in the best

18   interest of low-income New Yorkers and will advance the goal of

19   increasing access to the courts.  So plaintiffs have very

20   carefully --

21          THE COURT:  How does it increase access to the courts?

22          MR. NILES-WEED:  So as your Honor mentioned

23   initially --

24          THE COURT:  The client gets something from the debt

25   collector, and then he goes to see the reverend, one of the

M5CHUpsO

1    reverend's workers, and they have a consultation about the 18

2    steps that you can take under the state law, and then the

3    client, being so advised, goes off and does his own thing *pro*

4    *se*.  Is that how the program works?

5           MR. NILES-WEED:  That is how the program works, your

6    Honor, and the reason why it matters is because in these cases

7    you have 95 percent of people who receive no representation at

8    all, 88 percent who default; that is, they don't answer at all.

9    So what plaintiffs are trying to do is to meet these people

10   where they are.

11          Plaintiff, Reverend John Udo-Okon, is a good example.

12   He's already embedded in a low-income community in the Bronx, a

13   disproportionately black community, which are especially harmed

14   by the lack of legal services.  And he's making it easier for

15   them to understand what they should do when they're sued by a

16   debt collector and don't know how to respond.

17          So what plaintiffs are doing is taking the form that

18   the state provides, which the state plainly provided to make it

19   easier for people to respond to these suits, to show up, and

20   what plaintiffs want to do is they just want to make it a

21   little easier by providing advice that will help people

22   understand the state's form and use the state's form.  And

23   they're doing it because they believe that providing this

24   information will help these people understand their rights and

25   narrow --

M5CHUpsO

1           THE COURT:  Isn't the major one the one of sewer

2      service, and this really doesn't address sewer service?

3           MR. NILES-WEED:  I'll make two points about sewer

4      service, your Honor.  The first is that our training guide does

5      address sewer service.  In Exhibit B to the complaint, there's

6      a series of --

7           THE COURT:  Your client doesn't know that he's been

8      sued because he hasn't gotten notice.

9           MR. NILES-WEED:  So let me just clarify a few things

10     for your Honor.

11          So the plaintiffs here are not the people receiving

12     the advice.  They are the people who would be providing it.  In

13     our complaint we provided a few examples of people whose

14     stories illustrate the devastating and long-lasting harms that

15     can result from defaulting, but those people are not the

16     plaintiffs here.  The plaintiffs are Upsolve, a nonprofit, and

17     Reverend John Udo-Okon who want to provide this advice.  And

18     the advice they provide will address sewer service.

19          In fact, what it recommends and in fact requires

20     advisers to do is if someone comes to them seeking advice and

21     the problem is that they weren't served, it tells them:  Here's

22     a list of organizations, which is attached as Exhibit B to the

23     training guide.  Here's a list of organizations where you can

24     talk to a lawyer because that problem, the problem of dealing

25     with inadequate service, is outside the scope of what I can

M5CHUpsO

1    handle.

2          So it acknowledges the problem of sewer service.  It

3    directs people facing that problem to the resources they need

4    to assist them.  And what it's really doing is sort of a

5    triage, because when these suits come, they come fast and they

6    come hard.  You have people who have limited experience with

7    the court system, face great intimidation and fear, are often

8    in strained financial circumstances to begin with, and they go

9    to their pastor.  And the declaration from plaintiff Reverend

10   Udo-Okon talks about this.  They come to him asking for advice.

11   So this will be a sort of triage, a first line of defense where

12   he can provide them the advice they need to get started on the

13   process of responding to their lawsuit.

14         The other point I want to make about sewer service is

15   that there is nowhere in the brief of the amicus parties or in

16   the state that suggests that sewer service is the only problem

17   affecting these folks, and it's certainly not.  There are a

18   number of people who fail to answer even after receiving the

19   service, even after receiving adequate service, and the state

20   has made a number of steps to strengthen the requirements for

21   showing service that ensure that sewer service is becoming less

22   of a problem, but there are all of these other problems that

23   plaintiffs are trying to help.

24         So let m return back to the First Amendment free

25   speech question and show why, under the governing Supreme Court

M5CHUpsO

1     case law, what the state is doing here is a content-based

2     restriction on speech.

3              So that advice that I was just describing, the state

4     makes clear that plaintiffs could do it if they were just

5     providing general information, but as soon as the content of

6     what plaintiffs are saying in person, what Reverend John is

7     telling his congregant, as soon as the content of that becomes

8     specialized legal advice, it's illegal, and plaintiffs could be

9     arrested or civilly punished.  That's a very plain restriction

10    of the speech on the basis of its content.

11             I direct the Court to the Supreme Court's decision in

12    *Holder v. Humanitarian Law Project* where it addressed a very

13    similar question.  The issue in that case was there was a

14    statute that prevented providing material support to

15    terrorists, but as applied to the plaintiffs in *Holder*, what

16    that statute did is that statute said if you're giving general

17    advice, it's OK, you're allowed to do it, it's kosher, but as

18    soon as you provided specialized advice based on specialized

19    knowledge, then that falls within the ambit of the statute and

20    is unlawful.

21             And the Supreme Court said, well, it's a statute that

22    says "material support of terrorists."  That sounds a lot like

23    conduct and not speech.  And, in fact, a lot of the activity

24    covered by the statute is conduct.  But the Supreme Court said

25    that's not enough.  That, when it's applied to plaintiffs,

M5CHUpsO

1      regulates their speech on the basis of its content, and that's

2      the relevant question.  So the statute in *Holder*, just like the

3      UPL rules in this application, have to satisfy strict scrutiny.

4             The state for its part argues against somewhat of a

5      straw man on our First Amendment claims, claiming that we seek

6      some unfettered right to practice law without a license or that

7      what we want to do isn't speech at all but is instead conduct.

8      But as I explained, plaintiffs don't want to practice law in

9      any form without a license.  All they want to do is engage in

10     limited person-to-person communication on this single discrete

11     topic pursuant to the terms of the strict training guide.  If

12     you read the cases the state cites, not only are none of them

13     binding on this Court, but also none of them address facts that

14     are anything like what the Court is being presented here.

15            I'll say a few words now on our separate and

16     independent free association claim.

17            In our brief, we explain how cases like

18     *NAACP v. Button* and *In Re Primus*, as they've been interpreted

19     by the Courts of Appeal, by the Second Circuit in *Jacoby &*

20     *Meyers*, by the Fourth Circuit in *Stein*, they recognize that the

21     First Amendment freedom of association protects not for profit

22     collective activity when it is undertaken to ensure access to

23     the courts.  And they identify a number of considerations that

24     determine when this right comes into play and when it doesn't

25     come into play.

M5CHUpsO

1          And those considerations are (1) whether or not the

2    activity is undertaken for commercial purposes.  And the

3    commercial distinction is an important one.  Those cases say,

4    and this is what *Jacoby & Meyers* was saying, when you're

5    engaged in collective activity to increase access to the courts

6    but you're doing it to make a profit, your associational right

7    under the First Amendment doesn't come into play there.  And,

8    in fact, these cases require as a second element that you're

9    doing it for the purpose of helping people exercise their

10   rights to access the courts.  And third, these cases

11   acknowledge that where the right comes into play is where there

12   aren't ethical concerns that are activated.

13          Again, the commercial/noncommercial distinction is

14   relevant here.  If you're taking someone's money, your

15   incentives are misaligned, and the concerns that you might take

16   advantage of that person or provide them advice that is better

17   for you than for them comes into play.  None of that is at

18   issue here.  The facts of this case satisfy all of the

19   requirements of *Button*, of *Primus*, of *Jacoby & Meyers*, of *Stein*

20   from the Fourth Circuit.

21          So we separately, in addition to our free speech

22   claim, have an independent likelihood of success on the merits

23   of our freedom of association claim.  The government in its

24   opposition doesn't have much to say about our association

25   claim, except that the cases I just discussed have different

M5CHUpsO

1   facts from ours.  We acknowledge that, but what we're talking

2   about is the law and the rules set down by those cases, which

3   those cases made clear apply in situations like this one.

4           So because the rules in this application, and, again,

5   only in this precise application, because they trigger

6   heightened scrutiny under the First Amendment's freedom of

7   speech and freedom of association, the government must show

8   that those regulations are narrowly tailored to advance a

9   compelling government interest.  They must satisfy strict

10  scrutiny, and the state does not meet that burden.  In fact,

11  the protections built into our program ensure that what we're

12  doing will advance the state's own interests in ensuring that

13  people are receiving sufficient competent advice to help them

14  access their legal rights.

15          I'll conclude, and apologies if I've gone over my

16  time, just with a few words about the public interest and the

17  balance of the harms.  Though I want to emphasize that in the

18  First Amendment context, it's really the merits that control.

19  They're the dominant, if not the dispositive, consideration,

20  and that's because denial of First Amendment rights is always

21  irreparable harm.  And enforcing those rights, ensuring that

22  plaintiffs can advocate and associate pursuant to the terms of

23  the Constitution is always in the public interest.

24          Beyond that, we've shown -- and I would point the

25  Court specifically to Reverend Udo-Okon's declaration.  This is

1    ECF 7-2 at paragraph 17.  He says, and I quote, "There is a

2    critical and immediate need for legal advice on how to respond

3    to debt collection lawsuits within his community."

4              So there is a need for the help that we'll provide.

5    And I'll return to the undisputed points your Honor raised

6    earlier that the default rate in this area is astronomically

7    high; the rate of legal assistance is astronomically low, if

8    something can be astronomically low; and CLARO, a leading

9    provider that provides limited service assistance, can serve

10   fewer than 2 percent of the people facing these actions.

11   There's plainly need for help that plaintiffs would provide,

12   and New York's decision to implement the answer form that we

13   would be using shows as much.

14             For its part, the state's opposition addresses much

15   broader arguments in the public interest balancing, but none of

16   them are directly responsive.  So the state makes three

17   arguments, and I'll address each of them in turn and then I'll

18   conclude.

19             The first argument the state makes is that the state

20   faults plaintiffs for bypassing the ordinary safeguards that

21   lawyers must satisfy, the hoops lawyers have to jump through in

22   order to practice commercially the full scope of the practice

23   of law, including the bar exam and character and fitness

24   regulations.  But here, all we're talking about is free advice

25   on a single discrete topic with fully informed consent, subject

M5CHUpsO

1    to strict training and regulation that is reliably in clients'

2    best interests.

3              THE COURT:  Do you anticipate any character and

4    fitness requirements?

5              MR. NILES-WEED:  So, your Honor, Upsolve, plaintiff

6    Upsolve, has committed to vetting the justice advocates and

7    making them promise that the reason they are providing this

8    advice is in the best interest of the communities they're

9    serving.  But the rules, the strict definition of the program,

10   ensure that as long as the advice is being provided on those

11   terms, and that's all we're asking for, as long as the advice

12   is provided under those terms, it won't hurt anyone.  So

13   there's really no risk of --

14             THE COURT:  So there's no standards, then?

15             MR. NILES-WEED:  As I mentioned, Upsolve, plaintiff

16   Upsolve, has committed to vetting these people and requires

17   them -- and this is --

18             THE COURT:  Vetting the people against what standard,

19   though?  Do you have a standard?

20             MR. NILES-WEED:  So I would direct your Honor to --

21             THE COURT:  Have to be a high school graduate or

22   college graduate?

23             MR. NILES-WEED:  They have to be capable of providing

24   the advice on the terms laid out in the training guide.  And in

25   the training guide at Exhibit, I believe it's --

1              THE COURT:  That's kind of circular, don't you think?

2              MR. NILES-WEED:  I don't think so, your Honor, because

3     what's going on is plaintiffs are requiring these people to

4     attest that they will only do the things laid out in the

5     training guide.  If they do something that is outside the scope

6     of the training guide, if they go beyond it, then they will be

7     subject to the state's ordinary regulatory authority because

8     we're only seeking protection for the metes and bounds of the

9     training guide.

10             THE COURT:  How would they know that they gave

11    inappropriate advice?

12             MR. NILES-WEED:  So in the complaint we describe how

13    the people receiving the advice are -- every encounter is being

14    tracked by Upsolve, and the people are being followed up with

15    to ensure that the advice was provided pursuant to the terms of

16    the guide.  And that's a question one could ask the state in

17    any context.  How does it know that the advice people are

18    informally providing is pursuant to the terms governed -- of

19    the rules governing the unauthorized practice of law?  So all

20    we're talking about is this incredibly narrow --

21             THE COURT:  Does the booklet advise the client that

22    they can resort to the Attorney General's Office if they

23    believe something has gone amiss?

24             MR. NILES-WEED:  So in listing additional resource, I

25    believe we list some resources for the Attorney General's

M5CHUpsO

1    Office.  If that would be the dividing line, that is something

2    that could be included in the guide.  I'm not sure it includes

3    it now, but we have -- and we include in the complaint a link

4    to what is a complaint form through Upsolve, but that could

5    easily be updated to say you can also contact the Attorney

6    General.

7              THE COURT:  All right.

8              MR. NILES-WEED:  I'll just make a few more points, if

9    that's all right.

10             I also want to discuss --

11             THE COURT:  Two more.

12             MR. NILES-WEED:  Two more?

13             THE COURT:  Yes.  Take some time for rebuttal.  I'd

14   like to hear from Mr. Lawson.

15             MR. NILES-WEED:  Perfect.  Two quick points.

16             THE COURT:  Sure.

17             MR. NILES-WEED:  The state makes two more points about

18   the public interest, and I'll explain to you why they shouldn't

19   govern here.  The first is --

20             THE COURT:  It's amazing how many lawyers can't count

21   to two.

22             MR. NILES-WEED:  We'll see how I do.

23             THE COURT:  OK.

24             MR. NILES-WEED:  One, so the state says we're usurping

25   the legislature's role and introducing uncertainty.  That's not

M5CHUpsO

 1    about this case, your Honor.  We're not stopping the

 2    legislature from doing anything they want to do except regulate

 3    our activity to the extent their regulation violates the First

 4    Amendment.  They can do whatever they want outside of this

 5    narrow program.  And whatever future cases people want to

 6    bring, if they bring them, are not about us.  That's a

 7    different case.

 8            Second point, and final point, the state makes the

 9    point again that there's no need for this program and there are

10    lots of alternatives, but again I would direct the Court to the

11    statement from the affidavit of plaintiff Reverend Udo-Okon at

12    ECF 7-2, paragraph 17.  There's a critical and immediate need

13    for legal advice on how to respond to debt collection lawsuits

14    in his community.

15            THE COURT:  Thank you.

16            MR. NILES-WEED:  So to conclude, the public interest

17    balancing favors allowing plaintiffs' activity which would help

18    facilitate the state's own interests, and more importantly,

19    plaintiffs' rights are protected on the merits of their twin

20    First Amendment claims, the free speech claim and the freedom

21    of association claim.  So we've shown we're likely to succeed

22    on the merits, which is the dominant consideration.  We've also

23    shown that an injunction is in the public interest.  The Court

24    should grant plaintiffs' injunction.

25            THE COURT:  Thank you.

M5CHUpsO

1              Mr. Lawson.

2              MR. LAWSON:  Thank you, your Honor.  And again, I'm

3    Matthew Lawson from the New York State Attorney General's

4    Office, for the defendant, Letitia James.

5              I'd like to begin by emphasizing that a preliminary

6    injunction is an extraordinary remedy, and it's a remedy on

7    which the plaintiff carries the burden.  Among other

8    requirements, these plaintiffs must show that they are likely

9    to succeed on the merits and that an injunction is in the

10   public interest.  And these are the primary areas where they

11   have failed to meet their burden of proof.

12             With the Court's indulgence, and unless the Court has

13   any specific questions as to standing, I'd like to stand on the

14   positions we've taken in our brief on that point and move

15   directly to the First Amendment question on the merits.

16             THE COURT:  Yes.

17             MR. LAWSON:  So plaintiffs cannot possibly prevail in

18   this case because the First Amendment right that they're

19   asserting simply does not exist.  I'm a bit baffled by the

20   plaintiffs' characterization of the state's position in this

21   regard because at no time did the state simply limit its

22   argument to the alleged existence or nonexistence of an

23   unfettered right, as Mr. Niles-Weed said.  Nor did we limit it

24   to a blanket or unqualified right, as these plaintiffs state in

25   their reply brief.  Rather, there is no First Amendment right

M5CHUpsO

1   to give legal advice or practice law in any respect.  And

2   Supreme Court precedent establishes that states have a

3   compelling interest in regulating the practice of professions

4   within their boundaries.

5            THE COURT:  How do you explain the Supreme Court's

6   decision in *Holder against Humanitarian Law*?

7            MR. LAWSON:  I'm glad you ask, your Honor, because I

8   did want to respond to that in detail.  That was a case that

9   these plaintiffs did not cite in their opening grief, although

10  one of the amici did.  So I'd like to respond, and with the

11  Court's indulgence, I'd also like to hand up an additional

12  Eleventh Circuit published decision that was published --

13  decided just three months ago.

14           The problem with *Holder*, the *Holder* case, is that

15  courts, including the Supreme Court, have always treated

16  professional conduct rules, including licensing provisions

17  governing who may practice a profession, as their own special

18  category for First Amendment purposes.  And Mr. Niles-Weed said

19  earlier that the state didn't cite any controlling authority on

20  the First Amendment point.  That is incorrect.  Among the

21  decisions the state cited was the Supreme Court's 2018 decision

22  in *National Institute of Family and Life Advocates v. Becerra*,

23  which was decided eight years after *Holder*.  And in that case,

24  the Supreme Court specifically held that states may regulate

25  professional conduct even though that conduct incidentally

M5CHUpsO

1   involves speech.

2            And if I may, the Eleventh Circuit decision in a case

3   called *Del Castillo v. Secretary of the Florida Department of*

4   *Health*, 26 F.4th 1214, is relevant to that point as well.  This

5   is the case I'd like to hand up, with the Court's indulgence,

6   if I may.

7            THE COURT:  Sure.  Do you have a copy for your

8   adversary?

9            MR. LAWSON:  And before I put on the mask so I may do

10  so, I want to point out I'll be handing up both the Eleventh

11  Circuit published decision and the underlying district court

12  opinion from the Northern District of Florida because, as is

13  often the case --

14           THE COURT:  As long as you have copies for the

15  plaintiff.

16           MR. LAWSON:  I do and one for your Honor's clerk as

17  well.

18           THE COURT:  Great.  That will keep them busy.

19           MR. LAWSON:  So I will do that now.

20           THE COURT:  Thank you.

21           MR. LAWSON:  In the *Del Castillo* case -- and I'd like

22  to direct the Court and the parties specifically to

23  page 1225 -- the holding from *Del Castillo* just three months

24  ago is that a statute that governs the practice of an

25  occupation is not unconstitutional as an abridgment of the

M5CHUpsO

1    right to free speech so long as any inhibition of that right is

2    merely the incidental effect of observing an otherwise

3    legitimate regulation.

4            I would assert that that is a natural and necessary

5    extension of the Supreme Court's recognition in 2018 that

6    professional conduct rules are their own unique category for

7    First Amendment purposes.  And just so your Honor knows the

8    facts, the plaintiff in *Castillo* claimed that she had a First

9    Amendment right to give diet and nutrition advice, even though

10   she was not a licensed dietitian in Florida.  So the district

11   court dismissed the First Amendment lawsuit, and the Eleventh

12   Circuit affirmed.

13           And one thing I want to point out as well is that the

14   *Holder* decision was explicitly raised before the district court

15   in *Del Castillo*.  And so if I may, I'd like to refer the Court

16   to the district court decision, which is at 2019 WL 13141202,

17   at page 8, and that's the star pagination in Westlaw.  The

18   district court has this specific, direct quote.  The district

19   court stated that "*Holder* is distinguishable because the

20   statute at issue in that case was not a generally applicable

21   licensing statute regulating entry into a profession."  And

22   that district court decision was affirmed a mere three months

23   ago by the Eleventh Circuit in the published decision in

24   *Castillo*.

25           So there has been no sea change in the long-running

M5CHUpsO

1      understanding that professional conduct rules, including rules

2      that govern who may practice a profession, are constitutional

3      as long as the effect on speech is only incidental.

4              So consistent with --

5              THE COURT:  Let me interrupt you.  Is there any doubt

6      that the Attorney General would enforce this law against the

7      plaintiffs?

8              MR. LAWSON:  It's hard to make a determination on that

9      question simply because it's a hypothetical question, and the

10     issue of the unauthorized practice of law is a fact-based

11     inquiry that depends on what actually happens in a given

12     circumstance.

13             THE COURT:  You think this is not the practice of law?

14             MR. LAWSON:  For the purpose of this motion, your

15     Honor, the state is not disputing that the conduct that they

16     state that they would participate in would likely constitute

17     unauthorized practice of law.  But, again, that is our

18     assessment of their arguments, not an advisory opinion on

19     hypothetical circumstances that haven't transpired yet.

20             THE COURT:  Well, you're an experienced counsel, and

21     you've tried these cases before.  If the plaintiff were to

22     organize itself in the way it says it's going to organize

23     itself and then renders the advice and follows its program that

24     it says it's going to follow, would that constitute the

25     unauthorized practice of law?

M5CHUpsO

1          MR. LAWSON:  Based on my review of the case law, and

2     this is just my review, I think that if what the plaintiff is

3     doing is going beyond the mere distribution of relevant forms,

4     that the closer the plaintiff gets to rendering substantive

5     advice on defenses implicated by those forms, the more

6     likely -- in fact, it probably would fall within the

7     unauthorized practice of law statutes.

8          So we're not disputing that point for the purpose of

9     the motion, and I'm not sure in that scenario where our own

10    position diverges that much from what the plaintiff has laid

11    out.  But where we do disagree, obviously, is in the question

12    of whether there is a First Amendment right to practice law in

13    any respect.  And consistent with this long-standing, uniform

14    recognition that professional conduct rules are simply

15    different, they're unique, they're their own special category,

16    as far as I can tell, every single court, state or federal,

17    that has ever entertained the question of whether there is a

18    First Amendment right to give legal advice or to practice law

19    in any respect has rejected that lawsuit.  I've never seen a

20    single case from any jurisdiction where a plaintiff goes into

21    court, asks the Court to sign some type of order enjoining an

22    unauthorized practice of law statute so that plaintiff can

23    practice law or give legal advice without a license.

24         I should also note that the argument also fails in the

25    defensive context.  Often you'll see some type of enforcement

M5CHUpsO

1    action or prosecution for unauthorized practice of law, and the

2    defendant will assert as a defense to that type of prosecution

3    or enforcement action that he had a First Amendment right.  And

4    every single case, state or federal, although I believe all the

5    ones I've seen are state, but every state case where that

6    defense is made, the First Amendment argument is always

7    categorically rejected.

8              So the plaintiffs are in a bit of a conundrum here

9    because the position they're taking on the merits of this case

10   finds literally no support in any case whose facts are even

11   remotely analogous to those present here.  So what they're

12   forced to do is they're forced to rely on factual context that

13   have nothing to do with unlicensed laypersons practicing law

14   without a license.

15             And we got into that a little bit in *Holder*.  And

16   again, context matters.  The plaintiffs assert that, well, it's

17   not a problem that the facts here are not identical.  Well, it

18   is a problem for these plaintiffs because context matters, and

19   we know that because the Supreme Court and federal courts have

20   consistently recognized that professional conduct rules,

21   including generally applicable licensing statutes that govern

22   who may practice a profession, are essentially *sui generis*,

23   they're their own category, and they have been identified as

24   such by the Supreme Court of the United States as recently as

25   2018.

1            So I'm not aware of any case from any jurisdiction

2     where a court ever held that an unauthorized practice of law

3     statute was something that needed to be scrutinized under the

4     strict scrutiny standard.  The standard that they're asking the

5     Court to apply today has literally no precedent in any case

6     that has anything to do with the unauthorized practice of law.

7            And to the notion that these statutes are somehow

8     content-based, I would like to direct the Court to a case that

9     these plaintiffs cited from 2020.  The plaintiffs say that a

10    law is content based if it is a regulation of speech that on

11    its face draws distinctions based on the message a speaker

12    conveys, and that's *Barr v. American Association of Political*

13    *Consultants, Inc.,* 140 S.Ct. 2335, 2346 (2020).  A regulation

14    of speech that on its face draws distinctions based on the

15    message a speaker conveys, "on its face" means that you look at

16    the express text of the statute and see what that statute does

17    and does not direct.  Plaintiffs haven't cited a single

18    quotation from a statute that mentions any particular person's

19    message.  These are not statutes that suppress ideas.  These

20    statutes do not favor one type of message over another.  They

21    do not target the communicative aspects of law, but they simply

22    direct who may and who may not practice the profession as a

23    general matter.

24            And I want to just briefly go to the freedom of

25    association right.  The right to freedom of association also

M5CHUpsO

1    does not include any right to give unlicensed legal advice.

2    And somewhat bafflingly, Mr. Niles-Weed stated in his

3    presentation that the state doesn't mention the right of

4    association very much except to say that the facts are

5    different.  Our opposition brief actually had quite a bit to

6    say about the line of cases beginning with *NAACP v. Button* and

7    its progeny.  Those cases simply had nothing to do with

8    laypersons practicing law without a license.  And the fact is

9    that two primary cases they rely on, which are *NAACP v. Button*

10   and *In Re Primus*, one from 1963 and the other from 1978, didn't

11   involve an unauthorized practice statute at all.  They involved

12   First Amendment challenges to anti-solicitation statutes.  So

13   the Court never addressed the question.  And instead what it's

14   doing is it's saying that the First Amendment protects other

15   activities, and what the plaintiffs were trying to do in those

16   cases, they were trying to make a lawyer recommendation or

17   referral.  The plaintiffs here aren't trying to refer an

18   attorney.  They're trying to usurp the role of attorney by

19   practicing law without a license.  And *Button* and *Primus* simply

20   have nothing to say about that question.

21            And to further understand that point, one need look no

22   further than the *Jacoby* case, which the plaintiffs also cited

23   in their opening brief.  The Second Circuit noted in *Jacoby*

24   that the Supreme Court held that the First Amendment bears on

25   some situations in which clients and attorneys seek each other

M5CHUpsO

1     out to pursue litigation, and they specifically cite *Button* and

2     other cases for that point.

3          It is the case here that this is not a situation where

4     clients and attorneys are seeking each other out to pursue

5     litigation.  This is a case where the plaintiffs are trying to

6     usurp the role of counsel altogether by empowering unlicensed

7     laypersons to practice law without a license.  So there is

8     simply no right of association here, and no such right has been

9     recognized by any court, let alone the Supreme Court.

10         I just wanted to talk briefly about the tiers of

11    scrutiny analysis.  Our position is that any effect on speech

12    that these unauthorized practice statutes have is so incidental

13    that the Court can simply hold them constitutional without

14    proceeding to a separate tiers of scrutiny analysis.  But if it

15    does conclude that a tiers of scrutiny analysis is required,

16    the proper standard here would be the rational basis standard

17    and not strict scrutiny.

18         Under the rational basis standard, the Court need only

19    inquire into whether the state action is rationally related to

20    a legitimate governmental interest, and that's clearly the case

21    here.  The Supreme Court has long recognized that states have a

22    compelling interest in the practice of professions, including

23    law, within their borders.  And it goes without saying that a

24    statute that is designed to maintain minimum standards of

25    competence, qualifications, and moral fitness is rationally

M5CHUpsO

```
 1    related to that overriding goal.

 2            If I may, I'd like to proceed to the public interest

 3    questions.  Again, Mr. Niles-Weed stated that, really, the most

 4    compelling question in a First Amendment case is the question

 5    on the merits, and the court should focus most of its time on

 6    that issue.  However, the Supreme Court has recognized that

 7    when public interest considerations and the equities strongly

 8    weigh against the granting of injunctive relief, the court can

 9    deny a motion for preliminary injunction on that basis alone.

10    It's the state's position that --

11            THE COURT:  Why would I want to do that?  Here's a

12    situation that really cries out some sort of remedial effort.

13    There's a cycle of debt enforcement that is, I think in many

14    ways, shameless.  You see it here in the court when you have

15    people who come in and they've got problems with a debt

16    collection.  And it's an area that cries out for more help,

17    more assistance.  What's wrong with the state -- excuse me,

18    what's wrong with this effort where it provides some kind of

19    added assistance --

20            MR. LAWSON:  The problem --

21            THE COURT:  -- to people who need help?  I notice,

22    Mr. Lawson, you don't question that they need help.

23            MR. LAWSON:  They may very well need help, your Honor,

24    and the problem with the request for that relief is that what

25    it is is essentially a plea for legislative policymaking.  This
```

M5CHUpsO

1     is a court of law.  This court's primary function is to

2     determine whether there is some federal right that has been

3     implicated and to adjudicate legal questions respecting that

4     right.  There is a body whose primary function is to address

5     requests for legislative policymaking, and in fact, that body

6     has addressed such requests.  It has explicitly considered

7     requests for very specific exceptions to the prohibition

8     against the unauthorized practice of law.  And of course I'm

9     speaking of the New York State legislature here.

10           So my opinion is that questions for -- or requests for

11    legislative policymaking are best directed to the state

12    legislature, and this court is bound to the consideration and

13    adjudication of constitutional issues involving the enforcement

14    of federally recognized rights, at least in a federal question

15    such as the instant one.

16           But the relief requested here would also harm the

17    public interest in other ways.  As the Court, I believe,

18    alluded to, there's no actual standard as to whether the

19    persons recruited to provide this type of unlicensed advice

20    would even be high school graduates.  These plaintiffs don't

21    even identify who would be providing the advice here if

22    injunctive relief were to be granted in their favor.  So again

23    and again, accepting the Reverend Udo-Okon who would be one

24    such person, the state and this Court know nothing about the

25    character, experience, employment history, or level of

M5CHUpsO

1    education of the persons that would be empowered to give this

2    advice if an injunction were to be granted in their favor.  And

3    in our papers we spoke briefly about --

4            THE COURT:  Have there been bills introduced in the

5    state legislature which would envision a program like the one

6    we're talking about here?

7            MR. LAWSON:  I'm not personally familiar with any such

8    bill, your Honor.

9            There's really no independent vetting of justice

10   advocates' qualifications or character and fitness at all.  And

11   the plaintiffs' primary response to the fact that there are

12   really no character and fitness evaluation of any kind, let

13   alone independent character and fitness evaluation, is to say

14   that, well, we've got this really good training manual.  And I

15   fail to understand how a good training manual is an appropriate

16   screening mechanism to ascertain the suitability of character

17   and fitness of persons that would be practicing law or, in this

18   case, giving narrowly circumscribed legal advice.

19           I'd also like to refer to the advocate amici, and I

20   refer there to the briefs of amici curiae consumer law experts,

21   civil legal services organizations, and civil rights

22   organizations at ECF 57, and that is one of the amicus briefs.

23   The advocate amici make a number of compelling points about the

24   harms that could be implicated here that even I was not aware

25   of.  They point out, for example, that debt collection lawsuits

M5CHUpsO

1    often implicate multiple areas of law.  The advocate amici

2    point out that debt collection lawsuits can stem from a variety

3    of alleged debt, such as revolving lines of credit, retail

4    installment sales contracts, personal loans, student loans, and

5    other types of debts.

6           And the advocate amici point out that different types

7    of debts are often governed by different statutory schemes, and

8    they often present unique legal issues.  And what that means is

9    that the defenses can be different, and this is an area where

10   actual expertise in handling the defense of debt collection

11   actions is really important.  The advocate amici pointed out

12   that a defendant may have defenses that are different from the

13   ones that are in the form answer, and that if the defendant

14   fails to assert an applicable defense or fails to take the

15   steps required to move to dismiss, that that could be

16   detrimental or even fatal to the defense of the claims.

17          Another point that we did not have the opportunity to

18   raise in the papers but which is also important is that the

19   plaintiffs here fail to identify what remedy consumers would

20   have if a consumer is harmed after receiving negligent advice

21   from one of plaintiffs' justice advocates.  For example,

22   presumably there would be no cause of action for legal

23   malpractice because the persons to be providing this type of

24   advice would not be lawyers.  And plaintiffs never identify

25   what other type of claims or remedy would be available.

M5CHUpsO

1              So in closing, your Honor, I would just like to say

2      that -- one more point, which is that when you're balancing the

3      equities, generally speaking, the Court weighs the harms on

4      both sides.  And something important to that consideration is

5      what is the alleged public need for this?  And the plaintiffs

6      identify certain problems that community members were having in

7      their papers, they talk about harassing calls from debt

8      collectors, and they talk about community members who never

9      received any notice that they were ever being sued in the first

10     instance.  What they don't talk about is they don't put forth

11     any affidavit testimony from any community member who said the

12     primary problem that I've experienced in my life or in my

13     history with this creditor is that I haven't had a lawyer or

14     somebody tell me how to fill out the form answer.  Nobody

15     identified that as their primary problem.  So the injunction

16     here would not actually address the primary concerns identified

17     by the community members these plaintiffs consulted, and it

18     certainly wouldn't address the problem of sewer service where

19     plaintiffs never receive -- or defendants never receive any

20     notice that they're ever being sued in the first instance.

21             And the advocate amici identify a number of nonprofit

22     organizations that already give advice of the type here.  They

23     identified organizations such as CAMBA Legal Services, District

24     Council 37 Municipal Employees' Legal Services, Legal Services

25     NYC, Mobilization for Justice, and the New York Assistance

M5CHUpsO

1    Group, and TakeRoot Justice.  So there are a number of

2    nonprofits that provide this advice, and plaintiffs don't

3    identify a single occasion in which any of these organizations

4    turned away a New Yorker who simply wanted advice on filling

5    out a preprinted form answer in a debt collection action, which

6    is the sole advice that plaintiffs are seeking leave to provide

7    here.

8             So the public interest strongly weighs against the

9    granting of the requested injunctive relief, and the state

10   respectfully contends that the motion for preliminary

11   injunction is properly denied for that reason alone, in

12   addition to the fact that there is no likelihood of success on

13   the merits because the First Amendment right asserted here

14   simply does not exist.

15            THE COURT:  Thank you, Mr. Lawson.

16            Mr. Niles-Weed.

17            MR. NILES-WEED:  Just a few points, your Honor.  I'm

18   not going to commit to a number, but I'll try to keep it low.

19            The first point I'll note is that the government in

20   response to your question didn't dispute that they would

21   potentially prosecute us.  It was an opportunity to disavow

22   prosecution.  The state didn't do so.  It's relevant to the

23   standing inquiry.

24            The next point I want to discuss is the government's

25   reliance on cases talking about regulations of professional

M5CHUpsO

1    conduct with a merely incidental effect on speech and explain

2    why that's not the case here.  I think there are a number of

3    places I can point your Honor that explain that distinction.

4           So I would note that the government said in their

5    presentation that there's no right to practice law in any

6    respect, but in the *Lawline* case from the Second Circuit which

7    the government cites, the court says, and this is 956 F.2d at

8    1386, that there may well be activities, many activities,

9    excuse me, which lawyers routinely engage in which are

10   protected by the First Amendment and which could not be

11   constitutional prohibited to laypersons.

12          The *Shell* case from Colorado has a similar

13   recognition.  That's at 148 P.3d at 173.  And the real place to

14   go on this is *Primus*, which was decided the very same day as

15   the Supreme Court's decision in *Ohralik*.  And *Ohralik* talks

16   about how the state can regulate in-person solicitation for

17   pecuniary gain.  And what *Primus* says is when you're engaged in

18   collective activity for a nonprofit purpose, for political

19   aims, to increase access to courts, that issue that *Ohralik* was

20   talking about does not apply.

21          And more recent Supreme Court cases likewise confirm

22   that when the effect on speech is not incidental, which is the

23   case here, First Amendment scrutiny applies.  All plaintiffs

24   want to do is speech.  There is no conduct to which that speech

25   is incidental.  So as applied to plaintiffs, we're talking

M5CHUpsO

1     about a content-based regulation of speech.  *NIFLA*, the case

2     the government cites, makes clear that just because speech is

3     done in the context of a professional relationship doesn't

4     exempt it from heightened scrutiny.

5           And on the Eleventh Circuit case which was decided

6     before the government's brief was submitted in this case, what

7     they're talking about there is a broader swath of conduct

8     relating to nutrition.  They're not talking about what

9     plaintiffs are doing here, which is pure person-to-person

10    speech, no adjacent conduct, subject to strict regulations.

11          Just a few more points.  I would -- so on the public

12    interest question, the government points the Court to the

13    Supreme Court's case in *Winter* which looks solely at the public

14    interest balancing.  There, the public interest stakes were a

15    risk to a fleet of the U.S. Navy on the one hand, and on the

16    other hand, it was a number of plaintiffs who sought to protect

17    the right of endangered species.  What the court recognized is

18    that sometimes the balance is that extreme, but in that case,

19    there were no constitutional rights at issue and not the

20    delicate balancing that's required here.

21          And on that balancing, as your Honor said, the

22    plaintiffs are trying to help people who need help.  All we're

23    asking the Court to do is follow the law as the government

24    suggests, which requires, under the First Amendment speech

25    cases and association cases, that plaintiffs' pure speech,

M5CHUpsO

1    provided for free, subject to strict restrictions is protected.

2            I'll conclude just with two more quick points.  The

3    first is that the government raised a concern about not knowing

4    who is providing the advice or whether they even have high

5    school diplomas.  First, I'll say there are plenty of people

6    who don't have high school diplomas who are qualified to help

7    people in need.  And the second point I'll make is that the

8    only question relevant here is not who is doing the advising

9    but what they're doing, and what they're doing is subject to

10   the strict terms of the training guide attached to Exhibit B.

11   So when you're outside that scope, you're not within the

12   program, and so there are none of the concerns that normally

13   motivate the regulation of the practice of law.  And that's the

14   real question here.

15           As your Honor said, this is a problem that cries out

16   for more help.  What plaintiffs want to do and plaintiffs seek

17   and would think they would find common cause with the state and

18   its amici, what we're trying to do is to take the state's form,

19   which the state plainly believes is adequate, to help

20   self-represented individuals respond to these lawsuits, and

21   we're helping to make the state form better.

22           So the question on the public interest balancing is

23   not whether there are other problems that plaintiffs could be

24   solving, like the issue of sewer service.  The question is not

25   whether there are other people who might be solving this

M5CHUpsO

1    problem or helping to solve this problem, which there are, and

2    plaintiffs respect and appreciate the amazing work done by the

3    amici and other organizations, but the status quo as it sits

4    today is that there are 88 percent of people who default in

5    lawsuits like this, and the question for the Court on the

6    public interest balancing is a narrow one.  Given that

7    88 percent default rate, will people be better off with the

8    narrow advice that plaintiffs are seeking to provide, or will

9    they be worse off?

10              So there might be a bunch of other problems lurking

11   all around these issues, but all we want to do is exceptionally

12   narrow, and it will be in the public interest.  And most

13   importantly, it's protected by the First Amendment.

14              THE COURT:  Thank you.

15              Mr. Lawson, you want to say anything?

16              MR. LAWSON:  I just have a couple brief points on the

17   merits of the First Amendment question.

18              Mr. Niles-Weed was responding to my point that

19   professional conduct rules with only an incidental effect on

20   speech are constitutional and that such professional conduct

21   rules have been recognized to be a separate category, both by

22   the Supreme Court and others.  In rebuttal to my point,

23   Mr. Niles-Weed cited to cases.  He cited the Seventh Circuit's

24   opinion in *Lawline v. American Bar Association*, as well as the

25   Colorado Supreme Court's opinion in *People v. Shell*.  And let

M5CHUpsO

1     me just state at the outset that in both such cases, the court

2     squarely rejected the First Amendment arguments that the

3     plaintiff was making.

4          And far from rebutting the state's argument that

5     professional conduct regulations that have a merely incidental

6     effect on -- of observing an otherwise legitimate regulation,

7     the *People v. Shell* case actually dismissed the case -- or,

8     actually, it rejected a defense, but it rejected the First

9     Amendment argument on that precise basis.  On page 173 and 174,

10    the Supreme Court of Colorado explicitly held that the

11    unauthorized practice statute was "merely the incidental effect

12    of observing an otherwise legitimate regulation."

13         So, again, I would just assert that professional

14    conduct rules, including generally applicable licensing

15    statutes that govern who may practice a profession, are their

16    own category for First Amendment purposes.  And resorting to

17    cases from completely different context is simply not the

18    proper approach to First Amendment jurisprudence in this area.

19         Thank you.

20         THE COURT:  Thank you.

21         I want to thank the parties for the cogency of the

22    briefing and the oral advocacy.  It was very wonderful to see.

23         I also noticed the civility between the plaintiff and

24    the defendant, and civility is too often lacking in today's

25    hurly-burly of litigation.  So thank you for that.

M5CHUpsO

1          We'll have a decision for you shortly.  Thank you very

2    much.  Case is adjourned.

3          (Adjourned)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UPSOLVE, INC., and
REV. JOHN UDO-OKON,

                                    *Plaintiffs*,

                    v.

LETITIA JAMES, in her official capacity as
Attorney General of the State of New York,

                                    *Defendant*.

---

No. 22-cv-627 (PAC)

**OPINION & ORDER**

"The orderly functioning of our judicial system and the protection of our citizens require that legal advice should be offered only by those who possess the requisite qualifications and authorization for the practice of law. At the same time, one of the most fundamental principles of our system of government prohibits any restraint on a citizen's right to disseminate his views on important public issues." *Dacey v. New York Cty. Lawyers' Ass'n*, 423 F.2d 188, 189 (2d Cir. 1969). Sometimes these two principles conflict, and one must yield to the other.

This case exemplifies that conflict. Plaintiffs—a non-profit organization and a non-lawyer individual—seek to encroach upon a small part of what has heretofore been the exclusive domain of members of the Bar. Plaintiffs have crafted a program that would train non-lawyers to give legal advice to low-income New Yorkers who face debt collection actions. Specifically, Plaintiffs want to help those New Yorkers fill out checkboxes on a one-page answer form provided by the State, in the hopes that more people will avoid defaulting outright in such actions. The legal advice would be free and confined to helping clients complete the State's one-page form.

Plaintiffs' proposal faces one problem: by giving legal advice as non-lawyers, their activities would constitute the unauthorized practice of law ("UPL") under several New York

statutes. They risk being sued by the Defendant in this case, the New York State Attorney General. Thus, Plaintiffs seek an injunction that prevents the Attorney General from enforcing the UPL rules against them.

The Court concludes a preliminary injunction is warranted. The UPL rules cannot be applied to Plaintiffs' program because the First Amendment protects their legal advice as speech, and the UPL rules are not narrowly tailored to satisfy strict scrutiny in this context. Further, the balance of equities favors an injunction because Plaintiffs' program would help alleviate an avalanche of unanswered debt collection cases, while mitigating the risk of consumer or ethical harm. And enjoining enforcement against Plaintiffs alone, whose activities are carefully limited to out-of-court advice, will not threaten the overall regulatory exclusivity of the legal profession.

## **BACKGROUND**

### I.     **Debt Collection Actions in New York State**

Debt collection actions are extremely common in New York. By one estimate, they comprise approximately a quarter of all lawsuits in the State's court system. *See* Compl., ECF No. 1, at ¶ 18.

These debt collection actions have been the subject of commentary and regulatory reform. Many of these lawsuits are viewed as "clearly meritless," where the defendants sued do not actually owe the amount claimed, or any amount at all. *See id.* ¶ 21.[1]  Nonetheless, everyone agrees the vast majority of New Yorkers default when faced with debt collection actions. Plaintiffs provide estimates of the default rate that range from over 70% to up to 90%. *See id.* ¶ 19.

---

[1] Quoting *The Legal Aid Society et al., Debt Deception: How Debt Buyers Abuse the Legal System to Prey on Lower-Income New Yorkers*, 8–10, 26 n.91 (May 2010), https://www.neweconomynyc.org/wp-content/uploads/2014/08/DEBT_DECEPTION_FINAL_WEB-new-logo.pdf.

2

**A177**

Three such New Yorkers have submitted declarations describing their own default judgments. All three were sued on consumer debts such as credit card expenses, medical bills, or auto loans. *See* Evertsen Decl., ECF No. 7-7, at ¶ 9; Jurado Decl., ECF No. 7-8, at ¶ 17; Lepre Decl., ECF No. 7-9, at ¶ 6. However, none of them received notice they were being sued, so they all defaulted. *See* Evertsen Decl. at ¶¶ 12–14; Jurado Decl. at ¶¶ 14–15; Lepre Decl. at ¶¶ 9–11. They subsequently faced default judgments—and collateral consequences including wage garnishment, lowered credit scores, and bankruptcy—because they had failed to answer the lawsuits against them. *See* Evertsen Decl. at ¶ 17; Jurado Decl. at ¶¶ 18, 24; Lepre Decl. at ¶¶ 14, 17, 22.

Since at least 2015, New York has responded to this debt collection problem by providing a one-page answer form that defendants can download, complete, and submit in their cases. *See* Compl. ¶¶ 34–35; *id.* Ex. A, ECF No. 1-1 (the "State-Provided Answer Form"). The form includes checkboxes allowing a defendant to assert affirmative defenses, such as, "I did not receive a copy of the Summons and Complaint," "I had no business dealings with Plaintiff (Plaintiff lacks standing)," or "Unconscionability (the contract is unfair)." *See* State-Provided Answer Form at 2. A defendant can submit a notarized copy of the State-Provided Answer Form themselves, i.e., pro se.

## II.    Plaintiffs and their AJM Program

Plaintiff Upsolve, Inc. is a non-profit organization that seeks to "ensure that all Americans can access their legal rights." Compl. ¶ 3. The organization "hope[s] to improve public faith in the court system by ensuring that all defendants rich and poor can have their day in court, courts can decide more cases on their merits, and plaintiffs cannot secure default judgments on meritless claims simply due to defendants' inability to vindicate their rights." *Id.* ¶ 56. More specifically,

**A178**

Upsolve seeks "to provide free, narrowly circumscribed legal advice to low-income New Yorkers to ensure that they can understand how to respond to the debt collection lawsuits against them and help reduce wrongful deprivation of property and the lasting harm it can cause." *Id.*

To that end, Upsolve has "designed, crafted, and obtained funding to implement a program—the American Justice Movement ('AJM')—to train professionals who are not lawyers to provide free legal advice on whether and how to respond to a debt collection lawsuit." *Id.* Upsolve has not yet implemented the AJM program. *See id.* ¶ 92.

Under the AJM program, volunteer trainees—referred to as "Justice Advocates"—would use a training guide to help clients complete the State-Provided Answer Form. *See* Compl. Ex. B, ECF No. 1-2 (the "Training Guide"). The Training Guide provides several steps for a Justice Advocate to follow when counseling a client. Those steps include: (1) determining whether the client could benefit from their advice; (2) confirming the limited scope of representation with the client; (3) advising the client whether it is in their best interest to answer the lawsuit against them; (4) advising the client on how to fill out the answer's 24 checkboxes based on the client's answers to a series of questions; and (5) advising the client on how and where to file and serve the answer themselves. *See* Training Guide at ECF pagination 5–13. Upsolve designed the Training Guide with the help of lawyers and law professors who have experience in debt collection practice. *See* Lhewa Decl., ECF No. 7-5; Foohey Decl., ECF No. 7-6.

The Training Guide also limits the scope of legal assistance provided. Justice Advocates must sign an affidavit attesting that the advice they provide will be free of charge. They promise to abide by New York's Rules of Professional Conduct regarding client conflicts of interest, confidentiality, and informed consent. And they promise to refer clients to lawyer organizations if those client's needs exceed the scope of the advice authorized by the Training Guide. *See*

4

**A179**

Training Guide at ECF pagination 3–4, 15.  If Justice Advocates violate the Training Guide's rules, their membership in the AJM program will be terminated.  They are also warned they could be prosecuted for the unauthorized practice of law or other consumer-protection laws if they violate the AJM program's rules.  *See id.* at 4.

One such Justice Advocate would be Reverend Udo-Okon, the other plaintiff in this case.  Reverend Udo-Okon is a pastor in the South Bronx.  *See* Udo-Okon Decl., ECF No. 7-2, at ¶ 3.  He is not a lawyer, but would like to help members of his community who frequently come to him with their legal problems, including debt collection lawsuits.  *See id.* at ¶¶ 11, 13.  Reverend Udo-Okon "would welcome the opportunity to be trained by the American Justice Movement," and "would be willing to comply with the relevant ethical obligations, including confidentiality and conflict-of-interest protections, for the individuals seeking [his] advice."  *See id.* at ¶ 23.  He declares that his advice would be free to those who receive it.  *See id.*  Reverend Udo-Okon has gathered signatures from dozens of his constituents who say they would be willing to receive free legal advice from him.  *See id.* Ex. 2A, ECF Nos. 7-3, 7-4.

## III.   New York's UPL Statutes

New York makes it civilly and criminally punishable for someone who is not admitted to a State Bar Association to engage in the "unlawful practice of law."  *See* N.Y. Jud. Law §§ 476-a, 478, 484, 485.  A court may also hold a non-lawyer who practices law in civil or criminal contempt.  *See id.* §§ 750, 753.  The Attorney General is authorized to sue "any person, partnership, corporation, or association" who engages in the unauthorized practice of law.  *Id.* § 476-a.

Defining the "practice of law," however, is an elusive endeavor.  New York courts have held that one clear category "involves the rendering of legal advice and opinions directed to particular clients."  *Matter of Rowe*, 80 N.Y.2d 336, 341–42 (1992).  Others include "appearing in

court and holding oneself out to be a lawyer." *El Gemayel v. Seaman*, 72 N.Y.2d 701, 706 (1988). By contrast, giving generalized advice to the public—where judgment is not exercised on behalf of a particular client—is not considered the practice of law.  *See Rowe*, 80 N.Y.2d at 342; *El Gemayel*, 72 N.Y.2d at 706.

In this case, both sides agree that Justice Advocates in the AJM program would be "practicing law" in New York.  Justice Advocates would give clients advice on how to complete an answer form based on those clients' individual circumstances; those clients would then file their answers in court.  *See, e.g.*, *Sussman v. Grado*, 746 N.Y.S.2d 548, 552–53 (Dist. Ct. Nassau Cty. 2002) (paralegal who used independent judgment to help a client fill out a form, without attorney supervision, engaged in the unauthorized practice of law).  The UPL rules therefore apply to Plaintiffs' activities.

The question, then, is whether the UPL rules are constitutional in that application.

## ANALYSIS

IV.    **Subject Matter Jurisdiction**

A.    **Plaintiffs have Standing to Seek Injunctive Relief**

The Court must first assess the threshold issue of Article III standing.  Here, even though no one has yet sought to enforce the UPL rules against them, Plaintiffs have established standing.

"[I]n order to seek injunctive relief, a plaintiff must show the three familiar elements of standing: injury in fact, causation, and redressability."  *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (citing *Summers v. Earth Island Inst.*, 555 U.S. 488 (2009)).  At the preliminary injunction stage, "a plaintiff cannot rest on such mere allegations, as would be appropriate at the pleading stage but must set forth by affidavit or other evidence specific facts" supporting the three

standing elements.  *Cacchillo*, 638 F.3d at 404 (cleaned up) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).[2]

Plaintiffs have not provided any legal advice would expose them to prosecution under the UPL rules, raising questions as to the "injury in fact" element of Article III standing.  Yet such pre-enforcement challenges are regularly entertained by federal courts.  Where a plaintiff asserts injury based on the threat of prosecution, that plaintiff need not "expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced."  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007) (collecting cases).  Plaintiffs here could face civil or criminal prosecution under the UPL rules by the Attorney General.

In a pre-enforcement challenge, "[c]ourts are generally 'willing to presume that the government will enforce the law as long as the relevant statute is recent and not moribund.'" *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016) (quoting *Hedges v. Obama*, 724 F.3d 170, 197 (2d Cir. 2013)).  This presumption "sets a low threshold and is quite forgiving to plaintiffs seeking such preenforcement review," *Cayuga Nation*, 824 F.3d at 331 (quoting *Hedges*, 724 F.3d at 197), especially when First Amendment rights are at issue.  *See Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689 (2d Cir. 2013).

New York's UPL rules are hardly moribund; they are frequently enforced against lawyers and non-lawyers alike.  *See, e.g.*, *Spiegel v. Ahearn*, No. 101251/2016, 2018 WL 4743366, at *4 (Sup. Ct. N.Y. Cty. 2018) (non-lawyer engaged in the unauthorized practice of law "by discussing

---

[2] "An evidentiary hearing is not required . . . when the disputed facts are amenable to complete resolution on a paper record" or a part "waive[s] its right to an evidentiary hearing." *Charette v. Town of Oyster Bay*, 159 F.3d 749, 755 (2d Cir. 1998).  Plaintiffs have submitted several affidavits in support of their motion; the Court has also heard oral argument from both sides.  Accordingly, the Court reviews this motion on a paper record without an evidentiary hearing.

Defendants' legal problems with them and advising them what they needed to do to resolve those problems"); *People v. Jakubowitz*, 710 N.Y.S.2d 844, 845 (Sup. Ct. Bronx Cty. 2000) (criminal charges under UPL rules against disbarred attorney). Just a few months ago, the Attorney General charged a non-lawyer in Buffalo for allegedly posing as an attorney and representing clients at legal proceedings.[3] That non-lawyer faces a possible felony under the UPL rules.

      To be sure, the Attorney General has not announced an intention to prosecute the Plaintiffs for implementing the AJM program. But as discussed above, Plaintiffs' activities would clearly run afoul of the UPL rules. *See Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 71 (2d Cir. 2019). Moreover, the Attorney General declined to disavow enforcement against Plaintiffs at oral argument.[4] *See Walsh*, 714 F.3d at 691 (political non-profit had pre-enforcement standing, despite Government's suggestion that it *might* not enforce a statute, when that statute "clearly applie[d]" to non-profit's activities, and Government had conceded at oral argument that it regulated thousands of other political committees); *Vermont Right to Life Comm., Inc. v. Sorrell*, 221 F.3d

---

[3] *See Press Release: Attorney General James and State Police Superintendent Bruen Announce Arrest of Phony Attorney*, NEW YORK STATE ATT'Y GENERAL, Mar. 9, 2022, https://ag.ny.gov/press-release/2022/attorney-general-james-and-state-police-superintendent-bruen-announce-arrest.

[4] *See* Oral Argument Tr., ECF No. 66, at 27:5–17:

> THE COURT: Let me interrupt you. Is there any doubt that the Attorney General would enforce this law against the plaintiffs?
>
> MR. LAWSON: It's hard to make a determination on that question simply because it's a hypothetical question, and the issue of the unauthorized practice of law is a fact-based inquiry that depends on what actually happens in a given circumstance.
>
> THE COURT: You think this is not the practice of law?
>
> MR. LAWSON: For the purpose of this motion, your Honor, the state is not disputing that the conduct that they state that they would participate in would likely constitute unauthorized practice of law.

8

**A183**

376, 383 (2d Cir. 2000) (noting "there is nothing that prevents the State from changing its mind" about enforcement). The Attorney General has not rebutted the presumption of enforcement.

Plaintiffs have also buttressed their standing by showing exactly how they would violate the UPL rules. *See Wembley, Inc. v. Superba Cravats, Inc.*, 315 F.2d 87, 90 (2d Cir. 1963) ("Major stress should be placed on the 'definite' intention of the plaintiff to take 'immediate' action to utilize its potential and this intention should be 'evident' from the preparatory steps outlined in its complaint."). Upsolve has provided a fully fleshed-out Training Guide. It has identified willing Justice Advocate trainees (such as Reverend Udo-Okon) and willing clients (such as the signatories to the Reverend's petition) that could implement that Training Guide immediately. Plaintiffs' injury is thus sufficiently concrete to meet Article III's requirements.

With injury-in-fact established, the causation and redressability elements of standing are easily satisfied in this case. As to causation, Plaintiffs have alleged that the only thing preventing them from acting is the threat of UPL enforcement. *See* Udo-Okon Decl. ¶¶ 17–18, 21 ("One such religious leader in the South Bronx was accused of practicing law without a license because he was trying to help members of his community out with their legal issues. I fear that I would face the same consequences if I tried to help members of my own community out with their debt collection lawsuits."). And relatedly, an injunction against enforcement of the UPL rules would remove the threat to Plaintiffs' planned activities, satisfying the redressability requirement.

### B.     Plaintiffs' Challenge is As-Applied

The nature of Plaintiffs' pre-enforcement challenge presents another threshold question: whether the Court should treat that challenge as one that is "facial" or "as-applied." A facial challenge would seek to declare New York's UPL rules unconstitutional for everyone, while an as-applied challenge only seeks to hold those rules unconstitutional as to Plaintiffs' own activities.

"Facial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, but for the benefit of society—to prevent the statute from chilling the First Amendment rights of other parties not before the court." *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 958 (1984).   Given their breadth, facial challenges are highly disfavored.  *See Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008); *accord Dickerson v. Napolitano*, 604 F.3d 732, 741 (2d Cir. 2010).

Plaintiffs characterize their suit as an as-applied challenge—they do not seek to strike down the UPL rules whole cloth—and the Attorney General does not argue otherwise.  Yet the pre-enforcement timing of Plaintiffs' lawsuit unsettles their conclusion.  After all, how is the Court to resolve the application of the UPL rules to Plaintiffs if they have not yet violated anything?

Some Second Circuit precedent would seem to suggest that Plaintiff's lawsuit must be construed as a facial challenge.  In *Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third & Fourth Departments*, non-lawyer plaintiffs who wanted to invest in law firms sued before taking any action to violate the UPL rules.  852 F.3d 178, 191 (2d Cir. 2017).  The Second Circuit noted that the plaintiffs' suit "constitute[d] a facial, rather than as-applied challenge" because they had brought a "pre-enforcement appeal before they have been charged with any violation of law . . . ." *Id.* (quoting *N.Y.S. Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 265 (2d Cir. 2015) (internal quotation marks omitted)).  Likewise here, because Plaintiffs have not been charged with violating the UPL rules, *Jacoby & Meyers* would suggest their action should be construed as a facial challenge.

The Supreme Court, however, has eschewed any such bright line rule.  It has permitted pre-enforcement, as-applied challenges under the First Amendment.  *See Holder v. Humanitarian*

*Law Project*, 561 U.S. 1, 14–16 (2010); *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 234, 248–49 (2010).

While these two lines of authority are admittedly in "some tension," *Geller v. Cuomo*, 476 F. Supp. 3d 1, 17 (S.D.N.Y. 2020), it is more sensible to frame Plaintiffs' challenge as an as-applied one. Adjudicating their claims will not extend relief to non-parties outside of their organization, as the specifics of Plaintiffs' legal advice can be adjudicated on the factual basis of AJM Training Guide. They seek to allow members of a specific group to give legal advice about a specific legal topic—debt collection cases—with specific parameters about how those members would go about giving that advice. This analysis does not require adjudication of every possible application of the UPL rules based on hypothetical facts about other groups of non-lawyers. *See United States v. Salerno*, 481 U.S. 739, 745 (1987) (on a facial challenge, "the challenger must establish that no set of circumstances exists under which the [statute] would be valid").

Moreover, there is no tension at all surrounding the federal courts' general preference for as-applied challenges. As-applied challenges serve the foundational interest of judicial restraint. They allow for incremental decisions, based on actual cases or controversies, about the constitutionality of our laws. *See Kane v. De Blasio*, 19 F.4th 152, 174 (2d Cir. 2021).

The Court shall therefore examine the constitutionality of the UPL rules as applied to Plaintiffs alone.

This framing carries important consequences. A facial challenge would impose a heavy burden on Plaintiffs to prove the UPL rules lack a "plainly legitimate sweep," *Washington State Grange*, 552 U.S. at 449 (citation and quotation marks omitted)—an especially trying task considering that the UPL rules are one of the cornerstones of the modern practice of law in New York State. Instead, with an as-applied challenge, Plaintiffs need not challenge the legitimacy of

**A186**

the UPL rules in the abstract; they need only address the UPL rules with respect to their own activities. An as-applied challenge also guarantees that any relief would be narrow, affecting only the Plaintiffs and not the entire universe of non-lawyers. *See Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 502 (1985) (noting that "a federal court should not extend its invalidation of a statute further than necessary to dispose of the case before it").

With the scope of Plaintiffs' challenge to the UPL rules made clear, the Court turns to the merits.

## V.   MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs seek a preliminary injunction that prevents the Attorney General from enforcing the UPL rules against them for implementing the AJM program.

### A.   Legal Standard

A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008). To obtain this remedy, Plaintiffs must demonstrate three factors. Where, as here, "a preliminary injunction will affect government action taken in the public interest pursuant to a statute or regulatory scheme," the party seeking the preliminary injunction must demonstrate "(1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020) (citation and quotation marks omitted). More generally, "[t]he movant also must show that 'the balance of equities tips in his [or her] favor.'" *Yang v. Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

"To warrant a preliminary injunction, Plaintiffs need not show that there is a likelihood of success on the merits of all of their claims for relief. Rather, Plaintiffs must show a likelihood of

**A187**

success on the merits of at least one of their claims." *L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 618 (S.D.N.Y. 2018) (alterations and quotation marks omitted).

One wrinkle: Plaintiffs in this case seek an injunction that *alters* the status quo by allowing them to give legal advice for the first time. Thus, Plaintiffs seek a "mandatory" injunction (which alters the status quo) rather than a "prohibitory" injunction (which maintains the status quo). *See Kosinski*, 960 F.3d at 127. For a "mandatory" injunction, Plaintiffs must also: (1) make a "strong showing" of irreparable harm, and (2) demonstrate a "clear or substantial likelihood of success on the merits." *Id.* (citations omitted). Because the Court concludes Plaintiffs would prevail under either the "mandatory" or "prohibitory" standard, it does not distinguish between the two for purposes of this Opinion. *See id.*

**B.      Likelihood of Success on the Merits**

Much rises and falls on the likelihood of Plaintiffs' success on the merits. "Because the deprivation of First Amendment rights is an irreparable harm, in First Amendment cases 'the likelihood of success on the merits is the dominant, if not the dispositive, factor'" in granting a preliminary injunction. *Agudath Israel*, 983 F.3d at 637 (quoting *Walsh*, 733 F.3d at 488).

"It is fundamental that the First Amendment 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 548 (2001) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964)).

Plaintiffs advance two theories under the First Amendment. First, they claim the UPL rules infringe on their right to associate with potential clients and access the courts. Second, they claim the UPL rules infringe on their right to give legal advice under the Free Speech Clause. Although their first theory likely lacks merit, their second theory is likely to succeed on the merits.

**A188**

i)   Right of Association Claim

The Court first addresses, and dismisses, Plaintiffs' associational theory.  Plaintiffs allege the UPL rules unconstitutionally prevent them, and their clients, from accessing the courts and expressing their political beliefs.  They argue that debt collection lawsuits affect poor and minority Americans more than other groups, and that by responding to those lawsuits, they can express their beliefs about every New Yorker's right to be heard in court.  *See* Compl. ¶ 56.

Two threads of Supreme Court precedent are often invoked in this associational context. The first line of cases involves non-profits that seek to advocate politically through litigation.  In *NAACP v. Button*, 371 U.S. 415 (1963), the NAACP sought to recruit clients to battle racial segregation in court.  However, a state statute had prevented organizations like the NAACP from using attorneys to represent third-party clients.  *Id.* at 423–24.  The Supreme Court held that NAACP's efforts were "modes of expression and association protected by the First and Fourteenth Amendments . . . ."  *Id.* at 428–49.  The Court emphasized that "no monetary stakes [were] involved" in the NAACP's mission, such that "there [was] no danger that the attorney [would] desert or subvert the paramount interests of his client to enrich himself or an outside sponsor."  *Id.* at 443–44.  The NAACP's attorney advocacy was therefore a "mode[] of expression and association protected by the First and Fourteenth Amendments."  *Id.* at 428–49.

*Button*'s rationale was echoed in *In re Primus*, 436 U.S. 412 (1978).  In *Primus*, the Supreme Court struck down a law that prevented the ACLU from soliciting a client who had received an allegedly unconstitutional sterilization.  *Id.* at 422.  Again, the Court emphasized the organization's non-financial motives by contrasting the ACLU's activities from those in another case decided the same day, *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 458 (1978), which upheld a state law barring a lawyer from soliciting a client in-person for paid representation.

**A189**

*Primus*, 436 at 422.  Although the *Primus* Court concluded the state's interests may be stronger in circumstances where a commercial transaction is proposed, they were not sufficiently tailored in application to organizations such as the ACLU.  *Id.*

The second relevant line of cases involves lawyers who seek to represent union members. *See United Transp. Union v. Michigan*, 401 U.S. 576 (1971); *United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n*, 389 U.S. 217 (1967); *Brotherhood of R. R. Trainmen v. Virginia ex rel. Va. State Bar*, 377 U.S. 1 (1964).  In those cases, the Supreme Court has held the First Amendment protected union members' right to "associate with each other to obtain counsel and further their litigation ends, and to the union as a proxy for the workers in their exercise of associational rights." *Jacoby & Meyers*, 852 F.3d at 185.  States therefore could not "prevent efforts of a union to provide its members practical and economical access to courts to press work-related personal injury claims" by framing laws "in the guise of regulating the practice of law."  *Board of Education v. Nyquist*, 590 F.2d 1241, 1244 (2d Cir. 1979).

The "common thread" of these two lines of cases is the principle that "collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment."  *United Transp.*, 401 U.S. at 585.  And the cases have clearly differentiated between "activities of lawyers acting in a for-profit setting and those acting in a not-for-profit context, advocating political causes in which the attorneys themselves share . . . ." *Jacoby & Meyers*, 852 F.3d at 188.  Hence, Plaintiffs' non-profit status holds some superficial appeal in this action.

But the cases share another common thread which cuts against Plaintiffs: in each one, "clients and *attorneys* [sought] each other out to pursue litigation."  *Id.* at 185 (emphasis added). Here, by contrast, non-lawyers would seek out clients.  Accordingly, both the non-profit and the

union lines of caselaw are fundamentally distinguishable: neither confronted a non-lawyer's purported associational right to represent a client. In that respect, no precedent, binding or otherwise, appears to support Plaintiffs' position.

This Court doubts, moreover, that the rationale of *Button* and *Primus* extends so far as to justify non-lawyer legal advice merely because doing so would express a political belief. The lawyers in those non-profit cases sought to vindicate constitutional rights, such as equal protection against discriminatory laws, because such causes "implicate[d] expressive values" for both the lawyers and their clients. *Id.* at 185–86. Here, Plaintiffs would express their belief in ending cycles of poverty by assisting their clients in debt collection cases. But the only constitutional right they seek to vindicate is their *clients'* right to access the courts.[5] Promoting access to the courts—a right shared by every client—would allow any non-lawyer, so long as they do not charge a fee, to bootstrap a right to practice law. *See id.* at 187 ("We are not aware of any judicial recognition of such an interest, however, when it comes to the lawyer's generic act of pursuing litigation on behalf of any client."). Clients in any type of civil lawsuit would thus enjoy the right to full non-lawyer representation. The Court declines to endorse this broad associational theory to warrant a preliminary injunction.

ii)   <u>Free Speech Claim</u>

Plaintiffs' stronger theory is based on their *own* right to free speech. On this second claim, they have demonstrated a likelihood of success on the merits.

At the outset, the Court underscores that an abstract "right to practice law" is not at issue in this narrow challenge. The Court does not question the facial validity of New York's UPL rules

---

[5] Given that Plaintiffs have not included any clients in their lawsuit, they also risk creating a third-party standing problem by asserting constitutional rights on behalf of hypothetical clients. *See Jacoby & Meyers*, 852 F.3d at 189 n.7.

**A191**

to distinguish between lawyers and non-lawyers in most settings, and to regulate all sorts of non-lawyer behavior.[6]  Instead, the issue here is a narrow one: whether the First Amendment protects the precise legal advice that Plaintiffs seek to provide, in the precise setting in which they intend to provide it.  The Court holds that it does.

(1)      *Plaintiffs' Legal Advice is Content-Based Speech*

Plaintiffs' claim hinges on whether the act of giving legal advice should be conceptualized as conduct or speech.   The two concepts often blur, given that "the practice of law has communicative and non-communicative aspects."  *Capital Associated Indus., Inc. v. Stein*, 922 F.3d 198, 208 (4th Cir. 2019).  But "[w]hile drawing the line between speech and conduct can be difficult, [the Supreme] Court's precedents have long drawn it, and the line is long familiar to the bar."  *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2373 (2018) (citations and quotation marks omitted) ("*NIFLA*").

The distinction between speech and conduct matters because it determines the level of scrutiny that the Court must apply.   On the one hand, for regulations of professional conduct that *incidentally* involve speech, courts apply intermediate scrutiny.  *See id.* at 2372 (citing *Ohralik*, 436 U.S. at 456–57 (remarking that where "speech is an essential but subordinate component" of a transaction, "[w]hile this does not remove the speech from the protection of the First Amendment" altogether, "it lowers the level of appropriate judicial scrutiny")).  On the other hand,

---

[6] A recent motion by a non-party illustrates the limits of the Court's holding.  A non-lawyer, Erwin Rosenberg, has moved for permissive intervention in this case.  *See* ECF No. 64.  Rosenberg was apparently disbarred but remains "interested in practicing law in New York courts."  *Id.* at 1.  He pushes the Court to address the broad question of "whether the New York lawyer licensing and disciplinry [*sic*] system violates the First Amendment."  *Id.*  In other words, Rosenberg seeks to assert a facial challenge—a "general constitutional attack"—on New York's ability to "admit, suspend and/or disbar a lawyer."  *Id.* at 5.  Rosenberg's challenge to the UPL rules is nothing like the Plaintiffs' challenge here, and the Court can confidently predict his challenge to the State's licensing scheme would fall within the myriad of cases upholding UPL statutes generally.

a regulation invites strict scrutiny when it "'targets speech based on its communicative content'—that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022) (alteration omitted) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)).

There is no doubt: lower courts have overwhelmingly concluded that UPL statutes regulate professional "conduct" and merely burden a non-lawyer's speech incidentally. These authorities, however, have never addressed the narrow—and novel—question the AJM program presents here.

For example, many UPL cases have focused on specific "*conduct*" that non-lawyers sought to undertake. Non-lawyers have been excluded from "drafting" pleadings and "filing" legal documents.[7] Conduct could also include "representing" clients in a courtroom or proceeding.[8] These conduct-focused cases are inapposite, as Plaintiffs do not seek to do any of these activities. The AJM program does not allow Justice Advocates to file pleadings, represent clients in court, or handle client funds. Their counsel is limited to out-of-court verbal advice.

Other distinguishable cases have addressed *facial* challenges to UPL rules. Rather than focusing on discrete types of speech that non-lawyers could provide, these cases have concluded that the abstract practice of law does not implicate First Amendment scrutiny as a general matter.[9]

---

[7] *See, e.g.*, *People v. Shell*, 148 P.3d 162, 170 (Colo. 2006); *State v. Niska*, 380 N.W.2d 646, 648 (N.D. 1986); *Fla. Bar v. Furman*, 376 So. 2d 378, 379 (Fla. 1979).

[8] *See, e.g.*, *Montana Supreme Ct. Comm'n on Unauthorized Practice of Law v. O'Neil*, 147 P.3d 200, 204 (Mont. 2006); *Adams v. Am. Bar Ass'n*, 400 F. Supp. 219, 225 (E.D. Pa. 1975); *Turner v. Am. Bar Ass'n*, 407 F. Supp. 451, 477 (N.D. Tex. 1975).

[9] *See, e.g.*, *Monroe v. Horwitch*, 820 F. Supp. 682, 683–86 (D. Conn. 1993), *aff'd*, 19 F.3d 9 (2d Cir. 1994) (table); *Lawline v. Am. Bar Ass'n*, 956 F.2d 1378, 1386 (7th Cir. 1992) (but noting an as-applied challenge could implicate "many activities which lawyers routinely engage in which are protected by the First Amendment and which could not be constitutionally prohibited to laypersons"); *McDermott v. Langevin*, 587 B.R. 173, 184–85 (Bankr. N.D. Ga. 2018); *Howard v. Superior Ct.*, 52 Cal. App. 3d 722, 724 (1975).

18

**A193**

That approach would be overinclusive here, given Plaintiffs bring an *as-applied* challenge about spoken advice they would give to clients.  Moreover, these cases have been called into serious doubt by *NIFLA*,[10] which applied intermediate scrutiny to professional conduct regulations at the very least—not rational basis review, or indeed complete lack of First Amendment scrutiny, as the Attorney General proposes.  *See NIFLA*, 138 S. Ct. at 2375; *see also Stein*, 922 F.3d at 208–09 (concluding, after *NIFLA*, that intermediate scrutiny applied to a UPL rule that generally regulated conduct, and noting the rule at issue did not "target the communicative aspects of practicing law, such as the advice lawyers may give to clients").

Overall, none of these cases have dealt with (1) an as-applied challenge to a UPL statute where (2) a plaintiff sought to give pure verbal speech.  That combination is novel.  And where both these elements are present, modern Supreme Court doctrine has foreclosed a reductive

---

[10] *NIFLA* provided an example of a professional conduct regulation that only incidentally burdened speech from *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 884 (1992).  In *Casey*, doctors were required to provide information to a woman deciding whether to proceed with an abortion—a so-called "informed-consent" provision—before performing that procedure. *NIFLA*, 138 S. Ct. at 2373.  Although the informed-consent provision affected what licensed medical providers were required to say in specific contexts with their patients, the *NIFLA* Court emphasized the regulation only "incidentally burden[ed]" speech in the context of professional conduct: before a medical *procedure*. *Id.*  By contrast, the state regulation in *NIFLA* required organizations offering pregnancy services (but not provide abortion procedures) to provide notice about abortion options in the state, untethered from any larger conduct-dominated context; in other words, it "regulate[d] speech as speech," not speech as an auxiliary to a professional procedure. *Id.* at 2374; *see also EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 447 (6th Cir. 2019) (Donald, J., dissenting).

The professional conduct in *Casey*—and its "incidental" effect on speech—is far removed from a UPL regime that, as applied to these Plaintiffs, *only* affects speech: barring legal advice by non-lawyers.  Just as the Court distinguished the notice requirement in *NIFLA* from the informed-consent provision in *Casey*, here the bar on legal advice "is not tied to a procedure at all.  It applies to all interactions between [a non-lawyer] and [their] clients, regardless of whether [legal advice] is ever sought, offered, or performed." *NIFLA*, 138 S. Ct. at 2373.

approach where laws that are *generally* directed at conduct would avoid First Amendment scrutiny when applied to a particular plaintiff's speech.

Instead, for as-applied challenges, the Court in *Holder v. Humanitarian Law Project* adopted a "refined" approach to the speech/conduct problem. 561 U.S. at 28. The plaintiffs in *Humanitarian Law* challenged a statute that forbade providing "material support" to designated terrorist organizations, which included "expert advice or assistance" that was "derived from scientific, technical or other specialized knowledge." *Id.* at 12–13. The government, like the Attorney General here, argued that the law permissibly regulated the *conduct* of providing material support, and that any incidental effect on plaintiffs' own speech was not actionable under the First Amendment. The Court disagreed with the government, and in so doing, set forth the proper analytical framework for this case.

The *Humanitarian Law* Court set forth the following rule: for as-applied challenges, courts ask whether plaintiffs' own speech is directly or incidentally burdened, *not* whether the statute on its face imposes an incidental burden on speech. *See id.* at 27–28 (rejecting government's argument that "material support statute" "should nonetheless receive intermediate scrutiny because it generally functions as a regulation of conduct"). Thus, if a "generally applicable law" is "directed" at a plaintiff "because of what his speech communicated"—that is, the communication violates the statute "because of the offensive content of his particular message," then that law directly burdens plaintiff's speech. *Id.* at 28; *see also Otto v. City of Boca Raton, Fla.*, 981 F.3d 854, 865 (11th Cir. 2020) ("[T]here is a real difference between laws directed at conduct sweeping up incidental speech on the one hand and laws that directly regulate speech on the other. The government cannot regulate speech by relabeling it as conduct."). At that point, the burden is no longer "incidental."

**A195**

Although it diverged on other issues, the *Humanitarian Law* Court unanimously concluded the giving of expert advice was speech, not conduct. On its face, the statute was "described as directed at conduct" of providing material support, "but as applied to plaintiffs the conduct triggering coverage under the statute consists of communicating a message." *Humanitarian Law*, 561 U.S. at 28. Although the Court diverged on other issues, it was unanimous on this point. *See id.* at 61 (Breyer, J., dissenting) ("[T]he majority properly rejects the Government's argument that the plaintiffs' speech-related activities amount to 'conduct' and should be reviewed as such."). To show how expert advice was speech, the Court pointed to the content-based distinctions in the material support prohibition:

> Plaintiffs want to speak to [designated terrorist organizations], and whether they may do so under [the material support prohibition] depends on what they say. If plaintiffs' speech to those groups imparts a "specific skill" or communicates advice derived from "specialized knowledge"—for example, training on the use of international law or advice on petitioning the United Nations—then it is barred. On the other hand, plaintiffs' speech is not barred if it imparts only general or unspecialized knowledge.

*Id.* at 27 (majority opinion) (citation omitted).

That logic applies seamlessly to the statute at issue here. On its face, New York's UPL rules "may be described as directed at conduct" of acting as a lawyer, "but as applied to plaintiffs the conduct triggering coverage under the statute consists of communicating a message." *Id.* at 28. In other words, Plaintiffs' violation of the law "depends on what they say" to their clients. *Id.* at 27. If Justice Advocates provide non-legal advice about a client's debt problem (by, for example, advising that person to cut down on spending to pay off debts), the UPL rules do not apply. But if they provide legal advice about how to respond to the client's debt problem (by advising that person on how they should fill out the State-Provided Answer Form, based on their

21

**A196**

specific circumstances), the UPL rules forbid their speech. Their actions are therefore, by definition, content-based speech.

Concluding that Plaintiffs' legal advice is content-based speech is not only in line with modern First Amendment authority; it is also the intuitive result. At its core, Plaintiffs' action is indisputably speech, not conduct. "If speaking to clients is not speech, the world is truly upside down." *City of Boca Raton*, 981 F.3d at 866. The Court shall not ignore common sense by construing Plaintiffs' legal advice as something it is not.

The UPL rules are also speaker-based, and "laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2347 (2020) (quoting *Reed*, 576 U.S. at 170). Importantly, as in *Barr*, there is such a content preference, because the UPL rules do not merely focus on the identity of the speaker, but also "focus[] on whether the [speaker] is speaking *about a particular topic*." *Id.* (emphasis added); *see Sorrell v. IMS Health Inc.*, 564 U.S. 552, 563–64 (2011) (holding that a state statute restricting a particular set of speakers' ability to express a particular type of message was content-based). Therefore, because the UPL rules "'do[] not simply have an effect on speech, but [are] directed at certain content and [are] aimed at particular speakers'" they are content-based. *Barr*, 140 S. Ct. at 2347 (alterations added) (quoting *Sorrell*, 564 U.S. at 567).

> (2)   *Plaintiffs' Speech is Analyzed No Differently under a Licensing Regime*

Lurking under this speech/conduct muddle is the fact that the UPL rules constitute a licensing regime for lawyers. Some courts have concluded that generally applicable professional licensing regimes—and the speech that they burden—are outside of the First Amendment. But as will be explained, the "characterization of the licensing requirement as a professional regulation

cannot lower that bar.  The Supreme Court has consistently rejected attempts to set aside the dangers of content-based speech regulation in professional settings." *Brokamp v. D.C.*, No. CV 20-3574 (TJK), 2022 WL 681205, at *1 (D.D.C. Mar. 7, 2022) (alterations omitted) (quoting *City of Boca Raton*, 981 F.3d at 861).

Courts endorsing the theory that licensing requirements can permissibly burden speech have relied on Justice White's concurrence in *Lowe v. SEC*, 472 U.S. 181 (1985).  In that case, which involved an investment advisor who wrote an advice column in securities newsletters, Justice White drew a distinction between advice offered to the general public versus advice personalized to a particular client to infer that licensing regimes do not pose major First Amendment problems.  He began by defining what he believed "the practice of a profession" to be: where someone "takes the affairs of a client personally in hand and purports to exercise judgment on behalf of the client in the light of the client's individual needs and circumstances . . . ." *Id.* at 232 (White, J., concurring).  So far, so good.  *Lowe*, after all, was about whether the investment advisor had given general or client-based speech.  But Justice White then went further to reach a *constitutional* conclusion about licensing regimes.  He stated that, so long as a "personal nexus" exists between a professional and client, the government can "enact[] generally applicable licensing provisions limiting the class of persons who may practice the profession" without infringing on anyone's freedom of speech.  *Id.* (White, J., concurring).[11]

Some courts have extended Justice White's proposed "personal nexus" test to legal advice offered to clients by unlicensed laymen.  *See, e.g.*, *Rowe*, 80 N.Y.2d at 342 ("The courts may, in the public interest, prohibit attorneys from practicing law and that prohibition may incidentally

---

[11] Even Justice White did not believe licensing regimes should receive *no* First Amendment scrutiny; in a later dissent, he proposed they should receive rational basis review.  *See Thornburgh v. Am. College of Obstetricians & Gynecologists*, 476 U.S. 747, 802 (1986) (White, J., dissenting).

affect the attorney's constitutional right to free speech by forbidding the giving of advice to clients."). More generally, some circuits—but, notably, not the Second Circuit—have crystallized Justice White's concurrence to uphold other types of licensing regimes that impact speech. *See, e.g.*, *Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1221 (11th Cir. 2022) (rejecting a non-licensed person's free speech bid to give dietary advice).

Despite these cases, this Court is not persuaded by Justice White's concurrence in *Lowe*, and by extension, the assumption that licensing regimes can bar non-professionals' speech without any constitutional consequence. Justice White's discussion of licensing—joined only by two other Justices—was unquestionably dicta, and has never been referenced by the Supreme Court or the Second Circuit. *See Commodity Futures Trading Comm'n v. Vartuli*, 228 F.3d 94, 107 (2d Cir. 2000) ("*Lowe*'s holding was based on the Investment Advisers Act, not the Constitution. It therefore does not provide a framework for analysis of the constitutional issues raised on this appeal."). The Court is not bound by the *Lowe* concurrence.

Moreover, the Supreme Court recently undermined Justice White's theory that licensing requirements are somehow *sui generis* under the First Amendment merely because they target professionals. Under *Humanitarian Law*, the mere fact that speech "derive[s] from 'specialized knowledge'" does not remove it from the First Amendment's ambit. 561 U.S. at 27. And *NIFLA* rejected a lower-court doctrine—a so-called "professional speech" doctrine—that closely resembled Justice White's concurrence in *Lowe*. Some circuits had "define[d] 'professionals' as individuals who provide personalized services to clients and who are subject to 'a generally applicable licensing and regulatory regime.'" *NIFLA*, 138 S. Ct. at 2371 (citation omitted); *see also id.* at 2375 ("All that is required to make something a 'profession,' according to these courts, is that it involves personalized services and requires a professional license from the State."). But

the Supreme Court in *NIFLA* noted that such regimes would "give[] the States unfettered power to reduce a group's First Amendment rights by simply imposing a licensing requirement," an untenable result. *Id.* at 2375. *NIFLA* therefore undermines the premise that licensing regimes can somehow transform pure speech and evade First Amendment scrutiny altogether.[12]

To be sure, there are special categories of pure speech that the government can regulate without scrutiny. But legal advice does not appear to be one of them. Those special categories— for example, defamation, incitement, fraud, and obscenity—are tightly limited in number. *See NIFLA*, 138 S. Ct. at 2372 (noting that the Supreme Court "has been especially reluctant to exempt a category of speech from the normal prohibition on content-based restrictions") (alteration and citation omitted). To qualify, a type of speech must be historically rooted in a tradition of regulation going back to the Founding. *See NIFLA*, 138 S. Ct. at 2372; *United States v. Stevens*, 559 U.S. 460, 468–71 (2010).

Legal advice lacks that clear history of regulation. In the colonial period, courts "adopted UPL rules to control those who appeared before them," but "nonlawyers were free to engage in a wide range of activities which would be considered UPL today, such as giving legal advice and preparing legal documents." Derek A. Denckla, *Nonlawyers and the Unauthorized Practice of Law: An Overview of the Legal and Ethical Parameters*, 67 FORDHAM L. REV. 2581, 2583 (1999). That practice continued unabated through the post-colonial and Reconstruction eras. *See* Robert Kry, *The "Watchman for Truth": Professional Licensing and the First Amendment*, 23 SEATTLE UNIV. L. REV. 885, 954–57 (2000). "Simply put, the historical practices at the time of the ratification of the First and Fourteenth Amendments show that the rendering of personalized advice

---

[12] Although the Court in *NIFLA* did "not foreclose the possibility" that "some . . . reason exists" to afford professional speech some special First Amendment exemption, 138 S. Ct. at 2375, it has not identified any such reason.

to specific clients was not one of the 'well-defined and narrowly limited classes of speech, the prevention and punishment of which has never been thought to raise any constitutional problem.'" *Id.* at 957 (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72 (1942)). Without an established historical basis to do so, courts today cannot treat pure legal advice as a *sui generis* category of speech that is immune to constitutional scrutiny.

(3)    *Strict Scrutiny Applies*

As a content-based regulation of Plaintiffs' speech, the UPL rules trigger strict scrutiny. *See, e.g.*, *Barr*, 140 S. Ct. at 2347. Strict scrutiny "requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171 (citation omitted). The Government has the burden of proving the UPL rules satisfy strict scrutiny. *See id.* at 163 (noting that content-based laws are "presumptively unconstitutional"). This is a demanding—though not insurmountable—standard for the Government to meet. *See Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 444 (2015) (providing examples, including *Humanitarian Law*, where content-based statutes have been upheld against strict scrutiny).

"A court applying strict scrutiny must ensure that a compelling interest supports *each application* of a statute restricting speech." *Fed. Election Comm'n v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 478 (2007) (emphasis in original). Likewise, "[i]f a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000); *accord Green Party of Conn. v. Garfield*, 616 F.3d 189, 209 (2d Cir. 2010). Thus, the State must demonstrate that it has a compelling interest in criminalizing Plaintiffs' AJM program, and that it has no less restrictive alternative than the UPL rules that it could use to regulate that program.

26

**A201**

In the abstract, New York undoubtedly has a compelling interest in enforcing the UPL rules.  In general, "[s]tates have a compelling interest in the practice of professions within their boundaries, and that as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for licensing practitioners and regulating the practice of professions." *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 792 (1975).  In the context of the UPL rules, New York has a "well-established interest in regulating attorney conduct and in maintaining ethical behavior and independence among the members of the legal profession." *Jacoby & Meyers*, 852 F.3d at 191.  Such rules are designed to protect the public "from the dangers of legal representation and advice given by persons not trained, examined and licensed for such work, whether they be laymen or lawyers from other jurisdictions." *El Gemayel*, 72 N.Y.2d at 705 (citation and quotation marks omitted).  Beyond the consumer-projection justification, the State also has an interest the UPL rules' promotion of judicial integrity and efficiency, as lawyers are "officers of the courts." *Goldfarb*, 421 U.S. at 792.  Given these compelling interests, it is little wonder that the UPL rules have consistently withstood legal challenges.

Yet these justifications for the UPL rules appear less compelling in the context of Plaintiffs' specific, narrow mission.  Plaintiffs' program has anticipated many of the State's consumer protection concerns and erected preventative limits on what Justice Advocates may do.  Justice Advocates must attend a training—designed by lawyers—and be approved under the AJM program criteria.[13]  They must abide by State ethical guidelines for assisting clients, including for

---

[13] Relying on Plaintiffs' limited legal training would logically protect clients' interests better than trusting those clients to complete their own forms pro se, with no legal training at all.  And there is some common-sense truth to the notion that a non-lawyer "who has handled 50 debt collection matters, for example, would likely provide better representation than a patent lawyer who has never set foot in small claims court and last looked at a consumer contract issue when studying for the bar exam."  Brief of Amicus Curiae Rebecca L. Sandefur, ECF No. 38-1, at 21 (footnote omitted).

conflicts of interest and confidentiality. They cannot make money at their clients' expense. They must refer clients to licensed lawyers if those clients' needs exceed the scope of the Training Guide. And they cannot appear in court or file documents, thus eliminating any risk of providing bad advice in more complex or adversarial settings.

Nor does the UPL rules' other emphasis on judicial integrity provide a compelling reason to ban Plaintiffs' program. To the contrary, courts typically depend on a complete and accurate presentation of a dispute through the adversarial process. *See Velazquez*, 531 U.S. at 545; *Penson v. Ohio*, 488 U.S. 75, 84 (1988). By implementing the AJM program, more New Yorkers will respond to their lawsuits and begin that adversarial process, rather than default entirely. And answering those lawsuits with Plaintiffs' help does not risk additional legal error once their clients are through the courthouse doors; at that point, those clients will either retain a licensed lawyer (perhaps using a pro bono organization) or go on to represent themselves pro se (as anticipated by the State's do-it-yourself checkbox form).

One group of amici nonetheless maintain the real cause of defaults in debt collection cases is "sewer service," or the lack of adequate service on defendants. *See* Brief of Amici Curiae Consumer Law Experts et al., ECF No. 57, at 11–13. "Sewer service" occurs when debt collector plaintiffs serve process on invalid addresses or on nonexistent cohabitants so that defendants never receive notice of the lawsuits against them in the first place. *See id.* Because New Yorkers are well-past the point of answering the complaint once they learn they have defaulted, these Amici argue, Plaintiffs' program does not address any genuine legal problem. *See id.* After all, the three New Yorkers who filed declarations in this case had defaulted after failing to receive any notice.

"Sewer service" might be the primary cause of the debt collection problem, but Plaintiffs can still increase access to the courts without needing to provide a cure-all solution. It seems

28

**A203**

unlikely that every defendant in debt collection cases will default because of "sewer service" alone. And even if "sewer service" were truly universal, Plaintiffs' program has the potential to help even those clients who have defaulted. The Training Guide instructs Justice Advocates that "[i]f the client has already had a default judgment entered against them, they may be able to have it vacated if they follow the directions" at a website link to another State-provided, do-it-yourself affidavit to vacate a default judgment. Training Guide at ECF pagination 17. Thus, Plaintiffs' program, at the very least, would provide another link in the informational chain to help unaware defendants vacate defaults from "sewer service."

A related objection contends Plaintiffs' program will not be effective because licensed lawyers—through pro bono organizations and courthouse programs—already assist low-income New Yorkers in debt collection cases, and do not turn away clients. But again, Plaintiffs' program does not need to reach every potential client to strengthen the judicial system. As courts have acknowledged for decades, "the problems of indigents—although of the type for which an attorney has traditionally been consulted—are too immense to be solved solely by members of the bar. The supply of lawyer manpower is not nearby large enough." *Hackin v. Arizona*, 389 U.S. 143, 146–47 (1967) (Douglas, J., dissenting). And when the State's own forms encourage defendants to file their answers pro se, it seems clear that some New Yorkers lack the ability to fully access these lawyer services.

Aside from its less-than-compelling interests, the State has failed to narrowly tailor the statute. In fact, the UPL rules could hardly be broader: New York could implement less restrictive alternatives to blanket ban on all unauthorized legal advice. The Training Guide's disclaimers demonstrate how the State retains many tools to mitigate harmful speech in this arena. *See Bery v. City of New York*, 97 F.3d 689, 698 (2d Cir. 1996) (ordinance not narrowly tailored when other

sections of the city code "already achieve" the city's goals "without such a drastic effect").  As Justice Advocates are warned, the State has created tort remedies, including breach of fiduciary duty, that could apply to non-lawyers who harm their clients.  Justice Advocates are also warned that the State still forbids non-lawyers from holding themselves out as licensed lawyers to the public.  *See* N.Y. Jud. Law § 478 ("It shall be unlawful for any natural person . . . to hold himself or herself out to the public as being entitled to practice law . . . ."); *id.* § 475-a (making it a Class E felony to do so while causing "material damage to the impairment of a legal right").  To further these ends, the State could, for example, tailor the UPL rules by requiring Justice Advocates to fully disclose their qualifications and experience, such that clients can make an informed decision about the quality of the legal advice they would receive.  Or the State might impose targeted trainings or educational standards on Plaintiffs short of a full Bar certification.  These types of measures would allow Plaintiffs to dispense a circumscribed level of speech while still protecting the public from dishonest or untrained legal assistance.

The Court recognizes that legislative developments in this area remain ongoing.  States are exploring ways to regulate non-lawyers who provide legal advice to clients.  *See, e.g.*, Brief of Amicus Curiae Rebecca L. Sandefur, ECF No. 38-1, at 17–18 (providing examples of non-lawyer assistance in states including Wisconsin, Washington, Arizona, and California, and in the federal government).  These developments suggest a narrower tailoring of New York's UPL rules is feasible.  *See McCullen v. Coakley*, 573 U.S. 464, 494 (2014) (strict scrutiny not satisfied where state had failed to show "it considered different methods that other jurisdictions have found effective").  But the Court does not short-circuit the State's legislative process merely because it references these developments.  It is not the Court's role to decide how to more narrowly tailor the

30

**A205**

UPL rules, or to ask whether allowing non-lawyers to give legal advice is good policy.  Even if there might be plenty of legitimate reasons to ban such advice outright,

> The First Amendment's guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits.  The First Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs.  Our Constitution forecloses any attempt to revise that judgment simply on the basis that some speech is not worth it.

*Stevens*, 559 U.S. at 470.

Because the UPL rules likely fail strict scrutiny as applied to the AJM program, Plaintiffs' have shown a likelihood of success on the merits of their First Amendment free speech claim. With the "dominant, if not the dispositive, factor" weighing in favor of an injunction, *Agudath Israel*, 983 F.3d at 637, the Court turns briefly to the remaining factors.

### C.     Irreparable Injury

Plaintiffs' irreparable injury also favors an injunction.  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)).  Plaintiffs' irreparable injury necessarily follows from the likelihood of their success on the merits on the free speech claim.

### D.     Public Interest and Balance of Equities

Finally, the balance of equities and the public interest favor allowing Plaintiffs to commence their legal program.  As for the public interest, the State "does not have an interest in the enforcement of an unconstitutional law."  *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (quoting *ACLU v. Ashcroft*, 322 F.3d 240, 247 (3d Cir. 2003)).  Rather, the Second Circuit has recognized that "securing First Amendment rights is in the public interest."

31

**A206**

*Walsh*, 733 F.3d at 488.  And largely for the reasons provided in the strict scrutiny analysis, the balance of equities favors an injunction.

*     *     *

Lawyers, as members of a "noble profession," play a unique role in our society.  *Mallard v. United States Dist. Ct. for the Southern Dist. of Iowa*, 490 U.S. 296, 311 (1989) (Kennedy, J., concurring).  But Plaintiffs have designed a unique program of their own.  They have demonstrated a narrow exception, under the First Amendment, to New York's UPL rules, and they will be allowed to implement that program without the threat of prosecution.

### INJUNCTIVE RELIEF

Having concluded that a preliminary injunction shall issue, the Court must fashion relief that is "narrowly tailored" to this as-applied challenge.  *Patsy's Ital. Res., Inc. v. Banas*, 658 F.3d 254, 272 (2d Cir. 2011).

Accordingly, during the pendency of this action, the Attorney General and her officers, agents, and employees, and all other persons acting in concert with them, are enjoined from taking any of the following actions:

1. Enforcing the UPL rules against Plaintiffs or any Justice Advocates, to the extent Plaintiffs or Justice Advocates offer legal advice without a license to do so, to clients as contemplated in the AJM Training Guide.  Of course, the Attorney General is not enjoined from enforcing the UPL rules to the extent Plaintiffs or any Justice Advocates provide legal advice beyond the limits of the AJM Training Guide.

2. Enforcing the UPL rules against any clients of the AJM program who solicit or aid Plaintiffs or any Justice Advocates who provide legal advice as contemplated by the AJM Training Guide.

**A207**

3.  Enforcing the UPL rules against the AJM program's legal advisors, Tashi Lhewa and

Pamela Foohey, for having assisted in creating the Training Guide.

### **<u>CONCLUSION</u>**

Plaintiffs' motion for a preliminary injunction is **GRANTED**.  The parties are directed to

jointly submit a Civil Case Management Plan in accordance with the Court's Individual Practices

by June 3, 2022.

The Clerk of Court is respectfully directed to close the motion at ECF Number 5.


Dated: New York, New York
       May 2 4, 2022

SO ORDERED

HONORABLE PAUL A. CROTTY
United States District Judge

33

**A208**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UPSOLVE, INC. and REV. JOHN UDO-
OKON,

                                Plaintiffs,

                -v-

LETITIA JAMES, in her official capacity as
Attorney General of the State of New York,

                                Defendant.

22-CV-00627 (PAC) (SLC)

**NOTICE OF APPEAL**

PLEASE TAKE NOTICE that Defendant Letitia James, Attorney General of the State of New York, hereby appeals to the United States Court of Appeals for the Second Circuit from an order entered in this action on May 24, 2022, which granted Plaintiffs' motion for a preliminary injunction.

Dated:  New York, New York
        June 22, 2022

                        LETITIA JAMES
                        Attorney General
                        State of New York
                        By:

                         /s/ Matthew J. Lawson
                        Matthew J. Lawson
                        Assistant Attorney General
                        28 Liberty Street
                        New York, New York 10005
                        Tel.: (212) 416-8733
                        matthew.lawson@ag.ny.gov

**A209**

# Weil, Gotshal & Manges LLP

767 Fifth Avenue
New York, NY 10153-0119
+1 212 310 8000 tel
+1 212 310 8007 fax

**Gregory Silbert**
+1 (212) 310-8846
gregory.silbert@weil.com

BY ECF

July 13, 2022

Hon. Paul A. Crotty
United States District Court
Southern District of New York
500 Pearl Street, Chambers 1350
New York, New York 10007

Re: *Upsolve, Inc., et al., v. James*, 22-CV-627 (PAC)

Dear Judge Crotty:

We represent Plaintiffs Upsolve, Inc. and Rev. John Udo-Okon in connection with the above-referenced matter. We respectfully request that the Court hold all pending deadlines in abeyance pending the resolution of the Second Circuit appeal in this action. Defendant consents in this request.

On May 24, 2022, the Court issued an Opinion and Order granting Plaintiffs' Motion for a Preliminary Injunction (ECF 68). On June 22, 2022, Defendant filed a Notice of Appeal of this Court's Order to the United States Court of Appeals for the Second Circuit (ECF 77). Pursuant to this Court's scheduling order (ECF 72), the current deadline to submit a Civil Case Management Plan and for Defendant to respond to Plaintiffs' complaint is Friday, July 15, 2022 (ECF 72).

In light of Defendant's pending appeal, which will likely address the central legal issues in this action, it is unnecessary and would be inefficient to proceed simultaneously in this Court while Defendant's appeal is pending in the Second Circuit. To that end, Plaintiffs respectfully request that the Court hold all pending deadlines in abeyance until the resolution of Defendant's appeal in the Second Circuit. Defendant consents in this request. If this request is granted, Plaintiffs further seek leave to file a status report regarding further proceedings in this Court within 14 days of the issuance of the mandate from the Second Circuit.

Respectfully submitted,

*/s/ Gregory Silbert*
 Gregory Silbert

cc: Counsel of Record (via ECF)

7/13/2022
The matter is stayed pending the
resolution of Defendant's appeal in the
Second Circuit. SO ORDERED.

*[signature]*

**A210**