# 22-1345-cv

## United States Court of Appeals

### *for the*

## Second Circuit

UPSOLVE, INC., REVEREND JOHN UDO-OKON,

*Plaintiffs-Appellees,*

— v. —

LETITIA JAMES, in her official capacity
as Attorney General of the State of New York,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFFS-APPELLEES

ROBERT J. MCNAMARA
BRIAN MORRIS
INSTITUTE FOR JUSTICE
*Attorneys for Plaintiffs-Appellees*
901 North Glebe Road, Suite 900
Arlington, Virginia 22203
(703) 682-9320

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellee Upsolve, Inc. certifies and states as follows:

Upsolve, Inc. has no parent corporation. No publicly held corporation owns 10% or more of the stock of Upsolve, Inc.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................iv

JURISDICTION ................................................................................... 1

STATEMENT OF ISSUES.................................................................... 2

STATEMENT OF THE CASE ............................................................. 3

   I.    New York Debt Collection Actions................................... 3

   II.   The American Justice Movement ..................................... 5

   III.  New York's Regulation of the Unauthorized Practice
       of Law ............................................................................ 10

   IV.  The Proceedings in the District Court................................ 14

SUMMARY OF ARGUMENT ............................................................ 20

ARGUMENT ...................................................................................... 23

   I.    The Plaintiffs Have Standing ............................................ 23

   II.   A Restriction That Is Triggered By Providing Advice
       Is A Restriction On Speech .............................................. 28

       A.   *Humanitarian Law Project* controls even in
           cases about occupational licensing ............................ 29

       B.   As applied here, the statute is triggered by
           communicating a message, not by thinking
           about a message ........................................................ 34

       C.   New York's prohibition on legal advice is both
           content based and speaker-based ............................... 42

       D.   The history of lawyer licensing does not justify
           creating a new First Amendment exception ............... 44

III.   The State Has Failed To Present Evidence To Meet
       Its First Amendment Burden .................................................. 48

IV.    The Preliminary Injunction Can Also Be Affirmed On
       the Alternate Ground That The Plaintiffs' Freedom-
       Of-Association Claim Is Likely To Succeed ......................... 52

V.     The District Court Correctly Weighed The Remaining
       Preliminary-Injunction Factors ........................................... 54

CONCLUSION ...................................................................................... 55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Ams. for Prosperity Found. v. Bonta*,
  141 S. Ct. 2373 (2021) ................................................................. 53, 54

*Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*,
  564 U.S. 721 (2011) ............................................................................ 48

*Babbitt v. United Farm Workers Nat'l Union*,
  442 U.S. 289 (1979) ............................................................................ 24

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
  140 S. Ct. 2335 (2020) ....................................................................... 43

*Bery v. City of New York*,
  97 F.3d 689 (2d Cir. 1996) ................................................................. 49

*Billups v. City of Charleston*,
  961 F.3d 673 (4th Cir. 2020) ............................................. 31, 40, 48, 49

*Brokamp v. District of Columbia*,
  No. 20-cv-3574, 2022 WL 681205 (D.D.C. Mar. 7, 2022) ..................... 31

*Brown v. Ent. Merchants Ass'n.*,
  564 U.S. 786 (2011) ............................................................................ 46

*Capital Associated Industries, Inc. v. Stein*,
  922 F.3d 198 (4th Cir. 2019) ................................................... 37, 39, 52

*Cayuga Nation v. Tanner*,
  824 F.3d 321 (2d Cir. 2016) ............................................................... 24

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
  142 S. Ct. 1464 (2022) ....................................................................... 42

*Conant v. Walters*,
  309 F.3d 629 (9th Cir. 2002) ........................................................ 38, 39

*Connecticut Bar Association v. United States*,
  620 F.3d 81 (2d Cir. 2010) ................................................................. 27

*Del Castillo v. Secretary, Florida Department of Health*,
  26 F.4th 1214 (11th Cir. 2022) .................................................. 32, 33, 34

iv

*Delgado v. A. Korenegay Senior House HDFC*,
 No. 07-cv-7761, 2008 WL 748848 (S.D.N.Y. Mar. 21, 2008) .............. 26

*Edwards v. District of Columbia*,
 755 F.3d 996 (D.C. Cir. 2014)............................................................. 49

*Food & Water Watch, Inc. v. Vilsack*,
 808 F.3d 905 (D.C. Cir. 2015)....................................................... 23, 24

*Hines v. Quillivan*,
 No. 18-cv-155, 2021 WL 5833886 (S.D. Tex. Dec. 9, 2021)................. 31

*Holder v. Humanitarian Law Project*,
 561 U.S. 1 (2010) ........................................................................ *passim*

*Housing Works, Inc. v. Safir*,
 No. 98-civ-4994, 1998 WL 823614 (S.D.N.Y. Nov. 25, 1998).............. 44

*Huminski v. Corsones*,
 396 F.3d 53 (2d Cir. 2004).................................................................. 47

*In re N.H. Disabilities Rights Ctr. Inc.*,
 541 A.2d 208 (N.H. 1988) .............................................................. 52-53

*In re Primus*,
 436 U.S. 412 (1978) ....................................................................... 44, 52

*Jack Mailman & Leonard Flug DDS, P.C. v. Whaley*,
 No. 31880/02, 2002 WL 31988623 (N.Y. Civ. Ct. Nov. 25, 2002) .......... 8

*Kings & Queens Holdings, Inc. v. Ahmad*,
 53 N.Y.S.3d 503 (N.Y. Civ. Ct. 2017) .................................................. 8

*Lawline v. Am. Bar Ass'n*,
 956 F.2d 1378 (7th Cir. 1992) ............................................................ 39

*Locke v. Shore*,
 634 F.3d 1185 (11th Cir. 2011) .......................................................... 34

*McCullen v. Coakley*,
 573 U.S. 464 (2014) ..................................................................... 48, 49

*McCutcheon v. FEC*,
 572 U.S. 185 (2014) ........................................................................... 48

*MedImmune, Inc. v. Genetech, Inc.*,
    549 U.S. 118 (2007) ............................................................... 15

*Mullins v. City of New York*,
    626 F.3d 47 (2d Cir. 2010) ................................................... 26

*NAACP v. Button*,
    371 U.S. 415 (1963) ........................................... 44, 52, 53

*Nat'l Org. for Marriage v. Walsh*,
    714 F.3d 682 (2013) ............................................................. 28

*National Institutes of Family & Life Planning v. Becerra*,
    138 S. Ct. 2361 (2018) .................................................. *passim*

*Nerey v. Greenpoint Mortg. Funding, Inc*,
    144 AD3d 646 (N.Y. 2016) ................................................... 38

*New York Progress & Prot. PAC v. Walsh*,
    733 F.3d 483 (2d Cir. 2013) ................................................ 54

*Otto v. City of Boca Raton*,
    981 F.3d 854 (11th Cir. 2020) ............................... 18, 31, 32

*Pacific Coast Horseshoeing Sch., Inc. v. Kirchmeyer*,
    961 F.3d 1062 (9th Cir. 2020) ......................... 31, 33, 40, 41

*Pickup v. Brown*,
    740 F.3d 1208 (9th Cir. 2014) .............................. 32, 33, 41

*Reed v. Town of Gilbert*,
    576 U.S. 165 (2015) ............................................................. 43

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
    141 S. Ct. 63 (2020) ............................................................. 54

*Tingley v. Ferguson*,
    47 F.4th 1055 (9th Cir. 2022) ..................................... 32, 33

*United States v. Alvarez*,
    567 U.S. 709 (2012) ............................................................. 46

*United States v. Stevens*,
    559 U.S. 460 (2010) ..................................................... 45, 46

vi

*Vizaline, LLC v. Tracy,*
  949 F.3d 927 (5th Cir. 2020) ............................................................. 30

*Vt. Right to Life Comm., Inc. v. Sorrell,*
  221 F.3d 376 (2d Cir. 2000) ............................................................. 28

**Statutes & Other Authorities:**

28 U.S.C. § 1292(a)(1) ............................................................. 1

28 U.S.C. § 1331 ............................................................. 1

28 U.S.C. § 1343(a)(3) ............................................................. 1

42 U.S.C. § 1983 ............................................................. 1

N.Y. Jud. Law § 476-a ............................................................. 10

N.Y. Jud. Law § 478 ............................................................. 10

N.Y. Jud. Law § 484 ............................................................. 11

N.Y. Jud. Law § 485 ............................................................. 11

N.Y. Jud. Law § 750 ............................................................. 11

N.Y. Jud. Law § 753 ............................................................. 11

Barlow F. Christensen, "The Unauthorized Practice of Law: Do Good
  Fences Really Make Good Neighbors—or Even Good Sense?," 2 Am.
  Bar Found. 159 (1980) ............................................................. 12

Deborah L. Rhode, *Policing the Professional Monopoly: A Constitutional
  and Empirical Analysis of Unauthorized Practice Prohibitions,*
  34 Stan. L. Rev. 1 (1981) ............................................................. 14

Fed. R. Civ. P. 12(b)(1) ............................................................. 24

Fed. R. Evid. 801 ............................................................. 25, 26

Laurel A. Rigertas, *Lobbying and Litigating Against "Legal
  Bootleggers"—the Role of the Organized Bar in the Expansion of the
  Courts' Inherent Powers* in the Early Twentieth Century,
  46 Cal. W. L. Rev. 65 (2009) ............................................................. 13

Laurel A. Rigertas, *The Birth of the Movement to Prohibit the Unauthorized Practice of Law*, 37 Quinnipiac L. Rev. 97 (2018) ....................................................................................... 11, 12, 13

Robert Kry, *The "Watchman for Truth": Professional Licensing* and the First Amendment, 23 Seattle U. L. Rev. 885 (2000) .................... 12, 14

The Legal Aid Society et al., "Debt Deception: How Debt Buyers Abuse the Legal System to Prey on Lower-Income New Yorkers" (May 2010) ..................................................................................... 3, 4, 5

# JURISDICTION

This case was filed under 42 U.S.C. § 1983, and the district court has jurisdiction under both 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3). The district court entered a preliminary injunction on May 24, 2022, which the Appellant timely appealed. This Court has jurisdiction over this interlocutory appeal under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF ISSUES

The issue on appeal is whether the district court correctly concluded that the plaintiffs, a nonprofit and a private citizen who want to give limited legal advice in one-on-one conversations, are entitled to a preliminary injunction because New York's unauthorized-practice-of-law rules (as applied to these conversations) are a content-based restriction on their speech.

## STATEMENT OF THE CASE

### I.    New York Debt Collection Actions.

This case is a First Amendment challenge to New York's prohibition on giving legal advice without first becoming a fully licensed attorney. (J.A. 9–37.) It involves *only* advice; none of the plaintiffs seeks the right to appear in court, draft legal documents, or otherwise act on behalf of others. They seek only the right to talk.

And this case also involves an area of the law where New Yorkers desperately need legal advice—debt collection actions. "Debt collection actions are extremely common in New York," accounting for at least "a quarter of all lawsuits in the State's court system." (J.A. 177; *see also* J.A. 72–73 (explaining that "300,000 New York City residents [are] sued each year by debt collectors").) There is a reason for this overabundance—most of these lawsuits are "'clearly meritless,' where the defendants sued do not actually owe the amount claimed, or any amount at all." (J.A. 177.) Rather, "debt buyers—a relatively new and fast-growing segment of the debt collection industry"—are responsible for these frivolous lawsuits. The Legal Aid Society et al., *Debt Deception: How Debt Buyers Abuse the Legal System to Prey on Lower-Income New Yorkers*, at 1 (May 2010), https://tinyurl.com/Debt-Deception (cited at J.A. 14 n.1 & 177 n.1); *id.* at

3

26 n.91 (explaining the different types of "meritless" claims). Debt buyers purchase defaulted debts "for pennies on the dollar," *id.* at 3, and then try to aggressively collect whatever they can from whomever they can. (J.A. 18.)

But despite the frequent, crippling, and baseless nature of debt collection actions, New Yorkers are notoriously bad at defending against them. For example, most defendants—70 to 90 percent—lose through default judgments. (J.A. 9, 14; *see also* J.A. 177 (characterizing this problem as "an avalanche of unanswered debt collection cases")).) A default judgment typically occurs just because the defendant, who is usually a low-income individual who cannot afford a lawyer, lacks the knowledge or support to respond to the lawsuit. (J.A. 19.) And when New Yorkers fail to show up in court, debt buyers win big no matter the merits of their claims. For example, in a two-year span, "debt buyers extracted more than $1 billion in judgments against New York residents." *Debt Deception*, *supra*, at 1.

Default judgments (and windfalls to debt buyers) should not be happening at such an alarming rate. "Responding to a debt collection lawsuit in New York is typically straightforward and does not require

4

significant specialized legal training." (J.A. 18.) Instead, New York provides a one-page, check-the-box answer form. (J.A. 40.) This form includes 24 boxes that defendants can check to challenge service, raise defenses, and even include counterclaims. (J.A. 40.) Navigating this form, however, requires "some measure of familiarity with the legal system and specialized terminology." (J.A. 19.) For instance, to accurately complete the standardized form, a defendant must understand basic legal concepts like service, unconscionability, statutes of limitations, unjust enrichment, and laches. (J.A. 19, 40.) So, with a little guidance, New Yorkers can easily complete and file the answer form themselves, (J.A. 178), which instantly catapults their success rate against debt collection actions. After all, the biggest part of success in these cases is just showing up. *See Debt Deception*, at 17 (explaining that debt buyers "often walk away from cases rather than fight" once a defendant responds).

## II.  The American Justice Movement.

The American Justice Movement (AJM) provides New Yorkers with the meaningful advice they need to respond to debt collection actions. AJM is part of a larger nonprofit based in New York, Appellee Upsolve, Inc., a nonprofit organization dedicated to "helping Americans access

their civil legal rights for free." (J.A. 12.) Upsolve started by providing free bankruptcy-related resources—and has now grown into the largest such resource in the United States. (J.A. 12–13 (detailing Upsolve's online resources that serve "over 150,000 individuals per month").) Upsolve guides pro se debtors through Chapter 7 bankruptcies, which has resulted in over $400 million in debt relief. (J.A. 12.)

With its successes, Upsolve wanted to expand its free legal resources. And helping New Yorkers respond to debt collection actions was a natural fit. Upsolve thus created AJM, a program designed to "provide free legal advice on responding to a debt collection lawsuit." (J.A. 24.) To provide this advice, AJM trains and supervises "Justice Advocates"—i.e., volunteers who are public-interest professionals, but not lawyers. (J.A. 24.) AJM uses "a robust step-by-step Training Guide" to train Justice Advocates, who in turn provide legal advice to clients. (J.A. 26, 42–59.) "Upsolve designed the Training Guide with the help of lawyers and law professors who have experience in debt collection practice." (J.A. 179 (citing J.A. 108–10 and J.A. 112–15).) As one law professor put it: "Based on my knowledge, the Training Guide provides non-lawyers sufficient information and resources they need to help

unrepresented individuals respond to debt collection complaints[.]" (J.A. 114.)

At its core, the Training Guide provides practical questions and explanations to help clients navigate (and decide whether to check) each box on the standardized answer form. (J.A. 47–52.) Take box number 10: "Statute of limitations (the time has passed to sue on this debt)." (J.A. 40.) Without some help, a defendant may have no idea what this means or whether to assert this defense. But if a Justice Advocate is involved, he will walk the client through the relevant analysis (by asking several questions) and help decide whether the client should check the box (depending on the type of debt, when the client last made a payment, and whether the applicable statute of limitations has passed).[1] (J.A. 49.)

---

[1] The State and its amici argue that the Training Guide contains mistakes. Appellant Br., at 16–18; Br. of *Amici Curiae* in Support of Defendant-Appellant, Document 76, at 7–14. But that characterization is by turns either misleading or simply wrong. To the extent it identifies real misstatements of the law (like a misstatement of a statute of limitations), it ignores the changing nature of the law and, therefore, of the Guide itself. (*See* J.A. 49 (noting that the Guide's statute-of-limitations guidance would need to change "[a]fter April 1, 2022").) As Upsolve recently told the district court, it "has made updates to the Training Guide to reflect changes or updates in the law." *See* Letter from Plaintiff Upsolve, *Upsolve, Inc. v. James*, No. 22-cv-00627, ECF 89 (Dec. 12, 2022). And to ensure the Guide's accuracy and effectiveness, Upsolve "continuously monitors for changes and improvements." *Id.* Put simply,

Justice Advocates also provide other ancillary advice, such as "advising the client whether it is in their interest to answer the lawsuit against them," and if it is, explaining "how and where to file and serve the answer themselves." (J.A. 179.) Justice Advocates are also trained about the limits of their advice. For example, they promise, among other things, "not to request or receive any compensation" for their advice, "to adhere to the Training Guide," and to comply with the New York State Rules of Professional Conduct related to conflicts of interest, informed consent, and confidentiality. (J.A. 54.) Justice Advocates are also trained to recognize the limits of what they know and to "refer clients to lawyer organizations if those client's needs exceed the scope of the advice

---

it is not a static document because the law itself is not static. As for other concerns, such as the *amici's* allegation that the Training Guide incorrectly describes certain transactions as "consumer credit transactions," the *amici* are just wrong. New York courts routinely find that medical debts, tuition debts, and rent obligations can qualify as "consumer credit transactions" depending on the structure of the debt. *See, e.g.*, *Jack Mailman & Leonard Flug DDS, P.C. v. Whaley*, No. 31880/02, 2002 WL 31988623, at *5 (N.Y. Civ. Ct. Nov. 25, 2002); *Kings & Queens Holdings, Inc. v. Ahmad*, 53 N.Y.S.3d 503, 508 (N.Y. Civ. Ct. 2017). And other concerns from the State and the *amici* are just nuanced approaches or preferences on how to respond to debt collection actions. *See, e.g.*, Br. of *Amici*, Document 76, at 14 n.12 (explaining how, in "Amici's experience," they prefer to file counterclaims). But *amici's* preferences do not make Appellees' contrary advice wrong.

authorized by the Training Guide." (J.A. 179–80.) And if any Justice Advocate violates these limitations, AJM will terminate its relationship. (J.A. 180.)

AJM tells its clients about the same limitations. They are told that Justice Advocates "are not lawyers and not employees of the court," but rather, just volunteers providing "limited, free legal advice about whether and how to respond to your debt collection lawsuit." (J.A. 55.) Clients are also told that AJM will *not* represent them—so the client must still represent themselves in court. (J.A. 55.) And if the client's "legal problems are too complicated," they are warned that the Justice Advocate "may decline to provide you with advice." (J.A. 55.)

Armed with its Training Guide, AJM began recruiting candidates to become Justice Advocates. The first was Reverend John Udo-Okon—a "pastor in the South Bronx." (J.A. 180.) Reverend Udo-Okon often receives questions from his parishioners about a wide variety of both life and legal problems. (J.A. 81, 180.) For example, parishioners would come to Reverend Udo-Okon about possible evictions, harassing calls from debt collectors, missed utility bills, and even medical concerns. (J.A. 81.) And as any good pastor would, Reverend Udo-Okon wanted to talk with those

in need about all their problems—including their legal questions. Indeed, Reverend Udo-Okon's religious beliefs make him duty bound to do so. (J.A. 83.) But he is not a lawyer, so he has refrained from giving such advice "in fear that [he] would be arrested or fined." (J.A. 81–83.) That's why Reverend Udo-Okon wants to volunteer as a Justice Advocate. (J.A. 84.) This will finally allow him to help the dozens of New York residents who are already "interested in and would benefit from free legal advice from Pastor John Udo-Okon at Word of Life Church."[2] (J.A. 88–107.)

## III. New York's Regulation of the Unauthorized Practice of Law.

The one-on-one advice that AJM provides is forbidden as the unauthorized practice of law (UPL) in New York. Even though it involves drafting no documents, filing no papers, and never appearing in court, New York's UPL rules would punish Appellees (or any other New Yorker) with crimes and civil penalties merely for communicating one's opinion about a legal matter. (*See* J.A. 180 (citing N.Y. Jud. Law §§ 476-a, 478,

---

[2] The testimony below, of course, was limited to statements about what the plaintiffs intended to do in the future. Since the district court entered the preliminary injunction, however, Reverend Udo-Okon has become a Justice Advocate. And if the case proceeds, discovery will reveal that he has already counseled five clients and that the American Justice Movement's four Justice Advocates (including Reverend Udo-Okon) have counseled a total of 14 people to date.

484, 485, 750, 753).) Upsolve and the State actually agree on this point: "Justice Advocates in the AJM program would be 'practicing law' in New York." (J.A. 181.) Indeed, the State conceded at oral argument that it "is not disputing that [AJM's] conduct . . . would likely constitute [the] unauthorized practice of law." (J.A. 158–59.) So under the UPL rules, just talking about how to respond to a consumer-debt lawsuit—even with friends or family—requires a license.

But that was not always so. Even before the Founding, "[t]here is no evidence that colonists concerned themselves with the activities of lay persons outside the courthouse." Laurel A. Rigertas, *The Birth of the Movement to Prohibit the Unauthorized Practice of Law*, 37 Quinnipiac L. Rev. 97, 104 (2018). And following the American Revolution, the country actually experienced "a decline in respect for the bar and a decline in restrictions on law practice and bar admissions." *Id.* at 105 (calling this period of "Jacksonian democracy" as supporting "de-professionalization"). That decline tracked the "frontier conditions" and "egalitarian spirit" of the Founding, "which held any man capable of doing anything"—including giving legal advice. *Id.* That spirit carried on past the Civil War, when, "[a]s a practical matter, . . . there were no

11

significant restrictions on admission to law practice." *Id.* (quoting Barlow F. Christensen, *The Unauthorized Practice of Law: Do Good Fences Really Make Good Neighbors—or Even Good Sense?*, 2 Am. Bar Found. 159, 173 (1980)). And to the extent any restriction did prevent a layman from practicing law, it dealt only with conduct, not speech, such as "appearances in court and the signing of pleadings." *Id.* at 105 n.46. As a result, the original meaning of the First Amendment, from the Founding through the Reconstruction Era, understood legal advice as just ordinary speech.[3]

---

[3] The State argues the opposite: "the practice of law has been the legitimate subject of government regulation since even before the Founding." Appellant Br. at 36. But confusingly, the State supports this assertion with a citation to the district court's opinion saying the opposite: "Legal advice lacks that clear history of regulation." (J.A. 200 (explaining how, "In the colonial period," "nonlawyers were free to engage in a wide range of activities which would be considered UPL today, such as giving legal advice and preparing documents.").) The lone law review article the State cites says the same thing. Robert Kry, *The "Watchman for Truth": Professional Licensing and the First Amendment*, 23 Seattle U. L. Rev. 885, 955-56 (2000) ("In the legal profession, organized professional resistance to unauthorized practice did not begin to materialize until well into the twentieth century. Thus, when the Fourteenth Amendment was ratified in 1868, the scope of professional power was at an all-time low in the United States."). The State's contrary assertion is unsupported even by its own sources.

But then, "during the end of the nineteenth century and especially up through the 1920s," the legal profession rapidly expanded. Laurel A. Rigertas, *Lobbying and Litigating Against "Legal Bootleggers"—the Role of the Organized Bar in the Expansion of the Courts' Inherent Powers in the Early Twentieth Century*, 46 Cal. W. L. Rev. 65, 82 (2009). This growth triggered more "organization in state and regional bar associations," *id.* at 82–83, which started as social clubs that eventually turned into "vehicle[s] to advocate for the profession." Rigertas, *The Birth of the Movement*, *supra*, at 111–12. The New York City Bar Association was the first to take its "advocacy" to the next level, by "identifying and stopping unlicensed practitioners," which it saw as a means to curb the rise of legal competitors, such as title companies, that threatened to take work away from traditional attorneys. *Id.* at 113–14, 147–50. Other bar associations soon followed suit. And by the 1930s, organized bar associations, including the American Bar Association and the New York Bar, pushed for broad UPL restrictions like the advice prohibition at issue here.[4] Rigertas, *Lobbying*, *supra*, at 92–117.

---

[4] This push also shifted to the courts (and away from legislatures) to protect attorneys' economic interests. Rigertas, *Lobbying*, *supra*, at 92. This move came after "legislatures had not proved to be friendly forums

In other words, the use of UPL rules to stomp out legal competition, particularly out-of-court legal competition, is a comparatively new innovation. There was no historical or "common practice of imposing licensing requirements on those who did no more than render advice." Kry, *supra*, at 954–55.

## IV. The Proceedings in the District Court.

The only obstacle that prevented AJM from starting its program was New York's UPL rules—and the threat of criminal prosecution and civil fines if it violated those rules. (J.A. 10.) To avoid that, Appellees filed a preemptive complaint in the district court "to vindicate their First Amendment rights" and "declare that New York's UPL rules cannot be validly applied to prohibit the truthful and non-misleading advice they would provide." (J.A. 11.) To that end, Appellees asked the district court

---

for the organized bar's agenda, and the bar feared the influence of other interest groups in the legislative process." *Id.* at 135; *see also* Deborah L. Rhode, *Policing the Professional Monopoly: A Constitutional and Empirical Analysis of Unauthorized Practice Prohibitions*, 34 Stan. L. Rev. 1, 3, 53 (1981) (contrasting the bar's own characterization of UPL laws as "a selfless enterprise actuated solely by considerations of 'public interest and welfare,'" with the bar's "strong economic [and] psychological interests in declining to acknowledge that legal work could be done as competently by laymen as by lawyers"); Kry, *supra*, at 888 (explaining why "there is a large body of historical, economic, and sociological literature that suggests that the primary motivation for professional licensing laws is economic self-interest").

to (1) declare New York's UPL rules unconstitutional as applied to AJM, (2) enter an injunction enjoining the State from interfering with AJM's activities, and (3) award nominal damages, costs, and attorney's fees to Appellees. (J.A. 37.) Appellees moved the district court for a preliminary injunction, (J.A. 1), which included several supporting declarations. (*Id.*; *see also* J.A. 60–131.)

In response, the State made several arguments against the injunction, (R. 58), which the district court rejected. (J.A. 176–208.) To start, the district court dismissed the State's standing argument. The district court correctly explained that Appellees "need not 'expose [themselves] to liability before bringing suit to challenge the basis for the threat'"—here, the UPL rules. (J.A. 181 (quoting *MedImmune, Inc. v. Genetech, Inc.*, 549 U.S. 118, 128-29 (2007).) And regardless, as the district court pointed out, the State often goes after non-lawyers under the UPL rules, and in this case, has refused "to disavow enforcement against Plaintiffs." (J.A. 183 & n.4; J.A. 158-59.) As a result, the district court applied the presumption of enforcement against the State and found that "an injunction against enforcement of the UPL rules would

remove the threat to Plaintiffs' planned activities." (J.A. 184.) Appellees thus had standing.

Next, the district court evaluated whether Appellees' pre-enforcement challenge should be construed as a facial or as-applied challenge to the UPL rules. (J.A. 184–86.) After noting that the State and Appellees agreed that it was indeed an as-applied challenge, the district court went through cases from this Court that confirmed the same. (J.A. 185–86.) This meant that Appellees did not carry the "heavy burden" of knocking down the UPL rules for "the entire universe of non-lawyers," but rather, Appellees just needed to show how the UPL rules narrowly affected the AJM program. (J.A. 186–87.)

The district court then moved to the merits of the preliminary injunction. For the first factor, the likelihood of success on the merits, the district court explained how this is the "dominant, if not dispositive, factor" when deciding preliminary injunctions. (J.A. 188.) So unsurprisingly, "[m]uch rises and falls on the likelihood of [Appellees] success on the merits." (J.A. 188.) It then addressed Appellees' two theories under the First Amendment—right of association (J.A. 189-91)

16

and free speech (J.A. 191–206)—finding that Appellees showed a likelihood of success on the latter claim. (J.A. 191.)

The district court began with the plaintiffs' free-association claim. (*See* J.A. 189.) In the complaint, the plaintiffs detailed how the UPL rules prevented them from associating with low-income New Yorkers to access the courts and express their political beliefs—both fundamental rights under the First Amendment. (J.A. 36–37.) But the district court refused to recognize Appellees' rights of association in this context. In the district court's view, the association theory was too "broad" and would allow nonlawyers to practice law outright. (*See* J.A. 190–91.)

Things were different when it came to the free-speech claim. There, the district court recognized what the case essentially boiled down to: "whether the act of giving legal advice should be conceptualized as conduct or speech." (J.A. 192.) And importantly, the district court recognized the difference between AJM's program, which only uses "pure verbal speech" to give legal advice, (J.A. 194–95), and other attorney responsibilities not at issue here, such as "drafting" pleadings, "filing" legal documents, and "representing" clients in court. (J.A. 193.) In other words, to answer the speech-versus-conduct question, the district court

17

focused on precisely how AJM would provide legal advice, rather than on "the abstract practice of law" as a whole. (J.A. 193.)

With that correct framing of the issue, the district easily found that AJM's legal advice simply "consists of communicating a message," (J.A. 196), and that Appellees' "violation of the law 'depends on what they say' to their clients." (J.A. 196 (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010)).) For example, if Appellees wanted to "provide non-legal advice about a client's debt problem (by, for example, advising that person to cut down on spending to pay off debts), the UPL rules do not apply." (J.A. 196.) But if Appellees wanted to help the same person by telling them "how they should fill out the State-Provided Answer Form" to contest their debts, "the UPL rules forbid their speech." (J.A. 196–97.) That distinction, "by definition," is "content-based" because it matters what Appellees talk about. (J.A. 197; *see also id.* (quoting *Otto v. City of Boca Raton*, 981 F.3d 854, 866 (11th Cir. 2020) ("If speaking to clients is not speech, the world is truly upside down.").) As a result, strict scrutiny applied, (J.A. 201), which was true despite the State's characterization of UPL laws as a "professional licensing" requirement or "professional

speech." (J.A. 197–201.) In the end, the district court correctly found that speech is just speech even if a professional is doing the speaking.

The district court then turned to strict scrutiny for the free speech claim. It recognized that States generally have a compelling interest in enforcing UPL laws, such as setting attorney standards to protect the public. (J.A. 202.) But that interest is "less compelling in the context of [Appellees'] specific, narrow mission." (J.A. 202–03.) The district court then dispatched the State's (and its amici's) other alleged interests, including "sewer service" concerns and the imagined claim that enough *other* free services already provide the needed legal advice—so "we don't need AJM." (*See* J.A. 203–05.) This analysis led the district court to its ultimate conclusion: Appellees showed that they were likely to succeed "on the merits of their First Amendment free speech claim." (J.A. 206.) And a preliminary injunction was warranted because the other factors— irreparable injury and public interest—easily weighed in Appellee's favor (as they do for all meritorious free speech claims). (J.A. 206–07.)

The district court enjoined the State from enforcing the UPL rules against Upsolve, Reverend Udo-Okon, any other Justice Advocate, the attorneys who helped create the Guide, or "clients of the AJM program."

(J.A. 207–08.) The State appealed the district court's order and preliminary injunction, (J.A. 209), and the parties agreed to stay all proceedings below pending this appeal. (J.A. 210.) The preliminary injunction remains in place.

## SUMMARY OF ARGUMENT

The district court correctly concluded that the plaintiffs are likely to succeed on their free-speech claim, and its preliminary-injunction ruling should therefore be affirmed.

To begin, the district court correctly concluded that the plaintiffs have standing. The record details exactly what sort of advice Reverend Udo-Okon and other Justice Advocates want to give. It is undisputed that giving this advice would violate New York's prohibition on the unauthorized practice of law. And record evidence shows that people want to *listen to* this prohibited advice—many people have told Reverend Udo-Okon exactly that. (Indeed, as noted above, with the benefit of the preliminary injunction, AJM's volunteer Justice Advocates have in fact already given this previously prohibited advice to willing listeners.) That is enough—more than enough—for standing.

Second, the district court correctly held that the plaintiffs are likely to succeed on the merits of their First Amendment claim. The Supreme Court has held that a law must be treated as a restriction on speech if, as applied, it is triggered by the conduct of communicating a message—a rule that the district court said applied "seamlessly" to the law at issue here, which applies only if the plaintiffs communicate advice on a certain topic. If Reverend Udo-Okon (or anyone like him) gives advice about how to respond to a consumer-debt lawsuit, he commits a crime. If he gives advice about how to avoid debt in the first place, he does not. There is no exception to the First Amendment for "legal advice," and so the restrictions challenged here must be analyzed for what they are: content-based restrictions on speech.

And New York's restrictions on these plaintiffs' speech cannot hope to survive First Amendment scrutiny. Under even intermediate scrutiny, the government bears an affirmative evidentiary burden to prove that less-restrictive alternatives could not advance its goals: that it could not, for example, protect its interests by requiring disclosures or disclaimers to ensure that anyone getting advice from a Justice Advocate knew they were not talking to a real attorney. But it has

refused to present any evidence at all. This evidentiary default matters all the more here because this case is about a real problem—countless New Yorkers are facing frightening legal proceedings that, in many cases, they could make go away if they just got a little helpful advice that allowed them to show up in court. And these New Yorkers, undeniably, are not in fact getting this advice. Upsolve has a program that can help. But that program is illegal because New York law forbids nonlawyers from answering simple questions or even responding to the most basic plea of "what do you think I should do?" If New York wants to ban conversations, binding precedent dictates that it support that ban with real, concrete evidence. It has not done so, and the ruling below should therefore be affirmed.

In the alternative, the ruling below could be affirmed on the grounds that the plaintiffs are likely to succeed on their freedom-of-association claim. The district court rejected that claim, instead ruling for plaintiffs on their free-speech theory, but other courts have found a limited free-association right for nonprofits like Upsolve to engage in the practice of law. To the extent the Court agrees with the district court's free-speech ruling, of course, the free-association claims here are

moot. But either way, the associational claims illustrate the striking breadth of the State's argument here: On the State's view, there is no constitutional space whatsoever in which citizens have the right to band together to give or receive helpful advice about the law. Any conversations about the law, whether in a church, an office, or a coffee shop, are permitted solely as an act of legislative or executive grace. But surely the Constitution demands more—and, as the district court correctly found, it does.

Finally, the district court correctly weighed the remaining preliminary-injunction factors. To the extent New York's unauthorized-practice restrictions prevent the plaintiffs from speaking (and they do), that constitutes an irreparable injury, and it is always in the public interest and in the interest of equity to enjoin the enforcement of an unconstitutional law. The ruling below should therefore be affirmed.

## ARGUMENT

### I.  The Plaintiffs Have Standing.

A party seeking a preliminary injunction "must show a substantial likelihood of standing." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d

905, 913 (D.C. Cir. 2015) (internal quotation marks omitted).[5] And, to have standing, a First Amendment plaintiff need only show a "credible threat of prosecution"—a deliberately relaxed standard, intended to weed out claims where the alleged threat of prosecution is "imaginary or wholly speculative," *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979), where the statute being challenged is "moribund," *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016), or where the government has "disavow[ed]" any intention to enforce the law. *Id.* at 331–32. This requirement "sets a low threshold and is quite forgiving to plaintiffs." *Id.* at 331. Indeed, there is a presumption that the government will enforce the law. *Id.*

Here, the State does not argue that it would not enforce the law. It simply argues that none of the plaintiffs here would *break* the law

---

[5] The State's brief is mistaken about the standard. It suggests, for example, that it does not matter that it waived these standing arguments below because " 'a challenge to subject-matter jurisdiction cannot be waived.'" Appellant Br. 32 n.11. But the State does not challenge this Court's jurisdiction—a challenge to the Court's jurisdiction at this stage would address the sufficiency of the allegations of the complaint, not the sufficiency of the preliminary-injunction record. *See* Federal Rule of Civil Procedure 12(b)(1). At the preliminary-injunction stage, any factual question is about what the ultimate record is likely to show. *Vilsack*, 808 F.3d at 913.

because, if they tried to give legal advice, no one would listen to them. Appellant Br. 31–35. But the record below is replete with evidence that this is wrong: There is no question that consumer-debt lawsuits are rampant—they comprise, by one estimate, a quarter of all litigation in New York, and many of them would be easily defeated if only a defendant knew how to respond to them. (J.A. 177.) But, despite their lack of merit, as many as 90% of these lawsuits still end in default, illustrating that New Yorkers need far more legal help than they are actually getting. (*Id.*) Rev. Udo-Okon testified that he wanted to help with this pervasive problem and that (with AJM's assistance) he could: He testified that he would be able to give legal advice about how to respond to these consumer-debt lawsuits, he testified that there were people in his congregation who needed this advice, and he submitted a lengthy petition signed by individuals who said they would be interested in receiving legal advice from him. (J.A. 79–107.) On this record, there is no question that the plaintiffs have established the existence of both willing speakers and willing listeners, if only the legal barriers to their speech were removed.

The State argues that this list of willing listeners is insufficient because it is "hearsay" under Federal Rule of Evidence 801 and the

signatures are "unsworn and unverifiable." Appellant Br. 32 (citing *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010), and *Delgado v. A. Korenegay Senior House HDFC*, No. 07-cv-7761, 2008 WL 748848, at *4 (S.D.N.Y. Mar. 21, 2008)). But Rule 801 does not apply at the preliminary-injunction stage, and the district court was entitled to rely on hearsay. For confirmation, one need look no further than the cases the State itself cites. *See Mullins*, 626 F.3d at 51 ("Appellants contend that these findings are unsupported by sufficient evidence because they are based on hearsay testimony. We disagree.").[6]

At most, the State's objections amount to speculation. Perhaps, its brief suggests, the people who signed the petition misunderstood its nature and perhaps Reverend Udo-Okon would therefore find no takers for his advice when the moment came. The State is, of course, free to explore these objections through discovery or a fact hearing and try to poke holes in plaintiffs' standing at final judgment,[7] but the mere fact

---

[6] The State's other case, *Delgado*, discusses only whether hearsay should have been considered in an arbitration. 2008 WL 748848, at *4.

[7] There was no fact hearing because, as the State concedes, this argument was not raised below. *Supra* note 5. In any event, a fact hearing here would only reveal that Reverend Udo-Okon and others have already used the protection of the preliminary injunction to give legal advice to willing listeners who needed their help.

26

that it can invent hypothetical holes it might poke in the plaintiffs' evidence if given the opportunity does not mean the plaintiffs have not made a sufficient prima facie case for standing.

And the State cites no case holding otherwise. It relies, for example, on *Connecticut Bar Association v. United States*, 620 F.3d 81 (2d Cir. 2010), which it says presents "similar circumstances" to these. Appellant Br. 34. But *Connecticut Bar Association* provides no support for its position. In that case, a group of attorneys had challenged portions of a federal law governing bankruptcy advice. 620 F.3d at 86. While the case was on appeal, the Supreme Court clarified that the challenged statute regulated only attorneys who represented debtors, not creditors. *Id.* at 88. And the narrower interpretation had consequences for standing: The attorney plaintiffs who said they only represented and wanted to represent creditors no longer had standing, and the attorney plaintiffs who said they represented and wanted to represent debtors did. *Id.* at 90–91. But that simply stands for the commonsense proposition that people who do not allege they are within the sweep of a statute lack standing. It does not stand for the more remarkable idea that a First

27

Amendment plaintiff bears some kind of heightened burden to prove the existence of a willing listener.

Indeed, this circuit's cases establish quite the contrary. A First Amendment plaintiff need only allege "a real and imminent fear of [ ] chilling" of his speech. *Nat'l Org. for Marriage v. Walsh*, 714 F.3d 682, 689 (2013). This is because "the alleged danger of [a challenged] statute is, in large measure, one of self-censorship[.]" *Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 382 (2d Cir. 2000). And, on this record, the self-censorship is clear: Both Upsolve and Rev. Udo-Okon perceive a need for advice, and (until the injunction was entered) they refrained from filling that need by advising particular people because they reasonably feared prosecution. That is enough for standing.

## II. A Restriction That Is Triggered By Providing Advice Is A Restriction On Speech.

As the district court recognized, this case is controlled by *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010). (J.A. 196.) That case makes clear that the test for determining whether a law restricts speech or merely conduct is whether, "as applied to [a plaintiff,] the conduct triggering coverage under the statute consists of communicating a message." 561 U.S. at 28. As applied to the plaintiffs' advice here, that

makes New York's unlicensed-practice-of-law statute a restriction on speech because whether they are regulated depends entirely on what they say. (J.A. 196–97.)

The State offers four arguments in opposition to this straightforward conclusion. One, it claims *Holder* was not a case about occupational licensing and therefore does not apply to occupational-licensing cases. Two, it claims the unauthorized-practice restrictions here are triggered not by *communicating* legal advice but instead by the conduct of *thinking up* legal advice. Three, it claims the unauthorized practice statutes are neither content-based nor speaker based (even though they apply to the plaintiffs based solely on what they say and who they are). And four, it claims lawyer licensing is part of a "long tradition" warranting an exception from ordinary First Amendment doctrine. Each argument is wrong.

## A. *Humanitarian Law Project* controls even in cases about occupational licensing.

The State's first argument is that *Humanitarian Law Project* does not control here because that case did not directly address occupational licensing and pre-dates the Supreme Court's decision in *National Institutes of Family & Life Planning v. Becerra*, 138 S. Ct. 2361 (2018)

29

(*NIFLA*). Appellant Br. 50. On the State's view, *NIFLA* matters because it reaffirmed that "States may regulate professional conduct, even though that conduct incidentally involves speech." 138 S. Ct. at 2372. But that is not all *NIFLA* held: It also rejected the idea that the State's imposition of a licensing requirement affected the First Amendment analysis in either direction. *Id.* at 2374–75. To hold otherwise, the Court cautioned, would give "States unfettered power to reduce a group's First Amendment rights by simply imposing a licensing requirement." *Id.* at 2375. In other words, the distinction between "speech" and "conduct" is the same as the distinction "long familiar to the bar" that would apply in any other case. *Id.* at 2373.

And the test for distinguishing one from the other was set out in *Humanitarian Law Project*: whether, "as applied to [a plaintiff,] the conduct triggering coverage under the statute consists of communicating a message." 561 U.S. at 28. That is why, in the wake of *NIFLA*, courts across the country have applied *Humanitarian Law Project* to find that licensing laws trigger First Amendment scrutiny when, as applied, they are triggered by speech. *See, e.g.*, *Vizaline, LLC v. Tracy*, 949 F.3d 927, 931 (5th Cir. 2020) ("[T]he relevant question is whether, *as applied to*

*Vizaline's practice*, Mississippi's licensing requirements regulate only speech, restrict speech only incidentally to their regulation of non-expressive professional conduct, or regulate only non-expressive conduct." (emphasis added)); *accord Pacific Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062, 1069 (9th Cir. 2020) (applying First Amendment scrutiny to application of education-licensing law); *Billups v. City of Charleston*, 961 F.3d 673, 683 (4th Cir. 2020) (same, tour-guide licensing law); *Brokamp v. District of Columbia*, No. 20-cv-3574, 2022 WL 681205 (D.D.C. Mar. 7, 2022) (same, counselor license); *Hines v. Quillivan*, No. 18-cv-155, 2021 WL 5833886 (S.D. Tex. Dec. 9, 2021) (same, veterinarian license); *see also Otto v. City of Boca Raton*, 981 F.3d 854, 867 (11th Cir. 2020) ("The Supreme Court's decision in *NIFLA* also refused to recognize professional speech as a new speech category deserving less protection," and makes clear that the "idea that [a law] target[s] 'professional speech' does not loosen the First Amendment's restraints.").

The district court's ruling is in line with all of these cases, none of which are mentioned in the State's brief. And against this clear majority of post-*NIFLA* precedent, the State manages to find only two cases to

support its position: *Tingley v. Ferguson*, 47 F.4th 1055 (9th Cir. 2022), and *Del Castillo v. Secretary, Florida Department of Health*, 26 F.4th 1214 (11th Cir. 2022). Neither case justifies defying the rule in *Holder*.

Start with *Tingley*. In that case, the Ninth Circuit panel faced a challenge to a prohibition on talk therapy designed to change a patient's sexual orientation. 47 F.4th at 1063. And the panel held that it was bound by an earlier decision, *Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014), which had upheld a "nearly identical" law against a First Amendment challenge. 47 F.4th at 1063. *Pickup* had held that the earlier law regulated conduct rather than speech, and that conclusion dictated the outcome in *Tingley*. *Id.* at 1071.

But *Tingley*, at most, holds that *efforts by licensed psychotherapists to change their patients' sexual orientations* are conduct, rather than speech.[8] It does not stand for the proposition that *Humanitarian Law Project* does not apply to licensing laws—nor could it, when the Ninth

---

[8] And even there, *Tingley* is just on one side of an acknowledged circuit split. In *Otto v. City of Boca Raton*, the Eleventh Circuit treated a substantially similar restriction on talk therapy as a restriction on speech because it functioned as a restriction on what people were legally allowed to say, even though the government had chosen to label it as conduct. 981 F.3d 854, 859 (11th Cir. 2020); *see also Tingley*, 47 F.4th at 1077 (acknowledging *Otto*).

Circuit has already held to the contrary. *See Pacific Coast Horseshoeing*, 961 F.3d at 1069.[9] And it certainly does not stand for the proposition that advice like that at issue in this case—advice someone is free to take or leave—is "conduct" simply because it happens to fall within the ambit of a professional-licensing statute.

*Del Castillo* is similarly of little help. True, the Eleventh Circuit in *Del Castillo* looked at a licensing law that restricted dieticians and held that it restricted conduct, rather than speech. 26 F.4th at 1225–26. But the panel in *Del Castillo* did not cite or distinguish *Humanitarian Law Project*, instead finding itself (like the panel in *Tingley*) bound by an earlier decision that (also without discussing *Humanitarian Law Project*)

---

[9] The earlier Ninth Circuit decision, *Pickup*, does directly distinguish *Humanitarian Law Project*, holding that it was distinguishable because it involved only "(1) political speech (2) by ordinary citizens[.]" *Pickup*, 740 F.3d at 1230. But this holding, as recognized by *Pacific Coast Horseshoeing*, was abrogated by *NIFLA. Pac. Coast Horseshoeing*, 961 F.3d at 1068–69. And, in any event, that distinction was wrong from the outset—the petitioners in *Humanitarian Law Project* had argued they were engaged in "political" speech, but the Supreme Court rejected that argument, holding that the advice the petitioners wanted to give was not political speech but was still entitled to full First Amendment protection. 561 U.S. at 25–26. But whatever the merits of the Ninth Circuit's holding in *Pickup*, there is no dispute that here, just like in *Humanitarian Law Project*, the question is whether the First Amendment applies to advice given by "ordinary citizens." *Pickup*, 740 F.3d at 1230.

held a licensing law was only a restriction on conduct. *Id.* at 1225 (citing *Locke v. Shore*, 634 F.3d 1185, 1191 (11th Cir. 2011)). *Del Castillo*, to be sure, represents a circuit split, where the majority of courts apply *Humanitarian Law Project* to licensing laws and the Eleventh Circuit, standing alone and for unexplained reasons, does not. But—because it fails to even cite the case that other circuits say is controlling—nothing in *Del Castillo* provides any reason to reject the majority rule or ignore the holding of *Humanitarian Law Project*. The district court, like most federal courts to confront this question, followed binding Supreme Court precedent, and it was right to do so. The decision below should therefore be affirmed.

### B. As applied here, the statute is triggered by communicating a message, not by thinking about a message.

In the alternative, the State contends that its unauthorized-practice statute is not triggered by speech here at all. Instead, it is triggered by the "practice" of law, variously described as the conduct of "formulat[ing]" or "generating legal counsel." Appellant Br. 42, 52. This argument misses the mark for two reasons.

*First*, the question is not what sort of conduct a law regulates *in general*. The question is whether "as applied to [the American Justice Movement] the conduct triggering coverage under the statute consists of communicating a message." (J.A. 196.)[10] And it does. The American Justice Movement does not engage in the unauthorized practice of law by writing a guide (however long or complex) about how to respond to a consumer-debt lawsuit. And Reverend Udo-Okon does not engage in the unauthorized practice by *formulating* legal advice—he breaks no law by quietly thinking to himself, "You should really dispute the existence of this debt and make them prove their case." He only engages in the unauthorized practice of law if he then *communicates* this advice.

---

[10] This is also why the State's various hypotheticals about what triggers the statute in other circumstances are irrelevant. The opening brief, for example, suggests a situation in which an attorney is asked by a client to send a baseless demand letter and uses her legal judgment to refrain from sending the letter: That attorney, the brief pronounces, has practiced law without communicating anything. Appellant Br. 43. The hypothetical is dubious: The State cites nothing for the proposition that its unauthorized-practice-of-law rules could be triggered by the isolated act of *not sending* a letter (rather than, say, the hypothetical attorney's holding herself out as a lawyer and retaining clients on that basis). But it is also irrelevant. Upsolve and Reverend Udo-Okon propose only to communicate straightforward advice about legal topics. They do not plan to not-send (or, for that matter, to send) letters on anyone's behalf.

It is no answer to say, as the State does, that Reverend Udo-Okon would not be engaged in the unauthorized practice of law if he passed on *someone else's* advice instead of thinking of his own. Appellant Br. 42. That, too, is simply a restriction on the content of his message: "I talked to Mr. X, and he said you should do the following" is allowed, while "I think you should do the following" is forbidden. And, in any event, it remains a restriction triggered by communicating a message—*someone* in that chain has engaged in the practice of law, and the licensure requirement has been triggered by communicating advice, not by *thinking of* advice.

Indeed, even the State cannot quite keep up the façade that its regulations are triggered by thinking of advice instead of by communicating it. Just a few pages later in its brief, it characterizes its regulatory interest as "prevent[ing] plaintiffs from *dispensing* unlicensed and unregulated legal counsel." Appellant Br. 66 (emphasis added). And a few pages earlier, it asserts that "[e]nforcement action against these plaintiffs is plausible only if they actually render individualized legal counsel to 'particular clients.'" *Id.* 31. This gives up the game entirely: A

law that will only be enforced against someone who "actually render[s]" legal advice is a law that is triggered by rendering legal advice.

To be sure, not everything involved in the practice of law consists of communicating a message, as illustrated by the Fourth Circuit's decision in *Capital Associated Industries, Inc. v. Stein*, 922 F.3d 198 (4th Cir. 2019). In that case, the plaintiff trade association challenged North Carolina's prohibition on corporations' engaging in the practice of law. 922 F.3d at 202. While it disclaimed any desire to appear in court, it otherwise openly asked for the right to "practice law" including by "draft[ing] legal documents (such as contracts or employee handbooks)[.]" *Id.*

The Fourth Circuit in *Stein* did not apply *Humanitarian Law Project* because (as applied) the regulations there were not "trigger[ed by] communicating a message." *Humanitarian Law Project*, 561 U.S. at 28. Instead, as the plaintiff in that case expressly recognized, "the practice of law has communicative and non-communicative aspects." *Stein*, 922 F.3d at 208. And the plaintiff wanted to do both aspects. It wanted to "answer questions about employment and labor law," true, but it also wanted to "draft legal documents (such as contracts or employee

37

handbooks).” *Id*. at 202. And, while drafting a contract for a client involves writing words on paper, it does not necessarily involve “communicating a message” to the client. After all, a contract need not communicate a message: It is a binding legal instrument whether its signatories read it or not. *E.g.*, *Nerey v. Greenpoint Mortg. Funding, Inc*, 144 AD3d 646, 648 (N.Y. 2016). Put differently, drafting a legal instrument might communicate a message—someone might read it, after all—but it is the unauthorized practice of law whether anyone reads that message or not. By contrast, giving someone advice about what a good contract should include is, necessarily, communicating a message—if no one is listening, as the State so strenuously points out in its standing argument, then no law has been broken. *Cf.* Appellant Br. 31–35.

This distinction between *advice* and *conduct with legal significance* is commonly found in other regulated professions. For example, a restriction on a doctor’s ability to write a prescription (a legal document that gives the recipient the right to access controlled substances) is a restriction on conduct, but a restriction on that same doctor’s ability to simply advise a patient that taking a particular drug is a good idea would be a restriction on speech. *E.g., Conant v. Walters*, 309 F.3d 629, 635–36

(9th Cir. 2002) (holding as much); *cf. Lawline v. Am. Bar Ass'n*, 956 F.2d 1378, 1386 (7th Cir. 1992) (rejecting facial First Amendment challenge to lawyer licensing while conceding that "[t]here may well be activities which lawyers routinely engage in which are protected by the First Amendment and which could not be constitutionally prohibited to laypersons"). There will, of course, be edge cases—cases where it is hard to discern whether the law is being triggered by generating a binding legal document or by communicating advice about what the document should look like. But this is not one of them.

That is because the plaintiffs here did not seek (and the preliminary injunction does not allow them) to create documents with binding legal effects. They, unlike the plaintiff in *Stein*, only want to engage in the communicative aspect of the law—to give people advice and then allow people to make their own decisions. And giving advice—even "advice derived from 'specialized knowledge'"—is speech. *Humanitarian Law Project*, 561 U.S. at 27. Because the plaintiffs here seek only the right to communicate advice derived from specialized knowledge (that is, to speak), they are likely to succeed on the merits.

39

**Second**, holding that New York is regulating conduct here, albeit conduct that occurs wholly inside someone's head, would conflict with the approach of other courts of appeals. Take, for example, *Billups v. City of Charleston*, 961 F.3d 673, 683 (4th Cir. 2020). In that case, would-be tour guides challenged a municipal ordinance requiring them to obtain a special license before talking to tour groups for pay. *Id.* at 676–77. Talking to tour groups, undeniably, involves the kind of mental "conduct" the State points to in this case—a guide has to do research to decide what stories to tell, formulate answers to questions, decide how long to spend at each point of interest, and so on. But the Fourth Circuit nonetheless had no problem determining that the licensing law was subject to First Amendment scrutiny. *Id.* at 683 (citing *Humanitarian Law Project*, 561 U.S. at 28). It did not matter that the challenged law was structured as a business regulation or that tour guides engaged in the mental conduct of deciding what to say. All that mattered was that, as applied, it acted as a complete bar on unlicensed speech. *Id*. The same conclusion follows here.

So too with the Ninth Circuit's decision in *Pacific Coast Horseshoeing v. Kirchmeyer*, an as-applied challenge to California's

licensing law for post-secondary schools. 961 F.3d 1062, 1069–70 (9th Cir. 2020). There, the plaintiff, a school that taught basic farrier skills like horseshoeing, undeniably expended a great deal of mental energy deciding *what* and *how* to teach its students, and it engaged in what the Ninth Circuit called the "conduct" of entering into "enrollment agreement[s]" with its students. *Id.* at 1069. But the only thing that mattered for First Amendment purposes was that, *as applied*, the particular regulation being challenged was triggered by the content of the school's speech—it applied if the school provided vocational training like horseshoeing, but not if it provided recreational training like horseshoe *throwing*. And that, the Ninth Circuit held, was a restriction on speech. *Id.* (citing *Humanitarian Law Project*, 561 U.S. at 27).

At bottom, the State's request that this Court re-classify the American Justice Movement's advice as *the conduct of thinking of advice* is simply an invitation to replace the Supreme Court's First Amendment jurisprudence with a "labeling game" designed to "nullify the First Amendment's protections for speech." *Pickup v. Brown*, 740 F.3d 1208, 1218 (9th Cir. 2014) (O'Scannlain, J., dissenting from denial of rehearing

en banc). This Court should reject that invitation, just as other circuits nationwide have.

### C. New York's prohibition on legal advice is both content based and speaker-based.

As the district court correctly found, New York's restriction on who may give legal advice is both content-based and speaker-based. It is content-based because it hinges entirely on what message is communicated: Reverend Udo-Okon is allowed to give advice about how to avoid going into debt but is forbidden to give advice about how to respond to a lawsuit about debt. (J.A. 196–97.) And it is speaker-based because it limits *who* may speak on this subject out of an avowed concern for *what* that person might say. (J.A. 197.)

The State does not have a persuasive response to either holding. On the content-based front, the district court correctly concluded that the unauthorized-practice law is content-based because it "targets speech based on its communicative conduct—that is, it [ ] applies to particular speech because of the topic discussed or the idea or message expressed." (J.A. 193 (quoting *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022)) (internal quotation marks omitted).) And the unauthorized-practice prohibition does exactly that: Upsolve is free

to train people to give advice (and Reverend Uko-Odon is free to give advice) about how to avoid consumer debt. The same program is forbidden if the advice is about responding to consumer-debt lawsuits. That is a distinction based on content. The State's only response is to insist that it is not regulating the *content of speech*; it is only regulating the *formulation of speech*—the thoughts that occur in the speaker's head. But, again, neither Reverend Udo-Okon nor anyone else faces prosecution for thinking thoughts. He (like others) risks prosecution for *communicating advice on a particular topic*. That is a content-based restriction on speech.

And the State fares no better on the speaker-based front. It correctly articulates the Supreme Court's test—a speaker-based restriction triggers strict scrutiny when it "reflects a content preference." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2347 (2020) (quoting *Reed v. Town of Gilbert*, 576 U.S. 165, 170 (2015)). The State's entire argument on this front amounts to six words: "[T]here is no content preference here." Appellant Br. 52. But it is hard to see why the State thinks so. The entire justification for the unauthorized-practice restriction, repeated at great length by the opening brief, is that

unlicensed people might give *bad advice*. They might say the *wrong things*. Even if that were a laudable, narrowly tailored preference (and, as discussed below, it is not), it is hard to see how it amounts to anything but a content preference. There are, of course, many "speaker-based" restrictions that reflect no content preference: A parade permit is speaker-based (only the permit-holder may have a parade), but it is agnostic about the topic of the parade and motivated solely by the physical reality that the same street cannot have two parades at once.[11] This is not that: The only reason New York wants to forbid unlicensed people from talking about the law is that it worries about what they will say. That is a content preference, and that triggers strict scrutiny.

### D. The history of lawyer licensing does not justify creating a new First Amendment exception.

There is no question that, as a general matter, advice about the law is protected speech just like any other advice. The Supreme Court has repeatedly held as much. *See, e.g.*, *In re Primus*, 436 U.S. 412, 432 (1978); *NAACP v. Button*, 371 U.S. 415, 429 (1963). Indeed, in *Humanitarian Law Project* itself, the expert advice the plaintiffs wanted to give to

---

[11] Permitting schemes that fall short of this content-neutral vision, of course, themselves violate the First Amendment. *E.g.*, *Housing Works, Inc. v. Safir*, No. 98-civ-4994, 1998 WL 823614 (S.D.N.Y. Nov. 25, 1998).

designated terrorist groups was (in part) legal advice offered by trained lawyers. 561 U.S. at 14–15.

The only question is whether there is some exception to that rule because this restriction on legal advice comes in the form of a licensing requirement. There, too, the answer is no. As discussed above, the Supreme Court has emphatically rejected a First Amendment rule that would give "States unfettered power to reduce a group's First Amendment rights by simply imposing a licensing requirement." *NIFLA*, 138 S. Ct. at 2375. The State provides no basis on which this Court could depart from the holding in *NIFLA*.

And just as there is no exception to the First Amendment for licensing requirements in general, there is no exception to the First Amendment for licensing requirements *for lawyers*. The Supreme Court has been clear that courts do not have the "freewheeling authority to declare new categories of speech outside the scope of the First Amendment." *United States v. Stevens*, 559 U.S. 460, 472 (2010). To be sure, the Court suggests that it is possible there are "some categories of speech that have been historically unprotected, but have not yet been specifically identified or discussed as such in our case law." *Id.* But

demonstrating that such a category exists requires the proponent of a new free-speech exception to meet a high burden of showing "persuasive evidence that a novel restriction on content is part of a long (if heretofore unrecognized) tradition of proscription[.]" *Brown v. Ent. Merchants Ass'n.*, 564 U.S. 786, 792 (2011). And it is telling that not once since articulating this standard in *Stevens* has the Supreme Court found evidence sufficient to meet it. *See NIFLA*, 138 S. Ct. at 2375 (insufficient evidence to show historical exception for "professional" speech); *United States v. Alvarez*, 567 U.S. 709, 722 (2012) (insufficient evidence to show historical exception for false statements generally); *Brown*, 564 U.S. at 796–98 (insufficient evidence of longstanding tradition of restricting children's access to depictions of violence); *Stevens*, 559 U.S. at 472 (insufficient evidence of exception for depictions of animal cruelty). If everything from animal cruelty to outright lies can fall within the ambit of the First Amendment, then surely so too does advice about the law.

And the State simply declines to muster any evidence that advice about the law has historically been considered unprotected. Instead, it claims the only relevant question is whether the *in-court* practice of law was historically regulated and that the district court erred by asking

whether *out-of-court* speech about the law was considered unprotected. But of course not. The specific thing the plaintiffs here want to do is *talk about the law* outside of formal court settings, and the parties now seem to agree that speech about the law outside of formal court settings has historically been unregulated. That is enough to answer the question posed by *Stevens*—and to answer it with a resounding "no."

But, more broadly, the State's position that "there is no plausible constitutional distinction between a limitation on who may practice law in court . . . and who may practice law out of court" does not square with either law or history. Appellant Br. 53. At least two "plausible constitutional distinctions" readily suggest themselves. For one, historically, the law made exactly that distinction—regulating who could appear in court on behalf of a client without regulating who was allowed to speak about the law in streets or homes or taverns. *Supra* 10–14. And for another, courts *today* make exactly that distinction. Courthouses, of course, are not public forums in which the public has the right to express ideas, and so the government may more freely restrict speech in court than outside court. *E.g.*, *Huminski v. Corsones*, 396 F.3d 53, 90–91 (2d Cir. 2004). The distinction between a courtroom and a private

conversation may elude the State, but it has been quite plain to American courts, both historically and today.

### III. The State Has Failed To Present Evidence To Meet Its First Amendment Burden.

Under any standard of First Amendment review, the State here would have to present real evidence to establish that its restrictions were not burdening more speech than necessary. Under strict scrutiny, the government must prove that its "restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011). But even under intermediate scrutiny, the government must show a speech restriction is "narrowly tailored to serve a significant governmental interest"—in other words, it must show that "alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen v. Coakley*, 573 U.S. 464, 486, 495 (2014).[12]

---

[12] Given the state of the record, this Court may wish to assume without deciding that restrictions on legal advice are subject to intermediate scrutiny because the preliminary injunction should be upheld under either standard. *Cf. McCutcheon v. FEC*, 572 U.S. 185, 199 (2014) (plurality opinion) (declining to decide between strict and intermediate scrutiny because challenged law failed both); *Billups v. City of*

As the district court correctly found, nothing in the record comes close to meeting that burden. In these circumstances, the government's interest in prohibiting unlicensed legal advice to people who are *already* proceeding pro se is limited. (J.A. 203–04.) And the unlicensed-practice restriction is the opposite of narrowly tailored: It imposes a blanket ban on unlicensed legal advice even in the face of obvious less-restrictive alternatives ranging from disclosure requirements to tort remedies, many of which have actually been implemented in other jurisdictions. (J.A. 204–05.)

In situations like this, courts require the government to provide real evidence that a proposed less restrictive alternative "would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen*, 573 U.S. at 495; *see also Bery v. City of New York*, 97 F.3d 689, 698 (2d Cir. 1996) (upholding preliminary injunction where no record evidence demonstrated that other sections of the city code could not "achieve [the same] ends without such a drastic effect" on speech); *accord Billups*, 961 F.3d at 688 (demanding "actual evidence" that the

---

*Charleston*, 961 F.3d 673, 685 (4th Cir. 2020) (same) *Edwards v. District of Columbia*, 755 F.3d 996, 1001 (D.C. Cir. 2014) (same).

government "actually tried or considered less-speech-restrictive alternatives and that such alternatives were inadequate to serve the government's interest").

The State declines to provide any such evidence. Instead, it resorts to tautology, arguing that "[t]here is no way to prevent plaintiffs from dispensing unlicensed and unregulated legal counsel other than prohibiting them from dispensing that counsel." Appellant Br. 66. True enough. But the government's interest is not silencing speech for the sake of silencing speech. The government's interest is in protecting the public, and the government is therefore required to provide evidence showing why a more narrowly tailored law would not protect the public. It has not done so.

And that evidentiary failure is all the more glaring given what the record below actually shows, which is that countless New Yorkers need basic legal advice that they are not getting. Each year, hundreds of thousands of New Yorkers face consumer-debt lawsuits without the benefit of any legal advice at all. And New York itself recognizes this problem, having created a form designed to streamline the process of filing a *pro se* answer to these lawsuits. *Supra* 5. But if someone wants a

little more help—someone to walk them through the form or just someone to say "given your situation, you should at least show up to contest the debt because the plaintiff may not be able to prove it"—that advice is illegal, even if the recipient of the advice knows exactly what they are getting and wants to hear it anyway. The defendant in a consumer-debt action can seek out information (and misinformation) from the internet or from books or from social-media apps, but he is forbidden from asking a few simple questions of someone who has some relevant training and experience but is not a licensed attorney. That prohibition is not tailored, narrowly or otherwise, to any government interest.

Simply put, if New Yorkers are allowed to represent themselves pro se—and they are—then it cannot be illegal to give them helpful advice about how to represent themselves a little bit better.[13] But New York's unauthorized-practice laws forbid exactly that, which is why the district court was correct to preliminarily enjoin them.

---

[13] And Upsolve's advice is helpful. As discussed above in footnote 1, the State and its amici's various efforts to poke holes in the American Justice Movement's training guide amount to either reasonable differences of opinion or simple misstatements of the law on the critics' part.

51

## IV. The Preliminary Injunction Can Also Be Affirmed On the Alternate Ground That The Plaintiffs' Freedom-Of-Association Claim Is Likely To Succeed.

In the alternative, this Court could affirm the preliminary injunction on the ground that the plaintiffs are likely to succeed on their freedom-of-association claim. To be sure, the district court rejected this claim. (J.A. 189–91.) But, to the extent this Court rejects the district court's free-speech holding, it must then ask whether Americans enjoy any space in which they can talk to each other about the law without the express permission of the state.

The Supreme Court has repeatedly held that, even as to the conduct of in-court litigation and the creation of legal documents, the First Amendment requires states to give a certain amount of breathing room to mission-driven nonprofits like Upsolve that provide free legal assistance. *See, e.g.*, *NAACP v. Button*, 371 U.S. 415, 428 (1963); *In re Primus*, 436 U.S. 412, 432–39 (1978). And lower courts have followed suit. *See Capital Associated Industries v. Stein*, 922 F.3d 198, 206 (4th Cir. 2019) (recognizing freedom-of-association claim but finding that restrictions on trade associations' practicing law for commercial ends satisfied scrutiny); *In re N.H. Disabilities Rights Ctr. Inc.*, 541 A.2d 208

52

(N.H. 1988) (recognizing nonprofit's associational right to "provide legal representation to its members or beneficiaries despite State regulations restricting legal practice and the solicitation of clients"). An ideological nonprofit like Upsolve—which exists for the express purpose of helping Americans access their legal rights for free—fits squarely within this legal tradition.

The district court disagreed—but, in the district court's view, the constitutional space afforded to citizens to help each other with legal problems is defined by the limits of the First Amendment's Speech Clause. (J.A. 205–06.) In the State's view, though, that space simply does not exist. Instead, the State would have this Court hold that the ability of citizens to help one another with legal problems is entirely a matter of legislative largesse, to be given or taken away within the bounds of rational-basis analysis. But Supreme Court precedent squarely rejects such a narrow view of the Constitution. As the Court recently reaffirmed, "First Amendment freedoms need breathing space to survive." *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2384 (2021) (quoting *Button*, 371 U.S. at 433 (quotation marks omitted)). Put differently, Americans are afforded a broad area in which to exercise their rights to talk and

associate with each other; regulators are not empowered to impose "broad" rules that "broadly stifle" those rights. *Id.* (quotation marks omitted). The State's proposed rule gets this important principle exactly backwards, and the district court's ruling should therefore be affirmed.

## V. The District Court Correctly Weighed The Remaining Preliminary-Injunction Factors.

The district court correctly concluded that the remaining preliminary-injunction factors favored the plaintiffs. Irreparable harm has been established because " '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" (J.A. 206 (citing *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020).) And the public interest and balance of the equities favor the injunction because "the State 'does not have an interest in the enforcement of an unconstitutional law.'" (*Id.* (quoting *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013).)

The State's arguments to the contrary are unavailing. On irreparable harm, it simply reiterates its belief that the plaintiffs will find no one to talk to because no one needs this advice. Appellant Br. 71. But, again, the record below demonstrated that people *do* want to hear this kind of advice (and, indeed, Upsolve and Reverend Udo-Okon have

found eager audiences now that they enjoy the protection of the preliminary injunction). And on the public-interest prong, it contends only that the injunction should be vacated lest other people file First Amendment lawsuits seeking the right to give legal advice. *Id.* But the State cites no case holding (because no court has ever held) that courts should refrain from issuing First Amendment injunctions because those injunctions might encourage more people to speak. The ruling below should therefore be affirmed.

## CONCLUSION

For the foregoing reasons, the decision below should be affirmed.

January 4, 2023                           Respectfully submitted,

                                          */s/ Robert J. McNamara*
                                          Robert J. McNamara
                                          Brian Morris
                                          INSTITUTE FOR JUSTICE
                                          901 N. Glebe Rd., Suite 900
                                          Arlington, Virginia 22203
                                          (703) 682-9320

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS,
## AND TYPE-STYLE REQUIREMENTS

I hereby certify that this document complies with the type-volume limit of Local Rule 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 11,433 words.  Further, this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Century Schoolbook 14 point.

Dated: January 4, 2023                    */s/ Robert J. McNamara*
                                          Robert J. McNamara