# 22-1345

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

_____

UPSOLVE, INC. and REV. JOHN UDO-UKON,

*Plaintiffs-Appellees*,

v.

LETITIA JAMES, in her official capacity as Attorney General of New York,

*Defendant-Appellant.*

_____

On Appeal from the United States District Court
for the Southern District of New York

_____

**BRIEF OF *AMICI CURIAE* LAW PROFESSORS
IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

_____

Miles E. Coleman
NELSON MULLINS RILEY & SCARBOROUGH, LLP
2 W. Washington Street / Fourth Floor
Greenville, SC 29601
miles.coleman@nelsonmullins.com
(864) 373-2352

Counsel for *Amici Curiae*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *amici curiae* state that, as natural persons, they have no parent corporations and are not held by any publicly held corporation.

## TABLE OF CONTENTS

RULE 26.1 CORPORATE DISCLOSURE STATEMENT.........................................i

TABLE OF AUTHORITIES................................................................iii

INTEREST OF *AMICI CURIAE* ........................................................ 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT.....................................2

ARGUMENT..........................................................................4

    I.    The regulation of legal advice as the unauthorized practice of law is comparatively recent. ................................. 4

    II.    The regulation of legal advice is overly broad and only selectively formally enforced.........................................7

    III.    The State's vigorous effort to enforce a monopoly over basic legal advice is inconsistent with current practice and evidence. .............................................. 14

    IV.    The advice at issue is indistinguishable from everyday speech about the law. ........................................... 19

CONCLUSION.......................................................................20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*El Gemayel v. Seaman,*
  72 N.Y.2d 701 (N.Y. 1988) ................................................. 7

*Fla. Bar v. TIKD Servs. LLC,*
  326 So. 3d 1073 (Fla. 2021) ............................................. 11

*Matter of N.Y. Cty. Lawyers' Ass'n v. Dacey,*
  28 A.D.2d 161 (N.Y. App. Div. 1967) (Stevens, J.,
  dissenting), *rev'd on dissenting opinion,* 234 N.E.2d 459
  (N.Y. 1967) .......................................................................... 8

*Matter of Rowe,*
  604 N.E.2d 728 (N.Y. 1992) ............................................... 8

*People v. Alfani,*
  227 N.Y. 334 (N.Y. 1919) ........................................... 6, 7, 19

*People v. Divorce Associated & Publ.,*
  95 Misc.2d 340 (N.Y. Sup. Ct. 1978)................................... 7

*Spiegel v. Ahearn,*
  No. 101251/2016, 2018 WL 4743366 (N.Y. Sup. Ct. Oct. 2,
  2018)..................................................................................... 8

*Spivak v. Sachs,*
  16 N.Y.2d 163 (N.Y. 1965) ................................................. 7

*State v. Winder,*
  42 A.D.2d 1039 (N.Y. App. Div. 1973) ............................... 8

*Sussman v. Grado,*
  746 N.Y.S.2d 548 (N.Y. Dist. Ct. 2002) ............................ 8

*Unauthorized Practice of Law Comm. v. Parsons Tech., Inc.,*
  179 F.3d 956 (5th Cir. 1999) (per curiam)......................... 11

*Unauthorized Practice of Law Comm. v. Parsons Tech., Inc.*,
Civil Action No. 3:97-CV-2859-H, 1999 U.S. Dist. LEXIS
24030 (N.D. Tex. Aug. 13, 1999) ........................................................ 10

**Statutes**

20 U.S.C. § 1415(h)(1) ........................................................................ 16

**Other Authorities**

8 C.F.R. § 292.1 ................................................................................ 16

20 C.F.R. § 404.1705 ......................................................................... 16

42 C.F.R. § 435.908(b) ....................................................................... 16

N.Y. Comp. Codes R. & Regs. tit. 12, § 460.6 ................................... 15

N.Y. Comp. Codes R. & Regs. tit. 12, § 302-1.1 ............................... 15

Benjamin H. Barton, *The Lawyers' Monopoly—What Goes
and What Stays*, 82 FORDHAM L. REV. 3067 (2014) ........................... 13

Bruce A. Green, *Why State Courts Should Authorize Non-
Lawyers to Practice Law*, 91 FORDHAM L. REV.
(forthcoming 2023) ............................................................................. 18

Deborah L. Rhode & Lucy Buford Ricca, *Protecting the
Profession or the Public? Rethinking Unauthorized-
Practice Enforcement*, 82 FORDHAM L. REV. 2587 (2014) ............ 11, 12

Deborah L. Rhode, *Policing the Professional Monopoly: A
Constitutional and Empirical Analysis of Unauthorized
Practice Prohibitions*, 34 STAN. L. REV. 1 (1981) ........................ 4, 5, 6

Derek A. Denckla, *Nonlawyers and the Unauthorized
Practice of Law: An Overview of the Legal and Ethical
Parameters*, 67 FORDHAM L. REV. 2581 (1999) .............................. 4, 6

Elizabeth Chambliss, *Evidence-Based Lawyer Regulation*, 97
WASH. U. L. REV. 297 (2019) .............................................................. 12

iv

Gillian K. Hadfield & Deborah L. Rhode, *How to Regulate Legal Services to Promote Access, Innovation, and the Quality of Lawyering*, 67 HASTINGS L.J. 1191 (2016) ........................ 12

Jessica K. Steinberg, Anna E. Carpenter, Colleen F. Shanahan and Alyx Mark, *Judges and the Deregulation of the Lawyer's Monopoly*, 89 FORDHAM L. REV. 1315 (2021) ................. 18

Laurel A. Rigertas, *The Birth of the Movement to Prohibit the Unauthorized Practice of Law*, 37 QUINNIPIAC L. REV. 97 (2018) ................................................................................. 5

Lauren Sudeall, *The Overreach of Limits on "Legal Advice,"* 131 THE YALE L.J. FORUM 637 (Jan. 3, 2022) ................................. 9, 10

Mathew Rotenberg, Note, *Stifled Justice: The Unauthorized Practice of Law and Internet Legal Resources*, 97 MINN. L. REV. 709 (2012) .................................................................. 11

N.J. Unauthorized Practice of Law Comm., Op. 57 (Apr. 2021), *available at* https://tinyurl.com/NJ-UPL-Op-57 .................... 17

National Center for Access to Justice, *"Unauthorized Practice of Law" Enforcement in California: Protection or Protectionism?* (2022), *available at* https://tinyurl.com/NCAJ-report ....................................... 12

National Center for Access to Justice, *"Working with Your Hands Tied Behind Your Back": Non-Lawyer Perspectives on Legal Empowerment* (2021), *available at* https://tinyurl.com/NCAJ-Working-With-Your-Hands ..................... 13

New York City Bar Association, *Narrowing the "Justice Gap": Roles for Nonlawyer Practitioners* (2013), *available at* https://tinyurl.com/Narrowing-the-Justice-Gap ........................... 15

Ralph C. Cavanagh & Deborah L. Rhode, Project, *The Unauthorized Practice of Law and Pro Se Divorce: An Empirical Analysis*, 86 YALE L.J. 105 (1976) ...................................... 6

Rebecca L. Sandefur, *Accessing Justice in the Contemporary USA: Findings from the Community Needs and Services Study* 11 (2014), *available at* https://tinyurl.com/Accessing-Justice ............................................................................ 19

Rebecca L. Sandefur, *Legal Advice from Nonlawyers: Consumer Demand, Provider Quality, and Public Harms,* 16 STAN. J. CIV. RTS. & CIV. LIBERTIES 283 (2020) ............................ 18

Renee Newman Knake, *Democratizing the Delivery of Legal Services*, 73 OHIO ST. L.J. 1 (2012) ..................................................... 13

Robert Kry, *The "Watchman for Truth": Professional Licensing and the First Amendment*, 23 SEATTLE UNIV. L. REV. 885 (2000) ..................................................................... 5

W. Bradley Wendel, Foreword: *The Profession's Monopoly and Its Core Values*, 82 FORDHAM L. REV. 2563 (2014) ...................... 14

### INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are law professors who research and write about the regulation of the legal profession. They share a common interest in improving access to legal assistance for low- and moderate-income people facing debt collection actions. *Amici* are especially interested in this case because it presents an important question: whether laws prohibiting the unauthorized practice of law, as applied to community volunteers offering basic legal advice, infringe upon volunteers' First Amendment rights. A full list of *amici* is attached as Appendix A.

---

[1] *Amici curiae* submit this brief accompanied by a motion for leave of the Court pursuant to Federal Rule of Appellate Procedure 29(a)(2). Counsel for the parties were informed of and consented to this filing, and counsel for *amici curiae* states pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E) that no counsel for a party authored this brief in whole or in part, and no person other than *amici curiae*, its members, or its counsel made a monetary contribution to its preparation or submission.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

This case challenges lawyers' claim of monopoly over basic legal advice. The State has mounted a vigorous appeal of the narrow, as-applied judgment below, characterizing a carve-out for community volunteers as an existential threat to the State's ability to regulate the practice of law *at all*. But nonlawyers can assist one another in understanding and using the law without harm to the public or to the State's interests in professional licensing and regulation, as empirical evidence shows and as New York and other states—and the United States—have recognized in numerous contexts. The Court should affirm the injunction and invite further efforts to improve public access to basic legal assistance in specific contexts of widespread legal need. The State's arguments to the contrary are wrong for at least four reasons.

*First*, the allegedly "long tradition" of state regulation of the unauthorized practice of law, *see* Appellant's Br. at 26, 53, is not, in fact, a point in the State's favor. In New York and elsewhere, prohibitions against the provision of legal advice by nonlawyers are comparatively recent.

*Second*, the State's arguments are undercut by the fact that the regulatory regime at issue is both overly broad and only selectively formally enforced, chilling initiatives to improve access to basic legal assistance without any coherent doctrinal or factual foundation. The justifications for enforcement are strongest when nonlawyers misrepresent their credentials or there is risk of serious harm to the public. Neither danger is present here.

*Third*, the State's effort to enforce a monopoly over the provision of basic legal advice is inconsistent with current practice and evidence. In New York and elsewhere, nonlawyers are authorized to provide legal information *and advice* in specified contexts both in and outside of court and agency proceedings. Such authorizations have been shown not only to cause no harm, but, in appropriate situations (as here), to aid the administration of justice.

*Fourth*, the State's arguments go too far, as the advice it seeks to regulate is indistinguishable from everyday speech about the law. The State's position in this regard is not merely overbroad, it is counterproductive. When, as here, a program is carefully designed to train community volunteers to provide basic information and advice in a

specific, narrow context using a standardized form provided by the State, all while expressly *not* holding themselves out as lawyers, the State's enforcement zeal would be put to better use elsewhere.

<u>ARGUMENT</u>

## I. The regulation of legal advice as the unauthorized practice of law is comparatively recent.

Prior to the 1930s, unauthorized practice regulation focused on rights of appearance in court or nonlawyers holding themselves out to be lawyers. *See* Deborah L. Rhode, *Policing the Professional Monopoly: A Constitutional and Empirical Analysis of Unauthorized Practice Prohibitions*, 34 STAN. L. REV. 1, 7 (1981) ("Although some states had enacted unauthorized practice statutes before the 1930s, most dealt only with nonlawyer appearances in court . . . [and] scattered cases against lay practitioners . . . who had held themselves out as attorneys"); Derek A. Denckla, *Nonlawyers and the Unauthorized Practice of Law: An Overview of the Legal and Ethical Parameters*, 67 FORDHAM L. REV. 2581, 2583 (1999) (discussing the role of bar associations "in lobbying for passage of legislation which prohibited nonlawyers from making court appearances").

Even in New York, where bar associations formed as early as the 1870s, the first licensing statute was not promulgated until 1898, and

4

there was no enforcement activity for ten years. *See* Laurel A. Rigertas, *The Birth of the Movement to Prohibit the Unauthorized Practice of Law*, 37 QUINNIPIAC L. REV. 97, 117 (2018). Although Appellant dismisses original historical research on unauthorized practice regulation (Appellant's Br. at 53, referring to "secondary sources"), the historical record is clear that efforts to police the provision of advice by nonlawyers were virtually nonexistent before the twentieth century and expanded significantly only after the Great Depression. *See* Robert Kry, *The "Watchman for Truth": Professional Licensing and the First Amendment*, 23 SEATTLE UNIV. L. REV. 885, 956 (2000) ("States exercised virtually no licensing authority over the mere rendering of advice during either the post-colonial or Reconstruction eras."); Rigertas at 97 (stating that bar associations' efforts to prohibit the unauthorized practice of law "exploded" in the 1930s); Rhode at 7 (noting the "embarrassing absence" of precedent for expanded enforcement).

In New York, the New York County Lawyers Association launched the first unauthorized practice campaign in 1914, "by forming an unauthorized practice committee to curtail competition from title and trust companies." Denckla at 2583–84; *see also* Rhode at 7 (gathering

5

cases). The sole case that Appellant cites to demonstrate New York's supposedly "century-plus" tradition of regulating legal advice is factually distinguishable and, in any event, is a historic outlier. *See* Appellant's Br. at 53–54 (citing *People v. Alfani*, 227 N.Y. 334, 336–37 (N.Y. 1919)); *id.* at 4, 8, 6, 39. Admittedly, *Alfani* spoke of regulating the provision of "all advice . . . in matters connected to the law." *Alfani*, 227 N.Y. at 336–37. But *Alfani* involved advice that was being given by a notary who "held himself out to the public as *being in th*[e] *business*" of drawing legal instruments *for hire. See Alfani*, 227 N.Y. at 336–37.

The current appeal presents facts very different from those deemed regulable in *Alfani. Compare id.*, *with* J.A. 12–13, 24, 55 (explaining that the legal advice that Upsolve's volunteers would provide is free, and that the volunteers would affirmatively tell the recipients that the volunteers are not attorneys). Even if we ignore these factual distinctions (as Appellant does), *Alfani* was an outlier in its time, and that case hardly proves a long-standing and consistent tradition of regulating mere advice. *See* Ralph C. Cavanagh & Deborah L. Rhode, Project, *The Unauthorized Practice of Law and Pro Se Divorce: An Empirical Analysis*, 86 YALE L.J. 105, 111 n.29 (1976) (noting that *Alfani* departed

from the policy at that time of "imposing sanctions *only* against those who fraudulently styled themselves as 'attorneys' or undertook to represent others in court.") (emphasis added).

The other cases Appellant cites as authority for the regulation of legal advice in New York date from 1965 or later and only one involves a nonlawyer. *See* Appellant's Br. at 4, 8 (citing *Spivak v. Sachs*, 16 N.Y.2d 163, 166 (N.Y. 1965) (involving a California attorney trying to recover fees for advising a New York client); *El Gemayel v. Seaman*,72 N.Y.2d 701, 707 (N.Y. 1988) (holding that phone calls to New York client by an attorney licensed in a foreign jurisdiction "did not, without more, constitute the 'practice' of law in this State"); *People v. Divorce Associated & Publ.*, 95 Misc.2d 340, 343 (N.Y. Sup. Ct. 1978) (enjoining the seller of self-help divorce kits from "giving legal advice by . . . assisting individual customers in filling out legal forms").

## II. The regulation of legal advice is overly broad and only selectively formally enforced.

New York case law prohibiting nonlawyers from offering "legal advice" turns on a distinction between standard information directed at a general audience and individualized advice as applied to the facts of a particular case. For instance, New York courts have held that publishing

a book about how to avoid probate, or an article about the legal rights of psychiatric patients, are not "the practice of law" because they do not involve individualized advice to a particular client. *See Matter of N.Y. Cty. Lawyers' Ass'n v. Dacey*, 28 A.D.2d 161, 174 (N.Y. App. Div. 1967) (Stevens, J., dissenting) (finding book was not the practice of law because there was "no personal contact or relationship with a particular individual"), *rev'd on dissenting opinion*, 234 N.E.2d 459 (N.Y. 1967); *Matter of Rowe*, 604 N.E.2d 728, 731 (N.Y. 1992) (finding similarly for article).

In contrast, courts have taken the broad view that providing *any* individualized advice about how to respond to a legal problem amounts to the practice of law, no matter how basic or straightforward the advice. *See Sussman v. Grado*, 746 N.Y.S.2d 548, 552–53 (N.Y. Dist. Ct. 2002) (holding a paralegal who helped a client fill out a form without the supervision of an attorney engaged in the unauthorized practice of law); *State v. Winder*, 42 A.D.2d 1039, 1040 (N.Y. App. Div. 1973) (finding the sale of a do-it-yourself divorce kit with forms and instructions was not itself the practice of law, but providing advice to a particular purchaser was); *Spiegel v. Ahearn*, No. 101251/2016, 2018 WL 4743366, at *4 (N.Y.

Sup. Ct. Oct. 2, 2018) (finding a nonlawyer engaged in the unauthorized practice of law "by discussing Defendants' legal problems with them and advising them what they needed to do to resolve those problems.").

Yet the line between standard and individualized advice is not always easy to draw and becomes especially problematic in contexts involving the provision of basic legal information to individuals at scale (like the facts giving rise to this appeal). For instance, during the COVID-19 pandemic, the Center for Disease Control issued an order prohibiting evictions under certain circumstances, such as nonpayment of rent and related fees. While some courts made information about the order available to tenants facing eviction, and provided copies of the required form, other courts declined to provide any information or the required form, viewing it as prohibited "legal advice." *See* Lauren Sudeall, *The Overreach of Limits on "Legal Advice,"* 131 THE YALE L.J. FORUM 637, 638 (Jan. 3, 2022). Courts also take inconsistent positions as to whether clerks may supply information about possible courses of action or the types of evidence relevant to a legal form or hearing; or translate applicable law into more accessible language. *Id*. at 646 (discussing the "the wide range of legal advice definitions in use across state courts"). "In

the absence of guidance . . . court personnel often default to silence—even when it comes to providing basic logistical information that most courts find unobjectionable." *Id.*; *see also* John M. Greacen, *"No Legal Advice from Court Personnel": What Does that Mean?*, 34 JUDGES' J. 10, 10 (1995) (arguing that "legal advice" has no inherent meaning and that many clerks cannot themselves define it); *id.* at 12 ("An easy way to 'get rid of' [self-represented litigants], particularly on the telephone, is to cut the questions short with the useful phrase, 'I am not allowed to give legal advice.'").

The profession has responded to the difficulty of defining "legal advice" through overregulation. Bar associations and unauthorized practice committees have fought the distribution of self-help manuals, forms, and software even in the absence of personal contact with a particular individual, and without any showing of harm. *See*, *e.g.*, *Unauthorized Practice of Law Comm. v. Parsons Tech., Inc.*, Civil Action No. 3:97-CV-2859-H, 1999 U.S. Dist. LEXIS 24030, at *21 (N.D. Tex. Aug. 13, 1999) (enjoining the sale of self-help legal software despite the absence of personal contact, stating: "If Parsons believes such a personal contact requirement should be included in the Statute, it should address

these concerns to the Texas legislature."); *Unauthorized Practice of Law Comm. v. Parsons Tech., Inc*. 179 F.3d 956 (5th Cir. 1999) (per curiam) (vacating the injunction and remanding in light of an amendment to the Texas statute); Mathew Rotenberg, Note, *Stifled Justice: The Unauthorized Practice of Law and Internet Legal Resources*, 97 MINN. L. REV. 709, 722 (2012) (noting that most unauthorized practice claims against internet providers are brought by lawyers rather than consumers and settled without any showing of harm); Deborah L. Rhode & Lucy Buford Ricca, *Protecting the Profession or the Public? Rethinking Unauthorized-Practice Enforcement*, 82 FORDHAM L. REV. 2587, 2605 (2014) (discussing bar association lawsuits against LegalZoom despite high rates of customer satisfaction).

In the for-profit context, courts have endorsed vigorous enforcement against even defunct nonlawyer providers, explicitly repudiating the need to produce evidence of actual harm. *See*, *e.g.*, *Fla. Bar v. TIKD Servs. LLC*, 326 So. 3d 1073, 1082 (Fla. 2021) ("There is . . . no requirement in cases involving the unlicensed or unauthorized practice of law that the Bar produce evidence of actual harm to the public[.]"). A 2014 national survey of unauthorized practice of law enforcement found that, in 75% of

cases involving nonlawyer providers, courts did not even consider the issue of public harm. *See* Deborah L. Rhode & Lucy Buford Ricca, *Protecting the Profession or the Public? Rethinking Unauthorized-Practice Enforcement*, 82 FORDHAM L. REV. 2587, 2604 (2014); *see also* Elizabeth Chambliss, *Evidence-Based Lawyer Regulation*, 97 WASH. U. L. REV. 297, 321 (2019) (arguing that "existing research does not support the breadth of lawyers' monopoly" over basic legal assistance).

Regulators also use the threat of enforcement to shut down legal assistance by nonlawyers without state court oversight. For example, regulators have opened investigations and issued cease-and-desist letters that are not accessible to the public. *See* National Center for Access to Justice, *"Unauthorized Practice of Law" Enforcement in California: Protection or Protectionism?*, 3–4 (2022) (discussing the use of cease-and-desist letters against nonlawyer providers in California), *available at* https://tinyurl.com/NCAJ-report; Gillian K. Hadfield & Deborah L. Rhode, *How to Regulate Legal Services to Promote Access, Innovation, and the Quality of Lawyering*, 67 HASTINGS L.J. 1191, 1217 n.88 (2016) ("[M]ost regulatory oversight and intervention is carried out by bar committees composed entirely of practicing attorneys who open

investigations and send out warnings or cease and desist letters without state court oversight . . . ."). These methods of regulation, which avoid judicial scrutiny, can be strategic in that they allow regulators to evade political and legal accountability for regulation. *See*, *e.g.*, Br. of LegalZoom.com, Inc. *et al.* as *Amici Curiae*, in Supp. of Resp't, *N.C. State Bd. of Dental Exam'rs v. F.T.C.*, No. 13-534, 2014 WL 3895926, at *20 (Aug. 6, 2014) (describing the North Carolina bar's informal efforts to regulate LegalZoom and noting that the "bar took no direct enforcement action for five years, avoiding judicial review of its action"); *see also* Benjamin H. Barton, *The Lawyers' Monopoly—What Goes and What Stays*, 82 FORDHAM L. REV. 3067, 3089 (2014) (noting that "truly aggressive . . . [enforcement] would be likely to draw federal antitrust and congressional attention"); Renee Newman Knake, *Democratizing the Delivery of Legal Services*, 73 OHIO ST. L.J. 1, 8, 10–11 (2012) (arguing that current restrictions on nonlawyer assistance are vulnerable to First Amendment challenges).

The mere threat of enforcement can be enough to deter nonlawyers from engaging in conduct that might be construed as the unauthorized practice of law. *See*, *e.g.*, National Center for Access to Justice, *"Working*

*with Your Hands Tied Behind Your Back": Non-Lawyer Perspectives on Legal Empowerment*, 12–14 (2021) (discussing nonlawyers' frustration and "fear of being 'shut down' or otherwise sanctioned for providing unauthorized legal advice"), *available at* https://tinyurl.com/NCAJ-Working-With-Your-Hands. The threat of enforcement, coupled with the breadth of prohibited activity, effectively paralyzes potential providers and the community and civil rights organizations seeking to assist them in improving public access to basic legal advice. This chilling effect serves as a systemic barrier to legal assistance for low- and moderate-income individuals. *See* W. Bradley Wendel, Foreword: *The Profession's Monopoly and Its Core Values*, 82 FORDHAM L. REV. 2563, 2565–66 (2014) (noting the profession's "vigorous efforts to enforce its monopoly over the provision of legal services is exacerbating existing social disparities").

## III. The State's vigorous effort to enforce a monopoly over basic legal advice is inconsistent with current practice and evidence.

Nonlawyers currently provide legal assistance in numerous state and federal contexts without evidence of public harm. In New York, nonlawyers are authorized to provide legal information outside court or agency proceedings and to provide legal advice (not just information) in

some court and agency proceedings. *See* New York City Bar Association, *Narrowing the "Justice Gap": Roles for Nonlawyer Practitioners*, 12 (2013), *available at* https://tinyurl.com/Narrowing-the-Justice-Gap. For instance, New York City Civil Court clerks may help debtors answer a complaint by helping them complete a pre-printed form (the "Consumer Credit Transaction Answer in Person"), which provides a list of defenses. "The clerk fills out the form based on information provided by the debtor, sends the answer to the plaintiff, and advises the debtor of the hearing date." *Id.* at 15–16. Nonlawyers also are authorized to advise and represent clients in state unemployment and workers' compensation proceedings, subject to various training and licensing requirements. *Id.* at 257; *see* Fact Sheet, New York State Unemployment Insurance Appeal Board; N.Y. Comp. Codes R. & Regs. tit. 12, § 460.6; N.Y. Comp. Codes R. & Regs. tit. 12, § 302-1.1.

Many federal agencies also authorize nonlawyers to advise and represent people appearing before them. For instance, the Social Security Administration allows nonlawyers to represent claimants seeking Social Security disability insurance benefits, provided the representative is "capable of giving valuable help" in connection with the claim. *See* 20

15

C.F.R. § 404.1705. In Medicaid administrative proceedings, parties can choose anyone they want to assist them and often get assistance from social workers. 42 C.F.R. § 435.908(b) (permitting Medicaid applicants to choose anyone to assist in the application or renewal process); *see also* N.Y. City Bar, Comm. on Prof'l Ethics, Formal Op. 2017-4 (discussing the permissible role of nonlawyers working with not-for-profit legal services organizations), *available at* https://tinyurl.com/Formal-Op-2017-4. In special education hearings, parties may be accompanied and advised by anyone "with special knowledge or training with respect to the problems of children with disabilities," such as other parents who have experience with the process. 20 U.S.C. § 1415(h)(1). Federal regulations also allow "accredited representatives" of a recognized nonprofit organization to participate in Immigration Court proceedings to the same extent as attorneys; and allow other "reputable individuals" to appear on an "individual case basis" at the noncitizen's request. *See* 8 C.F.R. § 292.1.

States also have created *ad hoc* and *de facto* carve-outs for nonlawyer assistance in specific contexts of need. For instance, New Jersey recently authorized nonlawyers to advocate for parents in special education cases outside of administrative hearings. *See* N.J. Unauthorized

16

Practice of Law Comm., Op. 57 (Apr. 2021), *available at* https://tinyurl.com/NJ-UPL-Op-57. The committee recognized that, although advocating outside the hearings is the practice of law and is not specifically authorized by federal law, the need for advocates "far exceeds" the supply of available lawyers and parents would benefit from this assistance. *Id.* ("There are far more non-lawyer advocates offering services pro bono through various non-profit organizations than there are lawyers offering such services . . . . [N]on-lawyer advocates are generally helpful to parents . . . [and] there is little demonstrable harm to the public by permitting them to operate . . . .").

Some state courts also allow a *de facto* carve-out for nonlawyer advocates in protective order hearings, where most petitioners are unrepresented. A recent study of roughly 275 protective order hearings in two states found that courts allow nonlawyer domestic violence advocates to "provide the full range of services one might expect from a lawyer, short of appearing in court," including assisting petitioners with the preparation of pleadings and the development of evidence, and advising petitioners as to "whether to pursue legal recourse, how to select remedies, and how to clear procedural hurdles, such as service of

process." *See* Jessica K. Steinberg, Anna E. Carpenter, Colleen F. Shanahan and Alyx Mark, *Judges and the Deregulation of the Lawyer's Monopoly*, 89 FORDHAM L. REV. 1315, 1331–32 (2021).

States may be reluctant to experiment more broadly with nonlawyer providers based on lawyers' opposition and speculation about possible harm. *See id*. at 1316–17 (noting that judges' extensive reliance on domestic violence advocates is "hidden behind the scenes"); *see also* Bruce A. Green, *Why State Courts Should Authorize Non-Lawyers to Practice Law*, 91 FORDHAM L. REV. (forthcoming 2023) (criticizing state courts' reluctance to experiment "based on shopworn assumptions about the harms that nonlawyers might inflict or . . . optimism about alternative cures, such as the expansion of pro bono assistance"). But existing evidence suggests that "[c]onsumers value . . . legal services from providers who are not fully qualified attorneys," and "[t]he legal work produced by nonlawyers can be as good as—and sometimes better than—that of lawyers." *See* Rebecca L. Sandefur, *Legal Advice from Nonlawyers: Consumer Demand, Provider Quality, and Public Harms*, 16 STAN. J. CIV. RTS. & CIV. LIBERTIES 283, 312 (2020); *see also* Br. of Rebecca Sandefur

as *Amicus Curiae* Supporting Plaintiffs-Appellees, *Upsolve, Inc. v. James*, No. 22-1345 (2d Cir. January 11, 2023).

## IV. The advice at issue is indistinguishable from everyday speech about the law.

Rather than pursuing a blanket ban on "all advice . . . in matters connected to the law," *see Alfani*, 227 N.Y. at 336, the State should encourage efforts to train nonlawyers to provide basic legal advice in specific contexts of need. The program at issue is carefully designed to train community volunteers to provide basic information and advice in a specific, narrow context using a standardized form provided by the State. Advice about how to fill out a standardized form calls for less legal knowledge and skill than assistance that nonlawyers are lawfully permitted to give in many other legal contexts. Volunteers will not hold themselves out to be lawyers or offer any form of assistance beyond merely speaking to people who seek this specific advice. Such advice is indistinguishable from everyday speech about the law.

Many people facing legal problems turn to their immediate social networks for help. *See* Rebecca L. Sandefur, *Accessing Justice in the Contemporary USA: Findings from the Community Needs and Services Study*, 11 (2014) (conducting a random sample of more than 3,000 adults

and finding that people facing civil justice problems rarely turn to lawyers for help and instead are more likely to turn to friends, family, and others in their immediate social network), *available at* https://tinyurl.com/Accessing-Justice. States do not attempt to police this type of free, incidental, individualized advice, which presumably varies widely in quality and, under the State's theory, constitutes the unauthorized practice of law.

The program at issue is designed to promote both the quality and availability of everyday, free advice about a specific, widespread problem by providing training and support for volunteers within affected communities. Such community-based assistance could serve as a valuable resource for people without access to (or knowledge about) other forms of assistance. Unless the State proposes to ban all forms of everyday advice about the law, it has no principled basis for banning free legal advice in this context.

## CONCLUSION

Upsolve proposes to train community volunteers to offer basic legal advice in a specific context of widespread legal need. The State has mounted a vigorous appeal of the narrow, as-applied judgment below,

characterizing it as a threat to all State regulation of the practice of law. But the State's position is inconsistent with historic and current practice and unsupported by existing evidence, and the advice at issue is indistinguishable from everyday speech about the law. The Court should affirm the injunction and invite further efforts to improve public access to basic legal assistance in specific contexts of widespread legal need.

NELSON MULLINS RILEY & SCARBOROUGH LLP

By: /s/ Miles E. Coleman
    Miles E. Coleman
    2 W. Washington Street / 4th Floor
    Greenville, SC  29601
    (864) 373-2352
    E-Mail: miles.coleman@nelsonmullins.com

Counsel for *Amici Curiae*

**January 11, 2023**

## APPENDIX—LIST OF *AMICI CURIAE**

**Richard L. Abel**, Connell Distinguished Professor of Law Emeritus and Distinguished Research Professor, UCLA School of Law

**Benjamin Barton**, Helen and Charles Lockett Distinguished Professor of Law, University of Tennessee College of Law

**Raymond Brescia**, Hon. Harold R. Tyler Chair in Law and Technology, Albany Law School

**Elizabeth Chambliss**, Henry Harman Edens Professor of Law, University of South Carolina School of Law

**Benjamin P. Cooper**, Frank Montague, Jr. Professor of Legal Studies and Professionalism, University of Mississippi School of Law

**Scott Cummings**, Robert Henigson Professor of Legal Ethics, UCLA School of Law

**Hannah Demeritt,** Clinical Professor of Law, Duke University School of Law

**David Freeman Engstrom**, LSVF Professor in Law, Stanford Law School

**Nora Freeman Engstrom**, Ernest W. McFarland Professor of Law, Stanford Law School

**Cynthia Godsoe**, Professor of Law, Brooklyn Law School

**Gillian Hadfield**, Schwartz Reisman Chair in Technology and Society, University of Toronto Faculty of Law

**William D. Henderson**, Stephen F. Burns Professor of Law, Indiana University Maurer School of Law

* Institutional names provided for identification purposes only.

**Sung Hui Kim**, Professor of Law, UCLA School of Law

**Renee Knake Jefferson**, Professor of Law and the Joanne and Larry Doherty Chair in Legal Ethics, University of Houston Law Center

**David Luban**, University Profession and Professor of Law and Philosophy, Georgetown University Law Center

**Martha Minow**, 300th Anniversary University Professor, Harvard University

**Daniel B. Rodriguez**, Harold Washington Professor, Northwestern University Pritzker School of Law

**Tanina Rostain**, Agnes Williams Sesquicentennial Professor of Justice Innovation, Georgetown University Law Center

**Colleen F. Shanahan**, Clinical Professor of Law, Columbia Law School

**William H. Simon**, Arthur Levitt Professor of Law Emeritus, Columbia University

**Abbe Smith**, Scott K. Ginsburg Professor of Law, Georgetown University Law Center

**Lauren Sudeall**, Professor of Law, Georgia State University College of Law

\* Institutional names provided for identification purposes only.

A2

<u>C<span style="font-variant:small-caps">ERTIFICATE OF</span> C<span style="font-variant:small-caps">OMPLIANCE</span></u>

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and Local Rule 29.1(c) because this brief contains 4,010 words, including footnotes, but excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

January 11, 2023

/s/ Miles E. Coleman
Miles E. Coleman

Counsel for *Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of January 2023, I caused the foregoing Brief of *Amici Curiae* to be filed with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing to the following:

Robert J. McNamara
Brian Morris
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, Virginia 22203
(703) 682-9320

*Counsel for Plaintiffs-Appellees*

Letitia James
*Attorney General*
Barbara D. Underwood
*Solicitor General*
Judith N. Vale
*Deputy Solicitor General*
Cleland B. Welton II
*Assistant Solicitor General of Counsel*
28 Liberty Street
New York, New York 10005
(212) 416-6197

*Counsel for Defendant-Appellant*

/s/ Miles E. Coleman
Miles E. Coleman

Counsel for *Amici Curiae*