# 22-1345

IN THE
## United States Court of Appeals for the Second Circuit

---

UPSOLVE, INC., REVEREND JOHN UDO-OKON,

*Plaintiffs-Appellees*,

*v.*

LETITIA JAMES, in her official capacity as Attorney General of the State of New York,

*Defendant-Appellant.*

---

On Appeal from the United States District Court
for the Southern District of New York
No. 22-cv-627
Hon. Paul A. Crotty

---

## BRIEF OF AMICI CURIAE THE NAACP AND THE NAACP NEW YORK STATE CONFERENCE IN SUPPORT OF PLAINTIFFS-APPELLEES

Joseph Rostain Schottenfeld
Martina Tiku
Glynnis Hagins
NAACP | EMPOWERMENT PROGRAMS
4805 Mount Hope Drive
Baltimore, MD 21215
(203) 444-9577

Daniel A. Rubens
Jodie C. Liu
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
(212) 506-5000

*(Additional counsel on inside cover)*

Sarah H. Sloan
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
1152 15th Street, N.W.
Washington, DC  20005
(202) 339-8400

*Counsel for Amici Curiae*

## CORPORATE DISLCOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Amici Curiae the NAACP and the NAACP New York State Conference state that they have no parent corporations and that no publicly held corporations own 10% or more of their stock.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................iii

INTEREST OF AMICI CURIAE................................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................... 2

ARGUMENT ........................................................................................... 5

I.     The right to associate protects plaintiffs'—and the NAACP's—right to facilitate meaningful access to the courts through the provision of helpful and accurate legal advice. .......................................................................... 5

A.     The right to associate protects collective efforts to use the courts for political expression—including Upsolve's efforts to redress unfair and discriminatory debt collection actions. ......................... 7

B.     The right to associate protects collective activity intended to help people access the courts................... 10

II.     The First Amendment's protections for the right to associate in this context do not and cannot belong to lawyers alone....................................................................... 15

III.     The NAACP's debt-related advocacy demonstrates why it is vitally important that the right to associate protects plaintiffs' efforts to expand access to the courts. .................................................................................. 20

CONCLUSION ...................................................................................... 26

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bates v. State Bar of Ariz.,*
433 U.S. 350 (1977) ................................................................. 3, 14

*Bill Johnson's Rests., Inc. v. NLRB,*
461 U.S. 731 (1983) ............................................................. 10, 19

*Brotherhood of R. R. Trainmen v. Virginia ex rel.
Va. State Bar,*
377 U.S. 1 (1964) ........................................... 6, 11, 12, 13

*Burns v. Ohio,*
360 U.S. 252 (1959) ............................................................. 14

*Ga. Conf. of the NAACP v. City of LaGrange,*
No. 3:17-cv-67 (N.D. Ga. 2020) ..................................... 21

*Goldfarb v. Virginia State Bar,*
421 U.S. 773 (1975) .............................................................. 15

*Griffin v. Illinois,*
351 U.S. 12 (1956) ................................................................ 14

*Ex parte Hull,*
312 U.S. 546 (1941) .............................................................. 14

*Jacoby & Meyers, LLP v. Presiding Justices of the
First, Second, Third and Fourth Departments,*
852 F.3d 178 (2d Cir. 2017) ..................................... 9, 15, 18

*Johnson v. Avery,*
393 U.S. 483 (1969) ........................................................ 14, 18, 19

*Lewis v. Casey,*
518 U.S. 343 (1996) .............................................................. 14

*NAACP v. Alabama ex rel. Patterson,*
357 U.S. 449 (1958) ............................................................... 5

iii

*NAACP v. Button*,
371 U.S. 415 (1963) ..................................................... 1, 3, 6-12, 14, 17

*NAACP v. Claiborne Hardware Co.*,
458 U.S. 886 (1982) .................................................................... 5

*In re Primus*,
436 U.S. 412 (1978) ............................................................ 8-11, 16

*Roberts v. U.S. Jaycees*,
468 U.S. 609 (1984) .................................................................... 5

*Seminole Tribe of Fla. v. Florida*,
517 U. S. 44 (1996) ................................................................... 18

*Thomas v. Collins*,
323 U.S. 516 (1945) ................................................................. 3, 6

*United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n*,
389 U.S. 217 (1967) ........................................................ 10, 12, 17

*United Transp. Union v. State Bar of Mich.*,
401 U.S. 576 (1971) ................................................. 2, 6, 13, 16-18, 20

## Statutes & Rules

S.C. Code § 27-37-40 .................................................................. 25

## Other Authorities

*$50K & Beyond*, NAACP, https://tinyurl.com/y2bmz78u (last
visited Jan. 11, 2023) ................................................................ 21

Chris Albin-Lackey, *Rubber Stamp Justice: US Courts, Debt
Buying Corporations, and the Poor*, Human Rights Watch
(Jan. 2016), https://tinyurl.com/w8wphts5 ................................... 24

Mark E. Blue & George F. Nicholas, *Another Voice: Debt law
would fix an economic and racial injustice*, Buffalo News
(Dec. 2, 2021) ........................................................................ 21

iv

Khristopher J. Brooks, *Disparity in home lending costs minorities millions, researchers find*, CBS News (Nov. 15, 2019), https://tinyurl.com/2zvmsvcp ................................................... 22

*Debt in America: An Interactive Map*, Urb. Inst. (Mar. 31, 2021), https://tinyurl.com/5b5v3yyx ................................................... 22

Tashfia Hasan et al., *Disparities in Debt: Why Debt Is a Driver in the Racial Wealth Gap*, Aspen Inst. (Feb. 7, 2022), https://tinyurl.com/d9664vss ................................................... 22

*How Debt Collectors Are Transforming the Business of State Courts*, Pew Charitable Trusts (May 6, 2020), https://tinyurl.com/4hwzmjmp ..................................................... 23, 24

Paul Kiel & Annie Waldman, *The Color of Debt: How Collection Suits Squeeze Black Neighborhoods*, ProPublica (Oct. 8, 2015), https://tinyurl.com/2jdpmu6e ...................................... 23

*Payday Lending in America: Who Borrows, Where They Borrow, and Why*, Pew Charitable Trusts (July 2012), https://tinyurl.com/yza2kaens ........................................................... 22

Miranda Santillo et al., *Communities of Color Disproportionally Suffer from Medical Debt*, Urb. Inst. (Oct. 14, 2022), https://tinyurl.com/4eapw8da ................................... 22

Sara Sternberg Greene, Race, Class, and Access to Civil Justice, 101 Iowa L. Rev. 1263 (2016) ................................................ 23

## INTEREST OF AMICI CURIAE[1]

The National Association for the Advancement of Colored People (the "NAACP") is the country's oldest and largest civil rights organization. The New York State Conference of the NAACP is the NAACP's New York affiliate. The NAACP has over two million supporters and members, including nearly 8,000 members in New York. For more than a century, the NAACP has used collective action and the legal process to champion equality and justice, including in landmark cases like *NAACP v. Button*, 371 U.S. 415 (1963).

The outcome of this case will have profound civil rights implications for NAACP members and for the NAACP's institutional interest in redressing injustice and inequality. People of color are more likely to face debt collection actions; they are more likely to do so without adequate legal information or the assistance of an attorney; and they are more likely to default in these actions. Like Upsolve and

---

[1] No party's counsel authored this brief in whole or in part and no party or party's counsel or person other than Amici Curiae or their counsel contributed money that was intended to fund the preparing or submitting of this brief. All parties have consented to the filing of this brief.

1

Reverend Udo-Okon, the NAACP can help people facing debt collection actions. But New York's unnecessarily broad unauthorized practice of law ("UPL") rules prevent Plaintiffs-Appellees and the NAACP and its members from fully and effectively using collective action to provide the legal advice necessary to allow meaningful access to the courts and check the inequalities that result from debt collection actions.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The right of meaningful access to the courts is a core underpinning of the American justice system. That right, however, is not realized for thousands of low-income defendants in debt collection actions in New York who cannot obtain legal representation. Because nearly all of these defendants lack legal assistance, most cases result in default judgments.

The collective action proposed by Upsolve, Inc., and Reverend John Udo-Okon (together, "plaintiffs")—the provision by nonlawyers of free and straightforward legal advice to defendants in debt collection actions—can improve access to the courts. Plaintiffs' "group legal action" is also protected by the First Amendment's right to associate, *United Transp. Union v. State Bar of Mich.*, 401 U.S. 576 (1971): As the

Supreme Court has reiterated time and again, "collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment." *Id.* at 585; *Bates v. State Bar of Ariz.*, 433 U.S. 350, 376 n.32 (1977).

The NAACP writes in full support of plaintiffs, but limits this brief solely to explaining the freedom-of-association claim that the district court rejected as an alternative basis for preliminary injunctive relief.[2] That rejection was in error. The freedom-of-association claim, properly understood, independently supports a preliminary injunction. *See* Br. for Plaintiffs-Appellees (ECF No. 103) at 52-54. The right to associate—as *NAACP v. Button*, 371 U.S. 415 (1963), first acknowledged—unambiguously protects groups' efforts to use the courts for expressive political purposes, whether those purposes be ending school desegregation, as the NAACP sought in *Button*, or eliminating

---

[2] Even if this Court affirms the district court's ruling on plaintiffs' free-speech claim and does not reach the freedom-of-association claim, the precedent protecting the right to associate in this context helps demonstrate why the speech at issue here merits its own constitutional protection. The central lesson of these cases is the value of—and the protections afforded to—efforts to persuade people to action through the courts. *See Thomas v. Collins*, 323 U.S. 516, 537 (1945) ("Free trade in ideas means free trade in the opportunity to persuade to action, not merely to describe facts.").

unjust debt collection practices, as Upsolve seeks here. The protections afforded by the right to associate cover both these highly political causes and, relatedly, the efforts by groups like Upsolve and the NAACP simply to help people get through the courthouse doors to exercise their rights. And, critically, these protections do not depend on whether a lawyer leads the collective effort.

By prohibiting plaintiffs from providing helpful legal advice, New York's UPL rules burden the right to associate. As a practical matter, the unnecessary breadth of these rules not only deepens debt-related inequalities, but also forces organizations like the NAACP to limit their advocacy to less effective channels. A disproportionately high number of defendants in debt collection actions are people of color; default judgments against them compound the underlying disparities in terms of who owes debt and on what terms. But New York's UPL rules confine the NAACP and other advocacy organizations to working to offset the consequences of default judgments, rather than joining in efforts to prevent defaults in the first place by providing advice about the law.

## ARGUMENT

I. **The right to associate protects plaintiffs'—and the NAACP's—right to facilitate meaningful access to the courts through the provision of helpful and accurate legal advice.**

The First Amendment protects the "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). The NAACP is intimately familiar with the importance of this right. Indeed, landmark Supreme Court precedents on the freedom of association involve past efforts to silence the NAACP and its civil rights allies. *See, e.g.*, *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 924-33 (1982) (reversing judgment against NAACP and NAACP leaders for NAACP-led boycott because "one of the foundations of our society is the right of individuals to combine with other persons in pursuit of a common goal by lawful means"); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 466 (1958) (holding that NAACP members' "right … to pursue their lawful private interests privately and to associate freely with others" barred civil contempt judgment against NAACP for refusing to produce membership lists in lawsuit challenging NAACP's registration as a foreign corporation under state law).

5

In particular, the Supreme Court has established "that collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment." *United Transp. Union*, 401 U.S. at 585. The "common thread running through" this line of decisions is the need to protect collective activity directed at the various purposes of our court system, *id.*—from encouraging people to use the court system for political transformation, *see Button*, 371 U.S. at 429, to encouraging them to use the court system at all, *see Brotherhood of R. R. Trainmen v. Virginia ex rel. Va. State Bar*, 377 U.S. 1, 4-8 (1964). In this sense, the right to associate mirrors the express protections of the First Amendment, which guard "great secular causes" no less than "small ones." *Thomas*, 323 U.S. at 531. And, here, the right to associate safeguards efforts by plaintiffs and the NAACP to use collective action to achieve the twin aims of reducing unfair or discriminatory debt collection practices and helping debtors exercise their legal rights.

6

A. **The right to associate protects collective efforts to use the courts for political expression—including Upsolve's efforts to redress unfair and discriminatory debt collection actions.**

Starting with *NAACP v. Button*, the Supreme Court has specifically addressed how the right to associate protects the ability of nonprofit, mission-driven organizations like Upsolve or the NAACP to use collective action to advance political ideas or beliefs through the courts. *Button*, 371 U.S. at 429-33. In doing so, the Supreme Court has repeatedly made clear that associating for the sole purpose of political expression, as opposed to the advancement of commercial interests, occupies the heartland of the First Amendment's protection. Here, organizations like Upsolve and the NAACP seek to associate for the purposes of political expression—to voice a political stance on the abuse of state-enabled debt collection mechanisms, particularly as that abuse disproportionately affects communities of color and low-income individuals.

*Button* involved the NAACP's challenge to the application of Virginia laws regulating legal solicitation to prohibit the NAACP from assisting Black communities in litigation to end school desegregation. *See* 371 U.S. at 419-26. In holding that Virginia's laws "unduly

inhibit[ed]" the NAACP's freedoms of expression and association, *Button* emphasized that the NAACP's court-directed activities were "a form of political expression," aimed at "achieving the lawful objectives of equality of treatment by all government … for the members of the [Black] community in this country." *Id.* at 429, 437. Indeed, *Button* observed that, at the time, litigation was perhaps "the *sole* practicable avenue open to a minority to petition for redress of grievances." *Id.* at 430 (emphasis added). Absent the constitutional protections afforded to the right to associate, "a statute broadly curtailing group activity leading to litigation may easily become a weapon of oppression"—"[i]ts mere existence could well freeze out of existence all such [advocacy] on behalf of the civil rights of Negro citizens." *Id.* at 435-36.

The Supreme Court reiterated *Button*'s core message in *In re Primus*, 436 U.S. 412 (1978), which involved South Carolina's attempt to prohibit the ACLU from seeking potential clients in litigation to further the ACLU's political objectives. Drawing comparisons to the NAACP's activities in *Button*, *Primus* described the ACLU's work "as a vehicle for effective political expression and association, as well as a means of communicating useful information to the public." *Id.* at 431.

"[M]uch like the NAACP," *Primus* explained, the ACLU engages "'in extensive educational and lobbying activities' and 'also [devotes] much of [its] funds and energies to an extensive program of assisting certain kinds of litigation on behalf of [its] declared purposes.'" *Id.* at 427 (quoting *Button*, 371 U.S. at 419-20). As in *Button*, *Primus* concluded that this kind of activity "is 'a form of political expression' and 'political association'" protected by the First Amendment's "freedom to engage in association for the advancement of beliefs and ideas." *Id.* at 428, 438 n.32 (quoting *Button*, 371 U.S. at 429, 431).

Like the NAACP in *Button* and the ACLU in *Primus*, Upsolve is a not-for-profit organization that seeks to associate with the aim of pressing its political and ideological views about the social injustices perpetuated by the corporate debt collection apparatus. It does so by reaching out to disadvantaged communities and providing them tools to seek redress. Upsolve's mission and activities thus are highly akin to those of "advocacy group[s] like the ACLU or the NAACP" that "have recognized associational rights." *Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third and Fourth Departments*, 852 F.3d 178, 186 (2d. Cir. 2017). In fact, Upsolve's agenda overlaps very closely

9

with aims of the NAACP, which, as explained further below, also associates with communities heavily affected by overly burdensome and improper debt collection practices. As in *Button* and *Primus*, therefore, Upsolve's efforts to aid underrepresented communities entail associational activity that "come[s] within the right 'to engage in association for the advancement of beliefs and ideas.'" *Primus*, 436 U.S. at 424 (quoting *Button*, 371 U.S. at 430).

### B. The right to associate protects collective activity intended to help people access the courts.

In *Button* and across a variety of contexts, the Supreme Court has also repeatedly reaffirmed the First Amendment's related protections for—and the virtues of—collective activity directed at helping each other access the courts in the first place to exercise the right to petition. *United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n*, 389 U.S. 217, 221-23 (1967) (establishing that the right to associate protects union activity "to assist its members in the assertion of their legal rights," even though the rights were not "bound up with political matters of an acute social moment"); *see also Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 741 (1983) ("[T]he right of access to the courts is an aspect of the First Amendment right to petition the Government for

redress of grievances."). As the Supreme Court has recognized, collective action often provides the only means of securing access to the courts. *See, e.g.*, *Primus*, 436 U.S. at 431 ("[T]he efficacy of litigation as a means of advancing the cause of civil liberties often depends on the ability to make legal assistance available to suitable litigants."). The assistance Upsolve seeks to provide—and that, as described below, the NAACP often does provide in one form or another—serves the same purpose and merits the same protection.

In a set of cases following *Button*, the Supreme Court repeatedly struck down efforts to limit union members' ability to band together to help each other bring employment-related claims. The first of those cases, *Brotherhood of R. R. Trainmen v. Virginia ex rel. Va. State Bar*, 377 U.S. 1 (1964), is representative. *Trainmen* established that "the First Amendment guarantees of free speech, petition and assembly give railroad workers the right to gather together for the lawful purpose of helping and advising one another in asserting the rights Congress gave them." *Id.* at 5-6. At issue in *Trainmen* was Virginia's attempt to bar a railroad workers' association from, in relevant part, advising members that their personal injury claims "not be settled without first seeing a

11

lawyer, and that in the [association's] judgment the best lawyer to consult was the counsel selected by it." *Id.* at 4. As in *Button*, *Trainmen* concluded that Virginia "could not, by invoking the power to regulate the professional conduct of attorneys, infringe in any way the right of individuals and the public to be fairly represented in lawsuits authorized by Congress to effectuate a basic public interest." *Id.* at 7. *Trainmen* reasoned that, because "[l]aymen cannot be expected to know how to protect their rights when dealing with practiced and carefully counseled adversaries," "for them to associate together to help one another to preserve and enforce rights granted them under federal laws cannot be condemned as a threat to legal ethics." *Id.* Instead, the workers' activity was "an inseparable part of th[e] constitutionally guaranteed right to assist and advise each other." *Id.* at 6; *see also, e.g.*, *United Mine Workers*, 389 U.S. at 221-22.

Fundamental to *Trainmen*'s and related decisions' protection of "group legal action" was the Supreme Court's recognition that the workers' "statutory rights … would be vain and futile if [the workers] could not talk together freely as to the best course to follow." *United Transp. Union*, 411 U.S. at 585; *see Brotherhood of R. R. Trainmen*, 377

12

U.S. at 5-6. As *Trainmen* explained, the collective action at issue in that case stemmed from nearly 100 years of effort by the railroad workers' association to create and advance employment-related protections. The association's advocacy was one of "the moving forces that brought about the passage of" legislation protecting railroad workers in the late Nineteenth and early Twentieth Century. *Id.* at 3. But "[i]t soon became apparent to the railroad workers … that simply having these federal statutes on the books was not enough to assure that the workers would receive the full benefit of" these statutory protections, *id.*—only by banding together to advise each other and coordinate legal action could these railroad workers secure their rights.

That same understanding—that rights written on paper often have no force absent protections for the activity necessary to effectuate them—motivates a number of Supreme Court decisions on access to the courts. Based on the constitutional significance of the right to petition, for example, the Supreme Court has "protected" the right of access by prohibiting state officials from interfering with individuals' attempts to prepare or file legal documents and from imposing certain fees on the indigent. *Lewis v. Casey,* 518 U.S. 343, 350 (1996) (citing *Johnson v.*

13

*Avery*, 393 U.S. 483, 484, 489-90 (1969); *Burns v. Ohio*, 360 U.S. 252, 258 (1959); *Griffin v. Illinois*, 351 U.S. 12, 19 (1956); and *Ex parte Hull*, 312 U.S. 546, 547-49 (1941)). And the Supreme Court has rejected limits on the provision of legal information, because of the value of pursuing legal action rather than "suffer[ing] … silently" and the critical importance of "the aggrieved receiv[ing] information regarding their legal rights and the means of effectuating them." *Bates*, 433 U.S. at 376, 376 n.32.

Here, in light of the necessarily judicial nature of debt collection actions, it is not enough to say that "litigation may well be the sole practicable avenue open to a minority to petition for redress of grievances." *Button*, 371 U.S. at 430. By the time a debt collection action has been instituted in court, litigation is the *only* option for fighting against the often racially discriminatory abuses of the system that produced and attend the action. For that possibility to pan out, however, courts must zealously safeguard the associational rights of plaintiffs and organizations like the NAACP to join together to help debtors access the courts.

14

## II. The First Amendment's protections for the right to associate in this context do not and cannot belong to lawyers alone.

As a practical matter, Amici can attest—based on their combined experience of nearly 200 years of organizing and advocating for political causes—to the fact that collective action only rarely involves lawyers. As a legal matter, the Supreme Court and this Court's decisions setting forth the protections afforded the First Amendment's right to associate in the context of access to the courts make clear that nothing limits that right to lawyers. Instead, those protections belong, like all those secured by the First Amendment, "to the people" and are shared by those who join together without profit motive to further meaningful access to the courts.[3] *Jacoby & Meyers*, 852 F.3d at 187.

That is where the district court went astray. The district court correctly recognized that "the 'common thread'" throughout the relevant

---

[3] That is subject, of course, to the appropriate limitations a state may place on the practice of law. *See, e.g.*, *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 792 (1975) ("The interest of the States in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice."). The appropriate breadth of those limitations, however, depends on the First Amendment protections at issue in this case. Br. for Plaintiffs-Appellees at 48-51 (discussing state's burden under First Amendment).

Supreme Court freedom-of-association precedents "is the principle that 'collective activity undertaken to obtain meaningful access to the courts is a fundamental right within the protection of the First Amendment.'" A190 (quoting *United Transp. Union*, 401 U.S. at 585). But it incorrectly concluded that these precedents are "fundamentally distinguishable" from this cause because they allegedly apply only to *attorneys* who seek to exercise this right. A191. Contrary to the district court's reasoning, the Supreme Court's precedents all "confront[] a non-lawyer's purported associational right." A191.

*Button*, *Primus*, and the Supreme Court's union cases are explicit that it is not lawyers, or at least not lawyers alone, who enjoy the right to associate to promote meaningful access to the courts. Instead, these cases uniformly "uph[eld] the First Amendment principle that *groups* can unite to assert their legal rights as effectively and economically as practicable." *United Transp. Union*, 401 U.S. at 580 (emphasis added). That is, it is the organizations, their members, and their staff—legal or otherwise—that ultimately possess the protected right to associate under the First Amendment.

16

Across its union cases, for instance, the Supreme Court has consistently recognized the rights of the union and union members—not their lawyers—to engage in collective activity to promote access to the courts. For example, *United Mine Workers* "upheld the right of *workers to act collectively* to obtain affordable and effective legal representation." *United Transp. Union*, 401 U.S. at 584 (emphasis added). In other cases, like *Button*, the Supreme Court specifically protected "the activities of the NAACP, its affiliates *and* legal staff"— in that case, the NAACP's longstanding efforts to use litigation to "achiev[e] the lawful objectives of equality of treatment by all"—such that its holding was not cabined to the NAACP's lawyers or lawyers themselves. 371 U.S. at 429, 437.

While these cases may involve lawyers, they leave no doubt that the protections of the First Amendment's right to associate arise from the expressive nature of the activity, not the profession of the actor. *See, e.g.*, *United Mine Workers*, 389 U.S. at 221-23 (explaining that the nature of the protected activity is "not confined to any [particular] field of human interest" (citation omitted)). In *Jacoby & Myers*, for example, this Court recently summarized the Supreme Court's union cases in

17

this space as "uniformly decid[ing] that unions and union members have rights under the First Amendment to associate and to act collectively to pursue legal action—action that *ordinarily* necessitates the involvement of lawyers." 852 F.3d at 187 (emphasis added). Ordinarily, but not always. As *United Transp. Union* cautioned, "the principle here involved cannot be limited to the facts of this case. At issue is the basic right to group legal action."[4] 401 U.S. at 585.

That lawyers need not be the agent of expression or association is reinforced by *Johnson v. Avery*, 393 U.S. 483 (1969). *Johnson* dealt with a challenge by an incarcerated individual to state prison regulations that prohibited him from helping other incarcerated individuals to file habeas petitions. *Id.* at 484. The Supreme Court struck down the regulation, because "[i]n the case of all except those who are able to help

---

[4] *United Transp. Union*'s explicit caution that "the principle here involved" in these cases "cannot be limited to the facts of this case" further calls into question the district court's decision to limit that principle to situations in which "clients and *attorneys* [sought] each other out to pursue litigation." A190. In general, the result *and* the reasoning of Supreme Court opinions are binding, *see Seminole Tribe of Fla. v. Florida*, 517 U. S. 44, 67 (1996), so the district court had little reason to attempt to limit the principle of *Button*, *Primus*, and the union cases to their facts.

18

themselves—usually a few old hands or exceptionally gifted prisoners—the prisoner is, in effect, denied access to the courts unless such help is available." *Id.* at 488. In barring the state from effectively "adopt[ing] and enforc[ing] a rule forbidding illiterate or poorly educated prisoners to file habeas corpus petitions," *id.* at 487, *Johnson* explicitly rejected the state's contention that it could prohibit nonlawyers from providing this help under "the power of the State to restrict the practice of law to licensed attorneys," *id.* at 490 n.11. In other words, *Johnson* affirmed the right of a nonlawyer to provide legal advice to a client, because "[t]he power of the States to control the practice of law cannot be exercised so as to abrogate federally protected rights." *Id.*

*Johnson*'s lesson, as Justice Douglas described in his concurring opinion, is that "[t]he cooperation and help of laymen, as of lawyers, is necessary if the right of reasonable access to the courts is to be available to the indigents among us." 393 U.S. at 498. That lesson applies with equal force here. Beyond flying in the face of precedent, confining "group legal action" to "group legal action involving lawyers" further entrenches inequalities among who can access and use our legal system, perhaps especially in the context of debt collection. *See infra.*

19

The "indigents among us" are disproportionately people of color, and there are far too few lawyers—a profession with disproportionately few members of color—to ensure that they have "reasonable access to the courts," let alone the "meaningful access" plaintiffs and the NAACP seek to secure. But the First Amendment protects "collective activity undertaken to obtain meaningful access to the courts," *United Transp. Union*, 401 U.S. at 585, regardless of whether that activity involves lawyers.

## III. The NAACP's debt-related advocacy demonstrates why it is vitally important that the right to associate protects plaintiffs' efforts to expand access to the courts.

The NAACP undertakes a variety of forms of collective action to redress debt-related inequities. Broad as these efforts are, however, they are inadequate to provide the debtors who are at the heart of this case with the access to courts they need to secure their rights in debt collection actions. For these debtors, only helpful and tailored legal advice can provide recourse. Without that advice, they are far more likely to default and lose the cases brought against them. Because these debtors are disproportionately people of their color, their losses compound the harms caused by our unequal debt collection system—the

20

very harms the NAACP seeks to eliminate through its other forms of advocacy and collective action.

The NAACP's debt-related advocacy is extensive. The NAACP has, among other efforts, launched a campaign to advocate for student loan forgiveness. *See $50K & Beyond*, NAACP, https://tinyurl.com/y2bmz78u (last visited Jan. 11, 2023). The NAACP has sued to end unjust debt collection practices. *See, e.g.*, *Ga. Conf. of the NAACP v. City of LaGrange*, No. 3:17-cv-67 (N.D. Ga. 2020) (successfully challenging city's policy of cutting off utility services to residents who do not pay court debts). The NAACP has supported and helped pass new legislation in New York to lower interest rates on judgments against debtors who lose a consumer debt action. *See* Mark E. Blue & George F. Nicholas, *Another Voice: Debt law would fix an economic and racial injustice*, Buffalo News (Dec. 2, 2021), https://tinyurl.com/3re8667m. And the NAACP has worked alongside consumer advocates to provide general guidance to NAACP members so that they better understand debt collection practices and the debt collection system.

The intensity of these efforts reflects the profound consequences of debt for the Black community. Generational wealth gaps have left

disproportionately high numbers of people of color in debt. *See* Miranda Santillo et al., *Communities of Color Disproportionally Suffer from Medical Debt*, Urb. Inst. (Oct. 14, 2022), https://tinyurl.com/4eapw8da; Tashfia Hasan et al., *Disparities in Debt: Why Debt Is a Driver in the Racial Wealth Gap*, Aspen Inst. (Feb. 7, 2022), https://tinyurl.com/d9664vss. Black individuals typically pay higher interest rates on their debt, seemingly regardless of the size of that debt. *See Payday Lending in America: Who Borrows, Where They Borrow, and Why*, Pew Charitable Trusts 9, 13 (July 2012), https://tinyurl.com/yheawuyj; Khristopher J. Brooks, *Disparity in home lending costs minorities millions, researchers find*, CBS News (Nov. 15, 2019), https://tinyurl.com/mr42kk9f. And they are more likely than their white counterparts to fall behind on their debt—in New York, 29% of residents in communities of color are delinquent on their debt, as compared to 19% of residents in predominantly white neighborhoods. *Debt in America: An Interactive Map*, Urb. Inst. (Mar. 31, 2021), https://tinyurl.com/5b5v3yyx.

These underlying disparities don't stop at the courthouse door—judicially enforced debt collection causes debt consequences to cascade.

Black debtors are more likely to be subject to collection actions over their debt. *See How Debt Collectors Are Transforming the Business of State Courts*, Pew Charitable Trusts 17 (May 6, 2020), https://tinyurl.com/4hwzmjmp. And, when faced with these actions, Black defendants are also far more likely to default than other defendants, even when accounting for income. Paul Kiel & Annie Waldman, *The Color of Debt: How Collection Suits Squeeze Black Neighborhoods*, ProPublica (Oct. 8, 2015), https://tinyurl.com/2jdpmu6e. In general, "black families [have] grossly fewer resources to draw on when they come under financial pressure." *Id.* But higher default rates also arise specifically from the fact that communities of color have particularly uneven and inadequate access to legal information and legal representation. Low-income individuals only rarely have legal representation in debt collection actions, but low-income Black individuals are especially unlikely to seek legal help or to find it when they do. *See id.*; Sara Sternberg Greene, Race, Class, and Access to Civil Justice, 101 Iowa L. Rev. 1263, 1268 (2016) ("[B]lack respondents in this study were less likely than white respondents to have sought, or considered seeking, legal help for their civil legal problems."). Local

23

NAACP leaders grapple with this dynamic directly: As members and leaders of their respective communities, they interact frequently with other community members who are unsure of whether or where to turn for legal help; there are often no lawyers to whom they can be referred.

Defaulting has severe ramifications. A default judgment often triggers automatic interest rates and court fees, *see How Debt Collectors Are Transforming the Business of State Courts*, *supra*, at 2, 17, and allows creditors to seek wage garnishment. Further, defaulting almost entirely extinguishes the debtor's chances to challenge inaccurate or discriminatory debt collection practices, which, studies have shown, pervade throughout the debt collection system. *See, e.g.*, Chris Albin-Lackey, *Rubber Stamp Justice: US Courts, Debt Buying Corporations, and the Poor*, Human Rights Watch 28-32 (Jan. 2016), https://tinyurl.com/w8wphts5. Over time, default judgments contribute to job loss, housing instability, and even incarceration—issues that disproportionately affect the Black community.

So, for debtors facing a debt collection action, the battleground for advocacy is the courts. Organizations like the NAACP can advocate for debt relief or lower interest rates; they can inveigh against

24

discrimination in our debt collection system. But New York's UPL rules limit the ways in which plaintiffs and the NAACP can use advocacy to help debtors exercise their rights and, in effect, prevent Black and low-income debtors from losing those debt collection actions in the first place.

Through programs like Upsolve's, the NAACP's volunteer leaders and members could serve as they so often do in other contexts: To provide the advice their neighbors, friends, and community members need and often look to their local NAACP for.[5] Providing that advice about the law is critical to a debtor who has only thirty days to respond to a debt collection action and facilitate meaningful access to the courts.

---

[5] The NAACP specifically tailors programming around UPL provisions. For example, the NAACP runs a community-based housing program in South Carolina that strives to expand meaningful access to the courts by providing tenants facing eviction actions with basic information and referrals. Under South Carolina's housing laws, tenants who have an eviction action filed against them "must appear and show cause"—*i.e.*, request a hearing—within ten days of the filing to prevent a magistrate judge from summarily issuing a writ of ejectment. S.C. Code § 27-37-40. In practice, most tenants facing an eviction action in South Carolina default. Because of South Carolina's UPL rules, the NAACP trains its community volunteers to provide only general information about the hearing process, and not concrete advice about how and why to request a hearing.

And it falls within "th[e] constitutionally guaranteed right to assist and advise each other." *Trainmen*, 377 U.S. at 6.

## CONCLUSION

For the foregoing reasons, Amici respectfully request that this Court affirm the district court's grant of a preliminary injunction.

Respectfully submitted,

*/s/ Daniel A. Rubens*

| | |
|---|---|
| Joseph R. Schottenfeld | Daniel A. Rubens |
| Martina Tiku | Jodie C. Liu |
| Glynnis Hagins | ORRICK, HERRINGTON & |
| NAACP \| EMPOWERMENT | SUTCLIFFE LLP |
| PROGRAMS | 51 West 52nd Street |
| 4805 Mount Hope Drive | New York, NY 10019 |
| Baltimore, MD 21215 | (212) 506-5000 |
| (203) 444-9577 | |

Sarah H. Sloan
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
1152 15th Street, N.W.
Washington, DC 20005
(202) 339-8400

*Counsel for Amici Curiae*

January 11, 2023

26

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Second Circuit Local Rule 29.1(c) because this brief contains 5094 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Daniel A. Rubens*
Daniel A. Rubens
*Counsel for Amici Curiae*