# 22-1345

IN THE

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

FOR THE

# 𝔖𝔢𝔠𝔬𝔫𝔡 ℭ𝔦𝔯𝔠𝔲𝔦𝔱

UPSOLVE, INC., REVEREND JOHN UDO-OKON,

*Plaintiffs-Appellees,*

v.

LETITIA JAMES, in her official capacity as Attorney General of New York,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of New York

## *AMICUS* BRIEF OF PROFESSOR REBECCA L. SANDEFUR AND 22 EMPIRICAL SCHOLARS IN SUPPORT OF APPELLEES

Peter Karanjia
DLA PIPER LLP (US)
500 Eighth Street, N.W.
Washington, DC 20004
(202) 799-4135
peter.karanjia@us.dlapiper.com

*Counsel for Amici Curiae Professor Rebecca L. Sandefur & Empirical Scholars*

TABLE OF CONTENTS

Page

IDENTITY AND INTEREST OF AMICI CURIAE ...............................................1

SUMMARY OF ARGUMENT ...............................................................................2

ARGUMENT ..........................................................................................................4

    I.     The Crisis of Access to Civil Justice......................................................4

         A.    Impact on Individuals Facing Debt Collection Actions .............4

         B.    Impacts on the Courts and the Justice System.........................12

    II.    Social Science Research Demonstrates the Safety and Effectiveness of Legal Services and Solutions Provided by Nonlawyers...........................................................................................15

         A.    Common Law Countries Outside the United States Have Demonstrated Success in Responding to Access to Justice Issues with Nonlawyer Solutions............................17

         B.    Communities in the United States Have Also Begun to Successfully Rely on Trained Nonlawyers to Address the Access to Justice Gap.........................................................24

CONCLUSION .....................................................................................................27

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Penson v. Ohio*,
    488 U.S. 75 (1988)....................................................................12

*Turner v. Rogers*,
    564 U.S. 431 (2011)..................................................................24

**Other Authorities**

American Bar Association, *Supporting Justice: A Report on the Pro
    Bono Work of America's Lawyers*, (2017),
    https://www.americanbar.org/content/dam/aba/administrative/prob
    ono_public_service/ls_pb_supporting_justice_iv_final.pdf................8

Matthew Burnett & Rebecca L. Sandefur, *Designing Just Solutions at
    Scale: Lawyerless Legal Services and Evidence-Based Regulation*,
    RDP, Brasília, 19 ......................................................................20

Anna E. Carpenter, Alyx Mark, & Colleen F. Shanahan, *Trial and
    Error: Lawyers and Nonlawyer Advocates*, 42 Law & Soc. Inquiry
    1023 (2017)................................................................................23

Committee on Civil Court & Consumer Affairs, New York City Bar,
    *Report on the Consumer Credit Fairness Act* (May 28, 2021),
    https://www.nycbar.org/member-and-career-
    services/committees/reports-listing/reports/detail/report-on-the-
    consumer-credit-fairness-act#_ftnref9.........................................7

Congressional Research Service, R46554, *Unemployment Rates
    During the Covid-19 Pandemic,* (Aug. 20, 2021),
    https://sgp.fas.org/crs/misc/R46554.pdf. ...................................11

Consortium on Legal Services & the Public, American Bar
    Association, *Legal Needs and Civil Justice: A Survey of
    Americans*, (1994),
    https://www.americanbar.org/content/dam/aba/administrative/legal
    _aid_indigent_defendants/downloads/legalneedstudy.pdf.................5

Citizens Advice, *Who We Are and What We Do*,
https://www.citizensadvice.org.uk/about-us/about-
us1/introduction-to-the-citizens-advice-service/ .................................................18

J. Dugard & K. Drage, *To Whom Do the People Take Their Issues?*
*The Contribution of Community-Based Paralegals to Access to*
*Justice in South Africa*. Justice and Development Working Paper
Series, no. 21. World Bank Group, Washington, DC. 2013...............................21

Federal Trade Commission, *Repairing a Broken System: Protecting*
*Consumers in Debt Collection Litigation & Arbitration* (2010),
https://www.ftc.gov/sites/default/files/documents/reports/federal-
trade-commission-bureau-consumer-protection-staff-report-
repairing-broken-system-protecting/debtcollectionreport.pdf............................7

Hazel Genn & Yvette Genn, *The Effectiveness of Representation at*
*Tribunals* (London: Lord Chancellor's Department 1989) ........................17, 19

Bruce A. Green, *Why State Courts Should Authorize Non-Lawyers to*
*Practice Law*, 91 Fordham L. Rev. 15 (2023).....................................................15

Gillian K. Hadfield, *Higher Demand, Lower Supply? A Comparative*
*Assessment of the Legal Resource Landscape for Ordinary*
*Americans*, 37 Fordham Urban L.J. 129 (2010) ...................................................8

Human Rights Watch, *Rubber Stamp Justice: US Courts, Debt Buying*
*Corporations, and the Poor* (Jan. 20, 2016)
https://www.hrw.org/report/2016/01/20/rubber-stamp-justice/us-
courts-debt-buying-corporations-and-poor#_ftn96 .................................9, 16, 24

Institute for the Advancement of the American Legal System &
Hague Institute for the Innovation of Law, *Justice Needs &*
*Satisfaction in the United States of America* (2021)
https://iaals.du.edu/sites/default/files/documents/publications/justic
e-needs-and-satisfaction-us.pdf ...............................................................5, 11, 12

Paul Kiel & Annie Waldman, *The Color of Debt: How Collection*
*Suits Squeeze Black Neighborhoods*, ProPublica, Oct. 8, 2015,
https://www.propublica.org/article/debt-collection-lawsuits-
squeeze-black-neighborhoods...............................................................................10

Herbert M. Kritzer, *Legal Advocacy: Lawyers and Nonlawyers at Work* 113 (1998) ...................................................................................23, 26

Sheldon Krantz, *There Is No Justice When Low & Modest Income DC Residents Are Forced to Represent Themselves in Civil Cases*, 24 U.D.C. L. Rev. 18 (2021) ...................................................................21

The Legal Aid Society et al., *Debt Deception: How Debt Buyers Abuse the Legal System to Prey on Lower-Income New Yorkers* (2010) https://www.neweconomynyc.org/wp-content/uploads/2014/08/DEBT_DECEPTION_FINAL_WEB-new-logo.pdf ...........................................................................................6

*Legal Services Commission's 'Money Advice Outreach Pilot,'* Money & Pensions Service Financial Capability Secretariat, https://www.fincap.org.uk/en/evaluations/legal-services-commission-s-money-advice-outreach-pilot#key-findings ...............................18

Legal Services Corporation, *The Justice Gap: Measuring the Unmet Civil Legal Needs of Low income Americans, 6* (2017), https://www.lsc.gov/sites/default/files/images/TheJusticeGap-FullReport.pdf ..................................................................................10

Leslie C. Levin, *The Monopoly Myth and Other Tales About the Superiority of Lawyers*, 82 Fordham L. Rev. 2611 (2014) .........................26, 27

Sharon Miki, *Lawyer Statistics for Success in 2022*, CLIO Blog, Dec. 21, 2021, https://www.clio.com/blog/lawyer-statistics/ .......................................7

National Center for State Courts, *State of the State Courts in a (Post) Pandemic World: Results from a National Public Opinion Poll,* (2020), https://www.ncsc.org/__data/assets/pdf_file/0005/41000/COVID19-Poll-Presentation.pdf ............................................................................14

Andy Newman, *They Need Legal Advice on Debts. Should It Have to Come From Lawyers?*, NY Times, Jan. 25, 2022, https://www.nytimes.com/2022/01/25/nyregion/consumer-debt-legal-advice.html....................................................................................6

*Judges*, New York City Small Claims Court, https://nycourts.gov/COURTS/nyc/smallclaims/welcome.shtml......................13

*Welcome*, New York City Small Claims Court,
https://nycourts.gov/COURTS/nyc/smallclaims/welcome.shtml ....................... 13

Permanent Commission on Access to Justice, *Report to the Chief
Judge of the State of New York,* 22 (Nov. 2015),
http://ww2.nycourts.gov/sites/default/files/document/files/2018-
04/2015_Access_to_Justice-Report-V5.pdf .......................................................... 8

Permanent Commission on Access to Justice, *Report to the Chief
Judge of the State of New York* 29 (Nov. 2018)
ww2.nycourts.gov/sites/default/files/document/files/2018-
12/18_ATJ-Comission_Report.pdf ....................................................................... 6

Permanent Commission on Access to Justice, *Report to the Chief
Judge of the State of New York,* 18 (Nov. 2022),
www.nycourts.gov/LegacyPDFS/accesstojusticecommission/22_A
TJ-Commission_Report.pdf ................................................................... 7, 9, 10, 15

The Pew Charitable Trusts, *How Debt Collectors Are Transforming
the Business of State Courts,* (2020), https://www.pewtrusts.org/-
/media/assets/2020/06/debt- collectors-to-consumers.pdf .............................. 6, 7

Rebecca L. Sandefur & Emily Denne, *Access to Justice and Legal
Services Regulatory Reform.* Ann. Rev. Law Soc. Sci. 2022.
18:7.1–7.16 .......................................................................................................... 26

Rebecca L. Sandefur, *Access to What?*, 148 Daedalus 49 (2019) ........................... 6

Rebecca L. Sandefur & James Teufel, *Assessing America's Access to
Civil Justice Crisis*, 11 U.C. Irvine L. Rev. 753 (2021) ...................................... 6

Rebecca L. Sandefur, *The Fulcrum Point of Equal Access to Justice:
Legal and Nonlegal Institutions of Remedy*, 42 LOYOLA L.A. LAW
REV. 949 (2009) .................................................................................................. 22

Rebecca L. Sandefur, *The Impact of Counsel: An Analysis of
Empirical Evidence*, 9 Seattle J. Soc. Just. 51 (2010) ....................................... 17

Rebecca L. Sandefur, *Legal Advice from Nonlawyers: Consumer
Demand, Provider Quality, and Public Harms*, 16 Stanford J. Civil
Rights & Civil Liberties 283 (2020) ............................................................*passim*

Rebecca L. Sandefur, *Lawyers' Pro Bono Service and Market-Reliant Legal Aid*, in *Private Lawyers and the Public Interest: The Evolving Role of Pro Bono in the Legal Profession* (Oxford Univ. Press 2009)..............................................................................................8

Marisol Smith & Ashish Patel, *Money Advice Outreach Evaluation: Cost and Effectiveness of the Outreach Pilots,* (2008), http://www.infohub.moneyadvicetrust.org/content_files/files/debto utreachcosteffectiveness.pdf........................................................................18, 19

Social Security Administration, *Your Right to Representation* (2020), https://www.ssa.gov/pubs/EN-05-10075.pdf .....................................................26

*Recognized Organizations and Accredited Representatives Roster by State and City*, U.S. Dep. Justice, https://www.justice.gov/eoir/recognized-organizations-and-accredited-representatives-rosterstate-and-city .................................................26

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

Dr. Rebecca L. Sandefur is a leading scholar and sociologist with expertise in access to civil justice. She is Professor in the College of Liberal Arts and Sciences at Arizona State University and Faculty Fellow at the American Bar Foundation (ABF), an independent, non-partisan research organization focused on the study of law and legal processes. In 2018, Professor Sandefur was named a MacArthur Fellow for her development of a new evidence-based approach to access to civil justice for low-income people.

Professor Sandefur has served on a number of commissions exploring ways to improve access to justice in the United States and globally, including with the American Bar Association, the American Academy of Arts and Sciences, the Organisation for Economic Co-operation and Development (OECD), and the World Bank. She co-chaired a project at the American Academy to improve the collection and use of data about civil justice in the United States. Her work, which has been funded by the National Science Foundation, has received numerous awards, including from the National Center for Access to Justice (2015) and the National Center for State Courts (2020). In 2013, she was The Hague Visiting Chair in the Rule of Law.

---

[1] No counsel for a party authored Professor Sandefur's *amicus* brief in whole or in part, and no party or party's counsel contributed money to fund preparing or submitting the brief. All parties have consented to the filing of this brief.

1

In this *amicus* brief, Professor Sandefur is joined by 22 empirical scholars who study the legal profession, the provision of legal services across jurisdictions, and people's interaction with the legal system. The full list and qualifications of *Amici* joining this *amicus* brief are included in the appendix. In the brief, *Amici* review social science research that supports Appellees' claim that qualified nonlawyers can perform an essential role in helping people to protect their rights in debt collection proceedings. *Amici'*s knowledge of the field is a product of research over several decades on the barriers that prevent people from securing access to justice.

Specifically, *Amici* provide the Court with data documenting the gravity of this problem, including its detrimental effects on not only the individuals directly involved, but also on the courts and the justice system more broadly. *Amici* also discuss the effectiveness of alternative solutions, such as Upsolve's "Justice Advocates" program, that rely on trained nonlawyers. The evidence shows that these nonlawyers can be highly effective in providing quality advice to help bridge the access to justice gap, especially where legal aid and *pro bono* legal representation are in short supply.

## SUMMARY OF ARGUMENT

Echoing broader national trends, New York faces an increasingly acute crisis of access to civil justice that places hundreds of thousands of unrepresented people

in debt collection proceedings and undermines the legitimacy of the courts, as well as the rule of law itself.

Like countless others across the country, the vast majority of New Yorkers facing debt collection actions cannot afford counsel and are unable to adequately represent themselves. As a result, they frequently fail to appear in court to assert their legal rights, and state courts routinely enter default judgments against them. This crisis was already severe before the Spring of 2020, when the COVID-19 pandemic commenced. Since then, it has reached emergency proportions. A relentless onslaught of legal challenges continues to severely burden ordinary Americans, including debt enforcement proceedings, as well as employment matters, and disputes over rent and healthcare coverage. This crisis has hit low-income households, racial minorities, and rural communities particularly hard, and it has magnified the already deeply entrenched social and economic inequalities in this country.

One underexplored option for addressing the justice gap is the use of trained nonlawyers who, the evidence shows, can rapidly become experts in legal processes. Such legal processes—including, for example, handling actions in small claims court—can be unfamiliar even to many attorneys. Research concerning programs in other States, common law jurisdictions, and federal programs demonstrates the success of trained nonlawyers in helping overcome three access to justice barriers:

1) helping the individuals involved in these proceedings recognize the legal nature of their problems; 2) increasing the likelihood that these individuals will more actively engage with the legal process, including attending their court hearings; and 3) helping overburdened courts decide more cases on the merits, thereby improving procedural justice and the rule of law.

In each of these ways, Upsolve's program likewise can improve the fairness and effectiveness of our civil justice system. Given the scarcity of legal aid and *pro bono* resources for the hundreds of thousands of New Yorkers who cannot afford to hire counsel to vindicate their rights in civil debt collection proceedings, Upsolve should be allowed to deploy its well-designed and focused nonlawyer training to substantially improve access to justice for those who desperately need it.

## **ARGUMENT**

### I.     **The Crisis of Access to Civil Justice**

#### A.     **Impact on Individuals Facing Debt Collection Actions**

The access to justice crisis in this country has existed for decades and persists to this day, including in New York. In 1992, the American Bar Association commissioned a landmark study (*Legal Needs and Civil Justice*) that found approximately half of American households surveyed "faced some situation that raised a legal issue[,]" with 47% of low-income households and 52% of moderate-

4

income households reporting at least one legal need.[2]  Of those households facing legal issues, 41% of low-income households and 42% of moderate-income households were forced to deal with them without legal assistance, and an additional 38% of low-income households and 26% of moderate-income households took no action at all.[3]  Only 29% of low-income households turned to the civil justice system to attempt to resolve their issues, and only 39% of moderate-income households did so.  According to the report, "[t]he predominant reasons for low-income households not seeking legal assistance were a sense that it would not help and that it would cost too much."[4]

Thirty years later, the situation is unfortunately no better.  For example, a 2020 study commissioned by the Institute for the Advancement of the American Legal System (IAALS) surveyed over 10,000 Americans nationally.  The IAALS study found that Americans experience over 250 million civil justice problems annually, of which fully 120 million go unresolved.[5]

---

[2] Consortium on Legal Services & the Public, American Bar Association, *Legal Needs and Civil Justice: A Survey of Americans*, 9 (1994), https://www.americanbar.org/content/dam/aba/administrative/legal_aid_indigent_defendants/downloads/legalneedstudy.pdf.

[3] *Id.* at 17.

[4] *Id.* at 20.

[5] Institute for the Advancement of the American Legal System & Hague Institute for the Innovation of Law, *Justice Needs & Satisfaction in the United States of America*, 6 (2021) (hereinafter *IAALS Report*),

Cases involving consumer debt are emblematic of this broader trend. According to Pew, each year approximately four million Americans are sued in debt collection matters. Of those, over 90% reportedly receive no legal representation at all.[6] The problem is even more acute in New York State, where in 2018 and 2019, a total of 265,000 consumer debt suits were filed in city and district civil courts; in over 95% of them, the defendants were not represented by a lawyer, and 88% did not even respond to the suit.[7] This is in line with other reports, reflecting that debt collection suits in New York favored the debt buyer the vast majority of the time.[8]

---

https://iaals.du.edu/sites/default/files/documents/publications/justice-needs-and-satisfaction-us.pdf; *see also* Rebecca L. Sandefur, *Access to What?*, 148 Daedalus 49, 49-55 (2019); Rebecca L. Sandefur & James Teufel, *Assessing America's Access to Civil Justice Crisis*, 11 U.C. Irvine L. Rev. 753, 753 (2021).

[6] The Pew Charitable Trusts, *How Debt Collectors Are Transforming the Business of State Courts,* 1 & 14 (2020), https://www.pewtrusts.org/-/media/assets/2020/06/debt-collectors-to-consumers.pdf.

[7] Andy Newman, *They Need Legal Advice on Debts. Should It Have to Come From Lawyers?*, NY Times, Jan. 25, 2022, https://www.nytimes.com/2022/01/25/nyregion/consumer-debt-legal-advice.html. In this respect, debt collection proceedings reflect a broader access to justice gap that persists in this State; *see* Permanent Commission on Access to Justice, *Report to the Chief Judge of the State of New York* 29 (Nov. 2018) (hereinafter *2018 Annual Report*), ww2.nycourts.gov/sites/default/files/document/files/2018-12/18_ATJ-Comission_Report.pdf ( "Data suggests that the number of unrepresented litigants statewide remains unacceptably high, with percentages in particular case types, such as child support and consumer debt, near or above 90%.").

[8] The Legal Aid Society et al., *Debt Deception: How Debt Buyers Abuse the Legal System to Prey on Lower-Income New Yorkers,* 8-9 (2010) (hereinafter *Debt Deception*), https://www.neweconomynyc.org/wp-

Again, this echoes the broader crisis across the country, with over 70% of Americans losing debt collection suits by default.[9]  In sum, there continues to be a "growing need for legal assistance in consumer matters," especially given that "[d]uring the pandemic, the prevalence of consumer problems increased exponentially, particularly medical debt and consumer credit issues."[10]

This lack of representation is not surprising.  With attorneys' average hourly rates of $300 by early 2021,[11] finding counsel is out of reach for many.  And both in New York and nationwide, legal aid and *pro bono* resources are simply insufficient

---

content/uploads/2014/08/DEBT_DECEPTION_FINAL_WEB-new-logo.pdf; Permanent Commission on Access to Justice, *Report to the Chief Judge of the State of New York,* 18 (Nov. 2022) (hereinafter *2022 Annual Report*), www.nycourts.gov/LegacyPDFS/accesstojusticecommission/22_ATJ-Commission_Report.pdf ("There are over 100,000 default judgments against consumers per year in New York State.").

[9] The Pew Charitable Trusts, *supra* note 6, at 2.  *See also* Federal Trade Commission, *Repairing a Broken System: Protecting Consumers in Debt Collection Litigation & Arbitration,* 7 (2010), https://www.ftc.gov/sites/default/files/documents/reports/federal-trade-commission-bureau-consumer-protection-staff-report-repairing-broken-system-protecting/debtcollectionreport.pdf (Federal Trade Commission estimate that, nationwide, between "sixty percent to ninety-five percent of consumer debt collection lawsuits result in defaults[.]").

[10] *2022 Annual Report* 54; Committee on Civil Court & Consumer Affairs, New York City Bar, *Report on the Consumer Credit Fairness Act* (May 28, 2021), https://www.nycbar.org/member-and-career-services/committees/reports-listing/reports/detail/report-on-the-consumer-credit-fairness-act#_ftnref9.

[11] Sharon Miki, *Lawyer Statistics for Success in 2022*, CLIO Blog, Dec. 21, 2021, https://www.clio.com/blog/lawyer-statistics/.

to meet the acute need.  Research confirms that *pro bono* assistance nationwide does not come close to bridging the access to justice gap.  Economist and legal scholar Gillian Hadfield, for example, estimates that to offer just one hour of legal advice to every American facing civil legal problems, every one of the nation's more than one million lawyers would need to volunteer 100 hours annually.[12]  Yet, according to a 2016 study by the American Bar Association, only half (52%) of all lawyers engaged in any *pro bono* work—the equivalent of an average 37 *pro bono* hours per lawyer.[13]

Recent reports from the Permanent Commission on Access to Justice confirm that "[p]ro bono programs still receive more requests for assistance than they can satisfy . . . ."[14]  For example, in New York City, CLARO provides *pro bono* legal

---

[12] Gillian K. Hadfield, *Higher Demand, Lower Supply? A Comparative Assessment of the Legal Resource Landscape for Ordinary Americans*, 37 Fordham Urban L.J. 129, 152 (2010).

[13] American Bar Association, *Supporting Justice: A Report on the Pro Bono Work of America's Lawyers*, at v (2017), https://www.americanbar.org/content/dam/aba/administrative/probono_public_serv ice/ls_pb_supporting_justice_iv_final.pdf (analyzing *pro bono* commitments in calendar year 2016).  A further challenge is that lawyers' *pro bono* contributions are often counter-cyclical with respect to legal need:  When the economy contracts and lost employment and income leads Americans to have more problems with issues such as debt, the extent of lawyers' *pro bono* service decreases.  Rebecca L. Sandefur, *Lawyers' Pro Bono Service and Market-Reliant Legal Aid*, in *Private Lawyers and the Public Interest: The Evolving Role of Pro Bono in the Legal Profession* 99-114 (Oxford Univ. Press 2009).

[14] Permanent Commission on Access to Justice, *Report to the Chief Judge of the State of New York,* 22 (Nov. 2015), http://ww2.nycourts.gov/sites/default/files/document/files/2018-

advice to low-income consumers, but the demand is overwhelming, with dozens of people lining up to speak to volunteers.[15]  Even assuming the accuracy of Appellant's unsupported assertion (Br. at 25, 64) that services that currently exist for low-income defendants in debt collection suits "do not turn away clients," the abundant empirical data indisputably show a widespread need that is not being fulfilled.  Simply put, *pro bono* volunteers and legal aid are, to be sure, important contributors to narrowing the access to justice gap—but they come nowhere close to meeting it.

Although access to justice is a widespread concern, it hits certain households and groups in a more pernicious and pervasive manner.  According to the Legal Services Corporation, lower-income households bear the brunt of this hardship.  In 2017, 71% of low-income households experienced a civil legal problem (for example, a debt collection complaint or eviction proceeding), and 86% of those

04/2015_Access_to_Justice-Report-V5.pdf; *see* 2022 *Annual Report* 17-18 (Samantha Aguam, Deputy Executive Director of Volunteer Lawyers Project of Central New York testifying that there is a "relative lack of pro bono legal services outside of New York City"; and that "[t]here are over 100,000 default judgments against consumers per year in New York State" and "only about 4% of people are represented when sued for debt").

[15] Human Rights Watch, *Rubber Stamp Justice: US Courts, Debt Buying Corporations, and the Poor* (Jan. 20, 2016) (hereinafter *Rubber Stamp Justice*), https://www.hrw.org/report/2016/01/20/rubber-stamp-justice-us-courts-debt-buying-corporations-and-poor#_ftn96.

problems received inadequate or no legal help.[16]  The same is true for rural communities in New York.[17]

The impact on low-income households is more pronounced for racial minorities, especially Black Americans.  For example, even before the pandemic, elevated levels of default judgments against residents of predominantly Black communities were apparent.  One study, which surveyed judgments over five years in St. Louis, Chicago, and Newark, New Jersey, concluded that "even accounting for income, the rate of judgments was twice as high in mostly black neighborhoods as it was in mostly white ones."[18]

The COVID-19 pandemic has exacerbated the legal problems faced daily by ordinary Americans.  The pandemic has caused widespread job loss and the many cascading problems that emerge when people lose income—from unemployment insurance claims to unpaid bills and debts to unpaid rent and missed mortgage

---

[16] Legal Services Corporation, *The Justice Gap: Measuring the Unmet Civil Legal Needs of Low income Americans,* 6 (2017), https://www.lsc.gov/sites/default/files/images/TheJusticeGap-FullReport.pdf.

[17] *2022 Annual Report* 17-18.

[18] Paul Kiel & Annie Waldman, *The Color of Debt: How Collection Suits Squeeze Black Neighborhoods*, ProPublica, Oct. 8, 2015, https://www.propublica.org/article/debt-collection-lawsuits-squeeze-black-neighborhoods.

payments.  During the pandemic, unemployment rates rose as high as 14.8%,[19] and U.S. consumer debt rose by $800 billion (by 6%, the highest annual growth rate recorded in a decade) to a record high of $14.88 trillion.[20]  More generally, in 2020, 33% of Americans facing money problems attributed those problems to the pandemic.[21]

The pandemic has also accentuated the disproportionate effect of the access to justice crisis on racial minorities and low-income households.  According to one study, in 2020, "Black and Hispanic Americans . . . experienced higher unemployment rates during the pandemic than other groups[,]"[22] and "[p]oorer Americans, women, Black (non-Hispanic) and Hispanic Americans, and young people were more likely to identify an employment problem as their most serious legal problem."[23]  Overall, during the same period, multiracial (non-Hispanic) and Black (non-Hispanic) Americans encountered legal problems at higher rates than other racial/ethnic groups, at 74% and 71%, respectively.[24]  And Black Americans

---

[19] Congressional Research Service, R46554, *Unemployment Rates During the Covid-19 Pandemic, ii* (Aug. 20, 2021), https://sgp.fas.org/crs/misc/R46554.pdf.

[20] *IAALS Report* at 211.

[21] *Id.* at 202.

[22] *Id.* at 195.

[23] *Id.*

[24] *Id.* at 36.

typically experienced the most serious problems, including precarious housing, job losses, and lost income.[25]

In sum, the extraordinary hardships inflicted by the pandemic have exacerbated longstanding inequalities, including the acute lack of representation experienced by low-income—and, in particular, minority—communities in debt collection and other proceedings that have serious implications for their livelihoods. When people do not assert their legal rights (including, for example, by raising defenses to meritless collection actions), the result is adverse judgments that often cause a snowball effect on their lives and their communities, including mushrooming debt and, potentially, bankruptcy and housing insecurity.

## B.     Impacts on the Courts and the Justice System

These profound consequences of the access to justice crisis are not limited to the individuals named as defendants in debt collection proceedings.  They also extend to the courts and the justice system as a whole.

"The paramount importance of vigorous representation follows from the nature of our adversarial system of justice.  This system is premised on the well-tested principle that truth—as well as fairness—is 'best discovered by powerful statements on both sides of the question.'" *Penson v. Ohio*, 488 U.S. 75, 84 (1988) (quoting Kaufman, *Does the Judge Have a Right to Qualified Counsel?* 61 A.B.A.J.

---

[25] *Id.* at 29, 60.

569, 569 (1975)). While there is no constitutional right to counsel in most categories of civil (rather than criminal) matters, it remains the case that justice and the rule of law are advanced in our adversarial system when courts are able to hear competent arguments on both sides of a dispute. Yet where, as here, the overwhelming majority of debt collection cases heard by New York courts—by some counts, more than 85%[26]—result in default judgments because the defendant failed to appear in court to assert any defense, the system is not working as it should.

The lack of *any* legal assistance for these individuals (including, for example, the nonlawyer Justice Advocates that Appellees seek to provide) does a great disservice to the courts struggling to adjudicate the tidal wave of these cases.[27] In particular, it places a greater burden on these courts (which already manage very heavy case-loads[28]) to determine, without the benefit of hearing from the alleged debtor defendant, whether the collection action in question suffers from jurisdictional or other legal defects, such as a statute-of-limitations bar.

---

[26] *See* notes 7 & 8, *supra*.

[27] *See* note 7 *supra* (noting that more than 265,000 debt collection actions were filed in New York courts in 2018 and 2019).

[28] The Small Claims Court of the New York City Civil Court is "one of the busiest Small Claims Courts in the world." *See Welcome*, New York City Small Claims Court, https://nycourts.gov/COURTS/nyc/smallclaims/welcome.shtml. With over 40,000 cases filed each year, divided evenly among the 140 Civil Court judges, each judge would have an annual docket of 333 new cases. *See also id.*, *Judges*.

13

Our courts deserve better. In particular, they would benefit from having defendants appear and assert relevant defenses—aided by trained and experienced Justice Advocates—rather than attempting to do justice in a one-sided system where repeat-player attorneys for debt collection firms handily outmatch unrepresented and low-income individuals who do not understand the complexities of the legal process they must navigate and consequently often fail to appear. As noted, there is simply not enough legal aid and *pro bono* representation available for individuals in these sorts of state court proceedings. Thus, there can be no doubt that the advice provided by trained Justice Advocates is superior to no representation at all. Indeed, as discussed below, these nonlawyer representatives can provide high-quality assistance that may be superior even to that of attorneys who are not specialists in the relevant field.

The currently one-sided system also undermines public confidence in our justice system and the rule of law.[29] Where more than eight out of ten defendants

---

[29] Public confidence in the courts is already especially weak among many historically marginalized communities, including those who most acutely experience the lack of representation in legal proceedings. According to the National Center for State Courts' 2015 survey, for example, "only 32% of African Americans believe state courts provide equal justice to all." National Center for State Courts, *State of the State Courts in a (Post) Pandemic World: Results from a National Public Opinion Poll,* 4-5 (2020), https://www.ncsc.org/__data/assets/pdf_file/0005/41000/COVID19-Poll-Presentation.pdf. And as discussed, Black Americans experience a disproportionate number of default judgments for economic issues.

have default judgments entered against them without the court hearing any defense or explanation of their side of the case,[30] the public cannot have confidence that the system is working as it should.

Appellant repeatedly stresses (e.g., Br. at 25, 26, 35, 36, 53) that New York's unauthorized practice of law statute has been in effect for 125 years. But tradition alone cannot justify perpetuating a flawed system that has been under increasingly acute strain in recent years as the access to justice gap has turned into a chasm.[31]

## II. Social Science Research Demonstrates the Safety and Effectiveness of Legal Services and Solutions Provided by Nonlawyers

This problem is large and complex—but it is not without potential solutions.[32] Those solutions are found in the nonlawyer practice currently utilized by millions of

---

[30] *2022 Annual Report* at 18.

[31] Appellant's reliance (Br. at 55) on licensing requirements for other professions (medicine, in particular) also misses the mark. Apart from the fact that those fields involve different skills and qualification requirements from those relevant here, the medical profession is hardly supportive of Appellant's position. As explained in a recent article, "the medical profession has established stratified roles for many different categories of medical professionals, many of whom do not need as much training and experience as medical doctors[,]" and "there is plenty of evidence that the legal profession can serve the public equally well or better by expanding the range of people who are trained and certified to perform certain legal tasks for clients on their own, essentially as the medical profession has done with certain medical tasks." Bruce A. Green, *Why State Courts Should Authorize Non-Lawyers to Practice Law*, 91 Fordham L. Rev. 15 (2023).

[32] Advocate *Amici* in the district court claim that the main problem is "sewer service," "the practice of falsely claiming to serve litigants with notice of the lawsuit when no notice was ever provided." Brief of Advocate *Amici*, ECF No. 57

people in other countries, as well as growing numbers of people within the United States.  As discussed below, nonlawyers have provided high-quality representation that courts have commended—and they have routinely done so without the involvement of any lawyers.

Broadly speaking, "legal advice" is the application of knowledge about law, legal principles, or legal processes to specific facts or circumstances; creating an analysis of the situation (a diagnosis of its legal aspects); and suggestions about courses of action (proposed treatments).[33]  Nonlawyers are well equipped to provide legal advice in many straightforward, routine settings.  Indeed, the studies examining these practices in various contexts outside and within the United States reflect a consistent theme: nonlawyer providers can be highly effective when they are (1) trained and specialized, and (2) the issues at hand do not raise complex questions of substantive law.  That is precisely the situation that Upsolve rightly seeks to target.

---

("Advocate *Amici* Br.") at 4-5, 21-22 & n.17.  But Advocate *Amici* provide no statistical data to support that speculative claim. Furthermore, the "sewer service" issue is a longstanding problem that New York state has already taken steps to address, including by in 2014 imposing enhanced filing requirements on debtor plaintiffs proving service. *Rubber Stamp Justice* (citing New York State Unified Court System, *New Consumer Credit Rules and Resources*, 2015, https://www.nycourts.gov/rules/ccr/ (accessed Dec. 21, 2022)).  Regardless of the precise source of the crisis—which is likely too multifaceted to reduce to "sewer service" alone—Upsolve offers one well supported solution.

[33] Rebecca L. Sandefur, *Legal Advice from Nonlawyers: Consumer Demand, Provider Quality, and Public Harms*, 16 Stanford J. Civil Rights & Civil Liberties 283, 286-87 (2020) (hereinafter *Legal Advice*).

A.    **Common Law Countries Outside the United States Have Demonstrated Success in Responding to Access to Justice Issues with Nonlawyer Solutions**

The United States is certainly not alone in experiencing a lack of access to justice. In the late 1970s, the United Kingdom began to study its own access to justice problems and consider creative solutions.[34] Research in the United Kingdom showed that access to justice problems not only affected individual citizens' relationships with the law, but also had far-reaching effects: increasing expenditures on public benefits for loss of employment; increasing expenditures on medical services; and increasing public expense for temporary housing following evictions.[35]

The United Kingdom helped narrow the access to justice gap—in large part, by enabling individuals involved in routine but specialized legal proceedings (such as social security proceedings) to benefit from the advice of nonlawyers who have experience with these specific proceedings. A range of both voluntary sector and commercial services offer legal advice. The most well-known are "Citizens Advice" offices, lay-staffed community advice offices throughout the country. These offices

---

[34] Hazel Genn & Yvette Genn, *The Effectiveness of Representation at Tribunals* (London: Lord Chancellor's Department 1989).

[35] Rebecca L. Sandefur, *The Impact of Counsel: An Analysis of Empirical Evidence*, 9 Seattle J. Soc. Just. 51, 55 (2010).

now advise millions of people (including in person, online, and by telephone[36]) on justice issues at more than 2,500 locations in the United Kingdom.[37] The civil justice issues on which they advise include a wide range of matters, including debt, public benefits, employment, and family matters.[38]

In 2008, the Legal Services Research Centre studied the impact of nonlawyer advice services on debt in a program that used "partner agencies," including, among others, "community-based organisations" and housing support services.[39] The study found that the "projects were very successful at delivering advice to clients who had not sought advice before[,]" thus reaching many groups who had previously failed to assert their rights in debt claims.[40] The services delivered resulted in

---

[36] Citizens Advice, *Who We Are and What We Do*, https://www.citizensadvice.org.uk/about-us/about-us1/introduction-to-the-citizens-advice-service/.

[37] *Id.*

[38] *Id.*

[39] *Legal Services Commission's 'Money Advice Outreach Pilot,'* Money & Pensions Service Financial Capability Secretariat, https://www.fincap.org.uk/en/evaluations/legal-services-commission-s-money-advice-outreach-pilot#key-findings.

[40] Marisol Smith & Ashish Patel, *Money Advice Outreach Evaluation: Cost and Effectiveness of the Outreach Pilots,* 31 (2008), http://www.infohub.moneyadvicetrust.org/content_files/files/debtoutreachcosteffectiveness.pdf.

"approximately £6m of debt … [being] written off"[41] across 5,863 closed cases, or a debt reduction that averaged over £1,000 (about $1,340) per client.

Alongside legal advice providers, the United Kingdom has long permitted a range of nonlawyer advocates to appear in certain fora, such as social security hearings, immigration hearings, industrial tribunals, and mental health review tribunals. A landmark study conducted by a commission chaired by the Lord Chancellor found that lay specialists had a positive impact in all four types of administrative proceedings and were second to lawyers only in "industrial" (i.e., employment) disputes.[42] The judges presiding over these hearings agreed: "There was little agreement about the need for legal skills, although all tribunals agreed that specialist skills were required. In social security appeals, the view of tribunals was overwhelmingly that specialist lay advisers were *as good, and probably better, than the solicitors* who occasionally represented appellants."[43]

For social security hearings in the United Kingdom, the study found that access to legal advice from nonlawyer advisors almost doubled their odds of success on appeal. "In cases where appellants had not obtained advice before their hearing, appeals were allowed in just over one-quarter of cases (26%). Where appellants had

---

[41] *Id.* at 6.

[42] Sandefur, *Legal Advice*, *supra* note 33, at 305.

[43] Genn & Genn, *supra* note 34, at 216 (emphasis added).

obtained advice before their hearing, appeals were allowed in about 46% of cases."[44] And this was not the only benefit: Another advantage of obtaining pre-hearing advice was "to increase appellants' chances of succeeding by increasing the likelihood that they will attend their hearing."[45]

Two more foreign jurisdictions merit attention. Canada is another common law country that has successfully expanded the use of nonlawyer resources. Since 2007, Ontario has allowed licensed paralegals to engage in the limited independent practice of law, and today, nearly 10,000 such paralegals have been licensed by the Law Society of Ontario.[46] A study five years into the licensing scheme surveyed 1,000 people who had used these services for "traffic, small claims, landlord/tenant, worker's compensation, real estate, probate, and family issues."[47] Those surveyed stated that they went to paralegals because their services were more affordable, their matters were too simple to require a lawyer, and they believed the paralegals were experienced specialists.[48] And in South Africa, non-lawyer paralegals and community advice offices staffed by non-lawyers have played a fundamental role in

---

[44] *Id.* at 68.

[45] *Id.* at 68-69.

[46] Matthew Burnett & Rebecca L. Sandefur, *Designing Just Solutions at Scale: Lawyerless Legal Services and Evidence-Based Regulation*, RDP, Brasília, 19 n. 102, 104-119, at 109.

[47] Sandefur, *Legal Advice*, *supra* note 33, at 294.

[48] *Id.*

providing legal services for almost a hundred years—including, most notably, during the struggle against the racist Apartheid regime.[49]

Research also suggests that removing antiquated barriers to the use of nonlawyer specialists can increase the likelihood that people will take action to address their civil justice issues. For example, Professor Sandefur has compared studies addressing how people confronting civil access to justice issues respond to those problems in the United States and the United Kingdom. As shown below, the results (whether they reported (i) doing nothing, (ii) using nonlawyer resources, or (iii) retaining lawyers) are striking:

---

[49] *See* J. Dugard & K. Drage, *To Whom Do the People Take Their Issues? The Contribution of Community-Based Paralegals to Access to Justice in South Africa*. Justice and Development Working Paper Series, no. 21. World Bank Group, Washington, DC. 2013. South Africa's Community Advice Offices are staffed by paralegals and have a "long history of providing advice and information services to people who are marginalized through poverty, social circumstances, and geographical locations dating back to the apartheid era" on legal issues such as benefits, water sanitation, and housing. Sheldon Krantz, *There Is No Justice When Low & Modest Income DC Residents Are Forced to Represent Themselves in Civil Cases*, 24 U.D.C. L. Rev. 18 (2021).



**A Comparison of How People Handle Civil Justice Problems Involving Money and Housing: United States (1992) and England and Wales (2004)**

Data for the United States are based on 1,077 problems involving housing, real property, personal finances, and consumer needs from a sample of 3,087 households. The reference period for problems is one year.[93] Data for England and Wales are based on 453 problems involving livelihood, other sources of household income, housing security, housing conditions, and debt and credit from a sample of 4,667 individuals. The reference period for problems is three years or since the respondent turned eighteen.[94]

**FIGURE 4**

Rebecca L. Sandefur, *The Fulcrum Point of Equal Access to Justice: Legal and Nonlegal Institutions of Remedy*, 42 LOYOLA L.A. LAW REV. 949, 969 (2009).

The chart above shows that in the United States, people with access to justice problems are nearly as likely to do nothing, as to seek help from a legal resource. By contrast, respondents in the United Kingdom (specifically, England and Wales) often availed themselves of nonlawyers, such as the Citizens Advice offices.

22

This research supports appellees' claims in this case that Justice Advocates who are trained by Upsolve would be a valuable resource, likely to markedly improve the current problem of underrepresentation (even taking into account the limited extent of legal aid and *pro bono* assistance that is available to New Yorkers). *First*, as the District Court recognized (citing Professor Sandefur's *amicus* brief below), it makes sense that trained nonlawyers who have experience with a specialized legal process (e.g., debt collection proceedings or housing court proceedings) would be capable of providing more practical and effective legal advice than many attorneys, especially attorneys who have not handled such matters. A Justice Advocate "who has handled 50 debt collection matters, for example, would likely provide better representation than a patent lawyer who has never set foot in small claims court and last looked at a consumer contract issue when studying for the bar exam."[50] J.A. 202 (quoting *Amicus* Br. for Prof. Sandefur).

*Second*, even setting aside the ways in which Justice Advocates may be *more effective* than many lawyers, for the hundreds of thousands of individuals facing debt collections actions who cannot afford counsel (or find *pro bono* counsel),

---

[50] J.A. 204-205. Studies have shown that the effectiveness of lawyers versus nonlawyers turns more on specialized experience than formal qualifications such as a bar license. Herbert M. Kritzer, *Legal Advocacy: Lawyers and Nonlawyers at Work* 113 (1998); Anna E. Carpenter, Alyx Mark, & Colleen F. Shanahan, *Trial and Error: Lawyers and Nonlawyer Advocates*, 42 Law & Soc. Inquiry 1023, 1028 (2017).

23

representation by these nonlawyers is plainly better than no representation at all. And supervision of Justice Advocates by *pro bono* counsel is neither necessary nor feasible to effectively address this problem, as the above studies have shown.[51]

*Third*, the research discussed above shows that a simple but powerful benefit of access to free representation by Justice Advocates (or similar nonlawyer representatives) is that the individuals concerned become more invested in their cases and are much more likely to engage with the judicial process (including appearing in court). In this way, too, the Upsolve program not only helps the individuals facing debt collection actions, but also the courts hearing these cases and the justice system more broadly.

### B. Communities in the United States Have Also Begun to Successfully Rely on Trained Nonlawyers to Address the Access to Justice Gap

Courts, civil justice advocates, and scholars across the United States are starting to recognize the access to justice gap and the appeal of nonlawyer solutions. *See, e.g.*, *Turner v. Rogers*, 564 U.S. 431, 448 (2011) (refusing to grant a categorical right to counsel in child custody hearings in part because "assistance other than

---

[51] *Rubber Stamp Justice* ("[E]xperience shows that good results can be achieved simply by helping unrepresented defendants secure independent legal advice."). For example, in the context of landlord-tenant cases, "tenants who received informal legal advice but not formal legal representation achieved better results than average." *Id.* (citing Barbara L. Bezdek, *Silence in the Court: Participation & Subordination of Poor Tenants' Voices in Legal Process*, 20 Hofstra L. Rev. 533 (1992)).

purely legal assistance" can help ensure fairness).  Many states have responded with models that echo the success of the Citizen Advice offices in the United Kingdom. And when nonlawyers are available, people use them.

In Wisconsin, for instance, nonlawyers are permitted to help individuals involved in certain legal proceedings.  In 1991, 22% of all employee representatives in Wisconsin unemployment compensation appeals were nonlawyers; 38% of representatives in state tax appeals were nonlawyers.[52]  Other states are in various stages of expanding their own licensed legal practitioners.  For example, similar programs can be found in (1) Washington state, which has a licensing program for those who meet specific training, education, insurance, and examination requirements to offer family law services; (2) Utah, whose state supreme court and state bar created a program allowing licensed paralegals to provide legal advice and limited services in certain family disputes, eviction cases, and debt collection cases; and (3) Arizona, where a limited number of legal paraprofessionals are permitted to provide legal advice and representation in certain family law, civil, criminal, and

---

[52] Sandefur, *Legal Advice*, *supra* note 33, at 290.

state administrative cases.[53]  Additionally, certified legal preparers can prepare legal documents in California.[54]

The federal government also allows representation by nonlawyers in certain administrative hearings.  For immigration hearings, over 2,000 federally accredited nonlawyer immigration representatives deal with all sorts of legal matters faced by their clients, including representation in immigration court and before the Board of Immigration Appeals.[55]  Indeed, many of these services are provided by religious, community, and social services organizations, which are authorized by the U.S. Executive Office for Immigration Review to offer legal advice and representation through non-lawyer staff.[56]  To take another example, the Social Security Administration advises claimants appealing determinations of their right to representation, but it does not require that those representatives be licensed attorneys.[57]

---

[53] *See* Rebecca L. Sandefur & Emily Denne, *Access to Justice and Legal Services Regulatory Reform*.  Ann. Rev. Law Soc. Sci. 2022. 18:7.1–7.16, at 7.

[54] Leslie C. Levin, *The Monopoly Myth and Other Tales About the Superiority of Lawyers*, 82 Fordham L. Rev. 2611, 2615-16 (2014).

[55] Sandefur, *Legal Advice*, *supra* note 33, at 290.

[56] *See Recognized Organizations and Accredited Representatives Roster by State and City*, U.S. Dep. Justice, https://www.justice.gov/eoir/recognized-organizations-and-accredited-representatives-rosterstate-and-city.

[57] Kritzer, *supra* note 50, at 113; *see also* Social Security Administration, *Your Right to Representation* (2020), https://www.ssa.gov/pubs/EN-05-10075.pdf.

To be sure, nonlawyers are not the solution for every case (including in complex cases that present novel questions of law),[58] but this does not mean that they are not a good solution here. To the contrary, the social science research suggests that Justice Advocates will significantly help the hundreds of thousands of New Yorkers who otherwise would be likely to default in response to debt collection actions. This will lead to more just outcomes. It will also help overburdened state courts decide more cases on the merits—rather than on the happenstance of which defendants are unable to afford counsel or otherwise unable to mount their own defense. And it will further public confidence and trust in our legal system.[59]

## **CONCLUSION**

Like lawyers, nonlawyers need to study and train to properly advise people on their legal problems. The program developed by Upsolve, which includes comprehensive training, proposes to do just that. For the sake of the hundreds of thousands of New Yorkers in dire need of these services, and the state court judges drowning in these cases, this Court should affirm the District Court's preliminary injunction allowing Upsolve and its Justice Advocates to provide these much-needed

---

[58] Professor Sandefur's research suggests that the benefit of representation (as defined strictly by case outcome) varies significantly with the complexity at issue. Sandefur, *Legal Advice*, *supra* note 33, at 306; Levin, *supra* note 54, at 2618.

[59] *See* Sandefur, *Legal Advice*, *supra* note 33, at 301-02.

services without running afoul of New York's restrictions on the unauthorized practice of law while the litigation below is pending.

January 11, 2023

Respectfully submitted,

*/s/ Peter Karanjia*
Peter Karanjia
DLA PIPER LLP (US)
500 Eighth Street, N.W.
Washington, DC 20004
(202) 799-4135
peter.karanjia@us.dlapiper.com

*Counsel for Amici Curiae*
*Professor Rebecca L. Sandefur*
*and Empirical Scholars*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.  This brief complies with the type-volume limitations of Fed. R. App.

    P. 29(a)(4) and 29(b)(4). It contains 6,097 words, excluding the parts

    of the brief exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P.

    32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). It

    has been prepared in a proportionally spaced typeface using Microsoft

    Word in 14 point Times New Roman font.

Dated:     January 11, 2023
           Washington, DC                          _____*/s/ Peter Karanjia*_____
                                                           Peter Karanjia

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the court's CM/ECF system on January 11, 2023.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the court's CM/ECF system.

_____*/s/ Peter Karanjia*_____
Peter Karanjia

# APPENDIX

*Amici Curiae Scholars*

**Matthew Burnett, J.D.**
Visiting Scholar, Justice Futures Project, Arizona State University
Senior Program Officer, Access to Justice Research Initiative, American Bar
Foundation

Matthew Burnett, J.D. is a Visiting Scholar with the Justice Futures Project at
Arizona State University and Senior Program Officer for the Access to Justice
Research Initiative at the American Bar Foundation (ABF).  Prior to joining the
ABF, Matthew was Senior Policy Officer at the Open Society Foundations, where
he worked to advance community legal empowerment through research, advocacy,
litigation and grantmaking in Africa, Asia, Latin America, Eastern Europe and the
United States.  Over the past 15 years, Matthew's writing on access to civil justice
and legal empowerment has appeared in more than 20 publications, and he has
given more than 80 presentations and workshops around the world on people-
centered justice data, innovation, and regulatory reform.  He is currently a
collaborator on a National Science Foundation (NSF) funded CIVIC planning
grant focused on expanding access to justice through nonlawyer Community
Justice Workers in rural and Alaska Native communities and serves as a policy
advisor to the National Center for Access to Justice.

**Stacy Rupprecht Butler**
Director, Innovation for Justice Program (i4J)

Stacy Butler is the Director of i4J and has two decades of experience in community
advocacy and expanding the reach of civil legal services for under-represented
populations.  Her research focuses on the application of human-centered design
and innovation to social justice issues including eviction, debt collection, domestic
violence, regulatory reform, and online dispute resolution.  Prior to launching i4J,
she worked in the United States District Court for the District of Arizona and
served as an adjunct professor at the University of Arizona James E. Rogers
College of Law.  Stacy was appointed to the Arizona Supreme Court's Access to
Justice Commission in 2021.  She received the Association of American Law
Schools' Deborah L. Rhode Award in 2022, which honors the contributions,
service, and leadership of Deborah Rhode by recognizing new trailblazers in legal
education and the legal profession. Stacy received the Arizona State Bar Award of

1

Special Merit in 2020 for her contributions to the furtherance of public understanding of the legal system, the administration of justice, and confidence in the legal profession. Stacy earned a B.A. from Trinity University and a J.D. from the University of Arizona.

**Dr. Thomas M. Clarke**
Executive Committee and Board Member, Utah Supreme Court Office of Innovation for Legal Services

Tom Clarke recently retired as the Vice President for Research and Technology at the National Center for State Courts. He worked in that position for fourteen years, after serving with the Washington State court system as research manager and CIO for ten years. Tom led the re-engineering, technology, and access to justice practices at NCSC. Tom currently serves on the Executive Committee and Board of the Utah Supreme Court Office of Innovation for Legal Services.

**Professor Stephen Daniels**
Senior Research Professor, American Bar Foundation

Stephen Daniels is a Research Professor Emeritus at the American Bar Foundation, an independent, non-profit research institute dedicated to the empirical and interdisciplinary study of law and legal institutions. He holds a Ph.D. in political science from the University of Wisconsin-Madison and his research focuses on law and public policy, legal education, the legal profession, and various aspects of the American civil justice system. He has written on pro bono, access to justice, law school curriculum and financing, law students, trial courts, juries, plaintiffs' lawyers, and the politics of civil justice reform – including the areas of medical malpractice, products liability, and punitive damages. He has testified before congressional and state legislative committees about civil justice reform, served as an expert in cases dealing with large jury awards and/or constitutional challenges to civil justice reform, served as a consultant to the ABA's Task Force on the Financing of Legal Education, and long served as a volunteer for Chicago Appleseed and the Chicago Council of Lawyers on local court reform efforts. His current work focuses on law students and public service and on the increasing interest in licensed legal professionals (non-lawyers) as means of promoting greater access to justice.

**Professor Catrina Denvir**
Associate Professor
Monash University

Catrina is an Associate Professor at Monash University, Melbourne, Australia. She joined Monash from Ulster University where she was Director of the Legal Innovation Centre - a joint initiative between the School of Law and the School of Computer Science and Intelligent Systems. She has previously held research positions at the University of Sydney, University College London, the Australian Commonwealth Attorney-General's Department and the Legal Services Research Centre (London). Catrina brings expertise in a broad range of qualitative and quantitative research methodologies, including: the development and implementation of cutting edge methods of data collection; experimental designs; innovative use of legal service administrative data; large-scale longitudinal and cross-sectional 'legal need' survey research; in-depth qualitative work on ethics and industrial action; methods employing virtual avatars; as well as complex multilevel statistical modelling of survey data and natural language processing techniques. Her research interests include technological innovation in legal services (including the use of artificial intelligence and intelligent systems in law), the role of law in everyday life, public understanding of the law/legal rights, professional ethics and identity, design of legal services, legal pedagogy, access to justice, and research methods. Her research has particular relevance to UN Sustainable Development Goals 16 and 9.

**Professor Russell Engler**
Professor of Law and Director of Clinical Programs
New England Law | Boston

Professor Russell Engler serves as advisor for the Public Interest Law concentration at New England Law. He also directs the Public Service Project of the law school's Center for Law and Social Responsibility. Before joining the New England Law | Boston faculty in 1993, Professor Engler was director of the Housing Law Unit for Brooklyn, NY, Legal Services. He clerked for the Honorable Francis D. Murnaghan, Jr., of the US Court of Appeals for the Fourth Circuit. During the 1999–2000 academic year, he was a lecturer on law at Harvard Law School and was the 2004 chair of the Association of American Law Schools Standing Committee on Clinical Legal Education. Professor Engler serves on the Massachusetts Access to Justice Commission and is a member of the Steering Committee for the National Coalition for a Civil Right to Counsel. In 2013, he

3

was appointed to a newly formed Boston Bar Association Statewide Task Force on Civil Legal Aid in Massachusetts.

**Professor Nuno Garoupa**
Professor of Law & Associate Dean for Research and Faculty Development
George Mason University Antonin Scalia Law School
PhD Economics (U York, UK), LLM (U London, UK).

Nuno Garoupa is Professor of Law & Associate Dean for Research and Faculty Development at George Mason University Antonin Scalia Law School. He recently authored Deregulation and the Lawyers' Cartel, 43 U. Pa. J. Int'l L. 935 (2022), which concerns the legal profession and access to justice.

**Bryant G. Garth**
ABF Director Emeritus and Affiliated Research Professor

Bryant Garth is an empirical socio-legal scholar who has long-studied the legal profession and access to justice. He has written more than twenty books and one hundred fifty articles and has served in a number of administrate positions, including three times as dean of law schools and for fourteen years as director or the American Bar Foundation. He currently has returned to serve as interim director of the American Bar Foundation. He has been co-editor of the Journal of Legal Education, is currently chair of the Law School of Student Engagement advisory board, and has for more than twenty years served on the executive committee of the After the JD longitudinal study of the legal profession.

**Dame Hazel Genn DBE, KC, FBA, LLD**
Professor, Socio-Legal Studies, Faculty of Laws, University College London
Director, University College London Centre for Access to Justice

Dame Hazel Genn is Professor of Socio-Legal Studies in the Faculty of Laws at University College London ("UCL") and Director of the UCL Centre for Access to Justice, which she founded in 2013. She is a leading empirical legal researcher and expert on access to civil and administrative justice. She is author of *Paths to Justice: What People Do and Think About Going to Law* (1999). Her work has influenced policymakers in relation to the provision of legal aid and the social and health effects of unmet legal need. In 2016 she developed the activities of the UCL Centre for Access to Justice to include an innovative health justice partnership with a GP practice in East London delivering free social welfare legal services to low income and vulnerable patients within the practice. The services

4

were provided by a combination of specialist non-legal advisers and qualified lawyers supported by students under supervision. Dame Hazel has been appointed to numerous public service roles, including Judicial Appointments and Standards in Public Life. In recognition of her contribution to the justice system, she was awarded a CBE in the Queen's Birthday Honours List in 2000 and appointed DBE in the Queen's Birthday Honours List in 2006. In 2006 she was also appointed Queen's Counsel *Honoris Causa* and in 2008 she was elected Honorary Master of the Bench of Gray's Inn.

**Dr. Robert Granfield**, **Ph.D**.
Vice Provost for Faculty Affairs
University at Buffalo, State University of New York

Robert Granfield began his career in 1989 as an assistant professor of sociology at the University of Denver and was promoted to associate professor with tenure in 1995. A noted scholar in the areas of law and society as well as addiction studies, Professor Granfield was recruited to UB in 2004 after serving fourteen years at the University of Denver. He was promoted to Full Professor in 2005 and served as chair of UB's Department of Sociology from 2006 to 2012. He is also an affiliated scientist at UB's Research Institute on Addictions. He is the author or editor of six books and over 80 articles, book chapters, and reviews. He has been principal investigator or co-principal investigation on numerous grants from the National Institute of Health, US Department of Health and Human Services, Woodrow Wilson Foundation, and Law School Admissions Council, among others. He has been a visiting scholar at Harvard Law School, Middlebury College, the Singapore Institute of Management, and the University of Ottawa where he served as the Fulbright Research Chair in International Humanitarian Law and Social Justice. Professor Granfield has an extensive record of leadership at UB. In addition to serving as department chair, he was the founder and former director of UB's Civic Engagement and Public Policy strategic strength, a wide-reaching initiative with participants from 11 of UB's 12 decanal units and the hub for UB's community-based research activities. He was also the founder and director of UB's Institute for the Study of Law and Urban Justice. In addition, Professor Granfield has served in numerous leadership positions in the department of sociology, in the College of Arts and Sciences, and in the wider university. Granfield has also served on several editorial boards, on numerous professional association committees, and has been a faculty mentor on over 50 doctoral dissertations, master's theses, and undergraduate honor's theses. Granfield has a bachelor's degree from the University of Massachusetts and an MA /PhD from Northeastern University.

5

**Professor Herbert M. Kritzer**
Professor Emeritus
University of Minnesota Law School

Professor Herbert M. Kritzer is Marvin J. Sonosky Chair of Law and Public Policy emeritus at the University of Minnesota Law School and Professor of Political Science and Law emeritus at the University of Wisconsin – Madison where he taught from 1977 through 2007. He also held positions at the William Mitchell College of Law (2007-09), Rice University (1975–77), and Indiana University (1974–75). He is the recipient of multiple awards from the Law and Society Association: the Ronald Pipkin Service Award (2015), the Legacy Award (2019), and the Harry J. Kalven, Jr. Prize which is awarded annually for "empirical scholarship that has contributed most effectively to the advancement of research in law and society." From 2003 to 2007 he served as editor of Law & Society Review. His empirical research has focused on civil justice, judicial behavior, and judicial selection. At an early phase of his career he also wrote on research methods, which is reflected in his most recent book, Advanced Introduction to Empirical Legal Research (Edward Elgar Publishing 2021). Over the last 15 years his research has focused heavily on judicial selection resulting in two books, both published by Cambridge University Press, Justices on the Ballot: Continuity and Change in State Supreme Court Elections (2015) and Judicial Selection in the States: Politics and the Struggle for Reform (2020). He is the author or coauthor for seven other books, and editor or coeditor of three others. His current research focuses on litigation related to judicial selection in the United States.

**Professor Alyx Mark**
Assistant Professor of Government
Wesleyan University

Alyx Mark is an Assistant Professor of Government at Wesleyan University and an Affiliated Scholar of the American Bar Foundation, SoDa Labs at Monash University, and the Law of Law Center at the University of Utah. Her research focuses on how institutions empower and constrain legal elites, such as lawyers, judges, and lawmakers, as well as the consequences of institutional design decisions for access to justice. She is currently engaged in a project supported by the National Science Foundation, the Pew Charitable Trusts, and the American Association of University Women on state court responses to the Covid-19 pandemic, as well as studies of judicial behavior in state civil courts and of current efforts to reform the regulation of the legal profession in the United States. She

received her Ph.D. and M.A. in Political Science from The George Washington University in 2015 and her B.A. from Southern Illinois University – Edwardsville.

**Professor Lynn Mather**
SUNY Distinguished Service Professor Emerita
University of Buffalo School of Law

Lynn Mather is SUNY Distinguished Service Professor Emerita of Law and Political Science at University at Buffalo, New York. She has published extensively in the field of socio-legal studies, including six books and numerous journal articles. Her publications include empirical studies of: pro se representation in family law; when and why private lawyers in the U.S. provide pro bono services; and the extent to which lawyer organizations in selected countries actively support access to justice. Professor Mather was Director of the Baldy Center for Law & Social Policy at University at Buffalo. Prior to moving to Buffalo, she taught at Dartmouth College for thirty years where she was the Nelson A. Rockefeller Professor of Government.

**Professor Michael Millemann**
Jacob A. France Professor of Law
University of Maryland, Francis King Carey School of Law

Professor Michael Millemann, the Jacob A. France Professor of Law at the University of Maryland-Carey School of Law, graduated from Dartmouth College and Georgetown Law School, and began teaching in 1974. He has taught a broad range of classroom and clinical courses since then and has been a leader in developing the School's Clinical Law Program, as well as the school's Maryland Public Interest Law Project. He also was a leader in developing a number of legal services organizations in Maryland, including the Public Justice Center, Community Law in Action, the Maryland Volunteer Lawyer's Service, St. Ambrose Legal Services Program and Civil Justice. He has supported, through program development and scholarship, innovations in the delivery of legal services, including limited-scope legal representational projects (lawyers) and paralegal representational projects. He wrote the Maryland law authorizing trained paralegals to represent tenants in eviction proceedings and has published extensively in the fields of access to justice and the delivery of legal services, among others.

**Professor Richard Moorhead**
Professor of Law and Professional Ethics
University of Exeter Law School

Richard Moorhead is Professor of Law and Ethics at the University of Exeter, a
Fellow of the Academy of Social Science, and an Honorary Professor of Law at
UCL (University College London).  A former solicitor he has spent his career
researching lawyers and legal services, and has conducted research for the LSB,
SRA, Law Society, Civil Justice Council, Ministry of Justice and others on
professional competence and access to justice in particular.  He has also been a
member of the Civil Justice Council and the MoJs Data Science and Evidence
Board.  He runs the influential lawyerwatch.blog.

**Professor Michele Pistone**
Professor of Law
Villanova University Charles Widger School of Law

Michele R. Pistone is a law professor at Villanova University Charles Widger
School of Law and founding faculty director of VIISTA, Villanova
Interdisciplinary Immigration Studies Training for Advocates.  She can be reached
at pistone@law.villanova.edu.  Her website is michelepistone.org.

**Professor Emily Taylor Poppe**
University of California, Irvine School of Law

Emily S. Taylor Poppe is Professor of Law and (by courtesy) Professor of
Sociology at the University of California, Irvine School of Law.  She is also
Faculty Director of the UCI Law Initiative for Inclusive Civil Justice and a Faculty
Affiliate of the UCI Law Center for Empirical Research on the Legal Profession.
She holds a PhD in Sociology from Cornell University, a JD from Northwestern
Pritzker School of Law and AB degrees in Public Policy and Spanish from Duke
University.  Her research centers on inequalities in access to civil justice and she
has investigated variation in both formal and informal access to legal counsel, the
effect of legal representation on case outcomes, and the role of professional
regulation, legal technology, and institutional design in enhancing access to justice.

**Professor Noel Semple**
Associate Professor
Windsor Law

Noel is Associate Professor at the University of Windsor Faculty of Law. He teaches and writes in the areas of access to justice, legal ethics, and civil procedure. His work asks how the law and legal institutions work in real life. It also aspires to improve the ability of law and legal institutions to create justice. Empirical research (quantitative and qualitative) and policy analysis are key tools in his scholarship. Noel draws upon and seek to contribute to the law and society and empirical legal studies traditions. Noel's publications can be found at www.noelsemple.ca.

**Professor Carroll S. Seron**
Professor Emerita
University of California, Irvine

Carroll Seron is Professor Emerita in the Department of Criminology, Law and Society with a courtesy appointment in the Department of Sociology at the University of California, Irvine. Carroll Seron studies the organizations and culture of the professions, including law, policing and engineering. Throughout her career, her research asked whether and to what extent organizations deliver services fairly, equitably and effectively. She was the lead researcher and co-author of "The Impact of Legal Counsel on Procedural Outcomes for Poor Tenants in New York City's Housing Court: Results of a Randomized Experiment." [Law & Society Review. (2001) 35:419-434]. Seron has also published in Criminology, Work & Occupations, Annual Review of Sociology, Annual Review of Law and Social Sciences and American Sociological Review among other peer reviewed journals and law reviews. Carroll Seron is a former Editor of Law & Society Review, Volumes 42 to 44 and was President of the Law & Society Association from 2013-2015.

**Professor Michele Statz**
Assistant Professor
University of Minnesota Medical School

Michele Statz is an Assistant Professor at the University of Minnesota Medical School. She is also affiliated faculty with the University of Minnesota Law School and an Affiliated Scholar with the American Bar Foundation. Michele is an anthropologist of law and a leading empirical scholar in rural / Indigenous access

to justice.  Her work has appeared in Law & Society Review, Law & Social Inquiry, Harvard Law & Policy Review, and American Journal of Public Health, among others, and has been generously funded by the National Science Foundation, American Bar Foundation, and JPB Foundation.  Michele is also a member of the Legal Services Corporation Rural Justice Task Force and is a founding member of the Law and Rurality Collaborative Research Network.

**Professor Jessica Steinberg**
Professor of Law
The George Washington University Law School

Jessica Steinberg's research interests are in the areas of civil procedure, state courts, access to justice, and poverty law, with an emphasis on original empirical research.  Her recent scholarship has appeared or is forthcoming in leading journals, including the Columbia Law Review, NYU Law Review, Georgetown Law Journal, Stanford Law Review, Harvard Law Review Forum, and UCLA Law Review, among others.  Professor Steinberg has been named a Bellow Scholar for her research on lawyerless courts and is a former Chair of the Association of American Law Schools' Section on Poverty Law.  Professor Steinberg teaches civil procedure and criminal procedure. Prior to this, she taught the Prisoner & Reentry Clinic, which performed groundbreaking work on behalf of prisoners and returning citizens.  The clinic freed more than two dozen men from prison and terminated parole and supervised release for many more.  The clinic developed the first-ever parole treatise for DC prisoners incarcerated in the federal Bureau of Prisons and regularly testified on bills to promote "second chance" laws for people with felony records.  The clinic's work on clemency under President Obama's campaign to release nonviolent, low-level drug offenders was featured on the front page of the New York Times.

Professor Steinberg is a primary author of several bills to promote a fair criminal justice system in the District of Columbia, including legislation to create compassionate release for older prisoners, expand good time credits for people serving long terms of incarceration, and increase employment opportunities for individuals with criminal records.  For her role in developing a Compassionate Release Clearinghouse to expand representation for prisoners during the COVID-19 pandemic, Professor Steinberg received the Wiley A. Brant Award for "dismantling injustice" from the Washington Lawyers' Committee for Civil Rights.  Prior to joining the GW Law faculty, Professor Steinberg served as the Jay M. Spears Fellow at Stanford Law School, and an Equal Justice Works Fellow for the Legal Aid Society of San Mateo County.  Professor Steinberg earned a BA

magna cum laude and Phi Beta Kappa from Barnard College and a JD from Stanford University.

**Professor Kathryne M. Young**
Associate Professor of Law
The George Washington University Law School

Kathryne M. Young is an Associate Professor of Law (with tenure) at the George Washington University Law School and is Secretary-elect of the Law & Society Association. She is also a former Assistant Professor of Sociology at the University of Massachusetts, Amherst and a former Access to Justice Scholar at the American Bar Foundation. She holds a JD and a PhD from Stanford University and has published sociolegal work in numerous law reviews and peer-reviewed journals, including California Law Review, Harvard Law Review, Law & Society Review, and Law & Social Inquiry.