# 22-1345-cv

## In the United States Court of Appeals for the Second Circuit

—————————

UPSOLVE, INC, and REVEREND JOHN UDO-OKON,

*Plaintiffs-Appellees,*

v.

LETITIA JAMES, in her official capacity as Attorney General of New York,

*Defendant-Appellant.*

—————————

On Appeal from the United States District Court for the Southern District of New York

—————————

**BRIEF OF RESPONSIVE LAW AS AMICUS CURIAE IN SUPPORT OF APPELLEES AND AFFIRMANCE**

—————————

Gregory A. Beck
1250 Connecticut Ave. NW
Suite 700
Washington DC 20036
(202) 684-6339

*Counsel for Amicus Curiae*

January 11, 2023

# TABLE OF CONTENTS

Table of authorities ................................................................................ ii

Interest of amicus curiae.........................................................................1

Introduction and summary of argument ..................................................1

Argument.................................................................................................3

    I.   The purpose and effect of New York's prohibition on unauthorized
          practice of law is not the protection of consumers from harm, but the
          protection of lawyers from unwanted competition. .......................................3

    II.  As applied, New York's law infringes the First Amendment rights of
          consumers to receive important legal information. ....................................10

Conclusion................................................................................................ 20

i

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. Cahill*,
    598 F.3d 79 (2d Cir. 2010) ................................................................. 11, 12

*Edenfield v. Fane*,
    507 U.S. 761 (1993) ......................................................................... 12, 15

*Goldfarb v. Virginia State Bar*,
    421 U.S. 773 (1975) ............................................................................... 11

*NAACP v. Button*,
    371 U.S. 415 (1963) ............................................................................... 11

*In re Primus*,
    436 U.S. 412 (1978) ......................................................................... 11, 12

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ............................................................................. 12

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ............................................................................. 15

*Thompson v. Western States Medical Center*,
    535 U.S. 357 (2002) ............................................................................. 15

*Virginia Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976). .................................................................. 10, 11, 15

*Zauderer v. Office of Disciplinary Counsel*,
    471 U.S. 626 (1985) ............................................................................. 10

**Other Authorities**

Richard L. Abel,
    *American Lawyers* 113 (1989) .................................................................. 6

George W. Bristol,
    *The Passing of the Legal Profession*, 22 Yale L.J. 590 (1913). ..................................... 7

Aebra Coe,
*Where 5 States Stand On Nonlawyer Practice Of Law Regs*,
Law360, Feb. 5, 2021 .......................................................................................13

Derek A. Denckla,
*Nonlawyers and the Unauthorized Practice of Law: An Overview of the Legal and Ethical Parameters*, 67 Fordham L. Rev. 2581 (1999).............. 2, 3, 4, 8, 14, 15, 16, 18

Lawrence M. Friedman,
*A History of American Law* (3d ed. 2005) .............................................................5

Neil Gorsuch,
*Access to Affordable Justice*, 100 Judicature 46 (2016) ........................... 1, 2, 6, 9, 17

Bruce A. Green,
*Lawyers' Professional Independence: Overrated or Undervalued?*, 46 Akron L. Rev. 599 (2013) ......................................................................................6–7

Gillian K. Hadfield,
*Innovating to Improve Access: Changing the Way Courts Regulate Legal Markets*, 143 Daedalus 1 (2014) ....................................................................... 9, 10

Gillian K. Hadfield,
*Rules for a Flat World: Why Humans Invented Law and How to Reinvent it for a Complex Global Economy* (2017) ..................................................................... 5, 6

Robert Kry,
*The "Watchman for Truth": Professional Licensing and the First Amendment*, 23 Seattle U. L. Rev. 885 (2000) ...................................................... 3, 4, 8, 9, 13, 14

Alan Morrison,
*Defining the Unauthorized Practice of Law: Some New Ways of Looking at an Old Question*, 4 Nova L. Rev. 363 (1980) ............................................................. 15, 16

Permanent Commission on Access to Justice,
*Report to the Chief Judge of the State of New York* (2022),
https://bit.ly/3IFrbNy ...................................................................................16, 19

Deborah L. Rhode,
*Access to Justice: A Roadmap for Reform*, 41 Fordham Urb. L.J. 1227 (2014).............8

iii

Deborah L. Rhode,
> *Policing the Professional Monopoly: A Constitutional and Empirical Analysis of*
> *Unauthorized Practice Prohibitions*, 34 Stan. L. Rev. 1 (1981) ...................... 7, 13–14

Deborah L. Rhode & Lucy Buford Ricca,
> *Protecting the Profession or the Public? Rethinking Unauthorized-Practice*
> *Enforcement*, 82 Fordham L. Rev. 2587 (2014) ...........................................8, 13, 18

Laurel A. Rigertas,
> *The Birth of the Movement to Prohibit the Unauthorized Practice of Law*, 37
> Quinnipiac L. Rev. 97 (2018) ...............................................................2, 3, 4, 5, 7

World Justice Project,
> *Rule of Law Index* (2022), https://bit.ly/3GClqxH............................................... 9

## INTEREST OF AMICUS CURIAE

Amicus Consumers for a Responsive Legal System (Responsive Law) is a national nonprofit organization working to make the civil legal system more affordable, accessible, and accountable to its consumers. It has testified on numerous occasions to state regulators and to the American Bar Association about the bar's responsibility to give greater weight to increasing access to justice when interpreting rules of professional conduct, and to avoid interpretations that have an anticompetitive impact.

## INTRODUCTION AND SUMMARY OF ARGUMENT

New York, like almost every other state, maintains "sweeping and opaque restrictions" on the "unauthorized practice of law"—rules that prohibit anyone who is not a licensed attorney from expressing even the most basic opinions about legal issues faced by another. Neil Gorsuch, *Access to Affordable Justice*, 100 Judicature 46, 48 (2016). As applied here, New York's unauthorized-practice rules prohibit a nonprofit organization from giving free assistance to consumers in filling out a one-page legal form. That restriction violates the First Amendment right of consumers to receive noncommercial legal information—information that is vital to avoiding default judgments, wage garnishments, and liens in pending debt-collection cases.

To restrict the public's right to receive noncommercial information, a state must produce actual evidence—not just speculation—that the restriction serves a compelling state interest. The state's claim that its unauthorized-practice laws serve a compelling

1

interest in protecting consumers cannot be reconciled with history, evidence, or common sense. Although unauthorized-practice laws are "steeped in rhetoric" about the public interest, that is a post-hac rationalization. Laurel A. Rigertas, *The Birth of the Movement to Prohibit the Unauthorized Practice of Law*, 37 Quinnipiac L. Rev. 97, 112 (2018). When the laws were enacted, they were justified not by a desire to "protect the public interest," but to "eliminate competition." Derek A. Denckla, *Nonlawyers and the Unauthorized Practice of Law: An Overview of the Legal and Ethical Parameters*, 67 Fordham L. Rev. 2581, 2585 (1999).

And the laws have had their intended effect. As Justice Gorsuch has explained, lawyers have successfully "used the expansive UPL rules they've sought and won to combat competition from outsiders seeking to provide routine but arguably 'legal' services at low or no cost to consumers." Gorsuch, *Access to Affordable Justice*, 100 Judicature at 48. The result was to effectively freeze innovation in the market for legal services, driving legal fees beyond the reach of most Americans and creating an access-to-justice crisis in which the public's need for legal services vastly exceeds the affordable services available.

The state cannot claim a compelling interest in protecting consumers when the "protection" it provides cuts off the only legal help that remains available to them. This Court should affirm the district court's decision to enjoin New York's unauthorized-practice rules.

**ARGUMENT**

**I.** **The purpose and effect of New York's prohibition on unauthorized practice of law is not the protection of consumers from harm, but the protection of lawyers from unwanted competition.**

New York defends its interest in restricting the unauthorized practice of law based on what it characterizes as an established practice by the states, dating from before the American Revolution, to protect the public from nonlawyers who are unqualified to give legal advice. That historical account, however, is a fiction. New York's prohibition on legal advice actually arose as part of a wave of state laws adopted in the late nineteenth and early twentieth centuries—not to protect the public, but for the acknowledged purpose of "erecting barriers of entry to protect the professional elite" from unwanted competition. Rigertas, *The Birth of the Movement to Prohibit the Unauthorized Practice of Law*, 37 Quinnipiac L. Rev. at 112.

**A.** Contrary to the state's account, "the historical practices at the time of the [First Amendment's] ratification" do not support restrictions on the provision of legal advice. Robert Kry, *The "Watchman for Truth": Professional Licensing and the First Amendment*, 23 Seattle U. L. Rev. 885, 957 (2000). In fact, the historical evidence shows the opposite: that "the licensure of professional advice is inconsistent" with historical practice and "with the original understanding of the First Amendment." *Id.*

True, some colonial courts and legislatures adopted unauthorized-practice rules. *See* Denckla, *Nonlawyers and the Unauthorized Practice of Law*, 67 Fordham L. Rev. at

3

2583. But those rules were "focused on lay persons acting in a representative capacity *in court*." Rigertas, *The Birth of the Movement to Prohibit the Unauthorized Practice of Law*, 37 Quinnipiac L. Rev. at 108 (emphasis added). The issue "was raised as a defensive tactic in lawsuits," with the remedy being "dismissal of the lawsuit—not legal consequences for the person engaged in unauthorized practice." *Id.* In contrast, there is "no evidence that colonists concerned themselves with the activities of lay persons outside the courthouse." *Id.* at 104. As long as they were not in court, "nonlawyers were free to engage in a wide range of activities which would be considered UPL today," including "giving legal advice and preparing legal documents"—the same activities the state seeks to prohibit here. Denckla, *Nonlawyers and the Unauthorized Practice of Law*, 67 Fordham L. Rev. at 2583.

The next "hundred years of the American republic marked a liberalization" of even these narrowly crafted unauthorized-practice rules. *Id.* "[M]any legislatures" in the nineteenth century repealed their restrictions on nonlawyer practice, expressly permitting nonlawyers "to appear before the courts." *Id.* The unauthorized-practice laws that remained continued to deal only with "laypersons' activities in court—not with the mere rendering of legal advice." Kry, *The "Watchman for Truth"*, 23 Seattle U. L. Rev. at 956. Legislators of the era "believed it was inconsistent with democratic ideals to enact licensing requirements," and "would have thought licensing requirements on the advice-

rendering subset of professional practice—which struck much closer to free speech rights—singularly repugnant." *Id.* Indeed, no authority "even pretended … to govern the conduct of lawyers" in providing advice. Lawrence M. Friedman, *A History of American Law* 495-97 (3d ed. 2005).

**B.** It was not until the late nineteenth and early twentieth centuries that the legal profession began pushing for the sorts of unauthorized-practice restrictions that New York has today. By then, "the expansion of the economy and the shift to a much more formalized and regulated state" had "brought with it a new role for lawyers: planning transactions, advising on compliance, and completing the myriad forms that the newly bureaucratic state required." Gillian K. Hadfield, *Rules for a Flat World: Why Humans Invented Law and How to Reinvent it for a Complex Global Economy* 118–19 (2017); *see* Friedman, *A History of American Law* at 703–07. Unlike litigation, this brand of legal work took place in offices, where courts could not monitor or control it. *See* Rigertas, *The Birth of the Movement to Prohibit the Unauthorized Practice of Law*, 37 Quinnipiac L. Rev. at 139. That opened the door for "unlicensed competitors—such as banks, trusts, and realtors—to engage in work … that lawyers believed was within their scope of practice." *Id.* at 101–02.

The result was "a turf battle over work outside the courtroom that nonlawyers had occupied without much resistance for some time." *Id.* at 139. In response to these

new forms of competition, the profession "looked to legislatures to prohibit and crimi-nalize" the unauthorized practice of law. *Id.* at 142. The strategy began paying off in 1898, when New York's legislature created the first official register of New York attorneys and made it a misdemeanor to practice law without a license in the state. *Id.* at 117. Other states soon followed suit.

Recognizing that "it was impossible to anticipate all the new types of legal work and new legal providers that were cropping up," proponents of these laws sought the broadest prohibitions possible. *See* Hadfield, *Rules for a Flat World* at 119. Through a combination of lobbying and aggressive litigation, they argued that "no one, other than a bar-licensed lawyer practicing in a law firm or as a solo practitioner, should be allowed to do anything that touched the practice of law." *Id.* at 117; *see also* Richard L. Abel, *American Lawyers* 113 (1989) (explaining that bar associations "sought legislation that would define their monopoly as expansively as possible"). As a result, the definitions of unauthorized practice that states adopted, "usually at the behest of local bar associations, are often breathtakingly broad and opaque"—prohibiting nonlawyers from offering even the simplest of legal opinions and even when they do not charge a fee. Gorsuch, *Access to Affordable Justice*, 100 *Judicature* at 48.

**C.** The "transparent motivation behind" these efforts "was to protect lawyers' business." Bruce A. Green, *Lawyers' Professional Independence: Overrated or Under-*

6

*valued?*, 46 Akron L. Rev. 599, 618 (2013). Lawyers at the time lamented that the legal profession had "suffered much from the inroads of the new financial and business methods." George W. Bristol, *The Passing of the Legal Profession*, 22 Yale L.J. 590, 590 (1913). In an early article on the subject, for example, one New York lawyer complained that title companies had displaced lawyers from their traditional role in providing title searches. *See id.* Although "ten million dollars [were] paid annually by real estate interests in New York City alone," the advent of these companies meant that "only a small portion of the amount paid actually reache[d] the legal profession"—rendering "[o]ne of the most lucrative branches of the lawyer's practice … a thing of the past." *Id.* at 591.

Those anticompetitive motives, however, were not always stated so explicitly. Instead, state bars argued that unauthorized-practice laws were necessary for protecting the public by "increasing the professional status of the bar." Rigertas, *The Birth of the Movement to Prohibit the Unauthorized Practice of Law*, 37 Quinnipiac L. Rev. at 112. In the bars' characterization, the enforcement of unauthorized-practice laws was "a selfless enterprise actuated solely by considerations of 'public interest and welfare.'" Deborah L. Rhode, *Policing the Professional Monopoly: A Constitutional and Empirical Analysis of Unauthorized Practice Prohibitions*, 34 Stan. L. Rev. 1, 3, 53 (1981).

That claim, however, is contradicted by "a large body of historical, economic, and sociological literature that suggests that the primary motivation for professional

licensing laws is economic self-interest." Kry, *The "Watchman for Truth"*, 23 Seattle U. L. Rev. at 888. The evidence shows that consumers do "not desire the 'protection' that the bar and the courts have instituted on their behalf." Denckla, *Nonlawyers and the Unauthorized Practice of Law*, 67 Fordham L. Rev. at 2596. Rather, "the principal proponents of licensing laws are typically the occupational groups themselves." Kry, *The "Watchman for Truth"*, 23 Seattle U. L. Rev. at 888. It is thus unsurprising that "by far and away most UPL complaints come from lawyers rather than clients and involve no specific claims of injury." *See* Deborah L. Rhode, *Access to Justice: A Roadmap for Reform*, 41 Fordham Urb. L.J. 1227, 1234 (2014). Lawyers are "motivated to report nonlawyers" not to protect the public, but "because they viewed such individuals as taking work away from them." Deborah L. Rhode & Lucy Buford Ricca, *Protecting the Profession or the Public? Rethinking Unauthorized-Practice Enforcement*, 82 Fordham L. Rev. 2587, 2595 (2014).

**D.** The legal profession's "half-century campaign against UPL" was virtually a complete success. Denckla, *Nonlawyers and the Unauthorized Practice of Law*, 67 Fordham L. Rev. at 2585. Today, all states prohibit the unauthorized practice of law outside of court, with two-thirds imposing criminal penalties. *Id.* at 2587. These laws "greatly enlarged the areas of practice that now must be performed exclusively by lawyers," creating a "lawyer monopoly over a great deal of activity outside of the courts." *Id.* at 2581, 2585. "[I]n recent years," Justice Gorsuch has explained, "lawyers have used the expansive

UPL rules they've sought and won to combat competition from outsiders seeking to provide routine but arguably 'legal' services at low or no cost to consumers." Gorsuch, *Access to Affordable Justice*, 100 Judicature at 48.

By restricting entry into the practice of a profession and insulating themselves from competition, state bars effectively froze innovation in the provision of legal services to an early twentieth-century model, giving the legal profession "a roughly $10 billion annual 'self-subsidy,' in the form of higher prices lawyers may charge their clients compared to what they could charge in a more competitive marketplace." *Id.* at 53; *see also* Gillian K. Hadfield, *Innovating to Improve Access: Changing the Way Courts Regulate Legal Markets*, 143 Daedalus 1 (2014). Lawyers "derived these "monopoly profits at the expense of consumers, who are denied lower-cost alternatives to the professional's services." Kry, *The "Watchman for Truth"*, 23 Seattle U. L. Rev. at 888.

The consequence is to put legal services beyond the reach of most Americans. "Legal services in this country are so expensive that the United States ranks near the bottom of developed nations when it comes to access to counsel in civil cases." Gorsuch, *Access to Affordable Justice*, 100 Judicature at 47; *see* World Justice Project, *Rule of Law Index* (2022), https://bit.ly/3GClqxH (ranking the United States 115th out of 140 nations on whether "people can access and afford civil justice"). "The vast majority of ordinary Americans lack any real access to the legal system for resolving their claims and the

claims made against them," routinely going without legal representation when facing eviction, collection, or foreclosure and when seeking child support, custody, or protection from violence or harassment. Hadfield, *Innovating to Improve Access*, 143 Daedalus at 1.

## II. As applied, New York's law infringes the First Amendment rights of consumers to receive important legal information.

**A.** The state, unsurprisingly, does not rely on the anticompetitive justifications that actually motivated adoption of its unauthorized-practice laws. Instead, it puts forward an alternative rationale: that the laws "protect the public 'from the dangers of legal representation and advice given by persons not trained, examined and licensed for such work.'" State Br. at 14 (quoting *El Gemayel v. Seaman*, 72 N.Y.2d 701, 705 (1988)). All that the plaintiffs seek to do here, however, is help unrepresented consumers in selecting checkboxes on a standardized, one-page form. The state has no evidence of a need to "protect" consumers from receiving free assistance in filling out a simple legal form.

Even in the commercial-speech context, the protection of speech is "justified principally by the value to consumers of the information such speech provides." *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985). Just as commercial speakers have a First Amendment right to advertise, consumers have a "reciprocal right to receive the advertising." *Va. Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 (1976). In *Virginia Board of Pharmacy*—the first Supreme Court case to

10

recognize the right to commercial free speech—the plaintiffs were not pharmacists who had been denied the right to advertise, but consumer groups representing their members' right to receive commercial drug advertisements. *Id.* at 754 n.10. As the Court explained, the strong interest that consumers have in receiving such information "may be as keen, if not keener by far, than his interest in the day's most urgent political debate." *Id.* at 763. And consumers have an even stronger interest in receiving noncommercial legal information relevant to their pending legal cases. *See In re Primus*, 436 U.S. 412, 431 (1978) (upholding the right to "communicat[e] useful information to the public").

It is true that states have "broad power to establish standards for licensing practitioners and regulating the practice of professions." *Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (1975). But the mere assertion that a law's purpose is to "insure high professional standards" is not enough to justify a restriction on speech. *NAACP v. Button*, 371 U.S. 415, 438–39 (1963); *see also Alexander v. Cahill*, 598 F.3d 79, 91 (2d Cir. 2010). The Supreme Court in *Button* refused to credit similar ethical concerns in the absence of record evidence that the restriction there actually served its purported purpose. 371 U.S. at 441. As the Court explained, a state "may not, under the guise of prohibiting professional misconduct, ignore constitutional rights." *Id.* at 439. And the Court has also "required that broad rules framed to protect the public and to preserve respect for the

administration of justice must not work a significant impairment of the value of associational freedoms." *In re Primus*, 436 U.S. at 426.

Rather, as the district court correctly recognized, the state has the burden of proving that its speech restriction satisfies strict scrutiny by demonstrating "that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015). As applied here, the state's burden requires it to show a compelling interest in preventing a nonprofit organization from helping consumers prepare responses to debt actions. The state, however, devotes just six pages at the back of its brief (at 60–66) to its attempt at satisfying that heavy burden. It cites no consumer complaints, disciplinary records, studies, or empirical research of any kind showing that even a single consumer was ever harmed by a nonlawyer's legal advice—much less by the provision of free assistance in filling out a form.

That alone establishes the rule's unconstitutionality. *See Alexander*, 598 F.3d at 95 (holding that New York "failed to provide evidence that consumers have, in fact, been misled" by the prohibited speech, and thus "failed to meet [its] burden for sustaining [the] prohibition"). Even under intermediate scrutiny, the state must produce actual evidence, not "mere speculation and conjecture," "that the harms it recites are real and that its restrictions will in fact alleviate them." *Edenfield v. Fane*, 507 U.S. 761, 770–71 (1993). The state identifies no such evidence here.

On the contrary, the available evidence "casts doubt on the frequency of client injury" by nonlawyers. Rhode & Ricca, *Protecting the Profession or the Public?*, 82 Fordham L. Rev. at 2595. In a nationwide survey of officials responsible for enforcing laws against unauthorized practice of law, more than two-thirds "could not recall" even a single "instance of serious injury in the past year." *Id.* Moreover, other states allow the provision of legal services by nonlawyers without evidence of public harm. *See* Aebra Coe, *Where 5 States Stand On Nonlawyer Practice Of Law Regs*, Law360, Feb. 5, 2021. Likewise, other nations "permit nonlawyers to provide legal advice and to assist with routine documents." Rhode & Ricca, *Protecting the Profession or the Public?*, 82 Fordham L. Rev. at 2606. The "research available does not suggest that their performance has been inadequate." *Id.* Rather, it shows that, in assisting low-income clients, "nonlawyers generally outperformed lawyers in terms of concrete results and client satisfaction." *Id.*

**B.** Even on its face, New York's post-hac rationalization for its unauthorized-practice rules fails to articulate a legitimate state interest. Given the obvious unsavoriness of the bar's anticompetitive agenda, its asserted interest in "protect[ing] the public" has become the "most common interest asserted to justify professional practice regulation." Kry, *The "Watchman for Truth"*, 23 Seattle U. L. Rev. at 887. Members of the profession have "strong economic [and] psychological interests in declining to acknowledge that legal work could be done as competently by laymen as by lawyers." Rhode, *Policing the*

13

*Professional Monopoly*, 34 Stan. L. Rev. at 1, 3, 53. And that self-interest has been further bolstered by the success of the legal profession's long campaign against unauthorized practice, which "created an expectation among lawyers—no matter how unjustified—and a tradition in practice as to the tasks that only lawyers should perform." Denckla, *Nonlawyers and the Unauthorized Practice of Law*, 67 Fordham L. Rev. at 2585.

The profession's self-serving rationale, however, is predicated entirely on the "paternalistic belief that the public needs the protection which the UPL system provides." *Id.* at 2595. Proponents of the theory argue that the public cannot be trusted to "make informed decisions" about hiring nonlawyers. Kry, *The "Watchman for Truth"*, 23 Seattle U. L. Rev. at 888. As the ABA explained it in its Model Code of Professional Responsibility—the national bar's first restriction on the unauthorized-practice of law—a potential client is "not in a position to judge whether he or she will receive proper professional attention" from a nonlawyer on a legal matter concerning "the reputation, the property, the freedom, or even the life of the client." Denckla, *Nonlawyers and the Unauthorized Practice of Law*, 67 Fordham L. Rev. at 2593 (quoting Model Code Prof'l Resp. EC 3-4 (1969)).

Because "[t]hose who seek to censor or burden free expression often assert that disfavored speech has adverse effects," courts must "be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own

14

good." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 577 (2011). Fear that the public "would make bad decisions if given truthful information" is no justification for banning speech. *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 374 (2002). Rather than adopting that "highly paternalistic approach," states must "assume that information is not in itself harmful, that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them." *Va. Bd. of Pharmacy*, 425 U.S. at 770. It is for "the speaker and the audience, not the government, [to] assess the value of the information provided." *Edenfield*, 507 U.S. at 767.

New York's justification for restricting legal assistance by nonlawyers is just the sort of paternalistic speech restriction that the Supreme Court has repeatedly condemned. The argument "assumes that clients cannot be trusted to choose for themselves whether they want to pay for the extra protection of a generalist instead of the narrower protection of a nonlawyer specialist." Denckla, *Nonlawyers and the Unauthorized Practice of Law*, 67 Fordham L. Rev. at 2595. But there is no reason to believe consumers are incapable of looking after their own interests in making that choice. Reasonable consumers can be trusted to "recognize that in most situations lawyers will provide better representation." Alan Morrison, *Defining the Unauthorized Practice of Law: Some New Ways of Looking at an Old Question*, 4 Nova L. Rev. 363, 369 (1980). Nevertheless,

15

consumers who "are aware of the limitations on the abilities and ethics [rules] of nonlaw-yers might rationally want to" take advantage of lower-cost nonlawyer services. Denckla, *Nonlawyers and the Unauthorized Practice of Law*, 67 Fordham L. Rev. at 2595. That is particularly true here, where a nonprofit organization seeks to provide legal help without charge. New York's unauthorized-practice laws deny consumers that choice, forcing them to treat "the cost of having a lawyer" as "not a relevant consideration." Morrison, *Defining the Unauthorized Practice of Law*, 4 Nova L. Rev. at 363.

The state's rationale also ignores the well-documented fact that most low-income consumers in New York lack would lack the option of hiring a licensed attorney even if they wanted to do so. Although the state has made efforts to fund legal services and encourage pro-bono assistance, the overwhelming evidence demonstrates that the legal profession still fails to satisfy the legal needs of almost all consumers in the state. *See* Permanent Commission on Access to Justice, *Report to the Chief Judge of the State of New York* (2022), https://bit.ly/3IFrbNy. The problem is especially acute in consumer-debt cases like those in which the plaintiffs seek to assist consumers here. "Hundreds of thousands of consumer credit matters are filed annually" in New York. *Id.* at 55. But, while "all creditors have attorneys" in these cases, "low-income individuals generally are un-represented." *Id.* at 54. In particular, there is an "unmet need for civil legal services for low-income New Yorkers faced with medical debt." *Id.* at 11. In the past few years, New

York hospitals have filed tens of thousands of debt-collection lawsuits against mostly low-income consumers. *Id.* Hospitals in these cases "are always represented by professional debt collection attorneys," while "99% of patients are unrepresented." *Id.* at 12.

**C.** Because most consumers in debt-collection cases lack legal representation, the relevant question is not whether (as the state assumes) they would be better off with the assistance of a lawyer than with that of a nonlawyer. Rather, the question is whether they would be better off with the assistance of a nonlawyer than they would be with no assistance at all. That question answers itself: At least until the profession can guarantee affordable legal representation for consumers, the state cannot claim that it is protecting consumers by cutting off the limited options remaining to them, especially where that help is provided free of charge.

As Justice Gorsuch has noted, "nonlawyers already perform—and have long performed—many kinds of work traditionally and simultaneously performed by lawyers." Gorsuch, *Access to Affordable Justice*, 100 Judicature at 49. "Nonlawyers prepare tax returns and give tax advice. They regularly negotiate with and argue cases before the Internal Revenue Service. They prepare patent applications and otherwise advocate on behalf of inventors before the Patent & Trademark Office. And it is entirely unclear why exceptions should exist to help these sort of niche (and some might say, financially capable) populations but not be expanded in ways more consciously aimed at serving

17

larger numbers of lower- and middle-class clients." *Id.* Many such "tasks that lawyers now perform exclusively could be competently performed by nonlawyers because" they "do not necessarily require a lawyer's professional judgment." Denckla, *Nonlawyers and the Unauthorized Practice of Law*, 67 Fordham L. Rev. at 2595–96. That is the case here: Filling out the 24 checkboxes on the state's one-page answer form "is typically straight-forward and does not require significant specialized legal training." JA18.

Even in areas where "lawyers do have special knowledge, they may not be any more competent than a nonlawyer specialist." Denckla, *Nonlawyers and the Unauthorized Practice of Law*, 67 Fordham L. Rev. at 2594. The available research shows that "[e]xtensive formal training is less critical than daily experience for effective advocacy." Rhode & Ricca, *Protecting the Profession or the Public?*, 82 Fordham L. Rev. at 2606. The district court was therefore correct to recognize that a nonlawyer with experience and limited training in filling out the state's legal form will almost certainly be more useful to consumers than a patent lawyer who has never handled a debt-collection case. JA 202 n.13.

At a minimum, as the court noted, reliance on the plaintiffs' "limited legal training would logically protect clients' interests better than trusting those clients to complete their own forms pro se, with no legal training at all." *Id.* "In a high percentage of cases, consumers are being sued for debts they do not owe or for which creditors have no proof

to establish their right to collect the debt." Permanent Commission on Access to Justice, *Report to the Chief Judge of the State of New York* at 55. These lawsuits are "clearly meritless, where the defendants sued do not actually owe the amount claimed, or any amount at all." JA177. Yet even when they have strong defenses available to them, consumers without access to legal advice are often too overwhelmed or intimated by the complexities of the court system to respond. As a consequence, "a significant majority" of these cases (98% in medical-debt cases) "are decided in favor of the creditors on default"—often resulting in wage garnishments and liens on patients' homes. Permanent Commission on Access to Justice, *Report to the Chief Judge of the State of New York* at 12, 54. Because creditors who bring these lawsuits "depend[] on never having to litigate—or prove—a case," helping consumers to contest their debts would often allow them to avoid those serious outcomes. *Id.* at 55.

New York's decision to cut off consumers' access to that free assistance cannot be squared with the First Amendment. To justify censorship of noncommercial legal information that is vital to avoiding defaults in pending cases, the state would need—at a minimum—compelling evidence that its restriction is necessary to protect consumers from even more serious harm. The only evidence of harm here, however, is of harm to the financial interest of lawyers. For that reason, the restriction is unconstitutional.

19

## CONCLUSION

This Court should affirm the decision below.

January 11, 2023                    Respectfully submitted,

                                   Gregory A. Beck
                                   Gregory A. Beck
                                   1250 Connecticut Ave. NW
                                   Suite 700
                                   Washington DC 20036
                                   (202) 684-6339

                                   *Counsel for Amicus Curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Local Rule 29.1(c) because it contains 4,697 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Adobe Garamond Pro font.

January 11, 2023                    /s/Gregory A. Beck
                                    Gregory A. Beck