## UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

**Thurgood Marshall U.S. Courthouse   40 Foley Square, New York, NY 10007 Telephone: 212-857-8500**

## MOTION INFORMATION STATEMENT

**Docket Number(s):** 22-1345  _____   _____ Caption [use short title] _____

**Motion for:** Leave to file brief of Amicus Curiae National

Center for Access to Justice in support of Plaintiffs-

Apellees Upsolve, Inc. and Rev. John Udo-Okon

Set forth below precise, complete statement of relief sought:

The National Center for Access to Justice ("NCAJ"), a

non-profit organization dedicated to studying and eradicating

barriers to access to justice, seeks leave to file the annexed

brief as Amicus Curiae in support of Plaintiffs-Appellees

Upsolve v. James

_____

_____

**MOVING PARTY:** Proposed Amicus Curiae NCAJ      **OPPOSING PARTY:** Appellant Attorney General of New York

☐ Plaintiff          ☐ Defendant

☐ Appellant/Petitioner   ☐ Appellee/Respondent

**MOVING ATTORNEY:** David Udell      **OPPOSING ATTORNEY:** Cleland B. Welton II

[name of attorney, with firm, address, phone number and e-mail]

National Center for Access to Justice      _____

150 West 62nd Street, Suite 7-165      _____

New York, NY 10023      _____

Court- Judge/ Agency appealed from: Hon. Paul Crotty, SDNY

**Please check appropriate boxes:**

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes   ☐ No (explain):_____

_____

Opposing counsel's position on motion:
☑ Unopposed   ☐ Opposed   ☐ Don't Know
Does opposing counsel intend to file a response:
☐ Yes   ☐ No   ☑ Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUCTIONS PENDING APPEAL:**

Has this request for relief been made below?   ☐ Yes ☐ No
Has this relief been previously sought in this court?   ☐ Yes ☐ No
Requested return date and explanation of emergency:   _____

_____

_____

_____

Is oral argument on motion requested?   ☐ Yes ☑ No (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?   ☐ Yes ☑ No  If yes, enter date:_____

**Signature of Moving Attorney:**

s David Udell   Date: 1/11/2023   Service by: ☑ CM/ECF   ☐ Other [Attach proof of service]

UNITED STATES COURT OF APPEALS
SECOND CIRCUIT

------------------------------------------------------------X

UPSOLVE, INC., REV. JOHN UDO-OKON,　　　:

　　　　　　　Plaintiffs-Appellees,　　　:　　**22-1345**

　　　-against-

LETITIA JAMES, in her official capacity as,　　:
Attorney General of New York,

　　　　　　　Defendant-Appellant　　　:

------------------------------------------------------------X


## UNOPPOSED MOTION FOR LEAVE TO FILE BRIEF OF *AMICUS CURIAE* NATIONAL CENTER FOR ACCESS TO JUSTICE IN SUPPORT OF PLAINTIFFS-APPELLEES UPSOLVE, INC. AND REV. JOHN UDO-OKON

David Udell
Lauren A. Jones
National Center for Access to Justice
150 West 62nd Street
New York, NY 10023
dudell@fordham.edu

Bruce A. Green
Louis Stein Center for Law and Ethics
150 West 62nd Street
New York, NY 10023
bgreen@fordham.edu

*Attorneys for Amicus*

The National Center for Access to Justice ("NCAJ"), proposed Amicus Curiae, is a non-profit organization based at Fordham University School of Law that is committed to expanding access to justice: the ability of people to learn their rights, assert legal claims and defenses, and obtain a fair resolution under the rule of law. NCAJ uses rigorous research and analysis to highlight barriers that prevent people from accessing justice, and to persuade policymakers to embrace solutions that eliminate those barriers.

The barrier at issue here is New York's unauthorized-practice-of-law ("UPL") regime that prohibits, on pain of criminal sanction, Plaintiff-Appellee Reverend John Udo-Okon from speaking with members of his community in the South Bronx about how to address their concerns when facing debt-collection suits. All the Reverend seeks to do is help parishioners and others in his community deal with debt-collection suits by providing free advice about how to complete an official, state-drafted, answer form. But unless this Court affirms the injunction entered below, the UPL laws bar the Reverend from having those critically important conversations.

NCAJ respectfully requests that the Court grant it leave to file the annexed Brief of *Amicus Curiae* in Support of Reverend John Udo-Okon and Upsolve, Inc., the Plaintiffs-Appellees, pursuant to Federal Rule of Appellate Procedure 29. NCAJ's participation as amicus is warranted for the following reasons:

1.     NCAJ actively supports the steadfast work of legal services organizations in their efforts to protect the civil legal rights of low-income persons. Indeed, NCAJ also has long supported the movement to establish a right to counsel in civil legal matters in which fundamental rights are at stake. But, recognizing that there is not yet a civil right to counsel in most categories (including in debt litigation), and that there are not enough free civil legal aid lawyers to meet the level of unmet need in our society (including in debt litigation), NCAJ has also long studied and supported alternate means of providing limited legal advice when, as is all too often the case, counsel is unavailable.

2.     NCAJ proposes to submit the annexed amicus brief to inform the Court about the importance of allowing community members to discuss with Reverend Udo-Okon (and others who also receive training from Upsolve) how to respond to debt litigation. NCAJ believes that absent this critically important opportunity for speech, many debt-collection defendants would have nowhere to turn for the assistance they need.

3.     NCAJ has conducted research and written a report about how social services providers (like the Reverend) embedded in low-income communities are stymied in their efforts to communicate with residents about their pressing legal problems by the threat of criminal penalty from UPL laws. *See* NATIONAL CENTER FOR ACCESS TO JUSTICE, "WORKING WITH YOUR HANDS TIED BEHIND YOUR

BACK": NON-LAWYER PERSPECTIVES ON LEGAL EMPOWERMENT (2021),
https://ncaj.org/sites/default/files/2021-
06/NCAJ%20Working%20With%20Your%20Hands%20Tied%20Behind%20You
r%20Back.pdf. NCAJ's proposed amicus brief is an outgrowth of this work and its
other initiatives to ensure that vulnerable people in our society are not prevented by
UPL prohibitions from obtaining the basic assistance they need to protect their
legal rights. *See Legal Empowerment*, NATIONAL CENTER FOR ACCESS TO JUSTICE,
https://ncaj.org/tools-for-justice/legal-empowerment. (last visited, Jan. 9. 2023).

4.      Of late, NCAJ has focused on the flood of debt-collection cases in the
state courts and on the problems that creates for individuals, communities, and the
courts themselves. The research is clear: debt-collection defendants often have
defenses that are never raised, including that an alleged debt does not exist, that the
wrong amount is sought, that an incorrect person has been sued, that the action is
time-barred, or that the defendant was not properly served. *See, e.g.*, PEW
CHARITABLE TRUSTS, HOW DEBT COLLECTORS ARE TRANSFORMING THE BUSINESS
OF STATE COURTS 17 (2020), https://www.pewtrusts.org/en/research-and-
analysis/reports/2020/05/how-debt-collectors-are-transforming-the-business-of-
state-courts; LEGAL AID SOCIETY ET AL., DEBT DECEPTION: HOW DEBT BUYERS
ABUSE THE LEGAL SYSTEM TO PREY ON LOWER-INCOME NEW YORKERS, 8–10, 26
n. 91 (2010), http://mobilizationforjustice.org/wp-content/uploads/reports/DEBT-

DECEPTION.pdf; HUMAN RIGHTS WATCH, RUBBER STAMP JUSTICE: US COURTS,

DEBT BUYING CORPORATIONS, AND THE POOR, 28-31 (2016),

https://www.hrw.org/report/2016/01/20/rubber-stamp-justice/us-courts-debt-

buying-corporations-and-poor. We are currently analyzing aspects of debt-

collection-litigation policy that unfairly disadvantage vast numbers of people

facing debt-collection lawsuits, including the various causes of astronomical

default rates (as high as 88% in New York City). *See* Andy Newman, *They Need*

*Legal Advice on Debts. Should it Have to Come from Lawyers?,* N.Y. TIMES (Jan

25, 2022), https://www.nytimes.com/2022/01/25/nyregion/consumer-debt-legal-

advice.html.

5.      Given its mission to expand access to justice, NCAJ has a significant

interest in ensuring that New York City residents facing debt-collection lawsuits

can speak freely with individuals in their communities who hold their trust, such as

Reverend Udo-Okon, about how to fill in the blanks in an Answer form created by

the New York court system for lay people. Absent such assistance many people

will continue, unnecessarily, to face the consequences of debt-collection lawsuits

without any help at all.

6.      For these reasons, NCAJ seeks leave to file the enclosed amicus brief

urging affirmance of the order of the Hon. Paul Crotty, below, preliminarily

enjoining enforcement of the New York's UPL rule, as applied to the specific facts

of this case, against the Reverend Udo-Okon, Upsolve and others it would train.

Dated: January 11, 2023

New York, New York

_____/s_____

David Udell
Lauren A. Jones
National Center for Access to Justice
150 West 62nd Street
New York, NY 10023
dudell@fordham.edu

Bruce A. Green
Louis Stein Center for Law and Ethics
150 West 62nd Street
New York, NY 10023
bgreen@fordham.edu

Attorneys for Amicus

**PROPOSED *AMICUS* BRIEF**

# 22-1345

$\overline{\phantom{xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx}}$

# United States Court of Appeals

*for the*

# Second Circuit

$\overline{\phantom{xxxxxxxxxxxxxxxxxxxxx}}$

UPSOLVE, INC., REV. JOHN UDO-OKON,

*Plaintiffs-Appellees*,

- v. -

LETITIA JAMES, in her official capacity
as Attorney General of New York,

*Defendant-Appellant*

$\overline{\phantom{xxxxxxxxxxxxxxxxxxxxxxxxx}}$

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

$\overline{\phantom{xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx}}$

**BRIEF OF *AMICUS CURIAE*, NATIONAL CENTER FOR ACCESS TO
JUSTICE, IN SUPPORT OF PLAINTIFFS-APPELLEES UPSOLVE,
INC. AND REVEREND JOHN UDO-OKON**

$\overline{\phantom{xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx}}$

David Udell
National Center for Access to Justice
150 West 62nd Street
New York, NY 10023

Bruce A. Green
Louis Stein Center for Law and Ethics
150 West 62nd Street
New York, NY 10023

*Attorneys for Amicus*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

*Amicus Curiae* National Center for Access to Justice is not owned by any parent corporation. No publicly held corporation owns any stock in *amicus*.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

IDENTITY AND INTEREST OF AMICUS CURIAE ............................................... 1

SUMMARY OF ARGUMENT ..................................................................................... 4

ARGUMENT .................................................................................................................. 7

I.   THE DISTRICT COURT PROPERLY ENJOINED APPLICATION OF THE UPL LAWS TO THE REVEREND'S DISCUSSIONS WITH COMMUNITY MEMBERS ABOUT COMPLETING COURT-DESIGNED ANSWER FORMS IN DEBT CASES. . 7

    A.   There is Urgent Demand for the Advice the Reverend Udo-Okon Could Provide to People in his Community ................................................................... 8

    B.   The Record Shows that, But for New York's UPL Prohibition, Reverend Udo-Okon Would Provide Free Advice to Many Members of his Community ........... 14

    C.   Claims about the Complexity of Legal Practice Miss the Point that the Reverend, with Upsolve's Support, Could Help Many People ............................................... 16

II.   THERE IS GROWING AWARENESS OF THE VALUE OF RELYING ON PEOPLE WHO ARE NOT LAWYERS TO PROVIDE BASIC LEGAL ADVICE ...................... 18

    A.   The Role of People Who are Not Lawyers is Recognized in the Caselaw ........... 18

    B.   People Who are Not Lawyers Already Play Important Roles in the Federal and State Systems ..................................................................................................... 20

    C.   In Regulatory Sandboxes and Other Initiatives States are Learning that People who are Not Lawyers Can Successfully Provide Individualized Assistance on Certain Legal Matters ............................................................................................ 22

III.  APPLIED TO PLAINTIFFS-APPELLEES, THE UPL RULE THAT PROHIBITS LAY PROVISION OF LEGAL ADVICE IS NOT NARROWLY TAILORED ...................... 24

CONCLUSION ............................................................................................................... 27

## TABLE OF AUTHORITIES

**Cases**                                                                 **Pages**

*Hackin v. Arizona*,
  389 U.S. 143 (1967) ................................................................................19

*Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*,
  564 U.S. 721 (2011) ..............................................................................25

*People v. Alfani*,
  227 N.Y. 334 (1919).................................................................19, 25, 26

*Turner v. Rogers*,
  564 U.S. 431 (2011) ..............................................................................18

**Regulations**

20 C.F.R. § 404.1705 ...............................................................................20

42 C.F.R. § 435.908(b) .............................................................................20

42 C.F.R. § 435.908(b)(3) .........................................................................20

42 C.F.R. § 435.908(c) .............................................................................20

N.Y. Comp. Codes R. & Regs. tit. 12, § 460.5 .......................................21

N.Y. Comp. Codes R. & Regs. tit. 12, § 460.6 .......................................21

N.Y. Comp. Codes R. & Regs. tit. 12, §§ 302-1–302-2...........................22

**Other Authorities**

76 Fed. Reg. 45184, 45186-89 (July 28, 2011)........................................20

Aebra Coe, "Where 5 States Stand on Nonlawyer Practice of Law Regs," *Law360*
  *(Feb. 5, 2021)* ......................................................................................23

Andy Newman, *They Need Legal Advice on Debts. Should it Have to Come from*
  *Lawyers?, N.Y. Times (Jan 25, 2022)*..........................................2, 8, 12

*Attorney Access, National Center for Access to Justice* ............................................. 2

Bruce A. Green, *Why State Courts Should Authorize Non-Lawyers to Practice Law* (Nov. 7, 2022), 91 *Fordham L. Rev. (2023)* ....................................................... 26

D. James Greiner, Dalié Jiménez & Lois Lupica, *Self-Help, Reimagined*, 92 Ind. L.J., 1119 (2017) ................................................................................................ 12

*Human Rights Watch, Rubber Stamp Justice: US Courts, Debt Buying Corporations, and the Poor (2016)* ....................................................................... 9

*Legal Aid Society et al., Debt Deception: How Debt Buyers Abuse the Legal System to Prey on Lower-Income New Yorkers (2010)* ......................................... 9

*Legal Empowerment, National Center for Access to Justice* ................................... 3

*Legal Paraprofessional Program, Ariz. Cts* ............................................................. 23

*Legal Services Corporation, The Justice Gap: Measuring the Unmet Civil Legal Needs of Low-Income Americans 9 (2022)* ............................................. 11, 12, 13

*National Center for Access to Justice*, "*Working With Your Hands Tied Behind Your Back": Non-Lawyer Perspectives on Legal Empowerment (2021)* ......... 3, 15

News Release, Arizona Supreme Court Administrative Office of the Courts, Arizona Supreme Court Leads Nation in Tackling Access to Justice Gap with New Tier of Legal Services Providers (December 9, 2021) ................................ 22

*Permanent Commission on Access to Justice, Report to the Chief Judge of the State of New York 55 (2022)* ............................................................................ 9

*Pew Charitable Trusts, How Debt Collectors Are Transforming the Business of State Courts 8 (2020)* .................................................................................. *passim*

Unemployment Insurance Review Board, Important Information About What Lawyers or Representatives Can Charge Clients .................................................. 21

*What We Do*, *Off. of Legal Servs. Innovation* ......................................................... 23

"Answering a Case" in *COURT Help, New York State Unified Court System* .........5

"State Scores and Rankings" in *Justice Index*, *National Center for Access to Justice* ................................................................................................................1

## IDENTITY AND INTEREST OF AMICUS CURIAE

The National Center for Access to Justice ("NCAJ") is a non-profit organization based at Fordham University School of Law that brings rigorous research and analysis to the task of expanding access to justice in America.[1] We define access to justice as the ability of people to learn about their rights, assert their legal claims and defenses, and obtain a fair resolution under the rule of law.

NCAJ advocates for policies such as requiring use of plain language in courts, assuring quality interpreting and translating services, providing notice of the right to accommodations for disabilities, and deploying innovative technologies such as e-filing. To that end, NCAJ collects, analyzes and publishes data, researches and writes reports, convenes experts, and engages with reformers and regulators, including through formal comment on proposed regulatory and legislative reform. Our flagship project, the Justice Index, analyzes and ranks states on their adoption of select best policies for assuring access to justice. *See* "State Scores and Rankings" in *Justice Index*, NATIONAL CENTER FOR ACCESS TO JUSTICE, https://ncaj.org/state-rankings/2021/justice-index (last visited Jan. 10, 2023). This

---

[1] Upsolve's co-founder, Rohan Pavuluri, is a member of NCAJ's Board of Directors. Neither he nor Upsolve's counsel authored this brief in whole or in part. No money was contributed from any source (including Plaintiffs or their counsel), to fund the preparation or submission of this brief.

ranking system has spurred several states to eliminate or lower barriers in order to increase access to justice.

Our most recent project involves an extensive study of laws, rules, and policies that States should adopt to increase fairness in debt-collection litigation. Debt-collection cases account for approximately 25% of all civil cases filed in state courts. *See,* PEW CHARITABLE TRUSTS, HOW DEBT COLLECTORS ARE TRANSFORMING THE BUSINESS OF STATE COURTS 8 (2020), https://www.pewtrusts. org/en/research-and-analysis/reports/2020/05/how-debt-collectors-are-transformin g-the-business-of-state-courts ("Pew Report"). NCAJ's analysis focuses on the factors that drive the debt-collection default judgment rate, which averages close to 70% nationwide, *see id.* at 2, and is as high as 88% in New York City. *See* Andy Newman, *They Need Legal Advice on Debts. Should it Have to Come from Lawyers?,* N.Y. TIMES (Jan 25, 2022), https://www.nytimes.com/2022/01/25/nyreg ion/consumer-debt-legal-advice.html. When low-income people face debt-collection litigation without basic advice, massive injustice results.

Thus, NCAJ has long advocated for making counsel available to those who are unable to afford it when fundamental rights are at stake. For example, the Justice Index reports each state's count of civil legal aid lawyers, and each state's progress in establishing a right to counsel in certain civil cases. *See Attorney Access,* NATIONAL CENTER FOR ACCESS TO JUSTICE, https://ncaj.org/state-

rankings/justice-index/attorney-access (last visited, Jan. 10, 2023). While the effort to encourage states to fund more civil legal aid lawyers has gained traction, increased public funding of civil legal aid lawyers is unlikely to substantially increase the number of lawyers for people facing debt-collection cases.

Even assuming optimistically that governments will fund a substantial expansion of civil legal services, debt-collection litigation still would present a crisis for many low-income people who, for a variety of reasons, never seek counsel. *See infra* at 12-13. Thus, NCAJ has encouraged policymakers to reevaluate sweeping prohibitions that prohibit the unauthorized practice of law to ensure that UPL laws do not prevent low-income people facing legal problems from obtaining even the basic advice they sometimes seek from trusted community members. *See Legal Empowerment*, NATIONAL CENTER FOR ACCESS TO JUSTICE, https://ncaj.org/tools-for-justice/legal-empowerment (last visited, Jan. 10, 2023).

NCAJ believes that people facing debt-collection lawsuits should be able to talk about these suits with social services providers in their communities, known and trusted by the residents, and able to answer the kinds of questions that routinely surface in consumer-debt cases. In a recent report, NCAJ interviewed social services professionals about the impact of the UPL laws on their efforts to help low-income people. *See* NATIONAL CENTER FOR ACCESS TO JUSTICE, "WORKING WITH YOUR HANDS TIED BEHIND YOUR BACK": NON-LAWYER

PERSPECTIVES ON LEGAL EMPOWERMENT (2021),

https://ncaj.org/sites/default/files/2021-

06/NCAJ%20Working%20With%20Your%20Hands%20Tied%20Behind%20You

r%20Back.pdf. These individuals reported that their efforts to help residents with

simple legal problems are often frustrated by broad UPL laws, such as those at

issue here. *See id.* at 12-15.

NCAJ submits this brief as *amicus curiae* to offer its perspective as an

organization dedicated to expanding access to justice for low-income communities.

Specifically, NCAJ supports Reverend Udo-Okon's efforts to speak with his

parishioners and neighbors, with the benefit of Upsolve Inc.'s training, about how

to complete a court-created form designed by the New York Courts to assist lay

people in answering debt-collection claims.

## SUMMARY OF ARGUMENT

Consumer debt litigation is often catastrophic for people without access to

advice about how to solve their legal problems. Reverend Udo-Okon with the

support of Upsolve, Inc. ("Upsolve"), seeks to provide free, limited advice to

people in his South Bronx community. He wants to speak with members of his

community who face debt-collection litigation about how to fill in the blanks on a

court-designed Answer form. The Court below correctly enjoined New York from

banning this important speech through enforcement of its UPL laws against

Reverend Udo-Okon and against Upsolve, which seeks to train the Reverend and others like him about how best to deliver that advice.

In seeking reversal of that order, the Attorney General, and the Amici supporting Defendant-Appellant, downplay the demand for limited advice from trusted community figures about how to respond to debt-collection lawsuits as merely "speculative." Their briefs also incorrectly speculate that Upsolve's program will harm, rather than help, those low-income community residents currently left to navigate debt-collection cases entirely on their own. In fact, the record shows that, but for the application of the UPL laws, the Reverend would be providing advice to many members of his community, thereby ameliorating the disastrous impact that debt-collection claims have on unrepresented people.

The Attorney General and Amici likewise portray debt-collection law as complicated, incomprehensible to lay people, and understandable only by lawyers. But that characterization is inaccurate. The court system itself publishes a pro-se fill-in-the-blank Answer form. This form and the court-provided instructions for completing it, are posted on the New York Courts' website under the heading "Find the Help You Need to Represent Yourself in NY Courts." *See* "Answering a Case" in COURT HELP, NEW YORK STATE UNIFIED COURT SYSTEM, https://www.nycourts.gov/Courthelp/MoneyProblems/answer.shtml (last accessed Jan. 10, 2022). The New York Courts thus acknowledge both that people routinely

5

navigate these cases without a lawyer, and that providing basic help to them is necessary.

Not every debt-collection matter is simple. To the contrary, Upsolve's training manual requires its volunteers to refer more complex matters to legal services providers. (J.A. 45, 48, 51, 53, 57.) Yet, most cases are relatively straightforward and low-income defendants would benefit greatly from advice from a trained lay person such as the Reverend about how to respond to a complaint, including how to complete and file the court-approved answer form. Many who find the forms daunting can complete them successfully with a modicum of informed advice. But without access to advice from the Reverend and those like him, many low-income debt-defendants inevitably will be left confused, and potentially stymied upon being served with a debt-collection complaint.

Everyone agrees that New York has a compelling interest in protecting consumers. The Attorney General is justified in enforcing UPL laws to protect the public from laypeople falsely holding themselves out as lawyers, and in regulating those who charge money for giving legal advice. But that rationale does not apply here, where there is no deception of any kind, and none of the integrity-risking incentives the profit motive can foster. Nor would enforcement of UPL laws against the Reverend protect members of his community from relying on uncompensated but harmful advice. The Reverend wishes to provide his free and

well-informed advice to members of his community who know and trust him, only on the narrow topic of how to complete a court-designed form. His information and advice will reach people who cannot afford or for other reasons might not obtain a lawyer's advice. Common sense suggests, and experience shows, that allowing community members to be educated and then talk to each other in this way will go a long way toward bridging the justice gap for many debt-collection defendants.

Applying New York's UPL prohibitions to the speech of Reverend Udo-Okon and Upsolve violates the First Amendment because the prohibition is not narrowly tailored to serve a compelling consumer-protection interest. In fact, as applied to Plaintiffs-Appellees, the law *undermines* that interest by preventing Bronx residents faced with debt-collection litigation from obtaining help they seek from the Reverend even though they would benefit from his advice were he permitted to provide it. The District Court therefore properly enjoined application of the UPL laws to the Reverend and Upsolve.

## ARGUMENT

### I. THE DISTRICT COURT PROPERLY ENJOINED APPLICATION OF THE UPL LAWS TO THE REVEREND'S DISCUSSIONS WITH COMMUNITY MEMBERS ABOUT COMPLETING COURT-DESIGNED ANSWER FORMS IN DEBT CASES.

Judge Crotty correctly found that Reverend Udo-Okon and Upsolve have standing to bring this action because potential enforcement of New York's UPL

prohibition against them poses a cognizable injury that the requested injunction would redress. (J.A. 181-84.) Seeking to avoid scrutiny on the merits, the Attorney General and the Amici challenge this threshold finding, arguing that one can only speculate that there are low-income people in the Reverend's community who would seek his help in completing the court-designed Answer if the UPL laws did not prohibit those discussions. Appellant's Brief ("App. Br.") at 32-35; Brief of Amici Curiae in Support of Defendant-Appellant ("Am. Br.") at 31-32. That argument ignores both the record and reality.

### A. There is Urgent Demand for the Advice the Reverend Udo-Okon Could Provide to People in his Community

Nationwide, debt-collection cases comprise approximately one quarter of all civil state court filings. *See* Pew Report at 8. The plaintiffs in these cases are either creditors or bulk debt buyers that almost always have lawyers, whereas 90% of defendants are unrepresented. *Id.* at 13. This imbalance is even more extreme in New York, where approximately 95% of consumer debt defendants lack counsel. *See* Andy Newman, *They Need Legal Advice on Debts. Should it Have to Come from Lawyers?,* N.Y. TIMES (Jan 25, 2022), https://www.nytimes.com/2022/01/25/nyregion/consumer-debt-legal-advice.html (96% of consumer credit defendants are unrepresented in New York City, and 97% are unrepresented outside of the City). Lack of legal assistance for debtor defendants results in terrible injustice: the

overwhelming majority of cases end in default judgment because the defendants

never participate, even though many of the cases are meritless.

> Hundreds of thousands of consumer credit matters are filed annually
> in New York, with a significant majority of the cases being decided
> on default. In a high percentage of cases, consumers are being sued
> for debts they do not owe or for which creditors have no proof to
> establish their right to collect the debt. Creditors and their attorneys'
> practices depend on default judgments. . .

PERMANENT COMMISSION ON ACCESS TO JUSTICE, REPORT TO THE CHIEF JUDGE OF

THE STATE OF NEW YORK 55 (2022), https://www.nycourts.gov/LegacyPDFS/acces

stojusticecommission/22_ATJ-Comission_Report.pdf. *See also* Pew Report at 15,

17; HUMAN RIGHTS WATCH, RUBBER STAMP JUSTICE: US COURTS, DEBT BUYING

CORPORATIONS, AND THE POOR, 28–31 (2016),

https://www.hrw.org/report/2016/01/20/rubber-stamp-justice/us-courts-debt-

buying-corporations-and-poor; LEGAL AID SOCIETY ET AL., DEBT DECEPTION: HOW

DEBT BUYERS ABUSE THE LEGAL SYSTEM TO PREY ON LOWER-INCOME NEW

YORKERS, 8–10, 26 n. 91 (2010), http://mobilizationforjustice.org/wp-

content/uploads/reports/DEBT-DECEPTION.pdf. These widespread defaults have

created a crisis in low-income communities.

Yet in 71 pages of briefing, the Attorney General never mentions, let alone

addresses, the default rate in New York debt-collection litigation and never once

acknowledges the justice gap faced by defendants left to defend debt-collection

suits without the benefit of any individualized advice on how to proceed. Her

arguments on appeal thus are entirely divorced from the real-world catastrophe facing New York's low-income debt-collection defendants.

For their part, the Amici acknowledge "the distressingly high rate of default judgments" and admit that "the great majority of defendants in debt collection lawsuits do not benefit from full representation" and that their own organizations provide "advice and pro se assistance," Am. Br. at 33-34, yet incongruously claim there is no need for the free lay advice the Reverend seeks to provide. *Id.* at 33. They assert that "many" of the Amici organizations "rarely, if ever" turn away a low-income person seeking representation in a debt-collection case, noting that when they do, they refer such persons to another legal services organization. *Id*. at 34. They also assert there is no need for the advice the Reverend seeks to provide because defaults are primarily caused by "sewer service" meaning that defendants are unaware they need to answer a complaint and thus unable to secure the services offered by Upsolve-trained volunteers. *Id*. at 33.

Neither assertion is correct. First, the assertion that the legal services bar rarely if ever turns away a debt-collection defendant seeking assistance paints an incomplete picture.[2] While many legal service providers, often with insufficient resources, do an admirable job providing counsel to people, they cannot serve all

---

[2] The Amici provide no data on the number of debt-collection defendants they represent, or other support for this assertion.

who seek their assistance, and there are many more who never make it to the door

of legal aid, for a variety reasons.[3] The Legal Services Corporation ("LSC") – the

umbrella funding organization for civil legal aid organizations across the country,

including the Amici organization Legal Services for New York City – has

documented that legal services organizations must turn away 49% of those who

come to them for legal assistance. LEGAL SERVICES CORPORATION, THE JUSTICE

GAP: MEASURING THE UNMET CIVIL LEGAL NEEDS OF LOW-INCOME AMERICANS 9

(2022) ("Justice Gap Survey"), https://lsc-

live.app.box.com/s/xl2v2uraiotbbzrhuwtjlgi0emp3myz1. Moreover, that report

concludes that those who seek out legal assistance are only the tip of the iceberg of

those in need. "Low-income Americans sought legal help for 19% of their

collective civil legal problems," *id*. at 44, and the number was even lower (14%)

---

[3] There is no support in the record, and the Amici cite none, for their claim that "sewer service" is the *primary* cause of defaults. "Selection bias" offers a possible explanation insofar as people who learn of being sued only when their wages are garnished are likely to seek legal services counsel, especially if previously unaware of an alleged debt. Moreover, the potentially large population of people with means above the civil legal aid eligibility cut off may never seek out counsel at a legal aid office that limits eligibility to those with less means. Sewer service has also been the target of concerted efforts by regulators, legislators, legal service providers (including some of the Amici) that have reduced its incidence in New York since its height in the 2008 financial crisis. *See* "Public Interest Lawyers are Key in Passage of Landmark Legislation to Stem 'Sewer Service' in New York City," Clearinghouse Review Journal of Law and Poverty, Vol 44, Nos. 7-8 (Nov.-Dec. 2010), http://mobilizationforjustice.org/wp-content/uploads/Public-Interest-Lawyers-Are-Key-in-Passage-of-Landmark-Legislation-to-Stem-Sewer-Service-in-NYC.pdf.

for those experiencing consumer legal problems. *Id*. at 45.[4] LSC's empirical assessment is consistent with data that shows that only 5% of debt defendants are represented, and that 88% of them default. *See id; see also* Newman, *supra*, 8. Unfortunately, there is no support for the Amici's suggestion that their organizations are meeting the legal needs of New Yorkers facing debt-collection lawsuits.

Second, many factors other than "sewer service" cause the extremely high default rate in debt-collection cases. Academic studies of interventions to reduce the default rate posit that defaults result from "a variety of cognitive, emotional, and behavioral challenges, ranging from immobilizing feelings of shame, guilt, or hopelessness to lack of self-agency as well as failures in plan making and plan implementation." D. James Greiner, Dalié Jiménez & Lois Lupica, *Self-Help, Reimagined*, 92 IND. L.J., 1119, 1125 (2017). Other research shows that some defendants are intimidated by the legal system or too embarrassed by their financial circumstances to seek out a lawyer or defend the lawsuit. Some, particularly when sued by a debt-buyer rather than the original creditor, do not

---

[4] LSC's 2023 funding request bears out how few people facing debt-collection litigation it is actually able to serve, noting that the 2022 Justice Gap Survey found that 44% [of low-income Americans] experienced at least one money or debt-related civil legal problem in the past year but that in 2020, LSC's grantees handled only 69,000 such cases *nationwide*. *See* LSC 2023 Budget Request, 40, https://lsc-live.app.box.com/s/ip5pqq3dht40qvrl6hxz3l68fnivdssg.

recognize the plaintiff and do not understand the need to respond. Others do not believe that they will be treated fairly in the legal system. Many debt defendants also face practical obstacles such as language barriers or lack of internet access, childcare, time off from work, or transportation, that deter or prevent them from seeking legal advice or responding to debt-collection complaints. *See* Pew Report at 16 (citing practical realities in consumers' lives; a sense of futility, confusion or intimidation; non-recognition of the plaintiff (when a debt-buyer rather than the original creditor brings suit), and lack of notice as contributors to the default rate).

LSC's own research substantiates this analysis. Its 2022 Justice Gap Survey analyzes why Americans with civil legal problems never seek help from a lawyer and identifies three principal types of barriers: Knowledge, attitudinal and cost. *See* Justice Gap Survey at 49. The data reveal a "low level of awareness" on the part of survey respondents that lawyers can help, *id.*, and significant doubt that the legal system will treat them fairly or help protect their rights. *Id.* at 50-51. Fifty-three percent of those polled by LSC expressed that they did not know they could find a lawyer they could afford. *Id.* at 52.

The Reverend and Upsolve of course will not be able to help all defaulting debtor defendants or solve the default crisis in debt-collection cases. Yet, for individuals served with debt-collection complaints who might otherwise default for one or more of these reasons, advice from Reverend Udo-Okon or other Upsolve-

trained volunteers would help them make more informed decisions and potentially avoid default if the UPL laws did not prohibit such advice. Given this reality, the District Court correctly concluded that "Plaintiffs' program does not need to reach every potential client to strengthen the judicial system." (J.A. 204.)

**B.    The Record Shows that, But for New York's UPL Prohibition, Reverend Udo-Okon Would Provide Free Advice to Many Members of his Community**

The record below reflects the reality described above. The Reverend's declaration makes clear that, but for the UPL rules, he would be speaking, without charge, to his parishioners and neighbors about how to prepare their answers in response to debt-collection lawsuits. He would base these conversations on Upsolve's training and would gear them towards filling out the court-provided fill-in-the-blank Answer form.

The Reverend's declaration recounts his firsthand experiences with members of his community who cannot get help from attorneys: "[T]here also are not many consumer lawyers based in my neighborhood, and there are very few lawyers who reflect the diversity of my community." (J.A. 81.) He has sworn that "people frequently come to [him] with legal problems they cannot solve on their own," and that when he refers them to agencies for legal assistance, they report that "they are put on long waiting lists before even receiving legal advice, even though in most cases their situations are quite time sensitive and having to wait means losing the

ability to access their rights." (J.A. 81-82.) He explains that because "members of my community cannot afford to pay for a lawyer, cannot access free lawyers quickly enough, and cannot understand the system of their own, they are left without any guidance, and often without any ways to move forward." (J.A. 82.) Noting that these problems are "especially severe" when it comes to debt-collection lawsuits, he explains that "[o]ne thing is consistent: People do not know what to do when they are sued on a debt and have nowhere to turn for help." (J.A. 82.) He concludes that "people seek advice [on how to respond to debt collection lawsuits] from me directly. However, due to New York's unauthorized practice of law regulations, I am unable to provide that advice for fear that I will be arrested or fined." (J.A. 83.)

The Reverend's experience is common. NCAJ's research shows that librarians, social workers, and other social services professionals are regularly approached by community members with basic legal questions but operate with the understanding that the UPL laws require them to turn those people and their basic legal questions away. See NATIONAL CENTER FOR ACCESS TO JUSTICE, "WORKING WITH YOUR HANDS TIED BEHIND YOUR BACK": NON-LAWYER PERSPECTIVES ON LEGAL EMPOWERMENT (2021), https://ncaj.org/sites/default/files/2021-06/NCAJ%20Working%20With%20Your%20Hands%20Tied%20Behind%20Your%20Back.pdf at 4, 10, 12–15. These social services professionals often have

language skills, education, relevant cultural knowledge, and most importantly, relationships of trust with community members – all factors that enable them to help people fill out forms, navigate websites, organize and synthesize evidence, and respond to their questions and requests for help. *See id.*

The unchallenged record evidence shows that Plaintiffs-Appellees have standing. The Reverend's declaration reflects the trust and confidence his community has in him and shows that when – not if – members of his community face debt-collection lawsuits in the future and turn to him for help, he is ready, willing, and able to offer them advice in answering those complaints.

### C.     Claims about the Complexity of Legal Practice Miss the Point that the Reverend, with Upsolve's Support, Could Help Many People

In an effort to support their contention that the law is too complicated to risk having the Reverend discuss court-designed pro se forms with the unrepresented residents of his community, Appellant and the Amici point to alleged errors in the initial training manual created by Upsolve. App. Br. at 16–18; Am. Br. at 7–14.[5] Even assuming the training materials are imperfect, these arguments distract from the reality that vulnerable people confronted by garden-variety collection claims typically face their adversaries without the benefit of any advice at all. Surely

---

[5] Plaintiffs-Appellees have responded to some of these critiques, *see* Plaintiffs-Appellees' Br. at 15-17, n 1. Moreover, Upsolve has provided a revised training manual to the District Court to reflect changes in the law. *See* Letter from Upsolve, *Upsolve, Inc. v. James*, No. 22-cv-00627, ECF 89 (Dec., 2022).

individuals trying to use the form Answer will fare better if helped by a trained and trusted community member than if left to tackle it on their own.

The Attorney General offers no support for her warning that "Upsolve's nonlawyer advocates, incorrectly believing themselves to be experts, may readily and overconfidently misadvise clients who would have made better choices acting on their own." App. Br. at 77. NCAJ sees no basis for that hypothetical concern. We know already that people sued in debt-collection cases who lack access to counsel usually default. The Reverend, and others who work within low-income communities, bring literacy, interpersonal, and organizational skills to the task of helping people in their communities. With the additional training provided by Upsolve, advice about how to respond to a debt-collection suit provided by such community leaders plainly will leave low-income members of the community better off than if they are left to fend for themselves. Indeed, as Judge Crotty noted, a nonlawyer specifically trained on debt-collection issues who provides advice only on those issues might very well offer more useful advice than, say, a licensed patent lawyer with no experience with debt-collection litigation. (J.A. 202, n. 13.) (citing Brief of Amicus Curiae Rebecca L. Sandefur, ECF No. 38-1, at 21).

The salient point is that New York faces a crisis of astronomical default rates in debt-collection litigation. A major cause of those defaults is that low-income people often have no access to advice of any kind. NCAJ submits that the relevant

17

comparison is not between advice provided by trained nonlawyers and advice provided by lawyers; it is between advice from trained nonlawyers and *no advice at all*. The speculation that an error may occasionally occur is no basis for prohibiting a program in its entirety; nor does it justify a broad ban on speech affecting people with desperate needs when a more tailored regulatory approach could achieve the State's legitimate goals.

## II. THERE IS GROWING AWARENESS OF THE VALUE OF RELYING ON PEOPLE WHO ARE NOT LAWYERS TO PROVIDE BASIC LEGAL ADVICE

There is growing acceptance that individuals who are not attorneys can provide important assistance to people who are encountering pressing legal needs.

### A. The Role of People Who are Not Lawyers is Recognized in the Caselaw

The Supreme Court has acknowledged the importance of lay assistance in certain legal matters. For example, in *Turner v. Rogers*, 564 U.S. 431 (2011), the Court held that a parent facing civil contempt for failure to pay child support did not automatically have a constitutional right to appointed counsel, even though a contempt finding might result in incarceration. *Id.* at 448. Justice Breyer justified this result in part by noting that "sometimes assistance other than purely legal assistance (here, say, that of a neutral social worker)" is sufficient to protect against unwarranted deprivations of liberty. *Id.* This rationale reflects the observation that Justice Douglas made more than fifty years ago that equal justice

18

may depend on nonlawyers' volunteer efforts not unlike those that Plaintiffs-

Appellees offer here:

> It may well be that until the goal of free legal assistance
> to the indigent in all areas of the law is achieved, the poor
> are not harmed by well-meaning, charitable assistance of
> laymen. On the contrary, for the majority of indigents,
> who are not so fortunate to be served by neighborhood
> legal offices, lay assistance may be the only hope for
> achieving equal justice at this time.

*Hackin v. Arizona*, 389 U.S. 143, 152 (1967) (Douglas, J., dissenting from

dismissal for lack of federal question).

The New York Court of Appeals also has acknowledged the reality that

people discuss legal problems with their friends and neighbors. Although its

decision in *People v. Alfani*, 227 N.Y. 334 (1919), is often quoted for its

observation that UPL laws "protect the public from ignorance, inexperience and

unscrupulousness," *id.* at 339, the Court recognized that UPL laws must have some

outer limit, noting that people are free to represent themselves. *Id.* at 341. As

pertinent here, the Court then observed that "[p]robably [a person] may ask a

friend or neighbor to assist him" with a legal matter. *Id.* As explained below, the

UPL law has since been interpreted much more strictly.  But the notion that the

state could prevent a person from sharing her views about a legal matter with her

neighbor defies common sense as well as the First Amendment.

**B.** **People Who are Not Lawyers Already Play Important Roles in the Federal and State Systems**

Qualified nonlawyers have a proven track record of successfully advising people on a variety of legal issues. In federal and state agency proceedings, they routinely provide a broad array of individualized legal services.

Nonlawyers have long provided legal assistance in agency settings. For example, Medicaid regulations preempt state UPL laws, requiring states to "allow individual(s) of the applicant or beneficiary's choice to assist in the application process or during a renewal of eligibility." 42 C.F.R. § 435.908(b). The services that lay people may provide include "helping individuals complete an application or renewal, working with the individual to provide required documentation, submitting applications and renewals to the agency, interacting with the agency on the status of such applications and renewals, [and] assisting individuals with responding to any requests from the agency." 42 C.F.R. § 435.908(c). An applicant or beneficiary may also be represented at any hearing before the agency by counsel, or by a relative, friend, or other spokesman. 42 C.F.R. § 435.908(b)(3).[6]

---

[6] In addition to permitting unpaid lay representatives to assist claimants seeking Social Security disability insurance benefits, 20 C.F.R. § 404.1705, the Social Security Administration also permits the representatives to seek compensation if they meet various educational and training standards, maintain professional liability insurance, and pass a criminal background check. 76 Fed. Reg. 45184, 45186-89 (July 28, 2011), http://www.gpo.gov/fdsys/pkg/FR- 2011-07-28/pdf/2011-19026.pdf.

In New York, qualified individuals may represent clients in Unemployment Insurance appeals and before the Workers Compensation Board. The State Unemployment Insurance Appeals Board maintains a list of "registered representatives" who may present a claimant's case, introduce evidence, cross-examine opposing parties and their witnesses, and give a closing argument. Such nonlawyer representatives must be of good moral character, have a high school degree or its equivalent, and have at least 16 hours of relevant work or academic experience. The nonlawyer may have to pass an exam, and must submit a resume and be interviewed by the Board. The applicant must also indicate whether she intends to engage full-time in representing claimants for a fee, and upon certification must obtain a surety bond of $500. *See* N.Y. Comp. Codes R. & Regs. tit. 12, § 460.5. The Board controls and supervises the compensation that both lawyers and nonlawyers may charge for representing claimants. Registered representatives may charge a fee only if their client has won an award. N.Y. Comp. Codes R. & Regs. tit. 12, § 460.6; UNEMPLOYMENT INSURANCE REVIEW BOARD, IMPORTANT INFORMATION ABOUT WHAT LAWYERS OR REPRESENTATIVES CAN CHARGE CLIENTS, https://uiappeals.ny.gov/system/files/documents/2019/06/UIAB_25%20Claimant%20Flyer%2006-19%20%28003%29.pdf (last visited Jan. 10, 2023).

Similarly, the New York State Workers' Compensation Board licenses nonlawyers to practice before it. Applicants must be at least 18 years old, have a high school diploma or its equivalent, and reside in or have a regular place of business in New York. They must have knowledge of the relevant law and regulations, pass a written exam, and submit to possible oral review by the Board. N.Y. Comp. Codes R. & Regs. tit. 12, §§ 302-1–302-2. In these administrative settings, nonlawyers, both trained and untrained, have for years provided valuable guidance and support to people about legal matters.

C. **In Regulatory Sandboxes and Other Initiatives States are Learning that People who are Not Lawyers Can Successfully Provide Individualized Assistance on Certain Legal Matters**

Recognizing the need to empower more people to provide advice responsive to unmet legal needs, several states have begun to develop new roles for providing advice outside of the administrative setting. For example, Arizona has established an explicit exemption to its UPL laws permitting licensure of "legal paraprofessionals" ("LPs") to provide a broad array of legal services and advice, including about debt-collection litigation. LPs must meet eligibility requirements including core-skills and subject-matter examinations, satisfy education and experience combination requirements, and follow a code of conduct. *See* News Release, Arizona Supreme Court Administrative Office of the Courts, Arizona Supreme Court Leads Nation in Tackling Access to Justice Gap with New Tier of

Legal Services Providers (December 9, 2021),

https://www.azcourts.gov/Portals/201/120921LSP.pdf; *see also Legal*

*Paraprofessional Program*, ARIZ. CTS, https://www.azcourts.gov/Licensing-

Regulation/Legal-Paraprofessional-Program (last visited Jan. 10, 2022). Similarly,

Utah has created a "regulatory sandbox" for which the Office of Legal Services

Innovation within the Utah Supreme Court reviews and approves or disapproves of

applications for experimental approaches to the provision of legal services

(including by nonlawyers) that would otherwise be prohibited under the State's

UPL laws. *See What We Do*, OFF. OF LEGAL SERVS. INNOVATION,

https://utahinnovationoffice.org/about/what-we-do/. California, New Mexico and

Illinois are currently exploring potential changes to UPL laws that would increase

opportunities for nonlawyers to provide certain types of legal advice. *See* Aebra

Coe, "Where 5 States Stand on Nonlawyer Practice of Law Regs," LAW360 (Feb.

5, 2021), https://www.law360.com/access-to-justice/articles/1352126/where-5-

states-stand-on-nonlawyer-practice-of-law-regs.[7]

---

[7] Evaluation of the new models is ongoing, but these programs have been largely successful. In *Legal Innovation After Reform: Evidence from Regulatory Change,* the authors found: "few reported complaints against service providers in Arizona or Utah," and explained that "Data and information reported by Utah and Arizona regulators indicate that authorized entities do not appear to draw a substantially higher number of consumer complaints, as compared to their lawyer counterparts. In particular, Utah's June 2022 data reported one complaint per 2,123 services delivered, and Arizona has received no complaints. This is generally on par with the number of complaints lodged against lawyers." DAVID FREEMAN ENGSTROM,

Arguing, as the Attorney General does, that nothing short of a law degree and admission to the bar can qualify a person to help fill out a court-drafted, one-page form ignores the reality that nonlawyers already commonly provide far more extensive and involved advice on legal matters – in some cases before New York State agencies. The Attorney General's stance is tantamount to arguing that a medical degree and four-year residency is required for an individual to administer CPR, or perform the Heimlich maneuver. Lay people with minimal training save thousands of lives each year because they happen to be where a person needs urgent medical care. Trained nonlawyers like the Reverend can provide free advice that helps address an urgent need in his community.

## III.  APPLIED TO PLAINTIFFS-APPELLEES, THE UPL RULE THAT PROHIBITS LAY PROVISION OF LEGAL ADVICE IS NOT NARROWLY TAILORED

New York has a compelling interest in enforcing its consumer protection laws, including its UPL regime. But where, as here, such enforcement prohibits speech on the basis of its content, it violates the First Amendment unless the Government proves that the restriction furthers a compelling interest and is

---

LUCY RICCA, GRAHAM AMBROSE, & MADDIE WALSH, LEGAL INNOVATION AFTER REFORM: EVIDENCE FROM REGULATORY CHANGE 7, Stanford Law School Deborah L. Rhode Center on the Legal Profession (Sept. 27, 2022), https://law.stanford.edu/publications/legal-innovation-after-reform-evidence-from-regulatory-change/.

narrowly tailored to achieve that interest. *See Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011).

No one questions New York's interest in enforcing UPL laws to protect the public from laypeople falsely holding themselves out as lawyers or otherwise seeking to profit from giving legal advice. Indeed, in the seminal case interpreting the UPL laws, the New York Court of Appeals repeatedly emphasized that the primary evil at which those laws were addressed was falsely posing as a lawyer or otherwise making a business of giving legal advice: "To make it a business to practice as an attorney-at-law not being a lawyer is the crime. Therefore, to prepare instruments and contracts by which legal rights are secured and to hold oneself out as entitled to draw and prepare such [documents] as a business is a violation of the law." *Alfani*, 227 N.Y. at 338; *see also id.* at 339 ("'to practice as an attorney-at-law' means to do the work, as a business, which is commonly and usually done by lawyers in this country"); *id.* at 341 (distinguishing portions of the UPL statutes that permitted lay people to appear in certain courts not of record, in part because such cases "are seldom frequent enough to make it a business").[8]

---

[8] Although arguably dicta (because Alfani was a nonlawyer who had "for a long period of time drawn legal papers and instruments for hire and held himself out to the public as being in that business," 227 N.Y. at 335-36), the opinion does state that providing any "advice to clients and all actions taken for them" in legal matters constitutes the practice of law. *Id*. at 338. As the Attorney General notes, that view has become the law. *See* App. Br. at 8 (citing cases holding that advice given to a particular person about a legal matter constitutes the practice of law).

To be sure, prohibiting *all* advice about *any* legal topic provided by *any* nonlawyer might achieve the State's interests in protecting consumers. But that approach cannot be squared with the narrow tailoring the First Amendment requires. No compelling state interest is closely served by forbidding the Reverend and other trained non-lawyer professionals from providing free, limited advice to members of their low-income communities about how to address a discrete, but significant legal problem.

More than a century ago in *Alfani*, the Court of Appeals observed that "[a]ll rules must have their limitations, according to circumstances and as the evils disappear or lessen. Thus a man may plead his own case in court, or draft his own will or legal papers. *Probably he may ask a friend or neighbor to assist him*." *Id*. at 341 (emphasis added). Despite the suggestion in *Alfani* that the prohibition on the unlicensed practice of law has practical limitations, New York continues to insist on a sweeping interpretation of the UPL laws. *See* Bruce A. Green, *Why State Courts Should Authorize Non-Lawyers to Practice Law* (Nov. 7, 2022), 91 FORDHAM L. REV. (2023), Fordham Law Legal Studies Research Paper No. 4270508, https://ssrn.com/abstract=4270508 ("over the past century, the state court has never clarified whether neighborly help in drafting legal documents falls on the right side of the line."). This litigation gave New York a chance to reconsider its approach; but the Attorney General has adhered to the view that the UPL laws

prohibit any lay person from giving *any* legal advice, even on the facts here. App. Br. at 7, 8, 66.

But applying the UPL laws to ban the free advice on a narrow topic that the Reverend and Upsolve seek to provide violates the First Amendment. However compelling New York's interest may be in protecting people from the unauthorized practice of law in other contexts, the Attorney General cannot credibly contend that applying the UPL laws to ban the discussions the Reverend wants to have with his neighbors is narrowly tailored to serve that interest. To the contrary, applying those laws to bar the speech at issue serves only to inflict further harm on low-income people facing debt-collection suits.

## CONCLUSION

Everyone agrees that there are many legal activities that only licensed lawyers should perform. That is why NCAJ continues to push for more public funding of civil legal aid lawyers who can provide legal services to low-income people in complex court proceedings. Although there are not nearly enough lawyers to meet the need, New York would criminalize the free, basic advice that the Reverend wishes to provide to people in his community about how to complete a court-drafted form in debt-collection cases. By enjoining application of the UPL laws to Plaintiffs-Appellees, the District Court provided critically important relief. The injunction should be affirmed.

Dated: New York, New York
January 11, 2023

Respectfully Submitted,

_____/s_____

David Udell
Lauren A. Jones
National Center for Access to Justice
150 West 62nd Street
New York, NY 10023
dudell@fordham.edu

Bruce A. Green
Louis Stein Center for Law and Ethics
150 West 62nd Street
New York, NY 10023
bgreen@fordham.edu

*Attorneys for Amicus*

# CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitations of Fed. R. App. P.

29(a)(4). It contains 6,967 words, excluding the parts of the

brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6). It has

been prepared in a proportionally spaced typeface using Microsoft Word in

14 point Times New Roman font.


Dated:       January 11, 2023
             New York, New York            _____/s_____
                                                David Udell