# 22-1345

## United States Court of Appeals
## for the Second Circuit

UPSOLVE, INC., REVEREND JOHN UDO-OKON,

*Plaintiffs-Appellees,*

v.

LETITIA JAMES, in her official capacity as Attorney General of New York,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of New York

## REPLY BRIEF FOR APPELLANT

BARBARA D. UNDERWOOD
 *Solicitor General*
JUDITH N. VALE
 *Deputy Solicitor General*
CLELAND B. WELTON II
 *Assistant Solicitor General*
  *of Counsel*

LETITIA JAMES
 *Attorney General*
 *State of New York*
Attorney for Appellant
28 Liberty Street
New York, New York 10005
(212) 416-6197

Dated: February 8, 2023

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................ii

INTRODUCTION ................................................................................ 1

ARGUMENT ....................................................................................... 3

    A.    Plaintiffs Are Unlikely to Succeed on the Merits.................... 3

        1.    Plaintiffs have not carried their burden to establish standing. .......................................................................... 3

        2.    The unauthorized-practice statutes do not violate the First Amendment. ...................................................... 6

                a.    Plaintiffs' proposed speech is merely incidental to the conduct of practicing law. .............................. 8

                b.    The unauthorized-practice statutes do not regulate plaintiffs' speech based on its content....... 17

                c.    The unauthorized-practice statutes do not violate plaintiffs' freedom of association.................. 20

                d.    Regulating plaintiffs' unlicensed law practice is part of a long tradition of similar regulation........... 21

                e.    The unauthorized-practice statutes satisfy any applicable level of First Amendment scrutiny......... 25

    B.    The Remaining Factors Favor Reversal................................. 33

CONCLUSION ................................................................................... 35

# TABLE OF AUTHORITIES

| Cases | Page(s) |
|---|---|

*Barr v. American Ass'n of Pol. Consultants, Inc.*,
 140 S. Ct. 2335 (2020) ........................................................ 19

*Billups v. City of Charleston*,
 961 F.3d 673 (4th Cir. 2020) ............................................. 13

*Brokamp v. James*,
 573 F. Supp. 3d 696 (N.D.N.Y. 2021) ............................... 16

*Brown v. Entertainment Merchs. Ass'n*,
 564 U.S. 786 (2011) ............................................................ 23

*Capital Associated Indus., Inc. v. Stein*,
 922 F.3d 198 (4th Cir. 2019) ........................................ 8, 14

*Chiles v. Salazar*,
 No. 22-cv-2287, 2022 WL 17770837 (D. Colo. Dec. 19, 2022) ........... 15

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
 142 S. Ct. 1464 (2022) ....................................................... 18

*City of Lakewood v. Plain Dealer Publ'g Co.*,
 486 U.S. 750 (1988) .............................................................. 5

*Clapper v. Amnesty Int'l USA*,
 568 U.S. 398 (2013) .......................................................... 4-5

*Cohen v. California*,
 403 U.S. 15 (1971) ............................................................. 10

*Connecticut Bar Ass'n v. United States*,
 620 F.3d 81 (2d Cir. 2010) .................................................. 3

*Connecticut Citizens Def. League, Inc. v. Lamont*,
 6 F.4th 439 (2d Cir. 2021) ................................................... 3

*Crownholm v. Moore*,
 No. 22-cv-1720, 2022 WL 17968586 (E.D. Cal. Dec. 27, 2022) ......... 15

| Cases | Page(s) |
|---|---|

*Del Castillo v. Ladapo*,
   143 S. Ct. 486 (2022)...................................................................15

*Del Castillo v. Philip*,
   No. 17-cv-722, 2019 WL 13141202 (N.D. Fla. July 17, 2019)............15

*Del Castillo v. Sec'y, Fla. Dep't of Health*,
   26 F.4th 1214 (11th Cir. 2022) .....................................................8, 15

*Dent v. West Virginia*,
   129 U.S. 114 (1889)......................................................................7, 21

*El Gemayel v. Seaman*,
   72 N.Y.2d 701 (1988) ........................................................................26

*Geller v. Hochul*,
   No. 21-2514, 2023 WL 221725 (2d Cir. Jan. 18, 2023) .......................5

*Giboney v. Empire Storage & Ice Co.*,
   336 U.S. 490 (1949)............................................................................15

*Goldfarb v. Virginia State Bar*,
   421 U.S. 773 (1975)......................................................................25-26

*Green Haven Prison Preparative Meeting of Religious Soc'y of
   Friends v. New York State Dep't of Corr. & Cmty. Supervision*,
   16 F.4th 67 (2d Cir. 2021)...................................................................5

*Hertz Corp. v. Friend*,
   559 U.S. 77 (2010)..............................................................................33

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010).....................................................................8, 10-11

*In re Primus*,
   436 U.S. 412 (1978)............................................................................20

*Jacoby & Meyers, LLP v. Presiding Justs. of the First, Second,
   Third & Fourth Dep'ts, App. Div. of the Sup. Ct.*,
   852 F.3d 178 (2d Cir. 2017) ..............................................................25

**Cases**                                                                     **Page(s)**

*Locke v. Shore,*
    634 F.3d 1185 (11th Cir. 2011) ....................................................... 8, 15

*Matter of Rowe,*
    80 N.Y.2d 336 (1992) ........................................................................ 19

*McDonald v. Lawson,*
    No. 22-cv-1805, 2022 WL 18145254 (C.D. Cal. Dec. 28, 2022) .......... 15

*Monroe v. Horwitch,*
    820 F. Supp. 682 (D. Conn. 1993) ..................................................... 25

*NAACP v. Button,*
    371 U.S. 415 (1963) .......................................................................... 20

*National Ass'n for the Advancement of Multijurisdiction*
    *Prac. v. Castille,*
    799 F.3d 216 (3d Cir. 2015) ........................................................ 18, 25

*National Ass'n for Advancement of Psychoanalysis v. California*
    *Bd. of Psych.,*
    228 F.3d 1043 (9th Cir. 2000) ..................................................... 15, 18

*National Inst. of Fam. & Life Advocs. v. Becerra,*
    138 S. Ct. 2361 (2018) .......................................................... 1, 8, 12, 21

*Pacific Coast Horseshoeing School, Inc. v. Kirchmeyer,*
    961 F.3d 1062 (9th Cir. 2020) ........................................................... 13

*People v. Alfani,*
    227 N.Y. 334 (1919) .......................................................................... 22

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) .......................................................................... 17

*Tingley v. Ferguson,*
    47 F.4th 1055 (9th Cir. 2022) .................................................... 8, 14, 21

*United States v. O'Brien,*
    391 U.S. 367 (1968) .......................................................................... 10

| Cases | Page(s) |
|---|---|

*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989)..................................................................... 18

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)..................................................................34-35

**Laws**

Ch. 165, 1898 N.Y. Laws 309.................................................. 23

# INTRODUCTION

Plaintiffs advance a claim that no court had accepted before the district court in this case—that the First Amendment requires the States to allow someone with no relevant qualifications to practice law without a license. Plaintiffs' novel argument is wrong. It is also dangerous: As amici explain, allowing plaintiffs (and others who may follow in their footsteps) to practice law without "meaningful guardrails" would "carr[y] an unacceptable risk that [they] will harm, not help, low-income New Yorkers." Br. of *Amici Curiae* Civ. Legal Servs. Orgs. et al. ("Advocate Amici Br.") at 3. The injunction should be reversed.

At the outset, plaintiffs' speculation and unsupported assertions about matters outside the record do not establish standing. Absent evidence of even a single client to whom plaintiffs would provide legal counsel, the district court erred in granting relief.

On the merits (if the Court reaches them), plaintiffs cannot avoid the principle that "States may regulate professional conduct, even though that conduct incidentally involves speech." *See National Inst. of Fam. & Life Advocs. v. Becerra* (*NIFLA*), 138 S. Ct. 2361, 2372 (2018). This principle permits regulation of nonphysical conduct (like formulating legal advice

or a treatment plan), even though the output of that conduct is speech (like providing legal advice or mental-health counseling). Plaintiffs here are not merely seeking the right to talk; they want to practice law—specifically, to apply purported legal knowledge, judgment, and skill to guide low-income New Yorkers in the preparation of formal pleadings to be filed in court. That professional conduct is the legitimate subject of state regulation, even though it incidentally involves speech.

Because the unauthorized-practice statutes effect an evenhanded professional-conduct regulation (not a content-based speech regulation), plaintiffs' claims should be resolved and rejected under the rational-basis standard. But even under heightened review, the statutes are valid. The speech in which plaintiffs want to engage is bounded by Upsolve's training guide, and the terms of that document do not satisfy New York's compelling interest in protecting the public from unqualified and unethical legal advice. Prohibiting plaintiffs from practicing law without a license does not violate the First Amendment.

## ARGUMENT

### A. Plaintiffs Are Unlikely to Succeed on the Merits.

#### 1. Plaintiffs have not carried their burden to establish standing.

As the Attorney General explained (AG Br. at 31-35), plaintiffs' legal theory obligated them to demonstrate the existence of clients to whom they would (if granted relief) provide the specific legal counsel that their program contemplates. Absent such evidence, plaintiffs lack standing. Indeed, plaintiffs appear to concede that if no client engages their legal services, then "no law has been broken," and there can be no well-founded fear of prosecution. Pl. Br. at 38; *see Connecticut Bar Ass'n v. United States*, 620 F.3d 81, 90 (2d Cir. 2010).

Plaintiffs, however, identify no evidence that prospective clients exist.[1] While plaintiffs rely (Pl. Br. at 25-27) on Reverend John Udo-Okon's petition, that conclusory document does not support standing because it does not supply the requisite specific facts. *See Connecticut Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439, 448 (2d Cir. 2021). The

---

[1] Plaintiffs assert without citation that they have counseled fourteen unidentified persons (Pl. Br. at 10 n.2), but such unverified statements about matter outside the record are not evidence.

signatories attested only that they are generally interested in "free legal advice" from Udo-Okon (J.A. 88-107), and plaintiffs acknowledge that Udo-Okon "receives questions from his parishioners about a wide variety of . . . legal problems" (Pl. Br. at 9). None of the petition's signatories indicated a need for help answering a debt-collection complaint in New York City Civil Court—as opposed to advice on some other legal problem. It was *plaintiffs'* burden (not the Attorney General's) to produce evidence that the signatories were expressing an interest in plaintiffs' specific legal advice (*contra* Pl. Br. at 26), yet plaintiffs proffer nothing but impermissible speculation to support such a conclusion. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413-15 (2013).

While plaintiffs refer to high default rates in consumer-debt cases (Pl. Br. at 25), they ignore amici's explanation, based on decades of experience, that those defaults are primarily driven by "sewer service"—the practice of falsely representing to a court that service is complete (Advocate Amici Br. at 4, 21-22; *see* Br. of *Amici Curiae* Consumer Law Experts et al. at 11-13, Dist. Ct. ECF No. 57). Victims of sewer service—including all of plaintiffs' named affiants (J.A. 118, 121, 128)—are ineligible for plaintiffs' program (J.A. 45, 53).

Plaintiffs also disregard the fact that a debt-collection defendant who needs assistance preparing an answer would not need to resort to plaintiffs' unlawful program. Authorized legal-aid organizations already provide such assistance. (*See* J.A. 204; Advocate Amici Br. at 22-23.) Speculation that unidentified third parties would choose plaintiffs' unlicensed services over the free advice of an authorized practitioner does not establish standing. *See Clapper*, 568 U.S. at 413-14.

Plaintiffs attempt to lighten their burden by asserting that the "factual question" here is "what the ultimate record is likely to show." Pl. Br. at 24 n.5. But the issue is whether *the preliminary-injunction record* supplies "specific facts that establish" standing. *Green Haven Prison Preparative Meeting of Religious Soc'y of Friends v. New York State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 78 (2d Cir. 2021) (quotation marks omitted). The record here does not do so.[2]

---

[2] Plaintiffs' "self-censorship" theory (Pl. Br. at 28) is unavailing. "Self-censorship is immune to an 'as applied' challenge." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988); *accord Geller v. Hochul*, No. 21-2514, 2023 WL 221725, at *2 (2d Cir. Jan. 18, 2023).

Defendant's standing argument is not waivable. *Contra* Pl. Br. at 24 n.5. That is why this Court addressed standing sua sponte in *Green Haven*, 16 F.4th at 78.

## 2. The unauthorized-practice statutes do not violate the First Amendment.

If the Court reaches the merits, it should reverse.

To begin, the Court should disregard plaintiffs' attempts to redefine what this case is about. Plaintiffs are not merely seeking "the right to talk" (*e.g.*, Pl. Br. at 3), and they would not trigger the unauthorized-practice statutes by "just talking about how to respond to a consumer-debt lawsuit" (*id.* at 11). To the contrary, the unauthorized-practice statutes come into play only because plaintiffs are *not* proposing to engage in casual chats on the street or in a tavern. Rather, plaintiffs want to conduct legal consultations directed to the preparation of sworn pleadings that are filed in court, and which may have significant consequences (e.g., waiving meritorious defenses or counterclaims, admitting facts that negatively impact the case, or making false representations to the court). Plaintiffs are prohibited from engaging in that specific conduct without a license, because (as plaintiffs admit (J.A. 32-33)) it amounts to the practice of law—viz., the application of purported legal knowledge, judgment, and skill to the facts of individual cases to generate personalized advice about what the clients should say in formal legal papers. Outside that narrow prohibition, plaintiffs have ample space in which to talk about the law,

including about "how to respond" to a lawsuit: They may (for example) refer others to the state-provided answer form (and/or to a licensed attorney), and may freely discuss the relevant legal concepts and doctrines in general terms.[3]

As many decisions have recognized (see AG Br. at 37 nn.13-16), a requirement to obtain a license before practicing law is well within the State's legitimate and longstanding authority to regulate the profession. *See, e.g.*, *Dent v. West Virginia*, 129 U.S. 114, 122 (1889). A contrary ruling would endanger clients, patients, and consumers in this Circuit by applying strict scrutiny to (and potentially invalidating) statutes that protect the public against inept and unethical practitioners of law, medicine, and many other vocations. Neither precedent nor any First Amendment principle requires such an extreme result.

---

[3] Because plaintiffs want to practice law by generating in-person counsel on a client-by-client basis, this case does not implicate amici's concerns about providing "basic legal information" or gray areas in what other jurisdictions' unauthorized-practice statutes may prohibit. *Contra* Law Professors Br. at 9-13. Amici's assertion that plaintiffs' advice is "indistinguishable from everyday speech about the law" (*id.* at 19) is likewise false.

### a. Plaintiffs' proposed speech is merely incidental to the conduct of practicing law.

Plaintiffs' approach to this case disregards the constitutional distinction between a statute that regulates speech *directly* and one that burdens speech only *incidentally*, as the indirect effect of regulating conduct. The answering brief, for example, talks about "the test for determining whether a law restricts speech or merely conduct" (Pl. Br. at 28) as though those were the only two kinds of regulation.

But as the opening brief explained (AG Br. at 37-39), there is a third category: conduct regulations that may indirectly burden speech that is incidental to the regulated conduct. *See, e.g.*, *NIFLA*, 138 S. Ct. at 2372-73; *Holder v. Humanitarian Law Project*, 561 U.S. 1, 26-28 (2010). Such regulations—including professional-licensing regimes in a variety of fields—are not subject to the same constitutional scrutiny that applies to a direct speech regulation. *See, e.g.*, *Tingley v. Ferguson*, 47 F.4th 1055, 1077-78 (9th Cir. 2022) (psychotherapists); *Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1218, 1225-26 (11th Cir. 2022) (dieticians); *Capital Associated Indus., Inc. v. Stein* (*CAI*), 922 F.3d 198, 208 (4th Cir. 2019) (attorneys); *Locke v. Shore*, 634 F.3d 1185, 1190-91 (11th Cir. 2011) (interior designers).

The licensing regime in this case is a conduct regulation that, at most, burdens plaintiffs' speech only indirectly and incidentally. See AG Br. at 37-43. Specifically, New York's unauthorized-practice statutes regulate the conduct of practicing law—i.e., the application of legal knowledge, judgment, and skill to the facts of an individual client's case to generate legal counsel for that client. Or, as plaintiffs' amici put it, the statutes regulate the conduct of "appl[ying] . . . knowledge about law, legal principles, or legal processes to specific facts or circumstances; creating an analysis of the situation (a diagnosis of its legal aspects); and [creating] suggestions about courses of action (proposed treatments)." Sandefur Br. at 16. While the attorney-licensure requirement may arguably burden nonlawyers' ability to communicate legal counsel, that is an incident of the State's permissible regulation of the conduct of practicing law. Strict scrutiny therefore does not apply.

Relying on *Holder*, plaintiffs assert that the relevant question is whether "'the conduct triggering coverage under the statute consists of communicating a message,'" and that here the "conduct triggering coverage" is the communication of legal advice. *See* Pl. Br. at 28, 30, 35 (quoting 561 U.S. at 28). This is a misunderstanding of *Holder*.

*Holder* distinguished between (i) a regulation directed at conduct that has the merely incidental effect of burdening speech, and (ii) a regulation that is "directed at [a person] *because of*" his or her speech. 561 U.S. at 26-28 (emphasis added). As an example of a regulation directed at conduct with only incidental burdens on speech, *Holder* cited the prosecution for burning a draft card in *United States v. O'Brien*, 391 U.S. 367 (1968). The statute in that case targeted the conduct of destroying draft cards, and O'Brien was prosecuted because he destroyed his card—not because he had thereby expressed protest against the draft. *See Holder*, 561 U.S. at 26-27. The prosecution did not violate the First Amendment even though it incidentally burdened O'Brien's speech.

As an example of a regulation directed at speech, *Holder* cited the prosecution in *Cohen v. California*, 403 U.S. 15 (1971), for breaching the peace by wearing a jacket with an anti-draft epithet. As *Holder* explained, while *Cohen* (like *O'Brien*) "involved a generally applicable regulation of conduct," the law "was directed at Cohen because of what his speech communicated—he violated the breach of the peace statute because of the offensive content of his particular message." 561 U.S. at 28. That kind of prosecution triggers strict scrutiny. *Id.*

*Holder* itself also fell into the second category. That case involved a prohibition on material support to designated terrorist groups. *Id.* at 26. Although such support generally takes the form of conduct (e.g., providing weapons), the *Holder* plaintiffs wanted to provide support in the form of "expert advice" to designated groups. *See id.* at 26, 36-38. The Supreme Court ruled that prohibiting such communications was like the prosecution in *Cohen*: while the statute could "be described as directed at conduct, as the law in *Cohen* was directed at breaches of the peace," in *Holder* "the conduct triggering coverage under the statute consists of communicating a message." *Id.* at 28. Strict scrutiny therefore applied.

Under these precedents, what matters is whether the government is targeting speech or conduct. Strict scrutiny applied in *Cohen* and *Holder* because the government in those cases targeted speech itself, whereas less rigorous review applied in *O'Brien* because the prosecution targeted the conduct of destroying a draft card (irrespective of the communicative content of O'Brien's act). The constitutional standard does not turn on whether the act precipitating a prosecution is communicative (O'Brien's conduct was expressive), but on whether the government's aim in undertaking the prosecution is to suppress speech.

*NIFLA* reaffirms this analysis in the context of professional regula-tion. *Contra* Pl. Br. at 30. There, the Supreme Court explained that strict scrutiny applies where the government "regulates speech as speech"—as where it banned the message in *Cohen* and the advice in *Holder*. *See* 138 S. Ct. at 2374. But professional-conduct regulations, including "reasonable licensing" requirements, do not regulate "speech as speech." *See id.* at 2373 (quotation marks omitted). Such regulations, *NIFLA* recognized, are directed to the conduct of the profession, and are not subject to strict scrutiny even if they burden the speech of some persons engaged in the profession.

The case at bar does not fall under *Cohen* and *Holder*. That is because plaintiffs do not "seek only the right to communicate advice derived from specialized knowledge" (*contra* Pl. Br. at 39)—they seek to engage in the professional conduct of deriving the advice in the first place. And it is that professional conduct—not the communication of legal advice as such—that the regulation targets. Plaintiffs are free to communicate legal counsel that was generated by a licensed attorney; they are not free to

generate the counsel in the first instance.[4] See AG Br. at 9, 42, 45, 50-52. Thus, the "conduct triggering coverage" is the act of generating legal counsel without a license—not speech.

Plaintiffs' cases (Pl. Br. at 40-41) do not support a different conclusion. In both *Billups v. City of Charleston*, 961 F.3d 673, 677 & n.1 (4th Cir. 2020) (tour guides), and *Pacific Coast Horseshoeing School, Inc. v. Kirchmeyer*, 961 F.3d 1062, 1066, 1070-71, 1074 (9th Cir. 2020) (vocational schools), the government sought to directly regulate what the plaintiffs could say. The challenged laws did not merely impose a licensing requirement on persons engaged in the antecedent conduct of generating content (a tour guidebook or a course syllabus) later to be communicated to others. An unlicensed guide would have violated the Charleston ordinance in *Billups* by giving a tour even if it was based on materials prepared by a license-holder, and a vocational school would have violated the California statute in *Pacific Coast* by giving prohibited instruction even if the school

---

[4] Plaintiffs are incorrect to assert that requiring a nonlawyer advocate to consult with a licensed attorney before conveying legal advice is a "restriction on the content of his [or her] message." Pl. Br. at 36. Provided that he or she consults with a licensed attorney, a nonlawyer may tell a client, "You should do the following," whether or not the statement is prefaced with either "I think" or "Mr. X" thinks. *Cf. id.*

was accredited. The laws in those cases thus did not regulate underlying conduct; they directly regulated speech. The present case is different: Udo-Okon would *not* violate New York's unauthorized-practice statutes by merely communicating legal counsel generated by a licensed attorney. He would violate the statutes only by generating the counsel himself.

Plaintiffs' cases are thus inapposite. And plaintiffs are unable to distinguish *CAI*, 922 F.3d 198—a case that dealt with an attorney-licensing regime analogous to the one here. See AG Br. at 41-43, 47. Plaintiffs assert that this case is different from *CAI* because Upsolve and Udo-Okon only want "to give people advice." Pl. Br. at 39. But the plaintiff in *CAI* similarly wanted to "answer questions about employment and labor law," 922 F.3d at 202, which is why the Fourth Circuit undertook a First Amendment analysis, *see id.* at 208. Yet the court did not apply strict scrutiny, because unauthorized-practice statutes "don't target the communicative aspects of practicing law"—any burden on speech is only "incidental to the over-arching purpose of regulating who may practice law." *Id.* at 207-08.

Plaintiffs also have no good answer to *Tingley* or *Del Castillo*. Those cases recognize that there are forms of nonphysical conduct (e.g., "psycho-logical interventions," *Tingley*, 47 F.4th at 1064, and nutritional assess-

ments, *Del Castillo*, 26 F.4th at 1225-26) that the government has power to regulate even though in doing so it may indirectly burden communications that are incidental to that nonphysical conduct.[5] Indeed, the Supreme Court has long recognized the same principle in upholding (for example) the government's power to prohibit agreements in restraint of trade—another form of nonphysical conduct that incidentally involves speech. *See Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502-04 (1949). Many other cases have reached the same basic conclusion. *E.g.*, *Locke*, 634 F.3d at 1191; *National Ass'n for Advancement of Psychoanalysis v. California Bd. of Psych.* (*NAAP*), 228 F.3d 1043, 1053-54 (9th Cir. 2000); *McDonald v. Lawson*, No. 22-cv-1805, 2022 WL 18145254, at *10-11, *16 (C.D. Cal. Dec. 28, 2022); *Crownholm v. Moore*, No. 22-cv-1720, 2022 WL 17968586, at *6 (E.D. Cal. Dec. 27, 2022); *Chiles v. Salazar*, No. 22-cv-

---

[5] Plaintiffs' Rule 28(j) letter highlights that only three of the 29 active judges of the Ninth Circuit agreed with Judge O'Scannlain's dissenting view of *Tingley*.

While plaintiffs assert that *Del Castillo* "represents a circuit split" (Pl. Br. at 34), the Supreme Court denied certiorari without dissent. *Del Castillo v. Ladapo*, 143 S. Ct. 486 (2022). Plaintiffs also suggest that *Del Castillo* ignored *Holder*, but that decision was raised throughout the litigation. *See, e.g.*, *Del Castillo v. Philip*, No. 17-cv-722, 2019 WL 13141202, at *8 (N.D. Fla. July 17, 2019). The Eleventh Circuit simply (and correctly) determined that *Holder* was inapposite.

2287, 2022 WL 17770837, at *7-9 (D. Colo. Dec. 19, 2022); *Brokamp v. James*, 573 F. Supp. 3d 696, 709-10 (N.D.N.Y. 2021), *appeal pending*, No. 21-3050 (2d Cir.).

Plaintiffs' position is thus legally incorrect. And plaintiffs have no response to the Attorney General's observation that under their rule, strict scrutiny would not just govern this case—*any* attempt to enforce the unauthorized-practice statutes would be presumptively invalid. See AG Br. at 45-46. This would allow any number of unlicensed, unvetted, and even predatory practitioners to practice law in a variety of fields (including, for example, real-estate transactions, wills and trusts, taxation, and intellectual property), effectively beyond the reach of state oversight.[6] An unlicensed individual who advises a client *not* to file a claim in court would

---

[6] Plaintiffs suggest that drafting a legal document for a client is different from providing oral advice because a document may take on legal significance. Pl. Br. at 38-39. But plaintiffs' proposed counsel is directed to pleadings with legal significance—their clients will file those documents in court. In any event, plaintiffs' assertion is misguided, because merely drafting a contract or a will does not give the document legal force. The document has force only once all relevant parties have manifested their assent. Under the correct view, a practitioner who exercises legal judgment to prepare a contract is subject to New York's licensing requirements—not because he or she is typing a document, but because he or she is exercising legal judgment for a client.

also be shielded from unauthorized-practice liability—even though the consequences of such inaction (e.g., missing a jurisdictional filing deadline) may be dire. Indeed, plaintiffs' rule would mean allowing nonlawyers (and even disbarred lawyers) to draft pleadings and briefs for clients to file on a purported "pro se" basis—vitiating the courts' ability to use tools like Rule 11 to regulate those who practice before them.

At the same time, the courts would be burdened by demands for case-by-case adjudication of individual requests for exemptions from the unauthorized-practice statutes. And plaintiffs' proposed rule could rapidly reach outside the legal field, impairing the government's ability to protect the public in a wide variety of professional fields including medicine, accounting, psychology, counseling, and education. See AG Br. at 54-56. Any such rule should be rejected.

### b. The unauthorized-practice statutes do not regulate plaintiffs' speech based on its content.

The opening brief also explained (AG Br. at 48-52) why the unauthorized-practice statutes are content-neutral: They do not "target speech based on its communicative content," *see Reed v. Town of Gilbert,* 576 U.S. 155, 163 (2015), and do not "dictate what can be said" within an

attorney-client relationship, *see NAAP*, 228 F.3d at 1055; *accord National Ass'n for the Advancement of Multijurisdiction Prac. v. Castille* (*NAAMP*), 799 F.3d 216, 221 (3d Cir. 2015) (bar admission requirement is a permissible "content-neutral licensing requirement for the practice of law"). The statutes target the conduct of the legal profession, and they apply equally to everyone engaged in that profession irrespective of the content of his or her advice. Such regulations are permissible even if they may have "an incidental effect on some speakers or messages but not others," *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989), and even if assessing their content-neutrality "may require some evaluation of the speech" at issue, *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1473 (2022).

Plaintiffs' only response is to assert that they are permitted to communicate advice on some topics but not on others. Pl. Br. at 42-43. But the only speech in which plaintiffs may not engage is that which is incidental to the unauthorized practice of law. This is not a content-based speech regulation merely because it is directed to the practice of law and not to other fields of professional conduct.

Apart from this limited prohibition, plaintiffs (like all New Yorkers) have wide latitude to speak on any legal topic they wish. Plaintiffs are free to discuss legal topics, to publish books and guides, and to refer debt-collection defendants to the answer form. *See Matter of Rowe*, 80 N.Y.2d 336, 342 (1992); Advocate Amici Br. at 24-25. Plaintiffs are forbidden only to practice law without a license.

Because the unauthorized-practice statutes evince no impermissible content preference, they also do not enact any unlawful speaker preference. *See Barr v. American Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2347 (2020). Plaintiffs assert that the State might prefer for New Yorkers to receive good legal advice rather than incompetent or unethical advice (Pl. Br. at 43-44), but the unauthorized-practice statutes do not regulate the content of legal counsel. Rather, allegations of bad or fraudulent advice are investigated and addressed through mechanisms such as court-administered disciplinary proceedings and private malpractice suits. See AG Br. at 6-7, 60-61. The unauthorized-practice statutes enable those regulatory mechanisms to function by ensuring that those who practice law are bound by the rules of professional conduct and by settled malprac-

tice standards. But they do not effectuate a content preference. See AG Br. at 52.

### c. The unauthorized-practice statutes do not violate plaintiffs' freedom of association.

Plaintiffs assert in the alternative that the unauthorized-practice statutes burden their freedom of association. Pl. Br. at 17, 52-54. But as the district court determined, this theory is unsound. (J.A. 189-191.)

Plaintiffs' theory rests on cases recognizing that ideologically motivated attorneys have a First Amendment right to associate with clients for the purpose of advancing a political program through litigation. *See NAACP v. Button*, 371 U.S. 415, 419-20, 428-29 (1963); *In re Primus*, 436 U.S. 412, 422, 427-28, 431-32 (1978). The unauthorized-practice statutes do not implicate any such associational rights. Udo-Okon and Upsolve may associate with whomever they choose, including by retaining one or more lawyers. Plaintiffs may use their associations to express and to advocate for their political beliefs, including by bringing litigation (as they are doing through this lawsuit) and by publishing or speaking about general legal information. If plaintiffs choose to associate with a lawyer, he or she would be free to associate with clients and to formulate legal advice. The

only thing that plaintiffs cannot do is generate unlicensed legal advice directed to particular clients' cases. That is a restriction on plaintiffs' conduct, and it may arguably have an incidental (but constitutionally permissible) impact on their speech—but it in no way burdens plaintiffs' ability to associate.

### d. Regulating plaintiffs' unlicensed law practice is part of a long tradition of similar regulation.

Even if the Court were to conclude that the unauthorized-practice statutes represent a direct and content-based speech restriction (as opposed to a professional-conduct regulation with at most incidental effects on speech rights), the injunction still should be reversed. New York's 125-year-old licensure requirement falls squarely within a long tradition of permissible regulation. *See NIFLA*, 138 S. Ct. at 2372; *Tingley*, 47 F.4th at 1079-83.

Indeed, the States' power to impose professional licensure requirements to protect the people from "the consequences of ignorance and incapacity, as well as of deception and fraud" has been recognized "from time immemorial." *Dent*, 129 U.S. at 122. With respect to the legal profession specifically, it is common ground that in-court law practice, which

necessarily involves speaking to and communicating with judges and juries, has been regulated since before the Founding. And as plaintiffs acknowledge (Pl. Br. at 46-47), out-of-court law practice has been similarly regulated since at least the late nineteenth century. See AG Br. at 36 & n.12, 53-54. As plaintiffs' amicus explains, the expansion of attorney-licensure requirements was necessitated by increasing economic, bureaucratic, and regulatory complexity—which brought with it a need for trained and regulated legal counsel outside the courtroom. *See* Responsive Law Br. at 5. And as the New York Court of Appeals explained more than a century ago, prophylactic and consumer-protective regulation may be even more important outside of court than in court. While comparatively "little can go wrong in a court where the proceedings are public" and overseen by a judge, an untrained and unaccountable practitioner may through "[i]gnorance and stupidity . . . create damage which the courts of the land cannot thereafter undo." *People v. Alfani*, 227 N.Y. 334, 339-40 (1919).

Thus, as the scope of the legal profession expanded, regulation expanded with it to include out-of-court legal practice—professional conduct that is both related and analogous to the in-court practice that has always been subject to oversight. The resulting statutes are now well

over a century old, *see* Ch. 165, 1898 N.Y. Laws 309, and neither New York's rules nor those of the other 49 States have ever been invalidated before this case. To the contrary, courts have consistently held that such requirements comport with the Constitution. See AG Br. at 36-37 & nn.13-16. Plaintiffs have nothing to say about those decisions. In this context, it is hard to understand plaintiffs' denial that the unauthorized-practice statutes are "part of a long . . . tradition of proscription." *See Brown v. Entertainment Merchs. Ass'n*, 564 U.S. 786, 792 (2011).[7]

Plaintiffs assert that subjecting them to the unauthorized-practice statutes falls outside this tradition because the "specific thing" that they "want to do is *talk about the law* outside of formal court settings." Pl. Br. at 47. But that misrepresents both the scope of the unauthorized-practice statutes and the specifics of what plaintiffs want to do. As discussed, the statutes do not stop plaintiffs from "speak[ing] about the law in streets or homes or taverns." *Contra id.* No one is stopping Udo-Okon from

---

[7] Plaintiffs' suggestion that the Attorney General misrepresented the literature (Pl. Br. at 12 n.3) is baseless. The opening brief acknowledged that Founding-era regulation focused on in-court rather than out-of-court conduct. See AG Br. at 53. And it is not disputed that licensing laws and other attorney regulations were in force at the Founding.

discussing legal subjects with his congregants or with passersby. The statutes only prohibit the unlicensed provision of client-specific legal counsel. And the particular counsel that plaintiffs want to provide is hardly divorced from "formal court settings" (*id.*)—it is directed to the preparation of legal pleadings that individual clients then file in their lawsuits. Plaintiffs do not show that prohibiting Upsolve's actual program falls outside the tradition of law-practice regulation.

Plaintiffs attempt to draw a distinction between in-court and out-of-court law practice by invoking public-forum doctrine (*id.* at 47-48), but that is a non sequitur. This case is not about the public airing of ideas. It is about the provision of specialized legal counsel in individual court cases. Plaintiffs' proposal is to act as shadow counsel for nominally pro se litigants, who will file essentially ghostwritten court papers without disclosing that (or from whom) they have received legal advice. Regulation of such conduct is within the historical tradition of regulating those who may plead and practice in courts of law.

### e. The unauthorized-practice statutes satisfy any applicable level of First Amendment scrutiny.

The Attorney General demonstrated (AG Br. at 56-69) that New York is permitted to exercise its "broad power to establish standards for licensing practitioners" in service of the State's "compelling interest in the practice of professions within [its] boundaries"—including an "especially great" interest in regulating the practice of law. *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 792 (1975). Plaintiffs' cursory response (Pl. Br. at 48-51) is unpersuasive.

First, plaintiffs have no answer to the Attorney General's showing (AG Br. at 56-58) that professional-licensing requirements like those at issue here need only have a rational basis to pass constitutional muster. While "bar admission requirements" may increase the cost of practicing law, "[s]uch an increased cost does not implicate the First Amendment" because it does not cognizably burden speech rights. *See Jacoby & Meyers, LLP v. Presiding Justs. of the First, Second, Third & Fourth Dep'ts, App. Div. of the Sup. Ct.*, 852 F.3d 178, 190-91 (2d Cir. 2017); *accord NAAMP*, 799 F.3d at 221 (applying rational-basis review to bar admission requirement); *Monroe v. Horwitch*, 820 F. Supp. 682, 683-88 (D. Conn. 1993), *aff'd*, 19 F.3d 9 (2d Cir. 1994) (table). Plaintiffs do not even try to argue that

the unauthorized-practice statutes fail rational-basis review. The district court's decision should be reversed on this ground alone.

To the extent that either intermediate or strict scrutiny applies, plaintiffs supply no good basis for affirmance. Plaintiffs admit that the State has a compelling interest in "protecting the public" from the hazards of unlicensed legal practice. Pl. Br. at 50; *see also Goldfarb*, 421 U.S. at 792; *El Gemayel v. Seaman*, 72 N.Y.2d 701, 705 (1988). The State also has compelling interests in ensuring that legal practitioners are competent, ethical, and independent—not just to protect particular clients, but also to promote judicial integrity and efficiency. See AG Br. at 60. Plaintiffs do not dispute that regulating who may engage in the practice of law serves these important public interests. See AG Br. at 60-65.

Unable to contest the significance of the interests at stake, plaintiffs argue that the Attorney General proffered insufficient evidence of narrow tailoring. Pl. Br. at 50-51. But no evidence beyond Upsolve's own submissions is necessary to show that plaintiffs' First Amendment claims are unlikely to succeed. See AG Br. at 66-69.

That is because this case seeks to enjoin enforcement of the unauthorized-practice statutes against plaintiffs' proposed practice of

law under Upsolve's training guide. Plaintiffs are not seeking—and could not obtain—a court order requiring the Legislature to enact a new licensing statute. The First Amendment question is therefore whether there exists a regulatory regime that would permit plaintiffs to practice law under Upsolve's training guide while protecting the State's compelling interests. See AG Br. at 67.

No such regime exists. Plaintiffs note purported "less-restrictive alternatives" (Pl. Br. at 49) such as the Arizona and California laws allowing laypersons to prepare certain legal documents—but as amici explain, those statutes *prohibit* document preparers from practicing law (Advocate Amici Br. at 19-20). Moreover, even document preparers must complete "stringent qualification and educational requirements," and are subject to oversight by "independent, third-party entities." *Id.* Plaintiffs could not even prepare documents under these regimes (let alone practice law), because Upsolve imposes no "stringent" prerequisites and rejects third-party oversight. See AG Br. at 13-15.[8] The design of plaintiffs' program

---

[8] Plaintiffs' amici underscore the point, citing other officially sanctioned regimes under which nonlawyers are sometimes allowed to practice subject to appropriate oversight (which plaintiffs' program lacks). *See*

*(continued on the next page)*

also forecloses reliance on "tort remedies" as a form of post-hoc regulation by enforcement (*contra* Pl. Br. at 49), because Upsolve requires its clients to sign broad liability waivers (J.A. 55). After-the-fact tort suits, moreover, would not serve the State's interests in preventing unqualified and unscrupulous nonlawyers from causing injury in the first place. And although plaintiffs suggest that "disclosure requirements" could serve the State's aims (Pl. Br. at 49), Upsolve's training guide requires no such disclosures. In any event, such requirements might be difficult to enforce in practice, and they ultimately would not protect vulnerable New Yorkers from injury.

Because alternative regulatory regimes would not allow plaintiffs to operate their program as designed, the question becomes whether Upsolve's training guide suffices to accomplish the State's goals. And on that question, plaintiffs do not refute the Attorney General's explanation that the training guide is inadequate. See AG Br. at 62-65.

At the highest level, plaintiffs cannot explain how the Attorney General is supposed to protect the public from the dangers of unlicensed

---

Sandefur Br. at 25-26; Law Professors Br. at 15-18; National Center for Access to Justice Br. at 20-24.

law practice without even knowing who is practicing under Upsolve's program.[9] Plaintiffs also do not specify what is required for a person to be "approved" as a nonlawyer advocate (J.A. 43), and do not dispute that Upsolve designed its program to "bypass[]" attorney prerequisites such as competency and "character and fitness" examinations (*see* J.A. 149).

Nor do plaintiffs contest the Attorney General's observations concerning the many shortcomings of Upsolve's program. The nonlawyer advocates are not even notionally bound by the ethical duty of competence, and their promises to abide by other ethical rules are both empty (the training guide does not explain the rules) and toothless (the only remedy for breach is revocation of an unpaid volunteer position). Moreover, any nominal confidentiality obligation is effectively meaningless in the absence of an attorney-client privilege. And Upsolve has no procedure for addressing conflicts of interest. As amici put it, plaintiffs' program "is stunning in its lack of any meaningful guardrails" to protect their clients from error and abuse. Advocate Amici Br. at 5; *see id.* at 15-19.

---

[9] Apart from Udo-Okon, Upsolve does not identify the nonlawyer advocates with whom it purportedly has associated. Pl. Br. at 10 n.2.

With respect to the proposed legal advice itself, plaintiffs assert in a footnote that their counsel will be "helpful." Pl. Br. at 51 n.13. But that claim is unsubstantiated. The Attorney General (AG Br. at 11-13, 16-18) and the advocate amici (Advocate Amici Br. at 7-14)—experts in the precise area of law in which plaintiffs propose to practice—detailed litanies of significant errors, omissions, and confusing statements running throughout the training guide. Plaintiffs respond that Upsolve has "'update[d]'" the guide (Pl. Br. at 7 n.1)—but the injunction is based on the original document, and the "updated" guide is not before the Court. And there is good reason to doubt the new guide's accuracy: many of the errors that the Attorney General and the advocate amici identified were obvious, and were not the result of changes in the law or differences in judgment.[10]

More fundamentally, the point of identifying problems with the training guide was not to supply an exhaustive list of proposed "updates,"

_____

[10] For example, the training guide contains misstatements concerning the jurisdictions and procedural posture in which Upsolve's advocates may provide advice, and how to measure a limitations period. While plaintiffs suggest that the updated guide reflects changes in certain statutes of limitations, some of the limitations periods in the original guide (e.g., for medical debt) were inaccurate when the document was published. See AG Br. at 16-18.

but to illustrate that Upsolve's materials (which are not alleged to have been written by experts in debt-collection practice[11]) are not a reliable substitute for trained and competent legal advice. Plaintiffs' attempt to defend the guide only confirms this point, by making clear that appropriate advice can turn on complex considerations like "the structure of the debt" in a given case or professional judgments about "nuanced approaches or preferences" about how to respond to a complaint. *See* Pl. Br. at 7 n.1. Upsolve's training guide expressly calls for nonlawyer advocates to exercise legal judgment about such matters, even though they lack the education, training, and experience that are necessary to do so competently—and even though their client consultations are to last no more than 20 minutes.[12] (J.A. 47.)

---

[11] Plaintiffs uncritically quote (Pl. Br. at 6-7) Pamela Foohey's statement that "[b]ased on [her] knowledge, the Training Guide provides nonlawyers sufficient information and resources they need to help unrepresented individuals respond to debt collection complaints" (J.A. 114). But Ms. Foohey is not a New York lawyer and does not attest to any relevant experience or other basis for assessing the training guide's adequacy. See AG Br. at 64 n.19.

[12] The training guide's limited scope poses its own problems. For example, plaintiffs propose only to advise clients with respect to preparing and filing form answers (*see* J.A. 55), leaving clients to fend for themselves in the ensuing litigation—with no guidance regarding how the case will proceed or how to prepare for or handle future adversarial proceedings.

Finally, plaintiffs have no answer to the Attorney General's observation that a licensure regime (supported by the prohibition on unauthorized practice of law) is necessary to ensure that mechanisms like disciplinary proceedings are available to address and deter breaches of ethical and professional standards. See AG Br. at 61. Upsolve still has no oversight or enforcement plan through which to police even its own inadequate rules. See AG Br. at 63. And private remedies do not provide an enforcement mechanism, because plaintiffs do not accept fiduciary duties; are not subject to settled malpractice standards; require their clients to waive "any liability" arising from their cases (J.A. 55); and have not shown the ability to satisfy a money judgment. See AG Br. at 66-67.

Plaintiffs' program thus does not remotely satisfy the State's compelling interests in safeguarding low-income New Yorkers from the dangers of incompetent and unethical legal advice. The State does not violate the First Amendment by prohibiting such a program—particularly because the prohibition leaves open ample space for plaintiffs to talk about the law and to advocate for legal change.

One change for which plaintiffs might choose to advocate would be an amendment to the Judiciary Law permitting nonlawyers engage in

limited law practice without full bar membership, but subject to appropriate public-protective regulation like that which prevails in some other jurisdictions. But the blunt instrument of constitutional litigation cannot provide that kind of tailored relief. Plaintiffs' recourse is with the Legislature, not the courts.[13]

## B.    The Remaining Factors Favor Reversal.

Plaintiffs' brief discussion of the remaining injunction factors (Pl. Br. at 54-55) does not support the district court's decision.

*Irreparable injury.* Plaintiffs' failure to establish a likelihood of success on the merits disposes of their theory of irreparable harm. In any event, there is no evidence that there exist any clients in imminent need of plaintiffs' unlicensed legal advice. Plaintiffs' unsupported contrary assertion does not carry their heavy burden "to demonstrate that irrepa-

---

[13] If this Court determines that intermediate or strict scrutiny applies, it should at minimum vacate the injunction and remand for further proceedings. Prior to the decision below, no controlling precedent had subjected an attorney-licensing regime to such heightened scrutiny. While outright reversal is warranted for the reasons discussed in text, the Attorney General should at minimum have an opportunity to develop the record and to litigate the injunction motion under this Court's ruling. *See Hertz Corp. v. Friend*, 559 U.S. 77, 97 (2010).

rable injury is *likely.*" *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

***Public interest.*** The district court's injunction impinges upon New York's uncontroverted, compelling interests in protecting the public from the risks of incompetent and unethical legal advice. And a decision affirming the injunction would further damage the public interest—both by ratifying plaintiffs' substandard program and by encouraging others to lower the bar even further.

Plaintiffs assert that these grave public harms are outweighed by an abstract "right to give legal advice." Pl. Br. at 55. But for all the reasons set forth above, plaintiffs have no First Amendment right to implement Upsolve's program. And in any event, plaintiffs have not demonstrated any great public need for a preliminary injunction. To the contrary, plaintiffs' unverified assertion is that they advised only fourteen New Yorkers in the more than seven months that elapsed between the district court's injunction and the date the answering brief was filed. There is no evidence that plaintiffs' purported clients could not have obtained free advice from a licensed attorney, let alone evidence that any future clients require plaintiffs' counsel. Plaintiffs' failure of proof on this point is enough to

justify vacatur. *See Winter*, 555 U.S. at 23-24. New York should be permitted to reinstate its public-protective system of attorney regulation while this litigation is pending.

## CONCLUSION

The preliminary injunction should be reversed.

Dated:  New York, New York
        February 8, 2023

Respectfully submitted,

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Appellant

By:  <u>*/s/ Cleland B. Welton II*</u>
      CLELAND B. WELTON II
      Assistant Solicitor General

BARBARA D. UNDERWOOD
  *Solicitor General*
JUDITH N. VALE
  *Deputy Solicitor General*
CLELAND B. WELTON II
  *Assistant Solicitor General*
    *of Counsel*

28 Liberty Street
New York, NY 10005
(212) 416-6197

# CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Kelly Cheung, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 6,996 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.


 /s/ Kelly Cheung