**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 20-1776

PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.; ANIMAL
LEGAL DEFENSE FUND; CENTER FOR FOOD SAFETY; FOOD & WATER
WATCH; FARM SANCTUARY; GOVERNMENT ACCOUNTABILITY
PROJECT; AMERICAN SOCIETY FOR THE PREVENTION OF CRUELTY TO
ANIMALS; FARM FORWARD,

Plaintiffs - Appellees,

v.

NORTH CAROLINA FARM BUREAU FEDERATION, INC.,

Intervenor/Defendant – Appellant,

and

ATTORNEY GENERAL JOSH STEIN, Attorney General of the State of North
Carolina; KEVIN GUSKIEWICZ, in his official capacity as Chancellor of the
University of North Carolina-Chapel Hill,

Defendants.

------------------------------

LAW PROFESSORS; UNITED FARM WORKERS OF AMERICA; REPORTERS
COMMITTEE FOR FREEDOM OF THE PRESS AND 17 MEDIA
ORGANIZATIONS

Amici Supporting Appellees.

-----

### No. 20-1777

-----

PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.; ANIMAL LEGAL DEFENSE FUND; CENTER FOR FOOD SAFETY; FOOD & WATER WATCH; FARM SANCTUARY; GOVERNMENT ACCOUNTABILITY PROJECT; AMERICAN SOCIETY FOR THE PREVENTION OF CRUELTY TO ANIMALS; FARM FORWARD,

        *Plaintiffs - Appellees,*

    v.

ATTORNEY GENERAL JOSH STEIN, Attorney General of the State of North Carolina; KEVIN GUSKIEWICZ, in his official capacity as Chancellor of the University of North Carolina-Chapel Hill,

        *Defendants – Appellants,*

    and

NORTH CAROLINA FARM BUREAU FEDERATION, INC.

        *Intervenor/Defendant.*

------------------------------

LAW PROFESSORS; UNITED FARM WORKERS OF AMERICA; REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND 17 MEDIA ORGANIZATIONS

        *Amici Supporting Appellees.*

-----

### No. 20-1807

-----

PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.; ANIMAL LEGAL DEFENSE FUND; CENTER FOR FOOD SAFETY; FOOD & WATER WATCH; FARM SANCTUARY; GOVERNMENT ACCOUNTABILITY

PROJECT; AMERICAN SOCIETY FOR THE PREVENTION OF CRUELTY TO ANIMALS; FARM FORWARD,

        Plaintiffs - Appellants,

    v.

ATTORNEY GENERAL JOSH STEIN, Attorney General of the State of North Carolina; KEVIN GUSKIEWICZ, in his official capacity as Chancellor of the University of North Carolina-Chapel Hill,

        Defendants – Appellees,

    and

NORTH CAROLINA FARM BUREAU FEDERATION, INC.

        Intervenor/Defendant – Appellee.

------------------------------

LAW PROFESSORS; UNITED FARM WORKERS OF AMERICA; REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND 17 MEDIA ORGANIZATIONS

        Amici Supporting Appellants.

————————

Appeals from the United States District Court for the Middle District of North Carolina, at Greensboro.  Thomas D. Schroeder, Chief District Judge.  (1:16-cv-00025-TDS-JEP)

————————

Argued:  October 27, 2021                 Decided:  February 23, 2023

————————

Before DIAZ and RUSHING, Circuit Judges, and FLOYD, Senior Circuit Judge.

————————

Affirmed in part and reversed in part by published opinion. Senior Judge Floyd wrote the opinion in which Judge Diaz joined.  Judge Rushing wrote a separate dissenting opinion.

————————

**ARGUED:** Nicholas Scott Brod, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellants/Cross-Appellees. David Samuel Muraskin, PUBLIC JUSTICE, PC, Washington, D.C., for Appellees/Cross-Appellants. **ON BRIEF:** Joshua H. Stein, Attorney General, Ryan Y. Park, Solicitor General, Matthew Tulchin, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellants/Cross-Appellees Josh Stein and Kevin Guskiewicz. Timothy S. Bishop, Brett E. Legner, Chicago, Illinois, John S. Hahn, MAYER BROWN LLP, Washington, D.C.; Phillip Jacob Parker, Jr., Secretary and General Counsel, NORTH CAROLINA FARM BUREAU FEDERATION, INC., Raleigh, North Carolina, for Appellant/Cross-Appellee North Carolina Farm Bureau Federation, Inc. Daniel K. Bryson, Jeremy Williams, WHITFIELD BRYSON, Raleigh, North Carolina, for Appellees/Cross-Appellants. Gabriel Walters, Washington, D.C., Matthew Strugar, PETA FOUNDATION, Los Angeles, California, for Appellee/Cross-Appellant People for the Ethical Treatment of Animals, Inc. Cristina Stella, Kelsey Eberly, ANIMAL LEGAL DEFENSE FUND, Cotati, California, for Appellee/Cross-Appellant Animal Legal Defense Fund. Clare R. Norins, First Amendment Clinic, UNIVERSITY OF GEORGIA SCHOOL OF LAW, Athens, Georgia, for Amici Law Professors. Mario Martinez, MARTÍNEZ AGUILASOCHO & LYNCH, APLC, Bakersfield, California; Chris Lim, LAW OFFICE OF R. CHRIS LIM, Los Angeles, California, for Amicus United Farm Workers of America. Bruce D. Brown, Katie Townsend, Lin Weeks, REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS, Washington, D.C., for Amici The Reporters Committee for Freedom of the Press and 17 Media Organizations.

---

4

FLOYD, Senior Circuit Judge:

Seeking to follow in the well-trodden footsteps of Upton Sinclair, People for the Ethical Treatment of Animals (PETA)[1] wishes to conduct undercover animal-cruelty investigations and publicize what they uncover. But it faces a formidable obstacle: North Carolina's Property Protection Act (the Act), passed to punish "[a]ny person who intentionally gains access to the nonpublic areas of another's premises and engages in an act that exceeds the person's authority to enter." N.C. Gen. Stat. § 99A-2(a). The Act goes on to explain what actions "exceed" authority. Some provisions cover wide swaths of activities, such as "substantially interfer[ing] with the ownership or possession of real property." *Id.* § 99A-2(b)(5). Others appear more narrowly focused, prohibiting capturing, removing, or photographing employer data—but only when the employee uses the data "to breach the person's duty of loyalty to the employer." *Id.* § 99A-2(b)(1)–(2). Even these more specific provisions, however, potentially reach anything from stealing sensitive client information to ferreting out trade secrets in hopes of starting a competing business.

The parties spill much ink debating the repercussions of all these potential applications. PETA contends the Act is nothing more than a discriminatory speech restriction dressed up in property-protection garb. It urges us to put aside any legitimate protections the Act may offer and concentrate on what it believes the North Carolina

---

[1] Plaintiffs-Appellees and Cross-Appellants, which we collectively term PETA, are: People for the Ethical Treatment of Animals, Inc., Center for Food Safety, Animal Legal Defense Fund, Farm Sanctuary, Food & Water Watch, Government Accountability Project, Farm Forward, and American Society for the Prevention of Cruelty to Animals.

General Assembly really meant to accomplish: end all undercover and whistleblowing investigations. North Carolina[2] casts the Act as generally applicable. Any incidental restrictions on speech, it counters, come only as unavoidable side effects of the Act's strong remedies against trespass and disloyalty.

The need to confront the Act's potentially legitimate applications indeed makes our task difficult, especially on the sparse, pre-enforcement record before us, which renders *all* applications theoretical. But the First Amendment "give[s] the benefit of any doubt to protecting rather than stifling speech." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 327 (2010) (citation omitted). So, cautiously, we forge ahead to ensure those protections endure for "more than just the individual on a soapbox and the lonely pamphleteer." *Id.* at 373 (Roberts, C.J., concurring). But we decide no more than we must. We enjoin the Act insofar as it applies to bar protected newsgathering activities PETA wishes to conduct. But we leave for another day all other applications of the Act.

## I.

The facts of this pre-enforcement challenge are uncontested and relatively straightforward. In 2015, the North Carolina General Assembly prohibited "intentionally gain[ing] access to the nonpublic areas of another's premises and engag[ing] in an act that exceeds the person's authority to enter." N.C. Gen. Stat. § 99A-2(a). The legislature

---

[2] Defendants-Appellants and Cross-Appellees (collectively, North Carolina) are: the North Carolina Attorney General, University of North Carolina-Chapel Hill, and Intervenor North Carolina Farm Bureau Federation, Inc.

6

allegedly passed the Act to codify this Court's decision in *Food Lion, Inc. v. Cap. Cities/ABC Inc.*, 194 F.3d 505 (4th Cir. 1999), which allowed an employer to sue a double-agent employee for trespass and disloyalty. *See* J.A. 203–04, 282. The codification meant to accomplish two things. For one, North Carolina no longer had an employee-disloyalty cause of action: Although *Food Lion* predicted, under *Erie*, that the State would allow such a cause of action, 194 F.3d at 512, 515–16, the North Carolina Supreme Court soon held otherwise, *Dalton v. Camp*, 353 N.C. 647, 653 (2001). For another, *Food Lion* rejected all but nominal damages, reasoning that any damages flowing from the *publication* of the undercover investigation would violate the First Amendment. 194 F.3d at 522. Thus, the Act's "[e]xemplary damages" provision: It offers $5,000 per each day of violation as well as attorney's fees in addition to any traditional compensatory damages "otherwise allowed." N.C. Gen. Stat. § 99A-2(c).

PETA believes the Act unconstitutionally curbs its protected investigative activities. Specifically, PETA takes issue with subsections (b)(1)–(3) and (5), which define "an act that exceeds a person's authority to enter" to encompass:

> (1) An employee . . . enter[ing] the nonpublic areas of an employer's premises for a reason other than a bona fide intent of seeking or holding employment or doing business with the employer and thereafter without authorization captur[ing] or remov[ing] the employer's data, paper, records, or any other documents and us[ing] the information to breach the person's duty of loyalty to the employer.

> (2) An employee . . . enter[ing] the nonpublic areas of an employer's premises for a reason other than a bona fide intent of seeking or holding employment or doing business with the employer and thereafter without authorization record[ing] images or sound occurring within an employer's premises and us[ing] the information to breach the person's duty of loyalty to the employer.

7

(3) Knowingly or intentionally placing on the employer's premises an unattended camera or electronic surveillance device and using that device to record images or data.

   . . .

(5) [Committing a]n act that substantially interferes with the ownership or possession of real property.

*Id.* § 99A-2(b)(1)–(3), (5).  PETA challenges these provisions as applied and on their face.

On cross-motions for summary judgment, the district court held all four provisions violate the First Amendment.  As a threshold matter, the district court ruled the Act directly implicates speech.  Subsections (b)(1)–(3) restrict recordings, the court explained, which per se constitute speech.  *People for the Ethical Treatment of Animals, Inc. v. Stein*, 466 F. Supp. 3d 547, 569–71 (M.D.N.C. 2020).  And (b)(5), though it does not "target" speech, "necessarily ensnares First Amendment protected activity because the act that 'substantially interferes' with the ownership or possession of real property is the recording and image capture itself."  *Id.* at 574.

Next, in deciding what level of scrutiny to apply, the court observed that (b)(1) and (2) discriminate against a particular viewpoint as they prohibit only recordings "use[d]" contrary to an employer's interests.  *Id.* at 573.  And because North Carolina never contended the Act can pass strict scrutiny, the court easily found (b)(1) and (2) unconstitutional.  *Id.* at 575–76.  Conversely, the court applied only intermediate scrutiny to (b)(3) and (5) because whatever speech they restrict, they do so without reference to content.  *Id.* at 576–79.  Still, the court held those subsections violate even intermediate scrutiny because the legislature did not tailor them to advance any substantial interest and did not "*show*" with record evidence that it "seriously undertook to address the problem

8

with less intrusive tools." *Id.* at 577 (citation omitted).

As a final step, the court considered whether to enjoin the challenged provisions as applied to PETA or in all their applications. It concluded (b)(2) and (3) fail on their face because they hinge on recordings, meaning they always implicate speech. *Id.* at 571. But it enjoined subsections (b)(1) and (5) only as applied, because it could not "ignore the[ir] possible myriad legitimate applications." *Id.* at 570–71.

The parties now cross-appeal. PETA asks us to facially invalidate all four challenged provisions; North Carolina insists the entire Act passes constitutional muster. We review cross-motions for summary judgment with fresh eyes. *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014).

## II.

PETA seeks to conduct undercover investigations. It wishes to speak to employees, record documents found in nonpublic (but not necessarily private) areas, and carry out surveillance. The Act prohibits all of these. Still, North Carolina insists the Act does not implicate the First Amendment at all. It forwards four arguments, but none persuades.

## A.

North Carolina first offers that undercover investigations in nonpublic areas, as a class, constitute unprotected speech. That is a dangerous proposition that would wipe the Constitution's most treasured protections from large tranches of our daily lives. Fortunately, it has no basis in law. "From 1791 to the present," the Supreme Court has

placed only a "few limited areas" of speech outside the First Amendment's protections and has never suggested "a freedom to disregard these traditional limitations." *R.A.V. v. St. Paul*, 505 U.S. 377, 382–83 (1992). These "historic and traditional categories long familiar to the bar" include obscenity, defamation, fraud, incitement, and speech integral to criminal conduct. *United States v. Stevens*, 559 U.S. 460, 468 (2010) (citations omitted). But no comparable tradition withholds protections from nonpublic speech. Even more fundamentally, the Court excluded those categories "*because of their constitutionally proscribable content*," *R.A.V.*, 505 U.S. at 383; it has never exempted speech because of its *location*. *See New York v. Ferber*, 458 U.S. 747, 763 (1982) ("It is the content of an utterance that determines whether it is a protected epithet or an unprotected fighting comment." (internal quotation marks, brackets, and citation omitted)). That history must control, for it ensures that the First Amendment's shield falls away only from those narrow categories of speech for which the Constitution never intended protection, not from those forms of speech that the legislative majority just prefers not to protect.

North Carolina holds out *Lloyd Corp., Ltd. v. Tanner*, where the Court noted that it "has never held that a trespasser or an uninvited guest may exercise general rights of free speech on property privately owned." 407 U.S. 551, 568 (1972). But *Lloyd* concerned a mall owner's right to exclude persons distributing handbills, and the analysis focused solely on whether the mall has become a quasi-public space requiring the owner to "dedicat[e his] private property to public use." *Id.* at 569. Nothing in that case permitted *the government* to proscribe speech in nonpublic areas. *See Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219, 1238 (10th Cir. 2021) (observing that this line of reasoning "confuses two related but

10

distinct concepts: a landowner's ability to exclude from her property someone who wishes to speak, and the government's ability to jail the person for that speech" (citation omitted)). Quite the opposite, in at least one case, the Court has struck down an ordinance that "prohibits canvassers and others from going in and upon private residential property for the purpose of promoting any cause without first having obtained a permit." *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150, 154, 166–69 (2002) (internal quotation marks omitted).

We find no cogent principle that would permit us to apply the First Amendment to the government's attempts to stifle speech on "private residential property" yet eschew it when it comes to restrictions on "nonpublic" employer premises. *See Aptive Env't, LLC v. Town of Castle Rock*, 959 F.3d 961, 983 (10th Cir. 2020) (rejecting an argument, based in *Lloyd*, that a curfew on commercial door-to-door solicitation "does not implicate the First Amendment"); *S.H.A.R.K. v. Metro Parks Serving Summit Cnty.*, 499 F.3d 553, 561–62 (6th Cir. 2007) (scrutinizing whether the government's closure of a public park during deer-culling operations, which prohibited animal activists from filming those operations, conforms to the First Amendment). So while we agree that an employer could freely choose to deny entry to journalists who seek to secretly record its inner workings, it does not follow that a State can create "new categories of unprotected speech" to punish those journalists. *See Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 791–92 (2011). The First Amendment limits the government; the government does not limit the First Amendment.

Even granting that whole categories of speech can go unprotected, the challenged subsections would nonetheless implicate the First Amendment because they discriminate

11

based on speaker and viewpoint.  *See infra*, Part III.  Even within a First-Amendment-free

zone, "[t]he government may not regulate . . . based on hostility—or favoritism—towards

the underlying message expressed."  *R.A.V.*, 505 U.S. at 386 (striking down an ordinance

prohibiting bias-motivated fighting words even though fighting words as a category do not

have a claim on the First Amendment).  That is why the government may only restrict

"access to a nonpublic forum" by way of regulating the subject matter; it may not ban

speakers "because officials oppose the[ir] view."  *Bd. of Airport Comm'rs of L.A. v. Jews

for Jesus, Inc.*, 482 U.S. 569, 573 (1987) (quoting *Perry Educ. Ass'n. v. Perry Local

Educators' Ass'n*, 460 U.S. 37, 46 (1983)).

Circuit courts, including our own, have relied on this line of cases to invalidate

analogous statutes.  *Fusaro v. Cogan*, for example, acknowledged "the general principle

that there is no First Amendment right to" government information but nonetheless

remanded to apply the First Amendment because the statute "restrict[ed] access to and use

of [a list of registered voters] based on the identity of the speaker requesting the List and

the content of the speaker's message."  930 F.3d 241, 252–53 (4th Cir. 2019); *see also

Chaker v. Crogan*, 428 F.3d 1215, 1223, 1225 (9th Cir. 2005); *Holloman ex rel. Holloman

v. Harland*, 370 F.3d 1252, 1281 (11th Cir. 2004).  Just so here.  Assuming North Carolina

can punish all unauthorized recording or capture of documents, it cannot punish only

unauthorized recording or capture of documents done with the intent to breach the duty of

loyalty or cause damage to the facility.  *See Kelly*, 9 F.4th at 1233 (reaching the same

conclusion as to the Kansas Farm Animal and Field Crop and Research Facilities Protection

Act, which criminalized documenting animal abuse when undercover investigators acted "with intent to damage the enterprise").

B.

As its second line of defense, North Carolina insists the First Amendment does not confer a license to break the law. *E.g.*, *Zemel v. Rusk*, 381 U.S. 1, 16–17 (1965) (the right "to publish does not carry with it" the right to break Congress's travel restrictions to Cuba). And because the Act merely codifies *Food Lion*'s protections against a "particular type of employment-related trespass," PETA should not be allowed to wield the First Amendment to escape damages under the Act. Opening Br. 3.

Quite obviously, a journalist cannot invoke the First Amendment to shield herself from charges of illegal wiretaps, breaking and entering, or document theft. Just as obviously, however, a journalist cannot be charged under a law that prohibits criticism of all government activities or a law that punishes all protests on a city's streets. These intuitive outcomes hold true because the first set of laws *comports* with First Amendment strictures, not because the First Amendment plays no role at all. A law prohibiting breaking and entering, for example, may well restrict the right to gather news, but protecting the sanctity of a home presents a compelling government interest that overrides a journalist's (and society's) right to a story.

All of that is to say, we must go through the exercise of determining whether the Act clears the First Amendment bar; we cannot presume it constitutional and then deny PETA relief because the First Amendment confers no special privileges. *See Virginia v.*

13

*Hicks*, 539 U.S. 113, 123 (2003) (recognizing that a State can restrict a person from taking part in a political demonstration in a public park if that person has previously been banned from the park for vandalism "pursuant to a *lawful* regulation" (emphasis added)). For the reasons spelled out below, we conclude the four provisions of the Act cannot survive this scrutiny. But we pause now to observe that North Carolina places more weight on *Food Lion* than it can bear.

*Food Lion* held that certain actions undercover investigators commit, like entering into areas "not open to the public and secretly videotap[ing]," could amount to "an act that was directly adverse to the interests of their second employer," "thereby" constituting trespass. 194 F.3d at 519. Critical to the Court's conclusion was its *Erie* guess that North Carolina would extend the traditional duty of loyalty to food-counter clerks, for it supplied the chain link between taping and trespass. *Id.* at 516. But *Food Lion* guessed wrong. Shortly after the decision came out, the North Carolina Supreme Court held the State recognizes no such "broad" cause of action for disloyalty. *See Dalton*, 353 N.C. at 653. The Act, then, does not codify any tried-and-true common law principles, only the legislature's novel conceptions about disloyal undercover investigation. *Those* we must measure firsthand against the First Amendment to ensure disloyalty does not become a proxy for discriminating against employees voicing criticism of their employer. *See W. Watersheds Project v. Michael*, 869 F.3d 1189, 1197 (10th Cir. 2017) (suggesting *Zemel*

14

would have come out differently had the government "implement[ed] a law banning travel to Cuba for the purpose of writing about or filming what they observe.").[3]

## C.

As a variation on its second argument, North Carolina insists that the Act is a "generally applicable law[ ]" and such laws "do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news." Opening Br. 26 (quoting *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991)). That is true, as far as that goes. The media must, for example, obey antitrust laws. *Cowles*, 501 U.S. at 669 (citing *Associated Press v. United States*, 326 U.S. 1

---

[3] Long ago, speaking about the related right to peaceable assembly, the Supreme Court warned against precisely this kind of confusion: "If the persons assembling have committed crimes . . . , they may be prosecuted for their . . . violation of valid laws. But it is a different matter when the State, instead of prosecuting them for such offenses, seizes upon mere participation in a peaceable assembly and a lawful public discussion as the basis for a criminal charge." *De Jonge v. Oregon*, 299 U.S. 353, 365 (1937). So it is here. If PETA's actions truly violate some lawful prohibition (like trespass), PETA may be charged for that violation. What North Carolina may not do, however, is craft a law targeting PETA's protected right to speak.

That said, *Food Lion* clarified that merely entering an employer's nonpublic area after being hired under false pretenses does *not* add up to trespass because it does not invade "any of the specific interests relating to peaceable possession of land the tort of trespass seeks to protect." 194 F.3d at 518 (quoting *Desnick v. Am. Broad. Companies, Inc.*, 44 F.3d 1345, 1352 (7th Cir. 1995) (brackets omitted)). Under existing law, then, PETA can lawfully occupy nonpublic areas. And mere recording "what there is the right for the eye to see or the ear to hear" "falls squarely within the First Amendment right of access to information." *Fields v. City of Phila.*, 862 F.3d 353, 359 (3d Cir. 2017); *accord Kelly*, 9 F.4th at 1233–34 (holding a similar statute unconstitutional because "the Act focuse[d] not on the alleged legally cognizable harm from trespass, but on the subsequent harm from the intent to harm the facility once on property").

(1945)). It must pay taxes. *Id.* (citing *Murdock v. Pennsylvania*, 319 U.S. 105, 112 (1943)). It must answer subpoenas. *Id.* (citing *Branzburg v. Hayes*, 408 U.S. 665, 684 (1972)). But those cases hold only that neutral laws apply to the press as well as to the general public.

North Carolina intends "generally applicable" in a different sense: Laws that implicate a variety of conduct, it insists, need not pass First Amendment scrutiny even when applied to speech. Neither *Cowles* nor the cases it cites bear out that conclusion. While *Associated Press*, for example, held that newspapers cannot use their *press status* as defense to antitrust law, *Eastern Railroad Presidents Conf. v. Noerr Motor Freight Inc.*, 365 U.S. 127 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657 (1965), clarified that speakers—press or not—can raise as defense the fact that antitrust laws are being applied to them *because of their speech*. Take also *Cohen v. California*, which involved a generally applicable regulation barring breaches of the peace. 403 U.S. 15, 16, 26 (1971). When Cohen was convicted for wearing a jacket bearing an epithet, the Court applied First Amendment scrutiny, reasoning that "the generally applicable law was directed at Cohen because of what his speech communicated." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 28 (2010) (discussing *Cohen*). Same with *Holder* itself, where the Court deemed irrelevant that the law "may be described as directed at conduct" where plaintiffs triggered the statute by "communicating a message." *Id.* Other examples abound. *Cantwell v. Connecticut*, 310 U.S. 296, 308–09 (1940) (reversing a breach-of-the-peace conviction under a generally applicable statute because the conviction was predicated on "the effect of [the speaker's] communication upon his hearers"); *NAACP v. Claiborne Hardware Co.*, 458 U.S 886, 909–10 (1982) (finding speech constituting

tortious interference with business relations protected where interference flows from the persuasive effect of speech); *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 57 (1988) (reasoning that tort of intentional infliction of emotional distress cannot be used to impose liability for publishing cruel and vulgar satire); *Billups v. City of Charleston*, 961 F.3d 673, 683 (4th Cir. 2020) ("[A] law aimed at regulating businesses can be subject to First Amendment scrutiny even though it does not directly regulate speech."); *Kelly*, 9 F.4th at 1228 ("When a criminal prohibition includes multiple elements, some of which are unquestionably conduct (such as trespassing), the statute may still fall under the First Amendment if other elements target speech."); Eugene Volokh, *Speech as Conduct, Generally Applicable Laws, Illegal Courses of Conduct, "Situation-Altering Utterances," and the Uncharted Zones*, 90 Cornell L. Rev. 1277, 1278–93 (2005) (advancing this proposition).

Not to worry, North Carolina contends. *Food Lion* read *Cowles* to mean that generally applicable laws may escape the First Amendment, and that reading controls in this Circuit.[4] That is not quite right, even assuming we could set *Humanitarian Law*

---

[4] To be sure, North Carolina correctly observes that *Cowles* allowed a plaintiff to sue newspapers for disclosing his name on theory of promissory estoppel without First Amendment analysis. But the Court gave a specific reason: "Minnesota law simply requires those making promises to keep them. The parties themselves . . . determine[d] the scope of their legal obligations, and any restrictions which may be placed on the publication . . . are self-imposed." 501 U.S. at 671. So the Court balked at the free-speech argument because the newspapers waived their right to free speech, not because generally applicable laws by definition escape First Amendment scrutiny. Volokh, *supra*, at 1297; *see also IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1120 (9th Cir. 2020) (reading *Cowles* to espouse the "limited" principle that "[p]rivate parties may freely bargain with each other to restrict their own speech" but declining to extend that principle to "state-created restriction[s]" that

*Project* aside. *Food Lion* posited that *Cowles* involved only "the breach of promise and not some form of expression" and itself concerned only the non-expressive act: undercover employees working for two competing employers at once. 194 F.3d at 522. Consistent with that understanding, the Court allowed only nominal damages because Food Lion failed to prove damages stemming from the disloyal act. It then *rejected* damages flowing from any reporting as "an end-run around" *Hustler*'s prohibition that plaintiffs "may not recover for [violation of generally applicable torts] by reason of publications." *Id.* at 522–23 (quoting *Hustler*, 485 U.S. at 56). *Food Lion* thus properly recognized that a State may not harness generally applicable laws to abridge speech without first ensuring the First Amendment would allow it. *Accord ACLU of Ill. v. Alvarez*, 679 F.3d 583, 602 (7th Cir. 2012) (citing *Food Lion*'s interpretation of *Hustler* to hold that generally applicable laws trigger strict scrutiny when their "effect on First Amendment interests is far from incidental").

---

"exist independently of, and prior to, any interaction between the speaker and another" (internal quotation marks and citation omitted)).

And the same term it decided *Cowles*, the Court subjected Indiana's generally applicable public-indecency statute to First Amendment scrutiny when applied to establishments that offer nude dancing, without any reference to *Cowles*. *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560 (1991). Several years later, the Third Circuit criticized the court below for reading *Cowles* "too broadly" and could find no jurisprudence to "support the surprising proposition that a statute that governs both pure speech and conduct merits less First Amendment scrutiny than one that regulates speech alone." *Bartnicki v. Vopper*, 200 F.3d 109, 118, 121 (3d Cir. 1999). The Supreme Court affirmed, yet again without mentioning *Cowles*. *Bartnicki v. Vopper*, 532 U.S. 514 (2001). The last time the Court cited *Cowles* was in 1994, offering only that "a generally applicable law may or may not be subject to heightened scrutiny under the First Amendment." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 640 (1994). *Cowles* thus cannot support North Carolina's unqualified rule that generally applicable laws never trigger the First Amendment.

That makes good sense. Laws cast in broad terms can restrict speech as much as laws that single it out. Consider three statutes that regulate public-park behavior. One obligates speakers to obtain a license before using a megaphone. The second prohibits noise above a certain decibel level without a license. The third requires a license to (1) walk a dog, (2) play group sports, or (3) speak with a megaphone. The first statute readily calls for First Amendment review (and likely fails it). *See Saia v. People of State of New York*, 334 U.S. 558, 559–60 (1948) (striking down a statute that forbade the use of sound amplification devices without prior authorization from the chief of police). But the other two curtail the same speech right and to the same degree and should therefore similarly occasion First Amendment scrutiny.

*Applying* the First Amendment, of course, does not necessarily translate into invalidating a statute; it only triggers the balancing inquiry. And the way a legislature writes a statute matters a great deal to its ultimate constitutionality. The second, broadest hypothetical, for example, will most easily pass scrutiny because it is most likely to fit the legitimate, non-discriminatory government interests urged as its justification. *See* Elena Kagan, *Private Speech, Public Purpose: The Role of Governmental Motive in First Amendment Doctrine*, 63 U. Chi. L. Rev. 413, 496 (1996) ("The breadth of these laws makes them poor vehicles for censorial designs; they are instruments too blunt for effecting, or even reflecting, ideological disapproval."). The statute's general applicability also "goes to the breadth of the remedy"—whether the statute violates the First Amendment on its face or whether certain offending provisions can be severed. *Citizens United*, 558 U.S. at 331; *see infra*, Part IV.A. But legislatures do not write themselves out of the First

19

Amendment analysis simply by extending a statute's reach. General or not, the First Amendment applies when the Act is used to silence protected speech.

### D.

North Carolina offers one last defense, specific to subsections (b)(1) and (2). These subsections, it protests, punish not speech but intent to be disloyal, speech merely providing one way to *prove* disloyalty—and the First Amendment does not bar such evidentiary use of speech. That is certainly true of some statutes. When deciding whether to hold an employee liable for intentionally recruiting colleagues into a competing enterprise, a court can constitutionally consider the employee's conversations as proof of intent. But this is not that case. Here, the publication of an unfavorable article *is* the act of disloyalty. A more faithful analogy would be cancelling public debates on contentious topics under a statute that prohibits intentional breaches of the peace on the theory that holding such debates evidences intent to breach the peace. Such wordplay plainly cannot transmute an unconstitutional statute into one of constitutional merit. *See Hustler*, 485 U.S. at 53 (denying publication damages to a target of a scathing political cartoon even though "intent to cause injury is . . . the gravamen of the tort"); *Kelly*, 9 F.4th at 1242 (reasoning, persuasively, that "a law prohibiting making any utterance with the intention to criticize an agriculture facility" functions "identical[ly]" to a law that directly prohibits criticizing the facility). The First Amendment cannot so easily be evaded.

20

E.

Because we find no categorical reason to sidestep the First Amendment, we are left with the question whether the speech PETA seeks to undertake is "speech" the First Amendment protects.  We have no doubt that it is.  Both on their face and in their "practical operation," all four challenged provisions burden newsgathering and publishing activities. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011).  Subsection (b)(1)'s prohibition on using "captur[ed]" data in a disloyal manner prevents an undercover employee from publishing a critical article based on any notes she takes of documents or policies laid out in a breakroom.  N.C. Gen. Stat. § 99A-2(b)(1).[5]  Subsection (b)(2) forbids including a photograph of the same documents in the article.   N.C. Gen. Stat. § 99A-2(b)(2). Subsection (b)(3) then punishes the undercover employee for placing an unattended camera on the factory floor while she works.  *Id.* § 99A-2(b)(3).   And the "catch-all" (b)(5), Opening Br. 8, may reach even mere reporting of a conversation had with other employees—to a newspaper, a union, a state agency—if the reporting leads the State to shut down the facility.  *See id.* § 99A-2(b)(5) (prohibiting acts "that substantially interfere[ ] with the ownership or possession of real property").

---

[5] The Oxford English Dictionary defines "to capture" as, among others, to "represent, catch, or record (something elusive, as a quality) in speech [or] writing."  Oxford English Dictionary Online, https://www.oed.com/view/Entry/27660?rskey=ls7NSW&result= 2#eid.  Subsection (b)(1) thus reaches beyond mere "record[ing of] images or sound" that (b)(2) already proscribes.  *See also Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) (directing courts to give effect to each statutory provision).

If the First Amendment has any force, such "creation" of information demands as much protection as its "dissemination." *Sorrell*, 564 U.S. at 570. "Facts, after all, are the beginning point for much of the speech that is most essential to advance human knowledge and to conduct human affairs." *Id.* And the right to publish a recording would be "largely ineffective, if the antecedent act of *making* the recording is wholly unprotected." *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012). No surprise, then, that scores of Supreme Court and circuit cases apply the First Amendment to safeguard the right to gather information as a predicate to speech. *E.g.*, *Sorrell*, 564 U.S. at 571 (equating "content- and speaker-based restrictions on the availability" of prescriber-identifying information "with a law prohibiting trade magazines from purchasing or using ink" (citing *Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575 (1983))); *Citizens United*, 558 U.S. at 339 (invalidating ban on political-speech spending because the government may not "repress speech by silencing certain voices at any of the various points in the speech process"); *McConnell v. FEC*, 540 U.S. 93, 252 (2003) (Scalia, J., concurring in part and dissenting in part) ("The right to speak would be largely ineffective if it did not include the right to engage in financial transactions that are the incidents of its exercise."); *Fields v. City of Phila.*, 862 F.3d 353, 358 (3d Cir. 2017) ("[T]he Amendment must . . . protect the act of creating" photos and videos where those photos and videos are themselves protected); *Turner v. Lieutenant Driver*, 848 F.3d 678, 689 (5th Cir. 2017) ("[T]he First Amendment protects the act of making film, as there is no fixed First Amendment line between the act of creating speech and the speech itself." (quotation omitted)); *Buehrle v. City of Key West*, 813 F.3d 973, 977 (11th Cir. 2015) (First Amendment harm results from

22

"proceed[ing] upstream and dam[ming] the source" of speech); *Desnick v. Am. Broad. Cos., Inc.*, 44 F.3d 1345, 1355 (7th Cir. 1995) ("the production of the broadcast" warrants the same First Amendment attentions as "the content of the broadcast").

The right to gather information plays a distinctly acute role in journalism. First-hand accounts, buttressed by video evidence, enhance accuracy and credibility in reporting and increase transparency and reader trust, allowing the press "to tell more complete and powerful stories." *See* Br. of Amici Curiae the Reporters Committee for Freedom of the Press in Support of Pls.-Appellees 17–18 (citing *The Hierarchy of Information and Concentric Circles of Sources*, American Press Institute (last visited Feb. 4, 2021), https://perma/cc/NX8V-Q2UT; Deron Lee, *"Ag-gag" Reflex*, Columbia Journalism Review (Aug. 6, 2013), https://perma.cc/Z5D5-GSJZ). It is this "depth of . . . exploration," *Citizens United*, 558 U.S. at 339, that brings reporting to life, demanding our attention and allowing us to appreciate the full scope of the societal issues related.

These general newsgathering considerations aside, subsections (b)(1), (2), and (5) on their face single out speech. They would permit a journalist to procure employment under false pretenses, copy employer documents, and record backstage footage—so long as she keeps those findings to herself. Yet a journalist who *conducts* herself in the exact same manner but *speaks out against* the employer would face heavy penalties. *See* N.C. Gen. Stat. § 99A-2(b)(1), (2) (conditioning liability on employee's "us[ing] the information to breach the person's duty of loyalty"); *id.* at § 99A-2(b)(5) (punishing speech if it "substantially interferes with" possession of real property). This regulatory mechanism,

based on speech, triggers the First Amendment, and we proceed to inquire whether it can pass the appropriate level of scrutiny.

### III.

Apparent from our hypothetical immediately above, subsections (b)(1), (2), and (5) do not merely target speech, but speech critical of the employer—a laudatory publication, after all, is unlikely to breach the duty of loyalty or interfere with possession of real property. Whether this discrimination occurs "by design or inadvertence," these provisions merit strict scrutiny. *Citizens United*, 558 U.S. at 340. North Carolina does not agree. Subsections (b)(1), (2), and (5), it argues, regulate speech function, not content. But that fosters the same problem—and the same First Amendment violation. As *Reed v. Town of Gilbert* counseled, to give full force to the First Amendment, strict scrutiny must apply as much to "obvious" as to "more subtle" content distinctions, "defining regulated speech by its function or purpose." 576 U.S. 155, 163 (2015). North Carolina responds that *Reed* is but one Supreme Court decision standing for this proposition. But recently, the Court reaffirmed *Reed*'s "straightforward" conclusion that "a regulation of speech cannot escape classification as facially content based" (or, presumably, viewpoint-discriminatory) "simply by swapping an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same result." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1474 (2022) (favorably citing *Reed*, 576 U.S. at 159, 160, 163–64).[6]

---

[6] North Carolina argues *Austin* supports *its* argument, because the Court there declined to hold that a "classification that considers function or purpose is *always* content based." 142

And besides, the Court has long been wary of legislative attempts to evade First Amendment review through formalistic "labels." *NAACP v. Button*, 371 U.S. 415, 429 (1963) (striking down a Virginia law regulating attorney "solicitation" because, "[i]n the context of NAACP objectives, litigation is not a technique of resolving private differences; it is a means for achieving the lawful objectives of equality of treatment"); *accord Kelly*, 9 F.4th at 1233 (applying strict scrutiny to a statute "viewpoint discriminatory in operation").[7]

Subsection (b)(3) appears different, at first blush. It punishes the mere "placing" of an unattended camera without any reference to the content recorded. N.C. Gen. Stat. § 99A-2(b)(3). Recall, however, that (b)(3) prohibits filming "on the employer's premises." *Id.* We take that language to intentionally extend to *employee* activity only, following the "sound rule of construction that where a word has a clear and definite meaning when used in one part of a . . . document, but has not when used in another, the presumption is that the word is intended to have the same meaning in the latter as in the former part." A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 170

---

S. Ct. at 1474. But no one argues for such a capacious principle here. PETA simply points out that *these* subsections function to eradicate speech critical of the employer—just as the ordinance in *Reed* functioned to single out certain signs for favorable treatment. And that *Reed*—and now *Austin*—allow us to look beyond "overt" descriptions to decipher that function. *Id.*

[7] North Carolina further objects that subsection (b)(5) does not reference speech on its face, much less a particular viewpoint. That merely reprises its generally-applicable-laws argument. That "all sorts of non-speech acts can trigger" (b)(5), Opening Br. 64, does nothing for the instances where speech actually triggers the provision. And in *those* instances, (b)(5) applies only to speech that "substantially interferes with the ownership or possession" of the employer's property. N.C. Gen. Stat. § 99A-2(b)(5).

(2012) (citation omitted).  Subsections (b)(1) and (2)—which directly precede (b)(3)—concern "employee" actions on "employer" property.  N.C. Gen. Stat. § 99A-2(b)(1)–(2).  As does subsection (e), which addresses exemptions for certain whistleblower "employees."  *Id.* § 99A-2(e).  Other subsections, by contrast, apply broadly to "[a]ny person" operating on "another's premises."  *Id.* § 99A-2(a), *see also id.* § 99A-2(c).

Drawing on those distinctions, we might reasonably conclude that subsection (b)(3) applies to an undercover employee working on "employer's premises" but not to an outside journalist invited to profile a company (who would more likely write a positive review).  Nor a representative from a state enforcement agency (who would be much less likely to leak anything to the press).  And such "restrictions distinguishing among different speakers, allowing speech by some but not others" are as repugnant to the First Amendment as are restrictions distinguishing among viewpoints.  *Citizens United*, 558 U.S. at 340.  "As instruments to censor, these categories are interrelated:  Speech restrictions based on the identity of the speaker are all too often simply a means to control content."  *Id.*; *see also First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 784–85 (1978) ("the legislature is constitutionally disqualified from dictating" which speakers "may address a public issue").  Read this way, all four challenged subsections must accordingly clear strict scrutiny.  And because North Carolina has conceded—here and, previously, before the district court—that the Act cannot satisfy this highest bar, we might well end our inquiry here.

But the challenged provisions fail even intermediate scrutiny, for two reasons.  First off, all four challenged provisions chill an alarming amount of speech without any "actual evidence" in the legislative record that lesser restrictions will not do—a nonnegotiable

requirement in this Circuit. *Reynolds v. Middleton*, 779 F.3d 222, 229 (4th Cir. 2015). Even setting the evidentiary obligations aside, however, subsections (b)(1)–(3) are not equipped to further any permissible interests in safeguarding employer privacy or property. We take these considerations in turn.

## A.

As discussed, the Act outlaws all recordings, N.C. Gen. Stat. § 99A-2(b)(2), (3), and restricts capturing the contents of any document, even by hand, *id.* § 99A-2(b)(1). Together, those provisions halt all meaningful undercover investigations. And (b)(5), when coupled with the Act's joint-liability provision, reaches further still, punishing bona fide employees turned whistleblowers, the unions, the press, and anyone in between, if their actions eventually "interfere[ ] with the ownership or possession" of the employer's property. *Id.* § 99A-2(b)(5); *see also id.* § 99A-2(c) (extending liability to "[a]ny person who intentionally directs, assists, compensates, or induces another person to violate" the Act). Here consider a watchdog's publication of PETA's investigation, a worker who spots Occupational Safety and Health Administration (OSHA) violations and reports them to the federal government, or a union that exposes child labor violations to the State. If any of those lead to (even a temporary) shut down of the employer's operations, (b)(5) would allow the employer to collect $5,000 per day from anyone involved. The scope of this outright ban cannot be overstated.

North Carolina protests that other provisions in the Act curb liability. Subsection (e), it claims, ensures the Act may not be "construed to diminish the protections provided

to employees under Article 21 of Chapter 95 or Article 14 of Chapter 126 of the General Statutes," protecting whistleblowers. *See* N.C. Gen. Stat. § 99A-2(e). But these turn out to be narrow protections indeed. Article 21 protects only employees engaged in formal whistleblowing of retaliatory employment discrimination to state agencies, N.C. Gen. Stat. §§ 95-241 to 95-242, and Article 14 reaches solely state employees who offer legislative testimony on matters of public concern, N.C. Gen. Stat. §§ 126-84 to 126-85. North Carolina also offers that traditional principles of agency would allow employees to reveal "that the principal is committing or is about to commit a crime" without breaching the duty of loyalty—and thus without breaching subsections (b)(1) or (2). Resp.-Reply Br. 58 (quoting Restatement (Third) of Agency § 8.05(c)). And that, in any event, an employee breaches the duty of loyalty only where, like in *Food Lion*, she uses information with the "intent to harm one employer to benefit another" rather than all speech critical of the employer. Opening Br. 38, 43, 45. The Act's text, however, guarantees none of that restraint. If anything, the Act's (scant) whistleblower protections imply the Act otherwise covers bona fide employees who do not report to any other employers.

Before a State may pass such expansive speech restrictions, this Circuit's precedent requires it "to *produce* evidence demonstrating that it seriously undertook to utilize" existing laws or "attempted to use less intrusive tools readily available to it" to achieve the proffered aims. *Billups*, 961 F.3d at 689–90 (emphasis added) (internal quotation marks and citation omitted); *see also Reynolds*, 779 F.3d at 229 ("argument unsupported by th[at] evidence will not suffice to carry the government's burden"); *McCullen v. Coakley*, 573 U.S. 464, 496 (2014) ("Given the vital First Amendment interests at stake, it is not enough

for [the government] simply to say that other approaches have not worked."). North Carolina concedes the State produced no such evidence but distinguishes *Billups*, *Reynolds*, and *McCullen*, arguing they involved "unprecedented" laws whereas "[t]he Act merely provides an enhanced damages remedy for conduct that the common law has long deemed tortious." Resp.-Reply Br. 46. That mistakes both the facts and the law. We have never said the evidentiary rule applies only to novel speech regulations. And the Act is literally *un*precedented in common or statutory North Carolina law. We have already discussed why the Act does not merely codify the "particular type of employment-related trespass" sanctioned in *Food Lion*. *See supra*, Part II.B. Nor does it reflect the more traditional trespass or privacy principles. Subsections (b)(1)–(3) likely punish only employees and only when they exceed their authorization in a particular manner: by capturing documents, recording images, or placing unattended cameras. As for disloyalty, the Act makes it at most *an element* of (b)(1) and (2); it does not define acts that breach the duty or specify a class of employees who owe it. North Carolina can point to no historical precedents that conceptualize employee loyalty in that cookie-cutter way.

Because the legislature cannot meet its evidentiary burden, the Act cannot satisfy intermediate scrutiny.

## B.

But the problem with these subsections is not just that they enact novel restrictions on newsgathering. It is that those restrictions do not fit any of the State's professed interests in passing the Act. Start with (b)(1) and (2). North Carolina offers they protect private

property against trespass. As a rule, however, "trespassory interests" concern how the information is *obtained*. *Desnick*, 44 F.3d at 1353. Yet liability under (b)(1) and (2) does not attach until the information is *used* to breach the duty of loyalty. Subsections (b)(1) and (2) thus, at best, punish only a subset of trespassory conduct. The same goes for privacy: On their face, (b)(1) and (2) apply only to certain types of employees and certain modes of deception. *See* N.C. Gen. Stat. § 99A-2(b)(1)–(2) (punishing only "employee[s] who enter[ ] the nonpublic areas of an employer's premises for a reason other than a bona fide intent of seeking or holding employment"). But privacy interests are no less compromised when a bona fide employee performing genuine employment activities overhears and tapes a private conversation. In the same vein, (b)(1) and (2) punish certain types of disloyal speech: disclosure of recordings. Yet a critical interview can be just as disloyal. And just as damaging.

Similar concerns plague (b)(3), in that recording devices placed through breaking and entering (rather than trickery) impair privacy and property just the same. Such "facial underinclusiveness" "raises serious doubts about whether [the State] is, in fact, serving, with this statute, the significant interests" invoked. *The Fla. Star v. B.J.F.*, 491 U.S. 524, 540 (1989).

As for (b)(5), the district court was right the subsection has many permissible applications. It prohibits, for example, physical destruction of property that substantially interferes with employer operations. But North Carolina concedes that (b)(5), like (b)(3), also applies to employees installing hidden cameras. And to that extent, it must suffer the same fate.

On the other side of the token, the four subsections are also overinclusive. Perhaps most tellingly, they do not distinguish between nonpublic and private spaces. Yet privacy interests intimated in these spaces are different in kind. A journalist capturing documents laid out in the breakroom, (b)(1), recording her own conversations with other employees, (b)(2), or even propping an unattended camera on the factory floor, (b)(3) and (5), implicates fundamentally different interests from one recording private calls in a manager's office. *See Desnick*, 44 F.3d at 1353 (undercover patients who surreptitiously taped and then published their doctor's visits did not infringe the doctor's right to privacy because they did not reveal "intimate personal facts" or "intru[de] into legitimately private activities, such as phone conversations").

The challenged subsections thus fail intermediate scrutiny both because the legislature produced no record evidence justifying its expansive restrictions on newsgathering speech and because their newsgathering prohibitions are not tailored to any substantial government interest.

## IV.

Having determined that the challenged provisions cannot satisfy First Amendment scrutiny, we must select a proportionate remedy. PETA asks us to invalidate the four provisions on their face; North Carolina objects, believing facial invalidation appropriate only when "no set of circumstances exists under which the [statute] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). PETA retorts that "the dicta in *Salerno* does not accurately characterize the standard for deciding facial challenges." *Janklow v.*

31

*Planned Parenthood, Sioux Falls Clinic*, 517 U.S. 1174, 1175 (1996) (Stevens, J., respecting the denial of certiorari). Instead, a long line of cases invalidates statutes by simply applying the relevant constitutional test—here, strict or intermediate scrutiny. *See* Resp. Br. 58–60 (collecting cases); Br. of Amici Curiae Law Professors in Support of Pls.-Appellees 10–11. We agree with North Carolina, though not for the reasons it advances.

A.

On the narrow issue of *Salerno*, PETA has the better argument. In the words of the Supreme Court, *Salerno* is not "a speech case," *Stevens*, 559 U.S. at 472, and "the Court has allowed [facial] challenges to proceed under a diverse array of constitutional provisions," *Los Angeles v. Patel*, 576 U.S. 409, 415 (2015). *E.g.*, *Sorrell*, 564 U.S. at 580; *Packingham v. North Carolina*, 137 S. Ct. 1730, 1736 (2017); *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011); *Citizens United*, 558 U.S. at 365–66 (all applying the relevant constitutional standard, not *Salerno*'s no-set-of-circumstances test). So has this Circuit. *See Billups*, 961 F.3d at 690; *Fusaro*, 930 F.3d at 263–64; *Kolbe v. Hogan*, 849 F.3d 114, 148 n.19 (4th Cir. 2017); *Liverman v. City of Petersburg*, 844 F.3d 400, 407–09 (4th Cir. 2016); *Legend Night Club v. Miller*, 637 F.3d 291, 299–300 (4th Cir. 2011). And still others. *See Bruni v. Pittsburgh*, 824 F.3d 353, 363 (3d Cir. 2016); *Doe v. City of Albuquerque*, 667 F.3d 1111, 1127 (10th Cir. 2012); *Ezell v. City of Chic.*, 651 F.3d 684, 698–99 (7th Cir. 2011); *Rothe Dev. Corp. v. Dep't of Def.*, 413 F.3d 1327, 1337–38 (Fed. Cir. 2005). As it appears, if courts have ever "articulated a clear standard for facial challenges, it is not the *Salerno* formulation, which has never been the decisive factor in

32

any decision of th[e] Court, including *Salerno* itself." *City of Chic. v. Morales*, 527 U.S. 41, 55 n.22 (1999) (plurality op.).

But the *Salerno* debate largely reflects mistaken assumptions about what it means for a federal court to "invalidate" a state statute. Because state courts and lower federal courts stand in a coordinate, not a hierarchical, relationship, the binding effect of the federal judgment extends no further than the parties to the lawsuit; against nonparties, civil and criminal actions can go forward. *E.g.*, *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975). And state courts must ultimately decide what "invalidated" statutes mean. *E.g.*, *Gooding v. Wilson*, 405 U.S. 518, 520 (1972). To the extent that our decision is forward-looking at all, then, that is because "the *reasoning* of a decision may suggest that there is no permissible application of a particular statute." *Patel*, 576 U.S. at 429 (Scalia, J., dissenting).

Traditional constitutional and institutional principles point in the same direction. Article III teaches that we must always begin with the case and controversy before us, U.S. Const. art. III, so as not to "anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied," *Citizens United*, 558 U.S. at 933 (Stevens, J., concurring in part and dissenting in part) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)). So broader "[c]onstitutional judgments . . . are justified only out of the necessity of adjudicating rights in particular cases between the litigants brought before the Court." *Broadrick v. Oklahoma*, 413 U.S. 601, 611 (1973); *see Connection Distrib. Co. v. Holder*, 557 F.3d 321, 335 (6th Cir. 2009) (finding a facial

challenge appropriate where "the constitutional problems cannot meaningfully be severed"); Richard H. Fallon, Jr., *As-Applied and Facial Challenges and Third-Party Standing*, 113 Harv. L. Rev. 1321, 1324, 1328 (2000) ("There is no single distinctive category of facial, as opposed to as-applied, litigation;" "determinations that statutes are facially invalid properly occur only as logical outgrowths of rulings on whether statutes may be applied to particular litigants on particular facts."); Gillian E. Metzger, *Facial Challenges and Federalism*, 105 Colum. L. Rev. 873, 876 (2005) ("The debate regarding the availability of facial challenges" is "really a debate about statutory severability.").

Distilled to practice, those principles mean that, in some cases, resolving the specific question before the court ends the matter. *United States v. Grace*, for example, considered the constitutionality of a statute prohibiting the display of any flag, banner, or device that spotlights any party, organization, or movement on the Supreme Court grounds. 461 U.S. 171 (1983). The statute covered the building, the plaza, the surrounding promenade, and the sidewalks surrounding the Court. The challenged activity, however—distributing leaflets and displaying signs—occurred only on the sidewalks. The Court correspondingly "address[ed] only whether the [statute was] constitutional as applied to the public sidewalks," in the end holding the ban not "necessary for the maintenance of peace and tranquility," the main purpose behind the statute. *Id.* at 175, 182. But the Court saw no reason to analyze whether such a ban may permissively further the statute's aim when applied to the Court's plaza, steps, or the building itself. *See id.* at 183; *see also Marsh v. Alabama*, 326 U.S. 501, 509 (1946) (striking down a state trespass law only "[i]nsofar as the State has attempted to impose criminal punishment" on those distributing literature on

the streets of a company town); *Time, Inc. v. Hill*, 385 U.S. 374, 388, 397 (1967) (faulting a state court for applying a privacy statute to sanction a publication absent a finding of the magazine's "knowledge of its falsity" but declining to invalidate the statute in toto where the court otherwise "has been assiduous in construing the statute to avoid invasion of the constitutional protections of speech and press"); *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985) (invalidating a statute "only insofar as the word 'lust' is to be understood as reaching protected materials"); *Humanitarian Law Project*, 561 U.S. at 8 (considering whether a statute prohibiting material support to terrorist groups violates the First Amendment "as applied to the particular activities plaintiffs . . . wish to pursue" but declining to "address the resolution of more difficult cases that may arise under the statute in the future"). Put simply, when "it is not necessary to decide more, it is necessary not to decide more." *Citizens United*, 558 U.S. at 375 (Roberts, C.J., concurring) (citation omitted).

## B.

With these principles in mind, we decline to enjoin any potential applications of the Act outside the newsgathering context. *See Connection Distrib.*, 557 F.3d at 342 (reminding that courts need not "sever an offending portion of the *text* from the rest of the statute," they may instead "enjoin the unconstitutional applications of the law while preserving the other valid applications of the law" (citing *Brockett*, 472 U.S. at 504–05;

*Grace*, 461 U.S. at 180–83)). We thus reverse the district court's invalidation of subsections (b)(2) and (3) in their entirety.

Our main point of disagreement centers around the court's belief that all "recording is protected speech." *People for the Ethical Treatment of Animals*, 466 F. Supp. 3d at 571. We do not think it wise to go that far where the case itself does not call for a categorical pronouncement and where the briefing is, understandably, agnostic on the potential implications of such an absolute decision. Should posting a hidden camera in a CEO's office—or her home—per se constitute protected expression? How about photographing proprietary documents to tap into trade secrets, with no intent of creating a work of art? Recording private telephone conversations? *See Miller v. Brooks*, 472 S.E.2d 350, 354 (N.C. Ct. App. 1996) (First Amendment "not implicate[d]" where defendants infiltrated a plaintiff's "bedroom, and placed a hidden video camera in his room which recorded pictures of him undressing, showering, and going to bed"). For our purposes, it suffices to hold only that recording in the employer's nonpublic areas *as part of* newsgathering constitutes protected speech.[8]

Similarly circumscribed decisions by our sister circuits further convince us that a narrow decision is most appropriate today. *Fields*, for example, held that recordings of

---

[8] This approach is hardly unique. The Supreme Court has often rejected "categorical rule[s]" that a certain type of speech is always deserving of First Amendment protection. *E.g.*, *United States v. Alvarez*, 567 U.S. 709, 719, 723 (2012) (declining to hold broadly that all "false statements receive no First Amendment protection" and denying protection only to those claims that were "made to effect a fraud or secure moneys or other valuable considerations").

police activity constitute protected conduct—but only because "[t]here is no practical difference between allowing police to prevent people from taking recordings and actually banning the possession or distribution of them." 862 F.3d at 358. That is, the Third Circuit found recordings to be protected because the information recorded was the type of information we usually consider "important" to share with the society to encourage "discourse on public issues, 'the highest rung of the hierarchy of First Amendment values.' " *Id.* at 359 (quoting *Snyder v. Phelps*, 562 U.S. 443, 452 (2011)). But the court prudently declined to "say that all recording is protected or desirable" and declined to engage with plaintiffs' arguments that the "act of recording is 'inherently expressive conduct,' like painting, writing a diary, dancing, or marching in a parade." *Id.* at 359–60.

The Tenth Circuit took a similarly careful approach in *W. Watersheds Project*, 869 F.3d at 1197. It held recordings of animals and habitat conditions protected speech-creation because "[a]n individual who photographs animals or takes notes about habitat conditions is creating speech in the same manner as an individual who records a police encounter" and then "use[s] the speech-creating activities at issue to further public debate." *Id.* at 1196–97 (leaning on long-held understandings that "a major purpose of the First Amendment was to protect the free discussion of governmental affairs" (quoting *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 755 (2011))).

The Seventh Circuit offers more of the same. "The act of *making* an audio or audiovisual recording," the court reasons, "is necessarily included within the First Amendment's guarantee of speech and press rights" because it flows from "the right to

37

disseminate the resulting recording." *Alvarez*, 679 F.3d at 595.[9]  We follow these circuits and decline to answer today whether all manner of recording deserves First Amendment protection.

Invalidating the challenged provisions in their entirety poses a yet more fundamental problem.  It should go without saying that, before a court can invalidate a statute on its face, it should understand what the statute "actually authorizes." *Patel*, 576 U.S. at 418 (citing *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992)).  *Patel* helpfully tees up the problem.  The case involved a Los Angeles ordinance compelling hotels to disclose guest records to the police.  After determining that the ordinance violated the Fourth Amendment's warrant requirement in many of its applications, the Court, as here, had to decide whether to sever those offending applications or invalidate the entire ordinance. The Court acknowledged some constitutional "applications" remained—the ordinance could be applied in exigent circumstances, when a warrant has been issued, or by consent— but explained those searches were permissible even without the ordinance and as such "irrelevant" to the analysis.  *Id.* at 419.  The Court was thus able to strike down the statue in full.  *Id.*; *see also City of Houston v. Hill*, 482 U.S. 451, 460–61 (1987) (considering

---

[9] We recognize that at least one court has gone further.  In *Animal Legal Defense Fund v. Wasden*, the Ninth Circuit found "the recording process" itself "inherently expressive" because it necessitates "decisions about content, composition, lighting, volume, and angles." 878 F.3d 1184, 1203 (9th Cir. 2018).  But we are persuaded by the Third Circuit's reasoning in *Fields*, that PETA's core aim here is to record newsworthy content, not "create art."  862 F.3d at 359.  Nor has the Ninth Circuit been able to stress-test the outer limits of its expansive ruling—*Wasden* itself concerned only recordings of "the conduct of an agricultural production facility's operations."  878 F.3d at 1204 (quoting Idaho Code § 18–7042(1)(d)).

only "the enforceable portion of the ordinance," not potential applications that were in fact "pre-empted by the Texas Penal Code").

The sober appraisal of this limited pre-enforcement record precludes a definite resolution of this point. North Carolina contends the Act has many applications beyond newsgathering: it "[c]ould stop an enterprising campaign intern from going undercover to record a rival political party's election strategy"; "could stand in the way of a hate group's efforts to infiltrate a house of worship"; "could provide a damages remedy to a medical clinic whose patient information is exposed to the public." Opening Br. 5. But the State already has common-law trespass prohibitions, trade secret laws, and statutes authorizing non-disclosure agreements. *E.g.*, N.C. Gen. Stat. § 66-154 (setting out trade-secrets protections); *Hartman v. W.H. Odell & Assocs., Inc.*, 450 S.E.2d 912, 916 (N.C. Ct. App. 1994) (approving of certain non-compete agreements); *Chemimetals Processing, Inc. v. McEneny*, 476 S.E.2d 374, 376–77 (N.C. Ct. App. 1996) (acknowledging validity of non-disclosure agreements).

Even then, North Carolina insists, the Act has tangible value beyond prohibiting newsgathering because it provides a meaningful damages remedy. As proof, it cites three cases brought under (b)(5) for misappropriation of consumer information and fraud. *See* Resp.-Reply Br. 49–50. But those citations are to *complaints*, two of which have been dismissed and the other stayed. *See Tucker Auto-Mation of N.C., LLC v. Rutledge*, No. 1:15-CV-893, 2016 WL 11003637 (M.D.N.C. Sep. 26, 2016); *Budler v. MacGregor*, No. 18 CVS 1153, 2018 WL 9539078 (N.C. Super. Ct. Feb. 16, 2018); *Harris v. Peters*, No. 18 CVS 1646, 2018 WL 9903428 (N.C. Super. Ct. Feb. 27, 2018). So, six years in, any

39

applications of the Act to non-speech activities remain hypothetical. And regardless, *Patel* teaches that "[a]n otherwise facially unconstitutional statute cannot be saved from invalidation based solely on the existence of a penalty provision that applies when [conduct is] not actually authorized by the statute." 576 U.S. at 418, 419 n.1.

Whatever the Act's real applications beyond newsgathering, the material point today is that these questions remain unanswered, lurking in the background and warning us away from prejudging the entire Act in a pre-enforcement challenge. And so we "follow our traditional practice of adjudicating difficult and novel constitutional questions only in concrete factual situations." *Ferber*, 458 U.S. at 780–81 (1982) (Stevens, J., concurring in the judgment).

## C.

All of that discussion presumes, of course, that we *can* sever newsgathering applications from the Act without "rewriting state law" or "circumvent[ing] the intent of the legislature." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329–30 (2006) (internal quotation marks, brackets, and citations omitted). We think yes. Although the Act does not contain a severability clause, its text professes broad goals: to provide "damages for exceeding the scope of authorized access to property." N.C. Gen. Stat. § 99A-2. And the parties from the start have presumed severance appropriate: PETA has asked us to declare only four of the Act's provisions unconstitutional and North Carolina never objected to that request. On the contrary, as discussed, North Carolina advanced many conceivable applications of the Act beyond newsgathering. It has also cited

40

legislative history signaling the Act covers more than just undercover investigations: it "passed by overwhelming, bipartisan margins in both chambers" and several legislators have expressed their support for the Act because it "protect[s] private property." Resp.-Reply Br. at 42–43 (citing J.A. 174–75, 236–37, 202, 244, 261–62, 279, 304, 313).[10] Under these circumstances, we find no evidence that the "remainder of the statute" cannot "retain[ ] its effectiveness." *Brockett*, 472 U.S. at 507; *State v. Fredell*, 195 S.E.2d 300, 303 (N.C. 1973) (holding a statute divisible even though it did not contain a severability clause).

We accordingly hold the Act unconstitutional when applied to bar newsgathering activities PETA wishes to conduct and sever that application from the remainder of the Act. Our analysis likely means the same result must follow for most (if not all) who engage in conduct analogous to PETA's. But we leave it to the district courts to make such findings in the first instance.

## V.

PETA alternatively asks us to invalidate the challenged provisions on their face as overbroad because "a substantial number of [their] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Stevens*, 559 U.S. at 473 (quoting *Wash. State Grange*, 552 U.S. at 449, n.6). Adding to the hypotheticals already

---

[10] We do not mean to suggest that legislative history speaks authoritatively to severability, only that North Carolina's reference to that history demonstrates North Carolina's agreement that we can sever certain applications of the Act.

41

discussed throughout this opinion, PETA contends the four challenged provisions would further prohibit "newspapers from publishing articles on public whistleblowers," punish bona fide "employees who gather and report evidence of environmental pollution or harm to endangered species, as federal law encourages," as well as employees who, "outside their duties, gather evidence of contracting fraud to the federal government under the federal False Claims Act." Resp. Br. 62 (citing 16 U.S.C. § 1533(b)(3)(A); 40 C.F.R. § 1506.6(d); 31 U.S.C. §§ 3729–33). And PETA's amici press that the Act creates liability for employees reporting under a wide variety of workplace safety statutes, including the Occupational Safety and Health Act, 29 U.S.C. § 660(c); the Fair Labor Standards Act, *id.* § 218c; the Federal Railroad Safety Act, 49 U.S.C. § 20109(b); and North Carolina's Burt's Law, which prohibits abuse or harm to mentally ill persons, N.C. Gen. Stat. Ann. § 122C-66. *See* Br. of Law Professors Amici 29; *see also* Br. of the Reporters Committee Amici 15 (insisting the Act chills "all manner of constitutionally protected newsgathering activities and reporter-source communications"); Br. of Amici Curiae United Farm Workers of America in Support of Pls.-Appellees 10–15, 18–21 (explaining that the Act disincentivizes farmworker's "investigation and documentation" of workplace conditions as well as their unions' assistance in "documenting and reporting" of OSHA violations, among others). By all accounts, the sheer breadth of these restrictions raises red flags. That is why we faulted the legislature for failing to produce evidence that it considered less-abridging alternatives and found them nonviable. But PETA misapprehends what these restrictions cash out to mean in the overbreadth context.

The overbreadth doctrine offers prophylactic medicine to combat a statute's "chilling" of constitutionally valuable expression. *Massachusetts v. Oakes*, 491 U.S. 576, 584 (1989) (plurality op.). Reflecting our long-held understanding that "the First Amendment needs breathing space," the doctrine allows litigants "to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick*, 413 U.S. at 611–12. As a corollary of those doctrinal roots, overbreadth challenges typically arise when a litigant wishes to avoid sanction for *un*protected conduct, using the overbreadth vehicle to get around the customary standing barriers. *Id.* at 612.

On the flip side, courts usually do not entertain overbreadth challenges where, as here, "the parties challenging the statute are those who desire to engage in protected speech that the overbroad statute purports to punish," *Brockett*, 472 U.S. at 503—not because courts read some technical requirement into the doctrine, but because they can easily adjudicate such a challenge head-on. In *Brockett*, for example, the Court examined a Washington statute that declared a "moral nuisance" any place "where lewd films are publicly exhibited as a regular course of business." *Id.* at 493 (citation omitted). The problem was the statute's open-ended definition of "lewd," which "reached material that aroused only a normal, healthy interest in sex." *Id.* at 494. The Court agreed that definition could be characterized as overbroad, but observed any such overbreadth was not "incurable" and would not "taint all possible applications of the statute." *Id.* at 504. Employing the "normal" severability analysis, the Court simply invalidated the statute

"insofar as ['lewd'] is to be understood as reaching protected materials." *Id.* Taking the same tack in *Oakes*, the Court declined to consider an overbreadth challenge where "the defendant's conviction could have been—and indeed was—reversed on a narrower and alternative ground, *i.e.*, that the statute was unconstitutional as applied" and there was therefore "no need for any comment on the overbreadth challenge." 491 U.S. at 582 (plurality op.) (citing *Bigelow v. Virginia*, 421 U.S. 809, 829 (1975)).

Those cases reflect a common-sense principle that where as-applied challenges are available to the litigant, where the litigant has no need to argue that the statute abridges other persons' rights but can stand on her own footing, overbreadth should not be used to short-circuit the "normal" severability analysis. *See Brockett*, 472 U.S. at 504. Instead, the statute should "be declared invalid to the extent that it reaches too far, but otherwise left intact." *Id.*

Admittedly, a few cases resort to overbreadth even where litigants' own conduct falls under the First Amendment shield. But those cases offer good reasons to consider situations beyond the "flesh-and-blood" legal issues directly before the courts, *Ferber*, 458 U.S. at 768 (citation omitted)—such as, for example, when "as applied method of review [would] involve[ ] a prolonged and costly process of reshaping an overbroad statute." Note, *The First Amendment Overbreadth Doctrine*, 83 Harv. L. Rev. 844, 882 (1970). *Jews for Jesus*, for example, involved a resolution purporting to ban all First Amendment activity at the Los Angeles airport. 482 U.S. at 575. Although the Court contemplated case-by-case adjudication, it ultimately rejected such an approach because the resolution, which prohibited "*all* protected expression" in all areas of the terminal, could not "be limited by

44

anything less than a series of adjudications, and the chilling effect of the resolution on protected speech in the meantime would make such a case-by-case adjudication intolerable." *Id.* at 574, 576; *cf. Citizens United*, 558 U.S. at 333 (invalidating the entire statute to avoid "prolong[ing] the substantial, nationwide chilling effect," albeit without ruling directly on overbreadth principles because petitioners did not make an overbreadth challenge).

The critical take-away here is that overbreadth provides a "second type of facial challenge" meant to address a specific problem. *Stevens*, 559 U.S. at 473 (citation omitted). If the usual inquiry considers whether an as-applied ruling makes sense in terms of the decision's internal logic and the legislature's intent, *see supra*, Part IV.A, the overbreadth doctrine asks whether a court can resolve a case on narrower ground without chilling cherished expression. *See Hicks*, 539 U.S. at 122 (that courts may invalidate entire statutes because the legislature meant them to "stand or fall together" does not mean courts can "properly decree that they fall by reason of the overbreadth doctrine").

Here, the Act (subject to the *Patel* analysis) regulates at least some non-expressive, unprotected conduct, like "remov[ing] the employer's data," "interfer[ing] with the ownership or possession of real property," and perhaps even "placing . . . an unattended camera" in the CEO's office. N.C. Gen. Stat. § 99A-2(b)(1), (3), (5). We discussed at length above how these more general regulations of conduct do not insulate the Act from the First Amendment's wringer when the Act bars speech. And we mirrored that approach on the back end under the "normal" severability analysis by enjoining only the applications that pare protected newsgathering activities. Absent any indication that the Act "as a

whole" chills First Amendment freedoms, we follow the same principles under overbreadth. *Hicks*, 539 U.S. at 122 (2003); *see Broadrick*, 413 U.S. at 615 (declining to enjoin the entire statute because the court's authority under the overbreadth doctrine, "a limited one at the outset, attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from 'pure speech' toward conduct" a State has legitimate power to regulate); *Button*, 371 U.S. at 415 (1963) (holding that Virginia failed to "justify the broad prohibitions" imposed through a barratry law, but enjoining the statute only as applied to the politically oriented litigating efforts of the NAACP).

We enjoin North Carolina from applying the Act to PETA's newsgathering activities but sever and reserve all other applications for future case-by-case adjudication.

VI.

For the foregoing reasons, the district court's judgment is

*AFFIRMED IN PART AND REVERSED IN PART.*

46

RUSHING, Circuit Judge, dissenting:

The North Carolina Property Protection Act authorizes "the owner or operator of [a] premises" to sue for "damages sustained" as a result of certain trespasses into "nonpublic areas" of the premises.  N.C. Gen. Stat. § 99A-2(a).  The majority concludes that the First Amendment protects the right to surreptitiously record in an "employer's nonpublic areas as part of newsgathering" and holds the Act unconstitutional "when applied to bar [the undercover] newsgathering activities PETA wishes to conduct" on private property.  Maj. Op. at 36, 41 (emphasis omitted).  I must dissent because our precedent forecloses the conclusion that it offends the First Amendment to apply generally applicable tort law prohibiting trespass and breach of duty to PETA's proposed conduct.

I.

A.

The Property Protection Act provides that "[a]ny person who intentionally gains access to the nonpublic areas of another's premises and engages in an act that exceeds the person's authority to enter those areas is liable to the owner or operator of the premises for any damages sustained."  N.C. Gen. Stat. § 99A-2(a).  The statute identifies five acts that "exceed[] a person's authority to enter the nonpublic areas of another's premises" as follows:

> (1) An employee who enters the nonpublic areas of an employer's premises for a reason other than a bona fide intent of seeking or holding employment or doing business with the employer and thereafter without authorization captures or removes the employer's data, paper, records, or any other documents and uses the information to breach the person's duty of loyalty to the employer.

47

(2)  An employee who intentionally enters the nonpublic areas of an employer's premises for a reason other than a bona fide intent of seeking or holding employment or doing business with the employer and thereafter without authorization records images or sound occurring within an employer's premises and uses the recording to breach the person's duty of loyalty to the employer.

(3)  Knowingly or intentionally placing on the employer's premises an unattended camera or electronic surveillance device and using that device to record images or data.

(4)  Conspiring in organized retail theft, as defined in Article 16A of Chapter 14 of the General Statutes.

(5)  An act that substantially interferes with the ownership or possession of real property.

*Id.* § 99A-2(b).  The Act creates joint liability for "[a]ny person who intentionally directs, assists, compensates, or induces another person to violate this section." *Id*. § 99A-2(c).  A successful plaintiff may receive equitable relief, costs and fees, compensatory damages "as otherwise allowed by State or federal law," and exemplary damages of $5,000 per day "as otherwise allowed by State or federal law." *Id.* § 99A-2(d).  The Act explicitly preserves existing protections for employees reporting wrongdoing under a laundry list of state statutes incorporated by reference and exempts from liability parties who are covered by those statutes.[1] *Id.* § 99A-2(e).  It also does not apply to law enforcement or governmental agency investigations. *Id.* § 99A-2(f).

---

[1] Specifically, subsection (e) lists "Article 14 of Chapter 126," which protects state employees who report improper activities, *see* N.C. Gen. Stat. § 126-84 *et seq.*, and "Article 21 of Chapter 95," which protects employees who initiate inquiries or take part in investigations of any kind (or threaten to do so) with respect to the Workers' Compensation Act, the Wage and Hour Act, the Occupational Safety and Health Act of North Carolina, the Mine Safety and Health Act, laws prohibiting discrimination based on blood disorders

PETA has not been sued under the Act.  In fact, the parties have not identified any case in which a plaintiff has sued under the Act based on investigative reporting, speech, or any expressive activity.  "So, six years in, any applications of the Act to []speech activities remain hypothetical."  Maj. Op. at 39–40.  Some suits have been filed for fraud and misappropriation of consumer information and trade secrets.  *See* Maj. Op. at 39 (citing complaints).  But North Carolina courts have not yet interpreted the Act in any pertinent respect.  Given the absence of interpretation or application of the Act by state courts, we should be cautious in construing its terms in the first instance and opining about the constitutionality of hypothetical future applications of it.  *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 79 (1997) ("Warnings against premature adjudication of constitutional questions bear heightened attention when a federal court is asked to invalidate a State's law, for the federal tribunal risks friction-generating error when it endeavors to construe a novel state Act not yet reviewed by the State's highest court."); *cf. INS v. St. Cyr*, 533 U.S. 289, 300 (2001) ("[W]e are obligated to construe the statute to avoid [constitutional] problems" where "an alternative interpretation of the statute is fairly possible." (internal quotation marks omitted)).

B.

I would focus on PETA's challenge to the Act as applied to the specific activity in which it wishes to engage.  PETA wants to conduct undercover investigations by sending

---

or genetics, the law on National Guard Reemployment Rights, regulations on pesticides, the Drug Paraphernalia Control Act of 2009, and laws prohibiting discrimination against an employee for attending court-ordered activities for parents of delinquent juveniles, *see* N.C. Gen. Stat. § 95-241(a).

its employees to gain secondary employment at places like animal laboratories, where they will secretly record, including by placing unattended cameras, and then publicize their findings to the detriment of the duped employers and for the benefit of their primary employer, PETA.  PETA contends that the Act prohibits this conduct and therefore violates the First Amendment.

Our Court has already considered this exact mode of operation and held that North Carolina tort law may enforce a damages remedy without running afoul of the First Amendment.  In *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, undercover reporters working for ABC took jobs at Food Lion grocery stores, where they spent their work hours secretly filming meat-handling practices.  194 F.3d 505, 510–511 (4th Cir. 1999).  ABC then used some of the recorded footage in a news broadcast that was sharply critical of Food Lion.  Food Lion sued—not for defamation but for breach of the duty of loyalty and trespass, among other things.  *Id.* at 511.  We affirmed the verdict in favor of Food Lion on those claims.  *Id.* at 510.  As to "the tort of disloyalty," we concluded the reporters could be liable under North Carolina law because they "served ABC's interest, at the expense of Food Lion, by engaging in the taping for ABC while they were on Food Lion's payroll."  *Id.* at 516.  In other words, they acted "adversely to the second employer for the benefit of the first."  *Id.*  As to trespass, we similarly concluded the reporters could be liable under North Carolina law because they committed "a wrongful act in excess of [their] authority to enter Food Lion's premises as employees" when they "videotaped in non-public areas of the store and worked against the interests of [their] second employer, Food Lion, in doing so."  *Id.* at 518–519.

50

Importantly, we rejected ABC's First Amendment objection and affirmed the district court's refusal "to subject Food Lion's claims to any level of First Amendment scrutiny." *Id.* at 520. Although we acknowledged "First Amendment interests in newsgathering," *id.* (internal quotation marks omitted), we also recognized, based on the Supreme Court's decision in *Cowles*, that "'generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news,'" *id.* (quoting *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991)). We reasoned that "[t]he torts [the reporters] committed, breach of the duty of loyalty and trespass, fit neatly into the *Cowles* framework. Neither tort targets or singles out the press. Each applies to the daily transactions of the citizens" of North Carolina. *Id.* at 521. We considered and distinguished *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622 (1994), and *Barnes v. Glen Theatre Inc.*, 501 U.S. 560 (1991). *See Food Lion*, 194 F.3d at 521–522. And we ultimately concluded that "[h]ere, as in *Cowles*, heightened scrutiny does not apply because the tort laws (breach of duty of loyalty and trespass) do not single out the press or have more than an incidental effect upon its work." *Id.* at 522.[2]

---

[2] At the same time, we rejected Food Lion's request for publication damages as an "end-run around First Amendment strictures" forbidden by *Hustler Magazine v. Falwell*, 485 U.S. 46 (1988). *Food Lion*, 194 F.3d at 522. As we explained, Food Lion could not "recover defamation-type damages under non-reputational tort claims[] without satisfying the stricter (First Amendment) standards of a defamation claim." *Id.* The Property Protection Act limits compensatory and exemplary damages to those "otherwise allowed by State or federal law," which would include these First Amendment strictures. N.C. Gen. Stat. § 99A-2(d)(2), (4).

Our decision in *Food Lion* controls this case. As applied to the activities PETA desires to undertake, each of the contested provisions of the North Carolina Property Protection Act accords with the generally applicable conduct regulations this Court upheld against a First Amendment challenge in *Food Lion*.

To begin with the most obvious, paragraph (b)(3) forbids exceeding one's authority to enter the "nonpublic areas of another's premises" by "[k]nowingly or intentionally" placing an "unattended camera or electronic surveillance device and using that device to record images or data." N.C. Gen. Stat. § 99A-2(a), (b)(3). As we acknowledged in *Food Lion*, this is a generally applicable prohibition on trespass. *See Food Lion*, 194 F.3d at 518–519 (discussing *Miller v. Brooks*, 472 S.E.2d 350, 352, 355 (N.C. Ct. App. 1996), in which the court held that "[e]ven an authorized entry can be trespass if a wrongful act is done in excess of and in abuse of authorized entry," such as "install[ing] a hidden videotape camera" and using it to record); *see also Keyzer v. Amerlink, Ltd.*, 618 S.E.2d 768, 772 (N.C. Ct. App. 2005) (affirming that *Miller* stands for this proposition).

Similarly, paragraph (b)(5) is a classic statement of the law of trespass. That paragraph prohibits exceeding one's authority to enter a nonpublic area of another's premises by committing an "act that substantially interferes with the ownership or possession of real property." N.C. Gen. Stat. § 99A-2(b)(5). As we recognized in *Food Lion*, generally applicable trespass law protects against unauthorized "'interference with the ownership or possession of land.'" 194 F.3d at 518 (quoting *Desnick v. Am. Broad. Co.*, 44 F.3d 1345, 1353 (7th Cir. 1995)); *see also id.* (describing "the interest underlying

the tort of trespass" as "the ownership and peaceable possession of land" (citing, *inter alia*, *Matthews v. Forrest*, 69 S.E.2d 553, 555 (N.C. 1952)).

Paragraphs (b)(1) and (2) forbid employees "to breach the . . . duty of loyalty" by "us[ing]" information from documents "capture[d] or remove[d]" or "recording[s]" made in "nonpublic areas" of the employer's premises "without authorization." N.C. Gen. Stat. § 99A-2(b)(1)–(2). As applied to PETA, those paragraphs correlate with the generally applicable employment tort we upheld against constitutional challenge in *Food Lion*. *See Food Lion*, 194 F.3d at 521 ("If, for example, an employee of a competing grocery chain hired on with Food Lion and videotaped damaging information in Food Lion's non-public areas for later disclosure to the public, these tort laws would apply with the same force as they do against [the reporters] here.").

*Food Lion* acknowledged that laws that "single out the press," have "more than an incidental effect upon its work," or directly regulate an act that "necessarily involve[s] expression" would be subject to First Amendment scrutiny. *Food Lion*, 194 F.3d at 522. But the Act targets trespass and breach of the duty of loyalty, which—just like the torts in *Food Lion*—do not necessarily involve expression or impose a unique burden on the press. Applying our precedent, then, the Act is generally applicable and does not merit heightened First Amendment scrutiny simply because it may be enforced equally against an investigative reporter and a business competitor. *See id.* at 521–522; *see also*, *e.g.*, *Planned Parenthood Fed'n of Am., Inc. v. Newman*, 51 F.4th 1125, 1135 (9th Cir. 2022) (rejecting First Amendment challenge and affirming damages for trespass, fraud, and state wiretapping violations awarded against defendants who disclosed secretly recorded videos

of Planned Parenthood staff because "the pursuit of journalism does not give a license to break laws of general applicability").

## C.

Without attempting to distinguish *Food Lion*, the majority simply asserts that decision does not control here. The majority correctly observes that the Supreme Court of North Carolina subsequently held that the State does not recognize an independent claim for breach of the duty of loyalty. *See Dalton v. Camp*, 548 S.E.2d 704, 709 (N.C. 2001); Maj. Op. at 14. But by passing the Act, the General Assembly codified that cause of action, so this Court's previous constitutional analysis of that tort—not to mention the law of trespass—continues to apply here. The state court's decision did not, and could not, undermine this Court's First Amendment analysis.

## D.

Moving beyond its disregard of *Food Lion*, the underpinnings of the majority's decision are unpersuasive. I highlight just a few of its foundational problems.

First, an interest in newsworthy information does not confer a First Amendment right to enter private property (or a right to exceed the bounds of one's authority to enter) and secretly record. Newsgathering enjoys some constitutional protection because of its connection to speech and the press, *see Branzburg v. Hayes*, 408 U.S. 665, 681 (1972), but the mere act of recording by itself is not categorically protected speech. The majority therefore rightly rejects the Ninth Circuit's decision in *Animal Legal Defense Fund v. Wasden*, 878 F.3d 1184, 1203 (9th Cir. 2018). *See* Maj. Op. at 38 n.9. Other circuits to consider restrictions on recording have extended First Amendment protection to recording

matters of public interest in public spaces because of its connection with speech of public concern.  *See*, *e.g.*, *Glik v. Cunniffe*, 655 F.3d 78, 83 (1st Cir. 2011); *Fields v. City of Philadelphia*, 862 F.3d 353, 359 (3d Cir. 2017); *Turner v. Lieutenant Driver*, 848 F.3d 678, 688–690 (5th Cir. 2017); *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 595 & n.4, 600 (7th Cir. 2012); *W. Watersheds Project v. Michael*, 869 F.3d 1189, 1195–1196 (10th Cir. 2017); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000).  We have done the same, holding the First Amendment protects "livestreaming a police traffic stop." *Sharpe v. Winterville Police Dep't*, --- F.4th ---, 2023 WL 1787881, at *3 (4th Cir. Feb. 7, 2023). The majority does not grapple with this distinction between recording in public spaces and unauthorized recording on private property.  *See* Maj. Op. at 36–38 (discussing some of these cases).

As the Supreme Court has explained, "[t]he right to speak and publish does not carry with it the unrestrained right to gather information" in violation of the rights of others. *Zemel v. Rusk*, 381 U.S. 1, 17 (1965) (observing, as an example, that entry into the White House is not a First Amendment right, even if exclusion diminishes the citizen's opportunity to gather information); *see also Cowles*, 501 U.S. at 669 ("The press may not with impunity break and enter an office or dwelling to gather news."); *Branzburg*, 408 U.S. at 691 ("Although stealing documents or private wiretapping could provide newsworthy information, neither reporter nor source is immune from conviction for such conduct, whatever the impact on the flow of news.").  But under the majority's rule, if the estranged wife who placed the hidden camera in *Miller* had instead been a household employee looking for a juicy news story to sell (and, perhaps, had placed the camera in the parlor

55

rather than the bedroom), the First Amendment would have insulated her from liability. *See Miller*, 472 S.E.2d at 354; Maj. Op. at 36 ("[I]t suffices to hold only that recording in the employer's nonpublic areas *as part of* newsgathering constitutes protected speech."). Why tort law should bend to the trespasser in one instance but not the other is, at best, unclear.

Second, the majority seriously misconstrues the Act to characterize it as a speech regulation. For example, the majority reasons at various points that paragraphs (b)(1) and (2) reach only "*speak[ing] out against* the employer," Maj. Op. at 23, or only "certain types of disloyal speech: disclosure of recordings," Maj. Op. at 30. That is simply not true. A person can "use" captured data or recorded images to breach the duty of loyalty without ever disclosing the recording or speaking against the employer. Using recorded information to launch a competing product, to steal customers, or to blackmail management come to mind. This is because *using information* is not the same as *speaking*. *Cf. Bartnicki v. Vopper*, 532 U.S. 514, 526–527 (2001) ("[T]he prohibition against the 'use' of the contents of an illegal interception . . . is . . . a regulation of conduct," unlike a "naked prohibition against disclosures" which "is fairly characterized as a regulation of pure speech.").

Laws can undoubtedly prohibit "using" information to harm another person or breach an obligation without raising any First Amendment concern. The Act targets using stolen information or secret recordings to facilitate a tortious act: breaching the duty of loyalty to an employer. That is not a regulation on speech, even if some acts of disloyalty

56

may be accomplished with words, such as persuading a former colleague to work for a competing company or revealing a trade secret. *See* Maj. Op. at 20.

Similarly for paragraph (b)(5), the majority conjures outlandish hypothetical applications far beyond the provision's prohibition on entering nonpublic areas of another's premises and substantially interfering with "the ownership or possession of real property." N.C. Gen. Stat. § 99A-2(b)(5); *see*, *e.g.*, Maj. Op. at 21 (reporting a conversation with a colleague that ultimately "leads the State to shut down the facility"), 27 (reporting violations of laws or regulations that lead to a temporary closure). Those imaginary applications stretch this traditional trespass rule far beyond its ordinary scope. And in the process, the majority ignores basic legal principles like federal preemption and the requirement to read state laws—including whistleblower protections—in harmony with one another.

Lastly, the majority's alternative rationale—content discrimination—does not hold water. *See* Maj. Op. at 11–12, 24–25. The Act distinguishes between trespassers and non-trespassers, between documents taken from another without permission and documents taken with permission, between those who violate their duty of loyalty to an employer and those who do not. The majority stretches *Reed v. Town of Gilbert*, 576 U.S. 155 (2015), past its breaking point and then some in saying these are impermissible categories of discrimination based on speaker and viewpoint. *See City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1474 (2022) (cautioning against overreading *Reed*'s "function or purpose" language). The crux of paragraphs (b)(1) and (2) is disloyal behavior. Those paragraphs do not draw "facial distinctions based on a message," and they

are easily "justified without reference to the content of" any affected speech. *Reed*, 576 U.S. at 163–164 (internal quotation marks omitted). In particular, those paragraphs authorize an enhanced tort remedy for a heightened privacy invasion—one that is intentionally harmful by breaching an employee's duty of loyalty and causing actual damage to an employer.

As for paragraph (b)(3), the majority opines that it applies only to employees and therefore discriminates among speakers. *See* Maj. Op. 25–26. But the majority's effort to read a content-based purpose into paragraph (b)(3) goes nowhere because the provision targets trespassory conduct, not speech. A "journalist invited to profile a company" is not a trespasser, regardless of the content of her ultimate review, because she has the employer's permission to record in nonpublic areas, and "a state enforcement agency" is explicitly exempted by subsection (f), regardless of the content of the enforcement officer's report. Maj. Op. at 26.

Moreover, it is far from clear that paragraph (b)(3) is limited to employees as the majority suggests. Although paragraph (b)(3) applies to placing an unattended recording device on "the employer's premises," it does not specify who places that device. As the majority points out, the reference to the employer's premises could suggest paragraph (b)(3) applies only to employee activity, consistent with (b)(1) and (b)(2). But the canon of consistent usage on which the majority relies cuts the other way too: unlike (b)(1) and (2), paragraphs (b)(3), (4), and (5) do not explicitly limit themselves to employees but would presumably apply to "[a]ny person," as stated in subsection (a). *See* A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012) ("[A] material

variation in terms suggests a variation in meaning.").  After all, subsection (b) defines the conduct for which subsection (a) provides a remedy—the two operate in tandem and must be read as such.  Whatever the meaning of paragraph (b)(3), these interpretive possibilities demonstrate that the provision is less concerned with *who* the bad actor is than with *what* the bad actor is doing—namely, trespassing by acting in excess of his authority to be on the premises.

III.

Because I would hold the Act constitutional as applied to PETA's undercover reporting tactics, I would proceed to address its overbreadth argument.  In the First Amendment context, "a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."  *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021) (internal quotation marks omitted).  PETA "bears the burden of demonstrating, from the text of the law and from actual fact, that substantial overbreadth exists."  *Virginia v. Hicks*, 539 U.S. 113, 122 (2003) (internal quotation marks and brackets omitted).

PETA has not carried its burden. Its facial challenge rests entirely on speculation and hypotheticals that ignore the Act's textual limits and whistleblower protections laws. And when it comes to assessing the Act's scope, PETA refuses to acknowledge the possibility of even a single constitutional application of the Act.  Because PETA denies the Act's vast legitimate sweep—including preventing and compensating misappropriation, sabotage, espionage, extortion, unfair competition, and theft of trade secrets, to name a few—it fails to explain how unconstitutional applications of the Act could be substantial

59

by comparison, a requirement we must apply "vigorously." *United States v. Williams*, 553 U.S. 285, 292 (2008).