

INSTITUTE FOR JUSTICE

January 9, 2024

<u>**Via CM/ECF**</u>
Hon. Catherine O'Hagan Wolfe
Clerk of Court
United States Court of Appeals for the Second Circuit
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, NY 10007

RE:     *Upsolve, Inc. v. James*
        Case no. 22-1345-cv
        28(j) Letter

Dear Ms. Wolfe:

Pursuant to Federal Rule of Appellate Procedure 28(j), I write to draw the Court's attention to two recent federal court decisions, *Richwine v. Matuszak*, No. 1:23-cv-00370, R. 38 (N.D. Ind. Dec. 19, 2023), and *Nutt v. Ritter*, No. 7:21-cv-00106, R. 63 (E.D.N.C. Dec. 20, 2023), attached. Both cases rejected licensing restrictions on professional speech under the First Amendment.

In *Richwine*, Indiana wanted to enforce its funeral-licensing requirements on a "death doula," who wanted to give advice to clients to help navigate a family member's passing. Slip. Op. at 1. Indiana defended the restriction under the state's power "to maintain standards among members of a licensed profession." *Id.* at 18. But under *Holder v. Humanitarian Law Project*, 561 U.S. 28 (2010), the court rejected Indiana's attempt to recast the doula's speech as "professional conduct." *Id.* at 24, 18 (likening it "with lawyer speech").

In *Nutt*, North Carolina wanted to prevent a retired chemical engineer from being an expert witness because he didn't have an engineering license. According to North Carolina, it just wanted to restrict the "conduct" of preparing an expert report—not the expert testimony itself, which it admitted was pure speech. Slip. Op. at 20. But the court rejected the state's argument, emphasizing that "conduct leading to the creation of pure speech," like preparing the expert report, "is also protected activity under the First Amendment." *Id.* at 22-24.

1

Both cases run counter to New York's identical arguments here, that (a) it is only restricting the "professional" "practice" or "conduct" of law—or (b) that it is restricting just the "creating," "thinking of," or "generating" legal advice—not speech itself. Appellant Br. 42, 52; Reply at 1, 6-9. The Court should reject New York's attempt to redefine Appellee's pure speech as anything but.

Both courts also distinguish two primary cases New York relies on: *Del Castillo v. Sec., Florida Dep't of Health*, 26 F.4th 1214 (11th Cir. 2022), *Richwine* at 18, 24, and *Brokamp v. James*, 66 F.4th 374 (2d. Cir. 2023), *Nutt* at 29-30. The Court should do the same here.

I thank the Court for its attention.

Sincerely,

/s/ Brian A. Morris
Robert J. McNamara
Brian A. Morris
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, Virginia 22203
(703) 682-9320

*Attorneys for Plaintiffs-Appellees*

cc (by ECF):

All Counsel

## Certificate of Compliance

This letter brief complies with the type-volume limitation of Fed. R. App. P. 28(j) as it contains 349 words.

Dated: January 9, 2024                    /s/ Brian A. Morris
                                          Brian A. Morris

                                          *Attorney for Plaintiffs-Appellees*

2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| LAUREN RICHWINE and DEATH DONE DIFFERENTLY LLC, | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) CASE NO.: 1:23-cv-00370-HAB-SLC |
| | ) |
| KATHLEEN DIANE MATUSZAK, THOMAS SPROLES, FRANK DOWNING, and CHRISTOPHER COOKE, in their official capacities as members of the Indiana State Board of Funeral & Cemetery Service; THEODORE ROKITA, in his official capacity as Attorney General of Indiana; and LINDSAY HYER, in her official capacity as Executive Director of the Indiana Professional Licensing Agency, | ) ) ) ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |

**OPINION AND ORDER**

Plaintiff, Lauren Richwine ("Richwine"), is a "death doula." Through her business and co-Plaintiff, Death Done Differently LLC ("Death Done Differently"), Richwine speaks with people about a difficult topic, one many people avoid: death and dying. This includes providing individualized advice to clients and their families to plan for death, options for funeral goods and services, and how they would like to be remembered. Defendants—officials of the State of Indiana—ordered Richwine to cease speaking unless she obtains a funeral-director license for herself and a funeral-home license for her business.

Richwine does not claim to be a funeral director. Nor does she claim to be exempt from Indiana's licensing requirements for funeral directors. *See* Ind. Code § 25-15, et seq. Rather,

1

Richwine claims that she has been muzzled by an overinclusive statutory scheme which has rendered her business comatose. Plaintiffs sued Defendants alleging that the licensing scheme, as applied to Richwine and Death Done Differently, abridges their freedom of speech guaranteed by the First Amendment of the U.S. Constitution. (ECF No. 1). In the meantime—hoping to remove the tape from her mouth and bring her business back from purgatory—Plaintiffs moved to preliminarily enjoin the statutes' application. (ECF No. 2). That motion has been fully briefed (ECF Nos. 2, 26, 29) and is ripe for ruling.

## I.     Factual Background

A "death doula" or a "death midwife" is the death analog to a birth doula or midwife. (ECF No. 1, ¶ 13). When most people think of a conventional funeral, it involves embalming a body, holding a ceremony at a funeral parlor, and cremation or burial in a casket. (*Id.* at ¶ 19). This system often medicalizes death leaving the heavy lifting to hospitals and hospice. (*Id.* at ¶ 20). Medical professionals' typical concerns are on the health of the patient. Even with death impending, they often fail to create an emotionally supportive space for the dying person—and their family—to consider how they wish to approach death and be remembered. (*Id.*)

Death doulas aim to bridge that gap. They provide education in their communities to inform people of their options about death and work with families to develop an individualized plan. Their work, for the most part, involves discussions. These discussions include options for directing death care (medical directives), alternatives for being remembered, and options for disposition of remains. (*Id.* at ¶¶ 15-16, 23-24). Indeed, society has slowly moved away from the conventional death and funeral process embracing alternatives such as home funerals and green burials. Above all, death doulas aim to provide emotional support absent from the conventional system. They encourage people to engage in the important, yet frequently avoided, questions in a largely "death-

phobic culture." (*Id.* at ¶ 28).

Richwine took the gap personally and sought to bridge it herself. She began reading about death care, attending programs, doing in-person mentorships, and speaking with licensed funeral directors. (*Id.* at ¶ 31). Richwine joined the National Assocoiation of Certified Death Midwives, the National End-of-life Doula Alliance, the National Home Funeral Alliance, and The Order of the Good Death. (*Id.* at ¶ 33). She even became a trained facilitator in the "Respecting Choice Advance Care Planning" Program run by Parkview Health Network to help patients make personal plans for end-of-life decisions. (*Id.* at ¶ 32).

In 2019, Richwine made this a vocation and founded her business: Death Done Differently. (*Id.* at ¶ 35). Through her business, she offers individualized advising and planning to help clients and their families develop end-of-life plans covering topics like funeral options, options for body disposition, and choices for remembrance services. (*Id.* at ¶ 41(b)). Her full range of services include:

    a.  <u>Initial Consultation</u>: [Richwine] offers to have a free, no-obligation conversation with potential clients for them to learn more about her services and ask questions. She may direct them to others in the death care community, or she may arrange future individualized services. (Always Free)

    b.  <u>Full End of Life Planning</u>: [Richwine] will discuss end-of-life options with a client and their family. Topics she discusses include: funeral options, options for body disposition (including alternatives such as cremation, traditional burial, or green burial), and choices families have for remembrance services. [Richwine] also offers to advise clients and their families about end-of-life paperwork such as a living will, do-not-resuscitate ("DNR") form, and healthcare power of attorney. ($300-$500)

    c.  <u>Advance Care Planning</u>: [Richwine] will facilitate conversations with a client and their family about desired levels of medical intervention in the case of a sudden accident or medical issue. She will assist with related paperwork such as living will, DNR form, and healthcare power of attorney. ($100-$300)

    d.  <u>Support for Family Led Death Care</u>: [Richwine] will consult as a celebrant with family. She will discuss and coordinate personal information, music and reading selections, religious acknowledgements (if any), and other programming. These conversations ideally take place prior to death so that the dying person is involved in providing their own preferences for post death care and how they would like to be remembered. ($500-$1,000)

    e.  <u>Visits</u>: [Richwine] will visit with clients and family as they approach the end of life to offer emotional support. Her tasks may include readings, music, conversation, healing touch, or general companionship with the individual prior to death. Her services do not include medical treatments, housekeeping, household chores, or childcare. ($50-$80 per hour)

    f.  <u>Vigil</u>: In the active stages of dying immediately leading up to death, [Richwine] offers to be present to provide emotional support. ($50-$80 per hour)

    g.  <u>Legacy Letter for Loved Ones and/or Family</u>: [Richwine] offers to assist a dying person in drafting a letter to loved ones and ensuring it gets to intended recipients. This leverages her creative-writing skills and background to help a dying person express themself. ($50-$100 per letter)

(*Id.* at ¶ 41). Along with these individualized services, Richwine offers educational programs in the community to discuss these topics and mentors others who want to become death doulas. (*Id.* at ¶¶ 53-56).

    Death Done Differently maintained a website. (ECF No. 1-3). The website advertised that Richwine performed her services in conjunction with a licensed funeral director. (*Id.* at 11). But every page on the website contained a footer: "Death Done Differently is an educational consulting organization and is in no way considered a funeral establishment." (*Id.* at 1-12) Additionally, the FAQ page expressly stated that Richwine does "NOT perform any services that funeral directors are licensed to perform." (*Id.* at 6). She claims to be just as explicit in her in-person consultations.

## A.  Indiana's Requirements for Funeral-Related Licensing

    As explicit as she may be, at least some of Richwine's services fall within Indiana's definition of "the practice of funeral services." *See* Ind. Code § 25-15-2-22. Under Indiana law,

"the practice of funeral services" includes:

> (1) the application of the principles, methods, and techniques of mortuary science to the delivery of funeral services;
>
> (2) the counseling of individuals concerning methods and alternatives for the final disposition of human remains;
>
> (3) the prevention of the spread of infectious and contagious disease from human remains; and,
>
> (4) compliance, in the delivery of funeral merchandise and services, with laws relating to health, public safety, and the environment.

Ind. Code § 25-15-2-22. Unless exempted, "a person that engages in the practice of funeral services without a license under this article commits a Class B infraction." Ind. Code § 25-15-2-24(b). "Person" includes business associations under the statute. Ind. Code § 25-15-2-21.

### B. The Indiana Attorney General's Investigation

In June 2021, Indiana's Professional Licensing Agency ("IPLA") received a complaint from somebody in the funeral services industry that was concerned Richwine and Death Done Differently (collectively hereafter "Plaintiffs") needed a license to conduct certain aspects of the business. (ECF No. 26-1, ¶ 4). An IPLA investigator reviewed Death Done Differently's website and worried that Plaintiffs were engaging in the practice of funeral services without a license. In particular, Plaintiffs' services include: "[d]etermination of final disposition of body," "verbal guidance with loved ones for moving, bathing dressing, and arrangement of the deceased," and "support with the selection of services" at a funeral home. (*Id.* at ¶ 6). The investigator also expressed public health and safety concerns as the website conveyed that dead bodies are not dangerous.[1] (*Id.* at ¶ 9). And she expressed concerns that Plaintiffs were causing consumers to be

---

[1] The website also stated, "the individual given authority to determine the final disposition of the body has up to 72 hours or three days from the time of death to contact the funeral home of their choice. In most cases you do not need to have the body removed immediately following death. Death is not an emergency. (IC 25-15-9-18)." (ECF No. 26-1, at ¶ 9).

overcharged through duplicative services that the state requires funeral directors to provide. (*Id.* at 13).

The IPLA investigator filed a complaint with the Indiana Attorney General Consumer Protection Division and requested a cease-and-desist letter. (*Id.* at ¶ 15). The Attorney General sent a letter to Plaintiffs, requested a response to the Complaint, and continued to investigate. (ECF No. 26-2, ¶¶ 3-5). Based on Plaintiffs' response, it was clear that Richwine lacked training approved by the American Board of Funeral Service Education as required by 832 IAC § 3-1-1 to become a licensed funeral director. (*Id.* at ¶ 14). The Attorney General concluded that three services that Plaintiffs offer fell within the practice of funeral services: "end of life planning, preparation of remains after death, and 'support' with funeral arrangements." (*Id.* at ¶ 13). The Attorney General filed a Motion for Cease-and-Desist Order with Indiana's Board of Funeral and Cemetery Services (the "Board"), and a hearing was scheduled. (*Id.* at ¶¶ 14-15). Plaintiffs stopped taking clients after the motion was filed. (*Id.* at ¶ 20).

### C. The Settlement Agreement

Rather than take their issues in front of the Board, Plaintiffs pursued settlement. (*Id.*). The Attorney General proposed a draft Cease-and-Desist Agreement. (ECF No. 26-11). Drafts were exchanged between Plaintiffs' counsel and the Attorney General's office in which terms were negotiated. (*Id.*) Ultimately, a Cease-and-Desist Agreement (the "Agreement") was reached, the Board adopted it, and the Agreement became a final order in August 2023. (ECF No. 11).

Substantively, the Agreement barred just three services that Plaintiffs offered:

    a.   "Full End of Life Planning: $150-$500," which includes "discussion of funeral options, body disposition (cremation, traditional burial, or green burial), service choices, etc. and assistance with paperwork such as living will, DNR form, and healthcare power of attorney."

    b.   "Facilitation of Community Death Care: $300-$1,000," which includes

"verbal guidance with loved ones under the direct supervision of a licensed funeral director for moving, bathing, dressing, and arrangement of the deceased," as well as "consultation with family in regard to personal information about the family, music and reading selections, religious acknowledgements (if any) and programming."

***

d. "Support with Funeral Home: $100-$300," which includes "accompaniment to funeral home, review of general price list, support with selection of goods and services, presence at funeral service."

(ECF No. 11 at 6-7). The Agreement also ordered Plaintiffs to refrain from "counseling consumers, whether individually or in education events open to the public, in any manner and through any medium, concerning methods and alternatives for the final disposition of human remains" (*Id.* at 11) and cease advertising the services above. Notably, many services that Plaintiffs provided did not come within the scope of the Agreement.

The Agreement contained a provision which states that the "Board shall maintain continuing jurisdiction[,]" along with several waivers of rights. (*Id.*). The waivers establish that Plaintiffs waived many of their rights under Indiana law:

11. Respondents are fully aware of their legal rights under **Indiana law in this matter**, including the right to a hearing before the Board on the charges and allegations in the Motion for Cease and Desist Order; the right to confront and cross-examine witnesses and to present evidence and to testify in such a hearing; the right to the issuance of subpoenas to secure witnesses and the production of evidence; the right to rehearing and judicial review of an adverse Board decision; and all other **rights afforded by Indiana's Administrative Orders and Procedure Act and other applicable Indiana laws.**

12. Respondents voluntarily, knowingly, and intelligently waive **each of these rights under Indiana law**, and Respondents do so to terminate proceedings before the Board under the terms of the agreed Cease and Desist Order memorialized below.

(*Id.* at ¶¶ 11-12) (emphasis added). Plaintiffs and their counsel signed the Agreement which stated "I understand…[that] this is a final disposition and is not subject to further review. I enter into this

7

Agreement voluntarily, knowingly, and intelligently…" (*Id.* at 11).

Just over a week after the Agreement became a final order, Plaintiffs sued in this Court alleging that the Order unconstitutionally chilled their speech and seeking a preliminary injunction.

## II.  Discussion

### A.  Legal Standard

"A preliminary injunction is an extraordinary remedy intended to preserve the status quo until the merits of a case may be resolved." *Ind. Civ. Liberties Union v. O'Bannon,* 259 F.3d 766, 770 (7th Cir. 2001). To obtain a preliminary injunction, a plaintiff must show: (1) that there is a likelihood of success on the merits; (2) that they will suffer irreparable harm without a preliminary injunction; (3) that the balance of equities tips in their favor; and (4) that an injunction serves the best interest of the public. *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008).

"As a threshold matter, a party seeking a preliminary injunction must demonstrate (1) some likelihood of succeeding on the merits, and (2) that it has 'no adequate remedy at law' and will suffer 'irreparable harm' if preliminary relief is denied." *Cassell v. Snyders*, 990 F.3d 539, 544–45 (7th Cir. 2021) (quoting *Abbott Labs. v. Mead Johnson & Co.,* 971 F.2d 6, 11 (7th Cir. 1992)). Only when a plaintiff makes this showing should a court consider the remaining two elements: (3) "the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied" and (4) "the public interest, meaning the consequences of granting or denying the injunction to non-parties." *Id.* at 545 (quoting *Abbott Labs.*, 971 F.2d at 11–12).

### B.  Legal Analysis

In Plaintiffs' motion, they assert that Defendants' enforcement of Indiana's funeral-licensing scheme violates Plaintiffs' freedom of speech guaranteed by the First Amendment as

applied to the states through the Fourteenth Amendment. U.S. Const. Amend. 1 ("Congress shall make no law…abridging the freedom of speech[.]"). In particular, they allege that to forbid Plaintiffs from providing education and individualized advice likely fails any level of First Amendment scrutiny. And Plaintiffs claim that their website's advertising is protected commercial speech and the Board's Order fails the *Central Hudson* test for restrictions on commercial speech. *See Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York*, 447 U.S. 557 (1980).

Before addressing the substantive arguments, Defendants respond with a litany of procedural issues which they contend bars Plaintiffs' claims: (1) Plaintiffs waived their claims through the Agreement; (2) the Court lacks jurisdiction under *Rooker-Feldman* doctrine; (3) the Court should abstain from hearing the case under the *Younger* doctrine, *Younger v. Harris,* 401 U.S. 37 (1971); and (4) both claim and issue preclusion bars Plaintiffs' claims. (ECF No. 26). As for the substantive arguments, Defendants believe: (1) Indiana's licensing scheme only incidentally regulates speech such that strict scrutiny is inapplicable; (2) Indiana's statutes are a reasonable regulation "of professional conduct, even though that conduct incidentally involves speech" under *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2372 (2018); and (3) Plaintiffs' commercial speech is not protected under *Central Hudson.* (*Id.*). The Court will address each of the parties' arguments in turn—starting with Defendants' procedural contentions before addressing the underlying First Amendment claims.

## 1. Waiver and Procedural Arguments

### a. Plaintiffs Did Not Waive Their Right to Bring First Amendment Claims in This Court.

Constitutional rights may be waived by contract. Even First Amendment rights can be waived if there is "clear and convincing evidence that the waiver is knowing, voluntary, and intelligent." *Leonard v. Clark*, 12 F.3d 885, 889 (9th Cir. 1993) (citing *D.H. Overmyer Co.,* 405

U.S. 174). "In the civil no less than the criminal area, courts indulge every reasonable presumption against waiver of fundamental rights." *Fuentes v. Shevin,* 407 U.S. 67, 94 n. 31(1972). And the waiver must, "at the very least, be clear." *Fuentes,* 407 U.S. at 94; *See also Krieg v. Seybold*, 481 F.3d 512, 517 (7th Cir. 2007) ("Waiver of a constitutional right must be clear and unmistakable.").

Defendants first contend that Plaintiffs waived their right to bring First Amendment claims under the terms of the Agreement. Defendants' focus is the Agreement's final provisions where Richwine "voluntarily, knowingly and intelligently" agreed to the terms and understood that the Agreement should serve as "a final disposition and is not subject to further review." Plainly, this language is not a clear and unmistakable waiver of Plaintiffs' First Amendment claims. *See Krieg*, 481 F.3d at 517. The Agreement does not mention Plaintiffs' rights under the federal Constitution. Nor does it even reference the First Amendment. (*See* ECF No. 11). In addition, all other waiver provisions in the contract are limited to "rights under Indiana law" and "rights afforded by Indiana's Administrative Orders and Procedure Act and other applicable Indiana laws." (*Id.* at ¶¶ 11-12). Plaintiffs' claims derive from the federal Constitution, not Indiana law. There was no waiver.

### b. The Court Does Not Lack Jurisdiction under *Rooker-Feldman* Doctrine.

The *Rooker-Feldman* doctrine "prevents the lower federal courts from exercising jurisdiction over cases brought by 'state-court losers' challenging 'state-court judgments rendered before the district court proceedings commenced.'" *Lance v. Dennis,* 546 U.S. 459, 460 (2006) (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280 (2005)). However, "[t]he doctrine has no application to judicial review of executive action, including determinations made by a state administrative agency." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,* 535 U.S. 635, 644 n. 3 (2002); *See also Hemmer v. Ind. State Bd. of Animal Health*, 532 F.3d 610, 614 (7th Cir.

2008) ("[T]he question remains whether [the plaintiff] counts as a state-court loser when he lost

his state administrative agency proceedings. The Supreme Court has answered this question in the

negative.").

The Board is a state administrative agency and the final order is an executive action against

Plaintiffs. Under *Verizon* and *Hemmer*, Plaintiffs' claim clearly falls outside the scope of the

*Rooker-Feldman* doctrine. Even still, Defendants assert that *Rooker-Feldman* bars claims in two

instances: (1) when the plaintiff asks the federal court to overturn an adverse state court judgment

and (2) where the plaintiff presents federal claims "that were not raised in **state court** or that do

not on their face require review of a **state court's decision**." *Taylor v. Fed. Nt. Mortg. Ass'n,* 374

F.3d 529, 532–33 (7th Cir. 2004) (emphasis added). The latter serves as a jurisdictional bar if those

claims are "'inextricably intertwined' with a **state court judgment**." *Id.* at 533 (emphasis added).

"While 'inextricably intertwined' is a somewhat metaphysical concept, the 'crucial point is

whether the district court is in essence being called upon to review the **state court decision.**'"

*Taylor*, 374 F.3d at 533; *See also D.C. Court of Appeals v. Feldman*, 460 U.S. 462, 483-84 n. 16

(1983).

Creatively, Defendants contend that had Plaintiffs proceeded through the administrative

process, Plaintiffs' appeal would have gone before an Indiana trial court. (ECF No. 26 at 23). This

would have resulted in a state court judgment and given Indiana the chance to examine the issues

surrounding its own licensure statutes. (*Id.*). Yet there is one glaring flaw in Defendants'

analysis—there is no "state court decision," much less a "state court judgment[,]" under the facts

of this case. *See Taylor*, 374 F.3d at 532-33. *Rooker-Feldman* does not apply to the Board's Order

because it is no more than executive action by an administrative agency. Plaintiffs' claim does not

"on its face require review of a state court's decision" because Plaintiffs waived their rights under

Indiana law. The Court is not being "called upon to review a state court decision" because no Indiana court ever rendered a decision. *See id.* No court has extended *Rooker-Feldman* to such lengths.[2] This Court declines to do so now.

### c.   This Court Need Not Abstain Under the *Younger* Doctrine.

The *Younger* doctrine does not require this Court to abstain from exercising jurisdiction over Plaintiffs' First Amendment claims. The doctrine restrains federal courts from exercising jurisdiction where state proceedings are ongoing. *See Younger,* 401 U.S. at 43-44. Indeed, "[t]he rule in *Younger v. Harris* is designed to permit state courts to try cases free from interference by federal courts." *Forty One News, Inc. v. County of Lake*, 491 F.3d 662, 665 (7th Cir. 2007). And it applies to certain types of state administrative proceedings. *See Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982). In *Middlesex,* the Supreme Court developed a three-part test to determine whether the *Younger* doctrine applies to executive action:

> The question in this case is threefold:  *first*, do [the state proceedings] constitute an ongoing state judicial proceeding; *second*, do the proceedings implicate important state interests; and *third*, is there an adequate opportunity in the state proceedings to raise constitutional challenges.

*Id.*

Defendants focus on the Board's *Final* Order where it states that the "Board shall maintain continuing jurisdiction[.]" (ECF No. 11 at 11). They believe that this provision supports the notion that there is an ongoing state proceeding. (ECF No. 26 at 25). In response, Plaintiffs highlight the fact that the Order is final so there is no ongoing state proceeding. *See Forty One News,* 491 F.3d

---

[2] Judge Sutton of the Sixth Circuit was particularly critical of the *Rooker-Feldman* doctrine, noting that the Supreme Court has tried to "drive[] a stake through *Rooker-Feldman.*" *VanderKodde v. Mary Jane M. Elliott, P.C.,* 951 F.3d 397, 405 (6th Cir. 2020) (Sutton, J., concurring) ("One could be forgiven for thinking, as I and others did, that, unless your name was Rooker or Feldman, this supposed limit on the jurisdiction of the federal courts applied to no one, save the occasional innocent who thought he could obtain appellate review of a final state supreme court decision in federal district court, as opposed to the U.S. Supreme Court."). "Absent a claim seeking review of a final state court judgment, a federal court tempted to dismiss a case under *Rooker-Feldman* should do one thing: Stop." *Id.* at 409.

at 665 ("*Younger* abstention is appropriate only when there is an action in state court against the federal plaintiff and the state is seeking to enforce the contested law in that proceeding."). From Plaintiffs' perspective, "[w]ith no ongoing proceedings, *Younger* is inapplicable." (ECF No. 29 at 10).

Without requiring the Court to labor over whether the Board's continuing jurisdiction constitutes an ongoing proceeding, Defendants' defense fails the third prong of the Supreme Court's test. *See Middlesex*, 457 U.S. at 432 (asking "is there an adequate opportunity in the state proceedings to raise constitutional challenges."). Although the Order gives the Board continuing jurisdiction, it also waives Plaintiffs' right to judicial review and right to a rehearing with the state courts. (ECF No. 11, ¶¶ 11-12). According to the Order, there is no opportunity for Plaintiffs to raise their First Amendment claims in the state proceedings. Apart from the doubt that the Board's continuing jurisdiction creates an ongoing proceeding, the Order bars Plaintiffs from raising any constitutional challenges with the State. Thus, *Younger* is inapplicable.

### d.  Plaintiffs' First Amendment Claims Are Not Precluded

Lastly, Defendants urge the Court to consider claim preclusion and issue preclusion as a bar here.[3] As a threshold matter, this Court must determine what law applies. Defendants believe that Indiana preclusion law applies because the Board was acting in judicial capacity as authorized by Indiana law, so this Court must give the same preclusive effect to administrative findings as an Indiana court would. *See Woodruff v. Wilson*, 484 F. Supp. 2d 876, 927 (S.D. Ind. 2007), *aff'd sub nom. Woodruff v. Mason*, 542 F.3d 545 (7th Cir. 2008) (citing *Goodwin v. Bd. of Trustees of Univ. of Ill.*, 442 F.3d 611, 620 (7th Cir. 2006). Plaintiffs concede that "courts do look to state preclusion doctrine when there is a prior state-court judgment." (ECF No. 35 at 8). But—as has been

---

[3] This Court ordered supplemental briefing on the following issue: "whether Plaintiffs, by agreeing to the Cease-and-Desist Order, are precluded from bringing this action." (ECF Nos. 33-37).

emphasized previously—there is no state court judgment here.

The Full Faith and Credit Statute, 28 U.S.C. § 1738, "requires that state-court judgments be given both issue and claim preclusive effect in subsequent actions under 42 U.S.C. § 1983." *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 796 (1986). Yet "[Section] 1738 is inapplicable to the judicially unreviewed findings of state administrative bodies." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 109 (1991). And that is precisely the case here. The Board issued an Order that was never reviewed by an Indiana court.

"[I]n the absence of a governing statute," courts turn to the "federal common-law rules of preclusion." *Elliott*, 478 U.S. at 794. Because Section 1738 is inapplicable to the Board's unreviewed Order, the question becomes: "what does federal preclusion law have to say about the effect of the Order?" (ECF No. 35 at 9).

Unreviewed agency determinations don't preclude Section 1983 claims, but agency fact-finding may be given issue-preclusive effect. *See Elliott*, 478 U.S. at 799 ("[W]hen a state agency acting in a judicial capacity . . . resolves disputed issues of fact properly before it which the parties have had an opportunity to litigate, federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts.") *Id.* Indeed, the Supreme Court has "held that 'it is sound policy to apply principles of issue preclusion to the factfinding of administrative bodies acting in a judicial capacity" but it "has drawn the line at claim preclusion for unreviewed state agency findings." *Staats v. County of Sawyer*, 220 F.3d 511, 514 (7th Cir. 2000) (quoting *Elliott*, 478 U.S. at 797)); *See also Allahar v. Zahora*, 59 F.3d 693, 696 (7th Cir. 1995) ("Agency decisions may have a preclusive effect, but only in the limited area of factfinding."). Other circuits have employed the same distinction.[4]

---

[4] *See, e.g., Dionne v. Mayor & City Council of Baltimore*, 40 F.3d 677, 684–85 (4th Cir. 1994) ("Under *Elliott*, state issue preclusion rules may prevent the relitigation of factual issues already determined by the administrative agency,"

Simply put, the Board's Order does not preclude Plaintiffs' First Amendment claims, but the facts memorialized in the Order may be considered settled. In line with these principles, claim preclusion has no application to the Board's unreviewed Order, but the Board's findings of fact embodied therein are issue preclusive. So, the narrower issue can be framed as follows: "whether any fact found in the Order could sink Plaintiffs' free-speech claims?" (ECF No. 35 at 10).

The Order does memorialize certain facts at paragraphs 1-6 and 13-24. (ECF No. 11). These facts simply conclude that the services Plaintiffs offer fall under Indiana's funeral licensing scheme. (*Id.*). All of these facts are asserted in Plaintiffs' Complaint. (ECF No. 1 ¶¶ 39–74, 123–29). The Order and the Complaint are completely consistent. Affording issue-preclusive effect to the facts in the Order has no impact on the viability of Plaintiffs' free-speech claims.[5] *See Klein v. Perry*, 216 F.3d 571, 574-75 (7th Cir. 2000) (approving the district court's decision to bar the plaintiff from challenging the agency's unreviewed factual findings about what had occurred, but required an independent and rigorous application of First Amendment legal rules by the federal courts to determine whether the plaintiff's speech was constitutionally protected); *See also Taylor v. City of Lawrenceburg*, 909 F.3d 177, 179-81 (7th Cir. 2018) (finding that the plaintiff's First

---

but an "unreviewed state administrative decision at issue here has no claim preclusive effect in the subsequent § 1983 action."); *Edmundson v. Borough of Kennett Square,* 4 F.3d 186, 189 (3d Cir. 1993) ("[I]n section 1983 cases, only state administrative factfinding is entitled to preclusive effect in the federal courts when the agency ruling remains unreviewed by state courts."); *Robinson v. Block*, 869 F.2d 202, 207 n.5 (3d Cir. 1989) ("While we give res judicata effect to the factfindings of administrative agencies, we need not consider ourselves bound by their legal conclusions."); *Peery v. Brakke*, 826 F.2d 740, 746 (8th Cir. 1987) ("*Elliott* directs" only "that a state agency's factfinding is to be given preclusive effect in a subsequent § 1983 action," and there is no preclusion where "the disputed issue . . . is one of law.").

[5] It is important to understand the effect of the Board's Order here. The Order, which creates Plaintiffs' alleged injury, forecloses Plaintiffs' opportunity to obtain judicial review with an Indiana court. Although the Order appears to give the Board continuing jurisdiction, the Board is without authority to consider constitutional defenses which Plaintiffs now make. *See, e.g.*, *Sunshine Promotions, Inc. v. Ridlen*, 483 N.E.2d 761, 764–65 (Ind. Ct. App. 1985) ("It is not within the province of an administrative officer to pass on the validity of a statute."); *see also Consol. Rail Corp. v. Smith*, 664 F. Supp. 1228, 1233 (N.D. Ind. 1987) ("That agencies may not nullify statutes has long been the law."). So, in essence, this Court is asked to preclude Plaintiffs' claims based on an Order from an agency that could not have heard them in the first place. No constitutional claim could be resolved before the Board and the Order— that confers standing—prevents any Indiana court from hearing the issue.

Amendment retaliation claim was precluded because, as matter of fact, the administrative agency found there was "'no causal connection' between the termination proceedings and the [protest] letter" the plaintiff had written and publicized).

Plaintiffs are not precluded from bringing new First Amendment claims that are entirely consistent with the Board's factual findings.[6]

### 2.  Preliminary Injunction Standard

Having disposed of the procedural aspects of this case, the Court must determine whether a preliminary injunction is warranted. Therefore, Plaintiffs must show: (1) that there is a likelihood of success on the merits; (2) that they will suffer irreparable harm without a preliminary injunction; (3) that the balance of equities tips in their favor; and (4) that an injunction serves the best interest of the public. *Winter,* 555 U.S. at 20. Plaintiffs first hurdle is to prove their likelihood of success on the merits for their claim that the Indiana's licensing scheme violates their First Amendment right to freedom of speech.

### a.  Plaintiffs' Likelihood of Success on Their First Amendment Claims.

The Order restricts Plaintiffs' speech in two ways. First, it prohibits Plaintiffs from providing education or individualized advice about end-of-life care. Second, the Order prevents Plaintiffs from advertising those services on their website. Plaintiffs believe that the prohibition on education and individualized advice is a content-based restriction which triggers heightened scrutiny. *See Reed v. Town of Gilbert,* 576 U.S. 155, 165 (2015) ("A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral

---

[6] The Court has considered waiver and claim preclusion at length and is sensitive to Defendants' assertion that Plaintiffs negotiated the agreement upon which they now sue. This Court has searched at length—under Indiana and Federal law—for authority suggesting that such a situation serves as a bar to Plaintiffs' First Amendment claims, but to no avail. And Defendants provide little authority suggesting that traditional standards of federal claim preclusion do not apply to the negotiated Order.

justification, or lack of animus toward the ideas contained in the regulated speech."). And Plaintiffs claim that the ban on advertising restricts truthful commercial speech such that the advertisements are protected by the First Amendment. *See Central Hudson*, 447 U.S. at 566 ("For commercial speech to come within [the First Amendment], it at least must concern lawful activity and not be misleading.").

Defendants posit that Indiana's licensing regime is not a vehicle for chilling Plaintiffs' speech. Rather, they claim the regulations are not content-based and only incidentally involve speech. As such, they urge the Court to find that Indiana's statutes are a proper and reasonable "[regulation] of professional conduct, even though that conduct incidentally involves speech." *Nat'l Inst. of Fam. & Life Advocs.*, 138 S. Ct. at 2372 (hereinafter "*NIFLA*"). Defendants also claim that Plaintiffs' website runs afoul the *Central Hudson* test because it contains misleading information. *See Central Hudson*, 447 U.S. at 566. For clarity, the Court addresses each prohibition separately.

### i.   Restrictions From Providing Education and Advice

As a threshold matter, the Court must determine whether the Order's mandate is content-based. "[C]ontent-based restrictions on speech . . . can stand only if they survive strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id*. at 163. A regulation is "content based if it require[s] 'enforcement authorities' to 'examine the content of the message that is conveyed to determine whether' a violation has occurred." *McCullen v. Coakley*, 573 U.S. 464, 479 (2014) (quoting *FCC v. League of Women Voters of Cal*., 468 U.S. 364, 383 (1984)).

In Indiana, an individual cannot engage in the practice of funeral services without a license. *See* Ind. Code § 25-15-2-24(b). Under Indiana law, the practice of funerals services includes "the counseling of individuals concerning methods and alternatives for the final disposition of human remains." Ind. Code § 25-15-2-22(2). "Funeral services'" definition includes "counseling of survivors of a deceased individual on . . . the services, methods, and alternatives for final disposition of human remains" and "arranging, supervising, or conducting a funeral service in conjunction with the memorialization or the disposition of human remains." Ind. Code § 25-15-2-17. And the statute includes a list of words that unlicensed individuals cannot use to describe their services including "funeral," "funeral service," "funeral arrangement," and any "variant of these words." Ind. Code § 25-15-8-23.[7]

Defendants maintain that these statutes are a proper exercise of Indiana's police powers to maintain standards among members of a licensed profession. *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 460 (1978); *see, e.g., Douglas v. Noble*, 261 U.S. 165 (1923) (licensing dentists); *McNaughton v. Johnson*, 242 U.S. 344 (1917) (excluding ophthalmologists from optometry); *Collins v. Texas*, 223 U.S. 288 (1912) (licensing osteopaths). This authority includes the power to set up licensing boards to admit or exclude people from a profession. *Douglas*, 261 U.S. 165; *Collins*, 223 U.S. 288; *Watson v. Maryland*, 218 U.S. 173 (1910). But the question here is not how Indiana's funeral-licensing scheme operates in the abstract; the question is whether the regulation restricts speech because of its content. As with lawyer speech, the government cannot escape the First Amendment by claiming it is regulating conduct when the supposed "conduct triggering coverage under the statute consists of communicating a message." *Holder v. Humanitarian Law*

---

[7] "A person that renders or offers to render services to the public, if the words 'funeral service,' 'funeral directing,' 'undertaking,' 'funeral,' 'funeral arrangement,' 'embalming,' or a variant of these words is used to describe the services, without a license issued under this article commits a Class B infraction." Ind. Code § 25-15-8-23.

*Project*, 561 U.S. 1, 28 (2010).

This is all the more true considering the Supreme Court's decision in *NIFLA*. 138 S. Ct. 2361. Prior to *NIFLA*, some Courts of Appeals recognized "professional speech" as its own category of speech subject to a different rule. *Id.* at 2371. But the Supreme Court expressly rejected that notion. *NIFLA,* 138 S. Ct. at 2372 ("This Court's precedents do not permit governments to impose content-based restrictions on speech without 'persuasive evidence . . . of a long (if heretofore unrecognized) tradition' to that effect…This Court's precedents do not recognize such tradition for a category called 'professional speech.'"). And all authority Defendants cite in support came well before *NIFLA*.[8] Thus, Indiana's statutes are not exempt from heightened scrutiny merely because they regulate the professional speech of licensed funeral directors. States cannot exercise "unfettered power to reduce a group's First Amendment right by simply imposing a licensing requirement." *Id.* at 2375.

That said, Defendants' enforcement of the funeral licensing scheme against Plaintiffs is content based. The statutes' enforcement here turns entirely on the topics that Plaintiffs discuss and the messages they express. On their face, the funeral licensing statutes ban unlicensed "counseling of individuals concerning methods and alternatives for the final disposition of human remains" and "counseling of survivors" about the same. Ind. Code §§ 25-15-2-17, 25-15-2-22. Under the authority of those statutes, the Board ordered Plaintiffs to cease "[d]iscussion of funeral options"; "verbal guidance" and "consultation" with families about death care; "provid[ing] advice" about funeral services; and "counseling consumers" about those topics. (ECF No. 11). Any violation of the Order requires examination of the content of Plaintiffs' messages. *See*

---

[8] "By discarding the professional speech doctrine, *NIFLA* rejected the proposition that First Amendment protection turns on whether the challenged regulation is part of an occupational-licensing scheme." *Vizaline, L.L.C. v. Tracy*, 949 F.3d 927, 932 (5th Cir. 2020).

*McCullen*, 573 U.S. at 479.

Even still, *NIFLA* maintained two exceptions which "afforded lesser protections for professional speech." *NIFLA,* 138 S. Ct. at 2372. The first is an exception for laws that "require professionals to disclose factual, noncontroversial information in their 'commercial speech.'" *Id.* (citing *Zauderer v. Off. of Disciplinary Counsel of Supreme Court of Ohio,* 471 U.S. 626, 651 (1985)). A lower level of scrutiny applies to laws that compel disclosures in certain contexts. *Id.* Second, "[s]tates may regulate professional conduct even though that conduct incidentally involves speech." *Id.*

To highlight the first exception, Defendants rely on *Zauderer*. In that case, the Court acknowledged that 'commercial speech' receives First Amendment protection, but the protections are "somewhat less extensive than that afforded [to] noncommercial speech." *Zauderer,* 471 U.S. at 637. In analyzing Ohio's attorney advertising requirements, the Court noted that the State did not prevent attorneys from conveying information, but merely required them to provide more information in their advertising that was factual and noncontroversial. *Id.* at 650-51. Defendants believe their funeral statutes are analogous because they only require funeral directors to disclose factual and noncontroversial information as part of their duties. (ECF No. 26 at 32).

The Court is not convinced that the individualized advice and education that Plaintiffs provide is commercial speech, unlike their website's advertisements. *See Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 516 (7th Cir. 201) ("The Supreme Court] has provided this basic definition: Commercial speech is "speech that proposes a commercial transaction."). And the Order is drafted broadly enough to encompass much more than just commercial speech. It Orders Plaintiffs to "refrain from counseling consumers, whether individually or in educational events open to the public, in any manner and through any medium, concerning methods and alternatives

for the final disposition of human remains." (ECF No. 11 at 10). Further, nothing in the Order indicates that Plaintiffs could resume offering their services if they made a factual, noncontroversial disclosure. Instead, Plaintiffs are banned completely from discussing certain topics whether or not those discussions are commercial in nature.[9] *Zauderer* does not apply to the individualized advice and education Plaintiffs provide.

As for the second *NIFLA* exception, "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). Burdens are "incidental" when they flow from the core purpose of the regulation. *Id.* Indeed, courts have upheld restrictions which are aimed at conduct but incidentally burden speech. *See Rumsfeld v. Forum for Academic and Institutional Rts., Inc.,* 547 U.S. 47, 62 (2006) (a ban on race based hiring required employers to remove "White Applicants Only" signs); *R. A. V. v. St. Paul*, 505 U.S. 377, 391 (1992) (upholding an ordinance against outdoor fires forbidding flag burning); *Morgan v. White,* 964 F.3d 649, 652 (7th Cir. 2020) (holding that speech was only incidentally burdened when a COVID-related social distancing order makes it harder for a campaign to round up signatures).

In *Del Castillo v. Secretary, Florida Dep't of Health* is like this case. 26 F.4th 1214 (11th Cir. 2022), in that case, Del Castillo ran a health coaching business but lacked the license required by Florida's Dietetics and Nutrition Practices Act. *Id.* at 1216-17. Del Castillo offered a myriad of speech-based services:

---

[9] Commercial speech is not confined to the just "speech that proposes a commercial transaction." Indeed, "[w]hen deciding if speech is commercial, appropriate considerations include whether: (1) the speech is an advertisement; (2) the speech refers to a specific product; and (3) the speaker has an economic motivation for the speech." *United States v. Benson*, 561 F.3d 718, 725 (7th Cir. 2009). Plaintiffs do have an economic motivation for their speech, but not in all contexts. For example, the Court is not convinced that providing education to the public about misconceptions surrounding death has economic motivations. Nor do we believe the individualized advice that Plaintiffs provide is always guided by an economic interest.

Del Castillo's business focused on "[o]ne-on-one health coaching," which she described as "meeting with clients and discussing overall health and wellness, as well as goal setting." She gave them tailored advice on dietary choices, exercise habits, and general lifestyle strategies. For example, Del Castillo recommended vitamin supplements to some clients with low energy and told them to consult with their physicians before taking the supplements. For another client with food intolerances, Del Castillo recommended health goals that fit within a list of foods to avoid provided by the client's doctor.

Before her initial consultation with a new client, Del Castillo would ask them to fill out a "health history form." The health history form sought general background information about the client, like his or her age and occupation, as well as particulars about the client's dietary health, including past serious illness or recent weight change. Del Castillo used this form to get an overall picture of her client's health but did not make medical conclusions. Instead, she would recommend that a client consult a doctor if the client had experienced something unusual like drastic weight loss. Del Castillo never held herself out to her clients as a health care professional, never gave a diagnosis or provided medical treatment, and never gave advice contrary to physician advice.

*Id.* Florida's statute regulating "dietetics and nutrition" encompassed many of the "communicative" services Del Castillo supplied. *Id.* at 1225. Del Castillo challenged Florida's Act on First Amendment grounds and the Eleventh Circuit upheld the statute. *Id.* Relying on pre-*NIFLA* precedent from the same circuit, the court determined that Florida's regulations only incidentally burdened speech. *Id.* (citing *Lock v. Shore,* 634 F.3d 1185 (11th Cir. 2011) (holding that an interior designer licensing scheme did not violate the plaintiff's First Amendment free speech rights)).

The similarities between these cases are glaring.[10] Defendants believe a similar approach to *Del Castillo* is warranted. Plaintiffs direct us to a different case. *See Holder* 561 U.S. 1 (2010).

---

[10] Defendants brief gave the following comparison between this case and *Del Castillo*: "Plaintiffs categorize their services as purely speech, just as the *Del Castillo* plaintiff framed her business as giving advice on diet choices, exercising, and general lifestyle opinions. Plaintiffs disclaim that they need the same training as those who are licensed to practice funeral services because Ms. Richwine works in conjunction with and/or under the supervision of licensed funeral directors, while the *Del Castillo* plaintiff claimed that she instructed her clients to 'consult with their physicians' before beginning any medication or health plan she devised. *Del Castillo*, 26 F.4th at 1216. Moreover, much like the way the *Del Castillo* plaintiff 'never held herself out to her clients as a health care professional, never gave a diagnosis or provided medical treatment, and never gave advice contrary to physician advice,' *Id*. at 1217, Plaintiff Richwine states that she is not a funeral director and does not provide services that funeral directors do by

In *Holder,* the government argued that because the statute—which forbid material support for terrorist— "*generally* functions as a regulation of conduct," strict First Amendment scrutiny was inapplicable when the statute was employed to restrict a lawyer's speech. *Id.* at 27-28. The Supreme Court rejected that argument and held that when a generally applicable law is "directed at [a person] because of what his speech communicated," heightened scrutiny is warranted. *Id.* at 28. If the activity that actually "triggers coverage under the statute consists of communicating a message," strict scrutiny applies. *Holder* 561 U.S. at 28 ("The law here may be described as directed at conduct…but as applied to plaintiffs the conduct triggering coverage under the statute consists of communicating a message.").

Unlike the Eleventh Circuit, the parties have identified no pre-*NIFLA* cases from the Seventh Circuit which are binding on this Court. *See Del Castillo,* 26 F.4[th] at 1225-26 ("[W]e are not at liberty to disregard binding case law that is so closely on point and has been only weakened, rather than directly overruled, by the Supreme Court."). And other circuits have recognized that *NIFLA* abrogated their earlier professional speech cases to require strict First Amendment scrutiny of professional licensing laws. *See Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062, 1068–69 (9th Cir. 2020); *Billups v. City of Charleston*, 961 F.3d 673, 684, 690 (4th Cir. 2020); *Vizaline*, 949 F.3d at 933. Even the Eleventh Circuit in an earlier opinion acknowledged the dangers of categorizing restrictions on speech as merely incidental to conduct:

> But there is a real difference between laws directed at conduct sweeping up incidental speech on the one hand and laws that directly regulate speech on the other. The government cannot regulate speech by relabeling it as conduct. As we have said, characterizing speech as conduct is a dubious constitutional enterprise,

---

specifically avoiding the buzzwords stated in the statute. (ECF 1, ¶¶ 59, 61). Furthermore, the *Del Castillo* plaintiff had a certificate in 'holistic health coaching,' but did not have the 'necessary education and professional experience' to get a dietician or nutritionist license. *Del Castillo*, 26 F.4th at 1217. Likewise, Plaintiff Richwine has a bachelor's degree in creative writing, took a program from Earth Traditions, volunteered in hospice care, and is a member of alternative disposition alliances. (ECF 1, at ¶5; ECF 1-3, at 7)." (ECF No. 26 at 33-34).

and labeling certain verbal or written communications "speech" and others "conduct" is unprincipled and susceptible to manipulation.

*Otto v. City of Boca Raton*, 981 F.3d 854, 861 (11th Cir. 2020) (internal quotations and citation omitted).

Those dangers are real. *Del Castillo* allowed a state to transform pure speech about diet advice into non-expressive conduct by simply labeling it "the practice of dietetics." Applying the same rationale, professors' lectures could become "the practice of instruction"; musicians' songs could become "the practice of composing" and; writers' op-eds could become "the practice of journalism." Pursuant to *Del Castillo,* as long as the government can permissibly regulate some form of conduct, they could chill vast amounts of speech. "States cannot choose the protection that speech receives under the First Amendment" simply by calling "something a 'profession'" just because "it involves personalized services and requires a professional license from the State." *NIFLA,* 138 S. Ct. at 2375.

All Plaintiffs do is speak.[11] Indiana's funeral-licensing laws specifically prohibits "the counseling of individuals concerning methods and alternatives for the final disposition of human remains" without a license. Ind. Code § 25-15-2-22(2). This provision, which the Board relied on in its Order, "directly regulate[s] speech." *See Otto,* 981 F.3d at 861. And the Order only bars Plaintiffs' services that involve speech. (ECF No. 11). As applied to Plaintiffs, "the conduct triggering coverage under the statute consists of communicating a message." *See Holder* 561 U.S. at 28. Because "*NIFLA* rejected the proposition that First Amendment protection turns on whether the challenged regulation is part of an occupational-licensing scheme" and Indiana's funeral-

---

[11] Defendants contend Plaintiffs do more than speak based on a declaration by a cemetarian. (ECF No. 26-13). The cemetarian claims that Richwine, on one occasion, told him that she intended to transport a body and, twice, shrouded a body. (*Id.* at ¶¶ 4-9). This is a red herring. From the administrative records provided to the Court, there is no mention of these events and this was never Defendants' concern. Nor does the Board's Order concern any such activities.

licensing scheme directly regulates speech, ordinary First Amendment principles apply. *Vizaline*, 949 F.3d at 932. Indiana's content-based restriction of Plaintiffs' speech receives strict scrutiny.

"Content-based regulations are presumptively invalid." *R. A. V.,* 505 U.S. at 382. To survive strict scrutiny, "the Government must prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed,* 576 U.S. at 171. Defendants must "specifically identify an 'actual problem' in need of solving and the curtailment of free speech must be actually necessary to the solution." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799–800 (2011) (citation omitted). "Though there is no exact definition of a compelling interest, it is one 'of the highest order' and is only found in 'rare cases.'" *Listecki v. Off. Comm. of Unsecured Creditors*, 780 F.3d 731, 745 (7th Cir. 2015) (quoting *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 546 (1993)).

To that end, Defendants provide two interests which they believe are of the highest order. The first is public health and safety. Indeed, the statutes here require arrangement "for the final disposition of human remains in compliance with public health and safety laws and in a manner that prevents the spread of infectious disease." Ind. Code § 25-15-2-17. Defendants suggest that they can regulate Plaintiffs' advice that their client can choose the option of a funeral home and, in normal circumstances, safely keep a body at home for three days after death. (ECF No. 26 at 23, 29). Yet the only evidence that they provide is the declaration of an IPLA investigator and a cemetarian who stated that keeping a body un-embalmed or un-refrigerated for too long can create "potential" health concerns in "certain" circumstances. (ECF No. 26-1, ¶ 10; ECF No. 26-13, ¶ 11). That kind of "mere speculation and conjecture" falls short.[12] *See Edenfield v. Fane*, 507 U.S.

---

[12] In any event, Indiana law turns Defendants' argument on its head. While Defendants posit that keeping a body at home for three days is a public health concern, Indiana gives next of kin "up to 72 hours or three days from the time of death to contact the funeral home of their choice…to determine the final disposition of the decedent's remains" before the obligation to arrange for disposition passes to another. Ind. Code § 25-15-9-18(f). The Court acknowledges

761, 770 (1993) (finding that the government failed to meet the burden under intermediate

scrutiny). Nor have Defendants provided any compelling evidence of an "actual problem." *See*

*Brown,* 564 U.S. at 799–800.[13]

The second interest is consumer protection. Defendants assert that Indiana has compelling

interests in protecting consumers from making poor choices about the disposition of their loved

ones and avoiding the duplicative costs of hiring Plaintiffs to help select services which ultimately

are conducted by a licensed funeral director. (ECF No. 26 at 2-3, 29). In support, Defendants

provide two Attorney General employees' testimony which expressed concerns that Plaintiffs'

services overlapped with that of a licensed funeral director. (ECF No. 26-6, ¶ 12(d); ECF No. 26-

2, ¶ 22(c)). Defendants also provided a funeral director's testimony who stated one of their "biggest

concerns" was Plaintiffs "accompanying [families] to the funeral home to assist them in selecting

funeral services." (ECF No. 26-12, ¶ 16).

The Court is not convinced that Defendants have shown a compelling interest in consumer

protection. *See First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 786 (1978) ("[T]he burden is on

the government to show the existence of such an interest.") Although consumer protection may be

compelling in some situations, there is nothing compelling about deliberately suppressing speech

to keep consumers ignorant about their options in preparing for death and subsequent memorials.

*See 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 503 (1996) (plurality opinion) ("The First

Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark

for what the government perceives to be their own good."). The First Amendment rejects a "highly

---

the common sense that dead bodies pose a risk in some circumstances within that time frame. But it is axiomatic to
give people three days from death before they even have to contact a funeral home while claiming that Plaintiffs'
advice poses a risk to public health.

[13] On a summary-judgment record, a California district court held that it wasn't rational to require funeral-
establishment licensure even to physically assist with a home funeral because there was no evidence of public-health
issues. *See Full Circle of Living & Dying v. Sanchez*, 2023 WL 373681, at *13–14 (E.D. Cal. Jan. 24, 2023). That
issue was decided under a rational-basis standard, a much more lenient standard for the government than strict scrutiny.

paternalistic approach" and "assume[s] that . . . information is not in itself harmful, that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 770 (1976). If families choosing what services they want from a funeral home find value in a knowledgeable advisor without a financial stake in their purchases, that is the consumer's choice to make. (ECF No. 29 at 21). And, again, there is no actual evidence that Plaintiffs' advice ever harmed a consumer. Consumer protection is not a compelling interest here.

Even if the Court were to find Defendants' proposed interests compelling, the blanket speech ban is far from the least restrictive means. *See Perry v. Loc. Lodge 2569 of Int'l Ass'n of Machinists & Aerospace Workers*, 708 F.2d 1258, 1262 (7th Cir. 1983) ("[W]hen First Amendment interests are at stake, the least restrictive means of effectuating government interests must be employed."). Defendants here do not even argue that Indiana's statutes are narrowly-tailored. Meanwhile, Plaintiffs have provided several "effective alternatives."[14] *See United States v. Alvarez*, 567 U.S. 709, 729 (2012) (plurality opinion) ("[W]hen the Government seeks to regulate protected speech, the restriction must be the least restrictive means among available, effective alternatives."). Of course, the First Amendment is no barrier to Defendants' licensing non-expressive conduct such as embalming bodies or cremation. But the statutes as applied here are more akin to a blanket prior restraint of Plaintiffs' speech. Defendants advanced no argument to combat that notion.

---

[14] "Defendants could update their government websites to provide consumer information about death care to alleviate any concerns they may have. *See Alvarez*, 567 U.S. 709. (suggesting 'Government-created database' as alternative to prohibiting speech to 'protect the integrity of the military awards system'). Defendants can also invoke general anti-fraud and consumer protection laws that do not target the content of speech. *See Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 637 (1980) (recognizing that government's 'legitimate interest in preventing fraud can be better served by measures less intrusive than a direct prohibition on [speech]. Fraudulent misrepresentations can be prohibited and the penal laws used to punish such conduct directly.')." (ECF No. 3 at 19).

### ii.  Plaintiffs' Advertisements

As for Plaintiffs' advertisements, the parties agree that they are commercial speech. The First Amendment protects commercial speech that "concern[s] lawful activity" and is "not…misleading." *Central Hudson*, 447 U.S. at 566. In *Central Hudson,* the Supreme Court employed a four-part test to determine whether First Amendment protection applies: (1) "Whether the speech concerns lawful activity and is not misleading"; (2) [Whether t]he asserted government interest is substantial"; (3) "Whether the regulation directly advances the government interest asserted"; and (4) "Whether it is not more extensive than is necessary to serve that interest." *Pearson v. Edgar*, 153 F.3d 397, 401 (7th Cir. 1998) (quoting *Central Hudson,* 447 U.S. at 566). "Steps three and four of the *Central Hudson* test examine the fit between the restriction on speech and the government's justification for that restriction." *Id.*

The parties most hotly dispute the first prong of the test. Defendants posit that Plaintiffs' website contained several misleading statements. First, they claim that the website states that Plaintiffs work lawfully under the supervision of a licensed funeral director, but there is no provision by which funeral directors may delegate their authorities to unlicensed individuals through supervision. (ECF No. 26 at 35). Second, they are concerned with the services that Plaintiffs offer which are duplicative of a funeral directors' services. (*Id.*) Lastly, Defendants take issue where Plaintiffs' website states that: "the individual given authority to determine the final disposition of the body has up to 72 hours or three days from the time of death to contact the funeral home of their choice. In most cases you do not need to have the body removed immediately following death. Death is not an emergency. (IC 25-15-9-18)." (ECF No. 26-1, at ¶ 9).

First, the Court does not find it deceptive to state that Plaintiffs work in conjunction with licensed funeral directors. And Plaintiffs do not represent that they work under a funeral director's

28

supervision. The portion of Plaintiffs' website that Defendants cite does not even say so. Rather, Plaintiffs explicitly tell consumers that they must "hire a funeral director" and that Plaintiffs "do NOT perform any services that funeral directors are licensed to direct such as body care, death certificate filing, transportation, or making arrangements. My services are entirely educational." (ECF No. 1-3 at 7). As further support, every page of the website contained an explicit disclaimer: "Death Done Differently is an educational consulting organization and is in no way considered a funeral establishment. Any contributions received by Death Done Differently are for requested consulting services and private or public education." (*Id.*). To that end, Plaintiffs do not suggest they are allowed to perform the services of a licensed funeral director by merely being under their supervision. Nor are Plaintiffs deceptive in providing certain communicative services generally within the province of licensed funeral directors. As earlier stated, if the consumers find value in having advice from an entity without a pecuniary incentive in their loved one's passing, that is their choice.

Third and finally, Defendants attack Plaintiffs' website where they state, "the individual given authority to determine the final disposition of the body has 72 hours or three days…to contact the funeral home of their choice."[15] (ECF No. 1-3 at 11). Defendants provide the testimony of an IPLA investigator and a cemetarian which state, "from their personal experiences[,]" a dead body can present a public health concern. (ECF No. 26 at 36). Although these personal anecdotes support that position, Indiana law appears to make Plaintiffs' assertion true. *See* Ind. Code § 25-15-9-18(f) (stating that "the individual given authority to determine the final disposition of the body has 72 hours or three days…to contact the funeral home of their choice."). And while it may be necessary

---

[15] Defendants also contend that Plaintiffs' website "tells consumers that there is nothing dangerous about a dead body." (ECF No. 26 at 36). After reviewing Plaintiffs' website, this is an overstatement. Much of the information indicates embalming is not required under state law. (ECF No. 1-3 at 11). And this is a true statement—embalming is not a legal requirement. Ind. Code § 25-15-8-5.

to "have the body immediately following death" in some circumstances, consumers are expressly told on the website that immediate removal is not necessary "[i]n most cases." (ECF No. 1-3 at 11). Defendants point to no other provision of Indiana law that requires disposition faster under ordinary circumstances than Plaintiffs' website. *See* Ind. Code. § 23-14-54-1 (disposition of human remains required only "within a reasonable time after death."). That said, Plaintiffs' website is not misleading.

Defendants assert the same two interests which they view as substantial: (1) public health and (2) consumer protection. *See Pearson v. Edgar*, 153 F.3d at 401 (The government's asserted interest must be "substantial."). Even if these interests are substantial, "the fit" between the Indiana statutes and Defendants' justification gives this Court reason to believe Plaintiffs will likely succeed on the merits. *See id* (The regulation cannot "be more extensive than necessary to serve that interest.").

Indiana's statutes appear more extensive than necessary to advance public health and consumer protection. Defendants emphasize that the licensing scheme provides exemptions for certain people who conduct religious or memorial services to support that Indiana's statutes do not overreach. Indeed, even those who conduct a religious or memorial service with the remains of the deceased present may do so without a license so long as they are under the direct supervision of a funeral director. *See* Ind. Code § 25-15-2-10. But that does not explain why it is "necessary" to apply a commercial speech ban on Plaintiffs. To the contrary, the fact that other non-funeral directors are allowed to offer and advertise death-related services demonstrates that the public does not have an interest in giving funeral directors a monopoly over end-of-life discussions. Why are those who put on memorial services given this discretion but not Plaintiffs? The Court sees no practical justification and Defendants have not provided one. Plaintiffs will likely succeed on the

30

merits where a statute arbitrarily selects who can discuss death while prohibiting others who are likely more qualified. While Indiana may be concerned with the "safe and legal handling of remains following death[,]" all Plaintiffs do is speak. They do not "handle[]" any remains. (ECF No. 26 at 37).

### b. Remaining Preliminary Injunction Arguments

This Court is satisfied that Plaintiffs have shown a likelihood of success on the merits of their First Amendment claims. Plaintiffs must also show: (2) that they will suffer irreparable harm without a preliminary injunction; (3) that the balance of equities tips in their favor; and (4) that an injunction serves the best interest of the public. *Winter,* 555 U.S. at 20. Defendants do not address these prongs in their briefing. (ECF No. 26).

Simply put, there is irreparable harm to Plaintiffs' business absent a preliminary injunction because it has been placed in stasis under the Board's Order. Plaintiffs cannot operate and are losing money daily. So too, their potential clients are deprived from Plaintiffs' services in moments where time is certainly of the essence. The balance of equities also tips in their favor. *See Higher Soc'y of Ind. v. Tippecanoe Cty.*, 858 F.3d 1113, 1116 (7th Cir. 2017) ("[E]ven short deprivations of First Amendment rights constitute irreparable harm, and the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional."). And "injunctions protecting First Amendment freedoms are always in the public interest." *Alvarez*, 567 U.S. at 590. Plaintiffs have met their burden.

### III.    Conclusion

31

For the reasons above, Plaintiffs' First Motion for a Preliminary Injunction (ECF No. 2) is GRANTED. Defendants and their agents are ENJOINED from enforcing the Board's Cease-and-Desist Order against Plaintiffs during the pendency of this litigation.

SO ORDERED on December 19, 2023.


 s/ *Holly A. Brady*
CHIEF JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

Case No. 7:21-cv-00106-M

WAYNE NUTT,

        Plaintiff,

v.

ANDREW L. RITTER, *et al.*,

        Defendants.

OPINION
AND ORDER

This matter comes before the court on the parties' cross-motions for summary judgment [DE 42, 46]. Plaintiff Wayne Nutt ("Nutt") seeks summary judgment as to his claim for a declaration that certain provisions of the North Carolina Engineering and Land Surveying Act (the "Act"), as interpreted and enforced, violate the First Amendment as applied to expert testimony. He also seeks a permanent injunction allowing him and others similarly situated to testify on engineering matters without a license.

Defendants Andrew Ritter and other members of the North Carolina Board of Examiners for Engineers and Surveyors (collectively, the "Board") disavow the notion that the Board has targeted or will target expert testimony under the Act. Rather, the Board seeks a counter-declaration that Nutt's expert reports submitted on behalf of a group of plaintiffs in a state lawsuit violates the Act's prohibition against the unlicensed practice of engineering. Whereas Nutt seeks to protect engineering speech, the Board seeks to prohibit the work underlying that speech. For the following reasons, the court grants in part and denies in part Nutt's motion and denies in toto the Board's motion.

# I.  Background

## A.  Factual Background[1]

### i.  *Engineering Experience and Advocacy Efforts*

Nutt worked as a chemical engineer from 1967 to 2013.  He never obtained a professional engineering license because he qualified to practice engineering under the industrial exception of the licensing requirement in North Carolina.  A portion of his responsibilities involved overseeing the design, construction, and repair of building trench systems to manage both stormwater and potential chemical spills at his work facility.  As a result, he developed expertise in hydraulics, fluid flow, and piping systems.

Since his retirement, he has continued using his expertise to support the efforts of various local interest groups.  He has testified to the Wilmington City Council regarding the flaws he identified in a development proposal's traffic impact study.  He has also testified about an error he discovered in a development plan's calculation of the capacity of a stormwater detention pond.  His opinion and recommendations led to meaningful changes in the design of those projects.

In 2020, he agreed to offer expert testimony in a state action (the "state lawsuit" or "*Autry* litigation") on behalf of a group of homeowners alleging that a stormwater management system that had flooded during Hurricane Florence was negligently designed.  Nutt planned to offer in-court testimony about the consequences of an observed blockage on the fluid-flow capacity of a diverter pipe within the contested stormwater management system.  To this end, he prepared a

---

[1] Unless otherwise stated, the court has derived and relies on the following facts from the uncontested and admitted portions of the parties' statements of undisputed material facts.  *See* Defs.' Stmt. Of Undisputed Material Facts, DE 43 [hereinafter Defs.' SOF]; Pl.'s Resp. to Defs.' SOF, DE 53; Pl.'s Stmt. of Undisputed Material Facts, DE 48 [hereinafter Pl.'s SOF]; Defs.' Resp. to Pl.'s SOF, DE 51.  The court has deemed as admitted any facts that a party claims to dispute but fails to specifically controvert with citation to admissible evidence in their response to the other's statement of undisputed facts.  *See* Local Civil Rules 56.1(a)(2)–(4); Fed. R. Civ. P. 56(c)(1).

2

report that showed the fluid-flow capacity of the diverter under different scenarios. His report required him to perform fluid-flow calculations, reference engineering literature and methodologies, and prepare visual representations, charts, and tables to offer an opinion within a reasonable degree of engineering certainty. For example, his report included the below visuals to help illustrate the hypothetical scenarios he used to assess the diverter's performance.



*Figure 1 - Section View of Diverter System, Nutt Preliminary Draft Expert Report, DE 1-1 at 5.*

In his report, he concluded that the county-designed obstructions would reduce the diverter's capacity and result in spouting from the diverter and overflowing of the system. The *Autry* litigation plaintiffs' other designated expert was a licensed professional stormwater engineer, and he found Nutt's report to be helpful for his own analysis. He also found it useful to support his own prospective testimony, which concerned the design and performance of the stormwater management system as a whole. In contrast, Nutt would have offered testimony regarding the specific characteristics of the diverter, as a specific component within the system.

3

On March 8, 2021, Nutt appeared for a deposition to offer this opinion. Opposing counsel in the *Autry* litigation suggested that his testimony about the fluid-flow capacity of the diverter would constitute the unauthorized practice of engineering under the relevant statutory authority. The parties continued the deposition for a later day to contact the Board for its position on Nutt's prospective deposition testimony.

### ii. *Regulation of the Engineering Profession*

The North Carolina Engineering and Land Surveying Act (the "Act") sets out the relevant licensing regime for the engineering profession. Under the Act, the "practice of engineering" means the "application of special [mathematical and scientific] knowledge" to "any service or creative work," such as the consultation or evaluation "of engineering works and systems," to the extent that application "requires engineering education, training, and experience" to adequately perform. N.C. Gen. Stat. § 89C-3(6). The practice of engineering also includes the act of "represent[ing] [oneself] to be a professional engineer" or "hold[ing] [oneself] out as able to perform . . . any engineering service or work." *Id.* Practicing engineering without a license constitutes a Class 2 misdemeanor. *Id.* § 89C-23. The Act promises "to safeguard life, health, and property, and to promote the public welfare." *See id.* § 89C-2.[2]

The Board is the administrative agency responsible for interpreting and enforcing the Act. The Board has authority to enforce the rules of professional conduct, adopt an official seal for licensees to certify their reports, and investigate nonlicensees for the unauthorized practice of engineering. N.C. Gen. Stat. §§ 89C-4, -10(a). Pursuant to this authority, the Board has long

---

[2] The Act does not define what "engineering" means. However, it does define the term "engineer" as one who "is qualified to practice engineering" because of their "special knowledge" and "use mathematical, physical and engineering science and the principles and methods of engineering analysis and design" as "acquired by engineering education and engineering experience." *Id.* § 89C-3(2).

4

maintained that unlicensed testimony and reports containing engineering opinions violate the Act. Pursuant to this interpretation and enforcement position, the Board has charged at least two individuals for engaging in unlicensed engineering testimony.

### iii. Board's Correspondences and Investigation

Counsel for the *Autry* litigation plaintiffs (Kyle Nutt) contacted the Board about the opposing counsel's apparent accusation. Nutt then received several correspondences from the Board regarding his inability to testify in the *Autry* litigation without a license. The Board sent an email, explaining that an unlicensed individual cannot publicly use the term "engineer" in their descriptive title or offer testimony likely to be perceived by the public as "engineering advice." Email from David Tuttle to Kyle Nutt (Mar. 8, 2021), DE 49-29. The Board also provided a position statement—the focus of Nutt's claim—warning that "testimony impacting the public," including "expert witness testimony on engineering . . . matters in the courtroom . . . or during depositions" and testimony based on "engineering education, training or experience," requires licensing. Position Stmt., DE 1-2 at 1. The statement also indicated that expert reports are also "evidence of the practice of the profession." *Id.* The Board stated that it "has proceeded against unlicensed individuals . . . for the unlicensed practice of engineering." *Id.*

Despite the Board's explanation, Nutt proceeded to testify at a deposition on April 27, 2021. As a result, an expert witness for the defendants in the *Autry* litigation complained to the Board regarding Nutt's unlicensed deposition testimony. Nutt received another email stating that the Board's Engineering Committee "concurred with the response" initially provided and agreed that "rendering opinions on engineering matters in testimony is the practice of engineering." Email from David Tuttle to Kyle Nutt (May 18, 2021), DE 49-35.

On May 12, 2021, the expert witness for the defendants in the *Autry* litigation submitted a formal complaint to the Board alleging that Nutt was engaging in the unauthorized practice of

5

engineering by testifying in the litigation. The Board notified Nutt in a letter dated May 19, 2021 that he was charged with "violation[s] of G.S. 89C-23 for practicing, or offering to practice, engineering without a license" in connection with his expert report concerning the diverter's fluid-flow capacity and his deposition testimony on March 8, 2021 and April 27, 2021. Charging Letter, DE 1-2. Nutt did not participate in the investigation.

In a letter dated July 15, 2021, the Board informed Nutt that it found "sufficient evidence to support the charge that [he] [was] practicing, or offering to practice, engineering in North Carolina, as defined in G.S. 89C-3(6)," in "violation of G.S. 89C-23." Findings Letter, DE 49-39 at 1. The letter explained that those who violate the statute are "guilty of a Class 2 misdemeanor." *Id.* at 3. The Board warned him that "further action may be taken by the Board" if he did not "come into compliance" with the Act. *Id.* The Board instructed Nutt to cease "participating in the activities that fall within the practice of engineering," including "producing a 'chemical engineering' report," holding himself out to the public as having "any engineering expertise," and "providing opinions to a 'reasonable degree of engineering certainty,' including in testimony." *Id.*

**B. Procedural Background**

On June 9, 2021, after Nutt received the letter of investigation and before the Board issued its investigative finding, Nutt filed a verified complaint [DE 1], seeking a judgment declaring that the Act, as interpreted and enforced by the Board,[3] violates the First Amendment on its face and as applied to him and those similarly situated. Pl.'s Verified Compl., DE 1 at 14–15. Nutt also seeks a permanent injunction prohibiting the Board from enforcing the Act against himself and

---

[3] Specifically, Nutt's claim implicates N.C. Gen. Stat. § 89C-3(6) (defining "practice of engineering"), N.C. Gen. Stat. § 89C-23 (prohibition on unauthorized practice of engineering and use of the word "engineer"), and the Board's policies and practices enforcing those statutes as embodied in the Board's position statement regarding unlicensed expert testimony and reports, *see* Position Stmt., DE 1-2.

6

others similarly situated "for speaking or testifying about topics that require engineering knowledge without first obtaining an engineering license." *Id.* at 15.

On July 27, 2021, the Board answered Nutt's complaint and asserted a counterclaim [DE 25]. The Board seeks a counter-declaration that Nutt's engineering work for the plaintiffs in the *Autry* litigation, including his engineering calculations, analysis, and resulting expert report, constituted the unauthorized practice of engineering. The Board also seeks the same declaration regarding "testifying at the discovery depositions in support of the work contained in the expert report prepared by Wayne Nutt." *Id.* On August 17, 2021, Nutt answered the Board's counterclaim [DE 26]. The parties completed discovery on March 29, 2022.

On April 28, 2022, the Board filed its motion for summary judgment [DE 42] and accompanying materials [DE 43 (statement of facts); DE 44 (appendix); DE 45 (supporting memorandum)]. Nutt timely responded with his opposing brief [DE 52] and factual objections [DE 53]. The Board timely replied [DE 55].

On April 29, 2022, Nutt filed his motion for summary judgment [DE 46], along with his accompanying materials [DE 47 (supporting memorandum); DE 48 (statement of facts); DE 49 (appendix)]. The Board timely filed its opposing brief [DE 50] and factual objections [DE 51]. Nutt timely replied [DE 54].

The Board later informed the court that the dismissal of the state lawsuit was affirmed on appeal. Defs.' Notice of Filing, DE 57. Nutt then notified the court that the Fourth Circuit may have issued subsequently-decided controlling authority. Pl.'s Notice of Controlling Auth., DE 58; *People for the Ethical Treatment of Animals, Inc. ("PETA") v. N.C. Farm Bureau Fed'n, Inc.*, 60 F.4th 815 (4th Cir. 2023), *cert. denied*, No. 22-1148, 2023 WL 6797724 (U.S. Oct. 16, 2023), *and cert. denied*, No. 22-1150, 2023 WL 6797726 (U.S. Oct. 16, 2023). The Board did the same as to

7

certain other authority. *See* Defs.' Notice of Controlling Auth., DE 60. The court heard argument on Thursday, October 19, 2023. The court is now fully apprised.

## II. Legal Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *see also* Fed. R. Civ. P. 56(c).

"A fact is 'material' if proof of its existence or non-existence would affect disposition of the case under applicable law. An issue of material fact is 'genuine' if the evidence offered is such that a reasonable jury might return a verdict for the non-movant." *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021). Courts must view the evidence in the light most favorable to the nonmovant. *See id.*

When the nonmovant bears the burden of proof at trial, the party seeking summary judgment bears the initial burden of "pointing out to the district court[] that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant does so, the burden shifts to the nonmovant to point out "specific facts showing that there is a *genuine issue for trial.*" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In doing so, "the [nonmovant] must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). Instead, the nonmoving party must support their assertions by "citing to particular parts of . . . the record," or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(l); *Celotex Corp.,* 477 U.S. at 324.

8

### III. Discussion

**A. Justiciability**

    *i.    Standing*

The Board states that the "controversy" between the parties concerns only Nutt's work as a designated expert witness in the state lawsuit, including his analysis, reports, and deposition testimony, rather than expert trial testimony in the state litigation. *See* Answer & Countercl., DE 25 at 19, 24–25; Mem. in Supp. of Defs.' Mot. for Summ. J., DE 45 at 20–21 [hereinafter Defs.' Mem.]; Defs.' Opp'n to Pl.'s Mot., DE 50 at 6 [hereinafter Defs.' Resp.], 11–14; Reply Br. in Supp. of Defs.' Mot. for Summ. J., DE 55 at 2–3 [hereinafter Defs.' Reply]. In support of this claim, the Board states that it has not "threated [sic] to take any action against Nutt relating to trial testimony in the [state] lawsuit." Defs.' Reply, DE 55 at 2–3. The Board's position calls into question whether Nutt has suffered a sufficient injury-in-fact to maintain suit for declaratory and injunctive relief vindicating his right to testify on engineering matters without a license.[4]

Nutt argues that the Board's past actions have provided a sufficient injury-in-fact to support his claim. Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J., DE 52 at 33–35 [hereinafter Pl.'s Opp'n]; Pl.'s Reply in Supp. of Mot. for Summ. J., DE 54 at 5–7 [hereinafter Pl.'s Reply]. In support, Nutt points to the Board's letters prohibiting him from offering any opinions "'to a degree of engineering certainty' lest he be subject to criminal penalties." Pl.'s Opp'n, DE 52 at 34. In his view, the threat of criminal penalties for offering engineering opinions created a reasonable

---

[4] In addition to challenging Nutt's standing to maintain suit, the Board has suggested that the parties' dispute may be moot because the Board would not have sought "to interfere with any [expert] testimony" and has agreed "not to subject [Nutt] to any action" or punishment for duly admitted expert testimony. Defs.' Reply, DE 55 at 2–3. The Board expanded its disclaimer at oral argument, when it indicated that it currently has no interest in targeting any expert testimony. Standing and mootness "differ in respects critical to the proper resolution of this case, so [this court] address[es] them separately." *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000).

9

chilling effect that now motivates Nutt's claim under the First Amendment. *See* Pl.'s Opp'n, DE 52 at 34; Pl.'s Reply, DE 54 at 6.

'"One element of the case-or-controversy requirement' is that plaintiffs 'must establish that they have standing to sue.'" *Clapper v. Amnesty Int'l*, 568 U.S. 398, 408 (2013) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). A plaintiff may establish standing by demonstrating an injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Id.* at 409.

A plaintiff has a sufficient injury-in-fact to support a "pre-enforcement challenge" when the plaintiff experiences "a non-speculative and objectively reasonable chilling effect of his speech due to the actions of the [board]" or "faces a credible threat of prosecution" under the statute. *Cooksey v. Futrell*, 721 F.3d 226, 235–37 (4th Cir. 2013) (citation omitted); *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018). The board's "action[s] will be sufficiently chilling when it is likely to deter a person of ordinary firmness from the exercise of First Amendment rights." *Cooksey*, 721 F.3d at 236 (quoting *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011)). In contrast, a "threat of prosecution" exists where "[a] non-moribund statute . . . facially restricts expressive activity by the class to which the plaintiff belongs." *Id.* at 237 (quoting *N.C. Right to Life, Inc. v. Bartlett*, 168 F.3d 705, 710 (4th Cir. 1999)).

*Cooksey* illustrates both of these principles. There, the claimant had trouble losing weight due to diabetes but found success following a low-carbohydrate, high-fat diet. *Id.* at 230. He wanted to coach others on losing weight and started a website to answer dietary questions and advise readers on nutritional and lifestyle changes. *Id.* The state dietetics board received a complaint about his unlicensed practice of dietetics and issued several correspondences explaining that his activities were illegal under the dietetics licensing statute. *Id.* at 230–33.

10

The Fourth Circuit held that the health coach "experienced a non-speculative and objectively reasonable chilling effect of his speech due to the actions of the State Board." *Id.* at 236. He received a warning call from the "highest executive official of a state agency," "a red-pen mark-up of his website," a request that he "make any necessary changes to [his] site, and . . . align [his] [future] practices with the guidance provided." *Id.* "A person of ordinary firmness," the court concluded, "would surely feel a chilling effect." *Id.* at 236–37.

To further bolster its finding that a sufficient injury existed upon filing suit, the court also found that the health coach demonstrated a credible threat of prosecution. *Id.* at 238. On its face, the challenged statute criminalized providing "nutrition counseling," establishing "priorities, goals, and objectives that meet nutrition needs," and assessing "the nutritional needs of individuals and groups." *Id.* Because the health coach alleged that he had engaged in speech falling under each of those statutorily proscribed categories of dietetic practice, the court concluded that he sufficiently demonstrated that he faced a "'credible threat' of criminal penalties set forth in the [statute]." *See id.* (quoting *Bartlett*, 168 F.3d at 710).

 *a.* *Objective Chilling Effect*

Nutt has received several letters from the Board articulating its position broadly prohibiting unlicensed expert reports and testimony. *See, e.g.*, Pl.'s SOF, DE 48 ¶¶ 65, 73–74. For example, the Board's Executive Director issued a findings letter explaining that he violated the Act when he provided his expert report and "engineering testimony in depositions" for the plaintiffs in the state lawsuit. Findings Letter, DE 49-39 at 1. The letter instructed Nutt to refrain from writing a chemical engineering report, holding himself out as having "any engineering expertise" when presenting the report, and "providing opinions to a 'reasonable degree of engineering certainty,' including in testimony." *Id.* at 3. The letter warned that "further action may be pursued by the Board" if Nutt did not "come into compliance" and instead continued "participating in the

11

activities that fall within the practice of engineering" without a license. *Id.* To a reasonable person, the Board's letter effectively read like a "red-pen mark-up" striking Nutt's reports and testimony from the marketplace of ideas. *Cf. Cooksey*, 721 F.3d at 232–33, 236–37 (holding that the Board's "red-pen mark-up of his [activities]" surely triggered the same trepidation we have all experienced upon receiving such markings on a high school term paper").

The Board has also identified Nutt for violating the Act in its public newsletter. Pl.'s SOF, DE 48 ¶ 76. Publicly identifying Nutt for violating the Act would reasonably engender at least "the same trepidation" one would experience from a nonpublic letter explaining the violation. *See Cooksey*, 721 F.3d at 236. The newsletter, the Board stated at oral argument, merely provided "notice" that Nutt violated the Act; it was not an "action" that would have deepened any existing chilling effect. But notice is prejudicial action in this context. A call and a letter provided direct notice in *Cooksey*, but it also objectively chilled the health coach's speech because both of the dietetics board's actions informed him that his expressive activities exposed him to criminal liability and may be monitored for future compliance. *See id.* at 236–37. Here, as noted above, the Board's findings letter had the same effect. *See* Findings Letter, DE 49-39. The newsletter simply went further and provided notice to the public that unlicensed persons should refrain from writing engineering reports and testifying on engineering matters as a designated expert witness. *See* Newsletter, DE 49-37 at 4, 10, 15. Otherwise, the Board would publicly identify the apparent offender as a criminal, subject to "Board Actions" such as a findings letter that could very well support prosecution and penalty. *See id.* The Board's past actions are sufficiently chilling.

  b.   *Credible Threat of Prosecution*

  The Board has also engendered a credible threat of prosecution. Nutt is an unlicensed engineer belonging to the group of professionals subject to the force of the challenged provisions contained in the Act. Nutt has engaged, and seeks to continue engaging, in expert report writing

12

and testimony on engineering matters. *See, e.g.*, Pl.'s Verified Compl., DE 1 ¶ 60; Pl.'s SOF, DE 48 ¶ 72. But the Act sets out categories of activity that the Board uses to proscribe Nutt's speech.[5] And the Board has used those statutory categories to prevent others from engaging in the same kinds of speech. Nutt thus faces a credible threat of prosecution for engaging in the expressive activities he seeks to vindicate. *See Cooksey*, 721 F.3d at 238; *Bartlett*, 168 F.3d at 710.

    *c.    Causation and Redressability*

    Two elements of the standing requirement remain for the court's consideration. "First, causation is satisfied where a causal connection between the injury and the conduct complained of that is fairly traceable, and not the result of the independent action of some third party not before the court. Second, the redressability requirement is satisfied where there is a non-speculative likelihood that the injury would be redressed by a favorable judicial decision." *Cooksey*, 721 F.3d at 238 (cleaned up). Nutt has refrained from testifying about engineering matters because of the Board's letters. And he instituted this action to vindicate his ability to offer his expert reports and

---

[5] *Compare* N.C. Gen. Stat. § 89C-3(6) ("Any service or creative work, the adequate performance of which requires engineering education, training, and experience, in the application of special knowledge of the mathematical, physical, and engineering sciences to such services or creative work as consultation, investigation, evaluation, planning, and design of engineering works and systems. . . .") *and* Position Stmt., DE 1-2 (explaining that the Board considers "any testimony that requires engineering knowledge . . . falls with the definition of the practice of engineering"), *with* Pl.'s SOF, DE 48 ¶ 15 ("[Nutt] presented his [traffic impact evaluation] in various ways, including letters, PowerPoint slides, meetings with officials, and testimony before the Wilmington City Council"); *id.* ¶ 17 ("[I]n 2018, Wayne submitted expert commentary to North Carolina Department of Environmental Quality about a proposal to use methyl bromide . . . ."); *id.* ¶ 18 ("[Nutt] prepared a presentation [evaluating a stormwater engineering plan] for the New Hanover County Commissioners in which he detailed several errors in the stormwater plan . . . ."); *id.* ¶ 35 (stating that Nutt "prepared a report" that "showed the results of calculating the fluid-flow capacity of a 3-foot concrete pipe diverter line under different scenarios" and "concluded that the obstructions would reduce the fluid-flow capacity of the pipe and back up the water level in a manner consistent both with the spouting observed by the county employee and with the water levels observed by one of the nearby homeowners"); *id.* ¶ 40 ("Nutt was deposed in the *Autry* litigation . . . .").

testimony. If he obtains a favorable ruling, he will find "full redress" for his speech. *See id.*[6] Nutt

has standing to maintain suit.

### ii. *Mootness*

Since the Constitution limits federal-court jurisdiction to "cases" and "controversies," the

court must ensure that "an actual controversy . . . be extant at all stages of review, not merely at

the time the complaint is filed." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 160 (2016)

(citations omitted). After Nutt filed the instant complaint, the state appellate court unanimously

affirmed the dismissal of the *Autry* litigation. Defs.' Notice of Filing, DE 57; *see also Autry v. Bill*

*Clark Homes, LLC*, 882 S.E.2d 698, 700 (2022). Further, the Board stated at oral argument it

currently has no interest in targeting expert testimony under the Act—just expert reports. These

intervening circumstances call into question whether the dispute is moot.

A case is moot "only when it is impossible for a court to grant any effectual relief whatever

to the prevailing party." *Campbell-Ewald*, 577 U.S. at 161 (quoting *Knox v. Serv. Emps. Int'l*

*Union*, 567 U.S. 298, 307 (2012)). "If an intervening circumstance deprives the plaintiff of a

'personal stake in the outcome of the lawsuit[]' at any point during litigation, the action can no

longer proceed and must be dismissed as moot." *Id.* at 160–61 (quoting *Genesis Healthcare Corp.*

---

[6] There is also a minor justiciability question regarding the Board's counterclaim. Nutt points
out that the court will lack jurisdiction if the Board seeks a declaration solely regarding the legality
of his work thus far completed, rather than its impact regarding the parties' future conduct in
relation to each other. DE 47 at 18 n.6. Declaratory judgment is "unavailable in situations
where . . . claims and rights asserted have fully matured, and the alleged wrongs have already been
suffered." *AvePoint, Inc. v. Knickerbocker*, 475 F. Supp. 3d 483, 488 (E.D. Va. 2020) (citing
*Tapia v. U.S. Bank, N.A.*, 718 F. Supp. 2d 689, 695 (E.D. Va. 2010), *aff'd*, 441 Fed. App'x 166
(4th Cir. 2011) (per curiam), for the proposition that declaratory judgments are inappropriate "if
the questionable conduct has already occurred or damages have already accrued"). To the extent
that the Board's counterclaim, like Nutt's claim, has the prospective capacity "to steer" the parties'
conduct away from future litigation, jurisdiction to hear the Board's counterclaim is proper. *Id.*
To the extent the Board's counterclaim seeks only retroactive relief, jurisdiction is improper. *Id.*

14

*v. Symczyk*, 569 U.S. 66, 72 (2013)). But when the parties' dispute is "capable of repetition, yet

evading review," the "law should not be [so] rigid" so as to deny judicial review. *Roe v. Wade*,

410 U.S. 113, 125, (1973), *overruled on other grounds by Dobbs v. Jackson Women's Health Org.*,

142 S. Ct. 2228 (2022) (quoting *S. Pac. Terminal Co. v. Interstate Com. Comm'n*, 219 U.S. 498,

515 (1911) (citing *inter alia Carroll v. President and Commissioners of Princess Anne*, 393 U.S.

175, 178–179 (1968)). "To fall within this exception, it must be the case that 'the challenged

action is in its duration too short to be fully litigated prior to its cessation or expiration,

and . . . there is a reasonable expectation that the same complaining party will be subjected to the

same action again.'" *Am. Fed'n of Gov't Emps. v. Off. of Special Couns.*, 1 F.4th 180, 187 (4th

Cir. 2021) (quoting *United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1540 (2018)). The

complaining party may reasonably expect the controversy to recur, even if the defendant

terminates the allegedly unlawful conduct after the lawsuit has been filed, as long as the defendant

remains "free to return to [its] old ways." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC),

Inc.*, 528 U.S. 167, 189 (2000).

The *Carroll* decision illustrates why a speaker may continue challenging a time-limited

injunction on free speech grounds, even after its expiration. *See* 393 U.S. at 177–78. *Carroll*

concerned a group of white supremacy activists who wanted to rally on the steps of the county

courthouse during the course of a controversial trial. *Id.* at 177. The county obtained a ten-day

injunction prohibiting the activists from doing so due to the risk they presented to the public. *Id.*

The activists claimed the injunction violated the First Amendment, even after that injunction had

expired. *See id.* The Court held that the activists' challenge against the expired ten-day injunction

was still live because the activists "have sought to continue their activities, including the holding

of rallies in [the county], and it appears that the decision of the Maryland Court of Appeals

15

[affirming the injunction] continues to play a substantial role in the response of officials to their activities." *Id.* In short, "[t]he underlying question persist[ed] and [was] agitated by the continuing activities and program of [the speakers]." *Id.* at 179. *Carroll* shows that the expiration of a defendant's challenged practice does not necessarily moot the dispute.

Another instructive case is *Globe Newspaper Company v. Superior Court for Norfolk County*, 457 U.S. 596, 602 (1982). There, a Bostonian newspaper challenged a court order that implemented a state law excluding the press and public from trials of sex offenses against minors. *See id.* at 602. Although that order had "expired with the completion of the rape trial," the Supreme Court observed that the newspaper serviced the Boston metropolitan area and therefore "reasonably assumed" that the newspaper "will someday be subjected to another order relying on" the same statute. *Id.* at 602–03. Moreover, criminal trials are typically of "short duration," so the Court believed the dispute was capable of eluding jurisdiction. *Id.* at 603 (quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 563 (1980)); *see also Gannett Co. v. DePasquale*, 443 U.S. 368, 377 (1979) (holding that an "order closing a pretrial hearing is too short" to permit appellate review); *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 547 (1976) (holding that orders restricting pretrial publicity "are by nature short-lived"). Thus, the Supreme Court maintained jurisdiction to consider the merits of the parties' dispute. *Id.* at 603.

As *Carroll* and *Globe Newspaper* illustrate, the instant dispute is capable of repetition, yet evading review. Nutt seeks "to continue [his] activities," i.e., writing engineering reports to support trial testimony and testifying as an expert witness on engineering matters. *See Carroll*, 393 U.S. at 178. The statutory provisions preventing his expressive activities remain live. Under the Act, the Board has long prohibited others' reports and testimony and has repeatedly stated that Nutt cannot provide reports and testimony containing engineering opinions in the *Autry* litigation.

16

Nutt may reasonably expect that the Board's enforcement position preventing unlicensed engineering reports and testimony will "play a substantial [adverse] role in the response of officials to [his] activities" if the parties do not now settle their dispute. *See id.*

At oral argument, the Board argued that Nutt should no longer reasonably expect prosecution for providing engineering testimony as an expert witness because it has not tried, and will not try, to prohibit Nutt from testifying as an expert witness. But the Board *has* tried to prohibit Nutt's speech. *See, e.g.*, Findings Letter, DE 49–39; Newsletter, DE 49-37 at 4, 15. Moreover, renouncing its pre-filing enforcement position, while denying the true nature of its past practices, does not "make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *See Friends of the Earth*, 528 U.S. at 189. Despite the dismissal of the *Autry* litigation and the Board's post-filing enforcement position, the parties' dispute is reasonably capable of repetition.

The dispute is also reasonably capable of evading review. Like criminal cases, civil cases can have exceedingly short durations.[7] In fact, the actual duration of the parties' dispute—from the moment it became viable to the moment the state lawsuit's dismissal was affirmed—was nineteen months. *Compare* Charging Letter, DE 1-3 (issued May 19, 2021), *with* Appellate Opinion, DE 57-1 (issued Dec. 20, 2022). The court may reasonably assume that Nutt "will someday be subjected to another [criminal charge] relying on" the Board's interpretation and enforcement of the Act, should court no longer have jurisdiction to settle the dispute. *See Globe Newspaper*, 457 U.S. at 603 (citation omitted); *see also Turner v. Rogers*, 564 U.S. 431,

---

[7] Ninety-nine percent of federal civil cases are resolved before trial within 17.9 months. *See Table C-5—U.S. District Courts–Civil Federal Judicial Caseload Statistics (March 31, 2023)*, U.S. Courts (Mar. 31, 2023), https://www.uscourts.gov/statistics/table/c-5/federal-judicial-caselo ad-statistics/2023/03/31.

17

440 (2011) ("Our precedent makes clear that the 'challenged action,' [12-months' imprisonment], is 'in its duration too short to be fully litigated' . . . prior to its 'expiration.'" (quoting *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 774 (1978))); *see also Bellotti*, 435 U.S. at 774 (18-month period too short); *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 514–516 (1911) (2-year period too short). The dispute between Nutt and the Board is not moot.

## B. Canon of Constitutional Avoidance

Before turning to the heart of the parties' dispute, the court addresses whether the canon of constitutional avoidance applies. At oral argument, the Board urged the court to apply the canon of constitutional avoidance because the canon, as the Board indicated, instructs the court first to interpret whether the statutory definition of engineering practice covers expert reports and testimony on engineering matters before considering the constitutionality of the Board's ban on those activities. At face value, the Board's position makes sense. If the Act does not cover expert engineering reports and testimony, then the court need not consider the constitutionality of the regulatory restraint on Nutt's speech. But if it does, the court must consider whether the constitution frees Nutt's speech from the Board's oversight.

The Board takes too much from the canon. "The so-called canon of constitutional avoidance is an interpretive tool, counseling that ambiguous statutory language be construed to avoid serious constitutional doubts." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009). No doubt, Nutt's claim raises "serious constitutional doubts" about the Act's reach. But that reach arises from unambiguous statutory text. Rendering an expert report and testimony containing engineering opinions about a stormwater diverter system on behalf of purportedly aggrieved citizens plainly qualifies as "any service or creative work" such as the consultation and evaluation of "engineering works or systems" that "requires engineering education, training, and experience." N.C. Gen. Stat. § 89C-3(6). "In the absence of more than one plausible construction,

18

the canon simply has no application." *Johnson v. Arteaga-Martinez*, 142 S. Ct. 1827, 1833 (2022) (citation omitted).

### C. First Amendment

The court turns to the heart of this case. Nutt states he wants "to publicly speak his mind." Mem. in Supp. of Pl.'s Mot. for Summ. J., DE 47 at 10 [hereinafter Pl.'s Mem.]. He wants to share his engineering opinion on the quality of municipal systems that fail to meet his expectations as an experienced engineer. *See id.* In voicing his dissent, he can protect his community members from bureaucratic misjudgments and errors. *Id.* at 10–11. But the state has tried to silence him because he expresses his engineering opinions without their license. *See id.* at 16–20. Although he does not have the state's approval to speak on engineering matters, he believes he should still be allowed to voice his dissent. *See id.* at 19.

Nutt therefore claims that two provisions of the Act, namely § 89C-3(6) and § 89C-23, violate the First Amendment on their face and as applied to his unlicensed expert testimony on engineering matters. *See id.* at 24–25. In his view, the statutes' enforcement turns on whether he communicates an engineering opinion based on his experience and education as an engineer. *See id.* at 25. He argues the First Amendment should apply with full force. *See id.*

The Board believes it must protect the public from incompetent engineers, dangerous public works and systems, and engineering misrepresentations. *See* Defs.' Mem., DE 45 at 27–29. To accomplish this task, the Board cannot police every instance of poor engineering practice. Nor can the Board allow poor practice to persist and simply respond to the damage that results. It needs a regulatory system to manage the state's risk. And it must vigorously protect that system. Thus, the Board relies on a licensing regime to regulate the engineering profession. *See id.* at 8–9, 27–29. The Board uses that licensing regime to prohibit unlicensed individuals from engaging in conduct that constitutes engineering practice, even when that conduct leads to the creation of

19

valuable dissent. *See, e.g.*, *id.* at 31 ("The Act not only protects [Nutt's] clients (North Carolina homeowners) but others that would use and rely upon the published findings of Plaintiff Nutt.").

The Board thus rejects what it characterizes as Nutt's "attempt[] to reframe the issue as one involving only speech." *Id.* at 7. Rather, the Board maintains that engaging in engineering conduct, not articulating engineering opinions, triggers enforcement against Nutt. *See, e.g.*, *id.* at 6, 20–21; Defs.' Resp., DE 50 at 8–11. To this end, the Board has clarified, in its briefings and at oral argument, that it does not dispute Nutt's claim that he should be allowed to provide expert testimony on engineering matters. *See* Defs.' Resp., DE 50 at 6–7. Rather, the Board maintains that, under the Act, Nutt cannot engage in "the conduct of investigating and preparing an engineering report" without a license. *See, e.g.*, *id.* at 6, 8–11, 14.[8] According to the Board, the Act therefore targets unlicensed engineering conduct, thus imposing only "incidental burdens on [engineering] speech." *See id.* at 14–15. The Board believes lesser scrutiny should apply. *See id.* at 18–19.

The court notes that both sides have intelligible values underlying their respective legal positions. As the following analysis shows, the court decides this case "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open" unless good reason requires otherwise. *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

---

[8] In its briefing at times, the Board appears to dispute only Nutt's ability to render an expert report without a license. *See* Defs.' Resp., DE 50 at 6–7. At other times, it seeks to claim authority to regulate unlicensed report writing *and* testimony. *See id.* at 9–10; Answer & Countercl., DE 25 at 38 (seeking declaration that providing deposition testimony violates the Act). Regardless of the position advanced on paper, the Board has clarified at oral argument that it has no present interest in preventing Nutt from testifying as an expert as to engineering matters; its regulatory interest extends to unlicensed report writing.

### i.  *Expert Testimony*

As mentioned above, Nutt seeks a judgment declaring that the Act, as interpreted and enforced, violates the First Amendment, both on its face and as applied to him and others similarly situated.  Pl.'s Verified Compl., DE 1 at 14–15.  He also seeks a permanent injunction allowing him and others similarly situated to testify about topics that require engineering knowledge without first obtaining an engineering license.  *See id.* at 15.  The Board has conceded on paper and at argument that it will not enforce the Act to prohibit Nutt and others similarly situated from testifying on engineering matters.

As explained above, this concession does not render the parties' dispute moot.  It does, however, make clear that the Board does not contest Nutt's core claim.  Namely, the prohibition on unlicensed expert engineering testimony violates the First Amendment.  *See* Pl.'s Verified Compl., DE 1 at 14–15; Pl.'s Mot. for Summ. J., DE 46.  Therefore, in light of the parties' positions, the court will accept that claim as applied to Nutt.  The court will also enjoin the Board from enforcing the Act against Nutt for testifying about topics that require engineering knowledge without first obtaining an engineering license.

To the extent Nutt facially challenges the Act, namely § 89C-3(6) and § 89C-23, for substantial overbreadth, the court declines to "formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)).  Instead, as the Supreme Court has instructed, the court invokes a reasonable limiting construction to avoid needless overbreadth adjudication. *See Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973).  The court derives that limiting construction

21

from the Board's concession. Therefore, § 89C-3(6) and § 89C-23 are unconstitutional when applied to unlicensed expert testimony requiring engineering knowledge.[9]

### ii. *Expert Reports*

Nonetheless, a significant aspect of Nutt's claim remains. Nutt wants to write expert reports on engineering matters to support his expert testimony. But the Board maintains that it will enforce the Act to prohibit unlicensed persons from investigating, preparing, and writing engineering reports. The court will therefore consider whether the prohibition on unlicensed expert engineering reports violates the First Amendment.

### a. *Protected Activity*

As stated above, the Board maintains that producing engineering reports constitutes unprotected activity under the First Amendment. *See, e.g.*, Defs.' Resp., DE 50 at 14–15. Nutt argues that the First Amendment protects that activity as a necessary part of developing and supporting his expert testimony. *See* Pl.'s Mem., DE 47 at 28–29; Pl.'s Reply, DE 54 at 8.

The question "what is speech" is a fundamental issue of First Amendment analysis. *See Texas v. Johnson*, 491 U.S. 397, 404 (1989). Sometimes, the inquiry is complicated, escaping intuition and prior case law. Courts would have to identify the prohibited activity (i.e., conduct) and ask whether "[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it." *Id.* (quoting *Spence v. State of Wash.*, 418 U.S. 405, 411 (1974)). This test provides the necessary framework for extending the nation's "profound commitment" to free speech to certain conduct that would otherwise fall into the category of simple action. *See Sullivan*, 376 U.S at 270.

---

[9] Neither party addresses the severability of the Act's application to unlicensed expert testimony on engineering matters. Regardless, in light of the Act's severability clause, the court may sever this application without functionally rewriting state law or circumventing the intent of the state legislature. *See PETA*, 60 F.4th at 838; N.C. Gen. Stat. § 89C-28 (severability clause).

22

Other times, the inquiry is not so difficult. Specifically, the court need not scrutinize the extent of First Amendment coverage when the prohibited activity consists of pure forms of speech, such as writing and speaking one's mind. *Cf. Johnson*, 491 U.S. at 404 (distinguishing between "the spoken or written word" and expressive conduct). After all, those activities "necessarily convey [some] message" precluding their characterization as unprotected conduct. *Cf. Cohen v. California*, 403 U.S. 15, 18 (1971) (rejecting the notion that "the fact of communication" of an offensive epithet could be deemed "separately identifiable conduct" that "does not necessarily convey any message"). It is also settled that the conduct leading to the creation of pure speech is also protected activity under the First Amendment. *See PETA*, 60 F.4th at 829. Although forms of pure speech, such as "writing and painting[,] can be reduced to their constituent acts, and thus described as conduct, [courts] have not attempted to disconnect the end product from the act of creation." *Turner v. Lieutenant Driver*, 848 F.3d 678, 689 (5th Cir. 2017) (quoting *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061 (9th Cir. 2010)).

Here, the prohibited activity is investigating, preparing, and writing expert engineering reports. That is plainly protected activity. The reports communicated the "complete statement of all opinions [Nutt] will express [as an expert witness] and the basis and reasons for them." N.C. Gen. Stat. § 1A-26(b)(4)(a)(2)(I). Although writing his expert reports required him to engage in some conduct, such as calculating the fluid-flow capacity of the diverter pipe, courts have never "drawn a distinction between the process of creating a form of pure speech (such as writing or painting) and the product of these processes (the essay or the artwork) in terms of the First Amendment protection afforded." *Turner*, 848 F.3d at 689.

Moreover, as Nutt argues, producing his expert reports was integral to developing and supporting expert testimony. The Board conceded this point during oral argument. Moreover, the

23

parties in the state lawsuit relied on Nutt to furnish an expert report before deposing him. *See* Pl.'s SOF, DE 48 ¶¶ 35–40. True, state law does not require expert witnesses to furnish written reports before providing deposition or trial testimony. *See* N.C. Gen. Stat. § 1A-26(b)(4)(a)–(b). But the discovery timeline for the state lawsuit indicates the court or the parties elected to require designated experts to produce their report summarizing their opinion before participating in depositions or at trial. In sum, Nutt's expert reports were both integral and necessary to his testimony as an expert witness. To the extent that investigating, preparing, and writing those reports enabled him to testify as a designated expert in the state lawsuit, that activity constitutes the "'creation' of information' and thus "demands as much protection as its 'dissemination'" as verbal testimony. *See PETA*, 60 F.4th at 829 (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011)). Investigating, preparing, and writing expert reports are protected activities under the First Amendment.

      *b.*    *Content Discrimination*

The next issue is whether the Board's ban against unlicensed expert engineering reports discriminates based on the content of those reports. The Board argues that the focus of this analysis is the "actual language of the Act." *See* Defs.' Resp., DE 50 at 18. According to the Board, to impose a content-based restriction, the statutory language must possess a content-based distinction. *See id.* And since the statutory language "draws no such distinction," the Act is content neutral. *See id.* at 18–19.

Generally, regulations discriminate based on content when they "target speech based on its communicative content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). In other words, if a "law applies to particular speech because of the topic discussed or the idea or message expressed," it is content based. *Id.* Even if a law "may be described as directed at conduct" rather than speech, the law still "regulates speech on the basis of its content" when as applied to the speaker "the

24

conduct triggering coverage under the statute consists of communicating a message." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 26–28 (2010).

For example, in *Holder*, the Supreme Court assessed whether a statute prohibiting providing material support in the form of speech to designated terrorist organizations violated the First Amendment. *Id.* at 25–26. Because the statute applied when the plaintiffs' speech imparted a specific skill or communicated specially derived advice (but did not apply when the plaintiffs' speech imparted general or unspecialized knowledge), the Court held that the statute "regulate[d] speech on the basis of its content." *Id.* at 27.

*Cohen v. California*, 403 U.S. 15 (1971) is also a case that "involved a generally applicable regulation of conduct," namely "barring breaches of the peace." *Holder,* 561 U.S. at 27–28. In *Cohen*, if the speaker had not donned a jacket bearing an offensive epithet ("Fuck the Draft"), the regulation barring breaches of peace would not have applied to him. *See id.* Thus, the Supreme Court applied strict scrutiny to analyze the constitutionality of the breach-of-peace statute's application to the speaker. *See id.*

Consistent with *Holder* and *Cohen*, the Fourth Circuit recently observed that laws "cast in broad terms" do not categorically escape strict scrutiny, especially if they target expressive activity. *PETA*, 60 F.4th at 825–828. *PETA* concerned a pre-enforcement challenge to North Carolina's Property Protection Act ("PPA"), which contained three provisions banning undercover employees from (1) copying or removing and then disloyally using employer data; (2) placing unoccupied cameras to capture employer data; and (3) interfering substantially with an employer's ownership or possession of its premises. *Id.* at 820. The government in *PETA* (like the Board here) argued that the PPA is "generally applicable" and thus should not face constitutional scrutiny because "enforcement against the press has incidental effects on [protected activity]." *Id.* at 825.

25

In rejecting the government's position, the court held that laws that "implicate a variety of conduct" must face the appropriate level of scrutiny "when [those laws are] applied to speech." *See id.* at 825–26. Thus, newspapers must obey antitrust laws, unless those laws "are being applied to them because of their speech," and the government may prosecute breaches of peace, unless its prosecution turns on the communication of an inflammatory message. *Id.* (citing *United Mine Workers v. Pennington*, 381 U.S. 657 (1965); *Cohen*, 403 U.S. at 22–26; *Holder*, 561 U.S. at 28). Despite the general applicability of the PPA, the court held that the challenged statutory prohibitions, as interpreted and enforced by the government, "must clear strict scrutiny" because their application in context directly "burden[ed] newsgathering and publishing activities." *See PETA*, F.4th at 828–31.[10]

This court takes instructions from *Holder, Cohen*, and *PETA*. In this case, the court cannot rely on the Board's focus on the text of the challenged statutory provisions and their operation in the abstract. Rather, to give full force to the First Amendment, the court must scrutinize the provisions in context, based on the true nature of the government's interpretation and enforcement. *See id.* at 827 ("Laws cast in broad terms can restrict speech as much as laws that single it out.").

The Board's "long standing position" is that the Act prohibits "rendering opinions on *engineering* matters." *See, e.g.*, Email from David Tuttle to Kyle Nutt (May 18, 2021), DE 49-35 (emphasis added). The Board has long extended this position to apply to expert reports. *See* Position Stmt., DE 1-2 ("That is more clearly evidence of the practice of the profession."). With

---

[10] Although the court held that the challenged provisions "must clear strict scrutiny," the court did not apply strict scrutiny because "North Carolina has conceded—here and, previously, before the district court—that the Act cannot satisfy this highest bar." *PETA*, 60 F.4th at 831. The court then held that the challenged provisions failed intermediate scrutiny because "the legislature produced no record evidence justifying its expansive restrictions on newsgathering speech and because their newsgathering prohibitions are not tailored to any substantial government interest." *Id.* at 831–33.

26

respect to Nutt himself, the Board expressly confirmed that producing a "chemical engineering report" and "providing opinions to a 'reasonable degree of engineering certainty'" without licensure violated the Act. Findings Letter, DE 49–39 at 3. As interpreted and enforced by the Board, the Act makes "distinctions" by "defining regulated speech by particular subject matter," namely speech communicating an engineering opinion. *See Reed*, 576 U.S. at 163; *see also Wash. Post v. McManus*, 944 F.3d 506, 513 (4th Cir. 2019) (finding that the state's notice-and-disclosure requirement for online political advertising was a "content-based regulation" because the law "single[d] out one particular topic of speech—campaign-related speech—for regulatory attention"). Strict scrutiny should apply.

      *c.*    *Professional Conduct "Exception"*

Despite the content-based nature of the Act's challenged application to unlicensed expert engineering reports, the Board maintains intermediate scrutiny should apply based on the "exception for professional regulations that incidentally affect speech," as articulated in *National Institute of Family and Life Advocates ("NIFLA") v. Becerra*, 138 S. Ct. 2361 (2018) and applied in *Capital Associated Industries, Inc. ("CAI") v. Stein*, 922 F.3d 198, 207 (4th Cir. 2019) and related cases. DE 50 at 18.

The Board first invokes *NIFLA*, arguing that lesser scrutiny should apply because the Act "generally regulates" the conduct of professional engineers. Defs.' Resp., DE 50 at 15–18; Defs.' Reply at 6–8. According to the Board, the Act does so by imposing a licensing requirement, which does not regulate speech itself but rather "who can practice engineering." *See* Defs.' Resp., DE 50 at 17–18; Defs.' Reply, DE 55 at 7–8 (citing *CAI*, 922 F.3d at 207). This same statutory focus on the question "who gets a say" instead of "what they say" led the court in *CAI* to deem the unauthorized corporate practice of law ban content neutral and subject to intermediate scrutiny. *See* 922 F.3d at 207. So too here, the Board argues. *See* Defs.' Resp., DE 50 at 18.

27

The court rejects that argument. The Board places dispositive value on the fact that the Act "generally functions" as a regulation on professional conduct. That fact may start the relevant analysis, but it does not end it. Indeed, when the Supreme Court rejected the idea of a professional speech doctrine, it also rejected the idea that the government could regulate any speech "uttered by professionals" simply because "it involves personalized services and requires a professional license from the State." *NIFLA*, 138 S. Ct. at 2371–75. The Court explained that that would allow the government to get a free pass to abridge speech by "simply imposing a licensing requirement." *Id.* at 2375. Thus, in accordance with *NIFLA*, this court may not except the challenged ban from strict scrutiny just because the Act "generally regulates" professional conduct. Rather, this court must decide the appropriate scrutiny level based on whether the Act *as applied to expert reports* targets "speech as speech," rather than professional conduct that just so happens to sweep up speech. *See id.* at 2372–74. The court decides in favor of applying strict scrutiny: The communication of engineering opinions in Nutt's expert reports triggered the bureaucratic limit Nutt seeks to abolish. Therefore, the ban against expert reports directly, rather than incidentally, regulates speech. *See, e.g.*, *Holder*, 561 U.S. at 28; *Cohen*, 403 U.S. at 16; *PETA*, 60 F.4th at 826–27.

For substantially the same reasons, the court rejects the Board's argument from *CAI*. Recall, the Board argues that, like the court in *CAI*, this court should apply lesser scrutiny because the Act generally regulates "who can practice engineering." Defs.' Resp., DE 50 at 17–18 (citing 922 F.3d at 207). *CAI* examined whether a ban on the practice of law by corporations, as applied to a trade association that wanted to draft contracts and give legal advice, regulated pure speech or professional conduct. 922 F.3d at 202. The court held that the ban regulated conduct because unauthorized practice of law "statutes don't target the communicative aspects of practicing law,

28

such as the advice lawyers may give to clients. Instead, they focus more broadly on the question of *who* may conduct themselves as a lawyer." *Id.* at 208 (emphasis added). True, the Act generally focuses on the question who may conduct themselves as an engineer. But Nutt's claim implicates a specific application of the Act: the ban on expert reports containing engineering opinions. That ban does not focus on who may engage in nonexpressive engineering conduct; that ban focuses on what an unlicensed individual may say when writing expert reports.

The Board invokes two other cases to support its position: *360 Virtual Drone Services LLC v. Ritter*, No. 5:21-CV-137-FL, 2023 WL 2759032, at *1 (E.D.N.C. Mar. 31, 2023) (pending appeal); and *Brokamp v. James*, 66 F.4th 374 (2d Cir. 2023). Generally speaking, these cases held that a professional licensing restriction directly targeting expressive activity nonetheless regulates professional conduct. Neither persuades the court.

In *360 Virtual Drone*, the court held that a ban on creating land surveying maps and models without a land surveying license regulated expressive activity but nonetheless is "part of a generally applicable licensing regime" and therefore "does not control what surveyors may tell their clients, instead focusing more broadly on the question of who may conduct themselves as a surveyor." 2023 WL 2759032, at *9–11 (cleaned up). *360 Virtual Drone* focused on the general applicability of the land surveying licensing regime to determine whether the challenged ban targeted speech or conduct. In contrast, this court looks to a specific application of the challenged licensing regime to determine whether that application targets speech as speech. And since it does, strict scrutiny should apply.

In *Brokamp*, the appellate panel assumed, without deciding, that a ban on unlicensed mental health counseling regulates pure "speech without any non-verbal conduct." 66 F.4th at 392. The court held that the ban applied "regardless of what is said" between counselor and client

29

but rather when the unlicensed speech concerned "one of the statutorily identified therapeutic purposes, in addressing a mental disorder or problem, in the context of a private practice, group, or organized setting." *Id.* at 393–97. In contrast, the ban here "applies to particular speech because of the topic discussed or the idea or message expressed," namely opinions on engineering matters, *see Reed*, 576 U.S. at 163–64. The theory of content discrimination here renders *Brokamp* distinguishable.

### d.  *Application of Intermediate Scrutiny*

Because the ban on unlicensed expert reports targets engineering opinions, the ban must pass strict scrutiny. However, the court need only apply intermediate scrutiny to decide this case. *See Billups v. City of Charleston*, 961 F.3d 673, 684 (4th Cir. 2020) ("Simply put, there is nothing extraordinary about declining to decide the level of scrutiny to be applied to a given law."). In applying lesser scrutiny, the court assumes without deciding that the Board's asserted interests are substantial. The court focuses its inquiry on whether the challenged ban is narrowly tailored to serve the Board's asserted interests.

### i.  *Serving State Interests*

The Board asserts several interests supporting the ban. *See* Defs.' Mem., DE 45 at 31–32; Defs.' Resp., DE 50 at 22–24. Specifically, according to the Board, the ban advances the state's interest in establishing and enforcing "a minimum level of competence" for an engineer's opinion within a particular subject matter. *See* Defs.' Mem., DE 45 at 31; Defs.' Resp., DE 50 at 22–23.[11]

---

[11] The Board frames its interest differently. It states that, in addition to establishing and maintaining a competency standard, the Act "provides a system of accountability," should Nutt make any mistakes or violate the Professional Rules of Conduct, and ensures that Nutt complies with the obligations promulgated in the Professional Rules of Conduct, "including limiting [an engineer's] practice within [his] area of competence." *E.g.*, Defs.' Mem., DE 45 at 32.

30

The Board also states that the ban promotes the health, safety, and welfare of the public and the preservation of property. *See* Defs.' Resp., DE 50 at 22–23.

Courts "do not typically require governmental entities to present evidence demonstrating the existence of a significant interest" when "'common sense and the holdings of prior cases' [are] sufficient to establish the existence of such an interest." *Billups*, 961 F.3d at 685 (quoting *Reynolds v. Middleton*, 779 F.3d 222, 227 (4th Cir. 2015)). Moreover, "when it is obvious that a challenged law serves a significant governmental interest, we do not require that the government produce evidence so demonstrating." *Id.* However, "the government [must satisfy] its evidentiary burden when the relationship between a challenged regulation and the governmental interest it allegedly furthers is not obvious." *Id.* at 685 n.6. That is the case here.

The relationship between the Board's ban on unlicensed expert engineering reports and its asserted interests is not so obvious as to allow the Board to rest solely on case law and common sense. The Board does not even argue otherwise. *See* Defs.' Resp., DE 50 at 24. Moreover, some states—including the State of North Carolina—permit litigants to offer unlicensed expert engineering testimony to support their claims, and they do so without apparent reservation based on maintaining competency standards for practicing engineers and protecting the public. *See, e.g.*, *Stark v. N.C. Dep't of Env't & Nat. Res., Div. of Land Res.*, 736 S.E.2d 553, 561 (N.C. 2012) (holding that "the law in this state does not require a testifying scientific expert to be a person duly licensed to practice in a particular field" because "the line between [certain scientific subjects] is

---

The court sees little reason to treat these additional "interests" as materially distinct from the Board's interest in establishing and maintaining a competency standard. In context, those interests are important to the Board because they help ensure licensed engineers provide competent services for their clients. In other words, everything boils down to competency. Thus, for the court, the above formulation of the interests at stake sufficiently captures the Board's position. In any case, even if the court accepts the Board's formulation of its interests, the Board cannot justify its restriction on Nutt's testimony due to its evidentiary default. *See infra.*

31

too indefinite to admit of a practicable separation of topics" and "some of the most capable investigators have probably not needed or cared to obtain a license"); *see also Lance v. Luzerne Cnty. Mfrs. Ass'n*, 77 A.2d 386, 388 (Pa. 1951) ("The justification for a statute requiring the registration of engineers by the State as a valid exercise of the police power rests upon considerations other than an engineer's ability to testify as an expert before some tribunal . . . ."); Tex. Occ. Code Ann. § 1001.004(e) (exempting from the state's regulation of engineering "a person from giving testimony or preparing an exhibit or document for the sole purpose of being placed in evidence before an administrative or judicial tribunal").

The Board has failed to demonstrate the link between the ban and its interest in promoting the public welfare and safeguarding property. The Board merely reiterates that the Act has been declared to achieve that interest. *See, e.g.*, Defs.' Resp., DE 50 at 24–35. But declaring a purpose does not necessarily amount to achieving that purpose, especially in this instance. To be clear, the court has no doubt that the Act generally allows the state to effectively maintain and enforce educational and experiential standards for professional activities that often have the capacity to transform cityscapes and deflect torrential rain and turbulent winds. The issue, however, is whether the Act actually promotes the public welfare when applied to unlicensed expert engineering reports. On this issue, the evidence is scant.

On the next issue, however, the Board presents some viable evidence demonstrating the ban's connection to establishing and maintaining a level of professional competence for expert engineering reports. The evidence presented shows that, although Nutt practiced chemical engineering before his retirement, he rendered opinions on stormwater engineering in his reports. *See, e.g.*, Defs.' Resp., DE 50 at 26. And since chemical engineering and stormwater engineering

32

are different practice areas, Nutt's prior experience as a chemical engineer does not make him competent to opine on stormwater engineering matters. *See id.*

In contrast, Nutt maintains that he has the necessary experience to allow him to competently render the opinions presented in his reports. *See* Pl.'s Mem., DE 47 at 34–35. Specifically, prior to the state lawsuit, Nutt gained extensive experience designing and evaluating trench systems that managed water flow around buildings (functionally the same as stormwater drainage systems). *See* Pl.'s SOF, DE 48 ¶¶ 6–8, 29–30, 34. Those systems were far simpler than the one implicated in the state lawsuit. *See id.* ¶ 34.

Clearly, the parties disagree on the issue of Nutt's competence. Whereas Nutt attempts to demonstrate that he is competent to render the opinions in his reports due to his prior work experience, the Board attempts to demonstrate that Nutt is not competent to render those opinions based on his lack of credentials specifically related to the field of stormwater engineering. This disagreement is material because it determines whether the ban advances the Board's asserted interest in establishing and maintaining a competence standard as applied to Nutt's reports. Even so, to preclude summary judgment altogether and proceed to trial, the Board must clear another analytical hurdle.

### ii. *Considering Less-Restrictive Alternatives*

"To prove that [the ban] is narrowly tailored to serve a significant governmental interest, the government must, inter alia, present evidence showing that—before enacting the speech-restricting law—it 'seriously undertook to address the problem with less intrusive tools readily available to it'" and "that such alternatives were inadequate to serve the government's interest." *Billups*, 961 F.3d at 688 (quoting *McCullen v. Coakley*, 573 U.S. 464, 494 (2014)); *see also Reynolds*, 779 F.3d at 229 (explaining that "intermediate scrutiny does indeed require the government to present actual evidence supporting its assertion that a speech restriction does not

33

burden substantially more speech than necessary; argument unsupported by the evidence will not suffice to carry the government's burden"). In other words, the Board must present evidence of serious governmental efforts to use less restrictive means to advance its asserted interest in establishing and maintaining a competence standard, and to the extent it remains relevant, its interest in protecting the public welfare and safeguarding property.

Nutt argues that one such means the Board could have used was its existing regulations prohibiting the unlicensed use of an official stamp to certify engineering reports. *See* N.C. Gen. Stat. § 89C-16. The unlicensed stamping restriction is a less restrictive alternative. It provides for "more speech, not enforced silence," to remedy "the evil[s]" of incompetent engineering practice. *See Whitney v. California*, 274 U.S. 357, 377 (1927), *overruled on other grounds by Brandenburg v. Ohio*, 395 U.S. 444 (1969). In this case, the Board's expert testified that members of the public would likely rely on the certification to know that an engineer had a certain level of competence and was accountable to the Board for incompetence or other professional misconduct. *See* Pl.'s SOF, DE 48 ¶ 97. Thus, the unlicensed stamping restriction appears to be a less restrictive and effective alternative.

Yet, the Board presents no evidence demonstrating that it "'seriously undertook' to utilize those ordinances for [its] purpose[s] before" adopting the challenged ban. *See Billups*, 961 F.3d at 689. Rather, in response to the stamping restriction's potential as an alternative to the ban, the Board states that no disclaimer would prevent persons like Nutt from writing reports and testifying on matters outside their area of competence. *See* Defs.' Resp., DE 50 at 33. The Board also states that no disclaimer would prevent the public or Nutt's clients from relying on his incompetent work to determine liability and remediation. *See id.* However, the Board merely presents "myriad post-hoc justifications" regarding why the stamping restriction "could not be used to effectively

34

regulate" the interests threatened by Nutt's reports. *See Billups*, 961 F.3d at 689. These justifications are insufficient to satisfy the Board's burden.

The Board does not seriously dispute its evidentiary default. In fact, it fails to seriously dispute any of its evidentiary shortcomings with respect to its efforts to seriously consider any other alternative. *Compare* Pl.'s SOF, DE 48 ¶ 98 ("The Board has no evidence that its interests could not be equally well served simply by requiring unlicensed witnesses to affirmatively disclose that they are not professional engineers.") and *id.* ¶ 99 ("The Board's designated expert was unaware of any evidence regarding any alternatives to requiring a license to testify about engineering or whether those alternatives might protect the public."), *with* Defs.' Resp. to Pl.'s SOF, DE 51 ¶ 98 (noting "disputed") and *id.* ¶ 99 (noting "[n]ot disputed, the referenced testimony speaks for itself"). In light of the Board's evidentiary default, there is no triable dispute on the issue of tailoring.

In summary, the Board's ban on Nutt's unlicensed engineering testimony cannot survive intermediate scrutiny. The Board has failed to present evidence demonstrating that its ban on Nutt's unlicensed engineering reports substantially vindicates its asserted interest in protecting the public welfare and safeguarding property. Although the Board has presented some evidence demonstrating that the ban furthers its interest in establishing and maintaining a competence standard, the Board has also failed to show that it seriously considered any less restrictive alternatives before it adopted its ban on unlicensed expert engineering reports. Nutt is entitled to summary judgment declaring the ban unconstitutional as applied to his reports.

> *e.*    *Overbreadth Challenge*

As stated above, Nutt facially challenges § 89C-3(6) and § 89C-23 of the Act for substantial overbreadth. *See* Pl.'s Mem., DE 47 at 34. Again, the court declines Nutt's invitation to adjudicate overbreadth. *See Broadrick*, 413 U.S. at 613. Instead, the court holds that § 89C-

35

3(6) and § 89C-23 are unconstitutional when applied to unlicensed expert engineering reports. *See*

*PETA*, 60 F.4th at 838; N.C. Gen. Stat. § 89C-28 (severability clause).

## IV. Conclusion

At its core, this case concerns the extent to which a law-abiding citizen may use his technical expertise to offer a dissenting perspective against the government. Stating that dissent required the speaker to use his expertise in several ways. He had to do some math. He had to apply recognized methodologies. He even had to write a report memorializing his work. Some of that work may plausibly be considered conduct. But it ends up providing him the basis to speak his mind. Thus, although the government may properly exercise its interests in policing the use of technical knowledge for nonexpressive purposes, those interests must give way to the nation's profound national commitment to free speech in this case. At the very least, the government had to show that it seriously considered less restrictive alternatives before targeting pure speech. The government failed to meet its obligations under the First Amendment.

For the foregoing reasons, the court GRANTS in part and DENIES in part Nutt's motion for summary judgment [DE 46]. The court DENIES the Board's motion for summary judgment [DE 42]. The court will issue a judgment in conformance with this opinion and order.

SO ORDERED this ____19th____ day of December, 2023.

Richard E Myers II

RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE

36