# 22-1345

## United States Court of Appeals

*for the*

## Second Circuit

UPSOLVE, INC.,
REVERAND JOHN UDO-OKUN,

*Plaintiffs-Appellees,*

– v. –

LETITIA JAMES, in her official capacity,
as Attorney General of New York,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF OF *AMICI CURIAE* CIVIL LEGAL SERVICES
ORGANIZATIONS, CONSUMER LAW AND
ACCESS-TO-JUSTICE EXPERTS, AND CIVIL RIGHTS
ORGANIZATIONS IN SUPPORT OF DEFENDANT-
APPELLANT ATTORNEY GENERAL OF NEW YORK**

MATTHEW D. BRINCKERHOFF
EMERY CELLI BRINCKERHOFF ABADY
WARD & MAAZEL LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

*Attorneys for Amici Curiae*

## **CORPORATE DISCLOSURE STATEMENT**

No *amicus curiae* is owned by a parent corporation.  No publicly held corporation owns more than ten percent of stock in any *amicus*.

# **TABLE OF CONTENTS**

**PAGE NO(s)**:

TABLE OF AUTHORITIES .................................................................... iii

I.    IDENTITY AND INTERESTS OF AMICI CURIAE ................................. 1

II.   SUMMARY OF ARGUMENT .................................................... 3

III.  BACKGROUND ................................................................ 4

IV.  ARGUMENT ..................................................................... 7

     A.    UPSOLVE'S ILL-CONCEIVED EXPERIMENT TO DISPENSE LEGAL ADVICE WHILE CIRCUMVENTING RULES THAT REGULATE THE LEGAL PROFESSION WILL CAUSE HARM TO LOW-INCOME NEW YORKERS SUED ON ALLEGED DEBTS ................................................................ 7

        1.    Upsolve's "Training Guide" is Replete with Errors, Raising Concerns Regarding the Competency of the Legal Advice Being Dispensed .......................................................... 7

        2.    Contrary to Upsolve's Claims, the Training Guide Directs Justice Advocates to Provide Advice Beyond Completing the Court's Check-off Answer Form .............................................. 13

     B.    Upsolve's So-Called Protections for *Pro se* Litigants Are Illusory and Woefully Inadequate to Ensure Quality and Accountability ...... 15

        1.    Upsolve Does Not Require Any Clear Minimum Qualifications for Potential Justice Advocates to Ensure Knowledge or Integrity While Providing Legal Advice ................................. 15

        2.    Upsolve Provides No Assurance that Justice Advocates Will Be Trained or Supervised by a Person with Relevant Substantive Experience ...........................................16

        3.    Unlike Laws Regulating Lawyers, Upsolve's Model Does Not Have Any Meaningful Mechanisms for Oversight and Accountability and Does Not Provide Recourse to Low-Income New Yorkers Who Are Given Bad Legal Advice ......17

i

4.      Upsolve's Supposed "Strict Criteria" and "Robust Guardrails" Pale in Comparison Even to Restrictions of Existing Non-Lawyer Programs that Bar the Provision of Legal Advice...... 19

C.     Upsolve Failed to Demonstrate a "Critical and Immediate Need" in New York City for Legal Advice on Responding to Debt Collection Lawsuits, Raising Doubt as to Whether It Will Ultimately Prevail on the Merits ....................................................................................... 20

1.      Upsolve Did Not Identify Any New Yorkers Who Immediately Seek Its Program's Services ............................... 20

2.      Plaintiffs Misidentified the Primary Driver of Default Judgments ............................................................................. 21

3.      Upsolve Ignored the Wide Array of Free Legal Services Available to Low-Income New Yorkers Staffed by Experienced Attorneys and Closely Supervised Non-Attorneys .......................................................................... 22

D.     Upsolve Can Use Its Resources to Help Low-Income New Yorkers in Ways that Do Not Risk Harming Them Through Bad Legal Advice ....................................................................................... 24

CONCLUSION ............................................................................... 26

CERTIFICATE OF COMPLIANCE ................................................ 26

APPENDIX ...........................................................................................

# <u>TABLE OF AUTHORITIES</u>

<u>**PAGE NO(s)**</u>:

**RULES:**

N.Y. C.P.L.R. 211 .......................................................................................... 10

N.Y. C.P.L.R. 213-d ....................................................................................... 10

N.Y. C.P.L.R. 3025 ......................................................................................... 11

N.Y. C.P.L.R. 5004 ......................................................................................... 10

**OTHER AUTHORITIES:**

A.C.J.A. § 7-208(D)(1)-(4) (2021) ................................................................. 20

A.C.J.A. § 7-208(E)(2)(b)(1) (2021) .............................................................. 20

A.C.J.A. § 7-208(F)(b) (2021) ....................................................................... 19

Ca. Bus. & Prof. § 6402 (2020) ..................................................................... 20

Ca. Bus. & Prof. § 6411(e) (2020) ................................................................. 19

## I.  IDENTITY AND INTERESTS OF AMICI CURIAE[1]

*Amici curiae* are civil legal services and civil rights organizations, consumer law and access-to-justice experts, and law school-based programs and centers, most of which are located in New York State ("Advocate Amici").[2] Advocate Amici share the common goal of promoting economic justice in New York's low-income communities and communities of color, including by helping the people in those communities defend against abusive debt collection and other financial abuses.

Collectively, Advocate Amici have decades of experience with debt collection litigation and related access-to-justice issues, and provide the vast majority of the free civil legal services that are available to New York's low- and moderate-income residents on consumer issues. Advocate Amici have a

---

[1] No party's counsel authored this brief in whole or in part and no party or party's counsel or person contributed money that was intended to fund the preparing or submitting of this brief.

[2] Advocate Amici consist of the following nonprofit organizations: Access Justice Brooklyn, Asian American Legal Defense and Education Fund, CAMBA Legal Services, District Council 37 Municipal Employees Legal Services, Fordham Law School Feerick Center for Social Justice, Legal Assistance of Western New York, Legal Services of the Hudson Valley, Legal Services NYC, Mobilization for Justice, New Economy Project, New York Legal Assistance Group, Northern Manhattan Improvement Corporation, Queens Volunteer Lawyers Project, Inc., TakeRoot Justice, The UC Berkeley Center for Consumer Law and Economic Justice, and The Western New York Law Center. Advocate Amici's organizational statements are attached as an Appendix to this brief.

1

longstanding record of successful joint efforts to meaningfully reform the debt collection industry and debt collection lawsuit process nationally and locally, and to ensure that New Yorkers, especially low-income New Yorkers and New Yorkers of color, receive high-quality legal assistance with consumer debt collection lawsuits. These free legal services range from limited-scope legal assistance—including legal advice and assistance preparing *pro se* papers—to full representation in consumer debt collection lawsuits and affirmative litigation. Acutely aware of the vast "justice" gap in civil legal services for consumer debt collection lawsuits, Advocate Amici have also drawn on their extensive practical experience to lead access-to-justice innovations in consumer debt defense since the mid-2000s, frequently in partnership with the New York State courts. As access-to-justice innovators, social justice advocates, and consumer law experts who work in and with New York's low-income communities and communities of color, Advocate Amici have a substantial interest in ensuring that any proposed access-to-justice models do not risk causing undue harm to unrepresented low-income New Yorkers facing consumer debt collection litigation. Advocate Amici submit this brief to explain why the District Court's decision to grant Plaintiffs' motion for a preliminary injunction was wrong.

## II.    SUMMARY OF ARGUMENT

Advocate Amici submit this brief in support of the State's appeal of the District Court's decision granting Plaintiffs' motion for a preliminary injunction. Because of severe deficiencies in Plaintiffs' program that are at odds with long-standing provisions related to the dispensing of legal advice in an ethical and competent manner, the balancing of any equities clearly weighs against Plaintiffs and they are ultimately unlikely to prevail. In the proceedings below, Plaintiffs wildly exaggerated the accuracy and reliability of the Training Guide that its non-attorney "Justice Advocates" would rely on to give legal advice to low-income New Yorkers sued on alleged debts; falsely claimed that Justice Advocates would remain strictly within the confines of the Training Guide; mischaracterized the need in New York for Plaintiffs' non-attorney model; and severely understated the amount of free, expert legal assistance already available to low-income New Yorkers sued on alleged debts. Without any meaningful guardrails to ensure that the legal advice dispensed by Justice Advocates is in New Yorkers' best interest, Plaintiffs' model carries an unacceptable risk that it will harm, not help, low-income New Yorkers. Relying on Plaintiffs' speculations about the alleged lack of services available and claims about the protections in place, the District Court misconstrued the allegedly urgent need for and competency of Upsolve's program.

### III.   BACKGROUND

Plaintiffs, non-attorneys who lack experience in consumer law or debt collection defense, sought from the District Court, and were granted, an exemption on First Amendment grounds from New York's unauthorized practice of law (UPL) rules so that they could provide legal advice to low-income New Yorkers sued on alleged debts in New York courts. ECF 68. Plaintiffs claimed that if they were unable to dispense legal advice, New Yorkers "[would] likely receive no advice at all, default in their debt collection lawsuits, and face the risk of being wrongfully deprived of their property and the risk of harmful and long-lasting follow-on consequences." ECF 1 ¶ 5. Granting extraordinary injunctive relief that dramatically altered the status quo, the District Court permitted Plaintiffs to deploy non-attorney "Justice Advocates" as part of Plaintiff Upsolve's American Justice Movement (AJM), "as contemplated in the AJM Training Guide" ("Guide"). ECF 68.

The District Court's decision relied on fundamental misrepresentations by Plaintiffs. For example, Plaintiffs claimed, without evidence, that most low-income New Yorkers fail to respond to debt collection lawsuits because they lack legal representation, ECF 1 ¶ 28, but in Advocate Amici's experience, as discussed in their amicus brief before the District Court, lack of service of the lawsuit, or "sewer service," is the main cause of defaults in debt collection lawsuits. ECF 57

4

at 15-17. Plaintiffs also claimed, without support, that "[a]ttorneys who provide free or low-cost services to debt collection defendants are frequently overloaded and often cannot provide enough assistance on the quick timeline on which such suits proceed," ECF 1 ¶ 46, when in reality many low-income New Yorkers are able to proceed *pro se* in debt collection lawsuits, on their own or aided by the free, limited-scope legal assistance available through Advocate Amici and other legal services organizations throughout New York, ECF 57 at 9-13.

The District Court also seems to have accepted at face value Plaintiffs' claims concerning the supposed rigor and reliability of its legal-advice delivery model. Though Upsolve touted its model's "strict criteria" and "robust guardrails" to the District Court, ECF 6 at 6, these "criteria" and "guardrails" appear to consist of very little more than an 18-page "Training Guide" that is replete with legal, factual, and other errors, as discussed below. Though the court seemed concerned at oral argument with the vagueness of Plaintiffs' supposed criteria and guardrails, the court nevertheless concluded, wrongly, that "Plaintiffs' program has anticipated many of the State's consumer protection concerns and erected preventative limits on what Justice Advocates may do." ECF 68 at 27.

In fact, Upsolve's model is stunning in its lack of any meaningful guardrails to ensure that its Justice Advocates are adequately screened, trained, supervised, and held accountable for the legal advice they would purport to give to low-income

New Yorkers on their possible defenses to debt collection lawsuits. Upsolve's claim that their model averts conflicts of interest because it is free, ECF 66, 4:7-11, is simply inaccurate and not a basis to warrant a wholesale carveout from longstanding UPL laws.

Advocate Amici are unaware of any attempt by Upsolve to launch a pilot program to test the adequacy, accuracy, and effectiveness of its Guide and program. Instead, through this litigation, Plaintiffs sought, and were granted, full license to experiment on low-income New Yorkers dealing with debt collection lawsuits that, poorly defended as the result of bad legal advice, could wreak havoc on their ability to pay their rent or cover other basic living expenses. Advocate Amici are gravely concerned that the lack of any meaningful guardrails (contrary to those imposed by the state's licensing authority), combined with an error-riddled training manual, exposes low-income New Yorkers to an unconscionable risk of harm; and that the resulting confusion among those low-income New Yorkers could exacerbate an erosion of trust in the judicial system and unduly burden it as well.

# IV.  ARGUMENT

## A. UPSOLVE'S ILL-CONCEIVED EXPERIMENT TO DISPENSE LEGAL ADVICE WHILE CIRCUMVENTING RULES THAT REGULATE THE LEGAL PROFESSION WILL CAUSE HARM TO LOW-INCOME NEW YORKERS SUED ON ALLEGED DEBTS

### 1. Upsolve's "Training Guide" is Replete with Errors, Raising Concerns Regarding the Competency of the Legal Advice Being Dispensed

Upsolve touts its "robust step-by-step Training Guide" as its primary tool "to ensure that all of the advice that Justice Advocates are being directed to provide is in the clients' best interest." ECF 1 ¶ 63. But though the Training Guide ("Guide") focuses on debt collection lawsuits filed in New York courts, Upsolve does not claim to have hired any New York consumer law practitioners to draft the manual. Despite Upsolve's vetting of the Guide with two "experts in consumer law and debt collection defense," ECF 1 at 18 ¶ 64, the Guide is replete with errors that could result in Justice Advocates routinely giving bad legal advice and harming low-income New Yorkers sued on alleged debts. The Guide's myriad misstatements raise significant questions as to Upsolve's ability to adequately train its Justice Advocates to ensure that they will not give bad legal advice to low-income New Yorkers, and to keep the Guide's contents up to date with changes in relevant statutes and procedures.

For starters, the Guide incorrectly prescribes the statewide answer form, ECF 1-1 at 2, for types of debt collection lawsuits beyond the answer form's intended scope.[3] As its title, "Written Answer Consumer Credit Transaction," indicates, this answer form is intended for only a specific kind of debt collection lawsuit—namely, an action arising from a "consumer credit transaction,"[4] such as credit card debts. The Guide, however, indicates that the debt collection lawsuits Justice Advocates will advise on include lawsuits that do *not* arise from a consumer credit transactions, such as lawsuits brought by hospitals, for-profit colleges, and landlords on medical debt, tuition debt, and rent arrears, respectively, ECF 1-2 at 4, 11, even though those lawsuits do not arise from a "consumer credit transaction." The Guide also fails to mention that defenses outside the scope of the

---

[3] Though the terms of Plaintiffs' preliminary injunction permit them to give legal advice "as contemplated in the AJM Training Guide," ECF 68 at 32, the Guide is unclear as to whether Justice Advocates may advise only on debt collection lawsuits filed in New York City Civil Court or also on those filed elsewhere in New York State. For example, the Guide says it "is designed to empower you to assist only clients who are defendants in a debt collection lawsuit in New York [sic] Civil Court," ECF 1-2 at 5, *i.e.*, presumably New York City Civil Court, but includes advice to individuals sued in courts outside of New York City, ECF 1-2 at 10 (detailing advice for defense number 19 on the statewide answer form).

[4] Section 2101(g) of the New York City Civil Court Act defines consumer credit transaction as "a transaction wherein credit is extended to an individual and the money, property, or service which is the subject of the transaction is primarily for personal, family or household purposes." This definition generally excludes rental arrears, medical debt, and tuition debt, to name a few examples.

8

statewide consumer credit answer form (and unexplained by the Guide) likely apply to those non-consumer credit lawsuits, as well as to lawsuits on certain types of consumer credit, such as auto loans and payday loans.[5] Indeed, because auto loans and rent arrears implicate so many specific defenses not listed in the standard consumer credit answer form, several Advocate Amici have developed specific *pro se* answer forms for use in auto loan and rent arrear lawsuits.[6]

The Guide also indicates that if a client tells the Justice Advocate that they have not "received" a default judgment, the Justice Advocate may advise the client on preparing an answer, ECF 1-2 at 5, but in Advocate Amici's experience a defendant has often had a default judgment entered without their knowledge, and it is necessary to take further steps to try to confirm whether a default judgment already exists or not.[7]

---

[5] For instance, payday loans generally carry interest rates that far exceed New York's criminal usury cap and are therefore void under New York law.

[6] Amicus Fordham Law School Feerick Center for Social Justice developed these specialized *pro se* answer forms in consultation with several other Advocate Amici, including for use at CLARO clinics.

[7] If a defendant who does not know that a default judgment has already been entered against them and proceeds, per the Justice Advocate's advice, to try to file an answer at the clerk's office, in Advocate Amici's experience the clerk's office will likely reject the defendant's answer and advise the defendant that they need to file an Order to Show Cause instead. The defendant might then file an Order to Show Cause right then and there at the clerk's office, without the benefit of legal advice.

The Guide also includes outdated and/or incorrect information, including on a defense as critical as the statute of limitations. For example, the Guide misstates the statute of limitations for medical debt as six years, ECF 1-2 at 9, instead of three years, under N.Y. C.P.L.R. 213-d (as of April 2020), and the statute of limitations for auto loans as three years, ECF 1-2 at 9, instead of four years, under Article 2 of the Uniform Commercial Code.[8] The Guide also misleadingly states that judgments "are enforceable for 20 years," ECF 1-2 at 4, though they are enforceable for a *minimum* of 20 years and the 20-year period resets with every partial payment, N.Y. C.P.L.R. 211, and it says that the annual interest rate on consumer debt money judgments is nine percent, ECF 1-2 at 4, though the rate on any unpaid part of a judgment is two percent, N.Y. C.P.L.R. 5004.[9] The Guide (as well as the Complaint, ECF 1 ¶¶ 2, 24, 86, Professor Pamela Foohey, ECF 7-6 ¶ 7, and Reverend John Udo-Okon, ECF 7-2 ¶ 16) also incorrectly states that debt collection judgments can cause damage to one's credit, ECF 1-2 at 4, though the

---

[8] A law called the Consumer Credit Fairness Act went into effect in April 2022 establishing a newly uniform three-year statute of limitations for actions arising out of consumer credit transactions, but explicitly exempted certain consumer credit transactions, including those subject to the Uniform Commercial Code, which include auto loans.

[9] Governor Hochul signed the legislation lowering the consumer judgment interest rate on December 31, 2021.

national credit bureaus stopped including virtually all civil judgments on people's credit reports more than five years ago, in July 2017.[10]

The Guide also contains glaring omissions and questionable commentary and advice. For example, the Guide contemplates that Justice Advocates will advise low-income New Yorkers about amending an answer, ECF 1-2 at 6, but fails to inform Justice Advocates that defendants in New York City Civil Court have only 10 days to amend their answer *as of right* from the service of their answer and that if they are past the 10-day period they must file a *motion* to amend their answer, which is beyond the Guide's stated scope.[11] The Guide also inaccurately describes what constitutes correct service of a summons and complaint under New York law, ECF 1-2 at 7, and includes the questionable, categorical advice to always file an answer even if the defendant has not been served (and may never be), *id*. Given Upsolve's stated mission and its repeated claims that there are not enough free legal services to assist low-income New Yorkers who seek help responding to a debt collection lawsuit, it is also

---

[10] *See, e.g.*, Jasper Clarksberg, *A new retrospective on the removal of public records* (Dec. 10, 2019), https://www.consumerfinance.gov/about-us/blog/new-retrospective-on-removing-public-records/.

[11] N.Y. C.P.L.R. 3025. Though this statute allows 20 days to amend as of right, defendants in New York City Civil Court must comply with section 909 of the New York City Civil Court Act, which allows only 10 days.

remarkable that the Guide does not instruct Justice Advocates to first ask prospective clients whether they tried contacting any of the many free, experienced legal services providers available to low-income New Yorkers sued on alleged debts, and to offer referrals to one of Advocate Amici's free legal assistance hotlines.

The Guide's misleading guidance could also readily cause Justice Advocates to advise low-income New Yorkers to leave out critical defenses. For example, the Guide states categorically that those who "co-signed" on a debt should not check off the answer's form defense "I do not owe this debt," ECF 1-2 at 8, but in Advocate Amici's experience even someone who co-signed on an account may have sound legal reasons to raise this defense. The Guide could also mislead Justice Advocates to advise clients *not* to check off the form's standing defense if the defendant recognizes the name of the plaintiff, *id.* (referring to the defense numbered 7 in the answer form), though in Advocate Amici's experience the defendant may well recognize the name of the plaintiff because of pre-litigation collection efforts by the plaintiff or other reasons, but still have a basis to assert lack of standing as a defense. These errors reflect haphazard standards that lie in stark contrast to the competency requirements and the rules of professional conduct embedded in regulations that govern the practice of law.

12

**2. Contrary to Upsolve's Claims, the Training Guide Directs Justice Advocates to Provide Advice Beyond Completing the Court's Check-off Answer Form**

Upsolve claims that its Guide "will provide clients with substantial benefits at no cost and [] minimizes the risk of unreliable or harmful advice." ECF 1 ¶ 64. At oral argument below, Upsolve insisted that "the advice is that being provided in the training guide, and nothing more," ECF 66, 5:22-23, and further assured the court that "what [the Justice Advocates are] doing is subject to the strict terms of the training guide . . . . So when you're outside that scope, you're not within the program, and so there are none of the concerns that normally motivate the regulation of the practice of law." *Id.*, 41:9-13. The Guide's contents, however, give the lie to Upsolve's arguments.

The Guide cautions that Justice Advocates may provide clients only with "free legal advice about how to answer their lawsuit," but then instructs Justice Advocates to go further. Where the guidelines in the Guide are "unclear," the Justice Advocates are instructed *not* to seek guidance from a consumer law expert or to direct the client to consult a lawyer, but instead to "apply [their] best judgment" in advising clients about whether particular defenses apply in a particular case, ECF 1-2 at 7, even though the Justice Advocates may have nothing

13

on which to ground their judgment besides the deficient Guide and their single, virtual training, *see id.* at 3.

The Guide also encourages Justice Advocates to advise *pro se* defendants on asserting "common counterclaims that people in their situation sometimes have," ECF 1-2 at 12, despite the fact that, in Advocate Amici's experience, it is usually *not* in defendants' best interests to bring such causes of action as counterclaims in the state debt collection lawsuit, for myriad reasons.[12] Doing so may result in their essentially throwing away good claims or filing frivolous counterclaims that could undermine their credibility or expose them to sanctions.

---

[12] In Advocate Amici's experience, these and other potential counterclaims are best brought in an affirmative lawsuit filed in federal court. The Guide inadequately explains possible counterclaims under section 349 of New York's General Business Law and the Fair Debt Collection Practices Act (FDCPA). ECF 1-2 at 10-11. These causes of action have specific pleading requirements, are not applicable to all entities, and in fact are often applicable to the plaintiff's attorneys, who are non-parties to the debt collection lawsuit and would therefore have to be impleaded to be held liable. Also, the FDCPA's fee-shifting provision encourages private consumer attorneys to represent low-income individuals with FDCPA claims.

**B. Upsolve's So-Called Protections for *Pro se* Litigants Are Illusory and Woefully Inadequate to Ensure Quality and Accountability**

    **1. Upsolve Does Not Require Any Clear Minimum Qualifications for Potential Justice Advocates to Ensure Knowledge or Integrity While Providing Legal Advice**

The only clear qualification that Upsolve appears to require for its Justice Advocates is a willingness to sign the unsworn, unnotarized "Justice Advocate's Affidavit." ECF 1-2 at 14. Though the court noted that "Justice Advocates must. . . be approved under the AJM program criteria," ECF 68 at 27, it is not at all clear what these "criteria" are. When asked about their standard for vetting potential Justice Advocates, Plaintiffs merely responded, "They have to be capable of providing the advice on the terms laid out in the training guide," ECF 66, 19:23-24, but provided no detail on how they planned to test potential Justice Advocates' "capability." When pressed by the lower court, Plaintiffs pushed back against having minimum educational requirements for Justice Advocates, saying, "There are plenty of people without a high school diploma capable of helping people in need." *Id.*, 41:5-7.

This is likely true, but when the purported help takes the form of legal advice on a matter with potentially dire consequences, Advocate Amici believe it is imperative to require at least *some* minimum qualifications, such as sufficiently advanced literacy and reading comprehension skills. As Plaintiffs' District Court

amicus Professor Rebecca Sandefur acknowledges, "Like lawyers, nonlawyers need to study and train to properly advise people on their legal problems." ECF 38-1 at 23. The lack of any meaningful qualification requirements—contrary to licensing regulations that require some level of knowledge and skill—is especially disturbing given the Guide's directive to Justice Advocates to go beyond its scope and apply their best judgment. ECF 1-2 at 8.

> ## 2. Upsolve Provides No Assurance that Justice Advocates Will Be Trained or Supervised by a Person with Relevant Substantive Experience

Upsolve represented to the District Court that it would hire "someone with a track record of consumer-rights advocacy, a commitment to social justice, and a deep familiarity with the legal system," ECF 7-1 at 20, "to vet, train, and supervise Justice Advocates," ECF 6 at 12, and "ensur[e] that the advice being provided is advancing the interest of the public and consumers," ECF 7-1 at 20. However, in or around August 2022, nearly three months after the court below issued its decision, Upsolve published a job posting for "a full-time Justice Fellow," which lists *neither* experience in consumer-rights advocacy *nor* deep familiarity with the legal system as a job qualification.[13] It therefore appears unlikely that the sole full-time

---

[13] *See* https://upsolve.org/careers/justice-fellow/ (last accessed September 30, 2022). According to the posting, the only requirements are that the Justice Fellow "have a commitment to social justice, be comfortable using technology, be able to

staff member tasked with vetting, training, and supervising Justice Advocates will have experience providing legal advice to low-income New Yorkers on debt collection lawsuits, general experience in consumer rights advocacy, or deep familiarity with the legal system.

Furthermore, though Professor Sandefur represented to the District Court that Upsolve's program would provide "comprehensive training," in fact Upsolve appears to require only a *single*, virtual training of an unspecified duration. ECF 1-2 at 4. Though Upsolve holds up the Guide as a proxy for ostensible consumer law expertise, the Guide's myriad errors raise significant questions about its reliability as a source of correct legal information and advice.

### 3. Unlike Laws Regulating Lawyers, Upsolve's Model Does Not Have Any Meaningful Mechanisms for Oversight and Accountability and Does Not Provide Recourse to Low-Income New Yorkers Who Are Given Bad Legal Advice

Upsolve bases its claims of oversight and accountability largely on the "promises" of compliance they will get from Justice Advocates and the potential threat that Upsolve might report them to the Attorney General if they go beyond the scope of the Guide. However, there is no indication of any oversight of Justice

---

start full-time in September 2022, have a strong sense of organization, have a high degree of personal autonomy, and have a bias towards action."

Advocates' legal advice or review of completed answer forms in real time, by an experienced legal practitioner, who is subject to state oversight.

Upsolve claims that it will track "every encounter [with people receiving the advice]" and follow up "to ensure that the advice was provided pursuant to the terms of the guide." ECF 66, 20:12-16. Yet Upsolve provides no details as to what information they would try to elicit from litigants to try to make such an assessment or the criteria for their assessments. Upsolve makes no assurances that it will follow up with people in time to avert any possible harm that could result from filing a badly prepared answer; and makes no promises as to how it will help someone who receives legal advice beyond the Guide. Upsolve appears to be the only entity receiving litigants' feedback and determining what, if anything, to self-report to the Attorney General.

Similarly, Upsolve provides no meaningful assurance that Justice Advocates will sufficiently understand or act in compliance with New York Rules of Professional Conduct. Unlike attorneys—who must fulfill CLE ethics requirements and are under ethical obligations to report other attorneys for violations of the professional rules of conduct, and may suffer censure, suspension of their license, or disbarment, with potentially huge consequences for their livelihood—non-lawyer Justice Advocates are not bound by the Professional Rules of Conduct and

18

at most would likely suffer only expulsion from the AJM program if they acted unethically.

The lack of any recourse for an Upsolve client who receives bad advice is also a glaring consumer-protection omission. As explained by the State, "[P]laintiffs . . . fail to identify what remedy consumers would have if a consumer is harmed after receiving negligent advice from one of plaintiffs' justice advocates," ECF 66, 36:19-21, adding, "[f]or example, presumably there would be no cause of action for legal malpractice because the persons to be providing this type of advice would not be lawyers," *id.*, 36:21-24.

### 4. Upsolve's Supposed "Strict Criteria" and "Robust Guardrails" Pale in Comparison Even to Restrictions of Existing Non-Lawyer Programs that Bar the Provision of Legal Advice

Professor Sandefur's amicus brief before the District Court favorably cites non-lawyer, legal document preparer programs in Arizona and California,[14] which *prohibit* the legal document preparers from providing legal advice, A.C.J.A. § 7-208(F)(b) (2021), Ca. Bus. & Prof. § 6411(e) (2020), and yet have far more stringent qualification and educational requirements than Upsolve's model. Arizona's program requires its participants to pass an exam on legal terminology,

---

[14] Advocate Amici do not take any position on the effectiveness of these programs and discuss them only for comparison purposes.

client communication, data gathering, document preparation, ethical issues, and professional and administrative responsibilities. A.C.J.A. § 7-208(E)(2)(b)(1) (2021). As discussed above, Upsolve requires only attendance at a single virtual training and an unsworn "affidavit." Both Arizona's and California's legal document preparer programs task independent, third-party entities with oversight of their legal preparers—another difference from Upsolve, which professes its self-monitoring model to be sufficient. A.C.J.A. § 7-208(D)(1)-(4) (2021); Ca. Bus. & Prof. § 6402 (2020).[15]

### C. Upsolve Failed to Demonstrate a "Critical and Immediate Need" in New York City for Legal Advice on Responding to Debt Collection Lawsuits, Raising Doubt as to Whether It Will Ultimately Prevail on the Merits

#### 1. Upsolve Did Not Identify Any New Yorkers Who Immediately Seek Its Program's Services

Upsolve cited a "critical and immediate need" in New York City for legal advice on responding to consumer debt collection lawsuits, ECF 7-2 ¶ 17, yet failed to identify even one New Yorker who immediately needed and would benefit from its program. Despite its blanket statements about the supposed unmet need, Upsolve does not provide evidence of a single unrepresented defendant in a

---

[15] Advocate Amici also note that the New York City Civil Court has reportedly utilized non-lawyers even when they were not permitted to give legal advice (*see* https://www.americanbarfoundation.org/uploads/cms/documents/new_york_city_court_navigators_report_final_with_final_links_december_2016.pdf).

debt collection action who was unable to access legal advice in preparing an answer, notwithstanding the three examples (two of whom do not live in New York City) Upsolve cited in the Complaint. ECF 1 ¶ 25. Similarly, the 114 individuals who signed Upsolve's petition in advance of its litigation, ECF 7-3, do not actually aver to needing legal advice to prepare an answer to a New York City Civil Court debt collection action.[16] Plaintiffs' inability to identify even one individual who was unable to obtain legal advice on answering a debt collection lawsuit filed in New York City Civil Court belies their allegations of unmet need and request for drastic injunctive relief. With only hypothetical and speculative examples of any actual injury, Plaintiffs are unlikely to succeed on the merits of their case.

### 2. Plaintiffs Misidentified the Primary Driver of Default Judgments

Plaintiffs misleadingly asserted that the lack of legal assistance is the primary driver of default in consumer credit cases.[17] In Advocate Amici's

---

[16] The statement in the petition reads, "I am interested in and would benefit from legal advice from Pastor John Udo-Okon at World of Life Church, so that I can access my legal rights in court. I'm a resident of New York." ECF 7-4.

[17] Upsolve also asserts that "CLARO, a leading provider that provides limited service assistance, can serve fewer than 2 percent of the people facing these actions." ECF 66, 18:8-10. This statement is misleading. First, many more legal services organizations than just CLARO provide limited-scope services to unrepresented New Yorkers; second, thousands of New Yorkers access limited-scope legal services every year but still proceed *pro se*, and limitations in court

21

experience, and as explained in detail in Advocate Amici's District Court amicus brief, *see* ECF 57 at 15-17, the distressingly high rate of default judgments is largely the result of the well-documented phenomenon of sewer service—the practice of falsely claiming to serve litigants with notice of the lawsuit when no notice was ever provided. Many New Yorkers, including the three cited as examples in Plaintiffs' Complaint, find out they were sued only when a default judgment is enforced against them, often years after its entry. Their stories underscore the inadequacy of Upsolve's model and Plaintiffs' likely inability to eventually prevail on the merits because their program has not and will not actually help New Yorkers challenge default judgments against them.

**3. Upsolve Ignored the Wide Array of Free Legal Services Available to Low-Income New Yorkers Staffed by Experienced Attorneys and Closely Supervised Non-Attorneys**.

Upsolve misrepresented the access-to-justice landscape in New York City in consumer debt collection matters.[18] Though the great majority of defendants in

---

data prevent an accurate estimate of the percentage of *pro se* litigants who receive brief legal services, including help preparing *pro se* answers.

[18] *See*, *e.g.*, ECF 28-1  at 3 ("[R]epresentation from a licensed attorney is not a viable option because attorneys are seldom available to these communities and unaffordable when they are"); ECF ECF 38-1 at 10 ("[T]here is simply not sufficient legal aid and *pro bono* representation available for individuals in these sorts of state court proceedings.").

debt collection lawsuits do not benefit from full representation, many have access to free limited-scope legal services for help with preparing answers. As explained in detail in Advocate Amici's District Court amicus brief, *see* ECF 57 at 9-13, Advocate Amici include legal services organizations that routinely provide a full range of free legal assistance—from advice and *pro se* assistance to full representation—to New Yorkers sued in debt collection cases. Advocate Amici staff their consumer law practices with attorneys and non-attorneys, including paralegals, law students and law graduates, who are intensively trained and closely supervised by attorneys. Advocate Amici also include a robust array of limited-scope legal assistance providers that help New Yorkers to proceed *pro se* in debt collection lawsuits, including the Civil Legal Advice and Resource Office (CLARO) and the Volunteer Lawyer for the Day (VLFD) program.

Importantly, many of the Advocate Amici organizations rarely, if ever, turn away low-income New Yorkers who need help responding to debt collection lawsuits. On the rare occasions that one of the Advocate Amici lack the capacity to timely help a low-income New Yorker answer a debt collection lawsuit, Advocate Amici will refer that person to another legal services organization.

23

**D. Upsolve Can Use Its Resources to Help Low-Income New Yorkers in Ways that Do Not Risk Harming Them Through Bad Legal Advice**

Advocate Amici are acutely aware of the access to justice gap for low-income New Yorkers facing debt collection cases, the long-lasting and devastating effects of debt collection judgments, and the threat that abusive debt collection poses to people's financial health and stability. However, the public interest and balance of the equities make clear that granting a preliminary injunction to allow Upsolve to implement its  model is not a solution to these problems. Instead, Upsolve can use its resources to implement thoughtful programs, seek legislative reforms, and support existing limited-scope models that are already helping to reduce the justice gap.

For example, UPL laws do not prohibit non-lawyers from providing legal information, which Upsolve is well positioned to provide to low-income New Yorkers sued on alleged debts. Providing basic legal information—*e.g.*, that an answer must be filed with the court, how to obtain a court file, that a template answer form is available to litigants, and directions to the appropriate clerk to file the answer—serves an important role for low-income New Yorkers, and carries much less risk of error. Reliable and accurate legal information for unrepresented

24

defendants is a powerful tool in addressing the justice gap.[19] Providing reliable, accurate legal information affords a benefit to people without the risk of unsupervised, non-lawyers providing harmful legal advice.

Upsolve could also support existing limited-scope legal assistance programs staffed by both non-attorneys and experienced attorneys who are admitted to practice in New York and specifically trained in consumer debt defense. Two such limited-scope legal assistance programs—CLARO and VLFD—enable many low-income New Yorkers to be able to proceed *pro se* in debt collection lawsuits. *See* ECF 57 at 10-12. These programs provide unbundled services that not only help low-income New Yorkers with answer forms, but also advise and prepare *pro se* litigants for their court appearances, help litigants navigate the legal system, and coordinate with each other to provide holistic services. The VLFD and CLARO programs work in concert with each other and with other legal services providers to ensure that, though unrepresented, defendants in debt collection lawsuits have access to support, advice, and more extensive services throughout their case. This

---

[19] Advocate Amici have embraced technological and other innovations to help deliver empowering legal *information* to low-income New Yorkers responsibly and accountably. For example, some of the Advocate Amici maintain know-your-rights and other legal information on their organizational websites, and Advocate Amici have furnished much of the legal information available in the consumer section of the website LawHelpNY.org.

synergy between legal service providers benefits litigants and is possible only because of the legal training and analyses conducted by the attorneys and specialized staff.

Upsolve touts itself as a widely recognized organization that has successfully obtained funding for its program and has won the support of law firms and legal scholars; and says it "invests heavily in public advocacy to raise awareness around civil rights injustices." ECF 1 ¶ 10. In that case, Upsolve could use its influence and resources to advocate for policy reforms that expand access to quality legal services and increase consumer protections for low-income New Yorkers, rather than obtain a novel carveout of applicable laws and implement a flawed program with no oversight to help hypothetical clients who would be better served by existing resources.

**CONCLUSION**

Over the years, Advocate Amici have worked diligently in the public interest of low-income New Yorkers sued by debt collectors, including by working with the courts, area law schools, and local bar associations to establish key access-to-justice programs such as CLARO and VLFD and securing critical policy, legislative, and regulatory changes to help level the playing field for low-income New Yorkers facing debt collection lawsuits. Though the work continues, the

26

reforms to date have meaningfully increased access to justice for low-income New Yorkers and New Yorkers of color. Access to justice requires providing unrepresented litigants the opportunity to obtain counsel or, at a minimum, to obtain unbiased, informed advice on the legal issues that impact their lives. Efforts to increase access to justice require a deep understanding of the problem at hand, thoughtful and collaborative implementation, and input from and oversight by the courts and/or the legislature. Plaintiffs' program does not meet these criteria, and this Court should overturn the District Court's decision to grant Plaintiffs a preliminary injunction.

Dated:        October 12, 2022
              New York, New York

                                        EMERY CELLI BRINCKERHOFF
                                        ABADY WARD & MAAZEL LLP

                                        By: _____/s/_____
                                        Matthew D. Brinckerhoff
                                        600 Fifth Avenue, 10th Floor
                                        New York, New York 10020
                                        212-763-5000
                                        mbrinckerhoff@ecbawm.com

                                        *Counsel for Advocate Amici*

27

# CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitations of Fed. R. App. P.

29(a)(4) and 29(b)(4). It contains 6,086 words, excluding the parts of the

brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). It has

been prepared in a proportionally spaced typeface using Microsoft Word in

14 point Times New Roman font.


Dated:          October 12, 2022
                New York, New York          _____/s/_____
                                            Matthew D. Brinckerhoff

# <u>APPENDIX</u>

## *AMICI CURIAE* **ORGANIZATIONAL STATEMENTS**

1. Access Justice Brooklyn (formerly known as Brooklyn Bar Association Volunteer Lawyers Project) partners with compassionate pro bono attorneys to provide high-quality, civil legal services that help ensure equal access to the legal system. The organization's approach prioritizes the most basic, essential elements and experiences of human life, including housing, family stability, and subsistence income. Its proven pro bono model—recruit, train, supervise, and support—also provides flexibility to address new legal issues as they emerge. Everyone, whether an attorney or not, has a role to play in expanding access to justice.

2. The Asian American Legal Defense and Education Fund (AALDEF), founded in 1974, is a New York-based national organization that protects and promotes the civil rights of Asian Americans. By combining litigation, advocacy, education, and organizing, AALDEF works with Asian American communities across the country to secure human rights for all. AALDEF counsels low-wage workers, immigrants, senior citizens, and limited English proficient individuals at free legal advice clinics.

3. CAMBA Legal Services is a community based non-profit legal services provider located in the Flatbush neighborhood of Brooklyn. CAMBA provides a legal services in the areas of housing, immigration, foreclosure, and consumer law. Since its inception 15 years ago, the CAMBA Consumer Law Project works to assist working poor New Yorkers with a broad spectrum of consumer law issues including: representing defendants in collection actions filed in New York City Civil Court; assisting pro se defendants draft legal papers; and helping consumers facing debt collection abuse. The chief goal of the Consumer Law Project is to help our clients achieve self-sufficiency.

4. District Council 37 Municipal Employees Legal Services (MELS) is committed to providing poor and working New Yorker's equal access to justice. Our office offers free legal services to over 125,000 workers covered under District Council 37's collective bargaining agreements with municipal agencies and another 50,000 retirees. Our clients are among the working poor of New York State. Our Consumer/Debt/Bankruptcy Unit's staff of 16

- 1 -

attorneys and legal assistants defend against debt collection lawsuits in New York City and Nassau, Suffolk, Westchester and Rockland Counties and initiate bankruptcy proceedings to afford clients straddled with unsurmountable debt a fresh start.

5. Fordham Law School Feerick Center for Social Justice promotes the rights and addresses the problems facing marginalized and low-income New Yorkers and individuals seeking humanitarian relief, including asylum-seeking families and unaccompanied immigrant children. The Feerick Center inks the social justice community serving those in need to Fordham and engages the Fordham community in service of national and local social justice initiatives. We provide high-quality free, direct civil limited-scope legal assistance, conduct community education, work in partnership with a broad array of stakeholders, help lead coalitions, advance access-to-justice initiatives, and engage in policy advocacy. The Feerick Center has operated the Civil Legal Assistance and Resource Office (CLARO) Programs in Bronx, Manhattan, and Staten Island CLARO beginning in 2008, 2009, and 2010 respectively. The Feerick Center established the Remote CLARO Program in 2020. CLARO Programs provide limited-scope legal advice and assistance to New Yorkers sued in debt collection lawsuits, primarily in New York City Civil Court. The Feerick Center's CLARO Programs have facilitated over 24,000 consultations since 2008. The Feerick Center has also helped coordinate a variety of efforts in connection with the CLARO Programs, including advocacy campaigns, volunteer recruitment and training, and development of litigation and training resources.

6. Legal Assistance of Western New York, Inc. (LawNY) is a nonprofit civil legal services organization that represents low-income and vulnerable individuals across 14 counties and 10,000 square miles of New York. The Consumer Project at LawNY provides representation and advocacy services to people dealing with debt collection, auto fraud, student loans, bankruptcy, identity theft, credit reporting, and more. The Consumer Law Project operates a free know-your-rights hotline to provide information and pro se resources to people dealing with consumer debt collection cases, regardless of their eligibility for full representation from our organization. In addition to pro se assistance provided to all callers over the hotline, for eligible clients, we provide direct representation in consumer debt collection lawsuits. In 2021, LawNY partnered with the NYS Permanent Commission on Access to Justice to establish the Rochester City Court Consumer Debt Assistance Project (CDAP), a pilot program designed to address the high number of default

judgments in Rochester City Court consumer debt collection cases. To date, the work of the Consumer Law Project has served more than 2,000 individuals and helped save over a million dollars for low-income New Yorkers.

7. The mission of Legal Services of the Hudson Valley is to provide free, high quality counsel in civil matters for individuals and families who cannot afford to pay an attorney where basic human needs are at stake. Legal Services of the Hudson Valley is the only provider of comprehensive civil legal services to all seven counties of the Hudson Valley, including: Westchester, Putnam, Dutchess, Rockland, Orange, Ulster and Sullivan. We assist hundreds of vulnerable consumers every year. We help defendants in consumer credit cases avoid or obtain relief from money judgments through our legal experience and expertise and have a substantial interest in this matter.

8. Legal Services NYC ("LSNYC") is the nation's largest provider of free civil legal services to the poor. For more than 50 years, LSNYC has provided expert legal assistance and advocacy to low-income residents of New York City. Each year, LSNYC's neighborhood offices across New York City serve tens of thousands of New Yorkers, including homeowners, tenants, the disabled, immigrants, the elderly, and children. LSNYC provides both pro se assistance and full representation to low-income New Yorkers facing consumer debt issues in both New York State and federal courts, including affirmative litigation to stop abusive or deceptive debt collection practices, assistance with identity theft, and assistance with student loan discharges or income based repayment plans. LSNYC also provides training to community groups on consumer issues.

9. Mobilization for Justice's (MFJ) mission is to achieve justice for all. MFJ prioritizes the needs of people who are low-income, disenfranchised, or have disabilities as they struggle to overcome the effects of social injustice and systemic racism. We provide the highest-quality free, direct civil legal assistance, conduct community education and build partnerships, engage in policy advocacy, and bring impact litigation. We assist more than 14,000 New Yorkers each year, benefitting over 24,000. MFJ's Consumer Rights Project regularly provides legal advice and assistance to low-income New Yorkers sued in debt collection lawsuits.

10. New Economy Project works to promote economic justice and to eliminate discriminatory economic practices that perpetuate inequality and poverty. Since 2005 we have operated a free legal assistance hotline through which we

have helped thousands of low-income New York City residents resolve legal issues stemming from debt collection lawsuits, credit reporting problems, unfair banking practices, and more. We effectively combine our direct legal services with cutting-edge impact litigation, policy advocacy, coalition-building, and applied research to secure vital policy changes to curb the extraction of wealth from New York City's low-income neighborhoods and neighborhoods of color.

11. Founded in 1990, New York Legal Assistance Group (NYLAG) is a leading civil legal services organization that combats economic, racial, and social injustice by advocating for New Yorkers experiencing poverty or in crisis. Our work includes comprehensive, free civil legal services, financial empowerment, impact litigation, policy advocacy, and community partnerships. NYLAG exists because wealth should not determine who has access to justice. We aim to disrupt systemic racism by serving individuals and families whose legal and financial crises are often rooted in racial inequality. NYLAG goes to where the need is, providing services in more than 150 community sites in New York and in our Mobile Legal Help Center. NYLAG's Consumer Protection Unit Project (CPU) represents and advises consumer debtors in debt collection lawsuits, and assists them in challenging abusive debt collection practices, combating identity theft, and repairing credit. As part of a program conducted in partnership with the Unified Court System, CPU also supervises the Volunteer Lawyer for a Day - Consumer Credit Project in Bronx County, Queens County, and Richmond County Civil Courts, through which NYLAG and volunteer attorneys assist and represent thousands of pro se consumer debtors at court appearances each year.

12. Northern Manhattan Improvement Corporation (NMIC) is a community-based not-for-profit organization founded in 1979, which has grown into a leading multi-service agency with over 120 staff serving New York City, with a focus on upper Manhattan and the Bronx. Our mission is to serve as a catalyst for positive change in the lives of the people in our community, on their paths to secure and prosperous futures. Integration is the cornerstone of NMIC's programs, and our staff can identify and address a broad array of immediate needs through comprehensive crisis intervention services. With their crises resolved, clients move seamlessly to capacity building services through our holistic programs designed to transition individuals and families to self-sufficiency. Our Legal Services, Social Services, and Weatherization programs meet community members' basic needs including housing, income, nutrition, financial empowerment, and health. As a NYC Financial

Empowerment Center, NMIC offers debt and credit counseling, and works with our legal department to identify clients in need of legal assistance. Our legal program offers advocacy and legal counsel for New Yorkers with consumer debt issues, including active consumer debt court cases, judgements, frozen bank accounts, and garnishment of wages.

13. Queens Volunteer Lawyers Project, Inc. (QVLP) was created by the Queens County Bar Association to continue its history of community service provided since the association's inception in 1876.  For over 30 years QVLP has provided free legal assistance to residents of Queens County, New York on a wide range of civil legal issues, focusing on the vast majority of the low-income community who do not have the resources to retain paid legal counsel. We provide advice and representation to more than 2,500 Queens residents each year.  Since 2008 QVLP through its CLARO-Queens Consumer Debt Clinic, has provided legal advice and representation to over twelve-thousand (12,000) low-income Queens, New York residents sued in debt collection lawsuits.

14. TakeRoot Justice, formerly the Community Development Project, was founded in 2001 as part of the Urban Justice Center. TakeRoot Justice became an independent organization in July of 2019. TakeRoot Justice provides legal, participatory research, and policy support to strengthen the work of grassroots and community-based groups in New York City to dismantle racial, economic and social oppression. TakeRoot Justice's partners take the lead in determining the priorities and goals for our work, and advance our understanding of justice. We believe in a theory of change where short-term and individual successes help build the capacity and power of our partners, who in turn can have longer-term impact on policies, laws and systems that affect their communities. TakeRoot Justice's Consumer Practice provides legal counsel and representations to low-income New Yorkers in a variety of consumer issues, such as consumer debts lawsuits, credit reporting, residential rent arrears cases, and identity thefts. TakeRoot Justice also partners with community-based organizations in legislative and regulatory advocacy campaigns to support positive and sustainable change in the consumer landscape.

15. The UC Berkeley Center for Consumer Law and Economic Justice is a research and advocacy center housed at UC Berkeley School of Law. Through participation as amicus in major cases around the state and throughout the nation, the Center seeks to develop and enhance protections for consumers

and to foster economic justice. In particular, the Center has worked to safeguard consumers' fundamental rights and financial well-being in matters of debt collection.

16. The Western New York Law Center (the "Law Center") is a nonprofit legal services provider in Buffalo, New York. Founded in 1996, the Law Center exists to promote human and civil rights with an overarching vision of economic justice for all. To further that mission, the Law Center works in a variety of areas including housing, consumer debt, public benefits, and combating discrimination. The Law Center's work in these areas includes providing legal services to low-income and underserved Western New Yorkers through direct representation, impact litigation, and the administration of volunteer attorney programs including limited-scope representation clinics and attorney-of-the-day programs; public consciousness-raising and lobbying campaigns; and providing technical services and advice to other nonprofit legal services organizations. The Law Center provides direct legal services benefiting over 4,000 Western New Yorkers annually. The Law Center administers the CLARO-Buffalo consumer debt law clinic, which since 2012 has helped thousands of Western New Yorkers resolve millions of dollars in alleged consumer debts, primarily by helping consumers challenging consumer debt judgments or assert defenses to consumer debt lawsuits. In 2021 the program helped 865 consumers avoid $1.7 million in judgments and obtain $16,700 in direct monetary benefits such as refunds.