# 22-1345

## UNITED STATES COURT OF APPEALS

### For the

### SECOND CIRCUIT

_____

UPSOLVE, INC.,
REVEREND JOHN UDO-OKUN,

*Plaintiffs-Appellees*,

Vs.

LETITIA JAMES, in her official capacity
As Attorney General Of New York,

*Defendant-Appellant*

_____

ON THE APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

====================================================

**BRIEF OF AMICUS CURIAE TATIANA NERONI, EXPERT IN
CONSUMER LAW, CONSTITUTIONAL ISSUES IN ATTORNEY REGULATION
AND CRIMINAL LAW OF THE STATE OF NEW YORK
IN SUPPORT OF APPELLEES UPSOLVE, INC.,
REVEREND UDO-OKUN**

Tatiana Neroni,
240 Harvest Moon Drive
Georgetown, SC
(843) 240-7745

Amicus Curiae Pro Se

1

## Table of Contents

Page No.

TABLE OF AUTHORITIES ..................................................................6

IDENTITY AND INTERESTS OF AMICUS CURIAE ......................................15

I.   An expert in consumer debt law....................................................15

II.  An immigrant and non-native speaker of English and a holder of an MA in teaching English as a foreign language while Appellees alleged disparate impact of debt collection abuse litigation upon language-disabled populations..............19

III.   A survivor of the USSR mind-control regime who have suffered the loss of family members to that regime ............................................................20

IV.   The author, as a then-civil rights attorney for a client, of a constitutional challenge in federal court of New York's "practice of law" and UPL regulatory regime in 2013-2015 ...........................................................................21

V. An expert in comparative constitutional issues in attorney regulation in the U.S., New York, Great Britain and countries of the former Soviet block, including Russia, an opinion leader in international debates against instilling ABA attorney monopoly model in other countries ..............................................22

V. A victim of similarly unclear UPL laws in South Carolina preventing this Amicus from gainful employment in occupations not requiring a law license, including occupations badly needed to resolve various human rights crises, such as interpreting for Russian-speaking refugees from this Amicus' native Ukraine. A competent potential provider of much-needed legal, financial and interpretive services who is blocked from provision of such services, including to indigent

and disabled populations, by unconstitutional regulation and by issues unrelated to either this Amicus' competence or her integrity in relation to her clients .......23

VI.   A New York State taxpayer .........................................................................28

VII.   The daughter of a civil rights attorney forced by Russia to seek political asylum in Europe because of his professional activities, while his daughter, also a civil rights attorney, has suffered a similar fate in New York, United States of America.  Political mind-control of attorneys by the government in neither cases is a good reputation builder for the respective countries......................................29

VIII.  An expert in constitutional issues in criminal laws of the State of New York and specifically in UPL laws.........................................................................29

ARGUMENT .................................................................................................31

Point I.  New York's UPL laws are unenforceable against Appellees as a matter of due process of law whether Appellant's regulatory regime is constitutional or not based on Johnson v. Avery, 393 US 483 (1969). .....................................................31

Point II.  New York regulates its market of "practice of law" in violation of the Sherman Act, and such a regulation is not in public interest, which irredeemably taints New York's UPL prosecutions .....................................................................32

Point III.  New York's UPL laws are unenforceable against Appellees since they violate multiple constitutional requirements to criminal proceedings....................36

A.  New York UPL laws are unenforceable against consumers, as they violate their fundamental due process right to self-determination and have religious undertone, in violation of the 1st Amendment's Establishment Clause................37

B.  New York's UPL laws are unenforceable against authors of Appellees' training guide as expert testimony, publishing legal scholarship and teaching law do not require a law license in New York and may not be prosecuted for UPL..39

C.  New York's UPL laws are unenforceable against corporate Appellee Upsolve, Inc., as Appellee Upsolve, Inc. will be inevitably denied in a possible criminal UPL prosecution its 6th Amendment right to pro se representation.......42

D.  New York does not have a public interest in criminal prosecution by private interest groups ........................................................................................44

E.  Appellant did not establish the public need for regulation that New York conducts allegedly for 125 years, and abuse of the law, even for a significant period of time, does not become the law ..............................................................44

F.  New York cannot constitutionally establish jurisdiction in criminal UPL proceedings against Appellees, or prove its case beyond the reasonable doubt for lack of clear statutory definitions of what is the prohibited criminal act ............49

G.  New York UPL laws are unenforceable as against all Appellees as they deny to Appellees their federal due process right to impartial judicial review and to an impartial prosecutor ..............................................................................50

H.  New York's felony UPL statute is unenforceable against Appellees since New York state law made every judge disqualified in felonies as a counsel to the party plaintiff, the People......................................................................51

CONCLUSION ....................................................................................54

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS..........55

# TABLE OF AUTHORITIES

**Court cases**

American Communications Assn. v. Douds,
  339 US 382 (1950).................................................................... 34

Aptheker v. Secretary of State,
  378 US 500 (1964).................................................................... 41

Assoc. of American Railroads v. US DOT,
  821 F. 3d 19 (DC Cir., 2016), *reversed after imposing the remedy of severance of offending clause*, Association of American Railroads v. US DOT, 896 F. 3d 539 (D.C. Cir., 2018).................................................................... 30

Bailey v. State of Alabama,
  219 U.S. 219, 239 (1911)........................................................... 39

Bell v. Burson,
  402 US 535 (1971).................................................................... 41

Berger v United States,
  295 US 78 (1935)..................................................................... 46

Berman v City of New York,
  25 N.Y.3d 684, 37 N.E.3d 82, 16 N.Y.S.3d 25 (2015). ................. 42

Brazee v. Michigan,
  241 US 340 (1916).................................................................... 40

California Retail Liquor Dealers Assn. v. Midcal Aluminum, Inc.,
  445 U.S. 97 (1980)................................................................... 28

Caperton v. AT Massey Coal Co., Inc.,
  556 US 868 (2009);.................................................................. 46

Caprara v. Chrysler Corp.,
  52 NY 2d 114 (1981) ............................................................. 36

Carrington v. Rash,
  380 US 89 (1965)................................................................... 41

Cleveland Bd. of Ed. v. LaFleur,
  414 US 632 (1974)................................................................. 41

Cruzan v. Director, Mo. Dept. of Health,
  497 US 261 (1990)................................................................. 33

Department of Agriculture v. Murry,
  413 US 508 (1973)................................................................. 41

Doyle v. Continental Ins. Co.,
  94 US 535 (1877)................................................................... 39

Dugan v. Ohio,
  277 U.S. 61 (1928)................................................................. 46

Duncan & Hill Realty, Inc. v. Department of State,
  62 A.D.2d 690 (4th Dept. 1976), *app dismissed*, 45 N.Y.2d 821, 381 N.E.2d 608,
  409 N.Y.S.2d 210 (4th Dept., 1978)............................................29, 43

Faretta v. California,
  422 US 806 (1975)................................................................. 37

Francis v. Franklin,
  471 US 307 (1985)................................................................. 41

Frost & Frost Trucking Co. v. R. R. Comm.,
271 U. S. 583, 593-599 (1926) ........................................................ 39

Frost v. Railroad Commission,
271 U.S. 583, 593-594 (1925) ........................................................ 39

Grayned v. City of Rockford,
408 U.S. 104 (1972) ........................................................ 35

Griswold v. Connecticut,
381 US 479 (1965) ........................................................ 34

Hanover Ins. Co. v. Harding,
272 U. S. 494 (1926) ........................................................ 39

Hazelwood School Dist. v. Kuhlmeier,
484 US 260 (1988) ........................................................ 34

Heiner v. Donnan,
285 U. S. 312 (1932) ........................................................ 41

Hill v. Colorado,
530 US 703 (2000) ........................................................ 34

Home Ins. Co. v. Morse,
87 US 445 (1874) ........................................................ 39

Hortonville Joint School District No. 1 v. Hortonville Educational Ass'n,
426 U.S. 482 (1976) ........................................................ 46

In re Murchison,
349 U.S. 133, 137 (1955) ........................................................ 46

In re Winship,
   397 U.S. 358 (1970)......................................................................... 45

Johnson v. Avery,
   393 US 483 (1969)........................................................ 26, 27, 30, 32

Jordan v The City of New London,
   225 F.3d 645 (2nd Cir., 2000.) ........................................................ 44

Kennedy v. Mendoza-Martinez,
   372 US 144 (1963)........................................................................... 32

Marshall v. Jerrico, Inc.,
   446 U.S. 238 (1980);........................................................................ 46

Martin v. Struthers,
   319 U. S. 141 (1943)........................................................................ 34

Matter of New York County Lawyers' Ass'n v Dacey,
   21 NY 2d 694 (1967) ....................................................................... 36

Matter of Sharon B.,
   72 N.Y.2d 394, 398, 534 N.Y.S.2d 124, 125 (1988) ....................38, 43

Neroni v Zayas,
   3:13-cv-0127 LEK/DEP (NDNY, 2014) ........................................... 43

North Carolina Board of Dental Examiners v FTC,
   135 S.Ct. 1101 (2015).................................................................28, 43, 44

People v. DeLeyden,
   10 NY 2d 293 (1961) ....................................................................... 44

People v. Soddano,
  655 NE 2d 161 (1995)........................................................................ 43

Peters v Neroni,
  1:13-cv-180 NAM/DEP (NDNY, 2013), *affirmed*, 13-4772-cv (2nd Cir., 2015),
  *on remand*, Matter of Neroni, 135 AD 3d 97 (4th Dept. 2015), *appeal dismissed*,
  Matter of Neroni, 27 NY 3d 1146 (2016), *cert. denied sub nom* Tatiana Neroni v.
  Grievance Committee of Fifth Judicial Dist. of New York,  137 S. Ct. 818
  (2017). .........................................................................................19, 22

Price v. NYCHA,
  706 NE 2d 1167 (1998)...................................................................... 36

Sandstrom v. Montana,
  442 US 510 (1979)............................................................................ 41

Skinner v. Oklahoma ex rel. Williamson,
  316 US 535 (1942)............................................................................ 41

Soares v State of New York,
  2020 NY Slip Op 20068, 121 N.Y.S.2d 790, 68 Misc. 3d 249 (Sup. Ct., Albany
  County, 2020). ................................................................................. 43

Speiser v. Randall,
  357 U.S. 513, 526 (1958).................................................................. 39

Sperry v. Florida ex rel. Florida Bar,
  373 US 379 (1963)............................................................................ 36

Stanley v. Georgia,
  394 US 557 (1969)............................................................................ 34

Stanley v. Illinois,
     405 US 645 (1972).................................................................... 41


Tot v. United States,
     319 US 463 (1943).................................................................... 41


Tumey v. Ohio,
     273 US 510 (1927).................................................................... 46


U.S. v. Chicago, M., St. P. & P. Railway Co.,
     282 U.S. 311, 328-329 (1931)................................................... 39


United States v. Balsys,
     524 US 666 (1998).................................................................... 34


United States v. Halper,
     490 US 435 (1989).................................................................... 32


United States v. Reidel,
     402 US 351 (1971).................................................................... 34


United States v. Topco Associates, Inc.,
     405 US 596 (1972).................................................................... 29


Vernonia School Dist. 47J v. Acton,
     515 US 646 (1995).................................................................... 33


Vlandis v. Kline,
     412 US 441 (1973).................................................................... 41


Ward v. Village of Monroeville,
     409 U.S. 57 (1972).................................................................... 46

Western Union Tel. Co. v. Foster,
   247 U. S. 105, 114 (1918) ................................................................. 39

Western Union Tel. Co. v. Kansas,
   216 U. S. 1 (1910) ............................................................................ 39

Whitney v California,
   274 U. S. 357, 375-376 (1927) ......................................................... 34

Williams v. Pennsylvania,
   136 S. Ct. 1899 (2016) ................................................................46, 48

Wolkenstein v. Reville,
   694 F. 2d 35 (2nd Cir., 1982); ........................................................ 46

Yick Wo v. Hopkins,
   118 US 356 (1886) ........................................................................... 27

**Statutes**

N.Y. CPL §190.25(6) ............................................................... 47, 48

N.Y. CPLR § 306-d ....................................................................27

N.Y. CPLR § 321(a) ................................................................... 37

N.Y. JUD. LAW § 485-a ..........................................................46, 47

N.Y. JUD. LAW § 53 .................................................................. 28

N.Y. JUD. LAW § 90 .................................................................. 28

N.Y. PEN. LAW § 20.20 ..........................................................37, 38

The Consumer Credit Fairness Act

of 2021……………………………………………………………….16, 19, 30, 34

**Other Authorities**

Appellant's press-release of January 9, 2015 "A.G. Schneiderman Obtains
Settlement From Major Debt Buyer Who Filed Thousands Of Time-Barred Debt
Collection Actions"................................................................................30

Avrom Sherr, Richard Moorehead, *Contesting professionalism: legal aid and
nonlawyers in England and Wales*, Law and Society Review, 2003 ...................41

David Vladeck, *In Re Arons: The Plight of the 'Unrich' in Obtaining Legal
Services*, Georgetown University Law Center, 31 Jan 2005 ...............................42

Deborah L. Rhode and Lucy Buford Ricca, *Protecting the Profession or the
Public? Rethinking Unauthorized-Practice Enforcement*, 82 Fordham L. Rev.
2587 (2014) .......................................................................................... 42

*FTC Staff Guidance on Active Supervision of State Regulatory Boards Controlled
by Market Participants" of October 2015*, p. 7 ................................................ 28

NY Senate's press release of May 25, 2021 on approval by NY Governor of the
Consumer Credit Fairness Act ...................................................................12, 31

Constitutional Provisions

U.S. Const., Amend. 1 ...............................................................34, 35, 43
U.S. Const., Amend. 1, Establishment Clause...........................................25, 32, 33
U.S. Const., Amend. 14, Due Process Clause..............26, 30, 32, 34, 37, 45, 46, 48
U.S. Const., Amend. 14, Equal Protection Clause............................................. 38
U.S. Const., Amend. 4, Privacy and Security in Individual Persons' Clause....34, 35
U.S. Const., Amend. 4, Unreasonable Search Clause........................................... 35

U.S. Const., Amend. 5, Notice Clause ................................................................ 35

U.S. Const., Amend. 5, Self-Incrimination Clause .........................................34, 36

U.S. Const., Amend. 5, The Grand Jury Clause .............................................48, 49

U.S. Const., Amend. 6, Right to Counsel Clause ......................................37, 38, 39

## IDENTITY AND INTERESTS OF AMICUS CURIAE

The interest of the proposed Amicus Curiae in this case is multifaceted.

### I.   An expert in consumer debt law

The Amicus has helped multiple clients in an under-served poor rural area in the State of New York (Delaware-Otsego-Chenango Counties) for 16 years, first as a legal assistant to a trial lawyer, and for several years as an attorney in her own right, on the trial and appellate level, and has routinely had people coming to her office who already defaulted, with a need to reopen the default. Many of such defaulting clients misunderstood the meaning of the word "appear" in order to avoid default, and physically came to the courthouse within the 20 days of service of the lawsuit, only to be told by the court personnel, that (1) this is not the way to "appear", but (2) the court personnel may not give them legal advice as to how exactly they need to appear, there was no time or money to hire a private counsel on a rush, and people defaulted. The next problem that I see in New York's consumer debt collection law is CPLR 3215(a) allowing plaintiffs after default of defendants to enter judgments involving complaints listing liquidated damages (a "sum certain") to enter a judgment for that "sum certain" bypassing a judge, through a nonlawyer clerk who is supposed to assess legal sufficiency of evidence submitted with the default judgment, CPLR 3215(f). Judging by reports of human

rights groups, the overwhelming number of default judgments that have caused the crisis Appellees are trying to help indigent and disabled New Yorkers resolve are clerk-entered judgments where no judge was even near assessing the evidence. New York should stop this practice which deprives people of judicial review and undermines their trust in the New York justice system. Additionally, a large proportion of default judgments is on alleged credit card debt. For some reason inexplicable to me as a law expert and consumer advocate, New York and the United States, for decades, prefer to exacerbate the consumer debt collection abuse crisis that could be easily resolved, as multiple roundtables, studies and experts told New York and other states already. All New York had to do is to turn the key "affirmative defenses" of standing, statute of limitations, mitigation of damages, pledge of lack of imposition of punitive damages/penalties for breach of contract into the prima facie case for the plaintiffs. Notably, even Appellant, armed with enormous taxpayer-funded legal resources, has missed (as she claimed in her brief) a standing issue in the court below, but claimed that since standing is jurisdictional and non-waiveable issue, she can raise it for the first time on appeal. Appellees' clients in New York are not so lucky. Before the "compromise bill" (as one the most proliferate New York's debt collector has called it in New York Senate's

press-release[1] of Consumer Credit Fairness Act of 2021 effective in New York since April of 2022, they had to raise standing during the shotgun 20 days after they were served with the lawsuit, or "waive" the issue forever. After the compromise bill is enacted, consumers were given a token right to raise this issue twice, in the Answer and on a motion for a leave to amend the Answer, but at the same time the affirmative defense of standing was gutted in the bill completely when New York created an unconstitutional irrebuttable presumption that the original lender now is "deemed" to be the person who is the most successful in harassing the last payment out of the consumer, no matter how many times the account changed hands, in what way, or whether "the account" exists or was forged – which happens in such cases a lot. This amicus is also simply stunned in New York's pretense it does not notice, with all taxpayer funded legal resources, that the alleged credit card debt industry, specifically, is gouging the poor in contravention of the most basic concepts of contract theory – that there may not be punitive damages for breach of contract, and that the nonbreaching party must

---

[1] NY Senate's press release of May 25, 2021 on approval by NY Governor of the Consumer Credit Fairness Act, available at:
https://www.nysenate.gov/newsroom/press-releases/kevin-thomas/senate-approves-consumer-credit-fairness-act#:~:text=%28Albany%2C%20NY%29%20%E2%80%94%20Senate%20Majority%20Leader%20Andrea%20Stewart-Cousins,Yorkers%20from%20unscrupulous%20and%20predatory%20debt%20collection%20practices., last visited on 1/10/2023

mitigate, not multiply its damages before coming to court. Why this Amicus
believes that making the above four points (standing, statute of limitations,
mitigation of damages, a pledge that no penalties were computed in the "sum
certain" for breach of contract) a mandatory part of plaintiffs' prima facie case will
resolve the crisis – as well as through vigorous prosecution in criminal court for
fraud and fraud upon the court and in disciplinary proceedings against attorneys for
debt collectors which New York refuses to do – is because the alleged credit card
debt collection industry is based on (1) luring the poor, same as with the mortgage
crisis, into obtaining credit cards that they cannot afford, (2) waiting until they
miss a payment, and, after that happens, instead of, as contract theory requires,
stopping the card in order to mitigate damages, allowing the consumer to proceed
using the card while applying "penalty" fees at the rate that constitutes usury in
New York. The United States helps – the debt collectors, not consumers – in
charging those usury penalty rates by a special federal statute allowing to do just
that. Thus, where in all other contract types, plaintiffs must mitigate damages and
must not charge penalties for breach of contract, when the poor and consumer debt
is involved, the opposite is true. This expert's understanding, based on her
financial education (a Master's degree in management, with specialization in
financial management), is that the industry depends on the judge-less fast
production of default judgments after buying up debt for pennies on the dollar as

the fast tool producing super-profits (Encore reported 147% return on investment into buying up consumer debt according to Human Rights Watch). The "unnoticed" elephant in the room, then, is that New York, very possibly, benefits from tax contributions of debt collectors – as well as direct contributions to various political election campaigns – and that is why, for decades, criminal and disciplinary prosecution of identified robosigners and perpetrators of filing fraudulent affidavits of sewer service and of false affidavits of merit required to obtain judge-less default judgments is nonexistent.

II.   An immigrant and non-native speaker of English and a holder of an MA in teaching English as a foreign language while Appellees alleged disparate impact of debt collection abuse litigation upon language-disabled populations

This Amicus' next interest is as an immigrant and not a native speaker of English, as well as a holder of a Masters' degree in teaching English as a foreign language. This Amicus knows first hand what it means to speak English with an accent in America, and is blessed with the privilege of having had an advance education in teaching English as a foreign language and an extensive simultaneous interpreter experience before she arrived to the United States, which helped her tremendously to adjust to living in her new country. Moreover, from day one on the American soil this Amicus was supported in her legal needs by an attorney husband, a prominent trial lawyer in his area. Many of Appellees' clients, racial minorities and immigrants not knowing the English language, do not have such a combined

blessing. It is not enough, as New York does with its newly enacted Consumer Credit Fairness Act, to require plaintiffs in debt collection lawsuits to give people notices in Spanish (and, somehow not in Russian, Ukranian, Chinese, Vietnamese and a number of other languages spoken by immigrants). New York does not provide native-language-speaking attorneys to these consumers, nor any attorneys whatsoever, nor interpreters, nor does it allow to file answers in their native languages. Thus, Appellees are providing an inestimable benefit at the initial stages of litigation to preserve access to justice to individuals with no language ability allowing them to secure such access, and, as the proposed brief suggests, there is binding constitutional precedent preventing New York from punishing them for it.

III.     A survivor of the USSR mind-control regime who have suffered the loss of family members to that regime

This Amicus' next interest is Appellant's statement that the goal of the State of New York in its regulation of the "practice of law" for 125 years is control of thoughts of regulated attorneys (how legal advice is "generated", or "formulated", according to Appellant). As a person who has been born and raised in the USSR where mind control was required state ideology, to which this Amicus lost family members in the GULAG, this Amicus knows full well what kind of slippery slope exactly such a statement is. As a person who was actually given a law license in

the state of New York in 2009 which was taken in 2015, specifically based on

Amicus' criticism of persistent abuses of a misogynistic judge in motions to recuse

in violation of the sine qua non of New York's "do not criticize judges" attorney

regulation taboo, this Amicus was never told by the State of New York that the

public benefit of a law license was given to Amicus, on a condition that she

submits her thought processes to government control, and then taken away from

Amicus because she wouldn't do that.  Nor, as far as this Amicus polled New York

attorneys she knows, was that condition precedent to holding a New York law

license presented to any other New York attorney.

IV. The author, as a then-civil rights attorney for a client, of a constitutional
challenge in federal court of New York's "practice of law" and UPL regulatory
regime in 2013-2015

The next interest of this Amicus is constitutional issues in attorney regulation in

the State of New York.  As a civil rights attorney, this Amicus has launched a

challenge to unconstitutionality of the "practice of law" and UPL regulation in

2014 in the U.S. District Court for the Northern District of New York in (Frederick

J.) Neroni v Zayas, 3:13-cv-127.  The challenge was comprehensive, Appellant's

office opposed it and threatened this Amicus that her law license will be taken, "or

worse", if she does not stop prosecuting the case, because, as it was put to this

Amicus by the Assistant NY AG privately, while she was right on the law, she

wants too much of a change too quickly, and "we will not allow it". This Amicus

did not stop, and her law license was, indeed, taken – and threats of physical harm forced her to leave the State of New York. This Amicus, thus, is a witness of how exactly Appellant "wins" challenges to UPL and "practice of law' regulatory regime which has little, if anything, to do with the law.

V. An expert in comparative constitutional issues in attorney regulation in the U.S., New York, Great Britain and countries of the former Soviet block, including Russia, an opinion leader in international debates against instilling ABA attorney monopoly model in other countries

This Amicus is also an independent legal scholar in comparative constitutional law on the issue of attorney regulation in the U.S., including the State of New York, and in other countries, such as the U.K. and especially her native Russia and the former Soviet republics where the ABA is attempting to instill its model of attorney monopoly that has already caused the ever-widening access to justice crisis in the United States and the State of New York. This Amicus independently publishes law review articles in her native Russian and in English on her Academia.edu account analyzing the flaws of such regulation and how it undermines democracy in the United States and causes human rights abuses both on attorney and on consumer side. This Amicus' scholarship has large reading audience from around the world, as the administrative side of her account allows to see, including from faculty members of law schools from around the world, including from the United States. This Amicus has been, for years, involved in

educational efforts with legal community leaders in her native Russia and is

recognized by Russian legal community, including citations of this Amicus' law

review articles by Russian law professors, for her efforts in trying to prevent the

disaster of American-type attorney monopoly that is already hurting consumers in

the United States to be instilled in Russia, too.

V.      A victim of similarly unclear UPL laws in South Carolina preventing this Amicus from gainful employment in occupations not requiring a law license, including occupations badly needed to resolve various human rights crises, such as interpreting for Russian-speaking refugees from this Amicus' native Ukraine.  A competent potential provider of much-needed legal, financial and interpretive services who is blocked from provision of such services, including to indigent and disabled populations, by unconstitutional regulation and by  issues unrelated to either this Amicus' competence or her integrity in relation to her clients

This Amicus' next interest in this case is that she is herself a victim of similar-to-

New York vague and overbroad UPL laws of the State of South Carolina where

she currently resides.  Based on New York state suspension summarily imposed

upon this Amicus for 2 years in 2015 without a right for automatic reinstatement in

2017 for criticism in motions to recuse on behalf of pro bono clients of abuse of a

biased and misogynistic judge who New York refused to rein in[2], South Carolina,

---

[2] *See* <u>Peters v Neroni</u>, 1:13-cv-180 NAM/DEP (NDNY, 2013), *affirmed*, 13-4772-cv (2nd Cir., 2015), *on remand*, <u>Matter of Neroni</u>, 135 AD 3d 97 (4th Dept. 2015), *appeal dismissed*, <u>Matter of Neroni</u>, 27 NY 3d 1146 (2016), *cert. denied sub nom* <u>Tatiana Neroni v. Grievance Committee of Fifth Judicial Dist. of New York</u>,  137 S. Ct. 818 (2017).

in the absence of a clear statutory definition as to what it is controlling when it is controlling the "practice of law" and UPL (same as in New York), prohibits "just in case" to this Amicus so much as to work as a secretary, sweep floors, deliver packages or mow the lawn for a lawyers' office, for fear that the public will confuse a secretary, a courier, a cleaner or a lawn mower in the law office with a lawyer. Punishment for UPL, a felony, in South Carolina is 5 years in prison. This Amicus wonders whether the regulators in both states realize that in their zeal to banish heresy among lawyers they make themselves into a laughingstock with the public and the world where even the Supreme Court of the State of South Carolina or the Attorney General in the State of New York are so unsure what exactly is it that lawyers do and that they protect through regulation of their own market that they need to go out on a limb and prosecute conversations (in Appellees' case) and floor sweeping in South Carolina case as the felony "unauthorized practice of law". This Amicus is aware of the dire need of specialists with her knowledge, training and skill set of consumer debt, Family Court, criminal defense and civil rights litigation trial and appellate lawyer for the poor and under-served populations both in New York and in South Carolina. This Amicus does not believe that this kind of hunt and banishment for attorneys who for their entire career were selflessly serving the poor, but who (naturally) sinned, as good civil rights attorneys *should*, by engaging in the heresy of refusing to submit to the mind-controlling dogmas of

23

the government or the lawyers' guild regulating its own market in both the state of New York and the State of South Carolina, unsupervised, in violation of the federal Sherman Act, is anywhere near to benefiting the public interest. Nor does this Amicus believe, nor would it be reasonable for anybody to believe, that Appellees' services to the poor who would otherwise get no help in a dire situation *caused* by licensed attorneys for debt collectors who New York do not want to rein in, the help that this Amicus is qualified to provide with her three advanced degree in teaching English, financial management, law and her trial and appellate experience, but is forbidden to provide to the poor in both states for no other reason than the anathema of the guild, are dangerous to the public simply because Appellees did not subject themselves to such dogmatic anticompetitive and unlawful mind-control.

Same as Appellees here trying to avoid a criminal prosecution for unclear UPL laws, the Amicus in South Carolina is steering clear even of providing services based on her first degree, as an interpreter, services which are badly needed now in South Carolina and across the country remotely to the flood of refugees from this Amicus' father's native Ukraine assaulted by this Amicus' native Russia. This Amicus holds a degree estimated by a U.S. education certification services as a BA and an MA equivalent from the Moscow Linguistic University, a school accredited by the American Translators' Association. Moreover, she has had years of

24

experience in consecutive and simultaneous interpretation, including in the area of law. Her skills are marketable and highly valuable, both as a matter of monetary compensation and as matter of human need. This Amicus, nevertheless, steers clear of providing such services, even to Russian-speaking refugees from the Ukraine in honor of her late Ukranian father's memory, because in South Carolina, based on unclear UPL laws, similar to New York unclear UPL laws, this Amicus may be accused in interpreting "too much" and providing legal advice under the guise of language interpretation, so she self-censures, chills her speech and her much-needed services, to the detriment of potential clients and herself. Nor is this Amicus trying to use her second graduate degree, her MA in financial management, in which sphere this Amicus also has valuable experience in business management, including international business management, for a similar fear of being accused of "saying too much" and giving legal and not financial advice. It is simply wrong to criminally, or in any other way, punish people who just want to *help* other people, both for compensation and, and especially, for free, like Appellant is trying to do to Appellees, and as South Carolina threatens to do to this Amicus if she tries to share with people her much needed skills, knowledge and experience in several much-under-served areas of life – translation, financial advice and law.

This Amicus doubts that many attorneys in the United States will be able to draft briefs like the present one in a language which is not their native language. This Amicus' native language is Russian. As this brief demonstrates, there is nothing wrong with her competence as a consumer debt lawyer, a criminal defense lawyer, or a civil rights lawyer. The suspension decision this Amicus has cited[3] makes no indication that this Amicus brought harm to her clients, or that she is not a competent lawyer. Over the 7+ years of her suspension this Amicus has received a flood of requests from her former clients who trust her skills and competence and were in dire need of help, help that this Amicus was qualified to provide, was willing to provide, but for UPL laws, and that they could not receive anywhere else in their poor under-served area. This Amicus had to turn these people, who trusted her, down and deny them help because the government forbids her to help people.

Criminal laws are designed to prohibit doing bad things, not good things. Appellant's press-releases announcing that she has caught a yet another person practicing "without a law license" never mentions that consumers were wronged, that they suffered any harm. It is simply a power issue, and it is wrong to use

---

[3] Peters v Neroni, 1:13-cv-180 NAM/DEP (NDNY, 2013), *affirmed*, 13-4772-cv (2nd Cir., 2015), *on remand*, Matter of Neroni, 135 AD 3d 97 (4th Dept. 2015), *appeal dismissed*, Matter of Neroni, 27 NY 3d 1146 (2016), *cert. denied sub nom* Tatiana Neroni v. Grievance Committee of Fifth Judicial Dist. of New York, 137 S. Ct. 818 (2017)..

criminal laws for this purpose. This Amicus' knowledge and skills, including trial and appellate litigation experience in state and federal courts did not disappear once the state pulled her law license because she tried to secure for her pro bono clients their federal due process constitutional right to impartial judicial review the only way New York allows it to do, through a formal motion to recuse. Yet, New York and other jurisdictions across the nation continue to waste this readily available human talent, and refuse to allow willing consumers to receive for free or buy (nothing wrong about that either) services of a willing qualified provider, whether that provider submits to the government's now announced mind-control through licensing or not. Similarly, here, Appellant vigorously wastes taxpayer money to unconscionably fight for her supposed right to reverse a preliminary injunction protecting consumers from a criminal prosecution for their personal choices of a provider to resolve their private disputes based on public laws, which is a complete nonsense. Which brings this Amicus to her next interest in this case.

VI.    A New York State taxpayer

This Amicus is a taxpayer in the State of New York, and has an interest in how Appellant and the State uses her money, especially that the State forbid her to earn more with her marketable and much needed skills. From what this Amicus sees in Appellant's brief, what Appellant does with this Amicus's money is wasting it on defending unconscionable, Orwellian, anticompetitive, unconstitutional mind-

control regulation while not doing her actual job in prosecuting criminal behavior of individuals perpetually causing the crisis Appellees are trying to help resolve.

VII. The daughter of a civil rights attorney forced by Russia to seek political asylum in Europe because of his professional activities, while his daughter, also a civil rights attorney, has suffered a similar fate in New York, United States of America. Political mind-control of attorneys by the government in neither cases is a good reputation builder for the respective countries.

This Amicus's next interest in this case is as a daughter of a Russian-Ukranian civil rights attorney Oleg A. Liamin, a political asylee from Russia in Europe who has suffered a recent untimely demise after Russia bombarded his native town of Kramatorsk, Urkaine. This Amicus' father was ousted out of Russia by the Russian government's threats to himself and to this Amicus' then-young brothers based on his professional activities as a civil rights attorney. It is a sad irony that his daughter, also a civil rights attorney, has suffered a similar fate in a country and a state that declare themselves to the world as beacons of democracy, human rights and supporters of the rule of law. The saddest part in both cases is the population of clients both this Amicus' father and this Amicus had to leave behind without help. That's why this Amicus is so keen on supporting Appellees who are filling such a gap, possibly, the gap that she is not allowed by New York to help fill.

VIII. An expert in constitutional issues in criminal laws of the State of New York and specifically in UPL laws

Last, but not least, this Amicus' interest in this case is that it involves enforcement of criminal laws of the State of New York, but she saw only one aspect of enforceability of such laws in parties' briefs, narrowly addressing violation of the 1st Amendment, while there are many more grounds of the lack of such enforceability allowing Appellees to succeed on the merits of the case. This Amicus was trained in criminal for 10 years by a prominent criminal defense attorney before she went to law school, and in law school, she was trained and mentored by the famous now late Professor Peter L. Preiser, the author for many decades of Westlaw Practice Commentaries on New York's Penal Law and Criminal Procedure Law. This Amicus has won many criminal cases in New York and, whether she has the mind-controlling approval (law license) of New York or not at this time, she continues her research scholarship in the field of criminal law and continues to be an expert in criminal law by her education, a Juris Doctor degree from the New York's Albany Law School, training and experience.

This Amicus' proposed Amicus brief is dedicated to additional constitutional grounds making New York UPL laws unenforceable as applied to Appellees.

This Amicus believes that her expertise as to New York's criminal laws and their application may provide another angle of review for this court to consider the issue whether Appellees are likely to succeed on the merits of this case, for purposes of

determination whether to affirm or reverse the lower courts' preliminary injunction appealed herein.

## ARGUMENT

This amicus supports all arguments of Appellees in their brief and agrees with Appellees that grounds upon which they are likely to succeed on the merits may be expanded, as shown below.

Point I.  New York's UPL laws are unenforceable against Appellees as a matter of due process of law whether Appellant's regulatory regime is constitutional or not based on Johnson v. Avery, 393 US 483 (1969).

Appellees alleged in their Complaint that the debt collection litigation abuse crisis that they are trying to help resolve disparately affects racial minorities and individuals with language problems.  The State conceded that issue in its recent enactment of The Consumer Credit Fairness Act of 2021, where it introduced new requirements of notifications by plaintiffs of defendants in Spanish, N.Y. CPLR § 306-d that has become effective on May 7, 2022 (the text of N.Y. CPLR § 306-d, which may be deemed as disparate-impact racial discrimination and discrimination based on national origin, constitutionally prohibited even if the situation is facially neutral, Disparate-impact actions of the government have been held to be unconstitutional, even if they are facially neutral, *see e.g.* Yick Wo v. Hopkins, 118 US 356 (1886).

Based on these factors, New York's UPL regime is unenforceable against

Appellees, their clients and creators of their training guide based on <u>Johnson v.</u>

<u>Avery</u>, 393 US 483 (1969) . regardless of whether the UPL regulatory regime is

constitutional or not.  Additionally, in <u>Johnson</u>. *supra*, the U.S. Supreme Court

protected constitutional rights of both the nonlawyer in question and of his clients,

not seeing a problem with 3rd party standing.

Point II.  New York regulates its market of "practice of law" in violation of the
Sherman Act, and such a regulation is not in public interest, which irredeemably
taints New York's UPL prosecutions

The U.S. Supreme Court has held that if the state chooses to delegate control of a

certain market to active market participants, the state must supervise decisions of

such market participants to ensure that they implement in their regulation of the

market state policies and not interests of their own private interest group, and that

such supervision should be active, bona fide, specific by an agency or an individual

who is not a market participant and not controlled by market participants, and who

possesses a veto power over the regulatory action of active market participants,

<u>North Carolina Board of Dental Examiners v FTC</u>, 135 S.Ct. 1101 (2015),

<u>California Retail Liquor Dealers Assn. v. Midcal Aluminum, Inc.</u>, 445 U.S. 97

(1980).  Moreover, the Federal Trade Commission has issued letter regulation

where it advised to its staff as to who to consider an "active market participant":

"A person who temporarily suspends her active participation in an occupation for the purpose of serving on a state board that regulates her former (and intended future) occupation will be considered to be an active market participant", *FTC Staff Guidance on Active Supervision of State Regulatory Boards Controlled by Market Participants" of October 2015*, p. 7.

New York does not comply with either North Carolina Board of Dental Examiners *supra,* California Retail Liquor Dealers Assn. *supra,* or FTC regulations based on North Carolina Board of Dental Examiners.

New York's promulgators of rules regarding admission and revocation of law licenses, judges of the N.Y. Court of Appeals and justices of the Appellate Divisions, N.Y. JUD. LAW §§ 53, 90, as well as public prosecutors enforcing UPL, together with judges presiding over such cases, are 100% unsupervised active market participants.

Moreover, while market-division agreements are forbidden by Sherman Act, United States v. Topco Associates, Inc., 405 US 596 (1972), New York, in an arbitrary application of its definition-less UPL rules, endorses such agreements, *see* Duncan & Hill Realty, Inc. v. Department of State, 62 A.D.2d 690 (4th Dept. 1976), *app dismissed*, 45 N.Y.2d 821, 381 N.E.2d 608, 409 N.Y.S.2d 210 (4th Dept., 1978) (the drafting by real estate brokers of "simple" real estate contracts is not UPL as long as the two trade associations, of attorneys and of realtors, approve the contract form).

Moreover, New York's has reciprocity market-division agreements with forty five (45) states mutually agreeing to admit each other's candidates on motion *without testing the out of state candidate's knowledge of New York State law* as long as the candidate graduated from a private trade association-approved law school and was approved by the out-of-state similarly unsupervised active market participants regulating their own markets[4]. Such a reciprocity has nothing to do with ensuring competence of out-of-state license candidates to protect New Yorkers, and New York misleads New Yorkers by not including into the public attorney registration information whether such attorney was admitted with or without licensing exam testing the attorney's knowledge of New York State laws.

It was also held by a federal court that regulation of individuals by their competitors violates due process, <u>Assoc. of American Railroads v. US DOT</u>, 821 F. 3d 19 (DC Cir., 2016), *reversed after imposing the remedy of severance of offending clause*, <u>Association of American Railroads v. US DOT</u>, 896 F. 3d 539 (D.C. Cir., 2018).

---

[4] New York Board of Bar Examiners' rules of admission on motion based on reciprocity agreements, available at: https://www.nybarexam.org/AOM/AdmissiononMotion.htm (last visited on 1/10/2023).

New York, thus, cannot maintain that it is regulating the market of the "practice of law" in public interest.

Moreover, New York's position based on <u>Johnson</u> *supra* is exacerbated by the fact that the current crisis that Appellees are trying to help resolve is *the handiwork of New York-licensed attorneys for debt collectors* who are 100% corporate. New York (including Appellant), after identifying the culprits and publicizing their serial crimes of fraud and fraud upon the court[5] not only refuses to bring to justice through available means of criminal fraud and fraud upon the court prosecutions and with the help of attorney discipline against attorneys participating in such falsifications, but openly parades "compromise bills"[6] in collaboration with such

---

[5] *See e.g.* Appellant's press-release as of January 9, 2015 "A.G. Schneiderman Obtains Settlement From Major Debt Buyer Who Filed Thousands Of Time-Barred Debt Collection Actions", available at: https://ag.ny.gov/press-release/2015/ag-schneiderman-obtains-settlement-major-debt-buyer-who-filed-thousands-time , last visited on 1/10/2023, stating, inter alia: "In addition to filing time-barred debt collection actions, Encore was also engaged in a practice that is often referred to as "robosigning": Encore employees signed hundreds of affidavits submitted in support of debt collection actions each day without reviewing the affidavits and without possessing personal knowledge, as alleged in the affidavits, about the claimed debts and the amounts owed. The settlement requires Encore to institute reforms to ensure that "robosigning" does not occur and to ensure that all sworn statements filed in debt collection actions are reviewed prior to execution."
[6] *See* NY Senate's press release of May 25, 2021 on approval by NY Governor of the Consumer Credit Fairness Act, available at:
https://www.nysenate.gov/newsroom/press-releases/kevin-thomas/senate-approves-consumer-credit-fairness-act#:~:text=%28Albany%2C%20NY%29%20%E2%80%94%20Senate%20Majority%20Leader%20Andrea%20Stewart-

identified criminals under pretense that undisclosed compromises with criminals will somehow help New Yorkers. Several seminal criminal prosecutions and disbarments could stop the crisis entirely while New York would not do that, instead enacting "compromises" with criminals who proudly report super-profits on gouging on the New York poor.

Thus, New York did not provide reasonable alternatives to Appellees' services to their clients, and Appellees are entitled to an as-applied <u>Johnson</u> injunction against Appellant's UPL prosecutions.

Point III. New York's UPL laws are unenforceable against Appellees since they violate multiple constitutional requirements to criminal proceedings

Appellant is authorized by New York law to prosecute UPL by criminal and "civil" prosecutions. This brief treats in its argument both "civil" and criminal prosecutions as criminal, based on <u>Kennedy v. Mendoza-Martinez</u>, 372 US 144 (1963); <u>United States v. Halper</u>, 490 US 435 (1989). Since "civil" UPL prosecutions in New York seek to either deter (enjoin) or punish (fine) conduct that is also a crime, "civil" UPL prosecutions are as punitive in nature as criminal

---

<u>Cousins,Yorkers%20from%20unscrupulous%20and%20predatory%20debt%20collection%20practices</u>., last visited on 1/10/2023. For some inexplicable reason, New York Senate decided to include into its official press-release a statement from the recently caught serial fraudster Encore: "Encore Capital Group said, "Encore Capital Group appreciates Senator Thomas for his *willingness to engage all stakeholders to work through varying interests to achieve a **compromise bill**.*"

prosecutions, and require New York's compliance with constitutional requirements to criminal procedures.

A. New York UPL laws are unenforceable against consumers, as they violate their fundamental due process right to self-determination and have religious undertone, in violation of the 1ˢᵗ Amendment's Establishment Clause

Appellant has refused to pledge non-prosecution of any of the categories of individuals protected by the preliminary injunction, and is appealing the injunction in its entirety, including the portion protecting consumers, thus seeking to reinstate her right to prosecute them criminally for solicitation, aiding and abetting in commission of a crime of UPL.

Accepting arguendo only without concession that Appellees' unlicensed advice to their client is harmful, Appellant, thus, seeks to criminally prosecute Appellees' clients for self-harm.

Yet, the government has no authority to prosecute individuals criminally for self-harm, unless that self-harm involves a type of fraud against third parties – insurance fraud, false reporting of a crime, self-harm to avoid military draft.

Other than that, the right of self-determination and steering your own destiny the way the individual wants it is considered a fundamental right, <u>Vernonia School Dist. 47J v. Acton</u>, 515 US 646 (1995) ("[t]raditionally at common law, and still today, unemancipated minors lack some of the most fundamental rights of self-

determination"), and an individual is allowed to determine his own destiny to the point of harming himself and even causing his own death, <u>Cruzan v. Director, Mo. Dept. of Health</u>, 497 US 261 (1990).

Punishing consumers of Appellees' unlicensed legal advice for solicitation and/or for aiding and abetting commission of UPL *against themselves* also likely violates the Establishment Clause of the 1st Amendment, as only religions have customs to punish individuals for the sin of self-harm, such as a person who has died by suicide was, historically, routinely denied a Christian burial in consecrated burial grounds.

Moreover, a legal advisor is a recognized fiduciary, a person who the consumer *chooses* to trust. Appellant's admission that the goal of her regulation of the "practice of law" is to control *thought processes* ("generation" or "formulation" of "legal counsel") of licensed individuals means that Appellant is seeking to punish Appellees' clients criminally for choosing to trust with advice about public laws applied to their private matters individuals whose minds are *not* controlled by the government (or, rather, by unsupervised competitors of Appellees). Yet, the U.S. Supreme Court has specifically indicated that the First Amendment forbids prosecutions for thought crimes, <u>United States v. Balsys</u>, 524 US 666 (1998), and systematically prohibited thought control in various settings, on 1st, 4th privacy and

security in people's person's clause, 5th Amendment Self-Incrimination clause. and

14th Amendment due process clause grounds.[7]

Moreover, this Amicus is unaware what kind of practical tools of mind control

New York had 125 years ago and now (other than threats to attorneys like herself),

but mind control presupposes first securing what is in that brain and brain-search,

which would be a violation of the 4th Amendment Security in one's person Clause

and of unreasonable search clause, as no court would ever give the government a

warrant to search people's minds.

In view of the above, UPL laws are unenforceable against Appellees' clients.

B. New York's UPL laws are unenforceable against authors of Appellees'
   training guide as expert testimony, publishing legal scholarship and teaching
   law do not require a law license in New York and may not be prosecuted for
   UPL

The U.S. Supreme Court has predicted in Grayned v. City of Rockford, 408 U.S.

104 (1972) that the lack of clear statutory definition of what is prohibited leads to

arbitrary enforcement by the executive and judicial branches, self-censure and

violations of the 1st Amendment in the undefined gray areas of conduct. This

---

[7] See e.g. Whitney v California, 274 U. S. 357, 375-376 (1927); Martin v.
Struthers, 319 U. S. 141 (1943); American Communications Assn. v. Douds, 339
US 382 (1950); Griswold v. Connecticut, 381 US 479 (1965); Stanley v. Georgia,
394 US 557 (1969); United States v. Reidel, 402 US 351 (1971); Hazelwood
School Dist. v. Kuhlmeier, 484 US 260 (1988); Hill v. Colorado, 530 US 703
(2000).

litigation is Exhibit 1 of such arbitrary regulation, as, in the lack of a clear statutory definition of what is the object of regulation, *required* by the 5th Amendment's Notice Clause when violation of such regulation is criminally prosecuted in UPL cases, Appellant offers her own, including downright Orwellian, interpretations of what it is that New York has been regulating for 125 years, and thus is allegedly entitled to continue to regulate in the same manner, and Appellees are forced by the lack of 5th Amendment notice to (1) self-censure in their protected conduct, and (2) to self-incriminate themselves in "conceding" that they are about to engage or are engaging in what Appellant deems to be a crime in order to protect their constitutional rights in a pre-emptive federal lawsuit, in a forced violation of their 5th Amendment protection against self-incrimination.

The lack of clear statutory definition led Appellant, for example, to claim in her brief that a law professor who specializes in consumer debt law may be engaged in the crime of UPL under state law simply by virtue of providing to Appellees services of an expert in this federal litigation.  Yet, state UPL laws are inapplicable to federal proceedings, Sperry v. Florida ex rel. Florida Bar, 373 US 379 (1963), and expert qualifications in New York, including on the issue of law, does not require a license, education or any kind of formal training, Price v. NYCHA, 706 NE 2d 1167 (1998);  Caprara v. Chrysler Corp., 52 NY 2d 114 (1981) (long actual

observation and experience in the subject matter can qualify a witness as an expert without a formal study on the subject matter).

Appellant seeks to overturn the preliminary injunction in its entirety, including the part applicable to the creators of the training guide for Appellees.

Yet, legal scholarship and publication of legal scholarship, even for profit, is not punishable by State, Matter of New York County Lawyers' Ass'n v Dacey, 21 NY 2d 694 (1967) (NYS Court of Appeals has thwarted attempt of competitors of a disbarred lawyers from continuing a successful publication of his book advising New Yorkers how to avoid probate). At the same time, New York does not require a law license of its law professors, or creators of law textbooks, and a "training guide", by its very name, is a teaching material.

In view of the above, UPL laws are unconstitutional as applied to creators of Appellees' training guide on the basis of doctrine of unconstitutional conditions, as they violate Due Process Clause of the 14th Amendment, allowing the government to criminalize on an ad hoc basis, based on the lack of a clear statutory definition of what the "practice of law" is, actions not subject to any regulation, undermining academic and teaching freedom, and freedom to provide services as an expert.

C. New York's UPL laws are unenforceable against corporate Appellee Upsolve, Inc., as Appellee Upsolve, Inc. will be inevitably denied in a possible criminal UPL prosecution its 6th Amendment right to pro se representation

The right to pro se representation in a criminal proceeding has been recognized by the U.S. Supreme Court to be within the 6th Amendment right to counsel, <u>Faretta v. California</u>, 422 US 806 (1975) and afforded to *all* criminal defendants.

Yet, New York, while making corporations amenable to criminal prosecutions, N.Y. PEN. LAW § 20.20, forbid corporations to represent themselves in court, N.Y. CPLR § 321(a)[8]; *see also* <u>Matter of Sharon B.</u>, 72 N.Y.2d 394, 398, 534

---

[8] "Attorneys.  (a) Appearance in person or by attorney.  A party, other than one specified in section 1201 of this chapter, may  prosecute or defend a civil action in person or by attorney, except that a corporation or voluntary association shall appear by attorney, except as otherwise provided in sections 1809 and 1809-A of the New York city civil  court act, sections 1809 and 1809-A of the uniform district court act and sections 1809 and 1809-A of the  uniform  city  court  act, and except as otherwise provided in section 501 and section 1809 of the uniform justice court act."

N.Y.S.2d 124, 125 (1988)[9], to the point of deeming *pro se* representation by a corporation a separate crime of UPL, N.Y. JUD § 495(1) and (3)[10].

Thus, Appellee Upsolve, Inc., in the event it is prosecuted for UPL, will be deprived of equal protection of laws guaranteed by the 14th Amendment, as well as its 6th Amendment right to counsel since it is not a UPL-exempt corporation and, while it is amenable to a criminal prosecution, N.Y. PEN. LAW § 20.20, it is not going to be allowed to represent itself in court. Moreover, such a pro se representation will only add another UPL charge against Appellee Upsolve, Inc. under New York state law.

Based on the well-developed doctrine of unconstitutional conditions[11], New York may not prosecute protected conduct of Appellee Upsolve, Inc. under the guise of

---

[9] "On the merits, we begin our analysis with the proposition that parties as a rule may prosecute or defend their own civil 398*398 actions, but corporations can appear only by attorney (CPLR 321 [a]). When the party to an action is a fictional person — a legal entity with limited liability — the general rule is that it cannot represent itself but must be represented by a licensed practitioner, whether outside counsel or staff counsel, answerable to the court and other parties for his or her own conduct in the matter". Then, the court continues to an argument why non-profit corporations for prevention of cruelty to children may do what other corporations may not.

[10] "1. No corporation or voluntary association shall (a) practice or appear as an attorney-at-law for any person in any court in this state or before any judicial body"…"3. … Any association or corporation violating the provisions of this subdivision is guilty of a misdemeanor unless otherwise provided by section four hundred eighty-five-a of this article".

[11] *See e.g.,* Home Ins. Co. v. Morse, 87 US 445 (1874); Doyle v. Continental Ins. Co., 94 US 535 (1877); Western Union Tel. Co. v. Kansas, 216 U. S. 1 (1910);

occupational regulation, and may not condition availability of defense in the criminal prosecution on forfeiture of one of the choices of who is the best counsel for the corporation. Thus, New York State UPL laws violate the 6th Amendment's right to counsel as applied to Appellee Upsolve, Inc. and are constitutionally unenforceable as applied to this particular Appellee.

### D. New York does not have a public interest in criminal prosecution by private interest groups

As argued above, New York allowed regulation of the market of undefined "practice of law" to be controlled by unsupervised active market participants.

Thus, criminal prosecutions cannot be had as part of such supervision, since criminal prosecutions must be conducted for the benefit and on behalf of the People of the State of New York, which is not possible under the circumstances.

For the above reason, UPL statutes are unenforceable against all Appellees.

### E. Appellant did not establish the public need for regulation that New York conducts allegedly for 125 years, and abuse of the law, even for a significant period of time, does not become the law

---

Bailey v. State of Alabama, 219 U.S. 219, 239 (1911); Western Union Tel. Co. v. Foster, 247 U. S. 105, 114 (1918); Frost v. Railroad Commission, 271 U.S. 583, 593-594 (1925); Frost & Frost Trucking Co. v. R. R. Comm., 271 U. S. 583, 593-599 (1926), Hanover Ins. Co. v. Harding, 272 U. S. 494 (1926); U.S. v. Chicago, M., St. P. & P. Railway Co., 282 U.S. 311, 328-329 (1931); Speiser v. Randall, 357 U.S. 513, 526 (1958).

The U.S. Supreme Court has established in the U.S. Supreme Court in <u>Brazee v.</u>

<u>Michigan</u>, 241 US 340 (1916) that a state may only constitutionally regulate an

occupation under certain conditions[12].  Yet, nowhere in Appellant's brief did

Appellant allege, much less prove, that "the general nature of the [practice of law]

is such that unless regulated many persons may be exposed to misfortunes against

which the legislature can properly protect them".  Appellant repeatedly points in

her brief to alleged 125 years of regulation, but fails to present to the court the

required legislative *evidentiary findings* about the supposed danger of the "practice

of law", and, thus, the *properly established need* of its regulation *for public good*.

Instead, Appellant presented to the court two unsubstantiated, but irrebuttable in

New York courts on the issue of UPL unconstitutional evidentiary presumptions

contrary to fact[13], that (1) undefined "legal advice" provided by a New York-

---

[12] "Considering our former opinions it seems clear that without violating the
Federal Constitution a State, *exercising its police power, may require licenses for
employment agencies and prescribe reasonable regulations* in respect of them to
be enforced according to the legal discretion of a commissioner. *The general
nature of the business is such that unless regulated many persons may be exposed
to misfortunes against which the legislature can properly protect them*", internal
citations omitted, emphasis added.

[13] The U.S. Supreme Court has repeatedly held that irrebuttable evidentiary
presumptions are unconstitutional, <u>Heiner v. Donnan</u>, 285 U. S. 312 (1932);
<u>Skinner v. Oklahoma ex rel. Williamson</u>, 316 US 535 (1942);  <u>Tot v. United States</u>,
319 US 463 (1943);  <u>Aptheker v. Secretary of State</u>, 378 US 500 (1964);
<u>Carrington v. Rash</u>, 380 US 89 (1965);  <u>Bell v. Burson</u>, 402 US 535 (1971);
<u>Stanley v. Illinois</u>, 405 US 645 (1972);  <u>Vlandis v. Kline</u>, 412 US 441 (1973);
<u>Department of Agriculture v. Murry</u>, 413 US 508 (1973);  <u>Cleveland Bd. of Ed. v.</u>

licensed attorney is presumed correct, safe and ethical, while (2) the same advice

provided by an unlicensed individual is presumed to be incorrect, dangerous and

possibly dishonest.

In the context of this litigation, the claim that a New York-licensed attorney's legal

advice is presumptively honest and competent, while the legal advice of a

nonlawyer is presumptively dishonest and wrong, is not only unsupported by any

evidence, and not only is contradicted by serious empirical studies conducted both

in this country and in the "old country"[14], but such a claim is poignantly out of step

---

LaFleur, 414 US 632 (1974);  Sandstrom v. Montana, 442 US 510 (1979);  Francis
v. Franklin, 471 US 307 (1985).

[14] Avrom Sherr, Richard Moorehead, *Contesting professionalism: legal aid and
nonlawyers in England and Wales*, Law and Society Review, 2003 (describing a
study in Great Britain involving "model clients"-actors and statistical assessment
of results where legal services were provided by lawyers and nonlawyers; after the
study, the British government has ended the monopoly of lawyers to receive
government funding for legal services for the poor and allowed nonlawyers to
provide legal services to the indigent population; the study has found that there is
no significant difference between the quality of services of lawyers and
nonlawyers, and that nonlawyers were sometimes better in resolution of the
client's problems without pushing the client into a costly litigation; nonlawyers
were also favorably mentioned by clients as being more courteous than lawyers);
*see also* David Vladeck*, In Re Arons: The Plight of the 'Unrich' in Obtaining Legal
Services*, Georgetown University Law Center, 31 Jan 2005 (describing a situation
similar to the present one where Appellant claimed that Appellees' customers will
be better off without any help than with Appellees' help, where a nonlawyer of
proven competence helping disabled children who were faced off in IDEA
hearings with school attorneys and had no chance to secure their federal statutory
rights if not for the nonlawyer provider, was forbidden by the regulator, the
Supreme Court of the State of Delaware, to provide her successful services of
proven competence to the poor and disabled children as a matter of maintaining the

with reality, as the crisis Appellees are trying to help resolve *has been created by attorneys for corporate debt collectors* who New York, including Appellant, as it has been shown above, refuse to rein in.

Moreover, New York attorneys engaged in various wrongoing know that New York's regulatory system works to protect bad lawyers from the public and not the other way around, and undertake attempts to openly obtain such protections for their wrongdoing from New York courts.  Such attempts were undertaken, as far as amicus is aware, by (1) attorneys who are debt collectors gouging the New York City poor in their own right, attempting to use attorney regulation as a protection of their misconduct from a neutral NYC ordinance equally regulating attorney and non-attorney debt collectors[15] and (2) by prosecutors who have recently killed in the cradle the just-enacted Commission for Prosecutorial Conduct[16] created by New York State Legislature as an admission that attorney regulation does not work as applied to prosecutors (including Appellant herein), by claims that the not-working attorney regulatory system is the only legitimate method to regulate

---

regulator's power of the market of the "practice of law");  Deborah L. Rhode and Lucy Buford Ricca, *Protecting the Profession or the Public? Rethinking Unauthorized-Practice Enforcement*, 82 Fordham L. Rev. 2587 (2014). Available at: https://ir.lawnet.fordham.edu/flr/vol82/iss6/2 (

[15] Berman v City of New York, 25 N.Y.3d 684, 37 N.E.3d 82, 16 N.Y.S.3d 25 (2015).

[16] Soares v State of New York, 2020 NY Slip Op 20068, 121 N.Y.S.2d 790, 68 Misc. 3d 249 (Sup. Ct., Albany County, 2020).

them[17].  As a result, New York continues to carry the dubious title of second in the

nation in the number of wrongful convictions – also the handiwork of presumed-

competent and presumed-honest and ethical New York State-licensed attorneys.

Appellant, nevertheless, ardently argues to the court that unlicensed legal advice

and legal representation is inherently dangerous, while being eloquently silent to

explain (A) why New York exempts nonlawyers who are (1) realtors, (2) officers

for the societies to prevent cruelty to animals, (3) police officers - from the reach

of UPL statutes[18] and (B) why New York requires four years of college, and three

years of an ABA-controlled law school to *become* a prosecutor, but the same New

York allows nonlawyer police officers who may not have any education past high

school and a 6-months' police academy, and who are deliberately selected with a

---

[17] *See also in this respect* Neroni v Zayas, 3:13-cv-0127 LEK/DEP (NDNY, 2014)
where the federal district court, 1 years before North Carolina Board of Dental
Examiners) *supra*, dismissed this amicus' challenge to New York's regulatory
regime of UPL and practice of law claiming its antitrust monopolistic harmful
nature, and its political non-enforcement against large powerful groups of attorneys
(including Appellant) and, instead, its use to reduce the vigor or downright
eliminate civil rights litigation in New York, which is exactly what Appellant is
trying to do when, as Appellees noted in their brief, it is trying to prove to the court
that the injunction for violation of the 1st Amendment must be overturned, so that
there should be less civil rights litigation over 1st Amendment violations.
[18] *See, respectively,* Duncan & Hill Realty, Inc.  *supra*, Matter of Sharon B. *supra*,
People v. Soddano, 655 NE 2d 161 (1995) (police may prosecute a traffic ticket
instead of the district attorney as long as the district attorney is "aware" of the
prosecution);  People v. DeLeyden, 10 NY 2d 293 (1961) (prosecution by a deputy
sheriff).

lower IQ level to prevent them from leaving their jobs after being trained[19], to <u>try</u>

<u>cases in court</u> *instead of that prosecutor*, and why such individuals do not present

danger to the public and are not pursued by Appellant for UPL as vigorously as

Appellant is pursuing Appellees.

Moreover, the fact that Appellant is herself an unsupervised active market

participant regulating her own market only adds reasonable suspicion, based on

<u>North Carolina Board of Dental Examiners v FTC</u> *supra*, that the only danger that

Appellant, as a private active market participant, perceives in Appellees' services,

is *to her* as a competitor in a certain market, while competition, according to the

Sherman Act, is actually good for the public.

> F. New York cannot constitutionally establish jurisdiction in criminal UPL
> proceedings against Appellees, or prove its case beyond the reasonable
> doubt for lack of clear statutory definitions of what is the prohibited criminal
> act

In criminal cases, criminal courts receive jurisdiction on the basis of a probable

cause that a crime has been committed, and each element of the criminal statute

must be proven beyond the reasonable doubt, <u>In re Winship</u>, 397 U.S. 358 (1970).

In the absence of a clear statutory definition, New York cannot constitutionally

either establish its jurisdiction against Appellees in criminal and quasi-criminal

UPL cases, or convict/find liability against Appellees in such cases to *any*

---

[19] <u>Jordan v The City of New London</u>, 225 F.3d 645 (2nd Cir., 2000.)

evidentiary standard, especially to the constitutional standard in criminal cases of "beyond the reasonable doubt". Neither does New York have a public interest in multiplying wrongful convictions, for which it already holds the dubious honor of #2 place in the nation.

Appellant has de facto admitted in her brief that she prosecutes UPL *as a thought crime*, for defendants' failure to obtain a law license, which, in view of Appellant's of thought control as the goal of that license, means that she is prosecuting criminal defendants for failure submit to thought control by the government, or, rather, by unsupervised competitors regulating their own market from within the government and by permission of the government, in violation of the Sherman Act. As it was already argued above, based on binding precedents, prosecution for thought crimes is constitutionally forbidden in the United States and belongs only in sci-fi movies.

For the above reason, New York's UPL laws are unenforceable against Appellees.

G. New York UPL laws are unenforceable as against all Appellees as they deny to Appellees their federal due process right to impartial judicial review and to an impartial prosecutor

Appellees, if prosecuted for UPL, have fundamental federal due process rights to impartial judicial review[20], and to an impartial prosecutor <u>Berger v United States</u>, 295 US 78 (1935).

Both rights will be denied to Appellees since *all* judges and *all* prosecutors in UPL cases in New York will be inevitably active market participants prosecuting such cases in their own private interests and in the interest of their private trade group, rather than for the benefit of the public. In view of the above, New York UPL laws are unenforceable against Appellees.

> H. New York's felony UPL statute is unenforceable against Appellees since New York state law made every judge disqualified in felonies as a counsel to the party plaintiff, the People

A separate constitutional enforceability issue exists in enforcement against Appellees, for any reason, of felony UPL laws which are likely to be invoked against Appellees if the injunction is lifted, since N.Y. JUD. LAW § 485-a provides:

---

[20] <u>Tumey v. Ohio</u>, 273 US 510 (1927); <u>In re Murchison</u>, 349 U.S. 133, 137 (1955); <u>Dugan v. Ohio</u>, 277 U.S. 61 (1928); <u>Ward v. Village of Monroeville</u>, 409 U.S. 57 (1972); <u>Hortonville Joint School District No. 1 v. Hortonville Educational Ass'n</u>, 426 U.S. 482 (1976); <u>Marshall v. Jerrico, Inc.</u>, 446 U.S. 238 (1980); <u>Wolkenstein v. Reville</u>, 694 F. 2d 35 (2nd Cir., 1982); <u>Caperton v. AT Massey Coal Co., Inc.</u>, 556 US 868 (2009); <u>Williams v. Pennsylvania</u>, 136 S. Ct. 1899 (2016).

"Any person who violates the provisions of sections four hundred seventy-eight, four hundred eighty-four, four hundred eighty-six or four hundred ninety-five of this article is *guilty of a class E felony* when he or she: (1) *falsely holds himself or herself out as* a person licensed to practice law in this state, *a person otherwise permitted to practice law in this state, or a person who can provide services that only attorneys are authorized to provide*; and (2) causes another person to suffer monetary loss or damages exceeding one thousand dollars or other material damage resulting from impairment of a legal right to which he or she is entitled," emphasis added.

Since it is unclear what it is that "only attorneys are authorized to provide", and since Appellant has refused to disavow enforcement of any UPL statutes against any of the Appellees, prosecution of Appellees based on N.Y. JUD. LAW § 485-a is possible.

Yet, in respect to *all* felony prosecutions in the state, New York deprives *all* criminal defendants subject to such prosecutions of their federal constitutional rights to (1) an impartial judge, (2) an impartial prosecutor, (3) an impartial grand jury, (4) an impartial jury by making the judge, together with the prosecutor, mandatory co-legal advisors of the grand jury[21]. After that, the judge becomes the author of the accusatory instrument, together with the prosecutor, and may not

---

[21] N.Y. CPL §190.25(6): "*The legal advisors of the grand jury are the court and the district attorney, and the grand jury may not seek or receive legal advice from any other source*. Where necessary or appropriate, *the court or the district attorney, or both, must instruct the grand jury concerning the law with respect to its duties or any matter before it*, and such instructions must be recorded in the minutes", emphasis added.

prosecute the case, but, from this amicus 16-year experience as a legal assistant to a criminal trial lawyer and then as a New York criminal defense attorney in her own right, New York never substitutes judges in felony cases, ensuring that one and the same judge advises the grand jury, and the same one presides over the trial of his own accusatory instrument.

The 5th Amendment right to a grand jury proceeding in heinous and infamous cases (understood in New York as applicable only to felony cases) was created *as an additional procedural protection for the criminal defendant*.  Yet, New York has obviously gutted that procedural protection and imposed an unconstitutional condition on operation of a federally required investigative body by restricting the right *of* the grand jury as an independent investigative body to choose its own legal advisor.  New York's command that the grand jury *must* "choose" as its legal advisor only the local district attorney or the judge who will later preside over proceedings commenced based on the accusatory instrument the judge created as a legal advisor of the investigative body is unconstitutional and unconscionable.

Federal due process jurisprudence is clear that a judge may not be also a party or attorney for the party in litigation, especially in a criminal case, Williams v. Pennsylvania, 136 S. Ct. 1899 (2016).  Despite that, N.Y. CPL §190.25(6)

*mandates* exactly that situation, making all state felony prosecutions involving the grand jury void ab initio[22].

Additionally, considering that both mandatory legal advisors of the grand jury, the judge and the prosecutor, are unsupervised active market participants when they prosecute UPL cases, and that the UPL prosecution is part of their regulation of their own market for their own private interests and not interest of the public, such mandatory legal advice to the grand jury strips this federally-required body of its independence and of its purpose to protect the defendant, and hollows out the meaning for which it was created by the enactors of the 5th Amendment.

## CONCLUSION

In view of the above, there is more than enough grounds to believe that Appellees will succeed on the merits of the case, and the preliminary injunction should be affirmed.

---

[22] Not all felony prosecutions involve a grand jury proceedings, as defendants may waive them.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

I hereby certify that this document complies with the type-volume limit of Local Rule 32.1(a)(4)(A) and with F.R.A.P. (a) (5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), specifically (1) the cover page; (2) identity and interest of this proposed Amicus; (3) Table of Contents; (4) Table of Authorities; (4) Certification of the compliance - this document contains 5,927 words, less than a half of maximum allowed length of 13,000 for the principal brief of Appellees. Further, this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. 32(a)(5) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14 point font.

Dated:  Initial date of
proposed Amicus Brief:
January 11, 2023

Date of grant of motion
for leave to file amicus
brief:  May 20, 2024

Date of Amicus Brief:

May 20, 2024

/s/Tatiana Neroni

Tatiana Neroni