

INSTITUTE FOR JUSTICE

September 27, 2024

<u>Via CM/ECF</u>
Hon. Catherine O'Hagan Wolfe
Clerk of Court
United States Court of Appeals for the Second Circuit
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, NY 10007

     RE:    *Upsolve, Inc. v. James*
                Case No. 22-1345-cv
                28(j) Letter

Dear Ms. Wolfe:

Under Federal Rule of Appellate Procedure 28(j), I write to draw the Court's attention to the Fifth Circuit's recent decision in *Hines v. Pardue*, No. 23-40483 (attached). *Hines* is on all fours with this case and confirms that this Court must either affirm the district court's preliminary injunction or split with the Fifth Circuit.

*Hines*, like this case, is an as-applied challenge to a licensing restriction on giving advice—there, veterinary advice. The majority opinion reaches two legal conclusions that bear on this case. First, relying on many of the same Supreme Court cases Appellees rely on here, it concludes that the prohibition is a restriction on speech because it is triggered by communicating advice rather than by any conduct. *Compare* slip op. 10–14 *with* Appellees' Br. (Doc. 103) 28–42. Second, it assumes without deciding that the law is subject to only intermediate scrutiny because intermediate scrutiny imposes a real evidentiary burden on the government, which the government failed to meet. Slip op. 16–17. Again, Appellees have argued the same here, relying on many of the same binding Supreme Court authorities. Appellees' Br. 48–59.

The concurring opinion in *Hines* offers still another route to affirmance. That opinion would hold that the licensing law was subject to strict scrutiny because its application hinged entirely on whether Hines's "communications constituted personal advice" as opposed to general statements about animals. Slip op. 32 (Ramirez, J., concurring). So too here. Counsel for Appellant confirmed, repeatedly, at oral argument that the law challenged here also hinges on whether Appellees

offer personalized rather than general advice, and both the district court's opinion below and Upsolve's briefs here make exactly the same argument as Judge Ramirez, again relying on the same binding Supreme Court authority. J.A. 196–97; Appellees' Br. 42–44.

Simply put, *Hines* makes clear that, if this appeal were controlled by the law of the Fifth Circuit, Appellees would be entitled to affirmance. This Court is bound by the same precedents that control the *Hines* opinion, and the same result should follow here.

I thank the Court for its attention.

Sincerely,

/s/ Robert J. McNamara
Robert J. McNamara
Brian A. Morris
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, Virginia 22203
(703) 682-9320

*Counsel for Plaintiffs-Appellees*

cc (by ECF):

All Counsel

## Certificate of Compliance

This letter brief complies with the type-volume limitation of Fed. R. App. P. 28(j) as it contains 350 words.

Dated: September 27, 2024          /s/ Robert J. McNamara
Robert J. McNamara

*Attorney for Plaintiffs-Appellees*

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 26, 2024

Lyle W. Cayce
Clerk

———————————

No. 23-40483

———————————

RONALD S. HINES, DOCTOR OF VETERINARY MEDICINE,

*Plaintiff—Appellant*,

*versus*

KEITH PARDUE, *in his official capacity as Vice President of the Texas State Board of Veterinary Medical Examiners*; SANDRA "LYNN" CRINER, *Doctor of Veterinary Medicine, in her official capacity as Secretary of the Texas State Board of Veterinary Medical Examiners*; MICHAEL WHITE, *Doctor of Veterinary Medicine, in his official capacity as a Member of the Texas State Board of Veterinary Medical Examiners*; SAMANTHA MIXON, *Doctor of Veterinary Medicine, in her official capacity as a Member of the Texas State Board of Veterinary Medical Examiners*; RANDALL SKAGGS, *Doctor of Veterinary Medicine, in his official capacity as a Member of the Texas State Board of Veterinary Medical Examiners*; RAQUEL OLIVER, *in her official capacity as a Member of the Texas State Board of Veterinary Medical Examiners*; SUE ALLEN, *Licensed Veterinary Technician, in her official capacity as a Member of the Texas State Board of Veterinary Medical Examiners*; VICTORIA WHITEHEAD, *in her official capacity as a Member of the Texas State Board of Veterinary Medical Examiners*; STEVEN GOLLA, *Doctor of Veterinary Medicine, in his official capacity as President of the Texas State Board of Veterinary Medical Examiners*,

*Defendants—Appellees*.

———————————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 1:18-CV-155

_____

Before WILLETT, WILSON, and RAMIREZ, *Circuit Judges*.

DON R. WILLETT, *Circuit Judge*:

      Dr. Ronald S. Hines is a retired, physically disabled, Texas-licensed veterinarian who enjoys spending his golden years giving online pet-care advice to animal lovers around the world—often for free. Dr. Hines does not physically examine animals, perform surgeries, apply casts, splints, or bandages, administer vaccinations, or prescribe prescription medication. He merely sends emails. This would be no problem if the patients were people instead of pets. For humans, Texas law allows telemedicine without first requiring a face-to-face examination to establish a physician-patient relationship. Not so with animals, which require an in-person visit. Exam-free telehealth, turns out, is fine for your Uncle Bernard, but not for your Saint Bernard.

      No one ever complained about Dr. Hines's online pet-care advice or alleged that it harmed a single animal. However, because Dr. Hines does not physically examine animals before sharing his expertise, the State of Texas considered some of his emails criminal offenses, going so far as penalizing him with a year of probation, fining him $500, and forcing him to retake the jurisprudence section of the veterinary licensing exam. In 2013, Dr. Hines challenged the physical-examination requirement on First Amendment grounds. Over the last decade, his case has been before our court twice—and now, a *third* time.[1] After we remanded this case nearly four years ago, the district court granted summary judgment for the State.[2] Dr. Hines appealed.

_____

[1] *Hines v. Alldredge* (*Hines I*), 783 F.3d 197 (5th Cir. 2015); *Hines v. Quillivan* (*Hines II*), 982 F.3d 266 (5th Cir. 2020).

[2] In 2023, the enforcement authority for the laws at issue changed to the Texas Department of Licensing and Regulation. Act of June 18, 2023, 88th Leg., R.S., ch. 1103,

No. 23-40483

Today, we uphold Dr. Hines's First Amendment rights. We specifically conclude that the State of Texas is directly regulating Dr. Hines's speech and that this regulation fails to survive even intermediate scrutiny. We accordingly REVERSE and REMAND with instructions to enter judgment for Dr. Hines.

I

A

Dr. Hines is a veterinarian licensed by the State of Texas. He also holds a Ph.D. in microbiology. After obtaining his veterinary license in 1966, Dr. Hines worked in various roles across the country and around the world researching and working with animals. He worked as a veterinarian for almost four decades, including time spent on animal research.

In 1977, Dr. Hines suffered a fall that injured his spine, rendering him totally disabled according to the Department of Veterans Affairs. In 2002, Dr. Hines retired from his full-time practice of veterinary medicine because the rigors of daily practice had become too cumbersome. Around that time, he launched a website to share articles about veterinary care. Readers began emailing Dr. Hines, seeking advice about their pets or animals they found. Dr. Hines responded to readers' questions from his home in Brownsville, Texas. About half of these emails came from readers outside the United States and most came from outside Texas. At some point, Dr. Hines started charging a flat fee to cover expenses and to screen trivial inquiries, but he helped correspondents for free if they could not pay and refunded fees when

---

§ 2 (codified at TEX. OCC. CODE § 801.022(a)). The commissioners of the Texas Department of Licensing and Regulation are therefore "automatically substituted" for the members of the Texas State Board of Veterinary Medical Examiners. FED. R. APP. P. 43(c)(2).

he could not help. Dr. Hines requested that readers submit an electronic form with information about their animal and submit "photographs and lab work" for his review. In answering questions, he "always requested complete medical records from the owner's local veterinarian," and if none existed, he referred owners to a local veterinarian and urged them to have their pet physically examined.

In 2012, the Texas State Board of Veterinary Medical Examiners informed Dr. Hines that his wholly electronic veterinary practice violated Texas law. The law at issue requires veterinarians to establish a veterinarian-client-patient relationship (VCPR) before engaging in the practice of veterinary medicine.[3] Under the statute, a VCPR exists if, as relevant here, "the veterinarian . . . possesses sufficient knowledge of the animal to initiate at least a general or preliminary diagnosis of the animal's medical condition."[4] A veterinarian can establish the sufficient-knowledge requirement in two ways: "(1) examining the animal; or (2) making medically appropriate and timely visits to the premises on which the animal is kept."[5] The VCPR "may not be established solely by telephone or electronic means."[6]

The State concluded that because Dr. Hines's advice constituted the practice of veterinary medicine, and because Dr. Hines never physically

---

[3] The statute defines "practice of veterinary medicine" as "the diagnosis, treatment, correction, change, manipulation, relief, or prevention of animal disease, deformity, defect, injury, or other physical condition, including the prescription or administration of a drug, biologic, anesthetic, apparatus, or other therapeutic or diagnostic substance or technique." Tex. Occ. Code § 801.002(5)(A).

[4] Id. § 801.351(a)(2).

[5] Id. § 801.351(b).

[6] Id. § 801.351(c).

examined the animals that were the subject of his advice—facts that Dr. Hines concedes—he had not established a VCPR and thus violated the law. In response, Dr. Hines put a disclaimer on his website, informing readers that he could not "engage[] in the 'practice' of veterinary medicine as defined by Texas law," meaning that he could not offer "specific diagnosis [or] treatment," among other things.

But this did not satisfy the State. So, in 2013, Dr. Hines and the State entered into an agreed order, "formally reprimanding [Dr. Hines], imposing a year of probation, fining him $500, and forcing him to retake the jurisprudence section of the veterinary licensing exam."

About two weeks later, Dr. Hines sued the State, alleging that the physical-examination requirement violated his First Amendment rights.

B

Over the last decade, this lawsuit has braved an extensive procedural journey. We recount here the relevant portions related to Dr. Hines's First Amendment claim.

The State moved to dismiss the First Amendment claim under Federal Rule of Civil Procedure 12(b)(6), arguing that the physical-examination requirement did not implicate the First Amendment. The district court denied the motion and granted the State's unopposed motion to certify the question to our court for interlocutory appeal.

We reversed.[7] The panel concluded that the physical-examination requirement did not "regulate the content of any speech, require veterinarians to deliver any particular message, or restrict what can be said

_____

[7] *Hines I*, 783 F.3d at 203.

once a [VCPR] is established."[8] So it decided that the physical-examination requirement fell "squarely within [the State's] long-established authority" to regulate professional conduct and thus did not offend the First Amendment.[9] On remand, the district court entered final judgment for the State.

Three years later, after the Supreme Court held in *National Institute of Family & Life Advocates v. Becerra* (*NIFLA*)[10] that professional speech—like all other speech—is subject to traditional First Amendment scrutiny, Dr. Hines renewed his suit against the State. The district court again dismissed Dr. Hines's claim, concluding that *NIFLA* did not abrogate *Hines I*, which "require[d] dismissal."[11]

But while Dr. Hines's appeal was pending before our court, we issued an opinion in *Vizaline, L.L.C. v. Tracy*, which held that *Hines I*'s "reasoning does not survive *NIFLA*."[12] And we clarified that the "relevant question" was whether "[the State]'s licensing requirements regulate only speech, restrict speech only incidentally to their regulation of non-expressive professional conduct, or regulate only non-expressive conduct."[13] So "[b]ound by *Vizaline*" and "no longer bound by *Hines I*," we concluded that Dr. Hines's First Amendment claim "may be entitled to greater judicial

---

[8] *Id.* at 201.

[9] *Id.*; *see also id.* at 202 n.20 (describing the physical-examination requirement as a "content-neutral conduct regulation").

[10] 585 U.S. 755, 766–68 (2018).

[11] *Hines v. Quillivan*, 395 F. Supp. 3d 857, 864 (S.D. Tex. 2019).

[12] 949 F.3d 927, 928 n.1 (5th Cir. 2020).

[13] *Hines II*, 982 F.3d at 272 (citing *Vizaline*, 949 F.3d at 931).

scrutiny than *Hines I* allowed."[14] We reversed and remanded for the district court to make the initial evaluation of whether Dr. Hines's "conduct or speech [wa]s being regulated."[15]

On remand, the parties cross-moved for summary judgment.[16] The district court granted the State's motion and denied Dr. Hines's. It made three key determinations that are before us on appeal: The law (1) regulates Dr. Hines's speech, rather than his conduct; (2) does so in a content-neutral way, warranting intermediate scrutiny; and (3) survives intermediate scrutiny because it was "narrowly tailored to the [State's] substantial interests, which [were] unrelated to the suppression of speech."[17]

## II

We review summary judgment de novo.[18] Summary judgment is warranted if "no genuine dispute as to any material fact" exists and "the movant is entitled to judgment as a matter of law."[19] When parties file cross-motions for summary judgment, we review "each party's motion

---

[14] *Id.*

[15] *Id.* (citation omitted).

[16] At the Rule 12(b)(6) stage, the district court concluded that the law was a content-based restriction on Dr. Hines's speech, requiring discovery to develop the record for strict-scrutiny analysis. *See Hines v. Quillivan*, No. 1:18-CV-155, 2021 WL 6618658, at *10 (S.D. Tex. July 29, 2021), *report and recommendation adopted*, 2021 WL 5833886 (S.D. Tex. Dec. 9, 2021).

[17] *Hines v. Pardue*, 688 F. Supp. 3d 522, 546–57 (S.D. Tex. 2023).

[18] *Catalyst Strategic Advisors, L.L.C. v. Three Diamond Cap. SBC, L.L.C.*, 93 F.4th 870, 874 (5th Cir. 2024).

[19] Fed. R. Civ. P. 56(a).

independently, viewing the evidence and inferences in the light most favorable to the nonmoving party."[20]

### III

At the threshold, we face two thorny First Amendment questions. First, does the State's physical-examination requirement regulate Dr. Hines's speech directly, as Dr. Hines argues, or only incidentally to the law's general regulation of his conduct, as the State counters? Second, if it regulates his speech, does it do so in a content-based way, as Dr. Hines contends? The answers to these questions dictate, in turn, the applicable level of scrutiny.[21] Our precedents mandate that we apply intermediate scrutiny only if the law regulates his speech in a content-neutral way.[22] But if

---

[20] *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001).

[21] *See Tex. Ent. Ass'n v. Hegar*, 10 F.4th 495, 509 (5th Cir. 2021) (noting that the content-neutrality "determination dictates the level of scrutiny the challenged restriction must meet in order to pass muster").

[22] *See NIFLA*, 585 U.S. at 768 ("States may regulate professional conduct, even though that conduct incidentally involves speech."); *Vizaline*, 949 F.3d at 933 (citing *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 567 (2011) (explaining that "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech")); *Tex. Ent. Ass'n*, 10 F.4th at 509 ("[C]ontent neutral restrictions are generally subject only to intermediate scrutiny."). We acknowledge that the Fourth Circuit, on the other hand, has held that intermediate scrutiny applies even when regulations only incidentally impact speech. *See Cap. Associated Indus., Inc. v. Stein*, 922 F.3d 198, 208 (4th Cir. 2019) ("We think the correct reading of Supreme Court precedent, however, is that intermediate scrutiny should apply to regulations of conduct that incidentally impact speech."). But because our precedent—and that of the Supreme Court—suggests otherwise, we apply intermediate scrutiny only if the law regulates speech directly (and in a content-neutral way), not merely incidentally.

the law is a content-based regulation of Dr. Hines's speech, we apply strict scrutiny.[23]

## IV

First things first, we must determine what the physical-examination requirement primarily regulates. The State does not dispute that Dr. Hines's speech is implicated. It contends that the physical-examination requirement restricts Dr. Hines's speech incidentally to the general regulation of conduct. So, we consider whether the requirement regulates Dr. Hines's speech directly or only incidentally to the regulation of his conduct. On the one hand, all Dr. Hines does is send emails—pure speech. But on the other, the law regulates his speech as part of the practice of veterinary medicine.[24]

## A

The First Amendment prohibits laws "abridging the freedom of speech."[25] In the Supreme Court's jurisprudence since the adoption of that Amendment in 1791, however, the Court has held that the First Amendment does not protect *all* forms of speech and *does* protect some expressive conduct.[26] Still, neither the Supreme Court—nor our court—has suggested

---

[23] *See, e.g.*, *Tex. Ent. Ass'n*, 10 F.4th at 509 ("Content based restrictions on protected First Amendment expression are presumptively unconstitutional and subject to strict scrutiny.").

[24] We are mindful that under "[Supreme Court] precedents, [s]tates may regulate professional conduct, even though that conduct incidentally involves speech." *NIFLA*, 585 U.S. at 768.

[25] U.S. Const. amend. I. The First Amendment applies to the states via incorporation into the Fourteenth Amendment. *See Stromberg v. California*, 283 U.S. 359, 368 (1931).

[26] *See, e.g.*, *Counterman v. Colorado*, 600 U.S. 66, 73–74 (2023) (finding no protection for true threats); *Brandenburg v. Ohio*, 395 U.S. 444, 447–49 (1969) (per curiam) (finding no protection for incitement); *Chaplinsky v. New Hampshire*, 315 U.S. 568, 573

heightened protection for speech regulated only incidentally to a generally applicable regulation of conduct.[27]

As noted above, circuit courts have, until recently, applied the so-called professional-speech doctrine to licensing regulations like this one. These courts, including our own,[28] treated laws regulating professionals' speech as a separate category from non-professional speech, entitling them to less protection and exempting them from traditional First Amendment scrutiny.[29] The Supreme Court, however, rejected this doctrine in *NIFLA*,[30] and instructed courts to apply the "traditional conduct-versus-speech dichotomy."[31] But "[a]s it stands today, the relevant First Amendment doctrine is a mind-numbing morass of tangled precedents developed in contexts very different from professional licensing."[32]

The "notoriously foggy"[33] speech–conduct dichotomy makes "finding the line between speech and conduct . . . not as simple as asking whether the prohibition is literally one against verbal or written 'speech,' on the one hand, or one against 'conduct' (i.e., nonverbal action) on the

---

(1942) (finding no protection for fighting words); *Texas v. Johnson*, 491 U.S. 397, 406 (1989) (protecting flag burning); *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 99 (1972) (protecting picketing); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (protecting refusal to salute the flag).

[27] *See supra* note 22.

[28] *Hines I*, 783 F.3d at 202 (adopting the professional-speech doctrine).

[29] *See NIFLA*, 585 U.S. at 768 (collecting cases).

[30] *See id.* ("Speech is not unprotected merely because it is uttered by 'professionals.'").

[31] *Vizaline*, 949 F.3d at 932 (citing *NIFLA*, 585 U.S. at 771–75).

[32] *Tex. Dep't of Ins. v. Stonewater Roofing, Ltd. Co.*, --- S.W.3d ----, No. 22-0427, 2024 WL 2869414, at *16–17 (Tex. June 7, 2024) (YOUNG, J., concurring).

[33] *Jenevein v. Willing*, 493 F.3d 551, 562 (5th Cir. 2007).

other."[34] In as-applied challenges[35]—especially those involving "generally applicable regulation[s] of conduct," such as the regulation here—a particular act constitutes protected speech, rather than unprotected conduct, if that act "consists of communicating a message."[36]

For example, a generally applicable regulation proscribing breaching the peace regulated speech, rather than conduct, when an individual was arrested and convicted for wearing a jacket that said "F*** the Draft" inside a courthouse.[37] The Supreme Court found the conviction to "clearly rest[] upon the asserted offensiveness of the words [the plaintiff] used to convey his message to the public."[38] Because "[t]he only 'conduct' which

---

[34] *360 Virtual Drone Servs. LLC v. Ritter*, 102 F.4th 263, 274 (4th Cir. 2024).

[35] Dr. Hines's complaint states both as-applied and facial challenges to the physical-examination requirement. On appeal, Dr. Hines disclaimed his facial challenge. Accordingly, we evaluate only his as-applied challenge. *See United States v. Perez*, 43 F.4th 437, 443 (5th Cir. 2022) (recognizing that "circuit practice" requires us to address an as-applied challenge before a facial challenge).

[36] *Holder v. Humanitarian L. Project (HLP)*, 561 U.S. 1, 27–28 (2010) (concluding that a law barring communications to certain groups when it "imparts a 'specific skill' or communicates advice derived from 'specialized knowledge'" functioned as a regulation of speech, not conduct); *see R.A.V. v. City of St. Paul*, 505 U.S. 377, 389 (1992) ("[W]ords can in some circumstances violate laws directed not against speech but against conduct."). Admittedly, in *Giboney v. Empire Storage & Ice Co.*, the Court rejected the idea that free speech protection extends "to speech or writing used as an integral part of conduct in violation of a valid criminal statute," 336 U.S. 490, 498 (1949), and emphasized that "[i]t has never been deemed an abridgement of freedom of speech . . . to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed," *id.* at 502. But there, the case involved expressive conduct that violated *criminal* law, not speech that violated occupational regulations, as occurred here.

[37] *Cohen v. California*, 403 U.S. 15, 16 (1971) (asterisks substituted).

[38] *Id.* at 18.

[California] sought to punish [wa]s *the fact of communication*," the Supreme Court applied First Amendment scrutiny and reversed the conviction.[39]

In another (and more apt) example, a law proscribing support for "the humanitarian and political activities of" two designated terrorist organizations, which "generally function[ed] as a regulation of conduct," regulated speech because as "applied to [the] plaintiffs[,] the conduct triggering coverage under the statute consist[ed] of *communicating a message*"—individualized legal advice.[40] As the court recognized, whether the plaintiffs could speak with designated terrorist organizations "depend[ed] on what they [said]" because the regulation barred certain forms of speech—including "speech to those groups [that] impart[ed] a 'specific skill' or communicate[d] advice derived from 'specialized knowledge.'"[41]

Our goal then is to determine whether the physical-examination requirement *primarily* affects Dr. Hines's speech ("communication of a message") or his conduct by looking at what "trigger[s] coverage under the statute."[42]

### B

As explained below, the physical-examination requirement primarily regulates Dr. Hines's speech—and not merely incidentally to his conduct.

The State contends that the law is primarily a conduct regulation because the definition of practicing veterinary medicine applies to a "set of

---

[39] *Id.* (emphasis added).

[40] *HLP*, 561 U.S. at 10, 26–28; *id.* at 61 (BREYER, J., dissenting) ("[T]he majority properly rejects . . . that the plaintiffs' speech-related activities amount to 'conduct' and should be reviewed as such.").

[41] *Id.* at 27.

[42] *See id.* at 28; *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 47 (2017).

skilled actions"—that is, conduct. But calling an act "speech" or "conduct" (or "actions") does not make it speech or conduct for First Amendment analysis.[43] Indeed, the Supreme Court has been clear: "State labels cannot be dispositive of [the] degree of First Amendment Protection."[44] It is a court's duty to consider a "restriction's effect, as applied, in a very practical sense"[45]—not to follow whatever label a state professes. If courts were required to accept a governmental actor's speech-or-conduct designation, we would be compelled to forgo our solemn duty to "assess[] the First Amendment interest at stake and weigh[] it against the public interest allegedly served by the regulation."[46] This means we must determine from the evidence, rather than the parties' labels, whether Dr. Hines's course of action involved speech.[47]

The State identified Dr. Hines's provision of "individually tailored diagnostic services and veterinary medical advice for specific animals" as practicing veterinary medicine.[48] Dr. Hines was penalized specifically for engaging in the practice of veterinary medicine without first establishing

---

[43] *See Tex. Dep't of Ins.*, 2024 WL 2869414, at *17 (YOUNG, J., concurring) ("[C]onduct and speech are not hermetically sealed categories.").

[44] *NIFLA*, 585 U.S. at 773 (original alteration omitted) (quoting *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988)); *see also id.* ("States cannot choose the protection that speech receives under the First Amendment, as that would give them a powerful tool to impose invidious discrimination of disfavored subjects." (internal quotation marks and citation omitted)).

[45] *Thomas v. Collins*, 323 U.S. 516, 536 (1945).

[46] *Bigelow v. Virginia*, 421 U.S. 809, 826 (1975).

[47] *See Freedom Path, Inc. v. IRS*, 913 F.3d 503, 508 (5th Cir. 2019) (stating that an as applied challenge considers the "application" of a statute "to the particular circumstances of an individual" (citation omitted)).

[48] TEX. OCC. CODE § 801.002(5).

VCPRs in person.[49] But in detailing the specific acts that constituted the practice of veterinary medicine in violation of the physical-examination requirement, the State pointed to Dr. Hines's email exchanges in which he communicated individualized diagnoses and treatment plans with various animal owners.

For example, Dr. Hines was contacted by an owner whose bird had managed to remove a splint on its leg only a week after its placement by a local veterinarian. The bird owner, who was concerned that the bird's legs were crossing and that this might inhibit its mobility, attached a video of the bird to the email she sent Dr. Hines. Dr. Hines wrote back and informed the owner that a splint was necessary to ensure the bird's full recovery, and he instructed the owner on how to make a splint and how to apply and adjust it. The State concluded, based on the conclusions of its investigator and experts, that Dr. Hines had engaged in the practice of veterinary medicine without establishing a VCPR by communicating (via email) an individualized diagnosis and treatment plan to the bird owner.

Critically, not *all* of Dr. Hines's conduct was barred. Indeed, the State did not find Dr. Hines's review of the owner's email or video or the substance of his diagnosis and treatment plan violative of the physical-examination requirement; the State did not penalize Dr. Hines for viewing charts or considering different medical reports. And the State did not penalize him for applying a splint or administering medicine—nor could they. Instead, the State only penalized him for his *communication* with the owner about her bird in which he gave a diagnosis and treatment plan. In effect, the regulation *only* kicked in when Dr. Hines began to share his opinion with his patient's owner—as is the case with all of Dr. Hines's alleged violations of the

---

[49] *Id.* §§ 801.351, .401, .402(4).

physical-examination requirement.[50] Because the act in which Dr. Hines engaged that "trigger[ed] coverage" under the physical-examination requirement was the communication of a message, the State primarily regulated Dr. Hines's speech.[51]

## V

Regrettably, the Supreme Court's content-neutrality jurisprudence is not much clearer than its speech-conduct jurisprudence.[52] And here,

---

[50] *Cf. Chiles v. Salazar*, --- F.4th ----, No. 12-1445, 2024 WL 4157902 (10th Cir. Sept. 12, 2024) (holding that a Colorado law banning "conversion therapy" for minors regulated conduct and only incidentally burdened a therapist's speech). Given our analysis in today's case, we are hesitant to embrace *Chiles*'s threshold conclusion that conduct, and not speech, was the target of the Colorado law. Regardless, even if correct, *Chiles* is inapposite. Colorado's conversion-therapy law, unlike Texas's pet-telehealth law, regulates the *substance* of the medical care, not the *form* or *manner* of the care. Moreover, the "conversion therapy" law aims to restrict any counselors engaged in providing such therapy, regardless of how they provided that care; Dr. Hines's speech, by contrast, is the *only* part of his practice that is regulated.

[51] *See Cohen*, 403 U.S. at 18; *HLP*, 561 U.S. at 28. We previously characterized the physical-examination requirement as a conduct regulation in *Hines I*, and the State contends this characterization controls. *See* 783 F.3d at 201–202, 202 n.20. But *Hines I* merely described the physical-examination requirement in general terms. Here, Dr. Hines brings an as-applied challenge, which tests the "particular application" of the physical-examination requirement to Dr. Hines. *City of Los Angeles v. Patel*, 576 U.S. 409, 415 (2015). The Supreme Court "has often held that a valid statute was unconstitutionally applied in particular circumstances because it interfered with an individual's exercise of [free speech] rights." *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971). The physical-examination requirement's general nature does not demonstrate whether the requirement regulates Dr. Hines's speech or conduct here.

[52] The Court itself has often been divided over this question. *See, e.g.*, *McCullen v. Coakley*, 573 U.S. 464, 499 (2014) (Scalia, J., concurring in the judgment) (noting that "the Court is divided 5-to-4" on the issue of content neutrality); *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 86–106 (2022) (Thomas, Gorsuch, and Barrett, JJ., dissenting on the content-neutrality issue).

"content neutrality is far from clear."[53]   Indeed, we are divided on the issue,[54] "and the parties vigorously dispute the point."[55]

These questions do not need a definitive answer today,[56] however, because the law cannot withstand even *intermediate* scrutiny—the lowest tier of scrutiny available for our analysis based on the facts in this case.[57] Accordingly, we assume without deciding that the law regulates Dr. Hines's speech in a content-neutral manner, meaning we apply intermediate rather than strict scrutiny.

## A

"[T]o survive intermediate scrutiny, a restriction on speech or expression must be 'narrowly tailored to serve a significant governmental interest.'"[58] A content-neutral regulation will satisfy this test "if it furthers an important governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the

---

[53] *McCullen*, 573 U.S. at 499 (Scalia, J., concurring in the judgment).

[54] *See post*, at 29 (Ramirez, J., concurring).

[55] *McCullen*, 573 U.S. at 499 (Scalia, J., concurring in the judgment).

[56] *Id.* (collecting cases); *see also Sorrell*, 564 U.S. at 571. The concurrence would decide this issue today, deeming the physical-exam requirement a content-based regulation of Dr. Hines's speech that is subject to strict scrutiny. *Post*, at 29. But since Texas's requirement fails even intermediate scrutiny, *post*, at 28—we need go no further.

[57] *McCullen*, 573 U.S. at 498 (2014) (Scalia, J., concurring in the judgment) ("[W]here a statute challenged on First Amendment grounds 'fail[s] even under the [less demanding] test,'" we need not "parse the differences between . . . two [available] standards." (quoting *McCutcheon v. FEC*, 572 U.S. 185, 199 (2014) (plurality opinion))); *see also Recht v. Morrisey*, 32 F.4th 398, 410 (4th Cir. 2022) ("After all, if you can't ski a blue run successfully, you obviously can't tackle a double black diamond.").

[58] *City of Austin*, 596 U.S. at 76 (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

furtherance of that interest.'"[59] While not as exacting as strict scrutiny, intermediate scrutiny is no gimme for the government: "[I]ntermediate scrutiny is still tough scrutiny, not a judicial rubber stamp."[60] "[T]he burden of justification is demanding and it rests *entirely* on the State."[61]

B

We first address the State's asserted interests.

While we assume that the State's interests are significant in the abstract, we conclude that the State has failed to show that the harms it seeks to address with the physical-examination requirement are real. And even assuming the State could make this showing, the physical-examination requirement doesn't alleviate those harms in a "direct and material way."[62]

The State asserts four interests: "protecting animal welfare, promoting public confidence in professional licensure, maintaining minimum standards of care, and preventing the spread of zoonotic disease." Dr. Hines conceded before the district court that these interests are significant—at least in the abstract—and he does not argue that the interests relate to the suppression of speech. So we assume that the State's interests are significant.

But that does not end the inquiry. We must still examine whether the physical-examination requirement "will in fact advance those interests."[63] "When the Government defends a regulation on speech as a means to redress

---

[59] *Nat'l Press Photographers Ass'n v. McCraw*, 90 F.4th 770, 793 (5th Cir. 2024) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662 (1994)).

[60] *Cablevision Sys. Corp. v. F.C.C.*, 597 F.3d 1306, 1323 (D.C. Cir. 2010) (Kavanaugh, J., dissenting).

[61] *United States v. Virginia*, 518 U.S. 515, 533 (1996) (emphasis added).

[62] *See Turner Broad. Sys.*, 512 U.S. at 664.

[63] *Id.*

past harms or prevent anticipated harms, it must do more than simply 'posit the existence of the disease sought to be cured.'"[64] Rather, "[i]t must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way."[65]

The State's defense of the physical-examination requirement focuses exclusively on its interest in animal welfare.[66] So we consider whether the alleged harms to animal welfare are real, and if so, whether the statute alleviates those alleged harms.

1

First, the State has failed to show that the alleged harms to animal welfare in the context of the physical-examination requirement are real.

The State alleges that the physical-examination requirement protects animal welfare by reducing the risk that veterinarians will misdiagnose—and thereby harm—animals. In other words, the harm the State seeks to address is misdiagnosis by veterinarians who conduct telemedicine without first performing a physical exam.

To meet its burden to show that the harm it alleges is real, the State may rely on empirical data, anecdotal evidence, and studies.[67] "The evidence on which it relies need not 'exist pre-enactment.' It may also 'pertain[] to

---

[64] *Id.* (internal quotation marks and citation omitted).

[65] *Id.*

[66] Although the State mentions its other three interests in passing, it provides no argument on the means-end fit. Because the burden of justifying the law rests solely with the State, it has at the very least failed to meet its burden under the other three interests if it has not forfeited the argument.

[67] *Edenfield v. Fane*, 507 U.S. 761, 771 (1993).

different locales altogether.' This requirement may also be satisfied with 'history, consensus, and simple common sense.'"[68] But it cannot rely on "mere speculation or conjecture."[69]

As evidence of harm, the State presented a literature review, expert testimony, anecdotal evidence, and expert analysis of Dr. Hines's conduct. Dr. Hines argues that this evidence is little more than conjecture. Although we acknowledge that, in some cases, states may enact prospective regulations,[70] and we acknowledge that the State's concerns for animal welfare are legitimate, we agree with Dr. Hines that the State has failed to show sufficiently "real" harm as required by our precedents.

We address each category of the State's evidence in turn.

First consider the State's expert testimony. The State's first expert, Dr. Carly Patterson, testified to the general benefits of a physical exam. She explained that "[t]he physical exam is the cornerstone of all veterinary care" because "[w]ithout it, veterinarians are left to aimlessly pursue diagnostics that might be needless and in the worst case scenario, completely circumvent the actual problem at hand, resulting in the death of the patient."[71] Because, in her view, the physical exam "is what helps [veterinarians] localize the actual nature of the problem," she testified that "[i]n the absence of a physical exam," a veterinarian "cannot proceed forward with a logical and defensible plan for [a] veterinary patient." She also testified that in-person

---

[68] *Pub. Citizen Inc. v. La. Att'y Disciplinary Bd.*, 632 F.3d 212, 221 (5th Cir. 2011) (citations omitted).

[69] *Edenfield*, 507 U.S. at 770.

[70] *See Turner Broad. Sys.*, 512 U.S. at 664 (finding states may pass legislation to "prevent anticipated harms").

[71] Although, notably, the State doesn't point to *any* deaths that have occurred from a telemedicine misdiagnosis.

exams are "critical" because "pet owners can't speak for the pet themselves," and "even diligent pet owners may miss the subtle clues that only a physical exam can provide."

To support her opinion, she testified about two studies. The first was a study of "one hundred apparently healthy dogs," in which a physical exam revealed "anomalies warranting additional assessment." The study's authors "concluded that physical exam abnormalities are common in apparently healthy older dogs, and the veterinarian is instrumental in health screening by way of the history and physical exam." The second study was similar. It looked at "one hundred apparently healthy cats ages 6 years and older[, and] found that less than half of the cats had an ideal body condition, a majority of the cats had gingivitis, and 11% of the cats had a heart murmur auscultated." The study's authors again "emphasized the need for regular health checks in apparently healthy older cats due to the physical exam abnormalities and additional focused diagnostic tests."

Dr. Patterson also provided anecdotal evidence. She pointed to five cases from her own practice, which according to the State, "illustrate the importance of the physical exam—and particularly, how telemedicine alone would have been insufficient to treat these patients." In each case, Dr. Patterson testified that the animal presented with certain symptoms that might have suggested one diagnosis, but the physical exam revealed problems that she opined could not be discovered without a physical exam. Thus, in her opinion, based on these anecdotes, while telemedicine may have "certain distinct advantages for monitoring patients or fielding specific follow-up questions after a diagnosis is made," "it [cannot] substitute for [a patient] history and physical exam."

The State's second witness, Dr. Lori Teller, testified about her and Dr. Patterson's joint assessment of Dr. Hines's conduct. They reviewed

"representative examples of [Dr.] Hines's telemedicine practice and assessed it for potential harm." Their review revealed "at least five instances where [Dr.] Hines was practicing veterinary medicine and thus subject to the" physical-examination requirement. They agreed that in these five instances, his correspondence did not meet "the accepted standard of care." Dr. Teller testified that Dr. Hines "most likely" or "potentially" left these animals in a "worse position."

The State's expert testimony at least establishes that a physical exam *can* detect conditions that may not have otherwise been discovered. But neither expert identified any evidence of actual harm caused by telemedicine without a prior physical examination.

Before the district court, the State relied on a literature review conducted by Dr. Teller. The State does not press this evidence before us now, likely because the review didn't find *any* evidence of actual harm. It found "no published reports of veterinarians providing inadequate or substandard care via virtual care." And it found no "studies comparing in clinic visits with telehealth visits to determine if there is concordance between the findings of those exams." Although it mentions "risks of missed diagnoses" as a "concern[]," a hypothetical concern—even if seemingly significant—is insufficient to identify a "real harm."

Dr. Patterson's anecdotes fare no better. We agree with Dr. Hines that these anecdotes are "*guesses* about what would have happened after telemedicine that never occurred" rather than evidence of real harm. Like Dr. Patterson's testimony about the benefits of the physical exam, the anecdotes at most establish that a physical exam can help veterinarians detect ailments that they *may* have missed over a telemedicine appointment. A *missed* diagnosis does not actively harm the animal; a *misdiagnosis*, on the

other hand, might (neither of which Dr. Hines has done, according to the record).

The expert testimony about Dr. Hines's conduct is the least compelling. Dr. Hines has been answering emails for nearly *twenty* years. And yet, Dr. Teller could not provide a *single* instance where Dr. Hines's emails harmed an animal. Indeed, she testified that Dr. Hines only "potentially" or "'likely' harmed animals," and she admitted multiple times that "it is unknown if Dr. Hines'[s] actions caused harm." This testimony cannot be characterized as anything more than conjecture and speculation.

The State has effectively proven that veterinarians believe that a physical exam is helpful[72] and that telemedicine should be used only as a follow up to the in-person exam. Indeed, a physical exam seems to be a plus factor to a veterinarian's analysis—a check for physical ailments or physical manifestations of ailments that may not be readily apparent to a pet's owner. These are risks that an individual knowingly chooses to forego by choosing a telemedicine appointment for their animal.

But proving that a physical examination is helpful is not enough. The State has failed to meet its burden of proving that misdiagnoses from telemedicine are a real harm in this case. The State emphasizes that the physical exam reduces the *risk* of misdiagnosis from telemedicine without an exam and argues that it can enact prophylactic rules before the harm occurs.

---

[72] The literature review also pointed to a survey of Portuguese veterinarians, in which "most participants acknowledged that the service provided by teleconsultations is complementary to that of physical consultations but stressed the need for having a face-to-face interaction before resorting to telematic means." Again, this doesn't say anything about whether using telemedicine without a physical exam would cause *harm. See Pub. Citizen Inc.*, 632 F.3d at 222 (noting that survey responses the State relied on "fail[ed] to point to any specific harms or to how they will be alleviated by [the challenged regulation]").

No. 23-40483

Both are true, and the State's interest in reducing misdiagnoses is legitimate. But the State cannot meet its burden of proving real harm by pointing to "risks" of harm—or hypothetical concerns—that, according to the evidence, have never materialized.[73]

The district court faulted Dr. Hines for failing to provide "any controverting evidence," so it concluded "no genuine issue exists on the matter." But it is the *State's* burden to prove real harm,[74] and it has failed to do so here.

2

Even if the harms alleged by the State were real, as the State contends, the law suffers from a fatal defect: The State fails to prove that the law "alleviate[s] these harms in a direct and material way."[75]

The first problem with the State's chosen means is apparent on the face of the statute itself. There are two ways a vet can establish the VCPR, and one of them doesn't require a physical exam *at all*. To recap, a veterinarian must first establish a VCPR before practicing veterinary

---

[73] *See, e.g.*, *Junior Sports Mags. Inc. v. Bonta*, 80 F.4th 1109, 1117 (9th Cir. 2023) ("To start with the obvious, a state may not restrict protected speech to prevent something that does not appear to occur . . . . And if the state cannot cite a single case of a minor in California unlawfully buying a gun, then an advertisement about firearms logically could not have contributed to such a sale."); *McCraw v. City of Oklahoma City*, 973 F.3d 1057, 1071–72 (10th Cir. 2020) ("Critically, this record is devoid of evidence that accidents involving vehicles and pedestrians on medians in Oklahoma City is an actual issue, as opposed to a hypothetical concern."); *IMS Health Inc. v. Sorrell*, 630 F.3d 263, 276 (2d Cir. 2010), *aff'd*, 564 U.S. 552 (2011) ("Vermont's own expert was unaware of any instance in which a detailing interaction caused a doctor to prescribe an inappropriate medication.").

[74] *See Virginia*, 518 U.S. at 533.

[75] *See Turner Broad. Sys.*, 512 U.S. at 664.

medicine.[76] The VCPR exists "if the veterinarian: . . . possesses sufficient knowledge of the animal."[77] And "[a] veterinarian possesses sufficient knowledge of the animal . . . if the veterinarian has recently seen, or is personally acquainted with, the keeping and care of the animal by: (1) examining the animal; *or* (2) making medically appropriate and timely visits to the premises on which the animal is kept."[78] But the VCPR cannot "be established solely by telephone or electronic means."[79]

The State does not explain how the law alleviates the harm of misdiagnoses from telemedicine without a physical exam when the VCPR can also be established by a visit to the premises *without* a physical exam. Although the State's experts testified that the premises-visit option is *typically* used for herd animals, she conceded it is not so limited, testifying that the "premises" visited "could be the premises on which a dog is kept." Nor does the plain text provide this limitation.[80] And furthermore, the State fails to explain why a "recent[]" physical examination—which has no definition—is sufficient to establish a VCPR. For example, why would a "recent" physical examination in the last year or two provide any better insight into an animal's condition than a real-time telehealth appointment without a preceding physical examination?[81]

If that weren't enough, the State's looser approach to *human* welfare undercuts the State's insistence on a physical exam to advance animal

---

[76] Tex. Occ. Code § 801.351(a).

[77] *Id.* § 801.351(a)(2).

[78] *Id.* § 801.351(b) (emphasis added).

[79] *Id.* § 801.351(c).

[80] *See id.* § 801.351(b).

[81] *See id*. § 801.351(b).

welfare. After all, the State of Texas allows exam-free telemedicine for babies and noncommunicative adults—those who, like animals, cannot communicate with their physicians. How can the State insist a hands-on exam is necessary to protect animals while conceding a hands-on exam is unnecessary to protect humans?[82] Put differently, why does Texas mandate tougher telehealth rules for veterinarians treating animals than for physicians treating people?[83] The State does not say.

## C

The law suffers from one final defect: It is not narrowly tailored.

In making this determination, we consider whether the physical-examination requirement "burden[s] substantially more speech than is necessary to further the government's legitimate interests."[84] At this stage, we consider "the availability and efficacy of 'constitutionally acceptable less restrictive means' of achieving the [state's] asserted interests," while

---

[82] "If a pediatrician can use telemedicine to treat a three-month old infant—based upon medical records, the parent's description of external symptoms and a visual examination of the child—the Court cannot adduce why a veterinarian cannot do the same for a dog, cat, or hamster." *Hines II*, 982 F.3d at 279 (ELROD, J., concurring in part and dissenting in part) (quoting *Hines v. Quillivan*, No. CV B-18-155, 2019 WL 13036103, at *15 (S.D. Tex. Feb. 19, 2019), *report and recommendation adopted in part, rejected in part*, 395 F. Supp. 3d 857 (S.D. Tex. 2019), *aff'd in part, rev'd in part and remanded*, 982 F.3d 266 (5th Cir. 2020)).

[83] *See Hines II*, 982 F.3d at 280 (ELROD, J., concurring in part and dissenting in part) ("Babies and other non-communicative adults were intentional beneficiaries of Texas's expansion of telemedicine, not the subjects of unwitting overinclusion. Texas has never shown a preference for animals over humans that would support requiring higher standards for animals' medical treatment. *Cf. Strickland v. Medlen*, 397 S.W.3d 184, 185 (Tex. 2013) (WILLETT, J.) (holding that dog owners could not recover non-economic damages for loss of companionship under Texas tort law because '[p]ets are property in the eyes of the law.').").

[84] *Turner Broad. Sys.*, 512 U.S. at 662 (quoting *Ward*, 491 U.S. at 799).

keeping in mind that the regulation does not have to be the least restrictive means of advancing the State's interest.[85]

Dr. Hines proposed a number of less restrictive alternatives. But the district court failed to address any of them. And the State contends that it did not have to reject alternatives *at all* because "the Board was obligated to enforce the Physical Examination Requirement adopted by the Legislature." It cites no authority for this proposition. The burden rests with the State to prove that "it seriously undertook to address the problem with less intrusive tools readily available to it,"[86] and that burden often falls on the State officials that are sued.[87] In the alternative, the State contends that its experts rejected Dr. Hines's less-restrictive alternatives. But its argument—and the expert testimony on which it relies—is unpersuasive.

Take one example. Dr. Hines proposed that the State could "instruct veterinarians not to give veterinary advice without a physical exam if, in the speaker's professional judgment, he or she cannot provide useful help." Dr. Hines alleges that he already does this. The State provided no answer to why this alternative wouldn't work other than reasserting that the requirement is in the statute, and the Board "[has] to enforce the statute." But, in fact, based on Dr. Teller's testimony, veterinarians already do this when performing telemedicine. When asked about her practices for conducting telemedicine, Dr. Teller responded that after she establishes a VCPR by a physical exam or a visit to the premises, "[she] would determine if [she could] provide

---

[85] *Id.* (citation omitted).

[86] *McCullen*, 573 U.S. at 494.

[87] *See, e.g.*, *Nat'l Press Photographers Ass'n*, 90 F.4th at 793–94 (suit against McCraw in his official capacity as the Director of the Texas Department of Public Safety). And here, the Board is represented by the Texas Attorney General, the State's chief legal officer.

follow-up care via telemedicine or if [she] needed to see that patient, do a physical[,] or make a visit to the premises," "based on what [she] already knew about the client and about the patient." And as Dr. Hines suggests, veterinarians are required to use their professional judgment in many contexts. The State does not explain why this rule wouldn't work the same way for establishing a VCPR in the first instance, as Dr. Hines suggests. Nor did the State have any answer to Dr. Hines's similar proposal that the State could require "a trip to the veterinarian only when reasonable under the circumstances," or require consent from owners before performing telemedicine without a physical exam.

The State's contention that "at present, there is *no alternative* to the physical exam that outweighs the risks of causing animal harm or death from an improper diagnosis and treatment plan" rings hollow because as explained above, the statute itself provides an alternative. The VCPR can be *established*—and not just *maintained*—by a visit to the premises without a physical exam. And the veterinarian need never lay eyes on the animal during the visit.

Although the law does not have to be the *least* restrictive means to pass intermediate scrutiny, it must still be a close fit, and the State must show that it doesn't "regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals."[88] If Dr. Hines has never actually harmed any animal—and the State provides zero evidence that he has—then the heavy burden on his speech doesn't advance the State's interest in animal welfare.[89]

---

[88] *Ward*, 491 U.S. at 799.

[89] *See also McCullen*, 573 U.S. at 493–94 ("The point is not that Massachusetts must enact all or even any of the proposed measures discussed above. The point is instead

No. 23-40483

A physical-examination requirement may be an efficient and effective way to protect animal welfare by reducing the risk of missed diagnoses, and "[w]here certain speech is associated with particular problems, silencing the speech is sometimes the path of least resistance. But by demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily 'sacrific[ing] speech for efficiency.'"[90] The State has failed to carry its burden of showing the necessary narrow tailoring here.

## VI

The State of Texas has failed to meet its burden under intermediate scrutiny. Accordingly, we REVERSE the district court's judgment and REMAND with instructions to enter judgment for Dr. Hines.

---

that the Commonwealth has available to it a variety of approaches that appear capable of serving its interests, without excluding individuals from areas historically open for speech and debate.").

[90] *Id.*

Irma Carrillo Ramirez, *Circuit Judge*, concurring:

While I agree that the case should be reversed and remanded with instructions to enter judgment in favor of Dr. Hines, I write separately because the physical examination requirement, as applied to him, is a content-based speech restriction that does not survive strict scrutiny.

## I

Deciding whether a restriction is content neutral or content based is no simple task, as "not all content-based regulations are alike." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 429 (1992) (Stevens, J., concurring in the judgment). In this third iteration of the case, the district court first found that the PER, "[a]s applied to [Dr.] Hines, . . . regulate[d] speech" in a "content-based" manner, *Hines v. Quillivan*, No. 1:18-CV-155, 2021 WL 6618658, at *10 (S.D. Tex. July 29, 2021), *report and recommendation adopted*, 2021 WL 5833886 (S.D. Tex. Dec. 9, 2021), then later concluded that it represented a content-neutral regulation of speech. *Hines v. Pardue*, 688 F. Supp. 3d 522, 550–52 (S.D. Tex. 2023). "Th[is] determination dictates the level of scrutiny the challenged restriction must meet in order to pass muster"—if content based, then strict scrutiny applies; if content neutral, then intermediate scrutiny applies. *Tex. Ent. Ass'n, Inc. v. Hegar*, 10 F.4th 495, 509 (5th Cir. 2021); *see also SDJ, Inc. v. City of Houston*, 837 F.2d 1268, 1274 (5th Cir. 1988) ("Our task in setting the level of review is to strike for that point of equilibrium that vindicates [F]irst [A]mendment values at the least cost to a state's decisional arrangements.").

### A

"Regulations which permit the Government to discriminate on the basis of the content of [a] message cannot be tolerated under the First Amendment." *Regan v. Time, Inc.*, 468 U.S. 641, 648–49 (1984). If a speech regulation "require[s] 'enforcement authorities' to 'examine the content of

the message that is conveyed to determine whether' a violation has occurred," then it is content based. *McCullen v. Coakley*, 573 U.S. 464, 479 (2014) (quoting *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 383 (1984)). Put differently, when someone wishes to speak and their ability to do so "depends on what they say," the applicable speech regulation is content based. *Holder v. Humanitarian L. Project (HLP)*, 561 U.S. 1, 27 (2010); *see also Hill v. Colorado*, 530 U.S. 703, 738 (2000) (Souter, J., concurring) ("The effect of speech is a product of ideas and circumstances . . . . The question is simply whether the ostensible reason for regulating the circumstances is really something about the ideas."). As long as the enforcing authority need not examine what the speech expresses to determine whether a violation has occurred, then the regulation is content neutral. *McCullen*, 573 U.S. at 479.

> *McCullen* concerned a law that stated:
>
> No person shall knowingly enter or remain on a public way or sidewalk adjacent to a reproductive health care facility within a radius of 35 feet of any portion of an entrance, exit or driveway of a reproductive health care facility or within the area within a rectangle created by extending the outside boundaries of any entrance, exit or driveway of a reproductive health care facility in straight lines to the point where such lines intersect the sideline of the street in front of such entrance, exit or driveway.

Mass. Gen. Laws. Ann. ch. 266, § 120E½(b) (West 2013). Because the law only applied to "reproductive health care facilit[ies]," *i.e.*, "place[s], other than within or upon the grounds of a hospital, where abortions are offered or performed," *id.* § 120E½(a), the plaintiffs contended it was content based as applied[1] because "virtually all speech affected by the [law] [wa]s

---

[1] By the time *McCullen* reached the Supreme Court, only as-applied challenges remained. *See id.* at 475.

speech concerning abortion, *McCullen*, 573 U.S. at 479. But the Court disagreed, stating that the law was content neutral because whether the plaintiffs violated it "'depend[ed]' not 'on what they sa[id],' but simply on where they sa[id] it." *Id.* (citation omitted) (quoting *HLP*, 561 U.S. at 27). The plaintiffs could violate the law, the Court found, "merely by standing in a buffer zone, without displaying a sign or uttering a word." *Id.* at 480. Therefore, the law was content neutral.

Here, it is the interaction between the PER and the statutory definition of practicing veterinary medicine as applied to Dr. Hines that he challenges as a content-based restriction on his speech. To determine whether Dr. Hines engaged in the practice of veterinary medicine, the State examined his words. Where Dr. Hines's communications conveyed general information regarding veterinary care that was not tailored to a specific animal, the State found that Dr. Hines had not engaged in the practice of veterinary medicine. Where he had communicated veterinary-care information tailored to a specific animal, however, the State drew the opposite conclusion. Whether the PER regulated Dr. Hines's speech required the State to inspect his specific writings, so as applied, the PER is a content-based speech regulation. *See McCullen*, 573 U.S. at 479.

For example, a pigeon's owner contacted Dr. Hines about advice he had received for applying a wrap to the pigeon's wounded wing. Dr. Hines wrote back with advice about the pigeon's wing and how to assess the wrap. Because Dr. Hines communicated veterinary advice specific to this pigeon, the State determined that he had practiced veterinary medicine. By contrast, when a dog owner wrote to Dr. Hines about the dog's persistent itching and barking, Dr. Hines responded with several differential diagnoses and generally referred the dog owner to recommendations for various anti-flea and anti-tick products. Because Dr. Hines had only communicated general

information not tailored to the owner's dog, the State determined that Dr. Hines had not practiced veterinary medicine.

Because the determination of whether Dr. Hines violated Texas law "depend[ed] on what [he] sa[id]"—that is, whether his communications constituted personalized advice—the PER is a content-based speech restriction. *See HLP*, 561 U.S. at 27.

## B

The State contends the PER is content neutral under *City of Austin v. Reagan National Advertising of Austin, LLC* and *Ward v. Rock Against Racism*. Both concerned *facial* challenges, however. *See City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 76 (2022) ("[T]he City's ordinance is facially content neutral."); *Ward v. Rock Against Racism*, 491 U.S. 781, 790, 803 (1989) (finding the "content-neutral" ordinance "valid on its face"). Here, Dr. Hines brings an *as-applied* challenge. This distinction matters because the analyses in *City of Austin* and *Ward* generally center on the text and enactment history, respectively, of the regulation being challenged. *See City of Austin*, 596 U.S. at 69; *Ward*, 491 U.S. at 791. By contrast, the analysis in *McCullen* centers on the *implementation* of the regulation by the enforcing authority, which is more apt for the fact-specific nature of as-applied challenges such as Dr. Hines's.[2] *See United States v. Marcavage*, 609 F.3d 264, 273 (3d

---

[2] While the test from *McCullen* does not apply exclusively to as-applied challenges, *see, e.g.*, *League of Women Voters*, 468 U.S. at 383, its contextual utility appears greater since as-applied challenges examine the "implementation" of the law while facial challenges examine the "text" of that law, *see Whole Woman's Health All. v. Hill*, 937 F.3d 864, 875 (7th Cir. 2019). As *McCullen* demonstrates, whether a law is content based or content neutral *as applied* may turn on whether the content of the speech must be examined to determine if that law has been violated. *See* 573 U.S. at 464. Without a framework to analyze whether a regulation has been implemented in a content-based way, broad yet facially neutral regulations could be enacted and then enforced based on content, only to have those

Cir. 2010) ("A facial attack tests a law's constitutionality based on its text alone and does not consider the facts or circumstances of a particular case. An as-applied attack, in contrast, does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." (citation omitted)).

But even assuming *arguendo* that the PER is content neutral under *City of Austin* and *Ward*, it may nevertheless be content based under *McCullen*.[3] A law may be facially content neutral yet content based in application. *See, e.g.*, *Ness v. City of Bloomington*, 11 F.4th 914, 923–24 (8th Cir. 2021) (finding a speech restriction content based as applied even when assuming its facial content neutrality *arguendo*); *see also* Eugene Volokh, *Speech as Conduct: Generally Applicable Laws, Illegal Courses of Conduct, "Situation-Altering Utterances," and the Uncharted Zones*, 90 Cornell L. Rev. 1277, 1286–94 (2005) (discussing "content-based as applied" laws).

Here, the PER, on its face, is a generally applicable conduct regulation. This does not mean the PER is automatically content neutral as applied to Dr. Hines, however. *See, e.g.*, *HLP*, 561 U.S. at 26–27 (finding that even though a law's prohibition "most often does not take the form of speech at all," it may still be a content-based speech restriction as applied).

---

regulations face relaxed scrutiny in as-applied challenges. *See Hoye v. City of Oakland*, 653 F.3d 835, 854 (9th Cir. 2011) ("Courts must be willing to entertain the possibility that content-neutral enactments are enforced in a content-discriminatory manner. If they were not, the First Amendment's guarantees would risk becoming an empty formality, as government could enact regulations on speech written in a content-neutral manner so as to withstand judicial scrutiny, but then proceed to ignore the regulations' content-neutral terms by adopting a content-discriminatory enforcement policy.").

[3] The State does not cite, and we cannot find, authority holding that *City of Austin* and *Ward* are the exclusive tests for determining content neutrality.

Irrespective of the PER's facial nature, the PER has been enforced against Dr. Hines in a content-based manner.

The State also contends that the PER is content neutral because it need not decide on whether it agrees with the contents of Dr. Hines's advice. But content-based and viewpoint-based discrimination are not the same.[4] While viewpoint discrimination is "a particularly 'egregious form of content discrimination,'" *Vidal v. Elster*, 602 U.S. 286, 293 (2024) (quoting *Rosenberger*, 515 U.S. at 829), not all content discrimination is viewpoint discrimination, *Reed v. Town of Gilbert*, 576 U.S. 155, 168–69 (2015). *See also, e.g.*, *Iancu v. Brunetti*, 588 U.S. 388, 420 (2019) (Sotomayor, J., concurring in part and dissenting in part) (describing the breach-of-the-peace statute in *Cohen v. California* as "viewpoint-neutral content discrimination"). Because the PER, operating in conjunction with the definition of practicing veterinary medicine, "singles out specific subject matter"—*i.e.*, veterinary advice specifically concerning the animals of Dr. Hines's clients—"for differential treatment," the PER is a content-based speech restriction even though "it does not target viewpoints within that subject matter." *Reed*, 576 U.S. at 169.

## II

Strict scrutiny requires the State to show that the PER is "'narrowly tailored' to 'further compelling governmental interests.'" *McDonald v.*

---

[4] "Viewpoint discrimination exists 'when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.'" *Heaney v. Roberts*, 846 F.3d 795, 802 (5th Cir. 2017) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)). Because it is "uniquely harmful to a free and democratic society," *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 187 (2024), viewpoint discrimination is "presumptively unconstitutional," *Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273, 284 (5th Cir. 2003).

*Longley*, 4 F.4th 229, 246 (5th Cir. 2021) (quoting *Johnson v. California*, 543 U.S. 499, 505 (2005)).

Since "[s]trict scrutiny is 'the most demanding test known to constitutional law,'" *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1050 (6th Cir. 2015) (quoting *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997)), the showing the State must make is sizable. *See R.A.V.*, 505 U.S. at 382 ("Content-based regulations are presumptively invalid."). The State attempts to satisfy its burden with a single sentence: "[I]f the Court determines that strict scrutiny applies, the [PER] would meet it for the same reasons that it satisfies intermediate scrutiny." This conclusory assertion does not suffice to show that the PER is narrowly tailored to the compelling governmental interests asserted by the State. *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799–800 (2011). Considering strict scrutiny's "heavy thumb on the scale in favor of the individual right in question," *Heller v. District of Columbia*, 670 F.3d 1244, 1282 (D.C. Cir. 2011) (Kavanaugh, J., dissenting), the State has not met its burden.

\* \* \*

Because the PER requires the State to examine the content of the messages Dr. Hines communicated to determine whether a violation has occurred, the PER is a content-based restriction of Dr. Hines's speech, and strict scrutiny applies. The State failed to satisfy strict scrutiny.